UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| THOMAS RYAN, SUSAN RYAN, SEAN GALLAGHER, AND ASHLEY SULTAN GALLAGHER, individually and on behalf of others similarly situated, | |
| | Civil Action No. 4:22-cv-40089 |
| *Plaintiffs*, | CLASS ACTION COMPLAINT |
| v. | JURY TRIAL DEMANDED |
| GREIF, INC., CARAUSTAR INDUSTRIES, INC., THE NEWARK GROUP, INC., MASSACHUSETTS NATURAL FERTILIZER CO., INC., OTTER FARM, INC., AND SEAMAN PAPER COMPANY OF MASSACHUSETTS, INC. | |
| *Defendants*. | |

Plaintiffs Thomas Ryan, Susan Ryan, Sean Gallagher, and Ashley Sultan Gallagher, on behalf of themselves and all others similarly situated, allege the following based on personal knowledge, information and belief, and investigation of counsel.

INTRODUCTION

1.     Plaintiffs bring this class action against Defendants Greif, Inc., Caraustar Industries, Inc., The Newark Group, Inc., Massachusetts Natural Fertilizer Company, Inc., Otter Farm, Inc., and Seaman Paper Company of Massachusetts, Inc. (collectively, "Defendants') for the claims set forth below resulting from their intentional, reckless, and/or negligent acts and omissions in connection with the discharge, distribution, and/or disposal of per- and polyfluoroalkyl substances and their constituents (collectively referred to in this Complaint as, "PFAS"), which has resulted in the contamination of real property and drinking water supplies owned and used by Plaintiffs and other class members (the "Class Members").

<u>PARTIES</u>

2.      Plaintiff Thomas Ryan is a resident and citizen of Westminster, Massachusetts.

3.      Plaintiff Susan Ryan is a resident and citizen of Westminster, Massachusetts.

4.      Plaintiff Sean Gallagher is a resident and citizen of Westminster, Massachusetts.

5.      Plaintiff Ashley Sultan Gallagher is a resident and citizen of Westminster, Massachusetts.

6.      Defendant Greif, Inc. ("Greif") is a Delaware corporation. Greif's principal office is located at 425 Winter Road, Delaware, Ohio.

7.      Defendant Caraustar Industries, Inc. ("Caraustar") is a Delaware corporation. Caraustar is a wholly-owned subsidiary of Greif.

8.      Defendant The Newark Group, Inc. ("Newark Group") is a New Jersey corporation. Newark Group is a wholly-owned subsidiary of Greif.

9.      Defendant Massachusetts Natural Fertilizer Company, Inc. ("MassNatural") is a Massachusetts corporation. MassNatural's principal office is located at 65 Bean Porridge Hill Road, Westminster, Massachusetts.

10.     Defendant Otter Farm, Inc. ("Otter Farm") is Massachusetts corporation. Otter Farm's principal office is located at 35 Wilkins Road, Gardner, Massachusetts.

11.     Defendant Seaman Paper Company of Massachusetts, Inc. ("Seaman Paper") is a Massachusetts corporation. Seaman Paper's principal office is located at 35 Wilkins Road, Gardner, Massachusetts. Seaman Paper Company of Massachusetts, Inc. owns and controls Defendant Otter Farm, Inc.

JURISDICTION AND VENUE

12.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §

1332(d)(2)(A), because this case is a class action where the aggregate claims of all members of

the proposed Class exceed $5,000,000.00, exclusive of interest and costs, and the Plaintiff and

most members of the proposed Class are citizens of a state different from each Defendant.

13.     Venue is proper in this judicial District pursuant to 28 U.S.C. § 1391(b) and (c)

because each Defendant transacts business in, is found in, and/or has agents in this District, and

because some of the actions giving rise to this complaint took place within this District.

14.     The Court has personal jurisdiction over each Defendant. Each Defendant has

transacted business, maintained substantial contacts, and/or committed overt acts in furtherance

of the conduct alleged in the Complaint throughout the United States, including in this District.

The conduct was directed at, or had the effect of, causing injury to persons residing in, located

in, or doing business throughout the United States, including in this District.

FACTUAL BACKGROUND

I.     PFAS: PER- AND POLYFLUORALKYL SUBSTANCES

15.     PFAS chemicals are man-made, long-lasting chemicals that do not exist in nature.

16.     There are thousands of PFAS chemicals, but Perfluorooctanoic Acid ("PFOA")

and Perfluorooctane Sulfonate ("PFOS") are the two most widely used PFAS chemicals.

17.     PFOA and PFOS began to be applied to industrial and consumer products in the

1940's and 1950's due to their ability to repel water, dirt, oil, and grease, resist heat, and protect

surfaces.

18.     Applications of PFOA and PFOS have included machinery coatings, clothing,

furniture, adhesives, food packaging, heat-resistant non-stick cooking surfaces, and the insulation

of electrical wire and both are used across a wide range of industries, including the paper industry.

19.     PFOS and PFOA have unique properties that make them persistent, bioaccumulative, and toxic.

20.     PFOS and PFOA are colloquially referred to as "forever chemicals" for their ability to persist in the environment indefinitely without breaking down due to the strength of their multiple carbon-fluorine bonds.

21.     PFOS and PFOA are resistant to biodegradation, atmospheric photooxidation, direct photolysis, and hydrolysis.

22.     PFOS and PFOA are water soluble, making them mobile in groundwater and the environment.

23.     Because PFOS and PFOA repel organic materials, they readily leach through soil and can impact and infiltrate groundwater.

24.     Typical water treatment and filtration systems do not filter PFOS and PFOA from contaminated water due to the chemicals' physical and chemical properties

25.     Likewise, chlorine and other disinfectants that are often added to drinking water systems are not capable of removing, and do not remove, PFOS or PFOA.

26.     Human consumption of and oral exposure to PFOS and PFOA result in absorption of PFOS and PFOA in humans' blood, kidney, and liver.

27.     The half-life of PFOS and PFOA within the human body is anywhere from 2 to 9 years.

28.     PFOS and PFOA cross the placenta from mother to fetus and pass to infants through breast milk.

4

29.     The above-described characteristics contribute to health risks associated with human ingestion of PFOS and PFOA, even at low levels.

30.     According to the United States Environmental Protection Agency (the "EPA"), human exposure to PFOS and PFOA is associated with adverse health outcomes, which can manifest years after exposure. Adverse health outcomes linked to PFOS and PFOA include, but are not limited to:

a.   Reproductive effects such as decreased fertility or increased high blood pressure in pregnant women;

b.   Developmental effects or delays in children, including low birth weight, accelerated puberty, bone variations, or behavioral changes;

c.   Increased risk of some cancers, including prostate, kidney, and testicular cancers;

d.   Reduced ability of the body's immune system to fight infections, including reduced vaccine response;

e.   Interference with the body's natural hormones;

f.   Increased cholesterol levels and/or risk of obesity;

g.   Changes in liver enzymes;

h.   Increased risk of high blood pressure or pre-eclampsia in pregnant women;

i.   Small decreases in infant birth weights; and

j.   Suppression of vaccine response (decreased serum antibody concentrations) in children.

31.     Concerns over potential adverse health effects from PFAS chemicals on human grew in the early 2000s with the discovery of PFOA and PFOS in laboratory studies of human

blood. The United States Centers for Disease Control and Prevention (the "CDC") has issued a report that "found PFAS in the blood of 97% of Americans." More recent reports suggest a reduction of PFOS and PFOA in blood levels since the early 2000s, but the United States National Institute of Health has publicly stated that "the number of new PFAS chemicals appear to be increasing, and exposure is difficult to assess."[1]

32.      In 2009, the EPA published provisional health advisories for PFOA and PFOS, based on evidence available at that time. The EPA noted that levels of 0.04 ppb in tested sites were "not of concern," and the EPA sett the PFOS provisional health advisory at a level of 0.2 ppb and the PFOA provisional health advisory at a level of 0.4 ppb.[2]

33.      In 2016, the EPA issued a revised health advisory, "identify[ing] the concentration of PFOA and PFOS in drinking water at or below which adverse health effects are not anticipated to occur over a lifetime of exposure [as] 0.07 parts per billion (70 parts per trillion) for both PFOA and PFOS."[3]

34.      On June 15, 2022, the EPA released four drinking water health advisories for PFAS, updating and replacing its 2016 PFOA and PFOS advisories based on new science. The updated EPA advisory stated, "some negative health effects may occur with concentrations of PFOA or PFOS in water that are *near zero* and below EPA's ability to detect at this time."[4] The latest EPA advisory reflects the new understanding that exposure to any amount of PFAS is harmful to humans.

---

[1] https://www.niehs.nih.gov/health/topics/agents/pfc/index.cfm (accessed Aug. 2, 2022).

[2] https://www.epa.gov/sites/default/files/2015-09/documents/pfoa-pfos-provisional.pdf (accessed Aug. 2, 2022).

[3] https://www.govinfo.gov/content/pkg/FR-2016-05-25/pdf/2016-12361.pdf (accessed Aug. 2, 2022).

[4] *EPA Announces New Drinking Water Health Advisories for PFAS Chemicals, $1 Billion in Bipartisan Infrastructure Law Funding to Strengthen Health Protections*, U.S. ENVIRONMENTAL PROTECTION AGENCY, https://www.epa.gov/newsreleases/epa-announces-new-drinking-water-health-advisories-pfas-chemicals-1-billion-bipartisan (accessed Aug. 2, 2022).

## II.    PFAS REGULATION IN MASSACHUSETTS

35.     The Commonwealth of Massachusetts has strict PFAS standards, including rules for drinking water systems and cleanup of contaminated sites. Massachusetts has invested substantial funding to assist communities that experience PFAS contamination in drinking water.

36.     The Massachusetts Department of Environmental Protection ("MassDEP") has established a drinking water PFAS concentration limit of 20 nanograms per liter (ng/L) (or parts per trillion(ppt)) for the sum of the concentrations of the following six PFAS compounds: (1) PFOS; (2)  PFOA; (3) perfluorohexane sulfonic acid (PFHxS); (4) perfluorononanoic acid (PFNA); (5) perfluoroheptanoic acid (PFHpA); and (6) perfluorodecanoic acid (PFDA)."[5] MassDEP refers to the six PFAS chemicals referenced above collectively as "PFAS6."

37.     According to MassDEP regulations, the release of PFAS6 to groundwater that is detected in a public water supply well or private drinking water well is considered a "Condition of Substantial Release Migration," which requires notification of affected persons and implementation of "Immediate Response Actions."

38.     PFAS6 are listed as toxic and hazardous substances under the Massachusetts Toxics Use Reduction Act, M.G.L. c. 21I. 301 C.M.R. § 41.03(13), and are subject to the notification, assessment and cleanup requirements of the Massachusetts Waste Site Cleanup Program.[6]

---

[5] 310 CMR 22.00.

[6] *Drinking Water Standards and Health Information – Per- and Polyfluoroalkyl Substances (PFAS)*, MASSACHUSETTS DEPARTMENT OF ENVIRONMENTAL PROTECTION, https://www.mass.gov/info-details/per-and-polyfluoroalkyl-substances-pfas#:~:text=On%20October%202%2C%202020%2C%20MassDEP,the%20concentrations%20of%20six%20specific (accessed Aug. 2, 2022).

III.   MASSACHUSETTS NATURAL FERTILIZER COMPANY

39.    According to its website, MassNatural "is a 30-acre family-owned commercial composting facility on a 240 acre farm . . . established in 1987." MassNatural's composting operation became the primary business operating at 65 Bean Porridge Hill Road when a chicken egg farm that had existed at the same location ceased operations. As outlined below, the 240 acre farm where MassNatural operates is owned by defendant Otter Farm, an entity that is owned by defendant Seaman Paper (the location at 65 Bean Porridge Hill Road, Westminster, Massachusetts, is referred to in this Complaint as, the "Otter Farm Property").

40.    MassNatural states on its website that its composting site "is fully permitted as a Recycling, Composting or Conversion (RCC) Operation regulated by the Massachusetts Department of Environment Protection."[7]

41.    MassNatural's composting operation remains the property's primary business and MassNatural composts "a wide variety of organic materials, including short paper fiber, industrial food processing by-products, restaurant food waste, yard waste, animal/fish mortalities, and animal manure." Mass Natural "utilizes outdoor windrow and static pile composting and is permitted to accept 91,775 tons of organic materials annually." [8]

42.    MassNatural has marketed and sold its products to "garden centers, landscape contractors, homeowners, agricultural crop landowners and land reclamation projects [.]"[9] The following is MassNatural's list of its products, as stated on its website:

---

[7] *Our History*, MASS NATURAL, https://www.mnaturalfertilizer.com/about-us (accessed Aug. 2, 2022).

[8] *Id.*

[9] *Id.*

| Mass Natural Products – 2022 Pricing[10] | |
|---|---|
| 1/2" Screened Topshelf loam | $15.00/yard |
| 1/2" Screened compost | $15.00/yard |
| Potting soil | $15.00/yard |
| Farm mix (unscreened compost) | $3.00/yard |
| Pick-up truck load of soil | $20.00 |
| Premium hemlock mulch | $41.00/yard |
| Black mulch | $35.00/yard |
| Tailings | $5.00/yard |
| Stump grindings | $15.00/yard |
| Stumps in-bound | $10.00/yard |
| BYO 5 gallon bucket | $2.00/bucket |

## IV.   SEAMAN PAPER COMPANY OF MASSACHUSETTS

43.     Defendant Seaman Paper is a company engaged in paper production and distribution.  Seaman Paper owns Otter Farm and they Otter Farm Property, where MassNatural conducts its business and composting operations and where Seaman Paper has dumped and still dumps waste materials from its manufacturing processes.

44.     Seaman Paper also has owned and operated the Otter River Paper Mill ("Otter River Paper") in Otter River, Massachusetts since 1946. Seam Paper operates Otter River Paper 24 hours per day, 7 days a week. Otter River Paper operates two paper machines producing up to 100 tons per day of machine-finished and machine-glazed paper.

45.     As part of its production processes, Otter River Paper treats 900,000 gallons of water per day on-site and has dumped waste materials from its paper manufacturing processes at MassNatural's composting facility on the Otter Farm Property.

## V.   OTTER FARM, INC.

46.     Otter Farm is a Massachusetts corporation and the owner of the Otter Farm Property, where MassNatural operates its composting business. Otter Farm and the Otter Farm

---

[10] *Our Products and Pricing*, MASS NATURAL, https://www.mnaturalfertilizer.com/copy-of-products (accessed Aug. 2, 2022).

Property are wholly owned by Seaman Paper and Otter Farm's headquarters is at the same address as Seaman Paper.

47.     Otter Farm was incorporated in 2002 in connection with Seaman Paper's purchase of a former egg farm located at 65 Bean Porridge Hill Road, Westminster, Massachusetts.

48.     Land records show that Otter Farm acquired the farm at 65 Bean Porridge Hill Road in 2002 from a corporation named Molly Hill Farms, Inc.[11] ("Molly Hill Farms"), which was controlled by William S. Page, Sr., father of the current owner and operator of MassNatural: Williams S. Page, Jr.

VI.     THE GREIF DEFENDANTS

49.     Defendant Greif is a publicly traded industrial packaging products and services company founded in 1877.[12] Greif's principal place of business is located at 425 Winter Road, Delaware, Ohio.

50.     Greif operates three business segments: (1) Global Industrial Packaging, which "offers industrial packaging products, such as steel, fiber and plastic drums, rigid intermediate bulk containers and closure systems for industrial packaging products, among others and services, such as container life cycle management, filling, logistics, warehousing and other packaging services"; (2) Paper Packaging & Services, which "produces and sells containerboard, corrugated sheets, corrugated containers, and other corrugated products to customers in North America in industries such as packaging, automotive, food and building products"; and  (3) Land

---

[11] According to Molly Hill Farms, Inc.'s Articles of Incorporation, Molly Hill Farms, Inc.'s principal place of business was 65 Bean Porridge Hill Road. William S. Page, Sr. served as President, Treasurer, Clerk, and was the sole Director of Molly Hill Farms, Inc. *See* Articles of Incorporation, Molly Hill Farms, Inc., dated June 6, 1995.

[12] *About Greif*, Greif, https://www.greif.com/about/ (accessed Aug. 2, 2022).

Management, which is "focused on the harvesting and regeneration of its United States timber properties."[13]

51.     Greif acquired Defendants Caraustar Industries, Inc. and Newark Group (collectively with Greif, referred to as the "Greif Defendants") in 2019.[14] Caraustar and Newark Group operate within Greif's Paper Packaging & Services segment.[15]

52.      Together, the Greif Defendants operate the containerboard mill (the "Greif Mill") located at 100 Newark Way, Fitchburg, Massachusetts, which produces "a range of liners and mediums for [customers'] rollstock needs."[16]

53.     As of August 2, 2022, Greif advertised its ownership and control of the Greif mill on Greif's own website. For example, Greif maintained the following information on its website:

---

[13] *Id.*

[14] *GREIF COMPLETES ACQUISITION OF CARAUSTAR INDUSTRIES*, GREIF (Feb. 11, 2019), https://www.greif.com/greif-completes-acquisition-of-caraustar-industries/ (accessed Aug. 2, 2022).

[15] *Id.*

[16] *Containerboard*, GREIF, https://www.greif.com/containerboard/ (accessed Aug. 2, 2022).



54.     According to MassDEP, the Greif Defendants have dumped contaminated waste materials from Greif's paper manufacturing processes at MassNatural's composting facility on the Otter Farm Property since 2002.

<u>SUBSTANTIVE ALLEGATIONS</u>

55.     Together, the Greif Defendants, Seaman Paper, Otter Farm, and MassNatural are responsible for an environmental disaster in Westminster, Massachusetts, as outlined below.

56.     In January 2022, a Westminster, Massachusetts homeowner living on Bean Porridge Hill Road near MassNatural's operations at Otter Farm requested testing of the residence's private-well-supplied drinking water (the "Initial Testing Site").

---

[17] *Fitchburg*, GREIF, https://www.greif.com/wp-content/uploads/2021/11/Greif-Fitchburg-Mass.pdf (accessed Aug. 2, 2022).

57.     Laboratory analysis of the water sample collected at the Initial Testing Site revealed a PFAS6 concentration of 1,335 ppt, a level that dramatically exceeded the acceptable 20 ppt level published by MassDEP.

58.     MassDEP retested the Initial Testing Site on February 24, 2022, and the results confirmed elevated concentrations of PFAS6 at a level of 1,021 ppt.

59.     On February 24, 2022, MassDEP also arranged for the sampling of five additional residential private wells within 500 feet of the Initial Testing Site, including those of Plaintiffs Thomas Ryan, Susan Ryan, Sean Gallagher, and Ashley Sultan Gallagher. The results of those additional water tests revealed PFAS6 in drinking water at concentrations between 333 and 1,815 ppt, as follows:

   a.     64 Bean Porridge Hill Road, Total PFAS: 1,132 ng/L;

   b.     66 Bean Porridge Hill Road, Total PFAS: 939, ng/L;

   c.     67 Bean Porridge Hill Road, Total PFAS: 1,021 ng/L;

   d.     68 Bean Porridge Hill Road, Total PFAS: 623 ng/L;

   e.     70 Bean Porridge Hill Road, Total PFAS: 333 ng/L; and

   f.     72 Bean Porridge Hill Road, Total PFAS: 1,815 ng/L.

60.     Since February 2022, numerous additional Westminster, Massachusetts residents have learned that their private drinking water wells (the "Private Wells") are also contaminated with PFAS6. MassDEP has stated it believes water from at least 250 Westminster, Massachusetts homes may be impacted.

61.     As of July 14, 2022, testing results from the Private Wells of 137 Westminster, Massachusetts properties have been published by MassDEP. The testing results from the Private Wells reveal that PFAS6 concentrations in 116 of the 137 tested samples (or 85% of the test

samples) exceeded the 20 ppt limit that has been designated as the Imminent Hazard Level by MassDEP. Some test results from the Private Wells revealed PFAS6 concentrations more than 50 times the 20 ppt limit designated as the Imminent Hazard Level by MassDEP. Due to the 85% contamination rate, the MassDEP has been expanding the area of testing (the "Study Area") on a weekly basis to include more homes.

62.     Residents with the Private Wells that are contaminated cannot use the water from their wells and instead must use bottled water for drinking, cooking, bathing, and other ordinary household uses.

63.     Testing of MassNatural's own private well on the Otter Farm Property showed a PFAS6 concentration of 5,720 ppt, more than 286 times higher than the 20 ppt designated as the Imminent Hazard Level by MassDEP. On information and belief, this is the highest concentration level of PFAS6 ever recorded in water from a private well in Massachusetts.

64.     MassDEP concluded the PFAS6 contamination in the Study Area is the result of groundwater migration from MassNatural's operations at the Otter Farm Property.

65.     Accordingly, on March 13, 2022, MassDEP issued a Notice of Responsibility to both MassNatural and Otter Farm, stating that "MassDEP, based on the available information, considers [Mass Natural and Otter Farm each] a party with potential liability for response action costs and damages under M.G.L. c. 21E, §5."

66.     MassDEP also issued a Notice of Responsibility to Seaman Paper on May 13, 2022.

67.     On May 17, 2022, MassDEP issued a Unilateral Administrative Order ("UAO 1") directing MassNatural to "cease and desist from distributing any material containing PFAS at

levels that would exceed applicable standards for PFAS in groundwater that is or could be used as drinking water, including private wells."

68.     On July 20, 2022, MassDEP issued a Unilateral Administrative Order and Permit Suspension, Doc # 00013644, ("UAO 2") to Otter Farm and MassNatural finding "that operation of the [MassNatural site] poses a threat to public health and the environment." MassDEP also ordered Otter Farm and MassNatural to cease composting operations at the Otter Farm Property.

69.     On July 20, 2022, MassDEP also issued a Notice of Responsibility to Greif (the "Greif Notice of Responsibility") in connection with contamination of the Otter Farm Property and surrounding areas with materials dumped at Otter Farm by Greif.

70.     Both the Greif Notice of Responsibility and the UAO2 state that Greif had disposed of waste products at MassNatural and that MassDEP tested Greif waste products and found they contained PFAS6 concentrations in excess of the 20 ppt limit designated as the Imminent Hazard Level by MassDEP.

71.     MassDEP has identified Mass Natural, Seaman Paper, Otter Farm, and Greif as parties "with potential liability for response action costs and damages under M.G.L. c. 21E, §5."

72.     Westminster residents living near the Otter Farm Property and/or whose land and water are likely to be impacted by the emission of PFAS6 from the Otter Farm Property, including Plaintiffs and the Class Members, face an uncertain future. Their exposure to PFAS6 means they have experienced or are at risk of experiencing adverse health events known to be caused by PFAS6. They require medical monitoring and/or treatment to ensure that any adverse health effects resulting from exposure to PFAS6 are detected and treated as early as possible.

73.     Additionally, Westminster residents living near the Otter Farm Property and/or whose land and water are likely to be impacted by the emission of PFAS6 from the Otter Farm

Property, including Plaintiffs and the Class Members, can no longer fully enjoy the use of their property or use the water from their private wells, water that previously was their only source of water for drinking, cooking, bathing, and many other day-to-day activities.

74.    In addition to negatively impacting their day-to-day lives, Plaintiffs and the Class Members who may wish to relocate away from the contamination site will suffer additional challenges and diminution of property value as a result of the known presence of widespread PFAS6 contamination in their water and on their property.

75.    Defendants are individually and collectively responsible for the plight of the Plaintiffs and the Class Members as outlined below and should be held accountable.

I.    THE PAPER MANUFACTURER DEFENDANTS USED PFAS6 IN THEIR COMMERCIAL PRODUCTS FOR DECADES.

76.    Upon information and belief, manufacturers of paper, cardboard, and packaging, including Seaman Paper and the Greif Defendants (collectively, the "Paper Manufacturer Defendants") have knowingly used PFAS6 chemicals in their manufacturing processes for many decades.

77.    In the production of paper products, PFAS6 chemicals are typically used as a coating to repel grease, oil, fats, water, and other substances from paper products, preventing absorption of these substances into the paper. PFAS6 chemicals have also been used in inks and other moisture barriers utilized by the paper manufacturing industry.

78.    PFAS6-treated paper prevents grease, water, fats, and other substances from migrating to and/or from food during transport, storage, and consumption of the food. Some examples of PFAS6-treated paper include are pizza boxes, sandwich wrappers, and microwave popcorn bags.

16

79.    Upon information and belief, the Paper Manufacturer Defendants have produced PFAS6-treated paper products and created waste byproducts containing PFAS6. MassDEP has determined that paper waste generated by Greif at the Greif Mill and disposed of at the Otter Farm Property in connection with MassNatural's operations there contained high levels of PFAS6, including a PFOA concentration of 1,250 ppt (over 60 times higher than the 20 ppt designated as the Imminent Hazard Level by MassDEP) and a PFOS concentration of 1,890 ppt (over 90 times the 20 ppt designated as the Imminent Hazard Level by MassDEP).

80.    Upon information and belief, Seaman Paper also used PFAS6 in its operations and generated PFAS6 contaminated waste byproducts, although testing of Seaman Paper waste dumped at MassNatural's operations on the Otter Farm Property has been reported as inconclusive.

II.    DEFENDANTS ARRANGED FOR THE TRANSPORT, DISPOSAL, STORAGE AND/OR TREATMENT OF PFAS6-CONTAMINATED BIOSOLID WASTE AT 65 BEAN PORRIDGE HILL ROAD.

81.    MassDEP's investigation also found that Seaman Paper, Otter Farm, and Greif all "arranged for the transport, disposal, storage or treatment of hazardous material" to or at MassNatural's operations at Otter Farm.

82.    On March 31, 2022, MassDEP informed MassNatural and Otter Farm through Notices of Responsibility that MassDEP had identified both entities—MassNatural as operator of the composting operation and Otter Farm as landowner of the Otter Farm Property—as "Potentially Responsible Parties" for the contamination and disposal of contaminants at 65 Bean Porridge Hill Road.

83.    The UAO2 stated:

On June 30, 2022, Mass Natural voluntarily submitted 30 additional sampling results to MassDEP showing that most of the materials sampled on May 25 and June 2, 2022 at the

Site contain one or more PFAS compounds as levels exceeding MCP standards. Specifically, the following materials all had exceedances of RCS-1 standards for at least one PFAS compound: landfill cover; golf course material; fiber biopellets; potting soil; compost; "turkey paid" materials; **Greif paper**; "windrow"; and Top Shelf (loam). The data were inconclusive for four other materials: **Seaman paper**, lettuce waste, tea leaves waste, and cannabis roots.[18]

84.    The Greif Notice of Responsibility stated:

Available information indicates that [MassNatural] has accepted large volumes of short paper fiber sludge from [Greif] since approximately 2002. Such materials are generally now known or suspected to contain PFAS. On May 25, 2022, [MassNatural] collected samples of materials stockpiled at the Site, including a sample that originated from Greif, Inc. and identified as "Greif Paper" for PFAS analysis. The "Greif Paper" sample was found to contain PFOA at a concentration of 1,250 ng/kg. PFOS was also detected in the sample at a concentration of 1,890 ng/kg, but the result was qualified that the exact concentration is not determined, but it is not greater than the reported concentration. A copy of the laboratory analytical report is attached to this Notice.

Based upon [Greif's] role as a person who arranged for the transport, disposal, storage or treatment of hazardous material to or at a Site, MassDEP is issuing this Notice of Responsibility to Greif.[19]

85.    MassDEP's findings establish that each Defendant individually, and in combination with the activities of the other Defendants, caused the contamination at Otter Farm by substantially contributing to the transport, disposal, storage, or treatment of PFAS6-contaminated waste at the MassNatural composting site located at Otter Farm.

## III.    MASSNATURAL DECEPTIVELY SOLD PFAS6-CONTAMINATED PRODUCTS TO MASSACHUSETTS CONSUMERS.

86.    As the seller of consumer products, MassNatural had a duty not to sell harmful products to uninformed consumers.

---

[18] *Unilateral Administrative Order and Permit Suspension*, MASSDEP (July 20, 2022), https://fileservice.eea.comacloud.net/v1.4.0/FileService.Api/file/CETracker/gfjejjhe (accessed Aug. 2, 2022)

[19] Notice of Responsibility to Greif, Inc., MASSDEP (July 20, 2022), https://eeaonline.eea.state.ma.us/EEA/fileviewer/Rtn.aspx?rtn=2-0021866 (accessed Aug. 2, 2022) (Emphasis added) (hereinafter the "Greif Notice of Responsibility").

87.     The UAO2 and the Greif Notice of Responsibility establish that MassNatural accepted PFAS6-contaminated materials (the "Incoming Composting Materials") for composting.

88.     Upon information and belief, MassNatural sold and distributed compost and other products containing hazardous levels of PFSA6 to consumers without providing any notice of the presence of PFSA6 in the products.

89.     Upon information and belief, MassNatural falsely, misleadingly, and deceptively marketed and advertised to Massachusetts consumers that they were selling compost and other products that were safe for use in gardening, landscaping, home construction, agricultural, and land reclamation projects, when in fact the compost and other products were contaminated with dangerous levels of PFAS6.[20]

90.     Specifically, MassNatural falsely, misleadingly, and deceptively represented to Massachusetts consumers on its website that "[a]ll incoming materials are extensively tested prior to acceptance for composting."[21]

91.     Upon information and belief, MassNatural did not test all Incoming Composting Materials prior to acceptance for composting. Nor did MassNatural arrange for another party to test Incoming Composting Materials. Had MassNatural extensively tested or arranged for the extensive testing of Incoming Composting Materials, such testing would have revealed the dangerous levels of PFAS6 concentrations in the Incoming Composting Materials.

---

[20] *Our History*, MASS NATURAL, https://www.mnaturalfertilizer.com/about-us (accessed Aug. 2, 2022).

[21] *Id.*

92.     Alternatively, MassNatural tested Incoming Composting Materials and was aware they contained dangerous PFAS6 concentrations, then knowingly sold contaminated products to consumers while falsely representing that the products were safe for use.

93.     MassNatural also represented to Massachusetts consumers on its website that MassNatural's "compost products are tested by the UMass soil lab."[22]

94.     However, upon information and belief, MassNatural's products (*i.e.,* the post-composting soil and other consumer products it sold) were not "tested by the UMass soil lab." Had the UMass soil lab tested the MassNatural products, the tests would have detected dangerous levels of PFAS6 concentrations.

95.     On information and belief, MassNatural produced and sold yards of topshelf loam, compost, potting soil, fill, and other consumer products to Massachusetts consumer customers that were contaminated with PFAS6 and worth nothing or far less than what those consumer customers paid for the products.

96.     Plaintiffs Thomas Ryan and Susan Ryan paid MassNatural for topshelf loam for use in a land reclamation project they undertook on their residential property.

97.     Instead of receiving topshelf loam of the quality represented, marketed, and advertised by MassNatural, Thomas Ryan and Susan Ryan received PFAS6-contaminated topshelf loam, contamination that MassNatural never disclosed.

98.     Another Westminster resident similarly told the Boston Globe that she had "spread loads of Mass Natural soil in her yard" and found out in May 2022 that the soil on her property was contaminated with PFAS6.

---

[22] *Id.*

99.     MassNatural's sale and distribution of products contaminated with PFAS6 to consumers, including Plaintiffs Thomas Ryan and Susan Ryan, not only resulted in Massachusetts consumers paying more than they should have for MassNatural's products, but also has caused additional harm to Massachusetts consumers, including widespread contamination of consumers' property and water supply.

IV.    PFAS6 SPREAD FROM 65 BEAN PORRIDGE HILL ROAD TO THE
       SURROUNDING AREA'S NATURAL UNDERGROUND WATER SUPPLY.

100.    The dangers of composting hazardous materials are well understood: whatever goes into a composting pile can migrate through soil and into the underground water supply. By failing to use reasonable care to test the Incoming Composing Materials and preventing contaminated materials from composting in its operations at Otter Farm, MassNatural caused contamination of topshelf loam, compost, soil, and groundwater on and around Otter Farm.

101.    After identifying MassNatural's operations at Otter Farm as a potential contamination source in January and February 2022, MassDEP reviewed historical records from Otter Farm, including the Recycling, Composting, or Conversion (RCC) permit application submitted by MassNatural to MassDEP Bureau of Air and Waste (BAW) and the resulting RCC Permit issued on October 6, 2020. MassDEP then concluded that "Based upon the use of materials that contain PFAS at the [65 Bean Porridge Hill Road], and the PFAS detections in the private wells nearby, **MassDEP determined that a release of PFAS had come to be located at the Massachusetts Natural Fertilizer Company, Inc. (MNF) property at 65 Bean Porridge Hill Road, Westminster [Otter Farm].**"[23]

---

[23] *See* Greif Notice of Responsibility.

V.     RESPONSE & MITIGATION EFFORTS HAVE FAILED.

102.    Since learning of the PFAS6 contamination in Westminster, Massachusetts,
MassDEP has provided bottled water to Westminster residents whose water and/or soil was
contaminated with PFAS6, as a temporary solution for use as drinking water and for cooking,
bathing, and other ordinary household uses.

103.    MassDEP has also required Seaman Paper, Otter Farm, MassNatural, and the
Greif Defendants to pay for the installation of Point of Entry Treatment systems ("POET
Systems") in homes where water sources are known to be contaminated by PFAS6.

104.    Although POET systems do not address the problems caused by PFAS6-
contaminated soil, POET Systems theoretically can help filter harmful PFAS6 from water.

105.    POET Systems installed by Defendants have not effectively addressed the PFAS6
contamination of affected water, however. For example, Plaintiffs Sean Gallagher and Ashley
Sultan Gallagher had a POET System installed at their home during the week of March 30, 2022.
Despite the installation and use of a POET system at the Gallaghers' home, MassDEP informed
the Gallaghers on July 26, 2022 that tested water filtered through the Gallaghers' POET System
continued to contain unsafe levels of PFAS6. As a result, the Gallaghers were advised to
continue to drink bottled water until further notice, despite the existence and their use of a POET
system.

106.    In addition, not all POET Systems have been installed by licensed contractors,
which poses additional safety hazards such as flooding from faulty plumbing and fires from
faulty electrical work. During the week of March 30, 2022, Plaintiffs Thomas and Susan Ryan
had a POET System installed by an unlicensed plumbing contractor, as arranged by Seaman
Paper, Otter Farm, MassNatural, and/or the Greif Defendants.

107.    These examples demonstrate that PFAS6 contamination of the water supply of Plaintiffs and the Class Members will not be easily or effectively solved by installation of POET systems.

VI.    DEFENDANTS' ACTIVITIES HAVE SUBSTANTIALLY AND UNREASONABLY INTERFERED WITH PLAINTIFFS' ABILITY TO ENJOY THEIR PROPERTY.

108.    Defendants' creation, disposal, storage, sale, and/or distribution of PFAS6-contaminated waste products has upended the lives of Plaintiffs and the Class Members.

109.    The Plaintiffs and the Class Members' use and enjoyment of their property have been substantially and unreasonably impaired by Defendants' conduct. Owners of properties where the water supply and soil have been contaminated, including Plaintiffs and the Class Members, can no longer use their natural water sources for drinking, cooking, or other ordinary household uses. In addition, Plaintiffs and the Class Members cannot eat the fruits and vegetables from their gardens or the eggs laid by their chickens.

110.    Moreover, the Plaintiffs and the Class Members have suffered diminution of the value of their homes and properties and an impaired ability to sell their PFAS6-contaminated homes and properties.

VII.    ALLEGATIONS OF PLAINTIFFS

        a.    THE RYAN PLAINTIFFS

111.    Plaintiff Thomas Ryan and Plaintiff Susan Ryan (collectively, the "Ryan Plaintiffs") moved to Westminster to enjoy a healthier lifestyle, which included open space, clean air and water, and cultivating and eating food grown on their own land.

112.    The Ryan Plaintiffs purchased and currently own a residential property and home across Bean Porridge Hill Road from the MassNatural operations at Otter Farm (the "Ryan Property").

113.    PFAS6-contaminated MassNatural topshelf loam was used during construction of the homesite on the Ryan Property, resulting in PFAS6 contamination of soil and water on the Ryan Property.

114.    PFAS6 also has migrated from the operations of MassNatural on the Otter Farm property through runoff and groundwater, including the underground water supply to the Ryan Property.

115.    The Ryan Plaintiffs purchased and used additional topshelf loam from MassNatural in connection with a land reclamation project performed on the Ryan Property after they acquired ownership of the property.

116.    The soil and drinking water on the Ryan Property are contaminated with PFAS6. Testing of soil and water on the Ryan Property has revealed dangerous levels PFAS6 contamination.

b.    THE GALLAGHER PLAINTIFFS

117.    Plaintiff Sean Gallagher and Plaintiff Ashley Sultan Gallagher (collectively, the "Gallagher Plaintiffs") purchased and currently own a residential property and home in Westminster across Bean Porridge Hill Road from the MassNatural operations at Otter Farm (the "Gallagher Property").

118.     PFAS6-contaminated MassNatural topshelf loam was used during construction of the homesite on the Gallagher Property, resulting in the contamination of soil and water on the Gallagher Property.

119.    PFAS6 also has migrated from the operations of MassNatural on the Otter Farm property through runoff and groundwater, including the underground water supply to the Gallagher Property.

24

VIII.   TOLLING AND ESTOPPEL

     a.   DISCOVERY RULE TOLLING

120.   Plaintiffs and the Class Members had no way of knowing about Defendants' conduct with respect to PFAS6 chemicals.

121.   Neither Plaintiffs nor any other Class Members, through the exercise of reasonable care, could have discovered the conduct by Defendants alleged herein. Further, Plaintiffs and Class Members did not discover and did not know of facts that would have caused a reasonable person to suspect that Defendants were engaged in the conduct alleged herein.

122.   For these, reasons, all applicable statutes of limitation have been tolled by the discovery rule with respect to claims asserted by Plaintiffs and the Class Members.

     b.   FRAUDULENT CONCEALMENT TOLLING

123.   Defendants concealed their conduct and the existence of the claims asserted herein from Plaintiffs and Class Members.

124.   Upon information and belief, Defendants intended its acts to conceal the facts and claims from Plaintiffs and Class Members. Plaintiffs and the Class Members were unaware of the facts alleged herein without any fault or lack of diligence on their part and could not have reasonably discovered Defendants' conduct. For this reason, any statute of limitations that otherwise may apply to the claims of Plaintiffs or Class Members should be tolled.

IX.   CLASS ALLEGATIONS

125.   Plaintiffs bring this action as a class action pursuant to Federal Rules of Civil Procedure 23(a) and 23(b)(3) on behalf of themselves and the following individuals (the "Class" and "Consumer Subclass" and collectively, the "Classes"):

**Class**: All natural persons who have lived or owned property in Westminster, Massachusetts between 2002 and the present (the "Class Period").

**Consumer Subclass**: All natural persons who have purchased contaminated composted products from MassNatural during the Class Period.

126.    Plaintiffs reserve the right to expand, narrow or otherwise modify or refine the definition of the Classes based on additional information obtained through further investigation and discovery, and/or in order to address or accommodate any of the Court's manageability concerns.

127.    **Ascertainability**. The proposed Classes are readily ascertainable because they are defined using objective criteria, so as to allow class members to determine if they are part of the Classes. Further, the members of the Classes can be readily identified through records and information in Defendants' possession, custody or control.

128.    **Numerosity**. The Classes are so numerous and geographically dispersed that joinder of individual members is impracticable. The exact number of members of the Classes, as herein identified and described, is not known to Plaintiffs at this time and can only be ascertained through appropriate discovery, but given the testing, test results, and conclusions performed and reported by MassDEP about the nature and extent of PFAS6 contamination, Plaintiffs believe that there are at least hundreds of class members.

129.    **Commonality and Predominance**. Common questions of fact and law exist for each cause of action and predominate over questions solely affecting individual members of the Classes, including the following:

        a.   Whether Defendants' conduct was negligent;

        b.   Whether Defendants' conduct constitutes a public nuisance;

        c.   Whether Defendants' conduct constitutes an abnormally dangerous activity;

    d.   Whether Defendants owed a duty of care to the Class Members;

    e.   Whether the duty of care owed to the Class Members included the duty to protect against exposures to unsafe and unnecessarily high levels of PFAS;

    f.   Whether Defendants breached their duty to warn the Class Members of, and protect the Class Members from, the long-term health risks and consequences of exposure to high levels of PFAS;

    g.   Whether medical monitoring and early detection will provide benefits to the Class Members;

    h.   Whether the PFAS contamination described herein substantially interfered with the Plaintiffs' and the Class Members' use and enjoyment of their property;

    i.   Whether the PFAS contamination described herein caused, and continues to cause, a continuous invasion of the property rights of the Plaintiffs and the Class Members; and

    j.   Whether Defendants caused the devaluation of the Plaintiffs and the Class Members' properties.

130.   **Typicality**. Plaintiffs' claims are typical of the claims of the members of the Classes. Plaintiffs and the members of the Classes sustained damages arising out of Defendants' common course of conduct as described in this Complaint. The injuries of Plaintiffs and each member of the Classes were directly caused by Defendants' wrongful conduct, and Plaintiffs and the members of the Classes assert similar claims for relief.

131.   **Adequacy**. Plaintiffs have and will continue to fairly and adequately represent and protect the interests of the Classes. Plaintiffs have retained counsel competent and

experienced in complex litigation and class actions. Plaintiffs have no interest that is antagonistic

to those of the Classes, and Defendants have no known defenses unique to Plaintiffs. Plaintiffs

and their counsel are committed to vigorously prosecuting this action on behalf of the members

of the Classes, and they have the resources to do so. Neither Plaintiffs nor Plaintiffs' counsel has

any interest adverse to those of the other members of the Classes.

132.    **Substantial Benefits**. This class action is appropriate for certification because

class proceedings are superior to other available methods for the fair and efficient adjudication of

this controversy and joinder of all members of the Classes is impracticable. This proposed class

action is manageable. Plaintiffs know of no special difficulty to be encountered in the

maintenance of the action that would preclude its maintenance as a class action.

CLAIMS FOR RELIEF

FIRST CLAIM FOR RELIEF<br>MEDICAL MONITORING<br>(Against Defendant MassNatural)

133.    Plaintiffs and the Class Members re-allege and incorporate here the allegations set

forth above.

134.    Plaintiffs and Class Members have been actually and significantly exposed to

dangerous levels of PFAS6, levels that exceed the levels deemed dangerous by the MassDEP and

that are far higher than normal background levels. As is reported by the EPA, PFAS6 are

dangerous, hazardous, toxic substances that have been proven to cause disease and illness in

humans, including but not limited to certain kidney and reproductive cancers.

135.    Plaintiffs and the Class Members' actual and significant exposure to these

dangerous levels of PFAS6 is the direct and proximate result of Defendant MassNatural's

intentional, willful, wanton, reckless and/or negligent conduct in connection with Defendant

28

MassNatural's operations at Otter Farm, specifically the use, storage, emission, discharge, disposal, and/or distribution of PFAS6 chemicals.

136.    As a direct and proximate result of Defendant MassNatural's intentional, willful, wanton, reckless and/or negligent conduct in connection with Defendant MassNatural's operations at Otter Farm, specifically the use, storage, emission, discharge, disposal, and/or distribution of PFAS6 chemicals, Plaintiffs and the Class Members have been exposed to dangerous levels of PFAS6 and are at an increased risk of developing cancer and other illnesses, diseases and disease processes, which results in their present medical need for periodic diagnostic medical examinations and monitoring.

137.    Diagnostic testing of Plaintiffs and the Class Members for early detection of cancer and other illnesses, diseases, and disease processes caused by exposure to PFAS6 chemicals is reasonably and medically necessary to assure early diagnosis and effective treatment of those conditions.

138.    Plaintiffs and the Class Members have suffered the present harm of the need for the cost of diagnostic testing for the early detection of cancer and other illnesses, diseases, and disease processes. As a direct and proximate result of Defendant MassNatural's intentional, willful, wanton, reckless, and/or negligent acts or omissions in connection with its operations at Otter Farm, specifically the use, storage, emission, discharge, disposal, and/or distribution of PFAS6 chemicals, Plaintiffs and the Class Members require an award of the cost of a medical monitoring program necessary for early detection and treatment of the onset of illnesses, diseases, and disease processes.

139.    Monitoring procedures exist that make possible the early detection of cancer, the progression of biomarker abnormalities, and other illnesses, diseases, and disease processes

resulting from exposure to PFAS6. These monitoring procedures will benefit Plaintiffs and the

Class Members, and they are different from what would normally be recommended in the

absence of PFAS6 exposure. Such diagnostic testing is reasonably and medically necessary due

to the exposure of Plaintiffs and the Class Members to PFAS6 caused by defendants.

140.   Because Plaintiffs' and the Class Members' claims are based solely on the amount

of exposure to PFAS6 caused by Defendants, any alleged alternative exposure, or prior medical

or family history, is not a basis for Plaintiffs' and the Class Member's claims in this case.

141.   As a result, Plaintiffs and the Class should be awarded the quantifiable costs of

such a monitoring regime. Plaintiffs and the Class Members also seek all other available and

necessary relief in connection with this claim.

SECOND CLAIM FOR RELIEF
NEGLIGENCE
(Against Defendant MassNatural)

142.   Plaintiffs and the Class Members re-allege and incorporate here the allegations set

forth above.

143.   MassNatural owed Plaintiffs and the Class Members a duty of reasonable care to

avoid using, storing, emitting, discharging, disposing, and/or distributing PFAS6 in a manner

that would cause Plaintiffs and the Class Members injury or harm. Plaintiffs and the Class

Members were located within the scope of the risk created by the MassNatural's conduct and

they were foreseeable victims of any negligent operations by MassNatural at Otter Farm,

including the use, storage, emission, discharge, disposal, sale, and/or distribution of PFAS6.

144.   MassNatural owed Plaintiffs and the Class Members a duty of reasonable care to

eliminate or minimize the discharge of PFAS6 into the soil and water, commensurate with the

risk of using, emitting, discharging, disposing, and/or distributing PFAS6.

145.     Given the likelihood that MassNatural was creating PFAS6 contamination of land and water that would result in exposure to nearby residents, increasing the risk that those residents would develop significant illnesses or diseases, MassNatural also had a duty to use reasonable care to avoid, minimize, or warn about their use, storage, emission, discharge, disposal, and/or distribution of PFAS6.

146.     MassNatural breached its duty to use reasonable care in one or more of the following ways:

    a.   By negligently failing to use reasonable care to test and/or screen Incoming Composing Materials;

    b.   By negligently conducting composting operations without taking reasonable steps to prevent or minimize the accumulation and emission of PFAS6 chemicals into the soil, groundwater, and its own consumer products;

    c.   By negligently selling and/or distributing PFAS6-containing biosolids to customers who were unaware the products contained PSAS6;

    d.   By negligently failing to employ safe methods of operation to adequately prevent, control or eliminate PFAS discharge into the environment;

    e.   By negligently failing to institute proper procedures and training to prevent, minimize, and/or promptly and effectively respond to its release of PFAS6 into the environment;

    f.   By negligently failing to promptly and effectively respond to its release of PFAS6 into the environment;

g.  By negligently failing to warn Plaintiffs and the Class Members of the PFAS6 they were using, storing, emitting, discharging, disposing, selling, and/or distributing;

h.  By negligently failing to locate its operations in an unpopulated or much less populated area and/or by negligently discharging dangerous amounts of PFAS6 into land and groundwater near a populated community.

i.  By negligently failing to warn current and potential neighboring residents and property owners that they were being exposed to PFAS6 and of the consequent risks of disease the residents acquired because of that exposure.

147.   As a direct and proximate result of MassNatural's negligence, Plaintiffs and the Class Members have suffered, presently suffer, and will continue to suffer, real property damage, out of pocket expenses, personal property damage, loss of use and enjoyment of property, diminution in property value, the necessity for long-term medical monitoring, upset, aggravation, and inconvenience.

148.   MassNatural is liable to Plaintiffs and the Class Members for fair compensation for the resulting injuries, which includes pain and suffering; reasonable expenses incurred for medical care and nursing in the treatment and cure of the injury; diminution in earning capacity; and pain and suffering and such medical expenses and diminution in earning capacity as are shown to be reasonably probable to continue in the future.

THIRD CLAIM FOR RELIEF
MASSACHUSETTS CONSUMER PROTECTION ACT
Mass. Gen. Laws ch. 93, §§1, *et seq.*
(Against Defendant MassNatural)

149.    Plaintiffs and the Class Members re-allege and incorporate here the allegations set forth above.

150.    Plaintiffs and the Class Members intend to assert and prosecute claims against MassNatural under the under Massachusetts Consumer Protection Law, M.G.L. ch. 93A §1, et seq. ("MCPL"). This Count provides notice that this Complaint shall be amended to demand all appropriate relief once Plaintiffs have provided notice pursuant to M.G.L. ch. 93A §9(3) to MassNatural and the statutory period for a response has passed, subject to any response by MassNatural.

151.    MassNatural is a "person" as defined by M.G.L.A. 93A §1(a).

152.    Plaintiffs and members of the Consumer Subclass are consumers of MassNatural consumer products.

153.    MassNatural engaged in deceptive or unfair acts or practices in the in the conduct of trade or commerce, in violation of M.G.L. 93A §2(a), including but not limited to the following:

   a.  Knowingly or recklessly making a false representation as to the characteristics and use of MassNatural products, in violation of 93A §2(a);

   b.  Falsely representing that MassNatural Products are safe for use, in violation of 93A §2(a);

   c.  Advertising MassNatural Products with an intent not to sell it as advertised, in violation of 93A §2(a); and

      d.   Failing to disclose the material information that, as a result of MassNatural's arranging for the transport, disposal, storage, or treatment of PFAS6-contaminated materials, deemed hazardous material under Massachusetts law, MassNatural products contained unsafe PFAS6 chemicals and that MassNatural product users were at risk of suffering adverse health effects, in violation of 93A §2(a).

154.    MassNatural's deceptive trade practices significantly impacted the public, because there are at least hundreds of consumers of MassNatural Products, including Plaintiffs, the Class Members, and the Consumer Subclass Members.

155.    MassNatural's false representations and omissions were material because they were likely to deceive reasonable consumers to induce them to purchase MassNatural products without being aware that MassNatural products were unsafe to use.

156.    As a direct and proximate result of MassNatural's unfair and deceptive acts or practices, Plaintiffs, the Class Members, and the Consumer Subclass Members suffered damages by purchasing MassNatural Products because they would not have purchased MassNatural Products had they known the truth, and they received a product that was worthless or worth substantially less because it is unsafe to use.

157.    Defendant MassNatural's deceptive trade practices caused injury in fact and actual damages to Plaintiffs, the Class Members, and the Consumer Subclass Members in the form of the loss or diminishment of value of those MassNatural products purchased by Plaintiffs, the Class, and the Consumer Subclass, which caused MassNatural to profit at the expense of Plaintiffs, members of the Class, and members of the Consumer Subclass. The injuries to Plaintiffs, the Class, and the Consumer Subclass were to legally protected interests. The gravity

of the harm of Defendant MassNatural's actions is significant and there is no corresponding benefit to consumers of such conduct.

158.    Plaintiffs, the Class, and the Consumer Subclass seek relief under 93A §9 including, not limited to, compensatory damages, statutory damages, restitution, penalties, injunctive relief, and/or attorneys' fees and costs.

FOURTH CLAIM FOR RELIEF
PRIVATE NUISANCE
(Against Defendant MassNatural)

159.    Plaintiffs and the Class Members re-allege and incorporate here the allegations set forth above.

160.    At all relevant times, MassNatural knew or should have known PFAS6 chemicals were hazardous and harmful to real property, water, and human beings, and it was substantially certain that the method and manner of MassNatural's PFAS6 use, storage, emission, discharge, disposal, sale and/or distribution of PFAS6 would cause injuries and property damage to Plaintiffs and the Class Members.

161.    MassNatural, through the negligent, reckless and/or intentional conduct as alleged in this Complaint, has contaminated real property owned and/or possessed by Plaintiffs and the Class Members.

162.    MassNatural created, permitted, and maintained a hazardous condition or activity on property that caused substantial and unreasonable interference with Plaintiffs' and the Class Members' use and enjoyment of their property. Defendants' interference has caused and is causing Plaintiffs and the Class Members to, among other things, refrain from using their land to cultivate and grow fruit, vegetables, and other food and to use their water to drink, cook, or bathe, resulting in significant inconvenience and expense.

163.    MassNatural's contamination with PFAS6 of real property owned and/or possessed by Plaintiffs and the Class Members also has substantially interfered otherwise with the Plaintiffs' and Class Members' ability to enjoy their property, to avail themselves of their property's value as an asset and/or source of collateral for financing, and to use their property in the manner that each Class Member chooses.

164.    MassNatural's conduct was intentional, negligent, reckless, and ultrahazardous, and its conduct constitutes a continuous invasion of the property rights of Plaintiffs and the Class Members.

165.    As a direct and proximate result of MassNatural's use, storage, emission, discharge, disposal, sale, and/or distribution of PFAS6 and the exposure of the persons and/or property of Plaintiffs and the Class Members to PFAS6 resulting from the conduct of Defendants, Plaintiffs and the Class Members presently suffer, and will continue to suffer, real property damage, out of pocket expense, personal property damage, loss of use and enjoyment of property, diminution in property value, the necessity for long-term medical monitoring, annoyance, upset, aggravation, trauma, and inconvenience.

166.    Plaintiffs and the Class Members are therefore entitled to damages, costs, and a judgment that the nuisance be abated and removed.

FIFTH CLAIM FOR RELIEF
PUBLIC NUISANCE
(Against Defendant MassNatural)

167.    Plaintiffs and the Class Members re-allege and incorporate here the allegations set forth above.

168.    At all relevant times, MassNatural knew or should have known PFAS6 to be hazardous and harmful to real property and human beings, and it was substantially certain that its

36

use, emission, discharge, disposal, and/or distribution of materials containing PFAS6 would cause injuries and losses to the persons and property of Plaintiffs and the Class Members.

169.    Plaintiffs, the Class Members, and members of the public have a common right to enjoy their real property free of dangerous contamination of their land and water and to live their lives without exposure to unreasonable levels of toxic PFAS6 chemicals.

170.    MassNatural's conduct in arranging for the transport, disposal, storage and/or treatment of PFAS6-contaminated materials—deemed hazardous material under Massachusetts law—has contaminated groundwater that supplies water to Plaintiffs, the Class members and the public and substantially and unreasonably infringes upon and transgresses the public right of Plaintiffs and the Class Members, to enjoy their real property.

171.    MassNatural knew or should have known that the materials containing PFAS6 they used, stored, emitted, discharged, disposed, sold, and/or distributed would have a deleterious effect upon the health, safety, and well-being of people living in Westminster, Massachusetts and the surrounding areas, including Plaintiffs and the Class Members.

172.    MassNatural's use, storage, emission, discharge, disposal, sale, and/or distribution of materials containing PFAS6 caused those who owned and/or lived on nearby properties, including Plaintiffs and the Class Members, to come into contact with high levels of PFAS6 on a routine and constant basis, causing substantially elevated risks of health problems resulting from exposure to dangerous levels of PFAS6, as well as property damage and diminished property values.

173.    As a direct and proximate result of Defendants' use, storage, emission, discharge, disposal, sale, and/or distribution of materials containing PFAS6, Plaintiffs' and the Class

Members' common right to live free of dangerous, toxic substances was eliminated and/or severely diminished.

174.    As a direct and proximate result of Defendants' use, storage, emission, discharge, disposal, sale, and/or distribution of materials containing PFAS in Westminster, Massachusetts and the surrounding area, PFAS6 chemicals contaminated the land and water owned, possessed and/or used by Plaintiffs and the Class Members, thereby exposing their bodies to PFAS6.

175.    As a direct and proximate result of Defendants' use, storage, emission, discharge, disposal, sale, and/or distribution of materials containing PFAS6, Plaintiffs and the Class Members will be forced to pay for the private removal of contaminants from their property emanating from pollution of public water sources.

176.    As a direct and proximate result of Defendants' use, storage, emission, discharge, disposal, and/or distribution of materials containing PFAS6 and the resulting exposure of Plaintiffs and the Class Members to PFAS6, Plaintiffs and the Class Members presently suffer, and will continue to suffer, real property damage, out of pocket expenses, personal property damage, loss of use and enjoyment of property, diminution in property value, the necessity for long-term medical monitoring, annoyance, upset, aggravation, trauma, and inconvenience.

<u>SIXTH CLAIM FOR RELIEF</u>
ULTRAHAZARDOUS ACITIVITY/STRICT LIABILITY
(Against Defendant MassNatural)

177.    Plaintiffs and the Class Members re-allege and incorporate here the allegations set forth above.

178.    MassNatural's use, transport, disposal, storage, emissions, discharge, distribution, sale, and/or treatment of PFAS6-contaminated materials, constitutes an ultrahazardous activity.

179.    MassNatural's use, transport, disposal, storage, emissions, discharge, distribution, sale, and/or treatment of PFAS6-contaminated materials constitutes an abnormally dangerous activity and cannot be made safe by the exercise of the utmost care. The conduct of MassNatural in the use, transport, disposal, storage, emissions, discharge, distribution, sale and/or treatment of PFAS6-contaminated materials caused contamination of land and groundwater by PFAS6, which poses a high degree of risk of injury and loss to Plaintiffs and the Class Members.

180.    The presence of PFAS6 contaminants in the environment and the human body poses an inherent and extraordinary threat to human health and well-being and a danger of lasting contamination of property and water.

181.    The contamination of the property, water, and bodies of Plaintiffs and the Class Members were all probable and foreseeable consequences that resulted from MassNatural's use, emission, discharge, disposal, sale, and/or distribution of PFAS6 chemicals.

182.    There is a reasonable likelihood that MassNatural's use, transport, disposal, storage, emissions, discharge, distribution, sale, and/or treatment of PFAS6-contaminated materials in the populated areas of Westminster, Massachusetts and the surrounding area will result in life-threatening cancer and other illnesses, diseases, and disease processes for Plaintiffs and the Class Members. MassNatural's decision to engage in the use, transport, disposal, storage, emissions, discharge, distribution, sale, and/or treatment of PFAS6-contaminated materials in these areas, thereby causing large amounts of PFAS6 to be dispersed into the surrounding community, was unreasonably dangerous.

183.    MassNatural's use, transport, disposal, storage, emissions, discharge, distribution, sale, and/or treatment of PFAS6-contaminated materials created a high risk of harm to those who live in the area, including Plaintiffs and the Class Members, and substantially increased the risk

of community residents, including Plaintiffs and the Class Members, developing cancer and other illnesses, diseases, or disease processes.

184.    The activities conducted by MassNatural have been and are exceedingly dangerous, while offering little or no value to the surrounding community.

185.    Because the activities engaged in by MassNatural as outlined in this Complaint are ultrahazardous, MassNatural is strictly liable for any injuries proximately resulting from those activities.

186.    As a direct and proximate result of MassNatural's ultrahazardous activities and the exposure of Plaintiffs and the Class Members to PFAS6 chemicals resulting from those activities, Plaintiffs and the Class Members presently suffer, and will continue to suffer, real property damage, out of pocket expense, personal property damage, loss of use and enjoyment of property, diminution in property value, the necessity for long-term medical monitoring, upset, aggravation, and inconvenience.

SEVENTH CLAIM FOR RELIEF
WILLFUL AND WANTON CONDUCT
(Against Defendant MassNatural)

187.    Plaintiffs and the Class Members re-allege and incorporate here the allegations set forth above.

188.    At all times relevant, MassNatural owed a duty to refrain from willful, wanton, reckless, and/or outrageous conduct and/or conduct that exhibited an utter indifference to and/or conscious disregard of the health, safety, and well-being of Plaintiffs and the Class Members.

189.    Upon information and belief, MassNatural at all relevant times was aware of the considerable health risks associated with the discharge of PFAS6 into soil, groundwater, and

consumer products, including the risk of causing various forms of cancer to those exposed by PFAS6 from soil, water, or other exposures.

190.    Upon information and belief, MassNatural at all relevant times knew that its use, storage, emission, discharge, disposal, sale, and/or distribution of materials containing PFAS6 and the receipt and composting of waste and byproducts generated during the production of paper would be likely to result in the emission of unreasonably dangerous levels of PFAS6 into the soil and groundwater in a manner that would be likely to cause significant financial and personal injury to Plaintiffs and the Class Members. .

191.    Notwithstanding this knowledge, Defendant MassNatural acted in a manner that was intentional, willful, wanton, reckless, outrageous, and/or demonstrated an indifference to and/or conscious disregard of the health, safety, and well-being of Plaintiffs and the Class Members by, among other things:

      a.   Failing to test and/or screen Incoming Composing Materials, when it represented it was doing so and when it knew doing so was required to ensure safe composting without the substantial risk of contaminating soil, groundwater, and its consumer products;

      b.   Conducting composting operations without taking reasonable steps to prevent or minimize the accumulation and emission of PFAS6 chemicals into the soil, groundwater, and its own consumer products, when it knew doing so was necessary to prevent significant financial and/or personal injury to Plaintiffs and the Class Members;

      c.   Selling and/or distributing PFAS6-contaminated biosolids to customers who were unaware the products contained PSAS6, despite knowing that doing so

would likely cause PFAS6 contamination and the resulting significant

financial and/or personal injury to Plaintiffs, the Class Members, and/or the

Consumer Subclass;

d.  Failing to employ safe methods of operation to adequately prevent, control or

eliminate PFAS discharge into the environment when it knew doing so was

necessary to prevent significant financial and/or personal injury to Plaintiffs

and the Class Members;

e.  Failing to institute proper procedures and training to prevent, minimize, and/or

promptly and effectively respond to its release of PFAS6 into the environment

when it knew doing so was necessary to prevent significant financial and/or

personal injury to Plaintiffs and the Class Members;

f.  Failing to promptly and effectively respond to its release of PFAS6 into the

environment when it knew doing so was necessary to prevent significant

financial and/or personal injury to Plaintiffs and the Class Members;

g.  Failing to warn Plaintiffs and the Class Members of the PFAS6 they were

using, storing, emitting, discharging, disposing, selling, and/or distributing

when it knew doing so was necessary to prevent significant financial and/or

personal injury to Plaintiffs and the Class Members;

h.  Failing to locate its operations in an unpopulated or much less populated area

when it knew doing so was necessary to prevent significant financial and/or

personal injury to Plaintiffs and the Class Members;

    i.   Discharging dangerous amounts of PFAS6 into land and groundwater near a populated community, when it knew doing so would likely cause significant financial and/or personal injury to Plaintiffs and the Class Members; and

    j.   Failing to warn current and potential neighboring residents and property owners that they were being exposed to PFAS6 and of their consequent risks of disease because of that exposure when it knew doing so was necessary to prevent significant financial and/or personal injury to Plaintiffs and the Class Members.

192.    As a direct and proximate result of MassNatural's willful, wanton, and reckless conduct, Plaintiffs and the Class Members have suffered, presently suffer, and will continue to suffer, real property damage, out of pocket expense, personal property damage, loss of use and enjoyment of property, diminution in property value, the necessity for long-term medical monitoring, annoyance, upset, aggravation, and inconvenience.

EIGHTH CLAIM FOR RELIEF
MEDICAL MONITORING
(Against Defendant Seaman Paper)

193.    Plaintiffs and the Class Members re-allege and incorporate here the allegations set forth above.

194.    Plaintiffs and Class Members have been actually and significantly exposed to dangerous levels of PFAS6, levels that exceed the levels deemed dangerous by the MassDEP and that are far higher than normal background levels. As is reported by the EPA, PFAS6 are dangerous, hazardous, toxic substances that have been proven to cause disease and illness in humans, including but not limited to certain kidney and reproductive cancers.

195.    Upon information and belief, Plaintiffs and the Class Members' actual and significant exposure to these dangerous levels of PFAS6 is the direct and proximate result of Defendant Seaman Paper's intentional, willful, wanton, reckless and/or negligent conduct in connection with Defendant Seaman Paper's disposal of waste materials contaminated with PFAS6 chemicals at MassNatural's operations at Otter Farm.

196.    As a direct and proximate result of Defendant Seaman Paper's intentional, willful, wanton, reckless and/or negligent conduct in connection with disposal of waste materials contaminated with PFAS6 chemicals at MassNatural's operations at Otter Farm, the Class Members have been exposed to PFAS6 at dangerous levels and so are at an increased risk of developing cancer and other illnesses, diseases and disease processes, which results in their present medical need for periodic diagnostic medical examinations and monitoring.

197.    As owner of Otter Farm, and thus the Otter Farm Property, Seaman Paper is liable to Plaintiffs and the Classes for damages caused by MassNatural's operations.

198.    Diagnostic testing of Plaintiffs and the Class Members for early detection of cancer and other illnesses, diseases, and disease processes caused by exposure to PFAS6 chemicals is reasonably and medically necessary to assure early diagnosis and effective treatment of those conditions.

199.    Plaintiffs and the Class Members have suffered the present harm of the need for the cost of diagnostic testing for the early detection of cancer and other illnesses, diseases, and disease processes. As a direct and proximate result of Defendant Seaman Paper's intentional, willful, wanton, reckless, and/or negligent acts or omissions in connection with its operations at Otter Farm, specifically the use, storage, emission, discharge, disposal, and/or distribution of PFAS6 chemicals, Plaintiffs and the Class Members require an award of the cost of a medical

44

monitoring program necessary for early detection and treatment of the onset of illnesses, diseases, and disease processes.

200.     Monitoring procedures exist that make possible the early detection of cancer, the progression of biomarker abnormalities, and other illnesses, diseases, and disease processes resulting from exposure to PFAS6. These monitoring procedures will benefit Plaintiffs and the Class Members, and they are different from what would normally be recommended in the absence of PFAS6 exposure. Such diagnostic testing is reasonably and medically necessary due to the exposure of Plaintiffs and the Class Members to PFAS6 caused by defendants.

201.     Because Plaintiffs and the Class Members' claims are based solely on the amount of exposure to PFAS6 caused by Defendants, any alleged alternative exposure, or prior medical or family history, is not a basis for Plaintiffs' and the Class Member's claims in this case.

202.     As a result, Plaintiffs and the Class should be awarded the quantifiable costs of such a monitoring regime. Plaintiffs and the Class Members also seek all other available and necessary relief in connection with this claim.

NINTH CLAIM FOR RELIEF
NEGLIGENCE
(Against Defendant Seaman Paper)

203.     Plaintiffs and the Class Members re-allege and incorporate here the allegations set forth above.

204.     Seaman Paper owed Plaintiffs and the Class Members a duty of reasonable care to avoid dumping, emitting, discharging, disposing, and/or distributing materials with high levels of PFAS6 chemicals in a manner and location that would cause Plaintiffs and the Class Members injury or harm. Plaintiffs and the Class Members were located within the scope of the risk

45

created by Seaman Paper's conduct and they were foreseeable victims of negligent disposal of contaminated waste by Seaman Paper.

205.    Seaman Paper owed Plaintiffs and the Class Members a duty of reasonable care to eliminate or minimize the disposal of PFAS6-contaminated waste in a manner and location where it would be expected to leach into the soil, water, and consumer products sold by MassNatural commensurate with the risk of discharging, disposing, and/or distributing PFAS6.

206.    Given the likelihood that Seaman Paper was creating PFAS6 contamination of land and water that would result in exposure to residents near Otter Farm, increasing the risk that those residents would develop significant illnesses or diseases, Seaman Paper also had a duty to use reasonable care to avoid, minimize, or warn about their use, emission, discharge, disposal, and/or distribution of materials containing high levels of PFAS6.

207.    Seaman Paper breached its duty to use reasonable care in one or more of the following ways:

    a.  By negligently failing to use reasonable care to test and/or screen materials it was dumping or otherwise disposing of at MassNatural's operations at Otter Farm so as to ensure it was not disposing of materials that would be likely to contaminate soil, groundwater, and consumer products at Otter Farm;

    b.  By negligently dumping PFAS6-contaminated operations at Otter Farm without taking reasonable steps to prevent or minimize the accumulation and emission of PFAS6 chemicals into the soil, groundwater, and consumer products at Otter Farm;

    c.  By negligently failing to employ safe methods of disposal to adequately prevent, control or eliminate PFAS discharge into the environment;

d.  By negligently failing to institute proper procedures and training to prevent, minimize, and/or promptly and effectively respond to the release of PFAS6 from its waste products into the environment;

e.  By negligently failing to promptly and effectively respond to its release of PFAS6 into the environment;

f.  By negligently failing to dispose of its contaminated manufacturing waste in a safer, unpopulated or much less populated area and/or by negligently discharging dangerous amounts of PFAS6 into land and groundwater near a populated community.

g.  By negligently failing to warn MassNatural and/or current and potential neighboring residents and property owners near Otter Creek that they were being exposed to PFAS6 and of the consequent risks of disease the residents acquired because of that exposure.

208.    As a direct and proximate result of Seaman Paper's negligence, Plaintiffs and the Class Members have suffered, presently suffer, and will continue to suffer, real property damage, out of pocket expenses, personal property damage, loss of use and enjoyment of property, diminution in property value, the necessity for long-term medical monitoring, upset, aggravation, and inconvenience.

209.    Seaman Paper is liable to Plaintiffs and the Class Members for fair compensation for the resulting injuries, which includes pain and suffering; reasonable expenses incurred for medical care and nursing in the treatment and cure of the injury; diminution in earning capacity; and pain and suffering and such medical expenses and diminution in earning capacity as are shown to be reasonably probable to continue in the future.

TENTH CLAIM FOR RELIEF
MASSACHUSETTS CONSUMER PROTECTION ACT
Mass. Gen. Laws ch. 93, §§1, *et seq.*
(Against Defendant Seaman Paper)

210.     Plaintiffs and the Class Members re-allege and incorporate here the allegations set forth above.

211.     Plaintiffs and the Class Members intend to assert and prosecute claims against Seaman Paper under the under Massachusetts Consumer Protection Law, M.G.L. ch. 93A §1, *et seq.* This Count provides notice that this Complaint shall be amended to demand all appropriate relief once Plaintiffs have provided notice pursuant to M.G.L. ch. 93A §9(3) to Seaman Paper and the statutory period for a response has passed, subject to any response by Seaman Paper.

212.     Seaman Paper is a "person" as defined by M.G.L.A. 93A §1(a).

213.     Plaintiffs and members of the Consumer Subclass are consumers of MassNatural consumer products.

214.     Seaman Paper engaged in deceptive or unfair acts or practices in the in the conduct of trade or commerce, in violation of M.G.L. 93A §2(a), including but not limited to the following:

215.     Knowingly or recklessly making a false representation as to the characteristics of its disposal of PFAS6 which it knew went into MassNatural products, in violation of 93A §2(a);

  a.   Falsely representing that MassNatural Products are safe for use despite the presence of PFAS6-contaminated chemicals, in violation of 93A §2(a);

  b.   Advertising Seaman Paper's composting operations and MassNatural Products with an intent not to sell it as advertised, in violation of 93A §2(a); and

    c.   Failing to disclose the material information that, as a result of Seaman Paper's and MassNatural's arranging for the transport, disposal, storage, or treatment of PFAS6-contaminated materials, deemed hazardous material under Massachusetts law, MassNatural products contained unsafe PFAS6 chemicalsand that MassNatural product users were at risk of suffering adverse health effects, in violation of 93A §2(a).

216.   Defendant Seaman Paper's deceptive trade practices significantly impacted the public, because there are at least hundreds of consumers of MassNatural Products, including Plaintiffs, the Class Members, and the Consumer Subclass Members.

217.   Defendant Seaman Paper's false representations and omissions were material because they were likely to deceive reasonable consumers to induce them to purchase MassNatural products without being aware that MassNatural products were unsafe to use.

218.   As a direct and proximate result of Seaman Paper's and MassNatural's unfair and deceptive acts or practices, Plaintiffs, the Class Members, and the Consumer Subclass Members suffered damages by purchasing MassNatural Products because they would not have purchased MassNatural Products had they known the truth, and they received a product that was worthless or worth substantially less because it is unsafe to use.

219.   Defendant Seaman Paper's deceptive trade practices caused injury in fact and actual damages to Plaintiffs, the Class Members, and the Consumer Subclass Members in the form of the loss or diminishment of value of those MassNatural products purchased by Plaintiffs, the Class, and the Massachusetts Subclass, which caused Defendant Seaman Paper and Defendant MassNatural to profit at the expense of Plaintiffs, members of the Class, and members of the Consumer Subclass. The injuries to Plaintiffs, the Class, and the Massachusetts Subclass

were to legally protected interests. The gravity of the harm of Defendant MassNatural's actions is significant and there is no corresponding benefit to consumers of such conduct.

220.    Plaintiffs, the Class, and the Consumer Subclass seek relief under 93A §9 including, not limited to, compensatory damages, statutory damages, restitution, penalties, injunctive relief, and/or attorneys' fees and costs.

ELEVENTH CLAIM FOR RELIEF
PRIVATE NUISANCE
(Against Defendant Seaman Paper)

221.    Plaintiffs and the Class Members re-allege and incorporate here the allegations set forth above.

222.    At all relevant times, Seaman Paper knew or should have known PFAS6 chemicals were hazardous and harmful to real property, water, and human beings and it was substantially certain that the method and manner of Seaman Paper's disposal of materials contaminated with PFAS6 at MassNatural's business at Otter Farm would cause injuries and property damage to Plaintiffs and the Class Members.

223.    Seaman Paper, through the negligent, reckless and/or intentional conduct as alleged in this Complaint, has caused contamination with PFAS6 of real property owned and/or possessed by Plaintiffs and the Class Members.

224.    Seaman Paper created a hazardous condition or activity on property at Otter Farm that caused substantial, unreasonable, and foreseeable interference with Plaintiffs' and the Class Members' use and enjoyment of their property. Seaman Paper's interference has caused and is causing Plaintiffs and the Class Members to, among other things, refrain from using their land to cultivate and grow fruit, vegetables, and other food and to refrain from using their water to drink, cook, or bathe, resulting in significant inconvenience and expense.

50

225.     By causing contamination with PFAS6 of real property owned and/or possessed by Plaintiffs and the Class Members, Seaman Paper also has substantially interfered otherwise with the Plaintiffs' and Class Members' ability to enjoy their property, to avail themselves of their property's value as an asset and/or source of collateral for financing, and to use their property in the manner that each Class Member chooses.

226.     Seaman Paper's conduct was intentional, negligent, reckless, and ultrahazardous and constitutes a continuous invasion of the property rights of Plaintiffs and the Class Members.

227.     As a direct and proximate result of Seaman Paper's dumping, disposal, and/or distribution of PFAS6 at Otter Farm and the resulting exposure of the persons and/or property of Plaintiffs and the Class Members to PFAS6 resulting from the conduct of Seaman Paper, Plaintiffs and the Class Members presently suffer, and will continue to suffer, real property damage, out of pocket expense, personal property damage, loss of use and enjoyment of property, diminution in property value, the necessity for long-term medical monitoring, annoyance, upset, aggravation, trauma, and inconvenience.

228.     Plaintiffs and the Class Members are therefore entitled to damages, costs, and a judgment that the nuisance be abated and removed.

<u>TWELFTH CLAIM FOR RELIEF</u>
PUBLIC NUISANCE
(Against Defendant Seaman Paper)

229.     Plaintiffs and the Class Members re-allege and incorporate here the allegations set forth above.

230.     At all relevant times, Seaman Paper knew or should have known PFAS6 to be hazardous and harmful to real property and human beings, and it was substantially certain that its use, emission, discharge, disposal, and/or distribution of materials containing PFAS6 at Otter

Farm would cause injuries and losses to the persons and property of Plaintiffs and the Class Members.

231.    Plaintiffs, the Class Members, and members of the public have a common right to enjoy their real property free of dangerous contamination of their land and water and to live their lives without exposure to unreasonable levels of toxic PFAS6 chemicals.

232.    Seaman Paper's conduct in arranging for the transport, dumping, and disposal of PFAS6-contaminated materials at Otter Farm—deemed hazardous material under Massachusetts law—has contaminated groundwater that supplies water to Plaintiffs, the Class Members and the public and substantially and unreasonably infringes upon and transgresses the public right of Plaintiffs, the Class Members, and members of the public to enjoy their real property.

233.    Seaman Paper knew or should have known that the materials containing PFAS6 they dumped, discharged, and disposed of at Otter Farm would have a deleterious effect upon the health, safety, and well-being of people living near Otter Farm, including Plaintiffs and the Class Members.

234.    Seaman Paper's use, emission, discharge, disposal, and/or distribution of materials containing PFAS6 at Otter Farm caused those who owned and/or lived on nearby properties, including Plaintiffs and the Class Members, to come into contact with high levels of PFAS6 on a routine and constant basis, causing substantially elevated risks of health problems resulting from exposure to dangerous levels of PFAS6, as well as property damage and diminished property values.

235.    As a direct and proximate result of Seaman Paper's use, emission, discharge, disposal, and/or distribution of materials containing PFAS6 at Otter Farm Defendants' use,

Plaintiffs and the Class Members' common right to live free of dangerous, toxic substances was eliminated and/or severely diminished.

236.    As a direct and proximate result of Seaman Paper's use, emission, discharge, disposal, and/or distribution of materials containing PFAS6 at Otter Farm, PFAS6 chemicals contaminated the land and water owned, possessed and/or used by Plaintiffs and the Class Members, thereby exposing their bodies to PFAS6.

237.    As a direct and proximate result of Seaman Paper's use, emission, discharge, disposal, and/or distribution of materials containing PFAS6 at Otter Farm, Plaintiffs and the Class Members will be forced to pay for the private removal of contaminants from their property emanating from pollution of public water sources.

238.    As a direct and proximate result of Seaman Paper's use, emission, discharge, disposal, and/or distribution of materials containing PFAS6 at Otter Farm and the resulting exposure of Plaintiffs and the Class Members to PFAS6, Plaintiffs and the Class Members presently suffer, and will continue to suffer, real property damage, out of pocket expenses, personal property damage, loss of use and enjoyment of property, diminution in property value, the necessity for long-term medical monitoring, annoyance, upset, aggravation, trauma, and inconvenience.

THIRTEENTH CLAIM FOR RELIEF
ULTRAHAZARDOUS ACITIVITY/STRICT LIABILITY
(Against Defendant Seaman Paper)

239.    Plaintiffs and the Class Members re-allege and incorporate here the allegations set forth above.

240.    Seaman Paper's use, emission, discharge, disposal, and/or distribution of materials containing PFAS6 at Otter Farm has constituted an ultrahazardous activity.

241.     Seaman Paper's use, emission, discharge, disposal, and/or distribution of materials containing PFAS6 at Otter Farm has constituted an abnormally dangerous activity and cannot be made safe by the exercise of the utmost care. The conduct of Seaman Paper in the use, transport, disposal, storage, emissions, discharge, distribution, sale and/or treatment of PFAS6-contaminated materials caused contamination of land and groundwater by PFAS6, which poses a high degree of risk of injury and loss to Plaintiffs and the Class Members.

242.     The presence of PFAS6 contaminants in the environment and the human body poses an inherent and extraordinary threat to human health and well-being and a danger of lasting contamination of property and water.

243.     The contamination of the property, water, and bodies of Plaintiffs and the Class Members were all probable and foreseeable consequences that resulted from Seaman Paper's use, emission, discharge, disposal, and/or distribution of materials containing PFAS6 at Otter Farm.

244.     There is a reasonable likelihood that Seaman Paper's use, emission, discharge, disposal, and/or distribution of materials containing PFAS6 at Otter Farm near the populated areas of Westminster, Massachusetts and the surrounding area will result in life-threatening cancer and other illnesses, diseases, and disease processes for Plaintiffs and the Class Members. Seaman Paper's decision to engage in the use, emission, discharge, disposal, and/or distribution of materials containing PFAS6 at Otter Far, thereby causing large amounts of PFAS6 to be dispersed into the surrounding community, was unreasonably dangerous.

245.     Seaman Paper's use, emission, discharge, disposal, and/or distribution of materials containing PFAS6 at Otter Farm created a high risk of harm to those who live in the area, including Plaintiffs and the Class Members, and substantially increased the risk of

community residents, including Plaintiffs and the Class Members, developing cancer and other illnesses, diseases, or disease processes.

246.    The activities conducted by Seaman Paper have been and are exceedingly dangerous, while offering little or no value to the surrounding community.

247.    Because the activities engaged in by Seaman Paper as outlined in this Complaint are ultrahazardous, Seaman Paper is strictly liable for any injuries proximately resulting from those activities.

248.    As a direct and proximate result of Seaman Paper's ultrahazardous activities and the exposure of Plaintiffs and the Class Members to PFAS6 chemicals resulting from those activities, Plaintiffs and the Class Members presently suffer, and will continue to suffer, real property damage, out of pocket expense, personal property damage, loss of use and enjoyment of property, diminution in property value, the necessity for long-term medical monitoring, upset, aggravation, and inconvenience.

FOURTEENTH CLAIM FOR RELIEF
WILLFUL AND WANTON CONDUCT
(Against Defendant Seaman Paper)

249.    Plaintiffs and the Class Members re-allege and incorporate here the allegations set forth above.

250.    At all times relevant, Seaman Paper owed a duty to refrain from willful, wanton, reckless, and/or outrageous conduct and/or conduct that exhibited an utter indifference to and/or conscious disregard for the health, safety, and well-being of Plaintiffs and the Class Members.

251.    Upon information and belief, Seaman Paper at all relevant times was aware of the considerable health risks associated with the discharge of PFAS6 into soil, groundwater, and

consumer products, including the risk of causing various forms of cancer to those exposed by PFAS6 from soil, water, or other exposures.

252.    Upon information and belief, Seaman Paper at all relevant times knew that its use, emission, discharge, disposal, and/or distribution of materials containing PFAS6 or likely to contain PFAS6 would be likely to result in the emission of unreasonably dangerous levels of PFAS6 into the soil and groundwater in a manner that would be likely to cause significant financial and personal injury to Plaintiffs and the Class Members.

253.    Notwithstanding this knowledge, Seaman Paper acted in a manner that was intentional, willful, wanton, reckless, outrageous, and/or demonstrated an indifference to and/or conscious disregard of the health, safety, and well-being of Plaintiffs and the Class Members by, among other things:

> a.    Failing to test and/or screen materials it was dumping or disposing of at Otter Farm, when it knew doing so was required to ensure safe composting without the substantial risk of contaminating soil, groundwater, and consumer products;
>
> b.    Failing to take reasonable steps to prevent or minimize the accumulation and emission of PFAS6 chemicals in materials it dumped or disposed of at Otter Farm, into the soil, when it knew doing so was necessary to prevent significant financial and/or personal injury to Plaintiffs and the Class Members;
>
> c.    Dumping and/or disposing of PFAS6-contaminated waste products at Otter Farm, despite knowing that doing so would likely cause PFAS6 contamination

and the resulting significant financial and/or personal injury to Plaintiffs, the Class Members, and/or the Consumer Subclass;

d.   Failing to employ safe methods of operation to adequately prevent, control or eliminate PFAS discharge into the environment when it knew doing so was necessary to prevent significant financial and/or personal injury to Plaintiffs and the Class Members;

e.   Failing to institute proper procedures and training to prevent, minimize, and/or promptly and effectively respond to its release of PFAS6 into the environment when it knew doing so was necessary to prevent significant financial and/or personal injury to Plaintiffs and the Class Members;

f.   Failing to promptly and effectively respond to its release of PFAS6 into the environment when it knew doing so was necessary to prevent significant financial and/or personal injury to Plaintiffs and the Class Members;

g.   Failing to warn Plaintiffs and the Class Members of their use, emission, discharge, disposal, and/or distribution of materials containing PFAS6 at Otter Farm, when it knew doing so was necessary to prevent significant financial and/or personal injury to Plaintiffs and the Class Members;

h.   Failing to ensure it was dumping or disposing of its waste products in an unpopulated or much less populated area when it knew doing so was necessary to prevent significant financial and/or personal injury to Plaintiffs and the Class Members;

i.   Discharging dangerous amounts of PFAS6 into land and groundwater near a populated community, when it knew doing so would likely cause significant financial and/or personal injury to Plaintiffs and the Class Members; and

j.   Failing to warn current and potential neighboring residents and property owners that they were being exposed to PFAS6 and of the consequent risks of disease the residents acquired because of that exposure when it knew doing so was necessary to prevent significant financial and/or personal injury to Plaintiffs and the Class Members.

254.   As a direct and proximate result of Seaman Paper's willful, wanton, and reckless conduct, Plaintiffs and the Class Members have suffered, presently suffer, and will continue to suffer, real property damage, out of pocket expense, personal property damage, loss of use and enjoyment of property, diminution in property value, the necessity for long-term medical monitoring, annoyance, upset, aggravation, and inconvenience.

<u>FIFTEENTH CLAIM FOR RELIEF</u>
MEDICAL MONITORING
(Against Defendant Otter Farm)

255.   Plaintiffs and the Class Members re-allege and incorporate here the allegations set forth above.

256.   Plaintiffs and Class Members have been actually and significantly exposed to dangerous levels of PFAS6, levels that exceed the levels deemed dangerous by the MassDEP and that are far higher than normal background levels. As is reported by the EPA, PFAS6 are dangerous, hazardous, toxic substances that have been proven to cause disease and illness in humans, including but not limited to certain kidney and reproductive cancers.

257.    Plaintiffs and the Class Members' actual and significant exposure to these dangerous levels of PFAS6 is the direct and proximate result of Defendant Otter Farm's intentional, willful, wanton, reckless and/or negligent conduct in its operations at Otter Farm, specifically its use, storage, emission, discharge, disposal, and/or distribution of PFAS6 chemicals.

258.    As a direct and proximate result of Defendant Otter Farm's intentional, willful, wanton, reckless and/or negligent conduct in connection with the operations at Otter Farm, specifically the use, storage, emission, discharge, disposal, and/or distribution of PFAS6 chemicals, Plaintiffs and the Class Members have been exposed to dangerous levels of PFAS6 and are at an increased risk of developing cancer and other illnesses, diseases and disease processes, which results in their present medical need for periodic diagnostic medical examinations and monitoring.

259.    Diagnostic testing of Plaintiffs and the Class Members for early detection of cancer and other illnesses, diseases, and disease processes caused by exposure to PFAS6 chemicals is reasonably and medically necessary to assure early diagnosis and effective treatment of those conditions.

260.    Plaintiffs and the Class Members have suffered the present harm of the need for the cost of diagnostic testing for the early detection of cancer and other illnesses, diseases, and disease processes. As a direct and proximate result of Otter Farm's intentional, willful, wanton, reckless, and/or negligent acts or omissions in connection with its operations at Otter Farm, specifically the use, storage, emission, discharge, disposal, and/or distribution of PFAS6 chemicals, Plaintiffs and the Class Members require an award of the cost of a medical

monitoring program necessary for early detection and treatment of the onset of illnesses, diseases, and disease processes.

261.    Monitoring procedures exist that make possible the early detection of cancer, the progression of biomarker abnormalities, and other illnesses, diseases, and disease processes resulting from exposure to PFAS6. These monitoring procedures will benefit Plaintiffs and the Class Members, and they are different from what would normally be recommended in the absence of PFAS6 exposure. Such diagnostic testing is reasonably and medically necessary due to the exposure of Plaintiffs and the Class Members to PFAS6 caused by defendants.

262.    Because Plaintiffs and the Class Members' claims are based solely on the amount of exposure to PFAS6 caused by Defendants, any alleged alternative exposure, or prior medical or family history, is not a basis for Plaintiffs' and the Class Member's claims in this case.

263.    As a result, Plaintiffs and the Class should be awarded the quantifiable costs of such a monitoring regime. Plaintiffs and the Class Members also seek all other available and necessary relief in connection with this claim.

SIXTEENTH CLAIM FOR RELIEF
NEGLIGENCE
(Against Defendant Otter Farm)

264.    Plaintiffs and the Class Members re-allege and incorporate here the allegations set forth above.

265.    Otter Farm owed Plaintiffs and the Class Members a duty of reasonable care to avoid using, storing, emitting, discharging, disposing, and/or distributing PFAS6 in a manner that would cause Plaintiffs and the Class Members injury or harm. Plaintiffs and the Class Members were located within the scope of the risk created by the Otter Farm's conduct and they

60

were foreseeable victims of any negligent operations at Otter Farm, including the use, storage, emission, discharge, disposal, sale, and/or distribution of PFAS6

266.    Otter Farm owed Plaintiffs and the Class Members a duty of reasonable care to eliminate or minimize the discharge of PFAS6 into the soil and water, commensurate with the risk of using, emitting, discharging, disposing, and/or distributing PFAS6.

267.    Given the likelihood that Otter Farm was creating PFAS6 contamination of land and water that would result in exposure to nearby residents, increasing the risk that those residents would develop significant illnesses or diseases, Otter Farm also had a duty to use reasonable care to avoid, minimize, or warn about their use, storage, emission, discharge, disposal, and/or distribution of PFAS6.

268.    Otter Farm breached its duty to use reasonable care in one or more of the following ways:

   a.   By negligently failing to use reasonable care to ensure testing and/or screening of Incoming Composing Materials;

   b.   By negligently permitting composting operations without taking reasonable steps to prevent or minimize the accumulation and emission of PFAS6 chemicals into the soil, groundwater;

   c.   By negligently failing to employ and/or enforce safe methods of operation at Otter Farm to adequately prevent, control or eliminate PFAS discharge into the environment;

   d.   By negligently failing to institute or enforce proper procedures and training to prevent, minimize, and/or promptly and effectively respond to its release of PFAS6 into the environment;

61

e.  By negligently failing to promptly and effectively respond to its release of PFAS6 into the environment;

f.  By negligently failing to warn Plaintiffs and the Class Members of the PFAS6 they were using, storing, emitting, discharging, disposing, selling, and/or distributing;

g.  By permitting dangerous operations in a populated area and/or by negligently discharging dangerous amounts of PFAS6 into land and groundwater near a populated community; and

h.  By negligently failing to warn current and potential neighboring residents and property owners that they were being exposed to PFAS6 and of the consequent risks of disease the residents acquired because of that exposure.

269.    As a direct and proximate result of Otter Farm's negligence, Plaintiffs and the Class Members have suffered, presently suffer, and will continue to suffer, real property damage, out of pocket expenses, personal property damage, loss of use and enjoyment of property, diminution in property value, the necessity for long-term medical monitoring, upset, aggravation, and inconvenience.

270.    Otter Farm is liable to Plaintiffs and the Class Members for fair compensation for the resulting injuries, which includes pain and suffering; reasonable expenses incurred for medical care and nursing in the treatment and cure of the injury; diminution in earning capacity; and pain and suffering and such medical expenses and diminution in earning capacity as are shown to be reasonably probable to continue in the future.

SEVENTEENTH CLAIM FOR RELIEF
MASSACHUSETTS CONSUMER PROTECTION ACT
Mass. Gen. Laws ch. 93, §§1, *et seq.*
(Against Defendant Otter Farm)

271.    Plaintiffs and the Class Members re-allege and incorporate here the allegations set forth above.

272.    Plaintiffs and the Class Members intend to assert and prosecute claims against Otter Farm under the under Massachusetts Consumer Protection Law, M.G.L.A. ch. 93A §1, *et seq.* ("MCPL"). This Count provides notice that this Complaint shall be amended to demand all appropriate relief once Plaintiffs have provided notice pursuant to M.G.L. ch. 93A §9(3) to Otter Farm and the statutory period for a response has passed, subject to any response by Otter Farm.

273.    Otter Farm is a "person" as defined by M.G.L.A. 93A §1(a).

274.    Plaintiffs and members of the Consumer Subclass are consumers of MassNatural consumer products produced at Otter Farm.

275.    Otter Farm engaged in deceptive or unfair acts or practices in the in the conduct of trade or commerce, in violation of M.G.L. 93A §2(a), including but not limited to the following:

a.    Knowingly or recklessly making a false representation as to the characteristics and use of components of MassNatural products, in violation of 93A §2(a);

b.    Falsely representing that components of MassNatural Products and MassNatural Products are safe for use, in violation of 93A §2(a);

c.    Advertising components of MassNatural Products and MassNatural Products with an intent not to sell it as advertised, in violation of 93A §2(a); and

d.    Failing to disclose the material information that, as a result of MassNatural's arranging for the transport, disposal, storage, or treatment of PFAS6-

contaminated materials, deemed hazardous material under Massachusetts law,
MassNatural products contained unsafe PFAS6 chemicals and that
MassNatural product users were at risk of suffering adverse health effects, in
violation of 93A §2(a).

276.    Otter Farm's deceptive trade practices significantly impacted the public, because
there are at least hundreds of consumers of MassNatural Products, including Plaintiffs, the Class
Members, and the Consumer Subclass Members.

277.    Otter Farm's false representations and omissions were material because they were
likely to deceive reasonable consumers to induce them to purchase MassNatural products
without being aware that MassNatural products were unsafe to use.

278.    As a direct and proximate result of Otter Farm's unfair and deceptive acts or
practices, Plaintiffs, the Class Members, and the Consumer Subclass Members suffered damages
by purchasing MassNatural Products because they would not have purchased MassNatural
Products had they known the truth, and they received a product that was worthless or worth
substantially less because it is unsafe to use.

279.    Defendant Otter Farm's deceptive trade practices caused injury in fact and actual
damages to Plaintiffs, the Class Members, and the Consumers Subclass Members in the form of
the loss or diminishment of value of those MassNatural products purchased by Plaintiffs, the
Class, and the Massachusetts Subclass, which caused MassNatural to profit at the expense of
Plaintiffs, members of the Class, and members of the Consumer Subclass. The injuries to
Plaintiffs, the Class, and the Massachusetts Subclass were to legally protected interests. The
gravity of the harm of Defendant Otter Farm's actions is significant and there is no
corresponding benefit to consumers of such conduct.

280.     Plaintiffs, the Class, and the Consumer Subclass seek relief under 93A §9 including, not limited to, compensatory damages, statutory damages, restitution, penalties, injunctive relief, and/or attorneys' fees and costs.

EIGHTEENTH CLAIM FOR RELIEF
PRIVATE NUISANCE
(Against Defendant Otter Farm)

281.     Plaintiffs and the Class Members re-allege and incorporate here the allegations set forth above.

282.     At all relevant times, Otter Farm knew or should have known PFAS6 chemicals were hazardous and harmful to real property, water, and human beings, and it was substantially certain that the method and manner of Otter Farm's PFAS6 use, storage, emission, discharge, disposal, sale and/or distribution of PFAS6 would cause injuries and property damage to Plaintiffs and the Class Members.

283.     Otter Farm, through the negligent, reckless and/or intentional conduct as alleged in this Complaint, has contaminated real property owned and/or possessed by Plaintiffs and the Class Members.

284.     Otter Farm created, permitted, and maintained a hazardous condition or activity on property that caused substantial and unreasonable interference with Plaintiffs' and the Class Members' use and enjoyment of their property. Defendants' interference has caused and is causing Plaintiffs and the Class Members to, among other things, refrain from using their land to cultivate and grow fruit, vegetables, and other food and to refrain from using their water to drink, cook, or bathe, resulting in significant inconvenience and expense.

285.     Otter Farm's contamination with PFAS6 of real property owned and/or possessed by Plaintiffs and the Class Members also has substantially interfered otherwise with the

65

Plaintiffs' and Class Members' ability to enjoy their property, to avail themselves of their property's value as an asset and/or source of collateral for financing, and to use their property in the manner that each Class Member chooses.

286.    Otter Farm's conduct was intentional, negligent, reckless, and ultrahazardous and its conduct constitutes a continuous invasion of the property rights of Plaintiffs and the Class Members.

287.    As a direct and proximate result of Otter Farm's use, storage, emission, discharge, disposal, sale, and/or distribution of PFAS6 and the exposure of the persons and/or property of Plaintiffs and the Class Members to PFAS6 resulting from the conduct of Defendants, Plaintiffs and the Class Members presently suffer, and will continue to suffer, real property damage, out of pocket expense, personal property damage, loss of use and enjoyment of property, diminution in property value, the necessity for long-term medical monitoring, annoyance, upset, aggravation, trauma, and inconvenience.

288.    Plaintiffs and the Class Members are therefore entitled to damages, costs, and a judgment that the nuisance be abated and removed.

NINETEENTH CLAIM FOR RELIEF
PUBLIC NUISANCE
(Against Defendant Otter Farm)

289.    Plaintiffs and the Class Members re-allege and incorporate here the allegations set forth above.

290.    At all relevant times, Otter Farm knew or should have known PFAS6 to be hazardous and harmful to real property and human beings, and it was substantially certain that its use, emission, discharge, disposal, and/or distribution of materials containing PFAS6 would cause injuries and losses to the persons and property of Plaintiffs and the Class Members.

66

291. Plaintiffs, the Class Members, and members of the public have a common right to enjoy their real property free of dangerous contamination of their land and water and to live their lives without exposure to unreasonable levels of toxic PFAS6 chemicals.

292. Otter Farm's conduct in arranging for or allowing the transport, disposal, storage or treatment of PFAS6-contaminated materials at Otter Farm—deemed hazardous material under Massachusetts law—has contaminated groundwater that supplies water to Plaintiffs, the Class members and the public and substantially and unreasonably infringes upon and transgresses the public right of Plaintiffs, the Class Members, and members of the public to enjoy their real property.

293. Otter Farm knew or should have known that the materials containing PFAS6 they used, stored, emitted, discharged, disposed, sold, and/or distributed would have a deleterious effect upon the health, safety, and well-being of people living in Westminster, Massachusetts and the surrounding areas, including Plaintiffs and the Class Members.

294. Otter Farm's use, storage, composting, emission, discharge, disposal, sale, and/or distribution of PFAS6 caused those who owned and/or lived on nearby properties, including Plaintiffs and the Class Members, to come into contact with high levels of PFAS6 on a routine and constant basis, causing substantially elevated risks of health problems resulting from exposure to dangerous levels of PFAS6, as well as property damage and diminished property values.

295. As a direct and proximate result of Otter Farm's use, storage, composting emission, discharge, disposal, sale, and/or distribution of materials containing PFAS6, Plaintiffs' and the Class Members' common right to live free of dangerous, toxic substances was eliminated and/or severely diminished.

296.     As a direct and proximate result of Otter Farm's use, storage, emission, discharge, disposal, sale, and/or distribution of PFAS6 in Westminster, Massachusetts and the surrounding area, PFAS6 chemicals contaminated the land and water owned, possessed and/or used by Plaintiffs and the Class Members, thereby exposing their bodies to PFAS6.

297.     As a direct and proximate result of Otter Farm's use, storage, emission, discharge, disposal, sale, and/or distribution of PFAS6, Plaintiffs and the Class Members will be forced to pay for the private removal of contaminants from their property emanating from pollution of public water sources.

298.     As a direct and proximate result of Defendants' use, storage, emission, discharge, disposal, and/or distribution of PFAS6 and the resulting exposure of Plaintiffs and the Class Members to PFAS6, Plaintiffs and the Class Members presently suffer, and will continue to suffer, real property damage, out of pocket expenses, personal property damage, loss of use and enjoyment of property, diminution in property value, the necessity for long-term medical monitoring, annoyance, upset, aggravation, trauma, and inconvenience.

TWENTIETH CLAIM FOR RELIEF
ULTRAHAZARDOUS ACITIVITY/STRICT LIABILITY
(Against Defendant Otter Farm)

299.     Plaintiffs and the Class Members re-allege and incorporate here the allegations set forth above.

300.     Otter Farm's use, transport, disposal, storage, emissions, discharge, distribution, sale, and/or treatment of PFAS6, constitutes an ultrahazardous activity.

301.     Otter Farm's use, transport, disposal, storage, emissions, discharge, distribution, sale, and/or treatment of PFAS6 constitutes an abnormally dangerous activity and cannot be made safe by the exercise of the utmost care. The conduct of Otter Farm in the use, transport,

68

disposal, storage, emissions, discharge, distribution, sale and/or treatment of PFAS6 caused

contamination of land and groundwater by PFAS6, which poses a high degree of risk of injury

and loss to Plaintiffs and the Class Members.

302.    The presence of PFAS6 contaminants in the environment and the human body

poses an inherent and extraordinary threat to human health and well-being and a danger of

lasting contamination of property and water.

303.    The contamination of the property, water, and bodies of Plaintiffs and the Class

Members were all probable and foreseeable consequences that resulted from Otter Farm's use,

emission, discharge, disposal, sale, and/or distribution of PFAS6 chemicals.

304.    There is a reasonable likelihood that MassNatural's use, transport, disposal,

storage, emissions, discharge, distribution, sale, and/or treatment of PFAS6 in the populated

areas of Westminster, Massachusetts and the surrounding area will result in life-threatening

cancer and other illnesses, diseases, and disease processes for Plaintiffs and the Class Members.

Otter Farm's decision to engage in or allow the use, transport, disposal, storage, emissions,

discharge, distribution, sale, and/or treatment of PFAS6 on and from Otter Farm, thereby causing

large amounts of PFAS6 to be dispersed into the surrounding community, was unreasonably

dangerous.

305.    Otter Farm's use, transport, disposal, storage, emissions, discharge, distribution,

sale, and/or treatment of PFAS6 created a high risk of harm to those who live in the area,

including Plaintiffs and the Class Members, and substantially increased the risk of community

residents, including Plaintiffs and the Class Members, developing cancer and other illnesses,

diseases, or disease processes.

306.     The activities conducted by Otter Farm have been and are exceedingly dangerous, while offering little or no value to the surrounding community.

307.     Because the activities engaged in by Otter Farm as outlined in this Complaint are ultrahazardous, Otter Farm is strictly liable for any injuries proximately resulting from those activities.

308.     As a direct and proximate result of Otter Farm's ultrahazardous activities and the exposure of Plaintiffs and the Class Members to PFAS6 chemicals resulting from those activities, Plaintiffs and the Class Members presently suffer, and will continue to suffer, real property damage, out of pocket expense, personal property damage, loss of use and enjoyment of property, diminution in property value, the necessity for long-term medical monitoring, upset, aggravation, and inconvenience.

TWENTY-FIRST CLAIM FOR RELIEF
WILLFUL AND WANTON CONDUCT
(Against Defendant Otter Farm)

309.     Plaintiffs and the Class Members re-allege and incorporate here the allegations set forth above.

310.     At all times relevant, Otter Farm owed a duty to refrain from willful, wanton, reckless, and/or outrageous conduct and/or conduct that exhibited an utter indifference to and/or conscious disregard of the health, safety, and well-being of Plaintiffs and the Class Members.

311.     Upon information and belief, Otter Farm at all relevant times was aware of the considerable health risks associated with the discharge of PFAS6 into soil, groundwater, and consumer products, including the risk of causing various forms of cancer to those exposed by PFAS6 from soil, water, or other exposures.

312.    Upon information and belief, Otter Farm at all relevant times knew that the use, storage, emission, discharge, disposal, sale, and/or distribution of materials containing PFAS6 at Otter Farm and the receipt and composting of waste and byproducts generated during the production of paper at Otter Farm would be likely to result in the emission of unreasonably dangerous levels of PFAS6 into the soil and groundwater in a manner that would be likely to cause significant financial and personal injury to Plaintiffs and the Class Members.

313.    Notwithstanding this knowledge, Otter Farm acted in a manner that was intentional, willful, wanton, reckless, outrageous, and/or demonstrated an indifference to and/or conscious disregard of the health, safety, and well-being of Plaintiffs and the Class Members by, among other things:

    a.  Failing to test and/or screen or ensure there was testing and screening of Incoming Composing Materials, when it knew doing so was required to ensure safe composting without the substantial risk of contaminating soil, groundwater, and consumer products;

    b.  Conducting and/or permitting composting operations at Otter Farm without taking reasonable steps to prevent or minimize the accumulation and emission of PFAS6 chemicals into the soil, groundwater, when it knew doing so was necessary to prevent significant financial and/or personal injury to Plaintiffs and the Class Members;

    c.  Failing to employ safe methods of operation to adequately prevent, control or eliminate PFAS discharge into the environment when it knew doing so was necessary to prevent significant financial and/or personal injury to Plaintiffs and the Class Members;

d.  Failing to institute proper procedures and training to prevent, minimize, and/or promptly and effectively respond to its release of PFAS6 into the environment when it knew doing so was necessary to prevent significant financial and/or personal injury to Plaintiffs and the Class Members;

e.  Failing to promptly and effectively respond to its release of PFAS6 into the environment when it knew doing so was necessary to prevent significant financial and/or personal injury to Plaintiffs and the Class Members;

f.  Failing to warn Plaintiffs and the Class Members of the PFAS6 being used, stored, emitted, discharged, disposed, sold, and/or distributed at or from Otter Farm, when it knew doing so was necessary to prevent significant financial and/or personal injury to Plaintiffs and the Class Members;

g.  Permitting the accumulation and discharge of PFAS6 at and from Otter Creek, when it knew doing so was necessary to prevent significant financial and/or personal injury to Plaintiffs and the Class Members;

h.  Discharging dangerous amounts of PFAS6 into land and groundwater near a populated community, when it knew doing so would likely cause significant financial and/or personal injury to Plaintiffs and the Class Members; and

i.  Failing to warn current and potential neighboring residents and property owners that they were being exposed to PFAS6 and of the consequent risks of disease the residents acquired because of that exposure when it knew doing so was necessary to prevent significant financial and/or personal injury to Plaintiffs and the Class Members.

314.     As a direct and proximate result of Otter Farm's willful, wanton, and reckless conduct, Plaintiffs and the Class Members have suffered, presently suffer, and will continue to suffer, real property damage, out of pocket expense, personal property damage, loss of use and enjoyment of property, diminution in property value, the necessity for long-term medical monitoring, annoyance, upset, aggravation, and inconvenience.

TWENTY-SECOND CLAIM
MEDICAL MONITORING
(Against the Greif Defendants)

315.     Plaintiffs and the Class Members re-allege and incorporate here the allegations set forth above.

316.     Plaintiffs and Class Members have been actually and significantly exposed to dangerous levels of PFAS6, levels that exceed the levels deemed dangerous by the MassDEP and that are far higher than normal background levels. As is reported by the EPA, PFAS6 are dangerous, hazardous, toxic substances that have been proven to cause disease and illness in humans, including but not limited to certain kidney and reproductive cancers.

317.     Upon information and belief, Plaintiffs' and the Class Members' actual and significant exposure to these dangerous levels of PFAS6 is the direct and proximate result of the Greif Defendants' intentional, willful, wanton, reckless and/or negligent conduct in connection with the Greif Defendants' disposal of waste materials contaminated with PFAS6 chemicals at MassNatural's operations at Otter Farm.

318.     As a direct and proximate result of the Greif Defendants' intentional, willful, wanton, reckless and/or negligent conduct in connection with disposal of waste materials contaminated with PFAS6 chemicals at MassNatural's operations at Otter Farm, Plaintiffs and the Class Members have been exposed to PFAS6 at dangerous levels and so are at an increased

risk of developing cancer and other illnesses, diseases and disease processes, which results in their present medical need for periodic diagnostic medical examinations and monitoring.

319.   Diagnostic testing of Plaintiffs and the Class Members for early detection of cancer and other illnesses, diseases, and disease processes caused by exposure to PFAS6 chemicals is reasonably and medically necessary to assure early diagnosis and effective treatment of those conditions.

320.   Plaintiffs and the Class Members have suffered the present harm of the need for the cost of diagnostic testing for the early detection of cancer and other illnesses, diseases, and disease processes. As a direct and proximate result of the Greif Defendants' intentional, willful, wanton, reckless, and/or negligent acts or omissions in connection with its operations at Otter Farm, specifically the use, storage, emission, discharge, disposal, and/or distribution of PFAS6 chemicals, Plaintiffs and the Class Members require an award of the cost of a medical monitoring program necessary for early detection and treatment of the onset of illnesses, diseases, and disease processes.

321.   Monitoring procedures exist that make possible the early detection of cancer, the progression of biomarker abnormalities, and other illnesses, diseases, and disease processes resulting from exposure to PFAS6. These monitoring procedures will benefit Plaintiffs and the Class Members, and they are different from what would normally be recommended in the absence of PFAS6 exposure. Such diagnostic testing is reasonably and medically necessary due to the exposure of Plaintiffs and the Class Members to PFAS6 caused by Defendants.

322.   Because Plaintiffs' and the Class Members' claims are based solely on the amount of exposure to PFAS6 caused by Defendants, any alleged alternative exposure, or prior medical or family history, is not a basis for Plaintiffs and the Class Member's claims in this case.

323.     As a result, Plaintiffs and the Class should be awarded the quantifiable costs of such a monitoring regime. Plaintiffs and the Class Members also seek all other available and necessary relief in connection with this claim.

<u>TWENTH-THIRD CLAIM FOR RELIEF</u>
NEGLIGENCE
(Against the Greif Defendants)

324.     Plaintiffs and the Class Members re-allege and incorporate here the allegations set forth above.

325.     The Greif Defendants owed Plaintiffs and the Class Members a duty of reasonable care to avoid dumping, emitting, discharging, disposing, and/or distributing materials with high levels of PFAS6 chemicals in a manner and location that would cause Plaintiffs and the Class Members injury or harm. Plaintiffs and the Class Members were located within the scope of the risk created by the Greif Defendants' conduct and they were foreseeable victims of negligence disposal of contaminated waste by the Greif Defendants.

326.     The Greif Defendants owed Plaintiffs and the Class Members a duty of reasonable care to eliminate or minimize the disposal of PFAS6-contaminated waste in a manner and location where it would be expected to leach into the soil, water, and consumer products sold by MassNatural commensurate with the risk of discharging, disposing, and/or distributing PFAS6.

327.     Given the likelihood that the Greif Defendants were creating PFAS6 contaminated products and that contamination of land and water that would result in exposure of Westminster to PFAS6 thus increasing the risk that those residents would develop significant illnesses or diseases, the Greif Defendants also had a duty to use reasonable care to avoid, minimize, or warn about their use, emission, discharge, disposal, and/or distribution of materials containing high levels of PFAS6.

328.    The Greif Defendants breached their duty to use reasonable care in one or more of the following ways:

      a.  By negligently failing to use reasonable care to test and/or screen materials it was dumping or otherwise disposing of at MassNatural's operations at Otter Farm to ensure it was not disposing of materials that would be likely to contaminate soil, groundwater, and consumer products at Otter Farm;

      b.  By negligently dumping PFAS6-contaminated operations at Otter Farm without taking reasonable steps to prevent or minimize the accumulation and emission of PFAS6 chemicals into the soil, groundwater, and consumer products at Otter Farm;

      c.  By negligently failing to employ safe methods of disposal to adequately prevent, control or eliminate PFAS discharge into the environment;

      d.  By negligently failing to institute proper procedures and training to prevent, minimize, and/or promptly and effectively respond to the release of PFAS6 from its waste products into the environment;

      e.  By negligently failing to promptly and effectively respond to its release of PFAS6 into the environment;

      f.  By negligently failing to dispose of its contaminated manufacturing waste in a safer, unpopulated or much less populated area and/or by negligently discharging dangerous amounts of PFAS6 into land and groundwater near a populated community; and

      g.  By negligently failing to warn MassNatural and/or current and potential neighboring residents and property owners near Otter Farm that they were

being exposed to PFAS6 and of the consequent risks of disease the residents acquired because of that exposure.

329.    As a direct and proximate result of the Greif Defendants' negligence, Plaintiffs and the Class Members have suffered, presently suffer, and will continue to suffer, real property damage, out of pocket expenses, personal property damage, loss of use and enjoyment of property, diminution in property value, the necessity for long-term medical monitoring, upset, aggravation, and inconvenience.

330.    The Greif Defendants are liable to Plaintiffs and the Class Members for fair compensation for the resulting injuries, which includes pain and suffering; reasonable expenses incurred for medical care and nursing in the treatment and cure of the injury; diminution in earning capacity; and pain and suffering and such medical expenses and diminution in earning capacity as are shown to be reasonably probable to continue in the future.

TWENTY-FOURTH CLAIM FOR RELIEF
MASSACHUSETTS CONSUMER PROTECTION ACT
Mass. Gen. Laws ch. 93, §§1, *et seq.*
(Against Defendant the Greif Defendants )

331.    Plaintiffs and the Class Members re-allege and incorporate here the allegations set forth above.

332.    Plaintiffs and the Class Members intend to assert and prosecute claims against the Greif Defendants under the under Massachusetts Consumer Protection Law, M.G.L.A. ch. 93A §1, *et seq.* ("MCPL"). This Count provides notice that this Complaint shall be amended to demand all appropriate relief once Plaintiffs have provided notice pursuant to M.G.L. ch. 93A §9(3) to the Greif Defendants and the statutory period for a response has passed, subject to any response by the Greif Defendants.

333.    Each of the Greif Defendants is a "person" as defined by M.G.L. 93A §1(a).

334.    Plaintiffs and Consumer Subclass Members are consumers of MassNatural consumer products, which are made using Greif Paper.

335.    The Greif Defendants  engaged in deceptive or unfair acts or practices in the in the conduct of trade or commerce, in violation of M.G.L. 93A §2(a), including but not limited to the following:

      a.    Knowingly or recklessly making a false representation as to the characteristics and use of MassNatural products, in violation of 93A §2(a); and

      b.    Failing to disclose the material information that, as a result of MassNatural arranging for the transport, disposal, storage, or treatment of PFAS6-contaminated materials, deemed hazardous material under Massachusetts law, MassNatural products contained unsafe PFAS6 chemicals and that MassNatural product users were at risk of suffering adverse health effects, in violation of 93A §2(a).

336.    The Greif Defendants' deceptive trade practices significantly impacted the public, because there are millions of consumers of MassNatural Products, including Plaintiffs, the Class Members, and the Consumer Subclass.

337.    The Greif Defendants' false representations and omissions were material because they were likely to deceive reasonable consumers to induce them to purchase MassNatural products without being aware that MassNatural products were unsafe to use.

338.    As a direct and proximate result of the Greif Defendants' unfair and deceptive acts or practices, Plaintiffs, the Class Members, and the Consumer Subclass Members suffered damages by purchasing MassNatural Products because they would not have purchased

MassNatural Products had they known the truth, and they received a product that was worthless or worth substantially less because it is unsafe to use.

339.    The Greif Defendants' deceptive trade practices caused injury in fact and actual damages to Plaintiffs, the Class Members, and the Consumers Subclass Members in the form of the loss or diminishment of value of those MassNatural products purchased by Plaintiffs, the Class, and the Massachusetts Subclass, which caused MassNatural to profit at the expense of Plaintiffs, members of the Class, and Consumer Subclass Members. The injuries to Plaintiffs, the Class Members, and the Consumer Subclass Members were to legally protected interests. The gravity of the harm of Defendant Greif's actions is significant and there is no corresponding benefit to consumers of such conduct.

340.    Plaintiffs, the Class, and the Consumer Subclass seek relief under 93A §9 including, not limited to, compensatory damages, statutory damages, restitution, penalties, injunctive relief, and/or attorneys' fees and costs.

TWENTY-FIFTH CLAIM FOR RELIEF
PRIVATE NUISANCE
(Against the Greif Defendants)

341.    Plaintiffs and the Class Members re-allege and incorporate here the allegations set forth above.

342.    At all relevant times, the Greif Defendants knew or should have known PFAS6 chemicals were hazardous and harmful to real property, water, and human beings, and it was substantially certain that the method and manner of the Greif Defendants' disposal of materials contaminated with PFAS6 at MassNatural's business at Otter Farm would cause injuries and property damage to Plaintiffs and the Class Members.

343.    The Greif Defendants, through the negligent, reckless and/or intentional conduct as alleged in this Complaint, have caused contamination with PFAS6 of real property owned and/or possessed by Plaintiffs and the Class Members.

344.    The Greif Defendants created a hazardous condition or activity on property at Otter Farm that caused substantial, unreasonable, and foreseeable interference with Plaintiffs' and the Class Members' use and enjoyment of their property. The Greif Defendants' interference has caused and is causing Plaintiffs and the Class Members to, among other things, refrain from using their land to cultivate and grow fruit, vegetables, and other food and to use their water to drink, cook, or bathe, resulting in significant inconvenience and expense.

345.    By causing contamination with PFAS6 of real property owned and/or possessed by Plaintiffs and the Class Members, the Greif Defendants also have substantially interfered otherwise with the Plaintiffs' and Class Members' ability to enjoy their property, to avail themselves of their property's value as an asset and/or source of collateral for financing, and to use their property in the manner that each Class Member chooses.

346.    The Greif Defendants' conduct was intentional, negligent, reckless, and ultrahazardous and its conduct constitutes a continuous invasion of the property rights of Plaintiffs and the Class Members.

347.    As a direct and proximate result of the Greif Defendants' dumping, disposal, and/or distribution of PFAS6 at Otter Farm and the resulting exposure of the persons and/or property of Plaintiffs and the Class Members to PFAS6 resulting from the conduct of the Greif Defendants, Plaintiffs and the Class Members presently suffer, and will continue to suffer, real property damage, out of pocket expense, personal property damage, loss of use and enjoyment of

property, diminution in property value, the necessity for long-term medical monitoring, annoyance, upset, aggravation, trauma, and inconvenience.

348.    Plaintiffs and the Class Members are therefore entitled to damages, costs, and a judgment that the nuisance be abated and removed.

TWENTY-SIXTH CLAIM FOR RELIEF
PUBLIC NUISANCE
(Against the Greif Defendants)

349.    Plaintiffs and the Class Members re-allege and incorporate here the allegations set forth above.

350.    At all relevant times, the Greif Defendants knew or should have known PFAS6 to be hazardous and harmful to real property and human beings, and it was substantially certain that its use, emission, discharge, disposal, and/or distribution of materials containing PFAS6 at Otter Farm would cause injuries and losses to the persons and property of Plaintiffs and the Class Members.

351.    Plaintiffs, the Class Members, and members of the public have a common right to enjoy their real property free of dangerous contamination of their land and water and to live their lives without exposure to unreasonable levels of toxic PFAS6 chemicals.

352.    The Greif Defendants' conduct in arranging for the transport, dumping, and disposal of PFAS6-contaminated materials at Otter Farm—deemed hazardous material under Massachusetts law—has contaminated groundwater that supplies water to Plaintiffs, the Class Members and the public and substantially and unreasonably infringes upon and transgresses the public right of Plaintiffs, the Class Members, and members of the public to enjoy their real property.

353.   The Greif Defendants knew or should have known that the materials containing PFAS6 that it dumped, discharged, and disposed of at Otter Farm would have a deleterious effect upon the health, safety, and well-being of people living near Otter Farm, including Plaintiffs and the Class Members.

354.   Greif's use, emission, discharge, disposal, and/or distribution of materials containing PFAS6 at Otter Farm caused those who owned and/or lived on nearby properties, including Plaintiffs and the Class Members, to come into contact with high levels of PFAS6 on a routine and constant basis, causing substantially elevated risks of health problems resulting from exposure to dangerous levels of PFAS6, as well as property damage and diminished property values.

355.   As a direct and proximate result of the Greif Defendants' use, emission, discharge, disposal, and/or distribution of materials containing PFAS6 chemicals at the Otter Farm Property, Plaintiffs' and the Class Members' common right to live free of dangerous, toxic substances was eliminated and/or severely diminished.

356.   As a direct and proximate result of the Greif Defendants' use, emission, discharge, disposal, and/or distribution of materials containing PFAS6 at Otter Farm, PFAS6 chemicals contaminated the land and water owned, possessed and/or used by Plaintiffs and the Class Members, thereby exposing their bodies to PFAS6.

357.   As a direct and proximate result of the Greif Defendants' use, emission, discharge, disposal, and/or distribution of materials containing PFAS6 at Otter Farm, Plaintiffs and the Class Members will be forced to pay for the private removal of contaminants from their property emanating from pollution of public water sources.

358.     As a direct and proximate result of the Greif Defendants' use, emission, discharge, disposal, and/or distribution of materials containing PFAS6 at Otter Farm and the resulting exposure of Plaintiffs and the Class Members to PFAS6, Plaintiffs and the Class Members presently suffer, and will continue to suffer, real property damage, out of pocket expenses, personal property damage, loss of use and enjoyment of property, diminution in property value, the necessity for long-term medical monitoring, annoyance, upset, aggravation, trauma, and inconvenience.

TWENTY-SEVENTH CLAIM FOR RELIEF
ULTRAHAZARDOUS ACITIVITY/STRICT LIABILITY
(Against the Greif Defendants)

359.     Plaintiffs and the Class Members re-allege and incorporate here the allegations set forth above.

360.     The Greif Defendants' use, emission, discharge, disposal, and/or distribution of materials containing PFAS6 at Otter Farm has constituted an ultrahazardous activity.

361.     The Greif Defendants' use, emission, discharge, disposal, and/or distribution of materials containing PFAS6 at Otter Farm has constituted an abnormally dangerous activity and cannot be made safe by the exercise of the utmost care. The conduct of the Greif Defendants in the use, transport, disposal, storage, emissions, discharge, distribution, sale and/or treatment of PFAS6-contaminated materials caused contamination of land and groundwater by PFAS6, which poses a high degree of risk of injury and loss to Plaintiffs and the Class Members.

362.     The presence of PFAS6 contaminants in the environment and the human body poses an inherent and extraordinary threat to human health and well-being and a danger of lasting contamination of property and water.

363.     The contamination of the property, water, and bodies of Plaintiffs and the Class Members were all probable and foreseeable consequences of the Greif Defendants' use, emission, discharge, disposal, and/or distribution of materials containing PFAS6 at Otter Farm.

364.     There is and was a reasonable likelihood that the Greif Defendants' use, emission, discharge, disposal, and/or distribution of materials containing PFAS6 at Otter Farm near the populated areas of Westminster, Massachusetts and the surrounding area will result in life-threatening cancer and other illnesses, diseases, and disease processes for Plaintiffs and the Class Members. The Greif Defendants' decision to engage in the use, emission, discharge, disposal, and/or distribution of materials containing PFAS6 at Otter Far, thereby causing large amounts of PFAS6 to be dispersed into the surrounding community, was unreasonably dangerous.

365.     The Greif Defendants' use, emission, discharge, disposal, and/or distribution of materials containing PFAS6 at Otter Farm created a high risk of harm to those who live in the area, including Plaintiffs and the Class Members, and substantially increased the risk of community residents, including Plaintiffs and the Class Members, developing cancer and other illnesses, diseases, or disease processes.

366.     The activities conducted by the Greif Defendants have been and are exceedingly dangerous, while offering little or no value to the surrounding community.

367.     Because the activities engaged in by the Greif Defendants as outlined in this Complaint are ultrahazardous, the Greif Defendants are strictly liable for any injuries proximately resulting from those activities.

368.     As a direct and proximate result of the Greif Defendants' ultrahazardous activities and the exposure of Plaintiffs and the Class Members to PFAS6 chemicals resulting from those activities, Plaintiffs and the Class Members presently suffer, and will continue to suffer, real

property damage, out of pocket expense, personal property damage, loss of use and enjoyment of property, diminution in property value, the necessity for long-term medical monitoring, upset, aggravation, and inconvenience.

TWENTY-EIGHTH CLAIM FOR RELIEF
WILLFUL AND WANTON CONDUCT
(Against Defendant Greif)

369.    Plaintiffs and the Class Members re-allege and incorporate here the allegations set forth above.

370.    At all times relevant, the Greif Defendants owed a duty to refrain from willful, wanton, reckless, and/or outrageous conduct and/or conduct that exhibited an utter indifference to and/or conscious disregard of the health, safety, and well-being of Plaintiffs and the Class Members.

371.    Upon information and belief, the Greif Defendants at all relevant times was aware of the considerable health risks associated with the discharge of PFAS6 into soil, groundwater, and consumer products, including the risk of causing various forms of cancer to those exposed by PFAS6 from soil, water, or other exposures.

372.    Upon information and belief, the Greif Defendants at all relevant times knew that its use, emission, discharge, disposal, and/or distribution of materials containing PFAS6 or likely to contain PFAS6 would be likely to result in the emission of unreasonably dangerous levels of PFAS6 into the soil and groundwater in a manner that would be likely to cause significant financial and personal injury to Plaintiffs and the Class Members.

373.    Notwithstanding this knowledge, the Greif Defendants acted in a manner that was intentional, willful, wanton, reckless, outrageous, and/or demonstrated an indifference to and/or

conscious disregard of the health, safety, and well-being of Plaintiffs and the Class Members by, among other things:

    a.  Failing to test and/or screen materials it was dumping or disposing of at Otter Farm, when it knew doing so was required to ensure safe composting without the substantial risk of contaminating soil, groundwater, and its consumer products;

    b.  Failing to take reasonable steps to prevent or minimize the accumulation and emission of PFAS6 chemicals in materials it dumped or disposed of at Otter Farm, into the soil, when it knew doing so was necessary to prevent significant financial and/or personal injury to Plaintiffs and the Class Members;

    c.  Dumping and/or disposing of PFAS6-contaminated waste products at Otter Farm, despite knowing that doing so would likely cause PFAS6 contamination and the resulting significant financial and/or personal injury to Plaintiffs, the Class Members, and/or the Consumer Subclass;

    d.  Failing to employ safe methods of operation to adequately prevent, control or eliminate PFAS discharge into the environment when it knew doing so was necessary to prevent significant financial and/or personal injury to Plaintiffs and the Class Members;

    e.  Failing to institute proper procedures and training to prevent, minimize, and/or promptly and effectively respond to its release of PFAS6 into the environment when it knew doing so was necessary to prevent significant financial and/or personal injury to Plaintiffs and the Class Members;

f.  Failing to promptly and effectively respond to its release of PFAS6 into the environment when it knew doing so was necessary to prevent significant financial and/or personal injury to Plaintiffs and the Class Members;

g.  Failing to warn Plaintiffs and the Class Members of their use, emission, discharge, disposal, and/or distribution of materials containing PFAS6 at Otter Farm, when it knew doing so was necessary to prevent significant financial and/or personal injury to Plaintiffs and the Class Members;

h.  Failing to ensure it was dumping or disposing of its waste products in an unpopulated or much less populated area when it knew doing so was necessary to prevent significant financial and/or personal injury to Plaintiffs and the Class Members;

i.  Discharging dangerous amounts of PFAS6 into land and groundwater near a populated community, when it knew doing so would likely cause significant financial and/or personal injury to Plaintiffs and the Class Members; and

j.  Failing to warn current and potential neighboring residents and property owners that they were being exposed to PFAS6 and of the consequent risks of disease the residents acquired because of that exposure when it knew doing so was necessary to prevent significant financial and/or personal injury to Plaintiffs and the Class Members.

374.  As a direct and proximate result of the Greif Defendants' willful, wanton, and reckless conduct, Plaintiffs and the Class Members have suffered, presently suffer, and will continue to suffer, real property damage, out of pocket expense, personal property damage, loss

of use and enjoyment of property, diminution in property value, the necessity for long-term medical monitoring, annoyance, upset, aggravation, and inconvenience.

<u>REQUEST FOR RELIEF</u>

WHEREFORE, Plaintiffs, individually and on behalf of the Class Members proposed in this Complaint, request that the Court enter judgment in their favor and against all Defendants as follows:

I.      For an Order certifying the Class, as defined herein, and appointing Plaintiffs and their Counsel to represent the Class;

II.     For an award of damages, including nominal and compensatory damages, as allowed by law and in an amount to be determined;

III.    For an award to Plaintiffs and the Class Members in an amount sufficient to compensate them for real property damage, out of pocket expenses, personal property damage, loss of use and enjoyment of property, diminution in property values, the necessity for long-term medical monitoring, annoyance, upset, aggravation and inconvenience;

IV.     For an award to fund a medical monitoring program in an amount determined to be just and reasonable;

V.      For an award of punitive damages as allowed by law and in an amount to be determined;

VI.     For an award of attorneys' fees, costs, and litigation expenses, as allowed by law;

VII.    For prejudgment interest on all amounts awarded;

VIII.   For injunctive and declaratory relief, under Rule 23(b)(2) and (c)(4) and as otherwise allowed by law, including,

a.  Injunctive relief under Rule 23(b)(2) as necessary and appropriate to establish a court-supervised program of medical monitoring for the medically necessary diagnostic testing for the early detection of illness, disease or disease process; and

b.  Issue certification under Rule 23(c)(4) as necessary and appropriate to provide declaratory relief as to each element of each cause of action alleged herein (medical monitoring, ultrahazardous activity/strict liability, private nuisance, public nuisance, negligence, and willful and wanton conduct).

IX.   Such other and further relief as this Court may deem just and proper.

## JURY TRIAL DEMAND

Plaintiffs demand a jury trial on all issues so triable.

DATED:       August 2, 2022                      Respectfully submitted,

*/s/ Sean K. McElligott*
Sean K. McElligott (BBO# #651710)
Paul A. Slager (*pro hac vice* forthcoming)
Ian W. Sloss (*pro hac vice* forthcoming)
Zachary A. Rynar (*pro hac vice* forthcoming)
SILVER GOLUB & TEITELL LLP
One Landmark Square, 15th Floor
Stamford, Connecticut 06901
Telephone: (203) 325-4491
Facsimile: (203) 325-3769
smcelligott@sgtlaw.com
pslager@sgtlaw.com
isloss@sgtlaw.com
zrynar@sgtlaw.com