UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| THOMAS RYAN, SUSAN RYAN, SEAN GALLAGHER, AND ASHLEY SULTAN GALLAGHER, individually and on behalf of others similarly situated, | Civil Action No. 4:22-cv-40089 |
| *Plaintiffs*, | AMENDED CLASS ACTION COMPLAINT |
| v. | JURY TRIAL DEMANDED |
| GREIF, INC., CARAUSTAR INDUSTRIES, INC., THE NEWARK GROUP, INC., MASSACHUSETTS NATURAL FERTILIZER CO., INC., OTTER FARM, INC., AND SEAMAN PAPER COMPANY OF MASSACHUSETTS, INC. | |
| *Defendants*. | |

Plaintiffs Thomas Ryan, Susan Ryan, Sean Gallagher, and Ashley Sultan Gallagher, on

behalf of themselves and all others similarly situated, allege the following based on personal

knowledge, information and belief, and investigation of counsel.

<u>INTRODUCTION</u>

1.      Plaintiffs bring this class action against Defendants Greif, Inc., Caraustar

Industries, Inc., The Newark Group, Inc., Massachusetts Natural Fertilizer Company, Inc., Otter

Farm, Inc., and Seaman Paper Company of Massachusetts, Inc. (collectively, "Defendants') for

the claims set forth below resulting from their intentional, reckless, and/or negligent acts and

omissions in connection with the discharge, distribution, and/or disposal of per- and

polyfluoroalkyl substances and their constituents (collectively referred to in this Complaint as,

"PFAS"), which have caused the contamination of real property and drinking water supplies

owned and used by Plaintiffs and other class members (the "Class Members").

<u>PARTIES</u>

2.      Plaintiff Thomas Ryan is a resident and citizen of Westminster, Massachusetts.

3.      Plaintiff Susan Ryan is a resident and citizen of Westminster, Massachusetts.

4.      Plaintiff Sean Gallagher is a resident and citizen of Westminster, Massachusetts.

5.      Plaintiff Ashley Sultan Gallagher is a resident and citizen of Westminster, Massachusetts.

6.      Defendant Greif, Inc. ("Greif") is a Delaware corporation. Greif's principal office is located at 425 Winter Road, Delaware, Ohio.

7.      Defendant Caraustar Industries, Inc. ("Caraustar") is a Delaware corporation. Caraustar is a wholly-owned subsidiary of Greif.

8.      Defendant The Newark Group, Inc. ("Newark Group") is a New Jersey corporation. Newark Group is a wholly-owned subsidiary of Greif.

9.      Defendant Massachusetts Natural Fertilizer Company, Inc. ("MassNatural") is a Massachusetts corporation. MassNatural's principal office is located at 65 Bean Porridge Hill Road, Westminster, Massachusetts. MassNatural was organized in 1987. Beginning at least as early as 2002 and continuing through 2015, MassNatural identified William S. Page, Sr. in corporate filings as President, Treasurer, Secretary, and the sole Director of MassNatural. Beginning in 2016, William S. Page, Jr. (the son of William S. Page, Sr.) is listed as President and a Director of MassNatural, and his wife, Diane M. Page is listed as Treasurer, Secretary, and a Director of MassNatural.

10.      Defendant Otter Farm, Inc. ("Otter Farm") is Massachusetts corporation. Otter Farm's principal office is located at 35 Wilkins Road, Gardner, Massachusetts. Otter Farm has identified George D. Jones III in filings with the Office of the Secretary of the Commonwealth of

Massachusetts, Corporations Division as Otter Farm, Inc.'s President, Registered Agent, and as a Director.

11.     Defendant Seaman Paper Company of Massachusetts, Inc. ("Seaman Paper") is a Massachusetts corporation. Seaman Paper's principal office is located at 35 Wilkins Road, Gardner, Massachusetts. George D. Jones III in filings with the Office of the Secretary of the Commonwealth of Massachusetts, Corporations Division is identified as Seaman Paper's Registered Agent and as a Director with the Office of the Secretary of the Commonwealth of Massachusetts, Corporations Division. Seaman Paper Company of Massachusetts, Inc. owns and controls Defendant Otter Farm, Inc.

JURISDICTION AND VENUE

12.     This Court has subject matter jurisdiction of this action pursuant to 28 U.S.C. § 1331 because the Plaintiffs' claims arise under federal law; this action alleges violations of the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. § 1961, *et seq.*, which are made privately actionable under 18 U.S.C. § 1964(c).

13.     This Court has subject matter jurisdiction of this action pursuant to 28 U.S.C. § 1332(d)(2)(A) because this case is a class action where the aggregate claims of all members of the proposed Class exceed $5,000,000.00, exclusive of interest and costs, and the Plaintiff and most members of the proposed Class are citizens of a state different from at least one defendant.

14.     Venue is proper in this judicial District pursuant to 28 U.S.C. § 1391(b) and (c) because each Defendant transacts business in, is found in, and/or has agents in this District and because some of the actions giving rise to this complaint took place within this District.

15.     The Court has personal jurisdiction over each Defendant. Each Defendant has transacted business, maintained substantial contacts, and/or committed overt acts in furtherance

of the conduct alleged in the Amended Class Action Complaint throughout the United States, including in this District. The conduct was directed at, and has had the effect of, causing injury to persons residing in, located in, or doing business throughout the United States, including in this District.

FACTUAL BACKGROUND

I.      PFAS: PER- AND POLYFLUORALKYL SUBSTANCES

16.     PFAS chemicals are human-made, long-lasting chemicals that do not exist in nature.

17.     There are thousands of PFAS chemicals, but Perfluorooctanoic Acid ("PFOA") and Perfluorooctane Sulfonate ("PFOS") are the two most widely used PFAS chemicals.

18.     PFOA and PFOS began to be applied to industrial and consumer products in the 1940's and 1950's due to their ability to repel water, dirt, oil, and grease, resist heat and protect surfaces.

19.     Applications of PFOA and PFOS have included machinery coatings, clothing, furniture, adhesives, food packaging, heat-resistant non-stick cooking surfaces, and the insulation of electrical wire, and both are used across a wide range of industries, including the paper industry.

20.     PFOS and PFOA have unique properties that make them persistent, bioaccumulative, and toxic.

21.     PFOS and PFOA are colloquially referred to as "forever chemicals" for their ability to persist in the environment indefinitely without breaking down due to the strength of their multiple carbon-fluorine bonds.

4

22.     PFOS and PFOA are resistant to biodegradation, atmospheric photooxidation, direct photolysis, and hydrolysis.

23.     PFOS and PFOA are water soluble, making them mobile in groundwater and the environment.

24.     Because PFOS and PFOA repel organic materials, they readily leach through soil and can impact and infiltrate groundwater.

25.     Typical water treatment and filtration systems do not filter PFOS and PFOA from contaminated water due to the chemicals' physical and chemical properties.

26.     Likewise, chlorine and other disinfectants that are often added to drinking water systems are not capable of removing, and do not remove, PFOS or PFOA.

27.     Human consumption of and oral exposure to PFOS and PFOA result in absorption of PFOS and PFOA in humans' blood, kidney, and liver.

28.     The half-life of PFOS and PFOA within the human body is anywhere from 2 to 9 years.

29.     PFOS and PFOA cross the placenta from mother to fetus and pass to infants through breast milk.

30.     The above-described characteristics contribute to health risks associated with human ingestion of PFOS and PFOA, even at low levels.

31.     According to the United States Environmental Protection Agency (the "EPA"), human exposure to PFOS and PFOA is associated with adverse health outcomes, which can manifest years after exposure. Adverse health outcomes linked to PFOS and PFOA include, but are not limited to:

a.   Reproductive effects such as decreased fertility or increased high blood pressure in pregnant women;

b.   Developmental effects or delays in children, including low birth weight, accelerated puberty, bone variations, or behavioral changes;

c.   Increased risk of some cancers, including prostate, kidney, and testicular cancers;

d.   Reduced ability of the body's immune system to fight infections, including reduced vaccine response;

e.   Interference with the body's natural hormones;

f.   Increased cholesterol levels and/or risk of obesity;

g.   Changes in liver enzymes;

h.   Increased risk of high blood pressure or pre-eclampsia in pregnant women;

i.   Small decreases in infant birth weights; and

j.   Suppression of vaccine response (decreased serum antibody concentrations) in children.

32.   Concerns over potential adverse health effects from PFAS chemicals on human grew in the early 2000s with the discovery of PFOA and PFOS in laboratory studies of human blood. In 2009, the EPA published provisional health advisories for PFOA and PFOS, based on evidence available at that time. The EPA noted that levels of 0.04 ppb in tested sites were "not of concern," and the EPA set the PFOS provisional health advisory at a level of 0.2 ppb and the PFOA provisional health advisory at a level of 0.4 ppb.[1]

---

[1] https://www.epa.gov/sites/default/files/2015-09/documents/pfoa-pfos-provisional.pdf (accessed Aug. 2, 2022).

33.     In 2016, the EPA issued a revised health advisory, "identify[ing] the concentration of PFOA and PFOS in drinking water at or below which adverse health effects are not anticipated to occur over a lifetime of exposure [as] 0.07 parts per billion (70 parts per trillion) for both PFOA and PFOS."[2]

34.     On June 15, 2022, the EPA released four drinking water health advisories for PFAS, updating and replacing its 2016 PFOA and PFOS advisories based on new science. The updated EPA advisory stated, "some negative health effects may occur with concentrations of PFOA or PFOS in water that are *near zero* and below EPA's ability to detect at this time."[3] The June 15, 2022 EPA advisory reflects the new understanding that exposure to any amount of PFAS is harmful to humans.

II.     PFAS REGULATION IN MASSACHUSETTS

35.     The Commonwealth of Massachusetts has strict PFAS standards, including rules for drinking water systems and cleanup of contaminated sites. Massachusetts has invested substantial funding to assist communities that experience PFAS contamination in drinking water.

36.     The Massachusetts Department of Environmental Protection ("MassDEP") has established a drinking water PFAS concentration limit of 20 nanograms per liter (ng/L) (or parts per trillion (ppt)) for the sum of the concentrations of the following six PFAS compounds: (1) PFOS; (2)  PFOA; (3) perfluorohexane sulfonic acid (PFHxS); (4) perfluorononanoic acid (PFNA); (5) perfluoroheptanoic acid (PFHpA); and (6) perfluorodecanoic acid

---

[2] https://www.govinfo.gov/content/pkg/FR-2016-05-25/pdf/2016-12361.pdf (accessed Aug. 2, 2022).

[3] *EPA Announces New Drinking Water Health Advisories for PFAS Chemicals, $1 Billion in Bipartisan Infrastructure Law Funding to Strengthen Health Protections*, U.S. ENVIRONMENTAL PROTECTION AGENCY, https://www.epa.gov/newsreleases/epa-announces-new-drinking-water-health-advisories-pfas-chemicals-1-billion-bipartisan (accessed Aug. 2, 2022).

(PFDA)."[4] MassDEP refers to the six PFAS chemicals referenced above collectively as "PFAS6."

37.     According to MassDEP regulations, the release of PFAS6 to groundwater that is detected in a public water supply well or private drinking water well is considered a "Condition of Substantial Release Migration," which requires notification of affected persons and implementation of "Immediate Response Actions."

38.     PFAS6 are listed as toxic and hazardous substances under the Massachusetts Toxics Use Reduction Act, *see* G.L. c. 21I and 301 CMR § 41.03(13), and are subject to the notification, assessment and cleanup requirements of the Massachusetts Waste Site Cleanup Program.[5]

III.     MASSACHUSETTS NATURAL FERTILIZER COMPANY

39.     According to its website, MassNatural "is a 30-acre family-owned commercial composting facility on a 240 acre farm . . . established in 1987." MassNatural's composting operation became the primary business operating at 65 Bean Porridge Hill Road when a chicken egg farm that had existed at the same location ceased operations. As outlined below, the 240 acre farm where MassNatural operates is owned by defendant Otter Farm, an entity that is owned by defendant Seaman Paper (the location at 65 Bean Porridge Hill Road, Westminster, Massachusetts, is referred to in this Complaint as, the "Otter Farm Property").

---

[4] 310 CMR 22.00.

[5] *Drinking Water Standards and Health Information – Per- and Polyfluoroalkyl Substances (PFAS)*, MASSACHUSETTS DEPARTMENT OF ENVIRONMENTAL PROTECTION, https://www.mass.gov/info-details/per-and-polyfluoroalkyl-substances-pfas#:~:text=On%20October%202%2C%202020%2C%20MassDEP,the%20concentrations%20of%20six%20specific (accessed Aug. 2, 2022).

40.     MassNatural states on its website that its composting site "is fully permitted as a Recycling, Composting or Conversion (RCC) Operation regulated by the Massachusetts Department of Environment Protection."[6]

41.     MassNatural's composting operation remains the property's primary business, and MassNatural composts "a wide variety of organic materials, including short paper fiber, industrial food processing by-products, restaurant food waste, yard waste, animal/fish mortalities, and animal manure." Mass Natural "utilizes outdoor windrow and static pile composting and is permitted to accept 91,775 tons of organic materials annually." [7]

42.     MassNatural has marketed and sold its products to "garden centers, landscape contractors, homeowners, agricultural crop landowners and land reclamation projects [.]"[8] The following is MassNatural's list of its products, as stated on its website:

| Mass Natural Products – 2022 Pricing[9] | |
|---|---|
| ½" Screened Topshelf loam | $15.00/yard |
| ½" Screened compost | $15.00/yard |
| Potting soil | $15.00/yard |
| Farm mix (unscreened compost) | $3.00/yard |
| Pick-up truck load of soil | $20.00 |
| Premium hemlock mulch | $41.00/yard |
| Black mulch | $35.00/yard |
| Tailings | $5.00/yard |
| Stump grindings | $15.00/yard |
| Stumps in-bound | $10.00/yard |
| BYO 5 gallon bucket | $2.00/bucket |

---

[6] *Our History*, MASS NATURAL, https://www.mnaturalfertilizer.com/about-us (accessed Aug. 2, 2022).

[7] *Id.*

[8] *Id.*

[9] *Our Products and Pricing*, MASS NATURAL, https://www.mnaturalfertilizer.com/copy-of-products (accessed Aug. 2, 2022).

IV.    SEAMAN PAPER COMPANY OF MASSACHUSETTS

43.    Defendant Seaman Paper is a company engaged in paper production and distribution.  Seaman Paper owns Otter Farm and the Otter Farm Property, where MassNatural conducts its business and composting operations and where Seaman Paper has dumped and still dumps waste materials from its manufacturing processes.

44.    Seaman Paper also has owned and operated the Otter River Paper Mill ("Otter River Paper") in Otter River, Massachusetts since 1946. Seam Paper operates Otter River Paper 24 hours per day, 7 days a week. Otter River Paper operates two paper machines producing up to 100 tons per day of machine-finished and machine-glazed paper.

45.    As part of its production processes, Otter River Paper treats 900,000 gallons of water per day on-site and has dumped waste materials from its paper manufacturing processes at MassNatural's composting facility on the Otter Farm Property.

46.    Prior versions of Seaman Paper's website admitted that Seaman Paper had a history of using PFAS in the production of its products. Those statements have been removed from Seaman Paper's website.

V.    OTTER FARM, INC.

47.    Otter Farm is a Massachusetts corporation and the owner of the Otter Farm Property, where MassNatural operates its composting business. Otter Farm and the Otter Farm Property are wholly owned by Seaman Paper, and Otter Farm's headquarters is at the same address as Seaman Paper.

48.    Otter Farm was incorporated in 2002 by Seaman Paper in connection with Seaman Paper's purchase of the property located at 65 Bean Porridge Hill Road, Westminster, Massachusetts at public auction.

49.     Land records show that Otter Farm acquired the farm at 65 Bean Porridge Hill
Road in 2002 from a corporation named Molly Hill Farms, Inc.[10] ("Molly Hill Farms"), which
was controlled by William S. Page, Sr., father of the current owner and operator of MassNatural,
Williams S. Page, Jr.  Molly Hill Farms, Inc. was organized under the laws of Massachusetts in
1995 and dissolved voluntarily on December 23, 2002. From organization through dissolution,
William S. Page Sr. was listed as President, Treasurer, Secretary, and the sole Director of Molly
Hill Farms, Inc.

VI.     THE GREIF DEFENDANTS

50.     Defendant Greif is a publicly traded industrial packaging products and services
company founded in 1877.[11] Greif's principal place of business is located at 425 Winter Road,
Delaware, Ohio.

51.     Greif operates three business segments: (1) Global Industrial Packaging, which
"offers industrial packaging products, such as steel, fiber and plastic drums, rigid intermediate
bulk containers and closure systems for industrial packaging products, among others and
services, such as container life cycle management, filling, logistics, warehousing and other
packaging services"; (2) Paper Packaging & Services, which "produces and sells containerboard,
corrugated sheets, corrugated containers, and other corrugated products to customers in North
America in industries such as packaging, automotive, food and building products"; and  (3) Land
Management, which is "focused on the harvesting and regeneration of its United States timber
properties."[12]

---

[10] According to Molly Hill Farms, Inc.'s Articles of Incorporation, Molly Hill Farms, Inc.'s principal place of business was 65 Bean Porridge Hill Road. William S. Page, Sr. served as President, Treasurer, Clerk, and was the sole Director of Molly Hill Farms, Inc. *See* Articles of Incorporation, Molly Hill Farms, Inc., dated June 6, 1995.

[11] *About Greif*, Greif, https://www.greif.com/about/ (accessed Aug. 2, 2022).

[12] *Id.*

11

52.     Greif acquired Defendants Caraustar Industries, Inc. and Newark Group (collectively with Greif, referred to as the "Greif Defendants") in 2019.[13] Caraustar and Newark Group operate within Greif's Paper Packaging & Services segment.[14]

53.     Following the acquisition of Caraustar Industries, Inc. and Newark Group, Defendant Greif immediately integrated Caraustar's and Newark Group's operations into its own and took control of, and began actively operating, the containerboard mill (the "Greif Mill") located at 100 Newark Way, Fitchburg, Massachusetts, which produces "a range of liners and mediums for [customers'] rollstock needs."[15]

54.     As of August 2, 2022, Greif advertised its ownership and control of the Greif Mill, which Greif runs and manages on a daily basis, on Greif's own website:



16

---

[13] *GREIF COMPLETES ACQUISITION OF CARAUSTAR INDUSTRIES*, GREIF (Feb. 11, 2019), https://www.greif.com/greif-completes-acquisition-of-caraustar-industries/ (accessed Aug. 2, 2022).

[14] *Id.*

[15] *Containerboard*, GREIF, https://www.greif.com/containerboard/ (accessed Aug. 2, 2022).

[16] *Fitchburg*, GREIF, https://www.greif.com/wp-content/uploads/2021/11/Greif-Fitchburg-Mass.pdf (accessed Aug. 2, 2022).

55.     According to MassDEP, the Greif Defendants have dumped contaminated waste materials from Greif's paper manufacturing processes at MassNatural's composting facility on the Otter Farm Property since 2002.

## SUBSTANTIVE ALLEGATIONS

56.     Together, the Greif Defendants, Seaman Paper, Otter Farm, and MassNatural are responsible for an environmental disaster in Westminster, Massachusetts, as outlined below.

57.     In January 2022, a Westminster, Massachusetts homeowner living on Bean Porridge Hill Road near MassNatural's operations at Otter Farm requested testing of the residence's private-well-supplied drinking water (the "Initial Testing Site").

58.     Laboratory analysis of the water sample collected at the Initial Testing Site revealed a PFAS6 concentration of 1,335 ppt, a level that dramatically exceeded the acceptable 20 ppt level published by MassDEP.

59.     MassDEP retested the Initial Testing Site on February 24, 2022, and the results confirmed elevated concentrations of PFAS6 at a level of 1,021 ppt.

60.     On February 24, 2022, MassDEP also arranged for the sampling of five additional residential private wells within 500 feet of the Initial Testing Site, including those of Plaintiffs Thomas Ryan, Susan Ryan, Sean Gallagher, and Ashley Sultan Gallagher. The results of those additional water tests revealed PFAS6 in drinking water at concentrations between 333 and 1,815 ppt, as follows:

  a.     64 Bean Porridge Hill Road, Total PFAS: 1,132 ng/L;

  b.     66 Bean Porridge Hill Road, Total PFAS: 939, ng/L;

  c.     67 Bean Porridge Hill Road, Total PFAS: 1,021 ng/L;

  d.     68 Bean Porridge Hill Road, Total PFAS: 623 ng/L;

13

      e.      70 Bean Porridge Hill Road, Total PFAS: 333 ng/L; and

      f.      72 Bean Porridge Hill Road, Total PFAS: 1,815 ng/L.

61.     Since February 2022, numerous additional Westminster, Massachusetts residents have learned that their private drinking water wells (the "Private Wells") are also contaminated with PFAS6. MassDEP has stated it believes water from at least 250 Westminster, Massachusetts homes may be impacted.

62.     As of July 14, 2022, testing results from the Private Wells of 137 Westminster, Massachusetts properties have been published by MassDEP. The testing results from the Private Wells reveal that PFAS6 concentrations in 116 of the 137 tested samples (or 85% of the test samples) exceeded the 20 ppt limit that has been designated as the Imminent Hazard Level by MassDEP. Some test results from the Private Wells revealed PFAS6 concentrations more than 50 times the 20 ppt limit designated as the Imminent Hazard Level by MassDEP. Due to the 85% contamination rate, MassDEP has been expanding the area of testing (the "Study Area") on a weekly basis to include more homes.

63.     Residents with the Private Wells that are contaminated cannot use the water from their wells and instead must use bottled water for drinking, cooking, bathing, and other ordinary household uses.

64.     Testing of MassNatural's own private well on the Otter Farm Property showed a PFAS6 concentration of 5,720 ppt, more than 286 times higher than the 20 ppt designated as the Imminent Hazard Level by MassDEP. On information and belief, this is the highest concentration level of PFAS6 ever recorded in water from a private well in Massachusetts.

65.     MassDEP concluded the PFAS6 contamination in the Study Area is the result of groundwater migration from MassNatural's operations at the Otter Farm Property.

66.    Accordingly, on March 13, 2022, MassDEP issued a Notice of Responsibility to both MassNatural and Otter Farm, stating that "MassDEP, based on the available information, considers [Mass Natural and Otter Farm each] a party with potential liability for response action costs and damages under M.G.L. c. 21E, §5."

67.    MassDEP also issued a Notice of Responsibility to Seaman Paper on May 13, 2022.

68.    On May 17, 2022, MassDEP issued a Unilateral Administrative Order ("UAO 1") directing MassNatural to "cease and desist from distributing any material containing PFAS at levels that would exceed applicable standards for PFAS in groundwater that is or could be used as drinking water, including private wells."

69.    On July 20, 2022, MassDEP issued a Unilateral Administrative Order and Permit Suspension, Doc # 00013644, ("UAO 2") to Otter Farm and MassNatural finding "that operation of the [MassNatural site] poses a threat to public health and the environment." MassDEP also ordered Otter Farm and MassNatural to cease composting operations at the Otter Farm Property.

70.    On July 20, 2022, MassDEP also issued a Notice of Responsibility to Greif (the "Greif Notice of Responsibility") in connection with contamination of the Otter Farm Property and surrounding areas with materials dumped at Otter Farm by Greif.

71.    Both the Greif Notice of Responsibility and the UAO2 state that Greif had disposed of waste products at MassNatural and that MassDEP tested Greif waste products and found they contained PFAS6 concentrations in excess of the 20 ppt limit designated as the Imminent Hazard Level by MassDEP.

72.    MassDEP has identified Mass Natural, Seaman Paper, Otter Farm, and Greif as parties "with potential liability for response action costs and damages under M.G.L. c. 21E, §5."

15

73.     Westminster residents living near the Otter Farm Property and/or whose land and water are likely to be impacted by the emission of PFAS6 from the Otter Farm Property, including Plaintiffs and the Class Members, face an uncertain future. Their exposure to PFAS6 means they have experienced or are at risk of experiencing adverse health events known to be caused by PFAS6. They require medical monitoring and/or treatment to ensure that any adverse health effects resulting from exposure to PFAS6 are detected and treated as early as possible.

74.     Additionally, Westminster residents living near the Otter Farm Property and/or whose land and water are likely to be impacted by the emission of PFAS6 from the Otter Farm Property, including Plaintiffs and the Class Members, can no longer fully enjoy the use of their property or use the water from their private wells, water that previously was their only source of water for drinking, cooking, bathing, and many other day-to-day activities.

75.     In addition to this negatively impacting their day-to-day lives, Plaintiffs and the Class Members who may wish to relocate away from the contamination site will suffer additional challenges and diminution of property value as a result of the known presence of widespread PFAS6 contamination in their water and on their property.

76.     Defendants are individually and collectively responsible for the plight of the Plaintiffs and the Class Members as outlined below and should be held accountable.

I.     THE PAPER MANUFACTURER DEFENDANTS USED PFAS6 IN THEIR COMMERCIAL PRODUCTS FOR DECADES.

77.     Upon information and belief, manufacturers of paper, cardboard, and packaging, including Seaman Paper and the Greif Defendants (collectively, the "Paper Manufacturer Defendants"), have knowingly used PFAS6 chemicals in their manufacturing processes for many decades.

16

78.     In the production of paper products, PFAS6 chemicals are typically used as a coating to repel grease, oil, fats, water, and other substances from paper products, preventing absorption of these substances into the paper. PFAS6 chemicals have also been used in inks and other moisture barriers utilized by the paper manufacturing industry.

79.     PFAS6-treated paper prevents grease, water, fats, and other substances from migrating to and/or from food during transport, storage, and consumption of the food. Some examples of PFAS6-treated paper include are pizza boxes, sandwich wrappers, and microwave popcorn bags.

80.     Upon information and belief, the Paper Manufacturer Defendants have produced PFAS6-treated paper products and created waste byproducts containing PFAS6. MassDEP has determined that paper waste generated by Greif at the Greif Mill and disposed of at the Otter Farm Property in connection with MassNatural's operations there contained high levels of PFAS6, including a PFOA concentration of 1,250 ppt (over 60 times higher than the 20 ppt designated as the Imminent Hazard Level by MassDEP) and a PFOS concentration of 1,890 ppt (over 90 times the 20 ppt designated as the Imminent Hazard Level by MassDEP).

81.     Upon information and belief, Seaman Paper also used PFAS6 in its operations and generated PFAS6 contaminated waste byproducts, although testing of Seaman Paper waste dumped at MassNatural's operations on the Otter Farm Property has been reported as inconclusive.

II.     DEFENDANTS ARRANGED FOR THE TRANSPORT, DISPOSAL, STORAGE
        AND/OR TREATMENT OF PFAS6-CONTAMINATED BIOSOLID WASTE AT 65
        BEAN PORRIDGE HILL ROAD.

        82.     MassDEP's investigation also found that Seaman Paper, Otter Farm, and Greif all

"arranged for the transport, disposal, storage or treatment of hazardous material" to or at

MassNatural's operations at Otter Farm.

        83.     On March 31, 2022, MassDEP informed MassNatural and Otter Farm through

Notices of Responsibility that MassDEP had identified both entities—MassNatural as operator of

the composting operation and Otter Farm as landowner of the Otter Farm Property—as

"Potentially Responsible Parties" for the contamination and disposal of contaminants at 65 Bean

Porridge Hill Road.

        84.     The UAO2 stated:

        On June 30, 2022, Mass Natural voluntarily submitted 30 additional sampling results to
        MassDEP showing that most of the materials sampled on May 25 and June 2, 2022 at the
        Site contain one or more PFAS compounds at levels exceeding MCP standards.
        Specifically, the following materials all had exceedances of RCS-1 standards for at least
        one PFAS compound: landfill cover; golf course material; fiber biopellets; potting soil;
        compost; "turkey paid" materials; **Greif paper**; "windrow"; and Top Shelf (loam). The
        data were inconclusive for four other materials: **Seaman paper**, lettuce waste, tea leaves
        waste, and cannabis roots.[17]

        85.     The Greif Notice of Responsibility stated:

        Available information indicates that [MassNatural] has accepted large volumes of short
        paper fiber sludge from [Greif] since approximately 2002. Such materials are generally
        now known or suspected to contain PFAS. On May 25, 2022, [MassNatural] collected
        samples of materials stockpiled at the Site, including a sample that originated from Greif,
        Inc. and identified as "Greif Paper" for PFAS analysis. The "Greif Paper" sample was
        found to contain PFOA at a concentration of 1,250 ng/kg. PFOS was also detected in the
        sample at a concentration of 1,890 ng/kg, but the result was qualified that the exact
        concentration is not determined, but it is not greater than the reported concentration. A
        copy of the laboratory analytical report is attached to this Notice.

        Based upon [Greif's] role as a person who arranged for the transport, disposal, storage or

---

[17] *Unilateral Administrative Order and Permit Suspension*, MASSDEP (July 20, 2022),
https://fileservice.eea.comacloud.net/v1.4.0/FileService.Api/file/CETracker/gfjejjhe (accessed Aug. 2, 2022).

treatment of hazardous material to or at a Site, MassDEP is issuing this Notice of Responsibility to Greif.[18]

86.     MassDEP's findings establish that each Defendant individually, and in combination with the activities of the other Defendants, caused the contamination at Otter Farm by substantially contributing to the transport, disposal, storage, or treatment of PFAS6-contaminated waste at the MassNatural composting site located at Otter Farm.

87.     Because of MassNatural's business as a seller of compost and topsoil loam products, all Defendants had reason to know that the PFAS6-contaminated waste brought to Otter Farm would then be redistributed, spread, and sold by MassNatural to individuals and homeowners throughout the region. Defendants thus had a symbiotic or mutually beneficial business relationship with each other. The Greif and Siemen Paper defendants could reduce their byproduct disposal costs by taking advantage of MassNatural's Otter Farm operations and its business of redistributing soil products, and MassNatural and Otter Farm could be directly or indirectly compensated (above and beyond the moneys it brought in from product sales) for accepting this disposal while knowing they could cheaply offload such waste upon individuals and homeowners throughout the region by incorporating it into their soil products.

III.    <u>MASSNATURAL UNFAIRLY AND DECEPTIVELY SOLD PFAS6-CONTAMINATED PRODUCTS TO MASSACHUSETTS CONSUMERS.</u>

88.     As the seller of consumer products, MassNatural had a duty not to sell harmful products to uninformed consumers.

---

[18] Notice of Responsibility to Greif, Inc., MASSDEP (July 20, 2022), https://eeaonline.eea.state.ma.us/EEA/fileviewer/Rtn.aspx?rtn=2-0021866 (accessed Aug. 2, 2022) (Emphasis added) (hereinafter the "Greif Notice of Responsibility").

89.    The UAO2 and the Greif Notice of Responsibility establish that MassNatural accepted PFAS6-contaminated materials (the "Incoming Composting Materials") for composting.

90.    Upon information and belief, MassNatural sold and distributed compost and other products containing hazardous levels of PFSA6 to consumers without providing any notice of the presence of PFSA6 in the products.

91.    Upon information and belief, MassNatural falsely, misleadingly, unfairly, and deceptively marketed and advertised to Massachusetts consumers that they were selling compost and other products that were safe for use in gardening, landscaping, home construction, agricultural, and land reclamation projects, when in fact the compost and other products were contaminated with dangerous levels of PFAS6.[19]

92.    Specifically, MassNatural falsely, misleadingly, unfairly, and deceptively represented to Massachusetts consumers on its website that "[a]ll incoming materials are extensively tested prior to acceptance for composting."[20]

93.    Upon information and belief, MassNatural did not test all Incoming Composting Materials prior to acceptance for composting. Nor did MassNatural arrange for another party to test Incoming Composting Materials. Had MassNatural extensively tested or arranged for the extensive testing of Incoming Composting Materials, such testing would have revealed the dangerous levels of PFAS6 concentrations in the Incoming Composting Materials.

94.    Alternatively, upon information and belief, MassNatural tested Incoming Composting Materials and was aware they contained dangerous PFAS6 concentrations, and

---

[19] *Our History*, MASS NATURAL, https://www.mnaturalfertilizer.com/about-us (accessed Aug. 2, 2022).
[20] *Id.*

20

knowingly sold contaminated products to consumers while falsely representing that the products were safe for use.

95.    MassNatural also represented to Massachusetts consumers on its website that MassNatural's "compost products are tested by the UMass soil lab."[21]

96.    However, upon information and belief, MassNatural's products (*i.e.*, the post-composting soil and other consumer products it sold) were not "tested by the UMass soil lab." Upon information and belief, if the UMass soil lab tested the MassNatural products, the tests would have detected dangerous levels of PFAS6 concentrations.

97.    Upon information and belief, MassNatural produced and sold yards of topshelf loam, compost, potting soil, fill, and other consumer products to Massachusetts consumer customers that were contaminated with PFAS6 that was not worth the price that consumer customers paid for the products.

98.    Plaintiffs Thomas Ryan and Susan Ryan paid MassNatural for topshelf loam for use in a land reclamation project they undertook on their residential property.

99.    Instead of receiving topshelf loam of the quality represented, marketed, and advertised by MassNatural, Thomas Ryan and Susan Ryan and other Class Members received PFAS6-contaminated topshelf loam, contamination that MassNatural never disclosed.

100.    MassNatural's sale and distribution of products contaminated with PFAS6 to consumers, including Plaintiffs Thomas Ryan and Susan Ryan, caused Massachusetts consumers to pay more than they should have for MassNatural's products; such actions by MassNatural have caused additional harm to Massachusetts consumers, including widespread contamination of consumers' property and water supply.

---

[21] *Id.*

IV.    PFAS6 SPREAD FROM 65 BEAN PORRIDGE HILL ROAD TO THE
       SURROUNDING AREA'S NATURAL UNDERGROUND WATER SUPPLY.

101.    The dangers of composting hazardous materials are well understood: whatever

goes into a composting pile can migrate through soil and into the underground water supply. By

failing to use reasonable care to test the Incoming Composing Materials and keep out

contaminated materials from composting in its operations at Otter Farm, MassNatural caused

contamination of topshelf loam, compost, soil, and groundwater on the land at Otter Farm and its

aquifer.

102.    After identifying MassNatural's operations at Otter Farm as a potential

contamination source in January and February 2022, MassDEP reviewed historical records from

Otter Farm, including the Recycling, Composting, or Conversion (RCC) permit application

submitted by MassNatural to MassDEP Bureau of Air and Waste (BAW) and the resulting RCC

Permit issued on October 6, 2020 (the "2020 RCC Permit"). Based on such review, MassDEP

then concluded that "Based upon the use of materials that contain PFAS at the [65 Bean Porridge

Hill Road], and the PFAS detections in the private wells nearby, **MassDEP determined that a**

**release of PFAS had come to be located at the Massachusetts Natural Fertilizer Company,**

**Inc. (MNF) property at 65 Bean Porridge Hill Road, Westminster [Otter Farm].**"[22]

V.    RESPONSE AND MITIGATION EFFORTS HAVE FAILED.

103.    When it was determined that PFAS6 was contaminating water and soil in

Westminster, Massachusetts, MassDEP began providing bottled water to Westminster residents

whose water and/or soil was contaminated with PFAS6, as a temporary solution for use as

drinking water and for cooking, bathing, and other ordinary household uses.

---

[22] *See* Greif Notice of Responsibility.

104.    Shortly thereafter, MassDEP required Defendants, as Responsible Parties and Potentially Responsible Parties, to take over, arrange, and pay for remediation efforts such as bottled water delivery, installation of Point of Entry Treatment systems ("POET Systems") in homes where water sources are known to be contaminated by PFAS6, and water samplings, or face treble liability for those costs as incurred by MassDEP.

105.    Defendants have not complied with these agreements, and the POET Systems installed by Defendants have not effectively addressed the PFAS6 contamination of affected water.  For example, Plaintiffs Sean Gallagher and Ashley Sultan Gallagher had a POET System installed at their home during the week of March 30, 2022.  Despite the installation and use of a POET System at the Gallaghers' home, Lessard Environmental, Defendants' LSP, informed the Gallaghers on July 26, 2022 that tested water filtered through the Gallaghers' POET System continued to contain unsafe levels of PFAS6. As a result, the Gallaghers were advised to continue to drink bottled water until further notice, despite the existence and their use of a POET system. Despite these warnings, and the fact that no further sampling of the Gallagher's water occurred until mid-October, bottled water deliveries were discontinued to the Gallagher residence.

106.    Plaintiffs have suffered further injury because POET Systems were not installed properly or by licensed contractors, causing safety hazards such as flooding from faulty plumbing and fires from faulty electrical work. During the week of March 30, 2022, Plaintiffs Thomas and Susan Ryan had a POET System installed by an unlicensed plumbing contractor, GAP Mountain, as arranged by Seaman Paper, Otter Farm, MassNatural, and/or the Greif Defendants.

107.     Soon after a POET System was installed at the Ryan residence on March 29, 2022, the Ryans noticed a "carbon bleed". That is, carbon was leaking from carbon filters in the POET System installed by Defendants' contractor, GAP Mountain Drilling, LLC ("GAP Mountain") in household appliances such as a clothes washer. The Ryans proceeded to lodge several complaints to Larry Lessard of Lessard Environmental, the LSP (Licensed Site Professional)-of-Record Defendants are paying to advise on remediation efforts, regarding the carbon bleed and other POET System-related issues.

108.     The Ryans' complaints culminated with Morse Bros. LLC inspection of the Ryans' POET System installation in August 2022. Nathan Morse's inspection confirmed that the installation of the POET System was defective in the following ways:

      a.   First, GAP Mountain installed the water softener and POET System at the Ryan residence out of sequence so that water from the Ryans' drinking water well first passed through the water softener before the POET System. This is the opposite of the proper sequencing and can render the POET System's readings unreliable and erroneous. Further, this sequencing of the systems causes mineral content to build up which the mineral tanks, which necessitates tank regeneration. Tank regeneration inundates the resin beads in the mineral tank with a highly concentrated brine solution, washing off the hardness minerals and draining them out of the system. This discharge goes directly back into the soil/septic system which can make these systems contributing contaminators. The Ryan residence is not the only residence at which the water softener and POET System have been installed out of sequence.

24

b. Second, GAP Mountain installed copper tubing for water distribution inside the Ryan residence that violates the requirements of Massachusetts law concerning above ground water distribution. The Massachusetts Uniform State Plumbing Code, 248 CMR 10.06, governs the use of copper tubing for water distribution above ground and inside buildings, and reads:

> (m) Water Distribution Piping above Ground (Inside Building). For water distribution piping that is installed inside a building and above ground, only the following materials may be used:
> 1. Iron size brass or copper pipe with cast brass fittings.
> 2. *Type K or L* hard drawn copper tubing that is incised marked and has cast brass or wrought copper fittings. (emphasis added)

109.    Defendants' contractor GAP Mountain installed type M copper tubing (which is marked with a red stripe) in the Ryan residence despite the fact that Massachusetts law only permits type K (marked with a green stripe) or type L (marked with a blue stripe) copper tubing be used. Massachusetts has deemed type M copper tubing inadequate and does not permit type M copper tubing to be used for above-ground water distribution because it is not as thick as type K or type L tubing. If this was indeed Gap Mountain's regular practice, inadequate copper tubing has been illegally installed in over one hundred of Westminster homes.

110.    Upon inspection, Morse Bros. LLC determined that the type M copper tubing must be replaced, that an ultraviolet light must be installed, and that the sequencing of the water softener and POET Systems be reversed at the Ryan residence.

111.     Concurrent with the flaws outlined above, Defendants allowed bottled water deliveries to the Ryans to be cancelled in early October.

112.    When notified of these violations of their agreements with MassDEP, Defendants described Plaintiffs' complaints as "frivolous" and "without basis in fact or law".  Further, the Defendants threatened to move for sanctions if Plaintiffs persisted with their complaints.

113.     Subsequently, Defendants stated they would endeavor to fix the issues with POET System installations, and resume water deliveries, claiming that a "mystery caller" had caused water deliveries to Plaintiffs to stop.

114.      The Defendants' remediation efforts to date are inadequate and have failed to correct the problems caused by the contamination.

VI.     DEFENDANTS ASSOCIATED TO ILLEGALLY AVOID COMPLIANCE COSTS, CONCEAL COMPLIANCE FAILURES, AND PREVENT INVESTIGATIONS INTO THE SAME.

115.     Seaman Paper first began dumping "large volumes of short paper fiber sludge" at 65 Bean Porridge Hill Road in the 1980s. Since then, awareness of the dangers posed by PFAS6 chemicals has increased as have the costs of complying with environmental regulations concerning the used of hazardous substances.

116.     At all relevant times, Defendants operated an enterprise (the "Otter Farm Enterprise") involving the unchecked dumping of paper sludge at the property owned by Otter Farm and used by MassNatural.  The Defendants' unlawful enterprise was intentionally concealed by the fraudulent certifications by MassNatural that its operations were in compliance with its MassDEP permits and applicable regulations.

A.  THE UNLAWFUL ENTERPRISE FORMED BY DEFENDANTS AND THEIR OFFICERS (1) ILLEGALLY AVOIDED COMPLIANCE COSTS AND (2) PURPOSEFULLY CONCEALED COMPLIANCE VIOLATIONS

117.     Facing significant regulatory compliance costs, substantial fines, and liability for past environmental compliance failures, Seaman Paper, Seaman Paper & Otter Farm President George D. Jones, Otter Farm, MassNatural, and MassNatural President and owner Williams S. Page, Sr., and the Greif Defendants associated as members of an enterprise formed for the common and/or shared purposes of (1) enterprise members avoiding burdensome environmental

26

regulatory compliance costs; (2) concealing enterprise members' compliance failures; and (3) preventing investigations by into enterprise members' compliance violations of  environmental regulations by MassDEP and other regulators which  would likely result in substantial fines and legal liability and damages. This unlawful association is hereinafter referred to as the "Otter Farm Enterprise".

118.    As part of and to accomplish the common purposes of the unlawful Otter Farm Enterprise, Seaman Paper and the Greif Defendants paid MassNatural to take its PFAS6-contamianted paper sludge to use in its composting operations. MassNatural, in exchange for payment, willingly and without complying with the terms of the permit issued to MassNatural by MassDEP participated in the unlawful Otter Farm Enterprise while simultaneously and fraudulently representing to MassDEP and other regulators that MassNatural was in compliance with all applicable permits and regulations.

119.    The activities of the unlawful Otter Farm Enterprise, detailed below, as carried out by enterprise members as an unlawful association, were distinct from the individual operational activities carried out by each Otter Farm Enterprise member in furtherance of the separate business of each unassociated member.  For example, Seaman Paper, Greif, and MassNatural operate separate distinct businesses which with no relationship to the other except those entered into for the common purpose (1) allowing enterprise members to illegally avoid burdensome environmental regulatory compliance costs; (2) concealing enterprise members' compliance failures; and (3) preventing investigations by into enterprise members' failures to comply   with environmental regulations by authorities such as MassDEP and others.

120.    Defendants intended to associate together as members of the unlawful Otter Farm Enterprise via a series of corporate and real estate transactions and customer relationships in

order to engage in unlawful violations of statutory and regulatory requirements. For example, public land records show that Seaman Paper, Otter Farm, Molly Hill Farms Inc. (controlled by MassNatural's William S. Page, Jr.), and MassNatural executed a series of corporate and real estate transactions which manifest the enterprise members unlawful associations:

a. First, public land records show that by January 10, 2002, the property at 65 Bean Porridge Hill Road owned by Molly Hills Farms, Inc. had gone into foreclosure and that the mortgagor took possession of 65 Bean Porridge Hill Road.

b. Second, on January 10, 2002, Seaman Paper Co. of Mass., Inc. purchased at foreclosure the land located at 65 Bean Porridge Hill Road at public auction for $675,000.

c. Third, Seaman Paper created and organized the Massachusetts Domestic Profit Corporation named Otter Farm, Inc. on January 23, 2002.

d. Fourth, on February 1, 2002, Seaman Paper conveyed its rights pursuant to its successful bid for the land located at 65 Bean Porridge Hill Road to Otter Farm, Inc.

e. Fifth, on August 1, 2002 Otter Farm, Inc. via Seaman Paper President George D. Jones, together with Massachusetts Natural Fertilizer Company, Inc., via William S. Page, Sr., caused a Notice of Lease and Option to Purchase to be filed at the Worcester Registry of Deeds reflecting that Otter Farms, Inc. had agreed to lease the property at 65 Bean Porridge Hill Road to MassNatural for a team of "Five (5) Years Commencing on August 1, 2002" with a right of extension or renewal giving MassNatural the right to extend the lease for

"Eighteen (18) Additional Five (5) Year Terms with the Last Such Term
Ending on July 31, 2097." MassNatural was also given an option to purchase
during the term of the lease. Upon information and belief, attendant
circumstances suggest that MassNatural was granted rights under the lease
below market rates.

121.    Concurrently in 2002, the Greif Defendants arranged for MassNatural to begin
picking up, transporting, storing, processing, and/or disposing of the PFAS6-contaminated waste
generated by the Greif Mill.

122.    These transactions established relationships between Seaman Paper, Otter Farm,
the Greif Defendants, and MassNatural and the nature of the transactions (*i.e.*, a nearly century-
long lease) manifests the intentions of the enterprise members that the unlawful association
would last long enough to accomplish the Otter Farm Enterprise's unlawful common and/or
shared purposes.  These relationships were for the common and/or shared purposes of increasing
profits via (1) Otter Farm Enterprise members avoiding burdensome environmental regulatory
compliance costs; (2) concealing Otter Farm Enterprise members' compliance failures; and (3)
preventing investigations by into Otter Farm Enterprise members' compliance (or lack of) with
environmental regulations by authorities such as MassDEP and others which could reveal such
information and lead to fines and legal liability Collectively, these three purposes are hereinafter
referred to as the "Otter Farm Enterprise's Unlawful Purposes".

123.    Each Defendant engaged in and conducted the affairs of the unlawful Otter Farm
Enterprise by participating in the following scheme:

a.    First, Seaman Paper and Greif paid MassNatural to pick up, transport, dispose
of, store, treat, and/or process what both entities knew or should have known

29

was hazardous material containing concentrations of PFAS6 that pose a danger to human health. Seaman Paper and Greif made these arrangements knowing or with reason to know that MassNatural would not reject their materials due to the presence of hazardous materials because they knew MassNatural would not conduct testing of incoming materials necessary to detect hazardous materials. MassNatural's conduct saved Seaman Paper and Greif substantial amounts of money in two ways: First, it allowed Seaman Paper and Greif to avoid overhauling their manufacturing processes since MassNatural was willing to take hazardous materials off their hand. Second, Seaman Paper and Greif did not have to hire the required specially licensed hazardous waste transportation companies to transport hazardous materials.

b. Second, and in direct violation of several provisions of MassNatural's 2020 RCC Permit, MassNatural illegally transported, disposed of, stored, treated, and/or processed the hazardous materials acquired from Seaman Paper and Greif and sold untested contaminated consumer products to Plaintiffs and Class Members.

c. Third, MassNatural concealed the illegality of the scheme from authorities by annually certifying under penalty of perjury to MassDEP that MassNatural's operations were in compliance with its 2020 RCC Permit and all applicable regulations while knowing the statements were untrue. MassNatural's fraudulent certifications prevented MassDEP or other regulatory bodies from discovering the Otter Farm Enterprise's illegal operations.

B.  THE OTTER FARM ENTERPRISE ENGAGED IN A PATTERN OF RACKETEERING.

124.    At all relevant times, MassNatural's transmissions of false certifications to MassDEP and/or other authorities as part of the Otter Farm Enterprise's fraudulent scheme constituted "fraud by wire" pursuant to 18 U.S.C. § 1343 or "mail fraud" pursuant to 18 U.S.C. § 1341, and by repeatedly committing wire fraud and/or mail fraud, the Otter Farm Enterprise engaged in "a pattern of racketeering" prohibited by 18 U.S.C. § 1962.

125.    Plaintiffs Amended Class Action Complaint alleges a pattern of wire fraud and/or mail fraud, RICO predicate acts, and how those acts were in furtherance of Defendants' unlawful scheme. Upon information and belief, Plaintiffs assert that the specific instances of unlawful acts as alleged herein exist above and beyond the facts known to Plaintiffs as set forth herein and that a number of transmissions of false statements made in furtherance of the Defendants' unlawful scheme via wire facilities have been concealed.  Upon information and belief, discovery will reveal such additional unlawful acts. Upon information and belief, Defendants took steps to ensure no third parties obtained knowledge of their unlawful enterprise activities. Defendants' conduct constituting, *inter alia*, wire fraud and/or mail fraud is outlined below.

i.  THE 2020 RCC PERMIT REQUIRED THAT MASSNATURAL ENSURE ITS OPERATIONS, INCLUDING INCOMING MATERIALS AND OUTGOING MATERIALS, DID NOT POSE A THREAT OR CAUSE HARM TO PUBLIC HEALTH.

126.    During the Class Period, MassNatural operated pursuant to two sets of permits: (1) two permits issued in 1987 (the "1987 Permits"); and (2) the 2020 RCC Permit. The first set of permits was issued in 1987 by the Westminster Board of Health and MassDEP and authorized the composting of paper fiber waste and agricultural byproducts. Both the 1987 Permits and the 2020 RCC Permit contained reporting requirements which required, *inter alia*, that MassNatural

periodically certify that its operations were in compliance with the terms of the permits and with

applicable regulations.

127.    The 1987 Permits required that MassNatural maintain a groundwater monitoring

program which would be able to detect if the composing operation was contaminating the area's

groundwater and threatening public health:

> 8. A groundwater monitoring program of the area downgradient to the active composting
> site shall be conducted by a hydrogeologist or engineer registered in the Commonwealth.
> The contractors plan for placement, installation, monitoring schedule, and monitoring
> parameters shall be submitted to the Department by December 1, 1987, for review and
> approval. No construction of monitoring wells shall begin at the site prior to Department
> approval.[23]

128.    The 1987 Permits also required, *inter alia*, that a monthly report certifying

compliance with the 1987 Permits' conditions, such as the testing of incoming materials, be filed

with MassDEP:

> 11. A monthly report, prepared by the Project Manager, shall be submitted to the
> Department. Such report shall include, but not be limited to, a statement of compliance
> with the approved plan, records of all data concerning spot analysis of incoming raw
> material, records of the quantity of all raw materials received, and logs of temperature,
> oxygen, moisture content, and pH, from the active composting process. The need for
> continuing submittals or changes in monitoring schedules will be based on Department
> review.[24]

129.    Without access to Defendants' book and records, Plaintiffs cannot determine

whether MassNatural in fact submitted monthly reports as required by the 1987 Permits. If they

did not, then MassNatural was violating the terms of their permits. And, if MassNatural *did*

certify compliance on a monthly basis, based on what we now know, Plaintiffs are confident

---

[23] *Westminster Composing Plan Approval issued to Westminster Farms, Inc./Mass Natural Fertilizer Company*,
MASS. EXEC. OFFICE OF ENVIRONMENTAL AFFAIRS, DEPT. OF ENVIRONMENTAL QUALITY ENGINEERING, (Oct. 16,
1987).
[24] *Id.*

these certifications would meet the definition of wire fraud as defined by 18 U.S.C. § 1343 or mail fraud as defined by 18 U.S.C. § 1431, both RICO predicate acts.

130.    The 2020 RCC Permit was issued by MassDEP to Massachusetts Natural Fertilizer Company, Inc. as Permittee. The 2020 RCC permit identifies the property owner as George D. Jones on behalf of Otter Farm, Inc. and Seaman Paper Company.

131.    The regulations for RCC permits, including the 2020 RCC Permit that replaced MassNatural's 1987 Site Assignment and MassDEP's composting permit, require the Permittee (in this case, MassNatural) to file an annual compliance certification under pains and penalties of perjury stating whether the operation is in compliance with the conditions outlined in the RCC Permit and applicable regulations or, if not, to state the steps and schedule for returning to compliance.

132.    Specifically, Section(s) VI(B)(2)-(4) of the 2020 RCC Permit requires that;

2. The Permittee shall ensure that the Operation, at all times, is conducted in a manner that prevents an unpermitted discharge of pollutants to air, water, land or other natural resources, does not present a significant threat to public health, safety or the environment, and does not cause or contribute to a condition of public nuisance.

3. The Permittee shall ensure that the Operation, at all times, ensures the quality of the incoming materials, including but not limited to ensuring that the incoming materials are not contaminated by toxic substances at levels which may pose a significant threat to public health, safety or the environment, and that the type and quality of the incoming materials is sufficient for the Operation.

4. The Permittee shall ensure that the Operation, at all times, does not accumulate or store or handle materials of a nature or in quantities so as to cause or pose a threat to the public health, safety, welfare or the environment.

133.    Similarly, Section(s) VII(F)(1)-(2) of the 2020 RCC Permit require:

F. Inspection, Handling and Storage of compostable materials:

1. The Permittee shall ensure that all incoming loads of compostable material at the Operation are inspected by Mass. Natural personnel to determine the presence of unacceptable materials, including but not limited to, hazardous waste and universal waste

33

subject to 310 CMR 30.0000, oil or hazardous materials subject to 310 CMR 40.0000, municipal solid waste, non-compostable recyclable materials, and asbestos-containing materials and asbestos-containing waste materials. To the greatest extent practicable, Mass Natural personnel shall identify, and prevent processing of, materials that may threaten or cause harm to public health, safety, and the environmental and/or generate nuisance conditions.

2. The Permittee shall ensure that all incoming loads that contain materials not listed in the table provided in Section VII. A. of this Permit or that contain unacceptable materials, as well as any products contaminated with unacceptable materials, are handled and managed in accordance with all applicable state laws and regulations including without limitation, 310 CMR 16.00, 310 CMR 19.000, 310 CMR 7.00, 310 CMR 30.000, and 310 CMR 40.0000. The Permittee shall ensure that the quality of the incoming materials and the final product is not contaminated by toxic substances at levels which may pose a threat to public health, safety or the environment.

134.    MassNatural violated the terms of the 2020 RCC Permit by failing to test incoming materials for hazardous materials and by accepting PFAS6-contaminated materials into its composting operations.  Further, MassNatural violated the terms of the 2020 RCC Permit by contaminating the aquifer with PFAS6 chemicals.

135.    Instead, MassNatural failed to test the paper sludge acquired from Seaman Paper and Greif for PFAS6 chemicals (since at least 2020 PFAS6 was deemed a hazardous material by MassDEP), and dumped the untested sludge into MassNatural's composting piles where PFAS6 was allowed to spread and contaminate Westminster residents' water supplies. Additionally, MassNatural sold the untested resultant products (topsoil, etc.) that were tainted with PFAS6 to unsuspecting consumers such as Plaintiffs and Class Members.

ii.    <u>MASSNATURAL REPEATEDLY AND FRAUDULENTLY TRANSMITTED MISREPRESENTATIONS TO MASSDEP THAT IT WAS IN COMPLIANCE WITH THE RCC PERMIT.</u>

136.    The 2020 RCC Permit issued by MassDEP to MassNatural requires that MassNatural provide a certification on an annual basis certifying that MassNatural has complied

with all of the terms of the 2020 RCC Permit (including those outlined above) and other

applicable regulations.

137.    Specifically, Section J(3) of the 2020 RCC Permit issued to MassNatural by

MassDEP required MassNatural to annually certify compliance with all regulatory requirements

applicable to the operations of the MassNatural composting facility and the specific terms of the

RCC Permit. Such certification was to be filed via MassDEP's *Re-Trac Connect* online filing

system:

> 3. Annual Compliance Certification with Reporting – In order to validate that the
> Operation is in compliance with all applicable regulatory requirements and the terms and
> conditions of this Permit, the Permittee shall, on an annual basis, submit to MassDEP, no
> later than February 15th of each year, an annual compliance certification pursuant to the
> provisions and requirements of 310 CMR 16.06(1): Compliance Certification
> Requirements. Additionally, the Operator shall be required to submit an annual report to
> MassDEP by February 15th each year. The annual compliance certification and the
> annual report must be submitted jointly via the Re-Trac Connect online filing system that
> is currently accessible via this link:
> http://www.mass.gov/eea/agencies/massdep/service/approvals/annual-report-and-
> certificationpermitted-rcc-operations.htm

138.    The certification had several requirements. Specifically, 310 CMR 16.06(1)(b)

states that a Permittee's certification shall:

> 1. state whether the operation is in compliance with the applicable requirements as listed
> on the certification form and contained in 310 CMR 16.00;
> 2. include a commitment to identify to the Department any violations of 310 CMR 16.00
> that occur;
> 3. if the operation is out of compliance, state what the owner and operator will do to
> return to compliance and the date by which compliance will be achieved; and
> 4. include the following statement: "I, [name of responsible official], attest under the
> pains and penalties of perjury:
>
>> a. that I have personally examined and am familiar with the information contained
>> in this submittal, including any and all documents accompanying this certification
>> statement;
>> b. that, based on my inquiry of those individuals responsible for obtaining the
>> information, the information contained in this submittal is to the best of my
>> knowledge, true, accurate, and complete;

c. that systems to maintain compliance are in place at the operation and will be maintained even if processes or operating procedures are changed;
d. that I am fully authorized to make this attestation on behalf of this operation; and
e. that I am aware that there are significant penalties, including, but not limited to possible fines and imprisonment, for submitting false, inaccurate, or incomplete information"

139.    The annual certification required by the 2020 RCC Permit and 310 CMR 16.00 is an essential part of Massachusetts' environmental regulatory program. The Commonwealth of Massachusetts and its public relies on the certifications of Permittees to comply with environmental laws and regulations. MassDEP does not routinely inspect facilities with RCC permits for compliance because of the penalty of perjury certifications and deterrence of potential fines associated with a Permittee's fraudulent certification.

140.    The pains of perjury certification did not prevent or deter MassNatural from repeatedly, intentionally, and fraudulently misrepresenting to MassDEP that MassNatural was in compliance with MassDEP regulations and the 2020 RCC Permit despite its knowledge that it was not conducting adequate (if any) testing of incoming materials, outgoing materials, or its composting piles to ensure that they did not "pose a threat to public health, safety or the environment."

141.    For example, on February 4, 2021, William S. Page, Jr. and Diane M. Page both signed a RCC Certification form for the calendar year 2020 ("the "2020 RCC Certification") under penalty of perjury that "the operation is operating in compliance with all conditions of the RCC (Recycling, Composting or Conversion) permit issued to the operation by MassDEP as identified by the transmittal/Authorization number and date of issuance of the permit identified below" and checked the box corresponding with "Yes" under indicating that "The operation complies with all the conditions of the RCC permit listed above[.]" The 2020 RCC Certification

listed George Jones of Otter Farm and Seaman Paper as property owner, William S. Page, Jr. as the operator, and William S. Page, Jr. and Diane Page as "responsible official(s)." William S. Page, Jr. and Diane Page then caused the 2021 RCC Certification to be transmitted to MassDEP via wire facility.

142.    Similarly, *just weeks before the contamination was discovered*, on January 11, 2022, William S. Page, Jr. signed a RCC Certification form for the calendar year 2021 (the "2021 RCC Certification") under penalty of perjury stating that "[t]he operation is operating in compliance with all conditions of the RCC (Recycling, Composting or Conversion) permit issued to the operation by MassDEP as identified by the transmittal/Authorization number and date of issuance of the permit identified below" and checked the box corresponding with "Yes" under indicating that "The operation complies with all the conditions of the RCC permit listed above[.]"The 2021 RCC Certification listed George Jones of Otter Farm and Seaman Paper as property owner, William S. Page, Jr. as the operator, and William S. Page, Jr. and Diane Page as "responsible official(s)." Upon information and belief, William S. Page, Jr. and Diane Page then caused the 2021 RCC Certification to be transmitted to MassDEP via wire facility.

143.    Transmission of the 2020 RCC Certification and 2021 RCC Certification via wire facilities constitutes wire fraud pursuant to 18 U.S.C. § 1343. Because these transmissions occurred within 10 years of each other, were related to the same scheme and had the same or similar purpose and method of commission, and were essential to accomplishing the purposes for which the enterprise was formed. These transmissions thus constitute "a pattern of racketeering activity" undertaken by the Otter Farm Enterprise

144.    If, alternatively, the 2020 RCC Certification and/or the 2021 RCC Certification were submitted to MassDEP via U.S. mails, these submissions constitute the use of "the U.S.

mails in conducting a scheme or artifice to defraud, or for obtaining money or property by means

of false or fraudulent pretenses, representations, or promises", or "mail fraud", in violation of 18

U.S.C. 1341.

146. As stated above, Plaintiffs expect discovery to reveal additional instances of false

and misleading statements concerning Otter Farm Enterprise members' compliance with

environmental regulations and permits.

VII.   PLAINTIFFS AND CLASS MEMBERS HAVE BEEN INJURED AS A RESULT
       OF DEFENDANTS' CONDUCT

       a.   PLAINTIFFS AND CLASS MEMBERS WERE INJURED IN THEIR
            PROPERTY BY THE RICO SCHEME.

146. Defendants' compliance failures and wire fraud in furtherance of the unlawful

scheme caused Plaintiffs and Class Members to suffer property damages via, *inter alia*, (1)

diminution of the value of their real property as a result of the contamination of their drinking

water wells; (2) expenses incurred in connection with remediation efforts necessitated by the

contamination, and (3) emotional stress

147. The pattern of racketeering activity employed by the unlawful Otter Farm

Enterprise enabled its members to operate and cause the injurious contamination that has

occurred on the property of Plaintiffs and Class Members. For example, if Defendants complied

with MassDEP's material testing requirements, hazardous materials would not have

contaminated MassNatural's composting operations, and otherwise obviating the contamination

of Plaintiffs' water supply and property.

148. Further, if Defendants had not fraudulently misrepresented compliance with

MassDEP's regulations MassDEP would have affirmatively regulated activities of the enterprise

members to limit the damage caused by the contamination and to perform the necessary remediation.

149.    Injuries caused by the enterprise members were foreseeable to all Defendants. Seaman Paper, Otter Farm and Greif knew or had reason to know that MassNatural would use the paper sludge it collected from the paper mill facilities would yield hazardous materials that would likely contaminate nearby properties.

   b.   <u>DEFENDANTS' CONDUCT HAS PLACED PLAINTIFFS AND CLASS MEMBERS AT INCREASED RISK OF DEVELOPING DANGEROUS DISEASES AND CONDITIONS.</u>

150.    Defendants' conduct caused Plaintiffs and the Class Members to unknowingly ingest and absorb PFAS6 via, *inter alia,* their drinking water, the water they used to cook, and the food which they grew on their properties.

151.    This caused PFAS6 to bioaccumlate over time in Plaintiffs' and Class Members' bodies. The presence of manmade foreign substance, PFAS, in their bodies, tissue, and cells represents a manifest change in the bodies, tissue, and cells of Plaintiffs and Class Members and leaves Plaintiffs and Class Members at an increased risk of serious disease, illness, or injury. This is a physiological change in Plaintiffs' bodies occurring at a subcellular level.

152.    Plaintiffs Thomas Ryan and Susan Ryan and other Class Members have had their blood tested, and detected the presence of PFAS6 in their blood above the background level.

153.    For example, on April 26, 2022 Thomas Ryan's blood was tested for PFAS6 compounds. The results of the testing showed that Mr. Ryan's blood had PFAS6 concentration levels that were several times the typical background amounts, as illustrated by the following chart:

| Compound | Water Concentration Levels | Typical Blood PFAS6 Concentration Levels | Thomas Ryan Concentration Levels |
|---|---|---|---|
| PFBS | 1.09 | 0.05 | 0.11 |
| PFDA* | 2.21 | | NT |
| PFHpA* | 52.40 | 0.47 | 1.9 |
| PFHxA | 29.00 | | NT |
| PFHxS | 0.92 | 4.9 | 2.2 |
| PFNA* | 57.00 | 4.1 | 5.4 |
| PFOA* | 172.00 | 1.9 | 15 |
| PFOS | 848.00 | 13 | 91 |
| Total PFAS | 1132 | | 115.61 |

154.    Similarly, Plaintiff Susan Ryan's blood was tested on April 26, 2022, and her results showed that she had even higher levels of PFAS6 concentration than her husband, Thomas Ryan:

| Compound | Water Concentration Levels | Typical Blood PFAS6 Concentration Levels | Susan Ryan Concentration Levels |
|---|---|---|---|
| PFBS | 1.09 | 0.05 | ND |
| PFDA* | 2.21 | | NT |
| PFHpA* | 52.40 | 0.47 | 1.5 |
| PFHxA | 29.00 | | NT |
| PFHxS | 0.92 | 4.9 | 1.6 |
| PFNA* | 57.00 | 4.1 | 11 |
| PFOA* | 172.00 | 1.9 | 28 |
| PFOS | 848.00 | 13 | 200 |
| Total PFAS | 1132 | | 242.10 |

155.    The bioaccumulation that has occurred in Plaintiffs' and Class Members' bodies, as evidenced by, *inter alia*, Plaintiffs Thomas Ryan's and Susan Ryan's blood test results detailed above, is a subcellular physiological change that has occurred as a result of Defendants' conduct. Further, these subcellular changes indicate that Plaintiffs and Class Members are at increased risk of developing dangerous and deadly diseases.

c.   DEFENDANTS' CONDUCT SUBSTANTIALLY AND UNREASONABLY
INTERFERED WITH PLAINTIFFS' ABILITY TO ENJOY THEIR
PROPERTY.

156.   Defendants' creation, disposal, storage, sale, and/or distribution of PFAS6-
contaminated waste products has injured the Plaintiffs' and the Class Member's enjoyment and
quality of life.

157.   The Plaintiffs' and the Class Members' use and enjoyment of their property have
been substantially and unreasonably impaired by Defendants' conduct. Owners of properties
where the water supply and soil have been contaminated, including Plaintiffs and the Class
Members, can no longer use their natural water sources for drinking, cooking, or other ordinary
household uses. In addition, Plaintiffs and the Class Members cannot eat the fruits and
vegetables from their gardens or the eggs produced by their chickens.

158.   Moreover, the Plaintiffs and the Class Members have suffered diminution of the
value of their homes and properties and an impaired ability to sell their PFAS6-contaminated
homes and properties.

d.   DEFENDANTS' CONDUCT CAUSED PLAINTIFFS AND THE CONSUMER
SUBLASS TO OVERPAY FOR MASSNATURAL CONSUMER PRODUCTS.

159.   Plaintiffs Thomas Ryan and Susan Ryan, and other Class Members that purchased
MassNatural products such as topshelf loam did so without knowing that the products were
contaminated with PFAS6.

160.   As a result, Plaintiffs and Consumer Subclass members were harmed when they
overpaid for topshelf loam they did not know was contaminated and unfit for the purpose for
which it was being sold.

VIII.   ALLEGATIONS OF PLAINTIFFS

a.   THE RYAN PLAINTIFFS

161.    Plaintiff Thomas Ryan and Plaintiff Susan Ryan (collectively, the "Ryan Plaintiffs") moved to Westminster to enjoy a healthier lifestyle, which included open space, clean air and water, and cultivating and eating food grown on their own land.

162.    The Ryan Plaintiffs purchased and currently own a residential property and home (the "Ryan Property") on Bean Porridge Hill Road across from the MassNatural operations located on the Otter Farm Property.

163.    PFAS6-contaminated MassNatural topshelf loam was used during construction of the homesite on the Ryan Property, resulting in PFAS6 contamination of soil and water on the Ryan Property.

164.    PFAS6 has migrated from the operations of MassNatural on the Otter Farm property through runoff and groundwater, including the underground water supply to the Ryan Property.

165.    The Ryan Plaintiffs purchased and used additional topshelf loam from MassNatural in connection with a land reclamation project performed on the Ryan Property after they acquired ownership of the property.

166.    The soil and drinking water on the Ryan Property are contaminated with PFAS6. Testing of soil and water on the Ryan Property has revealed dangerous levels PFAS6 contamination.

b.    THE GALLAGHER PLAINTIFFS

167.    Plaintiffs Sean Gallagher and Ashley Sultan Gallagher (collectively, the "Gallagher Plaintiffs") purchased and currently own a residential property and home in Westminster across Bean Porridge Hill Road from the MassNatural operations at Otter Farm (the "Gallagher Property").

168.    PFAS6-contaminated MassNatural topshelf loam was used during construction of the homesite on the Gallagher Property, resulting in the contamination of soil and water on the Gallagher Property.

169.    PFAS6 also has migrated from the operations of MassNatural on the Otter Farm property through runoff and groundwater, including the underground water supply to the Gallagher Property.

IX.    <u>TOLLING AND ESTOPPEL</u>

a.    <u>DISCOVERY RULE TOLLING</u>

170.    At all relevant times, Plaintiffs and the Class Members did not know or have reason to know of the Defendants' conduct that caused PFAS6 chemical contamination.

171.    Neither Plaintiffs nor any other Class Members, through the exercise of reasonable care, could have discovered the conduct by Defendants alleged herein. Further, Plaintiffs and Class Members did not discover and did not know of facts that would have caused a reasonable person to suspect that Defendants were engaged in the conduct alleged herein.

172.    For these, reasons, all applicable statutes of limitation have been tolled by the discovery rule with respect to claims asserted by Plaintiffs and the Class Members.

b.    <u>FRAUDULENT CONCEALMENT TOLLING</u>

173.    Defendants concealed their conduct and the existence of the claims asserted herein from Plaintiffs and Class Members.

174.    Upon information and belief, Defendants intended its acts to conceal the facts and claims from Plaintiffs and Class Members as secrecy was essential to the success of the Otter Farm Enterprise. Plaintiffs and the Class Members were unaware of the facts alleged herein without any fault or lack of diligence on their part and could not have reasonably discovered

Defendants' conduct. For this reason, applicable limitation of actions and claims, at law or in equity, asserted herein are any statute of limitations that otherwise may apply to the claims of Plaintiffs or Class Members should be tolled with respect to claims asserted by Plaintiffs and the Class Members.

X.     CLASS ALLEGATIONS

175.    Plaintiffs bring this action as a class action pursuant to Federal Rules of Civil Procedure 23(a) and 23(b)(3) on behalf of themselves and the following individuals (the "Class" and "Consumer Subclass" and collectively, the "Classes"):

> **Class**: All natural persons who have lived or owned property in the Study Area (as defined by the LSP-of-record) between 2002 and the present (the "Class Period").

> **Consumer Subclass**: All natural persons who have purchased contaminated composted products from MassNatural during the Class Period.

176.    Plaintiffs reserve the right to expand, narrow or otherwise modify or refine the definition of the Classes based on additional information obtained through further investigation and discovery, and/or in order to address or accommodate any of the Court's manageability concerns.

177.    **Ascertainability**. The proposed Classes are readily ascertainable because they are defined using objective criteria, so as to allow class members to determine if they are part of the Classes. Further, the members of the Classes can be readily identified through records and information in Defendants' possession, custody or control.

178.    **Numerosity**. The Classes are so numerous and geographically dispersed that joinder of individual members is impracticable. The exact number of members of the Classes, as herein identified and described, is not known to Plaintiffs at this time and can only be ascertained through appropriate discovery, but given the testing, test results, and conclusions performed and

reported by MassDEP about the nature and extent of PFAS6 contamination, Plaintiffs believe that there are at least hundreds of class members.

179.    **Commonality and Predominance**. Common questions of fact and law exist for each cause of action and predominate over questions solely affecting individual members of the Classes, including the following:

     a.   Whether Defendants' conduct was negligent;

     b.   Whether Defendants' conduct constitutes a public nuisance;

     c.   Whether Defendants' conduct constitutes an abnormally dangerous activity;

     d.   Whether Defendants owed a duty of care to the Class Members;

     e.   Whether the duty of care owed to the Class Members included the duty to protect against exposures to unsafe and unnecessarily high levels of PFAS;

     f.   Whether Defendants breached their duty to warn the Class Members of, and protect the Class Members from, the long-term health risks and consequences of exposure to high levels of PFAS;

     g.   Whether medical monitoring and early detection will provide benefits to the Class Members;

     h.   Whether the PFAS contamination described herein substantially interfered with the Plaintiffs' and the Class Members' use and enjoyment of their property;

     i.   Whether the PFAS contamination described herein caused, and continues to cause, a continuous invasion of the property rights of the Plaintiffs and the Class Members;

45

j.   Whether Defendants caused the devaluation of the Plaintiffs and the Class

Members' properties;

k.   Whether Defendants caused Plaintiffs and Consumer Subclass members to

overpay for consumer products;

l.   Whether Defendants engaged in a fraudulent and/or deceptive scheme or

course of conduct through the Otter Farm Enterprise;

m.   Whether Defendants committed wire fraud; and

n.   Whether Defendants engaged in a pattern of racketeering activity.

180.   **Typicality**. Plaintiffs' claims are typical of the claims of the members of the

Classes. Plaintiffs and the members of the Classes sustained damages arising out of Defendants'

common course of conduct as described in this Complaint. The injuries of Plaintiffs and each

member of the Classes were directly caused by Defendants' wrongful conduct, and Plaintiffs and

the members of the Classes assert similar claims for relief.

181.   **Adequacy**. Plaintiffs have and will continue to fairly and adequately represent

and protect the interests of the Classes. Plaintiffs have retained counsel competent and

experienced in complex litigation and class actions. Plaintiffs have no interest that is antagonistic

to those of the Classes, and Defendants have no known defenses unique to Plaintiffs. Plaintiffs

and their counsel are committed to vigorously prosecuting this action on behalf of the members

of the Classes, and they have the resources to do so. Neither Plaintiffs nor Plaintiffs' counsel has

any interest adverse to those of the other members of the Classes.

182.   **Substantial Benefits**. This class action is appropriate for certification because

class proceedings are superior to other available methods for the fair and efficient adjudication of

this controversy and joinder of all members of the Classes is impracticable. This proposed class

action is manageable. Plaintiffs know of no special difficulty to be encountered in the maintenance of the action that would preclude its maintenance as a class action.

CLAIMS FOR RELIEF

FIRST CLAIM FOR RELIEF
MEDICAL MONITORING
(Against Defendant MassNatural)

183.     Plaintiffs and the Class Members re-allege and incorporate here the allegations set forth above.

184.     Plaintiffs and Class Members have been actually and significantly exposed to dangerous levels of PFAS6 exceeding the levels deemed dangerous by the MassDEP and which are far higher than normal background levels. As is reported by the EPA, PFAS6 are dangerous, hazardous, toxic substances that have been proven to cause disease and illness in humans, including but not limited to certain kidney and reproductive cancers.

185.     Plaintiffs and the Class Members' actual and significant exposure to these dangerous levels of PFAS6 is the direct and proximate result of Defendant MassNatural's intentional, willful, wanton, reckless, and/or negligent conduct in connection with Defendant MassNatural's operations at Otter Farm, specifically the use, storage, emission, discharge, disposal, and/or distribution of PFAS6 chemicals.

186.     As a direct and proximate result of Defendant MassNatural's intentional, willful, wanton, reckless, and/or negligent conduct in connection with Defendant MassNatural's operations at Otter Farm, specifically the use, storage, emission, discharge, disposal, and/or distribution of PFAS6 chemicals, Plaintiffs and the Class Members have ingested and absorbed PFAS6 into their bodies, tissue, and cells where it is known to and has bio accumulated over time. The presence of this manmade foreign substance, PFAS, in their bodies, tissue, and cells

represents a manifest change in Plaintiffs' bodies, tissue and cells and leaves Plaintiffs at an increased risk of serious disease, illness, or injury. This is a physiological change in Plaintiffs' bodies occurring at a subcellular level. Some Plaintiffs and other residents have had their blood tested, and detected the presence of PFAS6 in their blood above the background level.

187.    Due to these subcellular changes from PFAS6 exposure, Plaintiffs and the Class Members are at an increased risk of developing cancer and other illnesses, diseases, and disease processes, which results in their present medical need for periodic diagnostic medical examinations and monitoring.

188.    Diagnostic testing of Plaintiffs and the Class Members for early detection of cancer and other illnesses, diseases, and disease processes caused by exposure to PFAS6 chemicals is reasonably and medically necessary to assure early diagnosis and effective treatment of those conditions.

189.    Plaintiffs and the Class Members have suffered the present harm of the need for the cost of diagnostic testing for the early detection of cancer and other illnesses, diseases, and disease processes. As a direct and proximate result of Defendant MassNatural's intentional, willful, wanton, reckless, and/or negligent acts or omissions in connection with its operations at Otter Farm, specifically the use, storage, emission, discharge, disposal, and/or distribution of PFAS6 chemicals, Plaintiffs and the Class Members require an award of the cost of a medical monitoring program necessary for early detection and treatment of the onset of illnesses, diseases, and disease processes.

190.    Monitoring procedures exist that make possible the early detection of cancer, the progression of biomarker abnormalities, and other illnesses, diseases, and disease processes resulting from exposure to PFAS6. These monitoring procedures will benefit Plaintiffs and the

Class Members, and they are different from what would normally be recommended in the absence of PFAS6 exposure. Such diagnostic testing is reasonably and medically necessary due to the exposure of Plaintiffs and the Class Members to PFAS6 caused by Defendants.

191.    Because Plaintiffs' and the Class Members' claims are based solely on the amount of exposure to PFAS6 caused by Defendants, any alleged alternative exposure, or prior medical or family history, is not a basis for Plaintiffs' and the Class Member's claims in this case.

192.    As a result, Plaintiffs and the Class should be awarded the quantifiable costs of such a monitoring regime. Plaintiffs and the Class Members also seek all other available and necessary relief in connection with this claim.

<u>SECOND CLAIM FOR RELIEF</u>
NEGLIGENCE
(Against Defendant MassNatural)

193.    Plaintiffs and the Class Members re-allege and incorporate here the allegations set forth above.

194.    MassNatural owed Plaintiffs and the Class Members a duty of reasonable care to avoid using, storing, emitting, discharging, disposing, and/or distributing PFAS6 in a manner that would cause Plaintiffs and the Class Members injury or harm. Plaintiffs and the Class Members were located within the scope of the risk created by the MassNatural's conduct and were foreseeable victims of any negligent operations by MassNatural at Otter Farm, including the use, storage, emission, discharge, disposal, sale, and/or distribution of PFAS6.

195.    MassNatural owed Plaintiffs and the Class Members a duty of reasonable care to eliminate or minimize the discharge of PFAS6 into the soil and water, commensurate with the risk of using, emitting, discharging, disposing, and/or distributing PFAS6.

49

196.     Given the likelihood that MassNatural was creating PFAS6 contamination of land and water that would result in exposure to nearby residents, increasing the risk that those residents would develop significant illnesses or diseases, MassNatural also had a duty to use reasonable care to avoid, minimize, or warn about their use, storage, emission, discharge, disposal, and/or distribution of PFAS6.

197.     MassNatural breached its duty to use reasonable care in one or more of the following ways:

a.   By negligently failing to use reasonable care to test and/or screen Incoming Composing Materials;

b.   By negligently conducting composting operations without taking reasonable steps to prevent or minimize the accumulation and emission of PFAS6 chemicals into the soil, groundwater, and its own consumer products;

c.   By negligently selling and/or distributing PFAS6-containing biosolids to customers who were unaware the products contained PSAS6;

d.   By negligently failing to employ safe methods of operation to adequately prevent, control, or eliminate PFAS discharge into the environment;

e.   By negligently failing to institute proper procedures and training to prevent, minimize, and/or promptly and effectively respond to its release of PFAS6 into the environment;

f.   By negligently failing to promptly and effectively respond to its release of PFAS6 into the environment;

g.  By negligently failing to warn Plaintiffs and the Class Members of the PFAS6 they were using, storing, emitting, discharging, disposing, selling, and/or distributing;

h.  By negligently failing to locate its operations in an unpopulated or much less populated area and/or by negligently discharging dangerous amounts of PFAS6 into land and groundwater near a populated community.

i.  By negligently failing to warn current and potential neighboring residents and property owners that they were being exposed to PFAS6 and of the consequent risks of disease the residents acquired because of that exposure.

198.   As a direct and proximate result of MassNatural's negligence, Plaintiffs and the Class Members have suffered, presently suffer, and will continue to suffer, real property damage, out of pocket expenses, personal property damage, loss of use and enjoyment of property, diminution in property value, the necessity for long-term medical monitoring, upset, aggravation, and inconvenience.

199.   MassNatural is liable to Plaintiffs and the Class Members for fair compensation for the resulting injuries, which includes: reasonable expenses incurred for medical care and nursing in the treatment and cure of the injury; diminution in earning capacity; pain and suffering, and diminution in earning capacity as are shown to be reasonably probable to continue in the future.

THIRD CLAIM FOR RELIEF
MASSACHUSETTS CONSUMER PROTECTION ACT
Mass. Gen. Laws ch. 93, §§1, *et seq.*
(Against Defendant MassNatural)

200.   Plaintiffs and the Class Members re-allege and incorporate here the allegations set forth above.

201.    Plaintiffs and the Class Members assert and prosecute claims against MassNatural under the Massachusetts Consumer Protection Law, M.G.L. ch. 93A §1, et seq. ("MCPL"). Plaintiffs have provided notice pursuant to M.G.L. ch. 93A §9(3) to MassNatural, and the statutory period for a response has passed.

202.    MassNatural is a "person" as defined by M.G.L.A. 93A §1(a).

203.    Plaintiffs and members of the Consumer Subclass are consumers of MassNatural consumer products.

204.    MassNatural engaged in deceptive or unfair acts or practices in the in the conduct of trade or commerce, in violation of M.G.L. 93A §2(a), including but not limited to the following:

      a.   Knowingly or recklessly making a false representation as to the characteristics and use of MassNatural products, in violation of 93A §2(a);

      b.   Falsely representing that MassNatural Products are safe for use, in violation of 93A §2(a);

      c.   Advertising MassNatural Products with an intent not to sell them as advertised, in violation of 93A §2(a); and

      d.   Failing to disclose the material information that, as a result of MassNatural's arranging for the transport, disposal, storage, or treatment of PFAS6-contaminated materials, deemed hazardous material under Massachusetts law, MassNatural products contained unsafe PFAS6 chemicals and MassNatural product users were at risk of suffering adverse health effects, in violation of 93A §2(a).

205.    MassNatural's unfair and deceptive trade practices significantly impacted the public, because there are at least hundreds of consumers of MassNatural Products, including Plaintiffs, the Class Members, and the Consumer Subclass Members.

206.    MassNatural's false representations and omissions were material because they were likely to deceive reasonable consumers to induce them to purchase MassNatural products without being aware that MassNatural products were unsafe to use.

207.    As a direct and proximate result of MassNatural's unfair and deceptive acts or practices, Plaintiffs, the Class Members, and the Consumer Subclass Members suffered damages by purchasing MassNatural Products because they would not have purchased MassNatural Products had they known the truth, and they received a product that was worthless or worth substantially less because it is unsafe to use.

208.    Defendant MassNatural's unfair and deceptive trade practices caused injury in fact and actual damages to Plaintiffs, the Class Members, and the Consumer Subclass Members in the form of the loss or diminishment of value of those MassNatural products purchased by Plaintiffs, the Class, and the Consumer Subclass, which caused MassNatural to profit at the expense of Plaintiffs, members of the Class, and members of the Consumer Subclass. The injuries to Plaintiffs, the Class, and the Consumer Subclass were to legally protected interests. The gravity of the harm of Defendant MassNatural's actions is significant, and there is no corresponding benefit to consumers of such conduct.

209.    On August 5, 2022, Plaintiff sent "a written demand for relief, identifying the claimant and reasonably describing the unfair or deceptive act or practice relied upon and the injury suffered" to Defendant MassNatural via certified mail, return receipt requested. Defendant

MassNatural acknowledged receipt of the letter in a letter sent to Plaintiffs' counsel dated September 6, 2022.

210.    Plaintiffs, the Class, and the Consumer Subclass seek relief under 93A §9 including, but not limited to, compensatory damages, statutory damages, restitution, penalties, injunctive relief, and/or attorneys' fees and costs.

FOURTH CLAIM FOR RELIEF
PRIVATE NUISANCE
(Against Defendant MassNatural)

211.    Plaintiffs and the Class Members re-allege and incorporate here the allegations set forth above.

212.    At all relevant times, MassNatural knew or should have known PFAS6 chemicals were hazardous and harmful to real property, water, and human beings, and it was substantially certain that the method and manner of MassNatural's PFAS6 use, storage, emission, discharge, disposal, sale and/or distribution of PFAS6 would cause injuries and property damage to Plaintiffs and the Class Members.

213.    MassNatural, through the negligent, reckless and/or intentional conduct as alleged in this Complaint, has contaminated real property owned and/or possessed by Plaintiffs and the Class Members.

214.    MassNatural created, permitted, and maintained a hazardous condition or activity on property that caused substantial and unreasonable interference with Plaintiffs' and the Class Members' use and enjoyment of their property. Defendants' interference has caused and is causing Plaintiffs and the Class Members to, among other things, refrain from using their land to cultivate and grow fruit, vegetables, and other food and to refrain from using their water to drink, cook, or bathe, resulting in significant inconvenience and expense.

215.     MassNatural's contamination with PFAS6 of real property owned and/or possessed by Plaintiffs and the Class Members also has substantially interfered otherwise with the Plaintiffs' and Class Members' ability to enjoy their property, to avail themselves of their property's value as an asset and/or source of collateral for financing, and to use their property in the manner that each Class Member chooses.

216.     MassNatural's conduct was intentional, negligent, reckless, and ultrahazardous, and its conduct constitutes a continuous invasion of the property rights of Plaintiffs and the Class Members.

217.     As a direct and proximate result of MassNatural's use, storage, emission, discharge, disposal, sale, and/or distribution of PFAS6 and the exposure of the persons and/or property of Plaintiffs and the Class Members to PFAS6 resulting from the conduct of Defendants, Plaintiffs and the Class Members presently suffer, and will continue to suffer, real property damage, out of pocket expense, personal property damage, loss of use and enjoyment of property, diminution in property value, the necessity for long-term medical monitoring, annoyance, upset, aggravation, trauma, and inconvenience.

218.     Plaintiffs and the Class Members are therefore entitled to damages, costs, and a judgment that the nuisance be abated and removed.

<u>FIFTH CLAIM FOR RELIEF</u>
PUBLIC NUISANCE
(Against Defendant MassNatural)

219.     Plaintiffs and the Class Members re-allege and incorporate here the allegations set forth above.

220.     At all relevant times, MassNatural knew or should have known PFAS6 to be hazardous and harmful to real property and human beings, and it was substantially certain that its

use, emission, discharge, disposal, and/or distribution of materials containing PFAS6 would cause injuries and losses to the persons and property of Plaintiffs and the Class Members.

221.    Plaintiffs, the Class Members, and members of the public have a common right to enjoy their real property free of dangerous contamination of their land and water and to live their lives without exposure to unreasonable levels of toxic PFAS6 chemicals.

222.    MassNatural's conduct in arranging for the transport, disposal, storage, and/or treatment of PFAS6-contaminated materials—deemed hazardous material under Massachusetts law—has contaminated groundwater that supplies water to Plaintiffs, the Class members, and the public and substantially and unreasonably infringes upon and transgresses the public right of Plaintiffs and the Class Members to enjoy their real property.

223.    MassNatural knew or should have known that the materials containing PFAS6 they used, stored, emitted, discharged, disposed, sold, and/or distributed would have a deleterious effect upon the health, safety, and well-being of people living in Westminster, Massachusetts and the surrounding areas, including Plaintiffs and the Class Members.

224.    MassNatural's use, storage, emission, discharge, disposal, sale, and/or distribution of materials containing PFAS6 caused those who owned and/or lived on nearby properties, including Plaintiffs and the Class Members, to come into contact with high levels of PFAS6 on a routine and constant basis, causing substantially elevated health risks resulting from exposure to dangerous levels of PFAS6, as well as property damage and diminished property values.

225.    As a direct and proximate result of Defendants' use, storage, emission, discharge, disposal, sale, and/or distribution of materials containing PFAS6, Plaintiffs' and the Class Members' common right to live free of dangerous, toxic substances was eliminated and/or severely diminished.

226.    As a direct and proximate result of Defendants' use, storage, emission, discharge, disposal, sale, and/or distribution of materials containing PFAS in Westminster, Massachusetts and the surrounding area, PFAS6 chemicals contaminated the land and water owned, possessed, and/or used by Plaintiffs and the Class Members, thereby exposing their bodies to PFAS6.

227.    As a direct and proximate result of Defendants' use, storage, emission, discharge, disposal, sale, and/or distribution of materials containing PFAS6, Plaintiffs and the Class Members will be forced to pay for the private removal of contaminants from their property emanating from pollution of public water sources.

228.    As a direct and proximate result of Defendants' use, storage, emission, discharge, disposal, and/or distribution of materials containing PFAS6 and the resulting exposure of Plaintiffs and the Class Members to PFAS6, Plaintiffs and the Class Members presently suffer, and will continue to suffer, real property damage, out of pocket expenses, personal property damage, loss of use and enjoyment of property, diminution in property value, the necessity for long-term medical monitoring, annoyance, upset, aggravation, trauma, and inconvenience.

SIXTH CLAIM FOR RELIEF
ULTRAHAZARDOUS ACITIVITY/STRICT LIABILITY
(Against Defendant MassNatural)

229.    Plaintiffs and the Class Members re-allege and incorporate here the allegations set forth above.

230.    MassNatural's use, transport, disposal, storage, emissions, discharge, distribution, sale, and/or treatment of PFAS6-contaminated materials, constitutes an ultrahazardous activity.

231.    MassNatural's use, transport, disposal, storage, emissions, discharge, distribution, sale, and/or treatment of PFAS6-contaminated materials constitutes an abnormally dangerous activity and cannot be made safe by the exercise of the utmost care. The conduct of MassNatural

in the use, transport, disposal, storage, emissions, discharge, distribution, sale and/or treatment of PFAS6-contaminated materials caused contamination of land and groundwater by PFAS6, which poses a high degree of risk of injury and loss to Plaintiffs and the Class Members.

232.    The presence of PFAS6 contaminants in the environment and the human body poses an inherent and extraordinary threat to human health and well-being and a danger of lasting contamination of property and water.

233.    The contamination of the property, water, and bodies of Plaintiffs and the Class Members were all probable and foreseeable consequences that resulted from MassNatural's use, emission, discharge, disposal, sale, and/or distribution of PFAS6 chemicals.

234.    There is a reasonable likelihood that MassNatural's use, transport, disposal, storage, emissions, discharge, distribution, sale, and/or treatment of PFAS6-contaminated materials in the populated areas of Westminster, Massachusetts and the surrounding area will result in life-threatening cancer and other illnesses, diseases, and disease processes for Plaintiffs and the Class Members. MassNatural's decision to engage in the use, transport, disposal, storage, emissions, discharge, distribution, sale, and/or treatment of PFAS6-contaminated materials in these areas, thereby causing large amounts of PFAS6 to be dispersed into the surrounding community, was unreasonably dangerous.

235.    MassNatural's use, transport, disposal, storage, emissions, discharge, distribution, sale, and/or treatment of PFAS6-contaminated materials created a high risk of harm to those who live in the area, including Plaintiffs and the Class Members, and substantially increased the risk of community residents, including Plaintiffs and the Class Members, developing cancer and other illnesses, diseases, or disease processes.

236.    The activities conducted by MassNatural have been and are exceedingly dangerous, while offering little or no value to the surrounding community.

237.    Because the activities engaged in by MassNatural as outlined in this Complaint are ultrahazardous, MassNatural is strictly liable for any injuries proximately resulting from those activities.

238.    As a direct and proximate result of MassNatural's ultrahazardous activities and the exposure of Plaintiffs and the Class Members to PFAS6 chemicals resulting from those activities, Plaintiffs and the Class Members presently suffer, and will continue to suffer, real property damage, out of pocket expense, personal property damage, loss of use and enjoyment of property, diminution in property value, the necessity for long-term medical monitoring, upset, aggravation, and inconvenience.

## SEVENTH CLAIM FOR RELIEF
## WILLFUL AND WANTON CONDUCT
### (Against Defendant MassNatural)

239.    Plaintiffs and the Class Members re-allege and incorporate here the allegations set forth above.

240.    At all times relevant, MassNatural owed a duty to refrain from willful, wanton, reckless, and/or outrageous conduct and/or conduct that exhibited an utter indifference to and/or conscious disregard of the health, safety, and well-being of Plaintiffs and the Class Members.

241.    Upon information and belief, MassNatural at all relevant times was aware of the considerable health risks associated with the discharge of PFAS6 into soil, groundwater, and consumer products, including the risk of causing various forms of cancer to those exposed by PFAS6 from soil, water, or other exposures.

242.     Upon information and belief, MassNatural at all relevant times knew that its use, storage, emission, discharge, disposal, sale, and/or distribution of materials containing PFAS6 and the receipt and composting of waste and byproducts generated during the production of paper would be likely to result in the emission of unreasonably dangerous levels of PFAS6 into the soil and groundwater in a manner that would be likely to cause significant financial and personal injury to Plaintiffs and the Class Members. .

243.     Notwithstanding this knowledge, Defendant MassNatural acted in a manner that was intentional, willful, wanton, reckless, outrageous, and/or demonstrated an indifference to and/or conscious disregard of the health, safety, and well-being of Plaintiffs and the Class Members by, among other things:

a.   Failing to test and/or screen Incoming Composing Materials, when it represented it was doing so and when it knew doing so was required to ensure safe composting without the substantial risk of contaminating soil, groundwater, and its consumer products;

b.   Conducting composting operations without taking reasonable steps to prevent or minimize the accumulation and emission of PFAS6 chemicals into the soil, groundwater, and its own consumer products, when it knew doing so was necessary to prevent significant financial and/or personal injury to Plaintiffs and the Class Members;

c.   Selling and/or distributing PFAS6-contaminated biosolids to customers who were unaware the products contained PSAS6, despite knowing that doing so would likely cause PFAS6 contamination and the resulting significant

financial and/or personal injury to Plaintiffs, the Class Members, and/or the Consumer Subclass;

d.  Failing to employ safe methods of operation to adequately prevent, control or eliminate PFAS discharge into the environment when it knew doing so was necessary to prevent significant financial and/or personal injury to Plaintiffs and the Class Members;

e.  Failing to institute proper procedures and training to prevent, minimize, and/or promptly and effectively respond to its release of PFAS6 into the environment when it knew doing so was necessary to prevent significant financial and/or personal injury to Plaintiffs and the Class Members;

f.  Failing to promptly and effectively respond to its release of PFAS6 into the environment when it knew doing so was necessary to prevent significant financial and/or personal injury to Plaintiffs and the Class Members;

g.  Failing to warn Plaintiffs and the Class Members of the PFAS6 they were using, storing, emitting, discharging, disposing, selling, and/or distributing when it knew doing so was necessary to prevent significant financial and/or personal injury to Plaintiffs and the Class Members;

h.  Failing to locate its operations in an unpopulated or much less populated area when it knew doing so was necessary to prevent significant financial and/or personal injury to Plaintiffs and the Class Members;

i.  Discharging dangerous amounts of PFAS6 into land and groundwater near a populated community, when it knew doing so would likely cause significant financial and/or personal injury to Plaintiffs and the Class Members; and

j.   Failing to warn current and potential neighboring residents and property owners that they were being exposed to PFAS6 and of their consequent risks of disease because of that exposure when it knew doing so was necessary to prevent significant financial and/or personal injury to Plaintiffs and the Class Members.

k.   Accepting byproduct contaminated with PFAS6 in exchange for financial gain knowing that it would be spreading and redistributing that PFAS6 contamination as part of its sale of composting products.

244.   As a direct and proximate result of MassNatural's willful, wanton, and reckless conduct, Plaintiffs and the Class Members have suffered, presently suffer, and will continue to suffer, real property damage, out of pocket expense, personal property damage, loss of use and enjoyment of property, diminution in property value, the necessity for long-term medical monitoring, annoyance, upset, aggravation, and inconvenience.

<u>EIGHTH CLAIM FOR RELIEF</u>
MEDICAL MONITORING
(Against Defendant Seaman Paper)

245.   Plaintiffs and the Class Members re-allege and incorporate here the allegations set forth above.

246.   Plaintiffs and Class Members have been actually and significantly exposed to dangerous levels of PFAS6, levels that exceed the levels deemed dangerous by the MassDEP and that are far higher than normal background levels. As is reported by the EPA, PFAS6 are dangerous, hazardous, toxic substances that have been proven to cause disease and illness in humans, including but not limited to certain kidney and reproductive cancers.

247.    Upon information and belief, Plaintiffs and the Class Members' actual and significant exposure to these dangerous levels of PFAS6 is the direct and proximate result of Defendant Seaman Paper's intentional, willful, wanton, reckless and/or negligent conduct in connection with Defendant Seaman Paper's disposal of waste materials contaminated with PFAS6 chemicals at MassNatural's operations at Otter Farm.

248.    As a direct and proximate result of Defendant Seaman Paper's intentional, willful, wanton, reckless and/or negligent conduct in connection with disposal of waste materials contaminated with PFAS6 chemicals at MassNatural's operations at Otter Farm, Plaintiffs and the Class Members have ingested and absorbed PFAS6 into their bodies, tissue and cells where it is known to and has bio accumulated over time. The presence of this manmade foreign substance, PFAS, in their bodies, tissue and cells represents a manifest change in Plaintiffs' bodies, tissue, and cells and leaves Plaintiffs at an increased risk of serious disease, illness, or injury. This is a physiological change in Plaintiffs bodies occurring at a subcellular level. Some Plaintiffs and other residents have had their blood tested, and detected the presence of PFAS6 in their blood above the background level.

249.    As owner of Otter Farm, and thus the Otter Farm Property, Seaman Paper is liable to Plaintiffs and the Classes for damages caused by MassNatural's operations.

250.    Due to these subcellular changes from PFAS6 exposure, Plaintiffs and the Class Members are at an increased risk of developing cancer and other illnesses, diseases, and disease processes, which results in their present medical need for periodic diagnostic medical examinations and monitoring.

251.    Diagnostic testing of Plaintiffs and the Class Members for early detection of cancer and other illnesses, diseases, and disease processes caused by exposure to PFAS6

63

chemicals is reasonably and medically necessary to assure early diagnosis and effective treatment of those conditions.

252.    Plaintiffs and the Class Members have suffered the present harm of the need for the cost of diagnostic testing for the early detection of cancer and other illnesses, diseases, and disease processes. As a direct and proximate result of Defendant Seaman Paper's intentional, willful, wanton, reckless, and/or negligent acts or omissions in connection with its operations at Otter Farm, specifically the use, storage, emission, discharge, disposal, and/or distribution of PFAS6 chemicals, Plaintiffs and the Class Members require an award of the cost of a medical monitoring program necessary for early detection and treatment of the onset of illnesses, diseases, and disease processes.

253.    Monitoring procedures exist that make possible the early detection of cancer, the progression of biomarker abnormalities, and other illnesses, diseases, and disease processes resulting from exposure to PFAS6. These monitoring procedures will benefit Plaintiffs and the Class Members, and they are different from what would normally be recommended in the absence of PFAS6 exposure. Such diagnostic testing is reasonably and medically necessary due to the exposure of Plaintiffs and the Class Members to PFAS6 caused by Defendants.

254.    Because Plaintiffs and the Class Members' claims are based solely on the amount of exposure to PFAS6 caused by Defendants, any alleged alternative exposure, or prior medical or family history, is not a basis for Plaintiffs' and the Class Member's claims in this case.

255.    As a result, Plaintiffs and the Class should be awarded the quantifiable costs of such a monitoring regime. Plaintiffs and the Class Members also seek all other available and necessary relief in connection with this claim.

NINTH CLAIM FOR RELIEF
NEGLIGENCE
(Against Defendant Seaman Paper)

256.    Plaintiffs and the Class Members re-allege and incorporate here the allegations set forth above.

257.    Seaman Paper owed Plaintiffs and the Class Members a duty of reasonable care to avoid dumping, emitting, discharging, disposing, and/or distributing materials with high levels of PFAS6 chemicals in a manner and location that would cause Plaintiffs and the Class Members injury or harm. Plaintiffs and the Class Members were located within the scope of the risk created by Seaman Paper's conduct and they were foreseeable victims of negligent disposal of contaminated waste by Seaman Paper.

258.    Seaman Paper owed Plaintiffs and the Class Members a duty of reasonable care to eliminate or minimize the disposal of PFAS6-contaminated waste in a manner and location where it would be expected to leach into the soil, water, and consumer products sold by MassNatural commensurate with the risk of discharging, disposing, and/or distributing PFAS6.

259.    Given the likelihood that Seaman Paper was creating PFAS6 contamination of land and water that would result in exposure to residents near Otter Farm, increasing the risk that those residents would develop significant illnesses or diseases, Seaman Paper also had a duty to use reasonable care to avoid, minimize, or warn about their use, emission, discharge, disposal, and/or distribution of materials containing high levels of PFAS6.

260.    Seaman Paper breached its duty to use reasonable care in one or more of the following ways:

        a.    By negligently failing to use reasonable care to test and/or screen materials it was dumping or otherwise disposing of at MassNatural's operations at Otter

65

Farm so as to ensure it was not disposing of materials that would be likely to contaminate soil, groundwater, and consumer products at Otter Farm;

b.  By negligently dumping PFAS6-contaminated operations at Otter Farm without taking reasonable steps to prevent or minimize the accumulation and emission of PFAS6 chemicals into the soil, groundwater, and consumer products at Otter Farm;

c.  By negligently failing to employ safe methods of disposal to adequately prevent, control or eliminate PFAS discharge into the environment;

d.  By negligently failing to institute proper procedures and training to prevent, minimize, and/or promptly and effectively respond to the release of PFAS6 from its waste products into the environment;

e.  By negligently failing to promptly and effectively respond to its release of PFAS6 into the environment;

f.  By negligently failing to dispose of its contaminated manufacturing waste in a safer, unpopulated or much less populated area and/or by negligently discharging dangerous amounts of PFAS6 into land and groundwater near a populated community.

g.  By negligently failing to warn MassNatural and/or current and potential neighboring residents and property owners near Otter Creek that they were being exposed to PFAS6 and of the consequent risks of disease the residents acquired because of that exposure.

261.  As a direct and proximate result of Seaman Paper's negligence, Plaintiffs and the Class Members have suffered, presently suffer, and will continue to suffer, real property damage,

out of pocket expenses, personal property damage, loss of use and enjoyment of property, diminution in property value, the necessity for long-term medical monitoring, upset, aggravation, and inconvenience.

262.     Seaman Paper is liable to Plaintiffs and the Class Members for fair compensation for the resulting injuries, which includes pain and suffering; reasonable expenses incurred for medical care and nursing in the treatment and cure of the injury; diminution in earning capacity; and pain and suffering and such medical expenses and diminution in earning capacity as are shown to be reasonably probable to continue in the future.

<u>TENTH CLAIM FOR RELIEF</u>
MASSACHUSETTS CONSUMER PROTECTION ACT
Mass. Gen. Laws ch. 93, §§1, *et seq.*
(Against Defendant Seaman Paper)

263.     Plaintiffs and the Class Members re-allege and incorporate here the allegations set forth above.

264.     Plaintiffs and the Class Members assert and prosecute claims against Seaman Paper under the under Massachusetts Consumer Protection Law, M.G.L. ch. 93A §1, *et seq.* Plaintiffs have provided notice pursuant to M.G.L. ch. 93A §9(3) to Seaman Paper, and the statutory period for a response has passed.

265.     Seaman Paper is a "person" as defined by M.G.L.A. 93A §1(a).

266.     Plaintiffs and members of the Consumer Subclass are consumers of MassNatural consumer products.

267.     Seaman Paper engaged in deceptive or unfair acts or practices in the in the conduct of trade or commerce, in violation of M.G.L. 93A §2(a), including but not limited to the following:

268.    Knowingly or recklessly making a false representation as to the characteristics of its disposal of PFAS6 which it knew went into MassNatural products, in violation of 93A §2(a);

      a.    Falsely representing that MassNatural Products are safe for use despite the presence of PFAS6-contaminated chemicals, in violation of 93A §2(a);

      b.    Advertising Seaman Paper's composting operations and MassNatural Products with an intent not to sell it as advertised, in violation of 93A §2(a); and

      c.    Failing to disclose the material information that, as a result of Seaman Paper's and MassNatural's arranging for the transport, disposal, storage, or treatment of PFAS6-contaminated materials, deemed hazardous material under Massachusetts law, MassNatural products contained unsafe PFAS6 chemicalsand that MassNatural product users were at risk of suffering adverse health effects, in violation of 93A §2(a).

269.    Defendant Seaman Paper's unfair and deceptive trade practices significantly impacted the public, because there are at least hundreds of consumers of MassNatural Products, including Plaintiffs, the Class Members, and the Consumer Subclass Members.

270.    Defendant Seaman Paper's false representations and omissions were material because they were likely to deceive reasonable consumers to induce them to purchase MassNatural products without being aware that MassNatural products were unsafe to use.

271.    As a direct and proximate result of Seaman Paper's and MassNatural's unfair and deceptive acts or practices, Plaintiffs, the Class Members, and the Consumer Subclass Members suffered damages by purchasing MassNatural Products because they would not have purchased

MassNatural Products had they known the truth, and they received a product that was worthless or worth substantially less because it is unsafe to use.

272.     Defendant Seaman Paper's unfair and deceptive trade practices caused injury in fact and actual damages to Plaintiffs, the Class Members, and the Consumer Subclass Members in the form of the loss or diminishment of value of those MassNatural products purchased by Plaintiffs, the Class, and the Massachusetts Subclass, which caused Defendant Seaman Paper and Defendant MassNatural to profit at the expense of Plaintiffs, members of the Class, and members of the Consumer Subclass. The injuries to Plaintiffs, the Class, and the Massachusetts Subclass were to legally protected interests. The gravity of the harm of Defendant MassNatural's actions is significant and there is no corresponding benefit to consumers of such conduct.

273.     On August 5, 2022, Plaintiff sent "a written demand for relief, identifying the claimant and reasonably describing the unfair or deceptive act or practice relied upon and the injury suffered" to Defendant Seaman Paper via certified mail, return receipt requested. Defendant Seaman Paper acknowledged receipt of the letter in a letter sent to Plaintiffs' counsel dated September 7, 2022.

274.     Plaintiffs, the Class, and the Consumer Subclass seek relief under 93A §9 including, not limited to, compensatory damages, statutory damages, restitution, penalties, injunctive relief, and/or attorneys' fees and costs.

ELEVENTH CLAIM FOR RELIEF
PRIVATE NUISANCE
(Against Defendant Seaman Paper)

275.     Plaintiffs and the Class Members re-allege and incorporate here the allegations set forth above.

276. At all relevant times, Seaman Paper knew or should have known PFAS6 chemicals were hazardous and harmful to real property, water, and human beings and it was substantially certain that the method and manner of Seaman Paper's disposal of materials contaminated with PFAS6 at MassNatural's business at Otter Farm would cause injuries and property damage to Plaintiffs and the Class Members.

277. Seaman Paper, through the negligent, reckless and/or intentional conduct as alleged in this Complaint, has caused contamination with PFAS6 of real property owned and/or possessed by Plaintiffs and the Class Members.

278. Seaman Paper created a hazardous condition or activity on property at Otter Farm that caused substantial, unreasonable, and foreseeable interference with Plaintiffs' and the Class Members' use and enjoyment of their property. Seaman Paper's interference has caused and is causing Plaintiffs and the Class Members to, among other things, refrain from using their land to cultivate and grow fruit, vegetables, and other food and to refrain from using their water to drink, cook, or bathe, resulting in significant inconvenience and expense.

279. By causing contamination with PFAS6 of real property owned and/or possessed by Plaintiffs and the Class Members, Seaman Paper also has substantially interfered otherwise with the Plaintiffs' and Class Members' ability to enjoy their property, to avail themselves of their property's value as an asset and/or source of collateral for financing, and to use their property in the manner that each Class Member chooses.

280. Seaman Paper's conduct was intentional, negligent, reckless, and ultrahazardous and constitutes a continuous invasion of the property rights of Plaintiffs and the Class Members.

281. As a direct and proximate result of Seaman Paper's dumping, disposal, and/or distribution of PFAS6 at Otter Farm and the resulting exposure of the persons and/or property of

Plaintiffs and the Class Members to PFAS6 resulting from the conduct of Seaman Paper, Plaintiffs and the Class Members presently suffer, and will continue to suffer, real property damage, out of pocket expense, personal property damage, loss of use and enjoyment of property, diminution in property value, the necessity for long-term medical monitoring, annoyance, upset, aggravation, trauma, and inconvenience.

282.    Plaintiffs and the Class Members are therefore entitled to damages, costs, and a judgment that the nuisance be abated and removed.

TWELFTH CLAIM FOR RELIEF
PUBLIC NUISANCE
(Against Defendant Seaman Paper)

283.    Plaintiffs and the Class Members re-allege and incorporate here the allegations set forth above.

284.    At all relevant times, Seaman Paper knew or should have known PFAS6 to be hazardous and harmful to real property and human beings, and it was substantially certain that its use, emission, discharge, disposal, and/or distribution of materials containing PFAS6 at Otter Farm would cause injuries and losses to the persons and property of Plaintiffs and the Class Members.

285.    Plaintiffs, the Class Members, and members of the public have a common right to enjoy their real property free of dangerous contamination of their land and water and to live their lives without exposure to unreasonable levels of toxic PFAS6 chemicals.

286.    Seaman Paper's conduct in arranging for the transport, dumping, and disposal of PFAS6-contaminated materials at Otter Farm—deemed hazardous material under Massachusetts law—has contaminated groundwater that supplies water to Plaintiffs, the Class Members and the

71

public and substantially and unreasonably infringes upon and transgresses the public right of Plaintiffs, the Class Members, and members of the public to enjoy their real property.

287.    Seaman Paper knew or should have known that the materials containing PFAS6 they dumped, discharged, and disposed of at Otter Farm would have a deleterious effect upon the health, safety, and well-being of people living near Otter Farm, including Plaintiffs and the Class Members.

288.    Seaman Paper's use, emission, discharge, disposal, and/or distribution of materials containing PFAS6 at Otter Farm caused those who owned and/or lived on nearby properties, including Plaintiffs and the Class Members, to come into contact with high levels of PFAS6 on a routine and constant basis, causing substantially elevated risks of health problems resulting from exposure to dangerous levels of PFAS6, as well as property damage and diminished property values.

289.    As a direct and proximate result of Seaman Paper's use, emission, discharge, disposal, and/or distribution of materials containing PFAS6 at Otter Farm Defendants' use, Plaintiffs and the Class Members' common right to live free of dangerous, toxic substances was eliminated and/or severely diminished.

290.    As a direct and proximate result of Seaman Paper's use, emission, discharge, disposal, and/or distribution of materials containing PFAS6 at Otter Farm, PFAS6 chemicals contaminated the land and water owned, possessed and/or used by Plaintiffs and the Class Members, thereby exposing their bodies to PFAS6.

291.    As a direct and proximate result of Seaman Paper's use, emission, discharge, disposal, and/or distribution of materials containing PFAS6 at Otter Farm, Plaintiffs and the

Class Members will be forced to pay for the private removal of contaminants from their property emanating from pollution of public water sources.

292.    As a direct and proximate result of Seaman Paper's use, emission, discharge, disposal, and/or distribution of materials containing PFAS6 at Otter Farm and the resulting exposure of Plaintiffs and the Class Members to PFAS6, Plaintiffs and the Class Members presently suffer, and will continue to suffer, real property damage, out of pocket expenses, personal property damage, loss of use and enjoyment of property, diminution in property value, the necessity for long-term medical monitoring, annoyance, upset, aggravation, trauma, and inconvenience.

THIRTEENTH CLAIM FOR RELIEF
ULTRAHAZARDOUS ACITIVITY/STRICT LIABILITY
(Against Defendant Seaman Paper)

293.    Plaintiffs and the Class Members re-allege and incorporate here the allegations set forth above.

294.    Seaman Paper's use, emission, discharge, disposal, and/or distribution of materials containing PFAS6 at Otter Farm has constituted an ultrahazardous activity.

295.    Seaman Paper's use, emission, discharge, disposal, and/or distribution of materials containing PFAS6 at Otter Farm has constituted an abnormally dangerous activity and cannot be made safe by the exercise of the utmost care. The conduct of Seaman Paper in the use, transport, disposal, storage, emissions, discharge, distribution, sale and/or treatment of PFAS6-contaminated materials caused contamination of land and groundwater by PFAS6, which poses a high degree of risk of injury and loss to Plaintiffs and the Class Members.

296.     The presence of PFAS6 contaminants in the environment and the human body poses an inherent and extraordinary threat to human health and well-being and a danger of lasting contamination of property and water.

297.     The contamination of the property, water, and bodies of Plaintiffs and the Class Members were all probable and foreseeable consequences that resulted from Seaman Paper's use, emission, discharge, disposal, and/or distribution of materials containing PFAS6 at Otter Farm.

298.     There is a reasonable likelihood that Seaman Paper's use, emission, discharge, disposal, and/or distribution of materials containing PFAS6 at Otter Farm near the populated areas of Westminster, Massachusetts and the surrounding area will result in life-threatening cancer and other illnesses, diseases, and disease processes for Plaintiffs and the Class Members. Seaman Paper's decision to engage in the use, emission, discharge, disposal, and/or distribution of materials containing PFAS6 at Otter Far, thereby causing large amounts of PFAS6 to be dispersed into the surrounding community, was unreasonably dangerous.

299.     Seaman Paper's use, emission, discharge, disposal, and/or distribution of materials containing PFAS6 at Otter Farm created a high risk of harm to those who live in the area, including Plaintiffs and the Class Members, and substantially increased the risk of community residents, including Plaintiffs and the Class Members, developing cancer and other illnesses, diseases, or disease processes.

300.     The activities conducted by Seaman Paper have been and are exceedingly dangerous, while offering little or no value to the surrounding community.

301.    Because the activities engaged in by Seaman Paper as outlined in this Complaint are ultrahazardous, Seaman Paper is strictly liable for any injuries proximately resulting from those activities.

302.    As a direct and proximate result of Seaman Paper's ultrahazardous activities and the exposure of Plaintiffs and the Class Members to PFAS6 chemicals resulting from those activities, Plaintiffs and the Class Members presently suffer, and will continue to suffer, real property damage, out of pocket expense, personal property damage, loss of use and enjoyment of property, diminution in property value, the necessity for long-term medical monitoring, upset, aggravation, and inconvenience.

### FOURTEENTH CLAIM FOR RELIEF
### WILLFUL AND WANTON CONDUCT
(Against Defendant Seaman Paper)

303.    Plaintiffs and the Class Members re-allege and incorporate here the allegations set forth above.

304.    At all times relevant, Seaman Paper owed a duty to refrain from willful, wanton, reckless, and/or outrageous conduct and/or conduct that exhibited an utter indifference to and/or conscious disregard for the health, safety, and well-being of Plaintiffs and the Class Members.

305.    Upon information and belief, Seaman Paper at all relevant times was aware of the considerable health risks associated with the discharge of PFAS6 into soil, groundwater, and consumer products, including the risk of causing various forms of cancer to those exposed by PFAS6 from soil, water, or other exposures.

306.    Upon information and belief, Seaman Paper at all relevant times knew that its use, emission, discharge, disposal, and/or distribution of materials containing PFAS6 or likely to contain PFAS6 would be likely to result in the emission of unreasonably dangerous levels of

PFAS6 into the soil and groundwater in a manner that would be likely to cause significant financial and personal injury to Plaintiffs and the Class Members.

307.    Notwithstanding this knowledge, Seaman Paper acted in a manner that was intentional, willful, wanton, reckless, outrageous, and/or demonstrated an indifference to and/or conscious disregard of the health, safety, and well-being of Plaintiffs and the Class Members by, among other things:

   a.   Failing to test and/or screen materials it was dumping or disposing of at Otter Farm, when it knew doing so was required to ensure safe composting without the substantial risk of contaminating soil, groundwater, and consumer products;

   b.   Failing to take reasonable steps to prevent or minimize the accumulation and emission of PFAS6 chemicals in materials it dumped or disposed of at Otter Farm, into the soil, when it knew doing so was necessary to prevent significant financial and/or personal injury to Plaintiffs and the Class Members;

   c.   Dumping and/or disposing of PFAS6-contaminated waste products at Otter Farm, despite knowing that doing so would likely cause PFAS6 contamination and the resulting significant financial and/or personal injury to Plaintiffs, the Class Members, and/or the Consumer Subclass;

   d.   Failing to employ safe methods of operation to adequately prevent, control or eliminate PFAS discharge into the environment when it knew doing so was necessary to prevent significant financial and/or personal injury to Plaintiffs and the Class Members;

76

e.  Failing to institute proper procedures and training to prevent, minimize, and/or promptly and effectively respond to its release of PFAS6 into the environment when it knew doing so was necessary to prevent significant financial and/or personal injury to Plaintiffs and the Class Members;

f.  Failing to promptly and effectively respond to its release of PFAS6 into the environment when it knew doing so was necessary to prevent significant financial and/or personal injury to Plaintiffs and the Class Members;

g.  Failing to warn Plaintiffs and the Class Members of their use, emission, discharge, disposal, and/or distribution of materials containing PFAS6 at Otter Farm, when it knew doing so was necessary to prevent significant financial and/or personal injury to Plaintiffs and the Class Members;

h.  Failing to ensure it was dumping or disposing of its waste products in an unpopulated or much less populated area when it knew doing so was necessary to prevent significant financial and/or personal injury to Plaintiffs and the Class Members;

i.  Discharging dangerous amounts of PFAS6 into land and groundwater near a populated community, when it knew doing so would likely cause significant financial and/or personal injury to Plaintiffs and the Class Members; and

j.  Failing to warn current and potential neighboring residents and property owners that they were being exposed to PFAS6 and of the consequent risks of disease the residents acquired because of that exposure when it knew doing so was necessary to prevent significant financial and/or personal injury to Plaintiffs and the Class Members.

308.   As a direct and proximate result of Seaman Paper's willful, wanton, and reckless conduct, Plaintiffs and the Class Members have suffered, presently suffer, and will continue to suffer, real property damage, out of pocket expense, personal property damage, loss of use and enjoyment of property, diminution in property value, the necessity for long-term medical monitoring, annoyance, upset, aggravation, and inconvenience.

**FIFTEENTH CLAIM FOR RELIEF**
MEDICAL MONITORING
(Against Defendant Otter Farm)

309.   Plaintiffs and the Class Members re-allege and incorporate here the allegations set forth above.

310.   Plaintiffs and Class Members have been actually and significantly exposed to dangerous levels of PFAS6, levels that exceed the levels deemed dangerous by the MassDEP and that are far higher than normal background levels. As is reported by the EPA, PFAS6 are dangerous, hazardous, toxic substances that have been proven to cause disease and illness in humans, including but not limited to certain kidney and reproductive cancers.

311.   Plaintiffs and the Class Members' actual and significant exposure to these dangerous levels of PFAS6 is the direct and proximate result of Defendant Otter Farm's intentional, willful, wanton, reckless and/or negligent conduct in its operations at Otter Farm, specifically its use, storage, emission, discharge, disposal, and/or distribution of PFAS6 chemicals.

312.   As a direct and proximate result of Defendant Otter Farm's intentional, willful, wanton, reckless and/or negligent conduct in connection with the operations at Otter Farm, specifically the use, storage, emission, discharge, disposal, and/or distribution of PFAS6 chemicals, Plaintiffs and the Class Members have ingested and absorbed PFAS6 into their

bodies, tissue, and cells where it is known to and has bio accumulated over time. The presence of this manmade foreign substance, PFAS, in their bodies, tissue, and cells represents a manifest change in Plaintiffs' bodies, tissue and cells and leaves Plaintiffs at an increased risk of serious disease, illness, or injury. This is a physiological change in Plaintiffs' bodies occurring at a subcellular level. Some Plaintiffs and other residents have had their blood tested, and detected the presence of PFAS6 in their blood above the background level.

313. Due to these subcellular changes from PFAS6 exposure, Plaintiffs and the Class Members are at an increased risk of developing cancer and other illnesses, diseases, and disease processes, which results in their present medical need for periodic diagnostic medical examinations and monitoring.

314. Diagnostic testing of Plaintiffs and the Class Members for early detection of cancer and other illnesses, diseases, and disease processes caused by exposure to PFAS6 chemicals is reasonably and medically necessary to assure early diagnosis and effective treatment of those conditions.

315. Plaintiffs and the Class Members have suffered the present harm of the need for the cost of diagnostic testing for the early detection of cancer and other illnesses, diseases, and disease processes. As a direct and proximate result of Otter Farm's intentional, willful, wanton, reckless, and/or negligent acts or omissions in connection with its operations at Otter Farm, specifically the use, storage, emission, discharge, disposal, and/or distribution of PFAS6 chemicals, Plaintiffs and the Class Members require an award of the cost of a medical monitoring program necessary for early detection and treatment of the onset of illnesses, diseases, and disease processes.

316.     Monitoring procedures exist that make possible the early detection of cancer, the progression of biomarker abnormalities, and other illnesses, diseases, and disease processes resulting from exposure to PFAS6. These monitoring procedures will benefit Plaintiffs and the Class Members, and they are different from what would normally be recommended in the absence of PFAS6 exposure. Such diagnostic testing is reasonably and medically necessary due to the exposure of Plaintiffs and the Class Members to PFAS6 caused by defendants.

317.     Because Plaintiffs and the Class Members' claims are based solely on the amount of exposure to PFAS6 caused by Defendants, any alleged alternative exposure, or prior medical or family history, is not a basis for Plaintiffs' and the Class Member's claims in this case.

318.     As a result, Plaintiffs and the Class should be awarded the quantifiable costs of such a monitoring regime. Plaintiffs and the Class Members also seek all other available and necessary relief in connection with this claim.

SIXTEENTH CLAIM FOR RELIEF
NEGLIGENCE
(Against Defendant Otter Farm)

319.     Plaintiffs and the Class Members re-allege and incorporate here the allegations set forth above.

320.     Otter Farm owed Plaintiffs and the Class Members a duty of reasonable care to avoid using, storing, emitting, discharging, disposing, and/or distributing PFAS6 in a manner that would cause Plaintiffs and the Class Members injury or harm. Plaintiffs and the Class Members were located within the scope of the risk created by the Otter Farm's conduct, and they were foreseeable victims of any negligent operations at Otter Farm, including the use, storage, emission, discharge, disposal, sale, and/or distribution of PFAS6

321.     Otter Farm owed Plaintiffs and the Class Members a duty of reasonable care to eliminate or minimize the discharge of PFAS6 into the soil and water, commensurate with the risk of using, emitting, discharging, disposing, and/or distributing PFAS6.

322.     Given the likelihood that Otter Farm was creating PFAS6 contamination of land and water that would result in exposure to nearby residents, increasing the risk that those residents would develop significant illnesses or diseases, Otter Farm also had a duty to use reasonable care to avoid, minimize, or warn about their use, storage, emission, discharge, disposal, and/or distribution of PFAS6.

323.     Otter Farm breached its duty to use reasonable care in one or more of the following ways:

      a.   By negligently failing to use reasonable care to ensure testing and/or screening of Incoming Composing Materials;

      b.   By negligently permitting composting operations without taking reasonable steps to prevent or minimize the accumulation and emission of PFAS6 chemicals into the soil, groundwater;

      c.   By negligently failing to employ and/or enforce safe methods of operation at Otter Farm to adequately prevent, control or eliminate PFAS discharge into the environment;

      d.   By negligently failing to institute or enforce proper procedures and training to prevent, minimize, and/or promptly and effectively respond to its release of PFAS6 into the environment;

      e.   By negligently failing to promptly and effectively respond to its release of PFAS6 into the environment;

f.   By negligently failing to warn Plaintiffs and the Class Members of the PFAS6 they were using, storing, emitting, discharging, disposing, selling, and/or distributing;

g.   By permitting dangerous operations in a populated area and/or by negligently discharging dangerous amounts of PFAS6 into land and groundwater near a populated community; and

h.   By negligently failing to warn current and potential neighboring residents and property owners that they were being exposed to PFAS6 and of the consequent risks of disease the residents acquired because of that exposure.

324.   As a direct and proximate result of Otter Farm's negligence, Plaintiffs and the Class Members have suffered, presently suffer, and will continue to suffer, real property damage, out of pocket expenses, personal property damage, loss of use and enjoyment of property, diminution in property value, the necessity for long-term medical monitoring, upset, aggravation, and inconvenience.

325.   Otter Farm is liable to Plaintiffs and the Class Members for fair compensation for the resulting injuries, which includes pain and suffering, reasonable expenses incurred for medical care and nursing in the treatment and cure of the injury, diminution in earning capacity, and pain and suffering and such medical expenses and diminution in earning capacity as are shown to be reasonably probable to continue in the future.

SEVENTEENTH CLAIM FOR RELIEF
MASSACHUSETTS CONSUMER PROTECTION ACT
Mass. Gen. Laws ch. 93, §§1, *et seq.*
(Against Defendant Otter Farm)

326.    Plaintiffs and the Class Members re-allege and incorporate here the allegations set forth above.

327.    Plaintiffs and the Class Members assert and prosecute claims against Otter Farm under the under Massachusetts Consumer Protection Law, M.G.L.A. ch. 93A §1, *et seq.* ("MCPL"). Plaintiffs have provided notice pursuant to M.G.L. ch. 93A §9(3) to Otter Farm, and the statutory period for a response has passed.

328.    Otter Farm is a "person" as defined by M.G.L.A. 93A §1(a).

329.    Plaintiffs and members of the Consumer Subclass are consumers of MassNatural consumer products produced at Otter Farm.

330.    Otter Farm engaged in deceptive or unfair acts or practices in the in the conduct of trade or commerce, in violation of M.G.L. 93A §2(a), including but not limited to the following:

a.    Knowingly or recklessly making a false representation as to the characteristics and use of components of MassNatural products, in violation of 93A §2(a);

b.    Falsely representing that components of MassNatural Products and MassNatural Products are safe for use, in violation of 93A §2(a);

c.    Advertising components of MassNatural Products and MassNatural Products with an intent not to sell it as advertised, in violation of 93A §2(a); and

d.    Failing to disclose the material information that, as a result of MassNatural's arranging for the transport, disposal, storage, or treatment of PFAS6-contaminated materials, deemed hazardous material under Massachusetts law,

MassNatural products contained unsafe PFAS6 chemicals and that MassNatural product users were at risk of suffering adverse health effects, in violation of 93A §2(a).

331. Otter Farm's unfair and deceptive trade practices significantly impacted the public, because there are at least hundreds of consumers of MassNatural Products, including Plaintiffs, the Class Members, and the Consumer Subclass Members.

332. Otter Farm's false representations and omissions were material because they were likely to deceive reasonable consumers to induce them to purchase MassNatural products without being aware that MassNatural products were unsafe to use.

333. As a direct and proximate result of Otter Farm's unfair and deceptive acts or practices, Plaintiffs, the Class Members, and the Consumer Subclass Members suffered damages by purchasing MassNatural Products because they would not have purchased MassNatural Products had they known the truth, and they received a product that was worthless or worth substantially less because it is unsafe to use.

334. Defendant Otter Farm's unfair and deceptive trade practices caused injury in fact and actual damages to Plaintiffs, the Class Members, and the Consumers Subclass Members in the form of the loss or diminishment of value of those MassNatural products purchased by Plaintiffs, the Class, and the Massachusetts Subclass, which caused MassNatural to profit at the expense of Plaintiffs, members of the Class, and members of the Consumer Subclass. The injuries to Plaintiffs, the Class, and the Massachusetts Subclass were to legally protected interests. The gravity of the harm of Defendant Otter Farm's actions is significant, and there is no corresponding benefit to consumers of such conduct.

335.    On August 5, 2022, Plaintiff sent "a written demand for relief, identifying the claimant and reasonably describing the unfair or deceptive act or practice relied upon and the injury suffered" to Defendant Otter Farm via certified mail, return receipt requested. Defendant Otter Farm acknowledged receipt of the letter in a letter sent to Plaintiffs' counsel dated September 7, 2022.

336.    Plaintiffs, the Class, and the Consumer Subclass seek relief under 93A §9 including, not limited to, compensatory damages, statutory damages, restitution, penalties, injunctive relief, and/or attorneys' fees and costs.

EIGHTEENTH CLAIM FOR RELIEF<br>PRIVATE NUISANCE<br>(Against Defendant Otter Farm)

337.    Plaintiffs and the Class Members re-allege and incorporate here the allegations set forth above.

338.    At all relevant times, Otter Farm knew or should have known PFAS6 chemicals were hazardous and harmful to real property, water, and human beings, and it was substantially certain that the method and manner of Otter Farm's PFAS6 use, storage, emission, discharge, disposal, sale and/or distribution of PFAS6 would cause injuries and property damage to Plaintiffs and the Class Members.

339.    Otter Farm, through the negligent, reckless and/or intentional conduct as alleged in this Complaint, has contaminated real property owned and/or possessed by Plaintiffs and the Class Members.

340.    Otter Farm created, permitted, and maintained a hazardous condition or activity on property that caused substantial and unreasonable interference with Plaintiffs' and the Class Members' use and enjoyment of their property. Defendants' interference has caused and is

85

causing Plaintiffs and the Class Members to, among other things, refrain from using their land to cultivate and grow fruit, vegetables, and other food and to refrain from using their water to drink, cook, or bathe, resulting in significant inconvenience and expense.

341.     Otter Farm's contamination with PFAS6 of real property owned and/or possessed by Plaintiffs and the Class Members also has substantially interfered otherwise with the Plaintiffs' and Class Members' ability to enjoy their property, to avail themselves of their property's value as an asset and/or source of collateral for financing, and to use their property in the manner that each Class Member chooses.

342.     Otter Farm's conduct was intentional, negligent, reckless, and ultrahazardous and its conduct constitutes a continuous invasion of the property rights of Plaintiffs and the Class Members.

343.     As a direct and proximate result of Otter Farm's use, storage, emission, discharge, disposal, sale, and/or distribution of PFAS6 and the exposure of the persons and/or property of Plaintiffs and the Class Members to PFAS6 resulting from the conduct of Defendants, Plaintiffs and the Class Members presently suffer, and will continue to suffer, real property damage, out of pocket expense, personal property damage, loss of use and enjoyment of property, diminution in property value, the necessity for long-term medical monitoring, annoyance, upset, aggravation, trauma, and inconvenience.

344.     Plaintiffs and the Class Members are therefore entitled to damages, costs, and a judgment that the nuisance be abated and removed.

NINETEENTH CLAIM FOR RELIEF
PUBLIC NUISANCE
(Against Defendant Otter Farm)

345.    Plaintiffs and the Class Members re-allege and incorporate here the allegations set forth above.

346.    At all relevant times, Otter Farm knew or should have known PFAS6 to be hazardous and harmful to real property and human beings, and it was substantially certain that its use, emission, discharge, disposal, and/or distribution of materials containing PFAS6 would cause injuries and losses to the persons and property of Plaintiffs and the Class Members.

347.    Plaintiffs, the Class Members, and members of the public have a common right to enjoy their real property free of dangerous contamination of their land and water and to live their lives without exposure to unreasonable levels of toxic PFAS6 chemicals.

348.    Otter Farm's conduct in arranging for or allowing the transport, disposal, storage or treatment of PFAS6-contaminated materials at Otter Farm—deemed hazardous material under Massachusetts law—has contaminated groundwater that supplies water to Plaintiffs, the Class members, and the public and substantially and unreasonably infringes upon and transgresses the public right of Plaintiffs, the Class Members, and members of the public to enjoy their real property.

349.    Otter Farm knew or should have known that the materials containing PFAS6 they used, stored, emitted, discharged, disposed, sold, and/or distributed would have a deleterious effect upon the health, safety, and well-being of people living in Westminster, Massachusetts and the surrounding areas, including Plaintiffs and the Class Members.

350.    Otter Farm's use, storage, composting, emission, discharge, disposal, sale, and/or distribution of PFAS6 caused those who owned and/or lived on nearby properties, including

Plaintiffs and the Class Members, to come into contact with high levels of PFAS6 on a routine and constant basis, causing substantially elevated risks of health problems resulting from exposure to dangerous levels of PFAS6, as well as property damage and diminished property values.

351.    As a direct and proximate result of Otter Farm's use, storage, composting emission, discharge, disposal, sale, and/or distribution of materials containing PFAS6, Plaintiffs' and the Class Members' common right to live free of dangerous, toxic substances was eliminated and/or severely diminished.

352.    As a direct and proximate result of Otter Farm's use, storage, emission, discharge, disposal, sale, and/or distribution of PFAS6 in Westminster, Massachusetts and the surrounding area, PFAS6 chemicals contaminated the land and water owned, possessed and/or used by Plaintiffs and the Class Members, thereby exposing their bodies to PFAS6.

353.    As a direct and proximate result of Otter Farm's use, storage, emission, discharge, disposal, sale, and/or distribution of PFAS6, Plaintiffs and the Class Members will be forced to pay for the private removal of contaminants from their property emanating from pollution of public water sources.

354.    As a direct and proximate result of Defendants' use, storage, emission, discharge, disposal, and/or distribution of PFAS6 and the resulting exposure of Plaintiffs and the Class Members to PFAS6, Plaintiffs and the Class Members presently suffer, and will continue to suffer, real property damage, out of pocket expenses, personal property damage, loss of use and enjoyment of property, diminution in property value, the necessity for long-term medical monitoring, annoyance, upset, aggravation, trauma, and inconvenience.

<u>TWENTIETH CLAIM FOR RELIEF</u>
ULTRAHAZARDOUS ACITIVITY/STRICT LIABILITY
(Against Defendant Otter Farm)

355.    Plaintiffs and the Class Members re-allege and incorporate here the allegations set forth above.

356.    Otter Farm's use, transport, disposal, storage, emissions, discharge, distribution, sale, and/or treatment of PFAS6, constitutes an ultrahazardous activity.

357.    Otter Farm's use, transport, disposal, storage, emissions, discharge, distribution, sale, and/or treatment of PFAS6 constitutes an abnormally dangerous activity and cannot be made safe by the exercise of the utmost care. The conduct of Otter Farm in the use, transport, disposal, storage, emissions, discharge, distribution, sale and/or treatment of PFAS6 caused contamination of land and groundwater by PFAS6, which poses a high degree of risk of injury and loss to Plaintiffs and the Class Members.

358.    The presence of PFAS6 contaminants in the environment and the human body poses an inherent and extraordinary threat to human health and well-being and a danger of lasting contamination of property and water.

359.    The contamination of the property, water, and bodies of Plaintiffs and the Class Members were all probable and foreseeable consequences that resulted from Otter Farm's use, emission, discharge, disposal, sale, and/or distribution of PFAS6 chemicals.

360.    There is a reasonable likelihood that MassNatural's use, transport, disposal, storage, emissions, discharge, distribution, sale, and/or treatment of PFAS6 in the populated areas of Westminster, Massachusetts and the surrounding area will result in life-threatening cancer and other illnesses, diseases, and disease processes for Plaintiffs and the Class Members. Otter Farm's decision to engage in or allow the use, transport, disposal, storage, emissions,

discharge, distribution, sale, and/or treatment of PFAS6 on and from Otter Farm, thereby causing large amounts of PFAS6 to be dispersed into the surrounding community, was unreasonably dangerous.

361.    Otter Farm's use, transport, disposal, storage, emissions, discharge, distribution, sale, and/or treatment of PFAS6 created a high risk of harm to those who live in the area, including Plaintiffs and the Class Members, and substantially increased the risk of community residents, including Plaintiffs and the Class Members, developing cancer and other illnesses, diseases, or disease processes.

362.    The activities conducted by Otter Farm have been and are exceedingly dangerous, while offering little or no value to the surrounding community.

363.    Because the activities engaged in by Otter Farm as outlined in this Complaint are ultrahazardous, Otter Farm is strictly liable for any injuries proximately resulting from those activities.

364.    As a direct and proximate result of Otter Farm's ultrahazardous activities and the exposure of Plaintiffs and the Class Members to PFAS6 chemicals resulting from those activities, Plaintiffs and the Class Members presently suffer, and will continue to suffer, real property damage, out of pocket expense, personal property damage, loss of use and enjoyment of property, diminution in property value, the necessity for long-term medical monitoring, upset, aggravation, and inconvenience.

TWENTY-FIRST CLAIM FOR RELIEF
WILLFUL AND WANTON CONDUCT
(Against Defendant Otter Farm)

365.    Plaintiffs and the Class Members re-allege and incorporate here the allegations set forth above.

366.    At all times relevant, Otter Farm owed a duty to refrain from willful, wanton, reckless, and/or outrageous conduct and/or conduct that exhibited an utter indifference to and/or conscious disregard of the health, safety, and well-being of Plaintiffs and the Class Members.

367.    Upon information and belief, Otter Farm at all relevant times was aware of the considerable health risks associated with the discharge of PFAS6 into soil, groundwater, and consumer products, including the risk of causing various forms of cancer to those exposed by PFAS6 from soil, water, or other exposures.

368.    Upon information and belief, Otter Farm at all relevant times knew that the use, storage, emission, discharge, disposal, sale, and/or distribution of materials containing PFAS6 at Otter Farm and the receipt and composting of waste and byproducts generated during the production of paper at Otter Farm would be likely to result in the emission of unreasonably dangerous levels of PFAS6 into the soil and groundwater in a manner that would be likely to cause significant financial and personal injury to Plaintiffs and the Class Members.

369.    Notwithstanding this knowledge, Otter Farm acted in a manner that was intentional, willful, wanton, reckless, outrageous, and/or demonstrated an indifference to and/or conscious disregard of the health, safety, and well-being of Plaintiffs and the Class Members by, among other things:

    a.    Failing to test and/or screen or ensure there was testing and screening of Incoming Composing Materials, when it knew doing so was required to

ensure safe composting without the substantial risk of contaminating soil, groundwater, and consumer products;

b.   Conducting and/or permitting composting operations at Otter Farm without taking reasonable steps to prevent or minimize the accumulation and emission of PFAS6 chemicals into the soil, groundwater, when it knew doing so was necessary to prevent significant financial and/or personal injury to Plaintiffs and the Class Members;

c.   Failing to employ safe methods of operation to adequately prevent, control or eliminate PFAS discharge into the environment when it knew doing so was necessary to prevent significant financial and/or personal injury to Plaintiffs and the Class Members;

d.   Failing to institute proper procedures and training to prevent, minimize, and/or promptly and effectively respond to its release of PFAS6 into the environment when it knew doing so was necessary to prevent significant financial and/or personal injury to Plaintiffs and the Class Members;

e.   Failing to promptly and effectively respond to its release of PFAS6 into the environment when it knew doing so was necessary to prevent significant financial and/or personal injury to Plaintiffs and the Class Members;

f.   Failing to warn Plaintiffs and the Class Members of the PFAS6 being used, stored, emitted, discharged, disposed, sold, and/or distributed at or from Otter Farm, when it knew doing so was necessary to prevent significant financial and/or personal injury to Plaintiffs and the Class Members;

g.   Permitting the accumulation and discharge of PFAS6 at and from Otter Creek, when it knew doing so was necessary to prevent significant financial and/or personal injury to Plaintiffs and the Class Members;

h.   Discharging dangerous amounts of PFAS6 into land and groundwater near a populated community, when it knew doing so would likely cause significant financial and/or personal injury to Plaintiffs and the Class Members; and

i.   Failing to warn current and potential neighboring residents and property owners that they were being exposed to PFAS6 and of the consequent risks of disease the residents acquired because of that exposure when it knew doing so was necessary to prevent significant financial and/or personal injury to Plaintiffs and the Class Members.

j.   Accepting byproduct contaminated with PFAS6 in exchange for financial gain knowing that it would be spreading and redistributing that PFAS6 contamination as part of its sale of composting products.

370.   As a direct and proximate result of Otter Farm's willful, wanton, and reckless conduct, Plaintiffs and the Class Members have suffered, presently suffer, and will continue to suffer, real property damage, out of pocket expense, personal property damage, loss of use and enjoyment of property, diminution in property value, the necessity for long-term medical monitoring, annoyance, upset, aggravation, and inconvenience.

<u>TWENTY-SECOND CLAIM</u>
MEDICAL MONITORING
(Against the Greif Defendants)

371.   Plaintiffs and the Class Members re-allege and incorporate here the allegations set forth above.

372.     Plaintiffs and Class Members have been actually and significantly exposed to dangerous levels of PFAS6, exceeding the levels deemed dangerous by the MassDEP and which are far higher than normal background levels. As is reported by the EPA, PFAS6 are dangerous, hazardous, toxic substances that have been proven to cause disease and illness in humans, including but not limited to certain kidney and reproductive cancers.

373.     Upon information and belief, Plaintiffs' and the Class Members' actual and significant exposure to these dangerous levels of PFAS6 is the direct and proximate result of the Greif Defendants' intentional, willful, wanton, reckless and/or negligent conduct in connection with the Greif Defendants' disposal of waste materials contaminated with PFAS6 chemicals at MassNatural's operations at Otter Farm.

374.     As a direct and proximate result of the Greif Defendants' intentional, willful, wanton, reckless and/or negligent conduct in connection with disposal of waste materials contaminated with PFAS6 chemicals at MassNatural's operations at Otter Farm, Plaintiffs and the Class Members have ingested and absorbed PFAS6 into their bodies, tissue, and cells where it is known to and has bio accumulated over time. The presence of this manmade foreign substance, PFAS, in their bodies, tissue, and cells represents a manifest change in Plaintiffs bodies, tissue and cells and leaves Plaintiffs at an increased risk of serious disease, illness, or injury. This is a physiological change in Plaintiffs bodies occurring at a subcellular level. Some Plaintiffs and other residents have had their blood tested, and detected the presence of PFAS6 in their blood above the background level.

375.     Due to these subcellular changes from PFAS6 exposure, Plaintiffs and the Class Members are at an increased risk of developing cancer and other illnesses, diseases and disease

processes, which results in their present medical need for periodic diagnostic medical examinations and monitoring.

376.     Diagnostic testing of Plaintiffs and the Class Members for early detection of cancer and other illnesses, diseases, and disease processes caused by exposure to PFAS6 chemicals is reasonably and medically necessary to assure early diagnosis and effective treatment of those conditions.

377.     Plaintiffs and the Class Members have suffered the present harm of the need for the cost of diagnostic testing for the early detection of cancer and other illnesses, diseases, and disease processes. As a direct and proximate result of the Greif Defendants' intentional, willful, wanton, reckless, and/or negligent acts or omissions in connection with its operations at Otter Farm, specifically the use, storage, emission, discharge, disposal, and/or distribution of PFAS6 chemicals, Plaintiffs and the Class Members require an award of the cost of a medical monitoring program necessary for early detection and treatment of the onset of illnesses, diseases, and disease processes.

378.     Monitoring procedures exist that make possible the early detection of cancer, the progression of biomarker abnormalities, and other illnesses, diseases, and disease processes resulting from exposure to PFAS6. These monitoring procedures will benefit Plaintiffs and the Class Members, and they are different from what would normally be recommended in the absence of PFAS6 exposure. Such diagnostic testing is reasonably and medically necessary due to the exposure of Plaintiffs and the Class Members to PFAS6 caused by Defendants.

379.     Because Plaintiffs' and the Class Members' claims are based solely on the amount of exposure to PFAS6 caused by Defendants, any alleged alternative exposure, or prior medical or family history, is not a basis for Plaintiffs and the Class Member's claims in this case.

380.    As a result, Plaintiffs and the Class should be awarded the quantifiable costs of such a monitoring regime. Plaintiffs and the Class Members also seek all other available and necessary relief in connection with this claim.

TWENTH-THIRD CLAIM FOR RELIEF
NEGLIGENCE
(Against the Greif Defendants)

381.    Plaintiffs and the Class Members re-allege and incorporate here the allegations set forth above.

382.    The Greif Defendants owed Plaintiffs and the Class Members a duty of reasonable care to avoid dumping, emitting, discharging, disposing, and/or distributing materials with high levels of PFAS6 chemicals in a manner and location that would cause Plaintiffs and the Class Members injury or harm. Plaintiffs and the Class Members were located within the scope of the risk created by the Greif Defendants' conduct and they were foreseeable victims of negligent disposal of contaminated waste by the Greif Defendants.

383.    The Greif Defendants owed Plaintiffs and the Class Members a duty of reasonable care to eliminate or minimize the disposal of PFAS6-contaminated waste in a manner and location where it would be expected to leach into the soil, water, and consumer products sold by MassNatural commensurate with the risk of discharging, disposing, and/or distributing PFAS6.

384.    Given the likelihood that the Greif Defendants were creating PFAS6 contaminated products and that contamination of land and water that would result in exposure of Westminster to PFAS6 thus increasing the risk that those residents would develop significant illnesses or diseases, the Greif Defendants also had a duty to use reasonable care to avoid, minimize, or warn about their use, emission, discharge, disposal, and/or distribution of materials containing high levels of PFAS6.

385.     The Greif Defendants breached their duty to use reasonable care in one or more of the following ways:

      a.   By negligently failing to use reasonable care to test and/or screen materials it was dumping or otherwise disposing of at MassNatural's operations at Otter Farm to ensure it was not disposing of materials that would be likely to contaminate soil, groundwater, and consumer products at Otter Farm;

      b.   By negligently dumping PFAS6-contaminated operations at Otter Farm without taking reasonable steps to prevent or minimize the accumulation and emission of PFAS6 chemicals into the soil, groundwater, and consumer products at Otter Farm;

      c.   By negligently failing to employ safe methods of disposal to adequately prevent, control or eliminate PFAS discharge into the environment;

      d.   By negligently failing to institute proper procedures and training to prevent, minimize, and/or promptly and effectively respond to the release of PFAS6 from its waste products into the environment;

      e.   By negligently failing to promptly and effectively respond to its release of PFAS6 into the environment;

      f.   By negligently failing to dispose of its contaminated manufacturing waste in a safer, unpopulated or much less populated area and/or by negligently discharging dangerous amounts of PFAS6 into land and groundwater near a populated community; and

      g.   By negligently failing to warn MassNatural and/or current and potential neighboring residents and property owners near Otter Farm that they were

being exposed to PFAS6 and of the consequent risks of disease the residents

acquired because of that exposure.

386.    As a direct and proximate result of the Greif Defendants' negligence, Plaintiffs

and the Class Members have suffered, presently suffer, and will continue to suffer, real property

damage, out of pocket expenses, personal property damage, loss of use and enjoyment of

property, diminution in property value, the necessity for long-term medical monitoring, upset,

aggravation, and inconvenience.

387.    The Greif Defendants are liable to Plaintiffs and the Class Members for fair

compensation for the resulting injuries, which includes pain and suffering, reasonable expenses

incurred for medical care and nursing in the treatment and cure of the injury,diminution in

earning capacity, and pain and suffering and such medical expenses and diminution in earning

capacity as are shown to be reasonably probable to continue in the future.

TWENTY-FOURTH CLAIM FOR RELIEF
MASSACHUSETTS CONSUMER PROTECTION ACT
Mass. Gen. Laws ch. 93, §§1, *et seq.*
(Against Defendant the Greif Defendants)

388.    Plaintiffs and the Class Members re-allege and incorporate here the allegations set

forth above.

389.    Plaintiffs and the Class Members assert and prosecute claims against the Greif

Defendants under the under Massachusetts Consumer Protection Law, M.G.L.A. ch. 93A §1, *et*

*seq.* ("MCPL").  Plaintiffs have provided notice pursuant to M.G.L. ch. 93A §9(3) to the Greif

Defendants, and the statutory period for a response has passed.

390.    Each of the Greif Defendants is a "person" as defined by M.G.L. 93A §1(a).

391.    Plaintiffs and Consumer Subclass Members are consumers of MassNatural

consumer products, which are made using Greif Paper.

98

392.    The Greif Defendants engaged in deceptive or unfair acts or practices in the in the conduct of trade or commerce, in violation of M.G.L. 93A §2(a), including but not limited to the following:

      a.    Knowingly or recklessly making a false representation as to the characteristics and use of MassNatural products, in violation of 93A §2(a); and

      b.    Failing to disclose the material information that, as a result of MassNatural arranging for the transport, disposal, storage, or treatment of PFAS6-contaminated materials, deemed hazardous material under Massachusetts law, MassNatural products contained unsafe PFAS6 chemicals and that MassNatural product users were at risk of suffering adverse health effects, in violation of 93A §2(a).

393.    The Greif Defendants' unfair and deceptive trade practices significantly impacted the public, because there are millions of consumers of MassNatural Products, including Plaintiffs, the Class Members, and the Consumer Subclass.

394.    The Greif Defendants' false representations and omissions were material because they were likely to deceive reasonable consumers to induce them to purchase MassNatural products without being aware that MassNatural products were unsafe to use.

395.    As a direct and proximate result of the Greif Defendants' unfair and deceptive acts or practices, Plaintiffs, the Class Members, and the Consumer Subclass Members suffered damages by purchasing MassNatural Products because they would not have purchased MassNatural Products had they known the truth, and they received a product that was worthless or worth substantially less because it is unsafe to use.

396.     The Greif Defendants' unfair and deceptive trade practices caused injury in fact and actual damages to Plaintiffs, the Class Members, and the Consumers Subclass Members in the form of the loss or diminishment of value of those MassNatural products purchased by Plaintiffs, the Class, and the Massachusetts Subclass, which caused MassNatural to profit at the expense of Plaintiffs, members of the Class, and Consumer Subclass Members. The injuries to Plaintiffs, the Class Members, and the Consumer Subclass Members were to legally protected interests. The gravity of the harm of Defendant Greif's actions is significant, and there is no corresponding benefit to consumers of such conduct.

397.     On August 5, 2022, Plaintiff sent "a written demand for relief, identifying the claimant and reasonably describing the unfair or deceptive act or practice relied upon and the injury suffered" to Defendants Greif, Caraustar, and Newark Group via certified mail, return receipt requested. Defendants Greif, Caraustar, and Newark Group acknowledged receipt of the letter in a letter sent to Plaintiffs' counsel dated August 25, 2022.

398.     Plaintiffs, the Class, and the Consumer Subclass seek relief under 93A §9 including, not limited to, compensatory damages, statutory damages, restitution, penalties, injunctive relief, and/or attorneys' fees and costs.

TWENTY-FIFTH CLAIM FOR RELIEF
PRIVATE NUISANCE
(Against the Greif Defendants)

399.     Plaintiffs and the Class Members re-allege and incorporate here the allegations set forth above.

400.     At all relevant times, the Greif Defendants knew or should have known PFAS6 chemicals were hazardous and harmful to real property, water, and human beings, and it was substantially certain that the method and manner of the Greif Defendants' disposal of materials

contaminated with PFAS6 at MassNatural's business at Otter Farm would cause injuries and property damage to Plaintiffs and the Class Members.

401.   The Greif Defendants, through the negligent, reckless and/or intentional conduct as alleged in this Complaint, have caused contamination with PFAS6 of real property owned and/or possessed by Plaintiffs and the Class Members.

402.   The Greif Defendants created a hazardous condition or activity on property at Otter Farm that caused substantial, unreasonable, and foreseeable interference with Plaintiffs' and the Class Members' use and enjoyment of their property. The Greif Defendants' interference has caused and is causing Plaintiffs and the Class Members to, among other things, refrain from using their land to cultivate and grow fruit, vegetables, and other food and to use their water to drink, cook, or bathe, resulting in significant inconvenience and expense.

403.   By causing contamination with PFAS6 of real property owned and/or possessed by Plaintiffs and the Class Members, the Greif Defendants also have substantially interfered otherwise with the Plaintiffs' and Class Members' ability to enjoy their property, to avail themselves of their property's value as an asset and/or source of collateral for financing, and to use their property in the manner that each Class Member chooses.

404.   The Greif Defendants' conduct was intentional, negligent, reckless, and ultrahazardous and its conduct constitutes a continuous invasion of the property rights of Plaintiffs and the Class Members.

405.   As a direct and proximate result of the Greif Defendants' dumping, disposal, and/or distribution of PFAS6 at Otter Farm and the resulting exposure of the persons and/or property of Plaintiffs and the Class Members to PFAS6 resulting from the conduct of the Greif Defendants, Plaintiffs and the Class Members presently suffer, and will continue to suffer, real

property damage, out of pocket expense, personal property damage, loss of use and enjoyment of property, diminution in property value, the necessity for long-term medical monitoring, annoyance, upset, aggravation, trauma, and inconvenience.

406.     Plaintiffs and the Class Members are therefore entitled to damages, costs, and a judgment that the nuisance be abated and removed.

TWENTY-SIXTH CLAIM FOR RELIEF
PUBLIC NUISANCE
(Against the Greif Defendants)

407.     Plaintiffs and the Class Members re-allege and incorporate here the allegations set forth above.

408.     At all relevant times, the Greif Defendants knew or should have known PFAS6 to be hazardous and harmful to real property and human beings, and it was substantially certain that its use, emission, discharge, disposal, and/or distribution of materials containing PFAS6 at Otter Farm would cause injuries and losses to the persons and property of Plaintiffs and the Class Members.

409.     Plaintiffs, the Class Members, and members of the public have a common right to enjoy their real property free of dangerous contamination of their land and water and to live their lives without exposure to unreasonable levels of toxic PFAS6 chemicals.

410.     The Greif Defendants' conduct in arranging for the transport, dumping, and disposal of PFAS6-contaminated materials at Otter Farm—deemed hazardous material under Massachusetts law—has contaminated groundwater that supplies water to Plaintiffs, the Class Members, and the public and substantially and unreasonably infringes upon and transgresses the public right of Plaintiffs, the Class Members, and members of the public to enjoy their real property.

102

411.    The Greif Defendants knew or should have known that the materials containing PFAS6 that it dumped, discharged, and disposed of at Otter Farm would have a deleterious effect upon the health, safety, and well-being of people living near Otter Farm, including Plaintiffs and the Class Members.

412.    Greif's use, emission, discharge, disposal, and/or distribution of materials containing PFAS6 at Otter Farm caused those who owned and/or lived on nearby properties, including Plaintiffs and the Class Members, to come into contact with high levels of PFAS6 on a routine and constant basis, causing substantially elevated risks of health problems resulting from exposure to dangerous levels of PFAS6, as well as property damage and diminished property values.

413.    As a direct and proximate result of the Greif Defendants' use, emission, discharge, disposal, and/or distribution of materials containing PFAS6 chemicals at the Otter Farm Property, Plaintiffs' and the Class Members' common right to live free of dangerous, toxic substances was eliminated and/or severely diminished.

414.    As a direct and proximate result of the Greif Defendants' use, emission, discharge, disposal, and/or distribution of materials containing PFAS6 at Otter Farm, PFAS6 chemicals contaminated the land and water owned, possessed, and/or used by Plaintiffs and the Class Members, thereby exposing their bodies to PFAS6.

415.    As a direct and proximate result of the Greif Defendants' use, emission, discharge, disposal, and/or distribution of materials containing PFAS6 at Otter Farm, Plaintiffs and the Class Members will be forced to pay for the private removal of contaminants from their property emanating from pollution of public water sources.

416.     As a direct and proximate result of the Greif Defendants' use, emission, discharge, disposal, and/or distribution of materials containing PFAS6 at Otter Farm and the resulting exposure of Plaintiffs and the Class Members to PFAS6, Plaintiffs and the Class Members presently suffer, and will continue to suffer, real property damage, out of pocket expenses, personal property damage, loss of use and enjoyment of property, diminution in property value, the necessity for long-term medical monitoring, annoyance, upset, aggravation, trauma, and inconvenience.

TWENTY-SEVENTH CLAIM FOR RELIEF
ULTRAHAZARDOUS ACITIVITY/STRICT LIABILITY
(Against the Greif Defendants)

417.     Plaintiffs and the Class Members re-allege and incorporate here the allegations set forth above.

418.     The Greif Defendants' use, emission, discharge, disposal, and/or distribution of materials containing PFAS6 at Otter Farm has constituted an ultrahazardous activity.

419.     The Greif Defendants' use, emission, discharge, disposal, and/or distribution of materials containing PFAS6 at Otter Farm has constituted an abnormally dangerous activity and cannot be made safe by the exercise of the utmost care. The conduct of the Greif Defendants in the use, transport, disposal, storage, emissions, discharge, distribution, sale, and/or treatment of PFAS6-contaminated materials caused contamination of land and groundwater by PFAS6, which poses a high degree of risk of injury and loss to Plaintiffs and the Class Members.

420.     The presence of PFAS6 contaminants in the environment and the human body poses an inherent and extraordinary threat to human health and well-being and a danger of lasting contamination of property and water.

104

421.     The contamination of the property, water, and bodies of Plaintiffs and the Class Members were all probable and foreseeable consequences of the Greif Defendants' use, emission, discharge, disposal, and/or distribution of materials containing PFAS6 at Otter Farm.

422.     There is and was a reasonable likelihood that the Greif Defendants' use, emission, discharge, disposal, and/or distribution of materials containing PFAS6 at Otter Farm near the populated areas of Westminster, Massachusetts and the surrounding area will result in life-threatening cancer and other illnesses, diseases, and disease processes for Plaintiffs and the Class Members. The Greif Defendants' decision to engage in the use, emission, discharge, disposal, and/or distribution of materials containing PFAS6 at Otter Far, thereby causing large amounts of PFAS6 to be dispersed into the surrounding community, was unreasonably dangerous.

423.     The Greif Defendants' use, emission, discharge, disposal, and/or distribution of materials containing PFAS6 at Otter Farm created a high risk of harm to those who live in the area, including Plaintiffs and the Class Members, and substantially increased the risk of community residents, including Plaintiffs and the Class Members, developing cancer and other illnesses, diseases, or disease processes.

424.     The activities conducted by the Greif Defendants have been and are exceedingly dangerous, while offering little or no value to the surrounding community.

425.     Because the activities engaged in by the Greif Defendants as outlined in this Complaint are ultrahazardous, the Greif Defendants are strictly liable for any injuries proximately resulting from those activities.

426.     As a direct and proximate result of the Greif Defendants' ultrahazardous activities and the exposure of Plaintiffs and the Class Members to PFAS6 chemicals resulting from those activities, Plaintiffs and the Class Members presently suffer, and will continue to suffer, real

property damage, out of pocket expense, personal property damage, loss of use and enjoyment of property, diminution in property value, the necessity for long-term medical monitoring, upset, aggravation, and inconvenience.

TWENTY-EIGHTH CLAIM FOR RELIEF
WILLFUL AND WANTON CONDUCT
(Against Defendant Greif)

427.    Plaintiffs and the Class Members re-allege and incorporate here the allegations set forth above.

428.    At all times relevant, the Greif Defendants owed a duty to refrain from willful, wanton, reckless, and/or outrageous conduct and/or conduct that exhibited an utter indifference to and/or conscious disregard of the health, safety, and well-being of Plaintiffs and the Class Members.

429.    Upon information and belief, the Greif Defendants at all relevant times was aware of the considerable health risks associated with the discharge of PFAS6 into soil, groundwater, and consumer products, including the risk of causing various forms of cancer to those exposed by PFAS6 from soil, water, or other exposures.

430.    Upon information and belief, the Greif Defendants at all relevant times knew that its use, emission, discharge, disposal, and/or distribution of materials containing PFAS6 or likely to contain PFAS6 would be likely to result in the emission of unreasonably dangerous levels of PFAS6 into the soil and groundwater in a manner that would be likely to cause significant financial and personal injury to Plaintiffs and the Class Members.

431.    Notwithstanding this knowledge, the Greif Defendants acted in a manner that was intentional, willful, wanton, reckless, outrageous, and/or demonstrated an indifference to and/or

106

conscious disregard of the health, safety, and well-being of Plaintiffs and the Class Members by, among other things:

a. Failing to test and/or screen materials it was dumping or disposing of at Otter Farm, when it knew doing so was required to ensure safe composting without the substantial risk of contaminating soil, groundwater, and its consumer products;

b. Failing to take reasonable steps to prevent or minimize the accumulation and emission of PFAS6 chemicals in materials it dumped or disposed of at Otter Farm, into the soil, when it knew doing so was necessary to prevent significant financial and/or personal injury to Plaintiffs and the Class Members;

c. Dumping and/or disposing of PFAS6-contaminated waste products at Otter Farm, despite knowing that doing so would likely cause PFAS6 contamination and the resulting significant financial and/or personal injury to Plaintiffs, the Class Members, and/or the Consumer Subclass;

d. Failing to employ safe methods of operation to adequately prevent, control or eliminate PFAS discharge into the environment when it knew doing so was necessary to prevent significant financial and/or personal injury to Plaintiffs and the Class Members;

e. Failing to institute proper procedures and training to prevent, minimize, and/or promptly and effectively respond to its release of PFAS6 into the environment when it knew doing so was necessary to prevent significant financial and/or personal injury to Plaintiffs and the Class Members;

f.  Failing to promptly and effectively respond to its release of PFAS6 into the environment when it knew doing so was necessary to prevent significant financial and/or personal injury to Plaintiffs and the Class Members;

g.  Failing to warn Plaintiffs and the Class Members of their use, emission, discharge, disposal, and/or distribution of materials containing PFAS6 at Otter Farm, when it knew doing so was necessary to prevent significant financial and/or personal injury to Plaintiffs and the Class Members;

h.  Failing to ensure it was dumping or disposing of its waste products in an unpopulated or much less populated area when it knew doing so was necessary to prevent significant financial and/or personal injury to Plaintiffs and the Class Members;

i.  Discharging dangerous amounts of PFAS6 into land and groundwater near a populated community, when it knew doing so would likely cause significant financial and/or personal injury to Plaintiffs and the Class Members; and

j.  Failing to warn current and potential neighboring residents and property owners that they were being exposed to PFAS6 and of the consequent risks of disease the residents acquired because of that exposure when it knew doing so was necessary to prevent significant financial and/or personal injury to Plaintiffs and the Class Members.

432.   As a direct and proximate result of the Greif Defendants' willful, wanton, and reckless conduct, Plaintiffs and the Class Members have suffered, presently suffer, and will continue to suffer, real property damage, out of pocket expense, personal property damage, loss

of use and enjoyment of property, diminution in property value, the necessity for long-term

medical monitoring, annoyance, upset, aggravation, and inconvenience.

TWENTY-NINTH CLAIM FOR RELIEF
VIOLATIONS OF THE RACKETEER INFLUENCED AND CORRUPT
ORGANIZATION ACT ("RICO"), 18 U.S.C. § 1962(c)
(Against All Defendants)

433.    Plaintiffs and the Class Members re-allege and incorporate here the allegations set

forth above.

434.    18 U.S.C. § 1962(c) makes it "unlawful for any person employed by or associated

with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce,

to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through

a pattern of racketeering activity."

435.    Defendants Seaman Paper, MassNatural, Greif, Caraustar, and Newark Group are

each "persons," as that term is defined in 18 U.S.C. § 1961(3).

436.    This violations of Section 1962(c) against defendants Seaman Paper,

MassNatural, Greif, Caraustar, and Newark Group are as culpable persons under RICO.

437.    Under 18 U.S.C. § 1961(4), a RICO "enterprise" may be an association-in-fact

that, although it has no formal legal structure, has (i) a common purpose, (ii) relationships among

those associated with the enterprise, and (iii) longevity sufficient to pursue the enterprise's

purpose.

438.    Defendants formed an association-in-fact RICO enterprise with each other (the

Otter Farm Enterprise), and have conducted and/or participated in the conduct of the affairs of

the RICO enterprise through a pattern of racketeering activity in violation of § 1962(c) for the

purposes of carrying out their scheme, which caused Plaintiffs and Class Members to suffer loss

109

of property or money in the form of diminution of the value of their property and incurring out-of-pocket expenses in connection with necessary remediation.

439.    Plaintiffs and Class Members are "persons" as defined in 18 U.S.C. §§ 1961(3) and 1964(c) and have been financially injured as a result of Defendants' unlawful conduct in the form of diminution of the value of their property, out-of-pocket expenses in connection with necessary remediation, and a loss of use and enjoyment of their property, and assert this count for relief pursuant to 18 U.S.C. § 1964(c).

440.    The RICO enterprise was the association-in-fact consisting of Seaman Paper, MassNatural, and the Greif Defendants (the Otter Farm Enterprise).

441.    Until its illegal activities were uncovered, the Otter Farm Enterprise was an ongoing and continuing business organization consisting of both corporations and individuals that are and have been associated for the common and/or shared purposes of (1) illegally avoiding regulatory compliance costs while transporting, processing, storing, and/or disposing of short fiber paper sludge, (2) concealing compliance failures while transporting, processing, storing, and/or disposing of short fiber paper sludge, and (3) preventing investigations into compliance failures which may lead to fines or legal liability.

442.    Defendants conducted and participated in the affairs of the Otter Farm Enterprise through a pattern of racketeering activity under 18 U.S.C. § 1961 and committed wire fraud knowingly and with the intent to advance the scheme.

443.    Comprising racketeering activity under 18 U.S.C. § 1961(1)(B), Defendants have, through Defendant and co-conspirator MassNatural, and in violation of 18 U.S.C. § 1343, transmitted or caused to be transmitted false certifications by means of wire, radio, or television communication in interstate commerce, in conducting a scheme or artifice to defraud, or for

obtaining money or property by means of false or fraudulent pretenses, representations, or promises on at least two occasions. Specifically, as part of and to accomplish the common purpose of the Otter Farm Enterprise, Defendants, through MassNatural engaged in a pattern of racketeering activity by falsely certifying on at least two occasions the Otter Farm Enterprise's compliance with the 2020 RCC Permit issued by MassDEP to MassNatural. Specifically, the Otter Farm Enterprise submitted false 2020 RCC Permit certifications on (1) February 4, 2021, and (2) January 11, 2022.

444.    As outlined herein, MassNatural's false certifications constituted wire fraud pursuant to 18 U.S.C. § 1343 because MassNatural transmitted false and fraudulent statements via communication devices to MassDEP with the intent to deceive MassDEP. Until discovered, MassNatural's pattern of racketeering activity concealed compliance failures and prevented investigations into compliance failures which may have led to discovery of the violations, fines, and/or legal liability

445.    Alternatively, if MassNatural transmitted either or both of the false certifications via U.S. mails, MassNatural's use of the U.S. mails on behalf of the Otter Farm Enterprise in furtherance of the unlawful scheme constituted mail fraud in violation of 18 U.S.C. § 1341, and together with other violations of mail fraud or wire fraud described herein, establish a pattern of racketeering activity under 18 U.S.C. § 1961(1)(B). Until discovered, MassNatural's pattern of racketeering activity concealed compliance failures and prevented investigations into compliance failures which may have led to discovery of the violations, fines, and/or legal liability.

446.    All of Defendants' racketeering activities amounted to a common course of conduct, with a similar pattern and purposes. The racketeering activity constitutes a threat of continuing criminal activity.

447.    Defendants' violations of federal law and their pattern of racketeering activity have directly and proximately caused Plaintiffs and Class Members to be injured in their business or property by (1) suffering diminution in the value of their real property due to PFAS6 contamination; (2) incur out-of-pocket expenses directly related to remediation only necessary because of the PFAS contamination; (3) a loss of use and enjoyment of their property; and (4) by overpaying for consumer products sold by MassNatural. Each Defendant foresaw that Plaintiffs and Class Members would suffer these harms.

448.    By virtue of these violations of 18 U.S.C. § 1962(c), pursuant to 18 U.S.C. § 1964(c), Defendants are jointly and severally liable to Plaintiffs and Class Members for three times the damages that Plaintiff and Class members have sustained, plus the costs of bringing this suit, including reasonable attorneys' fees.

THIRTIETH CLAIM FOR RELIEF
VIOLATIONS OF RICO, 18 U.S.C. § 1962(d)
BY CONSPIRING TO VIOLATE 18 U.S.C. § 1962(c)
(Against All Defendants)

449.    Plaintiffs and the Class Members re-allege and incorporate here the allegations set forth above.

450.    Section 1962(d) of RICO provides that it "shall be unlawful for any person to conspire to violate any of the provisions of subsection (a), (b) or (c) of this section."

451.    Defendants each violated § 1962(d) by agreeing and conspiring to violate 18 U.S.C. § 1962(c). The object of the respective conspiracies has been and is to conduct or participate in, directly or indirectly, the conduct of the affairs of the § 1962(c) Otter Farm Enterprise described previously through a pattern of racketeering activity.

452.    As set forth in detail above, Defendants have engaged in numerous overt and predicate unlawful and fraudulent acts, constituting a pattern of racketeering activity, in

112

furtherance of the conspiracy. Defendants intended to engage in the schemes resulting in Plaintiffs and Class Members suffering diminution of property values and incurring out-of-pocket expenses for necessary remediation.

453.    Defendants knew that their predicate acts were part of a pattern of racketeering activity and agreed to the commission of those acts to further the schemes outlined herein.

454.    The nature of the Defendants' acts, material misrepresentations and omissions in furtherance of the conspiracy, as set forth in detail above, gives rise to an inference that they not only agreed to the objective of an 18 U.S.C. § 1962(d) violation of RICO by conspiring to violate 18 U.S.C. § 1962(c) but that they were aware that their ongoing unlawful and fraudulent acts have been and are part of an overall pattern of racketeering activity.

455.    Defendants have engaged in the commission of overt acts in furtherance of the Otter Farm Enterprise scheme, including multiple instances of wire fraud in violation of 18 U.S.C. § 1343 and /or mail fraud in violation of 18 U.S.C. § 1341.

456.    As a direct and proximate of Defendants' violations of federal and state law, Plaintiffs and Class Members have been injured in their business and property via (1) diminution in the value of Plaintiffs' and Class Members' real property; (2) out-of-pocket expenses incurred to perform necessary remediation as a result of PFAS6 contamination; (3) loss of use and enjoyment of their property; (4) by overpaying for consumer products sold by MassNatural. Plaintiffs and Class Members would not have suffered these losses but for the Defendants' conspiracies to violate 18 U.S.C. § 1962(c).

457.    By virtue of these violations of 18 U.S.C. § 1962(d), Defendants are liable to Plaintiffs and Class Members for three times the damages Plaintiffs and Class Members have sustained, plus the costs of bringing this suit, including reasonable attorneys' fees.

<u>REQUEST FOR RELIEF</u>

WHEREFORE, Plaintiffs, individually and on behalf of the Class Members proposed in this Complaint, request that the Court enter judgment in their favor and against all Defendants as follows:

I.       For an Order certifying the Class, as defined herein, and appointing Plaintiffs and their Counsel to represent the Class;

II.      For an award of damages, including nominal and compensatory damages, as allowed by law and in an amount to be determined;

III.     For treble damages under 18 U.S.C. § 1962(c);

IV.      For an award to Plaintiffs and the Class Members in an amount sufficient to compensate them for real property damage, out of pocket expenses, personal property damage, loss of use and enjoyment of property, diminution in property values, the necessity for long-term medical monitoring, annoyance, upset, aggravation and inconvenience;

V.       For an award to fund a medical monitoring program in an amount determined to be just and reasonable;

VI.      For an award of punitive damages as allowed by law and in an amount to be determined;

VII.     For an award of attorneys' fees, costs, and litigation expenses, as allowed by law;

VIII.    For prejudgment interest on all amounts awarded;

IX.      For injunctive and declaratory relief, under Rule 23(b)(2) and (c)(4) and as otherwise allowed by law, including,

       a.   Injunctive relief under Rule 23(b)(2) as necessary and appropriate to establish a court-supervised program of medical monitoring for the medically necessary diagnostic testing for the early detection of illness, disease, or disease process; and

       b.   Issue certification under Rule 23(c)(4) as necessary and appropriate to provide declaratory relief as to each element of each cause of action alleged herein (medical monitoring, ultrahazardous activity/strict liability, private nuisance, public nuisance, negligence, and willful and wanton conduct).

X.      Such other and further relief as this Court may deem just and proper.

## JURY TRIAL DEMAND

Plaintiffs demand a jury trial on all issues so triable.

DATED:      October 26, 2022         Respectfully submitted,

*/s/ Ian W. Sloss*
Ian W. Sloss (*pro hac vice*)
Sean K. McElligott (BBO #651710)
Paul A. Slager (*pro hac vice*)
Zachary A. Rynar (*pro hac vice*)
SILVER GOLUB & TEITELL LLP
One Landmark Square, 15th Floor
Stamford, Connecticut 06901
Telephone: (203) 325-4491
Facsimile: (203) 325-3769
isloss@sgtlaw.com
smcelligott@sgtlaw.com
pslager@sgtlaw.com
zrynar@sgtlaw.com

J. Tucker Merrigan (BBO #681627)
Victoria Santoro Mair (BBO #679120)
SWEENEY MERRIGAN LAW LLP
268 Summer Street, LL
Boston, MA  02210

tucker@sweeneymerrigan.com
victoria@sweeneymerrigan.com
Telephone: (617) 391-9001
Facsimile: (617) 357-9001

*Counsel for Plaintiffs Thomas Ryan, Susan*
*Ryan, Sean Gallagher, and Ashley Sultan*
*Gallagher*