## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| THOMAS RYAN, SUSAN RYAN, SEAN GALLAGHER, ASHLEY SULTAN GALLAGHER, MICHELE BURT, CHRISTOPHER CERASUOLO, NANCY DONOVAN, AND LAUREN LADUE, individually and on behalf of others similarly situated, | No. 4:22-cv-40089-MRG <br><br> Hon. Margaret R. Guzman |
| *Plaintiffs*, | |
| v. | |
| GREIF, INC., CARAUSTAR INDUSTRIES, INC., THE NEWARK GROUP, INC., MASSACHUSETTS NATURAL FERTILIZER CO., INC., OTTER FARM, INC., SEAMAN PAPER COMPANY OF MASSACHUSETTS, INC., AND 3M COMPANY. | |
| *Defendants*. | |

## PLAINTIFFS' OPPOSITION TO GREIF'S AND CARAUSTAR'S MOTION TO DISMISS PLAINTIFFS' SECOND AMENDED COMPLAINT <u>FOR LACK OF JURISDICTION</u>

# TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ................................................................................................. ii

I.      FACTUAL BACKGROUND ..................................................................................... 3

        A.      The Discovery of PFAS and the Greif Notice of Responsibility ............................. 3

        B.      Greif's Acquisition of Caraustar and Newark Group ............................. 5

        C.      Greif and Caraustar Control the Fitchburg Mill ..................................... 6

II.     LEGAL STANDARD .............................................................................................. 10

III.    ARGUMENT ......................................................................................................... 12

        A.      Greif and Caraustar are Subject to Specific Jurisdiction in
                Massachusetts ................................................................................... 13

                1.      Relatedness ....................................................................... 13

                2.      Purposeful Availment ....................................................... 14

                3.      Reasonableness ................................................................ 15

        B.       Alternatively, Massachusetts Has Jurisdiction over Greif and
                Caraustar through Corporate Veil Piercing .......................................... 17

        C.      Alternatively, Greif and Caraustar are Subject to Specific
                Jurisdiction by Way of Plaintiffs' RICO claims .................................... 19

IV.     CONCLUSION ...................................................................................................... 19

# TABLE OF AUTHORITIES

Cases                                    Page

*A Corp. v. All Am. Plumbing, Inc.,*
    812 F.3d 54 (1st Cir. 2016)........................................................10

*CDM Smith, Inc. v. Thevar,*
    C. A. 1:21-10249-MLW (D. Mass. Sep. 30, 2022) .........................................16

*City of Bangor v. Citizens Communication Co.,*
    No. Civ. 02-183-B-S, 2003 WL 22183205 (D. Maine 2003) ............................18

*D'Allessandro ex rel. Hewitts Landing Condo. Tr. v. Lennar Hingham Holdings, LLC,*
    Civil Action No. 17-cv-12567-IT (D. Mass. July 12, 2018).....................10, 11, 12, 13, 14

*Duggan v. Martorello,*
    Civil Action 18-12277-JGD (D. Mass. Mar. 30, 2022) ....................................19

*Gather, Inc. v. Gatheroo, LLC,*
    443 F. Supp. 2d 108 (D. Mass. 2006) ............................................................15

*Grice v. VIM Holdings Grp., LLC,*
    280 F. Supp. 3d 258 (D. Mass. 2017).............................................................11

*In Re Lernout & Hauspie Securities Litigation,*
    337 F. Supp. 2d 298 (1st Cir. 2004)...............................................................18

*Lewis v. Dimeo Constr. Co.,*
    Civil Action No. 14-cv-10492-IT (D. Mass. May 27, 2015)..........................10, 14, 15, 17

*Scallop Imaging, LLC v. Blackhawk Imaging, LLC,*
    Civil Action No. 17-cv-10092-ADB (D. Mass. Mar. 22, 2018) .........................11, 12, 13

*Scott v. NG US 1, Inc.,*
    450 Mass. 760 (2008) ....................................................................................18

*Smith v. McBc Hydra Boats, LLC,*
    CIVIL ACTION No. 16-11369-LTS (D. Mass. Aug. 18, 2017) .........................15, 16, 17

*Stars for Art Prod. FZ, LLC v. Dandana, LLC,*
    806 F. Supp. 2d 437 (D. Mass. 2011) ............................................................12

*Techtarget, Inc. v. Spark Design, LLC,*
    746 F. Supp. 2d 353 (D. Mass. 2010) ...............................................................17

*United States v. Kayser-Roth Corp.,*
    272 F. 3d 89 (1st Cir. 2001).............................................................................19

## INTRODUCTION

Plaintiffs Thomas Ryan, Susan Ryan, Sean Gallagher, Ashley Sultan Gallagher, Michele Burt, Christopher Cerasuolo, Nancy Donovan, and Lauren Ladue (collectively, "Plaintiffs") have brought this class action against multiple corporate Defendants responsible for the widespread contamination of per- and polyfluoroalkyl substances ("PFAS") across the community of Westminster, Massachusetts, rendering Plaintiffs' drinking water unusable, their property values diminished, and their lives at increased risk from cancer and other diseases. Three of these Defendants – Greif, Inc. ("Greif"), Caraustar Industries, Inc ("Caraustar"), and the Newark Group, Inc. ("Newark Group, and collectively, the "Grief Defendants") – together operate and manage the containerboard mill in Fitchburg, Massachusetts (the "Fitchburg Mill"), which, as Greif states on its website, produces "a range of liners and mediums for [customers'] rollstock needs."[1] Nevertheless, two of the Greif Defendants, Greif and Caraustar, have moved to dismiss all claims on jurisdictional grounds, asserting in their Memorandum of Law in Support of their Motion to Dismiss Plaintiffs' Second Amended Complaint ("SAC") for Lack of Jurisdiction ("Motion to Dismiss")[2] that they are merely the parent companies of the Newark Group and that Plaintiffs have failed to "articulate any nexus between their claims and Greif, Inc. and Caraustar Industries, Inc." and are attempting to "summarily pierce the corporate veil."

Greif's and Caraustar's argument ignores the obvious fact that Plaintiffs have made direct claims against both Greif and Caraustar based on their control and operation of the Fitchburg Mill. Portraying jurisdiction here as resting solely on corporate veil-piercing is a misleading attempt to avoid the more conventional, and direct, basis of personal jurisdiction resulting from Greif's and

---

[1] *Containerboard*, GREIF, https://www.greif.com/containerboard/ (last accessed Nov. 9, 2022).

[2] Citations to the Motion to Dismiss shall be defined as "MTD at __."

Caraustar's *own* actions in Massachusetts. Specifically, Plaintiffs allege Greif and Caraustar themselves (1) operated the Fitchburg Mill, (2) held themselves out to the public as running and operating the Fitchburg Mill, and (3) engaged in the Massachusetts-based conspiracy centered on Otter Farm in Westminster, Massachusetts.

Contrary to defendants' conclusory assertions that Greif and Caraustar are distantly removed from operations, Greif's and Caraustar's direct control of the Fitchburg Mill is abundantly clear from easily available sources. For example, Greif (1) displays "Greif" signage at the Fitchburg Mill; (2) advertises the Fitchburg Mill on its website as one of its own facilities; (3) has a "Greif Fitchburg Mill" Facebook page with Greif's contact information (which announces "we're hiring"); (4) provides Fitchburg Mill employees with handbooks prominently labeled "Greif"; and (5) posts numerous job solicitations to work *for Greif* at the Fitchburg Mill – and to do so explicitly under the Caraustar financial system and the Caraustar employment policy. As is discussed in more detail below, Newark Group also previously attempted to convince MassDEP that Greif has had no role in the operations of Newark Group to no avail and Greif's status as a Responsible Party was not changed. MassDEP has continued to include Greif on correspondence, and Greif remains subject to MassDEP's requirement that, together with the other Responsible Parties, it continue to carry out the Immediate Response Action ("IRA") Plan.

In fact, even in a Comprehensive Action Plan ostensibly submitted by Newark Group to the Massachusetts Department of Environmental Protection (MassDEP) concerning the Fitchburg Mill, which is included in the Exhibits to Defendants' Motion to Dismiss,[3] the representative signing the plan – the General Manager at the Fitchburg Mill – provides an "*@Caraustar*" email address, *see* Def. Ex. G, at *71, and in other official documents, that same General Manager is

---

[3] Exhibits to Defendants' Motion to Dismiss shall hereinafter be referred to as "Def. Ex. __" and Exhibits to the Declaration of Ian W. Sloss, filed concurrently with this Opposition, shall be defined as "Pl. Ex. ___."

listed as having an "*@Greif*" email address. Moreover, as Plaintiffs' allegations make clear, Greif and Caraustar, together with other Defendants in this case, agreed to work together to use the Otter Farm facility in Westminster, Massachusetts to cheaply redistribute paper mill byproduct contaminated with PFAS while avoiding regulation from the Massachusetts entity, MassDEP.

By these actions, Grief and Caraustar have easily subjected themselves to the personal jurisdiction of courts in the Commonwealth. While it is true that Plaintiffs maintain that Greif and Caraustar have pierced the corporate veil in their relation to Newark Group, this is an alternative theory for jurisdiction. The primary basis for personal jurisdiction here is the traditional basis: that Greif and Caraustar undertook direct business activities in Massachusetts related to Plaintiffs' claims in this case, including running the Fitchburg Mill and holding themselves out as doing so.

## I.    **FACTUAL BACKGROUND**

### A.    *The Discovery of PFAS and the Greif Notice of Responsibility*

Initial testing at a Westminster resident's drinking water source in January 2022 revealed PFAS6 concentration of 1,335 ppt, dramatically above the 20 ppt Imminent Hazard Level set by MassDEP. Subsequent testing in the water sources of other residences produced similarly alarming results, leading MassDEP to initiate an investigation. Through the course of its investigation, MassDEP issued a Notice of Responsibility ("NOR") to several Defendants in this case. On July 2, 2022, MassDEP issued an NOR *specifically to Greif* for dumping byproduct at Otter Farm in Westminster, Massachusetts. The NOR was based on two findings, which taken together exposed Greif's responsibility according to MassDEP: (1) that Greif disposed of waste products with Massachusetts Natural, Inc. ("MassNatural," another Defendant in this case[4]) and (2) that Greif

---

[4] Plaintiffs have alleged that MassNatural conspired with other Defendants, including Greif and Caraustar, to use Otter Farm in Westminster, Massachusetts, to redistribute byproduct containing PFAS to homes throughout the community. *See* SAC ¶ 120.

waste products were specifically tested by MassDEP and found to have PFAS6 concentrations above the 20 ppt Imminent Hazard Level.[5]

Newark Group responded to MassDEP's NOR addressed to Greif by claiming that Greif has no role in the operations of its subsidiary, Newark Group, and directing that all future correspondence be sent to Newark Group.[6] However, MassDEP did not credit this argument and did not change Greif's status as a Responsible Party. Further, MassDEP has continued to include Greif on recent correspondence.[7] Greif itself, in fact, remains subject to MassDEP's requirement that it, together with the other Responsible Parties, continue to carry out the IRA Plan. This IRA Plan requires Responsible Parties to install (and share in the expense of) Point of Entry Treatment ("POET") water remediation systems at the residences of affected homeowners and to implement continuous bottled water delivery. The Responsible Parties have together made numerous water bottle deliveries to Plaintiffs in Massachusetts and – after ceasing deliveries without warning – they recontinued bottled water deliveries to Plaintiffs in Massachusetts and have been installing (and, based on Plaintiffs' revealing improper installation, reinstalling) POET systems in plaintiffs' residences (note Plaintiffs' motion for Preliminary Injunctive Relief and the Stipulated Consent Order that Defendants entered into with Plaintiffs on October 7, 2022).

### B.    *Greif's Acquisition of Caraustar and Newark Group*

---

[5] The July 20, 2022 Notice of Responsibility is available on the MassDEP Waste Site / Reportable Release File Viewer at https://eeaonline.eea.state.ma.us/EEA/fileviewer/Default.aspx?formdataid=0& documentid =687886.

[6] The July 22, 2022 letter from Newark Group to MassDEP is available on the MassDEP Waste Site / Reportable Release File Viewer at https://eeaonline.eea.state.ma.us/EEA/fileviewer/Default.aspx? formdataid=0& documentid =688711.

[7] The October 28, 2022 letter from MassDEP is available on MassDEP Waste Site / Reportable Release File Viewer at https://eeaonline.eea.state.ma.us/EEA/fileviewer/Default.aspx?formdataid=0& documentid =709704 (cc'ing "Greif, Inc., Ole.Rosgaard@greif.com" on correspondence).

In 2015, Caraustar acquired Newark Group.[8] Then, in 2019, Greif acquired both Caraustar and Newark Group and immediately integrated their operations into its own.[9] Caraustar's own LinkedIn page currently contains "Greif" branding, notes in the "About Us" section that it is has been acquired by Greif, and states in its most recent post from three years ago that "Caraustar is now Greif, Inc."[10] Greif also confirmed in a press release that Caraustar and Newark Group had been fully integrated into Greif and that the facilities—*which include the Fitchburg Mill*—were now a part of Greif:

> Since officially acquiring Caraustar Industries in February 2019, Greif has worked to rebrand nearly 90 former Caraustar facilities, which are *now a part of Greif*. The facilities are spread throughout the United States and in Canada. Greif now has nearly 300 facilities in 43 countries throughout the world.
>
> The facilities Greif added with the acquisition operate within one of four business units that include Recycling Services, Mill Group (coated and uncoated paperboard and specialty paperboard products), Industrial Products Group (tubes and cores, construction products, protective packaging, adhesives) and Consumer Packaging (folding cartons, set-up boxes, packaging services). For more on *Greif's new facilities,* click here.

(Emphasis added).[11] The Independent Carton Group, an association of independently-owned-and-operated folding carton companies, similarly confirmed in a 2019 newsletter that the "*former Newark Group mills,*" including the Fitchburg Mill, now belong to Greif, after the acquisition of

---

[8] *Caraustar Industries Announces Closing of The Newark Group, Inc. Acquisition*, Cision PR Newswire, https://www.prnewswire.com/news-releases/caraustar-industries-announces-closing-of-the-newark-group-inc-acquisition-300038369.html (Newark Group "look[s] forward to working with [Caraustar President and CEO] to integrate Newark [Group] into Caraustar and continuing pursuit of our growth plan.")

[9] *Greif Completes Acquisition of Caraustar Industries*, Greif, February 11, 2019, https://www.greif.com/greif-completes-acquisition-of-caraustar-industries/.

[10] *Caraustar,* LinkedIn, https://www.linkedin.com/company/caraustar/.

[11] *Signs of New Greif,* Greif, August 20, 2019, https://www.greif.com/signs-of-new-greif/.

Caraustar[12] (emphasis added). And, as Greif itself explains, Caraustar and Newark Group operate within Greif's Paper Packaging & Services segment.[13]

### C. Greif and Caraustar Control the Fitchburg Mill

Following the acquisition of Caraustar and Newark Group, Greif took control of, and began actively operating, the Fitchburg Mill – and said as much in its public representations. This included Greif characterizing the Fitchburg Mill as one of its own on its website,[14] referring to it as "*[o]ur* Fitchburg, MA mill ...."[15] and "*Greif's* paperboard mill[] in … Fitchburg, Massachusetts,"[16] as well making available on its website a "Grief Fitchburg" information sheet.[17]

Greif similarly held itself out as controlling the Fitchburg Mill on social media. In a post about its acquisition of the "Mill Group" on the Greif Facebook page, Greif stated that following its acquisition of Caraustar, "Greif has worked to redesign exterior signs at nearly 90 of *our new facilities*." *See* Pl. Ex. A (emphasis added). That same posts links to an article on Greif's website, which lists Fitchburg, Massachusetts as a new location and states these facilities are "now a part of Greif."[18] There is also a publicly listed "Greif Fitchburg Mill" Facebook page, which was

---

[12] *Winter/Spring ICG Newsletter*, Independent Carton Group, Winter/Spring 2019, https://independentcartongroup.com/wp-content/uploads/2020/02/NewsWinterSpring2019.pdf.

[13] *Greif Completes Acquisition of Caraustar Industries*, Greif, February 11, 2019, https://www.greif.com/greif-completes-acquisition-of-caraustar-industries/.

[14] *See* SAC at ¶ 59.

[15] *Water*, Greif, https://www.greif.com/sustainability-2021/sustainability-strategies/reducing-our-footprint/water/.

[16] *Climate Strategy,* Greif, https://www.greif.com/sustainability-2021/sustainability-strategies/reducing-our-footprint/climate-strategy/.

[17] *Fitchburg,* Grief, https://www.greif.com/wp-content/uploads/2021/11/Greif-Fitchburg-Mass.pdf.

[18] *Signs of New Greif,* Greif, August 20, 2019, https://www.greif.com/signs-of-new-greif/.

previously named "Fitchburg Containerboard" but was changed to "Greif Fitchburg Mill" in May 2022. *See* Pl. Ex. B. The "Greif Fitchburg Mill" Facebook page unsurprisingly displays as contact information Greif's website (greif.com), and Greif's LinkedIn page[19] but not Newark Group's.

Greif's control over day-to-day operations at the Fitchburg Mill is also plainly evident from numerous job postings on popular job search sites such has LinkedIn,[20] Glassdoor,[21] JOFDAV (a disabled Veterans job search site),[22] and Monster,[23] as well as on Greif's own website.[24] These posts were for positions such as Project Engineer, Production Supervisor, and General Laborer Rotating Shifts; all are located at the Fitchburg Mill that Greif and Caraustar now claim (for purposes of avoiding responsibility in this litigation) not to own, operate, or control.

At the bottom of the job postings for positions at the Fitchburg Mill, Greif and Caraustar both make clear that they are responsible for hiring there. Greif specifically adds the following statements to the bottom of its job posts for the Fitchburg Mill:

> Greif offers a great working environment and the opportunity to make an immediate impact at a company where your ideas are always welcome.
> . . .
>
> We offer a competitive salary, excellent benefits and opportunity for growth. Greif, Inc. is an equal opportunity employer. We will not discriminate against any applicant or employee on the basis of sexual orientation, gender identity, race, gender, religion, age, national origin, color, disability, or veteran status.

---

[19] Greif Fitchburg Mill, Facebook, https://www.facebook.com/people/Greif-Fitchburg-Mill/100063655442876/.

[20] *See, e.g.,* Pl. Ex. C (Production Supervisor at Greif); Pl. Ex. D (Project Engineer at Greif); Pl. Ex. E (General Laborer Rotating Shifts at Greif).

[21] *See, e.g.,* Pl. Ex. F (Production Supervisor at Greif); Pl. Ex. G (Project Engineer at Greif); Pl. Ex H (General Laborer Rotating Shifts at Greif).

[22] *See, e.g.,* Pl. Ex. I (Production Supervisor at Greif Inc.); Pl. Ex. J; (Project Engineer at Greif Inc.).

[23] *See* Pl. Ex. K.

[24] *See* Pl. Ex. L.

EOE/Minority/Female/Disabled/Veteran. For more information read Greif's Equal Opportunity Policy.

*See, e.g.,* Pl. Ex. M. Caraustar includes similar language to that of Greif on job posts for the Fitchburg Mill, including one for "General Laborer at Greif Inc.," which states:

> Caraustar provides equal employment opportunities for all qualified persons and does not discriminate against any associate or applicant for employment because of race, color, religion, sex (including pregnancy), sexual orientation, gender identity or expressions, national origin, age, disability, genetic information, marital status, status as a protected veteran, or any other protected status in accordance with applicable federal, state and local laws. In all activities of recruitment, employment, promotions, transfers and other terms and conditions of employment, the individual s ability to perform specific job functions shall be the primary consideration. If, because of a disability, you need a reasonable accommodation for any part of the application process, please contact us atcorporatestaffing@caraustar.com or via fax at 770.799.5832.

*See* Pl. Ex. N. Moreover, Fitchburg Mill employees are expected to "[p]erform[] all required duties and tasks in accordance with Caraustar accounting policies and financial control procedures." *See* Pl. Ex. O.

Under these facts, any job applicant or member of the public would understand that Greif and Caraustar operate the Fitchburg Mill. It is no wonder that on his LinkedIn page the General Manager of the Fitchburg Mill, Dana Pelletier, states "General Manager at Grief" as his title and lists his employer as "Greif Fitchburg Containerboard." *See* Pl. Ex. P. Even more telling is that Mr. Pelletier lists his *former* employer (immediately prior to Greif and before Greif acquired the Fitchburg Mill) as the Newark Group – a sharp contrast from how he lists the place of his current employer, *i.e.,* that he works "at Greif." Greif itself spotlighted Mr. Pelletier as a *Greif employee,* in a post on LinkedIn, stating in relevant part:

> Meet Dana Pelletier, General Manager of Fitchburg Containerboard, *part of Greif's Mill Group*, who is leading the way to create a culture of Zero Harm at his site in North Central Massachusetts.
>
> …

When asked what three words he would use to describe Greif, Dana replied: "Care, engagement and service."

A perfect description of both Greif and all *our* fantastic safety leaders like Dana, who go above and beyond every day to keep their teams safe. From all of us at Greif globally, thank you.

*See* Pl. Ex. Q (emphasis added).

Of course, Mr. Pelletier is not the only Fitchburg Mill employee that lists Greif as their employer. Some examples of Greif employees who understand they work for (and hold themselves out on LinkedIn as working for) Greif, because they *do* work for Greif, include:

- Michael Berger, Production Supervisor at Greif Inc., Fitchburg, Massachusetts, May 2019 to present (whose previously employment was with Caraustar beginning in 2012), *see* Pl. Ex. R;

- Becky LaFreniere, Regional Human Resources Manager at Greif, Inc., Fitchburg, Massachusetts, June 2010 to present, *see* Pl. Ex. S;

- Robert Zanchi, Mechanical Maintenance Superintendent, Greif Corp., Fitchburg Container Board, Fitchburg, Massachusetts, February 2019 to present (previously Maintenance Superintendent at the Newark Group beginning in 2005), *see* Pl. Ex. T; and

- Steve West, Technical Manager, Greif, Inc., Fitchburg, Massachusetts, November 2020 to present, *see* Pl. Ex. U.

Numerous employees publicly describe their employment as being with "Greif Fitchburg Mill" on their personal Facebook pages. *See* Pl. Ex. V. Even a post on Twitter by a third party – the MassHire North Central Workforce Board, which shares Massachusetts career opportunities – labels the employer for open jobs at the Fitchburg Mill as Greif. *See* Pl. Ex. W. As if all of that was not enough publicly available evidence of Grief's open and obvious control of the Fitchburg Mill, Greif also provides Fitchburg Mill employees with a handbook depicting the Greif logo and

titled "Grief Fitchburg Mill," Pl. Ex. X, and has placed outside of the Fitchburg Mill signs reading "Greif" in large letters (and which in August 2018, displayed "Caraustar" branding). *See* Pl. Ex. Y.

All of these facts demonstrate that Greif and Caraustar own and control the Fitchburg Mill and maintain significant contacts with Massachusetts such that this Court maintains personal jurisdiction under Massachusetts law.

## II.    LEGAL STANDARD

On a motion to dismiss for lack of personal jurisdiction, "the party seeking to hale another party into court bears the burden of establishing the court's personal jurisdiction." *Lewis v. Dimeo Constr. Co.*, Civil Action No. 14-cv-10492-IT, at *4 (D. Mass. May 27, 2015). When a district court rules on a motion to dismiss for lack of personal jurisdiction without an evidentiary hearing, it applies a *prima facie* standard, under which the "plaintiff must 'proffer[] evidence which, if credited, is sufficient to support findings of all facts essential to personal jurisdiction.'" *D'Allessandro ex rel. Hewitts Landing Condo. Tr. v. Lennar Hingham Holdings, LLC*, No. 17-cv-12567-IT, at *4 (D. Mass. July 12, 2018) (quoting *A Corp. v. All Am. Plumbing, Inc.,* 812 F.3d 54, 58 (1st Cir. 2016)).

Although the plaintiff must go beyond the pleadings to support its jurisdictional allegations, the court does not "act as a factfinder" at the motion to dismiss stage. *Lewis,* Civil Action No. 14-cv-10492-IT, at *4. Rather, the court must accept as true the plaintiff's evidentiary proffers and construe them in the light most favorable to the plaintiff's jurisdictional claim. *D'Allessandro*, at *4. The court considers facts set forth by the defendant only to the extent that such facts are uncontradicted. *Id.* Thus, where "the plaintiff makes a *prima facie* showing of jurisdiction supported by specific facts alleged in the pleadings, affidavits, and exhibits, its burden is

met." *Scallop Imaging, LLC v. Blackhawk Imaging, LLC*, Civil Action No. 17-cv-10092-ADB, at *6 (D. Mass. Mar. 22, 2018) (denying motion to dismiss where plaintiff met its burden of establishing personal jurisdiction over parent corporation).

Personal jurisdiction may be established through general or specific jurisdiction – *D'Allessandro*, at *5 – or alternatively, in the absence of general or specific jurisdiction, under a corporate veil piercing theory. *Scallop Imaging, LLC*, at *6. General jurisdiction exists where "the litigation is not directly founded on the defendant's forum-based contacts, but the defendant has nevertheless engaged in continuous and systematic activity, unrelated to the suit, in the forum." *Id.* The contacts with the forum must be "so continuous and systematic" as to render the foreign corporation essentially "at home" in the forum state." *Id.* at *6-7. General jurisdiction is typically appropriate in the states of incorporation or principal place of business. For this reason, "[t]he standard for establishing general jurisdiction is … considerably more stringent than the standard for specific jurisdiction." *Stars for Art Prod. FZ, LLC v. Dandana, LLC*, 806 F. Supp. 2d 437, 9 (D. Mass. 2011).

In contrast, specific jurisdiction, which plaintiffs invoke here,[25] exists over a defendant whenever "the cause of action arises out of, or relates to, a defendant's contacts with the forum state." *D'Allessandro* at *5 (denying motion to dismiss for lack of personal jurisdiction where specific jurisdiction existed over plaintiff company due to contacts with forum state via use of advertising and marketing materials). Two requirements must be met for specific jurisdiction: that of the state's long-arm statute and of the Constitution. *Scallop Imaging*, at *7. However, "[b]ecause

---

[25] To be sure, Greif and Caraustar would also be subject to general jurisdiction via the same continuous and systematic contacts described here. *Grice v. VIM Holdings Grp., LLC*, 280 F. Supp. 3d 258 (D. Mass. 2017) ("A court may exercise general jurisdiction over foreign corporations "when their affiliations with the State are so 'continuous and systematic' as to render them essentially at home in the forum State.").

the First Circuit has generally treated the limits of Massachusetts' long-arm statute as coextensive with those of the Due Process Clause … the Court may sidestep the statutory inquiry and proceed directly to the constitutional analysis." *Id.* (citations and internal quotation marks omitted).

Under the Due Process Clause, a court may exercise personal jurisdiction over an out-of-state defendant "if that defendant has certain minimum contacts with [the forum state] such that the maintenance of the suit does not offend traditional notions of fair play and substantial justice." *D'Allessandro*, at *4 (internal quotation marks omitted). In the First Circuit, the minimum contacts analysis involves application of a three-part inquiry:

> First, the claim underlying the litigation must directly arise out of, or relate to, the defendant's forum state activities. Second, the defendant's in-state contacts must represent a purposeful availment of the privilege of conducting activities in the forum state, thereby invoking the benefits and protections of that state's laws and making the defendant's involuntary presence before the state's court foreseeable. Third, the exercise of jurisdiction must, in light of the *Gestalt* factors, be reasonable.

*Scallop Imaging, LLC,* at *8. An affirmative finding on all three is necessary for specific jurisdiction. *D'Allessandro*, at *5. Here, Plaintiffs' claims against Greif and Caraustar meet each of these three requirements and so they are subject to the personal jurisdiction of this Court.

## III.  ARGUMENT

Greif and Caraustar argue that they are not subject to jurisdiction in Massachusetts for two main reasons, both of which sidestep Plaintiffs' direct allegations of their ownership and control: (1) specific jurisdiction is absent where they have not pierced the corporate veil and (2) Plaintiffs improperly attempt to use their RICO claims to establish personal jurisdiction over Greif and Caraustar. MTD at 11-17. Both arguments are red herrings and should be rejected.

As set forth below, specific jurisdiction exists because all three Constitutional factors authorizing specific jurisdiction are easily met based on Greif's and Caraustar's own *direct* actions

in Massachusetts.[26] And in the unlikely event this Court does not find specific jurisdiction based on this analysis, both defendants would alternatively be subject to personal jurisdiction in Massachusetts under the "piercing the corporate veil" theory and through assertion of a RICO claim with other Defendants whose conduct was centered in Massachusetts. Yet Plaintiffs maintain that this Court should so easily find specific jurisdiction over Greif and Caraustar, through their direct actions in Massachusetts, that consideration of these alternative means of jurisdiction is rendered unnecessary.

### A. Greif and Caraustar are Subject to Specific Jurisdiction in Massachusetts.

#### 1. Relatedness

The first prong is "relatedness," which requires a court to determine whether the claim underlying the litigation arises directly out of or relates to the defendant's connections to the forum state, "using a flexible, relaxed standard." *D'Allessandro, at \*5-6.* Additionally, "[i]f the lawsuit sounds in tort law, then the relatedness inquiry requires a district court to probe the causal nexus between the defendant's contacts and the plaintiff's cause of action." *Id.*

Here, the claims underlying this litigation arise directly from Greif and Caraustar's activities in Massachusetts. Plaintiffs' core allegations against Greif and Caraustar are that they generated PFAS through their operations at the Fitchburg Mill; spread PFAS across Westminster (and in surrounding Massachusetts towns) through their dumping waste on Otter Farm; and engaged with other Massachusetts actors, including MassNatural, in a coordinated effort to cheaply redistribute paper mill sludge across Massachusetts via MassNatural's topsoil products. All of this occurred, Plaintiffs have alleged, while Greif and Caraustar hid this activity from a Massachusetts regulatory body, MassDEP. There can be no question under these facts that the

---

[26] The Massachusetts long-arm statute need not be analyzed separately because, as described *infra,* it is coextensive with the Constitutional requirements. *Scallop Imaging,* at \*7.

relatedness factor is met; Greif's and Caraustar's contacts with Massachusetts are not in any way separate from the theories of this case, but instead are central to them. *See, e.g., D'Allessandro,* at *6-7 (finding "relatedness" prong satisfied in negligent representation case because, despite parent corporation's claim that it had no role in marketing of property at issue, there was "a meaningful link between [parent corporation's] contact and the harm suffered" where, among other things, the property is referred to as parent company's "new waterfront community," parent corporation was named on press releases, and parent corporation itself was advertising the property).

### 2. Purposeful Availment

The second prong of the inquiry is a search for "purposeful availment," where the court looks to whether the defendant "purposefully and voluntarily direct[ed its] activities toward the forum so that [it] should expect, by virtue of the benefit [it] receives, to be subject to the court's jurisdiction based on these contacts." *Lewis,* at *7 (denying motion to dismiss for lack of personal jurisdiction and finding the purposeful availment prong met where parent corporation "sen[t] employees to Massachusetts with relative regularity," including for product training and support of the business, even though parent corporation "does not own property, pay taxes, or directly sell its products in Massachusetts").

Here, as is plain from Plaintiffs' allegations and the factual recitation above, Greif and Caraustar have deliberately, voluntarily, and directly maintained significant contacts with Massachusetts. Greif and Caraustar (1) run and operate the Greif Fitchburg Mill, a Massachusetts facility; (2) publicly describe the Greif Fitchburg Mill as their own and brand it as such; (3) advertise for jobs and solicit and hire employees to work in their own "Greif Fitchburg Mill;" (4) dumped waste at Otter Farm in Massachusetts, and (5) have conspired with other Massachusetts actors – including MassNatural – to redistribute such waste across Massachusetts.

Additionally, MassDEP has deemed Greif, along with other Defendants in this case, to be responsible for the delivery of bottled water and installation of POET systems to Plaintiffs in Massachusetts as part of an effort required by MassDEP (and, now via a stipulated judgment, by this Court) to remediate the damage they caused. In undertaking these actions in Massachusetts, Greif and Caraustar accepted the risk that they would be subject to personal jurisdiction in a Massachusetts court. *See, e.g., Gather, Inc. v. Gatheroo, LLC*, 443 F. Supp. 2d 108, 116 (D. Mass. 2006) (finding purposeful availment prong met where defendant maintained, through an interactive website, "contacts that illustrate purposeful availment of the privilege of conducting commercial activity in the forum" by accepting Massachusetts users as registered users of their website, communicating directly with those Massachusetts users, providing information specifically about Massachusetts to Massachusetts users, and soliciting advertisement revenue from Massachusetts users).

### 3. Reasonableness

The third and final prong in the inquiry is, "reasonableness." To evaluate reasonableness "the court must determine whether the exercise of personal jurisdiction is reasonable in light of the so-called '*Gestalt* factors.'" *Smith v. McBc Hydra Boats, LLC,* CIVIL ACTION No. 16-11369-LTS, at *16-17 (D. Mass. Aug. 18, 2017). The five *Gestalt* factors are:

> (1) the defendant's burden in appearing in the court; (2) the forum state's interest in hearing the suit; (3) the plaintiff's convenience and interest in effective relief; (4) the judicial system's interest in obtaining the most effective resolution of the controversy; and (5) the common interests of all interested states in promoting substantive social policies.

*Lewis,* at *9-10.

Here, the *Gestalt* factors weigh strongly in favor of Plaintiffs. Looking to the first *Gestalt* factor, "[b]ecause staging a defense in a foreign jurisdiction is almost always inconvenient and/or

costly, . . . [the first *Gestalt*] factor is only meaningful where a party can demonstrate some kind of special or unusual burden." *Id.* at *10; *see also CDM Smith, Inc. v. Thevar,* C. A. 1:21-10249-MLW, at *14 (D. Mass. Sep. 30, 2022) ("[i]n the modern era, the need to travel between New York and Puerto Rico creates no especially ponderous burden for business travelers"). Greif and Caraustar might prefer this case be litigated elsewhere, but their burden as large corporations (particularly Greif, as a "global leader in industrial packaging products" with revenue in the hundreds of millions of dollars per *quarter*[27]) of appearing in a Massachusetts court is minimal. Indeed, it is difficult to imagine Greif and Caraustar could argue that being in Massachusetts is unreasonably inconvenient, considering their direct involvement operating the Fitchburg Mill.

For the second factor, when the injury occurs within the state, that state has interest. *Id.; see also Smith,* at *18 (state "has a significant interest in obtaining jurisdiction over a defendant who causes tortious injury within its borders"). Here, it is residents of Massachusetts who are unable to use their water for drinking, cooking, or bathing; whose property values are sharply diminished; and who are at markedly increased risk of developing cancer and other health issues – all as a result of Defendants' actions. Not only are the named Plaintiffs all residents of Massachusetts, but the evidence also is concentrated around the areas where Greif and Caraustar run their Massachusetts facility (the Fitchburg Mill), where they dumped their contaminated byproduct (Otter Farm), and where that contaminated byproduct ended up (in and around the Westminster community, and beyond). Accordingly, Massachusetts has a significant (indeed the most significant) interest in adjudicating this case.

The "Gestalt factors" three and four, relating to the plaintiff's convenience and interest and the efficiency of judicial systems, also weigh in Plaintiffs' favor. "A plaintiff's choice of forum

---

[27] *See* 2022 Third Quarter Statement, https://investor.greif.com/static-files/d6880d25-9223-463b-b840-5243543e8101.

must be accorded a degree of deference with respect to the issue of its own convenience." *Lewis,*
*at \*10.* Plaintiffs chose Massachusetts because the Plaintiffs, the evidence, and the contaminated
soil and water are all centered in Massachusetts. For the fourth factor, the judicial system's interest
in obtaining the most effective resolution of the case, "the First Circuit has recognized that
[u]sually this factor is a wash" and neither weighs against nor for the exercise of personal
jurisdiction. *Id.* at \*11. Here, however, the most effective resolution of the case supports
Massachusetts as the forum. The matter can most effectively be resolved where the parties and
evidence lie.

Finally, for the fifth factor, the interests of affected states in promoting substantive social
policies, courts in Massachusetts have found that the state "has a clear interest in protecting its
citizens from foreign providers of goods and services and in affording those citizens a convenient
forum in which to bring their claims." *Smith*, CIVIL ACTION No. 16-11369-LTS, at \*18-19.
Massachusetts thus has a "clear interest" in protecting its citizens from environmental
contamination and in deciding disputes involving damage to Massachusetts persons and property.

**B.     *Alternatively, Massachusetts Has Jurisdiction over Greif and Caraustar through Corporate Veil Piercing.***

Defendants are subject to personal jurisdiction based on Plaintiffs' direct claims against
them.  As an alternative basis of jurisdiction, however, in Massachusetts, a court may pierce the
corporate veil (1) when the parent exercises some form of pervasive control of the activities of the
subsidiary and there is some fraudulent or injurious consequence;[28] or (2) where there is a confused
intermingling of activity of two or more corporations with a substantial disregard of the separate
nature of the corporate entities. *Techtarget, Inc. v. Spark Design, LLC*, 746 F. Supp. 2d 353, 356

---

[28] Fraud, while part of the twelve factors considered, is not essential for veil piercing. *See A.G. v. M.C.K. Inc.,* 432 Mass. 546, 557 (2000).

(D. Mass. 2010). Greif and Caraustar exercised clear, pervasive control over the Newark Group and the Fitchburg Mill and created a confused intermingling of activity amongst the corporations.[29]

As detailed above, Greif referred to the Fitchburg Mill as one of its own on its website, advertised employment opportunities at the Fitchburg Mill, provided welcome handbooks to new employees bearing the Greif logo, and installed signage inside and outside the Fitchburg Mill that said "Greif." That same signage, in the years leading up to 2019, said "Caraustar" – not Newark Group. *See* Pl. Ex. Y. Additionally, Caraustar executives, as registered with the Georgia Corporations Division, *see* Pl. Ex. Z, are listed on Greif's website as Greif executives, Pl. Ex. AA; Caraustar and Newark Group employees and executives represent themselves online as being employed by Greif; and the General Manager at the Fitchburg Mill uses both "*@caraustar.com*", *see* Def. Ex. G, and "*@greif.com*" email addresses.

Defendants have argued, citing *Scott v. NG US 1, Inc.,* 450 Mass. 760, 766 (2008), that "in the environmental context … corporate veils are pierced only in 'rare particular situations.'" *See* MTD at 11-12. *Scott*, however, is easily distinguished. In *Scott*, the parent company did not even own the subsidiary at the time of the contamination, whereas here, Greif owned the Newark Group during relevant time periods, as it still does today. Unsurprisingly, MassDEP identified Greif as a Responsible Party for the dumping and PFAS contamination in Westminster. *See* Pl. Ex. BB. Greif and Caraustar have thus exercised consistent control over Newark Group and the Fitchburg Mill and have entirely disregarded the corporate formalities on which they now seek to rely. This permits this Court to pierce the corporate veil and impute Newark Group's activities to Greif and

---

[29] A failure to observe corporate formalities, maintain separate financial records, and have separate facilities, as well as the overlapping of ownership, officers, directors, and personnel may indicate that the subsidiary is the alter ego of its parent. *See In Re Lernout & Hauspie Securities Litigation,* 337 F. Supp. 2d 298 (1st Cir. 2004); *see also City of Bangor v. Citizens Communication Co.,* No. Civ. 02-183-B-S, 2003 WL 22183205 (D. Maine 2003).

Caurastar as an additional, alternative means of jurisdiction over Greif and Caraustar. *See United States v. Kayser-Roth Corp.*, 272 F. 3d 89 (1st Cir. 2001) (finding parent company liable as operator of subsidiary's facility due to parent's control over environmental affairs).

### C. Alternatively, Greif and Caraustar are Subject to Specific Jurisdiction by Way of Plaintiffs' RICO claims.

In a last-ditch effort to escape the court's jurisdiction, Greif and Caraustar argue that Plaintiffs assert RICO claims in an "attempt to use those claims to establish personal jurisdiction" and "circumvent traditional requirements for piercing the corporate veil." MTD at 17-19. This argument hardly bears addressing, as jurisdiction through RICO is just one of *three ways* in which jurisdiction exists over these defendants. As set forth above, this court has specific jurisdiction over Greif and Caraustar through both traditional means and, alternatively, through a piercing the corporate veil theory. Thus, there are many bases to establish personal jurisdiction over the Defendants absent RICO; Plaintiffs' RICO claim – which they brought not for purposes of asserting jurisdiction but because Defendants' conduct constitutes civil RICO – is just *another* alternative for doing so. See, e.g., *Duggan v. Martorello,* Civil Action 18-12277-JGD, at *29 n.7 (D. Mass. Mar. 30, 2022) ("Because this court finds that [plaintiff] has shown that [defendant] has sufficient contacts with Massachusetts to justify personal jurisdiction over him in this forum, it is not necessary for this court to consider the plaintiff's argument that personal jurisdiction over [defendant] is also appropriate under RICO's nationwide service of process provision").

## IV.   CONCLUSION

Greif's and Caraustar's motion should be denied.  They simply cannot avoid personal jurisdiction in Massachusetts where their conduct that is the subject of this case is inextricably tied to Massachusetts. If this Court disagrees, however, then Plaintiffs respectfully request the grant of

limited jurisdictional discovery on any entity for which such further information is deemed by this Court to be necessary.

DATED: April 14, 2023

Respectfully submitted,

/s/ Ian W. Sloss
Ian W. Sloss (*pro hac vice*)
Sean K. McElligott (BBO# #651710)
Paul A. Slager (*pro hac vice*)
Zachary A. Rynar (*pro hac vice*)
SILVER GOLUB & TEITELL LLP
One Landmark Square, 15th Floor
Stamford, Connecticut 06901
Telephone: (203) 325-4491
Facsimile: (203) 325-3769
isloss@sgtlaw.com
smcelligott@sgtlaw.com
pslager@sgtlaw.com
zrynar@sgtlaw.com

J. Tucker Merrigan (BBO #681627)
Victoria Santoro Mair (BBO #679120)
SWEENEY MERRIGAN LAW LLP
268 Summer Street, LL
Boston, MA  02210
tucker@sweeneymerrigan.com
victoria@sweeneymerrigan.com
Telephone: (617) 391-9001
Facsimile: (617) 357-9001

David C. Strouss, BBO#546253
Christian Uehlein, BBO#667325
Leah M. McMorris, BBO#681437
THORNTON LAW FIRM, LLP
One Lincoln St., 13th Fl.
State Street Financial Center
Boston, MA 02111
(617) 720-1333
lmcmorris@tenlaw.com

*Counsel for Plaintiffs Thomas Ryan, Susan Ryan, Sean Gallagher, Ashley Sultan Gallagher, Michele Burt, Christopher Cerasuolo, Nancy Donovan, and Lauren Ladue*

## CERTIFICATE OF SERVICE

I, Ian W. Sloss, hereby certify that a true copy of the above document was served upon the attorney of record for each other party through the Court's electronic filing service on April 14, 2023.

/s/  Ian W. Sloss
Ian W. Sloss