| | |
|---|---|
| THOMAS RYAN, SUSAN RYAN, SEAN GALLAGHER, ASHLEY SULTAN GALLAGHER, MICHELE BURT, CHRISTOPHER CERASUOLO, NANCY DONOVAN, and LAUREN LADUE, individually and on behalf of others similarly situated, | No. 4:22-cv-40089-MRG<br><br>Hon. Margaret R. Guzman |
| *Plaintiffs*, | |
| v. | |
| GREIF, INC., CARAUSTAR INDUSTRIES, INC., THE NEWARK GROUP, INC., MASSACHUSETTS NATURAL FERTILIZER CO., INC., OTTER FARM, INC., SEAMAN PAPER COMPANY OF MASSACHUSETTS, INC., and 3M COMPANY. | |
| *Defendants.* | |

**PLAINTIFFS' OPPOSITION TO MOTIONS TO DISMISS PLAINTIFFS'
SECOND AMENDED COMPLAINT FILED BY DEFENDANTS GREIF, INC.,
CARAUSTAR INDUSTRIES, INC., THE NEWARK GROUP, INC., MASSACHUSETTS
NATURAL FERTILIZER COMPANY, SEAMAN PAPER COMPANY OF
<u>MASSACHUSETTS, INC., AND OTTER FARM, INC.</u>**

# TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ................................................................ iii

INTRODUCTION ...............................................................................1

FACTUAL BACKGROUND ................................................................2

LEGAL ARGUMENT..........................................................................4

    I.      DEFENDANTS ARE LIABLE FOR NEGLIGENCE BECAUSE
           IT WAS FORESEEABLE THAT PLAINTIFFS WOULD BE
           HARMED BY DEFENDANTS' BREACHES OF THEIR DUTIES
           OF CARE .......................................................................................5

           A.     *Greif Defendants' Extrinsic Evidence and Factual Rebuttals*
                    *Are Improper and Should be Disregarded*..................................11

    II.     DEFENDANTS ARE LIABLE FOR PLAINTIFFS' INJURIES
           UNDER SECTION 1962(c) OF RICO...........................................13

           A.     *Defendants Formed a RICO Enterprise* ....................................13

           B.     *Defendants Participated in the Operation or Management*
                    *of the Enterprise*........................................................................16

           C.     *Defendants Engaged in a Pattern of Racketeering*....................18

           D.     *The Alleged Acts of Racketeering Were the Proximate Cause*
                    *of Plaintiffs' Injuries* ................................................................20

    III.    DEFENDANTS ENGAGED IN A CONSPIRACY AND ARE
           LIABLE FOR PLAINTIFFS' INJURIES UNDER SECTION 1962(d)
           OF RICO.......................................................................................22

    IV.    PLAINTIFFS' CHAPTER 93A CLAIMS ARE PROCEDURALLY
           AND SUBSTANTIVELY PROPER ...............................................24

           A.     *Plaintiffs Provided Defendants with Notice of their*
                    *Chapter 93A Claims*..................................................................24

           B.     *Defendants' Wrongful Conduct in Trade or Commerce*
                    *Injured Plaintiffs* ......................................................................26

        1.  *Defendants and Plaintiffs Engaged in a Transaction in Trade or Commerce* ........................................................26

        2.  *Defendants Each Engaged in Deceptive or Unfair Conduct Under 93A* ............................................................28

            i.   *Deceptive Conduct* ....................................................29

            ii.  *Unfair Conduct* ..........................................................31

V.     DEFENDANTS CREATED A PRIVATE NUISANCE ....................................33

VI.    DEFENDANTS CREATED A PUBLIC NUISANCE........................................36

VII.   DEFENDANTS ARE LIABLE UNDER STRICT LIABILITY BECAUSE THEIR ABNORMALLY DANGEROUS ACTIVITY ESCAPED ONTO PLAINTIFFS' PROPERTY....................................................39

VIII.  DEFENDANTS' CONDUCT WAS WILLFUL AND WANTON ......................43

IX.    PLAINTIFFS ARE ENTITLED TO MEDICAL MONITORING........................47

CONCLUSION.................................................................................................................49

# TABLE OF AUTHORITIES

*Akar v. Federal Nat. Mortg. Ass'n,*
    845 F.Supp.2d 381 (D. Mass. 2012) .........................................................................24, 25

*Allstate Ins. Co. v. Fougere,*
    450 F. Supp. 3d 10 (D. Mass. 2020) ................................................................................27

*Andres v. Town of Wheatfield,*
    Case No. 1:17-cv-00377 (W.D.N.Y. Dec. 30, 2020)........................................................40

*Ashcroft v. Iqbal,*
    556 U.S. 662 (2009).............................................................................................................5

*Asiala v. Fitchburg,*
    24 Mass. App. Ct. 13 (1987)............................................................................................33

*Barnes v. General Electric Co.,*
    1995 Ct. Sup. 8417 (1995) ..............................................................................................40

*Basf Corp. v. Martineaus Auto Body, Inc.,*
    Civil Action No. 18-cv-10881-ADB (D. Mass. Jan. 30, 2019) .......................................12

*Belanger v. Com.,*
    41 Mass. App. Ct. 668, 673 N.E.2d 56 (1996) ....................................................33, 35, 36

*Bell Atlantic v. Twombly,*
    550 U.S. at 556, 127 S.Ct. 1955 (2007).............................................................................5

*Boyd v. National R.R. Passenger Corp.,*
    446 Mass. 540 (2006) .......................................................................................................44

*Boyle v. United States,*
    556 U.S. 938, 129 S. Ct. 2237, 173 L. Ed. 2d 1265 (2009).............................................13

*Burns ex rel Off. of Pub. Guardian v. Hale & Dorr LLP,*
    445 F. Supp. 2d 94 (D. Mass. 2006) ...................................................................24, 26, 33

*Casavant v. Norwegian Cruise,*
    76 Mass. App. Ct. 73 (Mass. App. Ct. 2009)...................................................................30

*Ciardi v. Hoffmann-La Roche*,
    436 Mass. 53 (Mass. 2002) ...............................................................................26, 27, 28

*Clark-Aiken Co. v. Cromwell-Wright Co.*,
    367 Mass. 70, 323 N.E.2d 876 (1975) ......................................................................40, 41

*Cohen v. Elephant Rock Beach Club*, Inc.,
    63 F. Supp. 3d 130 (D. Mass. 2014) ..............................................................................10

*Com. of Mass. v. Pace*,
    616 F. Supp. 815 (D. Mass 1985) ...........................................................................33, 35

*Commonwealth v. Power*,
    76 Mass. App. Ct. 398 (Mass. App. Ct. 2010) ..............................................................45

*Connerty* v. *Metropolitan Dist. Comm'n*,
    398 Mass. 140 (1986) .....................................................................................................36

*Cornett v. Northrop Grumman Corp.*,
    18-CV-06453 (DRH)(AKT) (E.D.N.Y. Jan. 6, 2020) ....................................................43

*Corradetti v. Sanitary Landfill, Inc.*,
    912 F. Supp. 2d 156 (D.N.J. 2012) ................................................................................38

*Cremins v. Clancy*,
    415 Mass. 289, 612 N.E.2d 1183 (1993) ....................................................................9, 10

*D'Addario v. D'Addario*,
    901 F.3d 80 (2d Cir. 2018)...............................................................................................13

*D'Agostino v. Fed. Ins. Co.*,
    Civil Action No. 12-11628-DJC (D. Mass. Mar. 3, 2014) ..............................................26

*Davis v. Westwood Group*,
    420 Mass. 739, 652 N.E. 2d 567 (1995) ..........................................................................5

*Deshaies v. DJD Med.*,
    Civil Action 21-cv-12050-ADB (D. Mass. Jan. 28, 2022) .........................................11, 12

*Donovan v. Philip Morris USA, Inc.*,
    268 F.R.D. 1 (D. Mass. 2010) ("*Donovan II*") ..................................................................6

iv

*Donovan v. Philip Morris USA, Inc.*,
   455 Mass. 215 (2009) ("*Donovan I*") .......................................................47, 48

*Duggan v. Martorello*,
   Civil Action 18-12277-JGD (D. Mass. Mar. 30, 2022) .......................................13, 20, 22

*Ezell v. Lexington Ins. Co.*,
   286 F. Supp. 3d 292 (D. Mass. 2017) ..............................................................15

*Fiorillo v. Winiker*,
   85 F.Supp.3d 565 (D. Mass. 2015) ................................................................22

*Francisque v. Wells Fargo Bank, N.A.*,
   2012 WL 860212 (D. Mass. 2012) .................................................................24

*Full Spectrum Software, Inc. v. Forte Automation Sys., Inc.*,
   858 F.3d at 671 (1st Cir. 2017) .....................................................................28

*Genereux v. Hardric Labs. Inc.*,
   950 F.Supp.2d 332 (D. Mass. Jun. 23, 2013) ("Genereux II") ........................................47

*Genereux v. Raytheon Co.*,
   754 F.3d 51 (1st Cir. 2014) ("Genereux III") ............................................................48, 49

*Gov't Emps. Ins. Co. v. Analgesic Healthcare, Inc.*,
   CIVIL ACTION No. 16-11970-RGS (D. Mass. Mar. 28, 2017)....................................15

*Grimaldi v. Akzo Nobel Chemicals International B.V.*,
   C.A. No. 04-1052 (December 28, 2005).........................................................28

*Guest-Tek Interactive Ent. Inc. v. Pullen*,
   731 F. Supp. 2d 80 (D. Mass. 2010) .................................................................5

*Hanrahran v. Specialized Loan Servicing, LLC*,
   54 F. Supp. 3d 149 (D. Mass. 2014) .......................................................5, 29, 31

*Helfman v. Ne. Univ.*,
   485 Mass. 308, 149 N.E.3d 758 (2020) ..............................................................9

*Henderson v. U.S.*,
   965 F.2d 1488 (8th Cir. 1992) .......................................................................42

*Higgins v. Huhtamaki Inc.*,
   1:21-cv-00369-NT (D. Me. June 23, 2022) .................................................6, 7 37, 40, 43

*H.J. Inc. v. Nw. Bell Tel. Co.*,
   492 U.S. 229, 109 S. Ct. 2893,106 L. Ed. 2d 195 (1989).................................18

*Holmes v. Sec. Investor Prot. Corp.*,
   503 U.S. 258 (1992).................................................................................................22

*Illinois Brick Co. v. Illinois*,
   431 U.S. 720 (1977)................................................................................................27

*In re Jamison*,
   467 Mass. 269, 4 N.E.3d 889 (2014) ......................................................................25

*In re Paoli R.R. Yard PCB Litig.*,
   916 F.2d 829 (3d Cir. 1990)....................................................................................49

*In re Pharmaceutical Industry Average Wholesale Price Litig*,
   307 F. Supp. 2d 196 (D. Mass. 2004) ........................................................18, 19, 22

*Jean W. v. Commonwealth*,
   414 Mass. 496 (Mass. 1993) ...................................................................................36

*Judge v. City of Lowell*,
   160 F.3d 67 (1st Cir. 1998)........................................................................................5

*Kaiser Found. Health Plan, Inc. v. Pfizer, Inc.*,
   712 F.3d 21 (1st Cir. 2013) .....................................................................................21

*Kraft Power Corp. v. Merrill*,
   464 Mass. 145 (2013) ..............................................................................................27

*LePorin v. Parzych*,
   No. CV 21-11249-NMG, 2022 WL 2208940 (D. Mass. June 21, 2022) ..................5

*Lev v. Beverly Enterprises-Massachusetts, Inc.*,
   457 Mass. 234, 929 N.E.2d 303 (2010) ....................................................................9

*Lewis v. General Elec. Co.*,
   37 F. Supp. 2d 55 (D. Mass. 1999) .........................................................................37

*Lonsk v. Middlesex Water Co.*,
   21cv19808 (EP) (ESK) (D.N.J. Oct. 31, 2022) ...........................................34, 38, 39

vi

*M.G. v. A.I. Dupont Hosp. for Children*,
　　393 F.App'x 884 (3d Cir. 2010) ..................................................49

*Mass. Eye & Ear Infirmary v. QLT Phototherapeutics, Inc.*,
　　552 F.3d 47, 69 (1st Cir.2009)....................................................31

*McBarron v. Arena*, No. CIV. A. 94-01515, 1999 WL 968543
　　(Mass. Super. Sept. 30, 1999)......................................................6

*McKenna v. Wells Fargo Bank, N.A.*,
　　693 F.3d 218 (1st Cir. 2012)......................................................25

*Menard v. CSX Trans. Inc.*,
　　840 F.Supp.2d 421 (D. Mass. 2012) .......................................43, 45

*Metro. Prop. & Cas. Ins. Co. v. Savin Hill Family Chiropractic, Inc.*,
　　266 F. Supp. 3d 502 (D. Mass. 2017) ...................13, 16, 18, 19, 23

*Moniz v. Bayer Corp.*,
　　484 F. Supp. 2d 228 (D. Mass. 2007) .......................................5, 27

*Morrissey v. New England Deaconess Ass'n--Abundant Life Communities, Inc.*,
　　458 Mass. 580, 940 N.E.2d 391 (2010) .......................33, 43, 47, 49

*Mullins v. Pine Manor College*,
　　389 Mass. 47, 56, 449 N.E.2d 331 (1983) ...................................6

*Murray v. Bath Iron Works Corp.*,
　　867 F.Supp. 33 (D. Me. 1994) ..................................................41

*New England Data Services, Inc. v. Becher*,
　　829 F.2d 286 (1st Cir. 1987).................................................19, 23

*O'Connor v. Nantucket Bank*,
　　992 F. Supp. 2d 24 (D. Mass. 2014) ..........................................25

*O'Keeffe v. Superior Carpet, Inc.*,
　　1987 Mass. App. Div. 108 (Mass. Dist. Ct. App. 1987)..................26

*Prospect Indus. Corp. v. Singer Co.*,
　　238 N.J.Super 394 (N.J. Sup. 1989) ...........................................41

*Remy v. MacDonald*,
　　440 Mass. 675 (2004) .............................................................8, 10

*Rodi v. Southern New England School of Law*,
   389 F.3d 5(1st Cir. 2004) ............................................................24

*Sa v. Red Frog Events, LLC*,
   979 F. Supp. 2d 767 (E.D. Mich. 2013)..........................................46

*Sarro v. Philip Morris USA Inc.*,
   857 F. Supp. 2d 182 (D. Mass. 2012) ..............................43, 44, 47

*Sarro v. Philip Morris USA, Inc.*,
   C.A. No. 08-10224-MLW (D. Mass. May 12, 2010) .....................49

*Severa v. Solvay Specialty Polymers U.S., LLC*,
   524 F. Supp. 3d 381 (D.N.J. 2021) ...............................................11

*Sourcing Unlimited, Inc. v. Elektroteks, LLC*,
   Civil Action No. 20-cv-11955-ADB (D. Mass. July 8, 2021) .......15, 23

*Spring v. Geriatric Authority of Holyoke*,
   394 Mass. 274 (Mass. 1985) ........................................................25

*Standard Register Co. v. Bolton-Emerson, Inc.*,
   38 Mass. App. Ct. 545 (Mass. App. Ct. 1995)..............................28

*Stearns v. Metro. Life Ins. Co.,*
   308 F. Supp. 3d 471 (D. Mass. 2018) ...........................................39

*Stop Shop Companies, Inc. v. Fisher*,
   387 Mass. 889 (1983) ...................................................................34

*Suero v. Fed. Home Loan Mortg. Corp.*,
   Civil Action No. 13-13014-JGD (D. Mass. Dec. 17, 2013) ...........27

*Sullivan v. Chief Justice for Admin and Management of Trial Court*,
   858 N.E.2d 699 (Mass 2006) ........................................................38

*Thomalen v. Marriott Corp.*,
   845 F. Supp. 33 (D. Mass. 1994) ..................................................39

*Town of Princeton v. Monsanto Co.*,
   202 F. Supp. 3d 181 (D. Mass. 2016) .............................................5

*VanDenBroeck v. CommonPoint Mortg. Co.,*
    210 F.3d 696 (6th Cir. 2000) ........................................................15

*Weirton Area Water Bd. v. 3M Co.,*
    CIVIL ACTION No. 5:20-CV-102 (N.D.W. Va. Dec. 30, 2020) ...................................11

*Willett v. Herrick,*
    242 Mass. 471 (Mass. 1922) ........................................................46

*Wright v. Conway,*
    2003 WL 22391232 (D. Mass. Oct. 17, 2003) ..................................43

*Zimmerman v. The 3M Company,*
    542 F. Supp. 3d 673 (W.D. Mich. 2021) .........................................6

Statutes and Other Authorities:

18 U.S.C.§ 1962(c) ....................................................................13, 23

18 U.S.C. §1962(d) ....................................................................22, 23

Fed. R. Civ. P. 9(b) .....................................................................5

Fed. R. Civ. P. 12(b)(6) .............................................................1, 4

Mass. G.L. c. 93A ...............................................................*passim*

Mass. G.L. c. 93A § 1 ................................................................26

Mass. G.L. c. 93A § 2 ................................................................26

Mass. G.L. c. 93A, § 9 (1) .........................................................26

Mass. G.L. c. 93A § 9(3) ...........................................................25

Restatement (Second) of Torts § 519..........................................39

Restatement (Second) of Torts § 520..........................................39, 40

Restatement (Second) of Torts § 834..........................................34

*Stedman's Medical Dictionary* 1492 (25th ed. 1990)...................47

**<u>INTRODUCTION</u>**

Plaintiffs Thomas Ryan, Susan Ryan, Sean Gallagher, Ashley Sultan Gallagher, Michele Burt, Christopher Cerasuolo, Nancy Donovan, and Lauren Ladue (collectively, "Plaintiffs"), on behalf of themselves and all others similarly situated, submit this Memorandum of Law in Opposition to the Motions to Dismiss by Defendants Greif, Inc. ("Greif"), Caraustar Industries, Inc. ("Caraustar"), The Newark Group, Inc. ("Newark Group," and together with Greif and Caraustar, the "Greif Defendants"), Massachusetts Natural Fertilizer Company ("MassNatural"), Seaman Paper Company of Massachusetts, Inc. ("Seaman"), and Otter Farm, Inc. ("Otter Farm," and together with MassNatural and Seaman, the "Seaman Defendants") (collectively, "Defendants"). Specifically, the Greif Defendants move to dismiss Counts 22–28 and 34–35 of Second Amended Complaint ("SAC"); Seaman and Otter Farm move to dismiss Counts 8–21 and 34–35; and MassNatural moves to dismiss Counts 1, 3, 5, 6, 7, 34 and 35.[1] As set forth in detail below, Plaintiffs have sufficiently pleaded each of the requisite elements for these claims of negligence, violations of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), violations of the Massachusetts Consumer Protection Act, private nuisance, public nuisance, strict liability, willful and wanton conduct, and medical monitoring. Accordingly, Plaintiffs respectfully request that this Court deny Defendants' Motions to Dismiss in their entirety.[2]

---

[1] Herein, the Greif Defendants' *Memorandum of Law in Support of Defendants Greif, Inc., Caraustar Industries, Inc., and the Newark Group, Inc.'s Motion to Dismiss Plaintiffs' Second Amended Complaint* shall be defined as "*Greif Br.*"; MassNatural's *Motion to Dismiss Second Amended Class Action Complaint Pursuant to Federal Rule of Civil Procedure 12(b)(6)* shall be defined as "*MassNatural Br.*," and Seaman's and Otter Farm's *Memorandum of Law in Support of Rule 12(b)(6) Motion to Dismiss Second Amended Class Action Complaint* be defined as "*Seaman Br.*"

[2] Defendant 3M Company has also moved to dismiss, which Plaintiffs address in a separate brief.

## FACTUAL BACKGROUND

As set forth in detail in the SAC,[3] this case arises out of each Defendants' role in causing the disastrous and widespread PFAS, or "forever chemical," contamination in and around Westminster, Massachusetts. For decades, Defendants used and manufactured high levels of PFAS chemicals in their paper manufacturing and disposed of and stored the resulting hazardous paper sludge byproduct material at 65 Bean Porridge Hill Road (the "Otter Farm Property") *SAC* ¶¶ 89. Defendant MassNatural further resold and distributed PFAS-containing topsoil products made from the hazardous paper sludge to consumers throughout the region. ¶ 115. Defendant Greif, a global industrial packaging products and services company, owns Defendants Caraustar and Newark Group, which operate within Greif's "Paper Packaging & Services" segment, and, together, the Greif Defendants run the Greif Mill, in Fitchburg, Massachusetts, handling PFAS-contaminated waste that they transported to and disposed of at the Otter Farm Property. *Id.* ¶¶ 55–60. Defendant Seaman, a global paper production and distribution company that has acknowledged its routine use of PFAS, similarly disposed of PFAS-contaminated waste materials at the Otter Farm Property, a property it owns together with Otter Farm, Inc. (which was formed in connection with the acquisition of the Otter Farm Property). *Id.* ¶¶ 48–51. Defendant MassNatural ran the composting operation on the Otter Farm Property and converted PFAS-contaminated waste dumped by the other Defendants into consumer soil Products sold to Plaintiffs and Consumer Subclass Members. *Id.* ¶¶ 44–47.

As manufacturers, handlers, and/or distributors of contaminated waste, and specifically paper manufacturing sludge,[4] each Defendant knew or should have known of the dangers

---

[3] To the extent a term is not defined herein, it shall have the same meaning set forth in the SAC.

[4] There is a well-established connection between PFAS contamination and paper manufacturing, and manufacturers such as Seaman and the Greif Defendants have purposefully used PFAS chemicals for many

associated with PFAS, including the tendency of PFAS chemicals to migrate through soil and contaminate underground water supplies and property. *Id.* ¶¶ 25–29. Each Defendant also knew or should have known (1) that these dangers can be avoided only through proper handling and disposal and compliance with applicable regulations, *id.* ¶¶ 21–37, 40–43, 169–73, 181, and (2) that PFAS exposure, even at very low levels, absorbs into the blood, kidney, and liver and accumulates and can lead to the development of serious disease including cancers. *Id.* ¶¶ 32–39. And yet, Defendants proceeded to cheaply dispose of PFAS-containing waste without conducting proper testing, illegally avoid burdensome environmental regulatory compliance costs, conceal compliance failures, and prevent investigations by authorities, including MassDEP. *Id.* ¶¶ 151–52, 155. As part of that concerted effort, Seaman and the Greif Defendants paid for their PFAS-contaminated waste to be accepted by MassNatural at the Seaman-owned Otter Farm Property knowing MassNatural would not appropriately test it; MassNatural then offloaded the same on unknowing consumers and homeowners as PFAS-contaminated soil products. *Id.* ¶¶ 148–52, 155.

The consequences of Defendants' conduct were discovered in January 2022. First, testing performed at the residential private wells located near the Otter Farm Property revealed PFAS-concentrations in the drinking water between 333 and 1,815 ppt, dramatically exceeding the 20 ppt level set by MassDEP. *Id.* ¶¶ 90–95. Then, testing of the private well on the Otter Farm Property itself revealed a PFAS concentration of 5,720 ppt – which is 286 *times* the acceptable MassDEP standard – in a location where water could be expected to not only spread to surrounding properties but also to enter into the production of the consumer products made on the property and resold throughout the region. *Id.* ¶¶ 97, 120.

---

decades to, e.g., prevent substances such as grease from migrating from food and provide moisture barriers on paper. *SAC* ¶¶ 110–13.

MassDEP's subsequent investigation confirmed that Defendants were responsible for the PFAS contamination, and MassDEP issued Notices of Responsibility to Defendants soon thereafter. *Id.* ¶¶ 98–100, 103, 115. MassDEP further directed MassNatural to cease and desist distributing PFAS-contaminated material and required Defendants to arrange and pay for remediation efforts – including bottled water delivery, installation of POET water treatment systems, and frequent water testing – for properties affected by Defendants' spread of PFAS. *Id.* ¶¶ 98–105, 137. Defendants, however, have not alleviated the continued harm experienced by Plaintiffs and Class Members, having, amongst other things, discontinued bottled water deliveries and improperly installed POET systems. *Id.* ¶¶ 138–47.

Defendants' conduct has caused considerable harm to Plaintiffs and Class Members, including (1) loss of enjoyment of their property, as they can no longer drink, cook, bathe, or otherwise use their water, (2) diminution of property value and an impaired ability to sell their PFAS-contaminated homes, and (3) subcellular changes and increased risk of deadly diseases, as demonstrated by levels of PFAS found in Plaintiffs' blood results that are elevated well above background levels. *Id.* ¶¶ 106–108, 183–89, 190–92. Additionally, Defendants caused consumers to purchase PFAS-contaminated products not worth the price they paid, products which themselves facilitated the spread of PFAS chemicals. *Id.* ¶¶ 130–33, 193–94. Notwithstanding their responsibility for causing these harms, as was confirmed by the Notices of Responsibility issued by MassDEP, Defendants now attempt to escape liability by moving to dismiss the well-pleaded allegations against them. Defendants' motions to dismiss should be rejected.

## LEGAL ARGUMENT

It is well settled that "[a] court may not dismiss a complaint for failure to state a claim under Fed. R. Civ. P. 12(b)(6) 'unless it appears, beyond doubt, that the [p]laintiff can prove no

set of facts in support of his claim which would entitle him to relief.'" *Moniz v. Bayer Corp.*, 484 F. Supp. 2d 228, 229 (D. Mass. 2007) (*quoting Judge v. City of Lowell*, 160 F.3d 67, 72 (1st Cir. 1998). The court must "accept all factual allegations in the complaint as true and draw all reasonable inferences in the plaintiff's favor." *Id.* at 229–30 (Gorton, J., denying defendant's motion to dismiss on a 93A claim). A claim "has 'facial plausibility' when plaintiff pleads factual content that allows the court to draw a reasonable inference that the defendant is liable for the misconduct alleged." *Hanrahran v. Specialized Loan Servicing, LLC*, 54 F. Supp. 3d 149, 153 (D. Mass. 2014) (*citing Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)). Additionally, although allegations of fraud or mistake "must state with particularity the circumstances constituting fraud or mistake," a plaintiff may allege generally "[m]alice, intent, knowledge, and other conditions of a person's mind." Fed. R. Civ. P. 9(b). "A well-pleaded complaint may succeed even if . . . actual proof of those facts are improbable." *Guest-Tek Interactive Ent. Inc. v. Pullen*,731 F.Supp. 2d 80, 84 at *4 (D. Mass. 2010) (*quoting Bell Atlantic v. Twombly,* 550 U.S. at 556, 127 S.Ct. 1955 (2007). "'In determining whether a [claim] crosses the plausibility threshold,' the Court is instructed to 'draw on its judicial experience and common sense.'" *Town of Princeton v. Monsanto Co.*, 202 F. Supp. 3d 181, 185 (D. Mass. 2016).

## I. DEFENDANTS ARE LIABLE FOR NEGLIGENCE BECAUSE IT WAS FORESEEABLE THAT PLAINTIFFS WOULD BE HARMED BY DEFENDANTS' BREACHES OF THEIR DUTIES OF CARE.

"Liability for negligence under Massachusetts law requires proof that the defendant 1) owed a legal duty to the plaintiff, 2) which the defendant breached, thereby 3) causing injury to the plaintiff." *LePorin v. Parzych*, No. CV 21-11249-NMG, 2022 WL 2208940 (D. Mass. June 21, 2022) (*citing Davis v. Westwood Group*, 420 Mass. 739, 652 N.E. 2d 567, 569 (1995)). "Only when no rational view of the evidence warrants a finding that the defendant was negligent may the

issue be taken from the jury." *McBarron v. Arena*, No. CIV. A. 94-01515, 1999 WL 968543 at \*4 (Mass. Super. Sept. 30, 1999) (*quoting Mullins v. Pine Manor College,* 389 Mass. 47, 56, 449 N.E.2d 331 (1983) and finding that this appropriate judicial hesitancy to summarily dismiss negligence cases, together with the "general rule that every person has a duty to exercise reasonable care for the safety of others," precluded defendant's summary judgment).[5]

Plaintiffs have clearly pled the elements of negligence. To begin with, Plaintiffs have laid out standards of care applying to all Defendants,[6] including their duties to act reasonably in their production and disposal of waste potentially containing PFAS, to not cause PFAS concentrations above the 20 ng/l level set by MassDEP to contaminate the water and property of others, and to notify affected parties under the specific protocol if they have knowledge that PFAS was released into groundwater. *See, e.g., SAC* ¶¶ 41–43. 121, 134, 245–47, 308–10, 371–73, 433–35.

Yet, each Defendant plainly breached these and other standards of care: the Paper Manufacturing Defendants, as the entities dumping PFAS-contaminated materials at the Otter Farm Property, failed to use reasonable care to employ safe methods of disposing of such materials; MassNatural, as the operator of the composting operation at the Otter Farm Property, failed to use reasonable care in its acceptance, use, storage, distribution, and/or sale of PFAS chemicals or take any reasonable steps to prevent or minimize the accumulation and emission of PFAS chemicals

---

[5] *See also Higgins v. Huhtamaki Inc.*, 1:21-cv-00369-NT, at \*10 (D. Me. June 23, 2022) (requiring only "a plausible case that they were exposed to waste from each of the Defendants and that exposure to that waste was a substantial factor in causing the Plaintiffs' injuries").

[6] Standards of care have been broadly applied to defendants who use, manufacturer, and/or handle PFAS, even if there is no direct relationship with the plaintiffs. *See, e.g., Zimmerman v. The 3M Company*, 542 F. Supp. 3d 673, 681 (W.D. Mich. 2021) (where defendant-manufacturer argued it had no relationship with plaintiffs, court held that "[b]ecause Plaintiffs were foreseeable victims of PFAS contamination, a relationship existed between Plaintiffs and 3M sufficient to impose a duty").

into the environment and its own consumer products; and Otter Farm, as owner of the Otter Farm Property, failed to use reasonable care to employ and/or enforce safe methods of operation on its Property. *Id.* ¶¶ 248, 311, 374, 436. All Defendants further breached their duties by, *inter alia*, failing to (1) properly test or screen incoming and outgoing materials at the Otter Farm Property; (2) institute or employ proper procedures, training, or methods for PFAS disposal; (3) promptly and effectively respond to their respective releases of PFAS into the environment; (4) dispose of their contaminated manufacturing waste in a safer, less populated area; and (5) warn affected parties, including residents and property owners near the Otter Farm Property, that they were being exposed to PFAS and risks of life-threatening disease. *Id.*

In so breaching, Defendants negligently created and failed to curtail the dispersion of PFAS chemicals into the soil, groundwater, and consumer products, causing significant harm to Plaintiffs and Class Members. *Id.* ¶¶ 106–08, 249, 312, 375, 437. Defendants' direct breaches of their duties, moreover, proximately caused harm to Plaintiffs by contaminating their drinking water, diminishing their property values, and putting their health at severe risk. *See Higgins*, at *13 (finding that the pleading "sets forth a chain of events that, when interpreted in the light most favorable to the Plaintiffs, leads to the plausible conclusion that the Defendants' disposal of PFAS-contaminated waste from the [Defendants'] Mills contributed to the contamination of the Properties").

In the face of the above facts, and without a legal defense, MassNatural has chosen not to move for dismissal of negligence.[7] Seaman's, Otter Farm's, and the Greif Defendants' responses are limited to particular elements of the offense: the Greif Defendants have asserted that they owed

---

[7] "Defendant [MassNatural] ... moves to dismiss Counts One, Three, Five, Six, Seven, Thirty-Four, and Thirty-Five, **but not Count 2, which is "Negligence Against Defendant MassNatural."** *MassNatural Br.* at 1.

"no duty of care" to Plaintiffs and that the alleged harms were not "foreseeable," while Seaman and Otter Farm contend that Plaintiffs did not allege the existence or breach of a duty they owed to Plaintiffs. *Greif Br.* 6–10; *Seaman Br.* 12–14. These limited attacks on components of Plaintiffs' larger negligence claims fall well short.

Plaintiffs, as detailed above, have set forth multiple *direct* allegations of negligence, *SAC* ¶¶ 51, 89–95, 115–20, 182, 248, 311, 374, 436, which Defendants have effectively ignored.[8] Instead, Greif Defendants, Seaman, and Otter Farm attempt a slight of hand by casting Plaintiffs' allegations as relying on a third-party duty to intervene which requires a "special relationship" between plaintiff and defendant and then argue that no such relationship exists here. *Greif Br.* 7–8; *Seaman-Otter Br.* 12–14. But such third-party intervention cases are wholly irrelevant here, where Defendants *themselves* created, transported, disposed of, and conspired to resell PFAS-containing waste, and the Defendants' citations to third-party intervention cases which quite obviously have no relevance to the environmental contamination they directly caused are immaterial.[9]

---

[8] Above and beyond Seaman's and Otter Farm's affirmatively negligent actions were also instances of negligence through failures to act in the face of a duty. Seaman and Otter Farm *owned* the Otter Farm Property, where the dumping and redistribution occurred, and they formed a business relationship with MassNatural knowing that they would be redistributing the PFAS-containing waste. *SAC* ¶¶ 48, 54. Thus, the argument that "Seaman Paper and Otter Farm had no ability to control the actions of MassNatural," *Seaman Br.* 12, is absurd. Their ownership with reason to know – and a duty to know – of the misconduct occurring on their property, and their failure to stop it, itself constituted negligence. While there are situations, such as in *Lev*, where an omission might not be considered negligent, here there was repeated and long-term misconduct occurring on the Otter Farm Property, which caused the spread of PFAS throughout Westminster and beyond. *SAC* ¶¶ 119–20, 134–35. This constitutes the precise foreseeability that the *Lev* court found to be missing, *i.e.,* "whether a defendant reasonably could foresee that he would be expected to take affirmative action to protect the plaintiff and could anticipate harm to the plaintiff from the failure to do so." *Lev,* 457 Mass. at 243.

[9] The Greif Defendants cite just three cases in their section on negligence: (1) a case brought by a victim of sexual assault against her university following a party with underage drinking; (2) a case brought by a child against her mother for her mother's alleged carelessness resulting in a car accident *while the child was in utero*; and (3) a case brought against the *employer* of an individual who caused a car crash when driving home after having drinks at an unsanctioned, afterwork dinner. *See Remy v. MacDonald*, 440 Mass. 675,

For example, in *Lev*, 457 Mass. at 245–46, cited repeatedly by the Greif[10] and Seaman

Defendants, a pedestrian car crash victim sued the *employer* of a person driving home following

two drinks at an afterwork dinner with colleagues. Defendants want this Court to be interested in

the general rule that under the common law "[t]here is no duty to control another person's conduct

to prevent that person from causing harm to a third party," *Greif Br.* 7; *Seaman Br.* 12–13. But,

again, Plaintiffs here do not rely on any obligation to control a third party's conduct to state a claim

for negligence, rendering *Lev* irrelevant.

Similarly far afield is *Helfman*, 485 Mass. at 315, where the court rejected (on summary

judgment) negligence claims against a university following a sexual assault committed by one

student against another, because "it was not reasonably foreseeable that the plaintiff would suffer

a criminal act by a third party or other imminent physical harm due to her intoxication at the time

of the incident." Cited in *Greif Br.* 9–10. Once again, the injuries to Plaintiffs here do not hinge

on a third-party act, let alone questions of intervention to prevent a third-party *criminal* act. Rather,

Plaintiffs make direct claims as to Defendants' own conduct as the creators of the hazard.[11]

The remaining cases cited by Seaman and Otter Farm are no closer to the mark. Instead of

examining cases involving environmental contamination, they cite to the concurrence in *Cremins*

*v. Clancy*, 415 Mass. 289, 612 N.E.2d 1183 (1993) – which concerns a claim of negligence against

---

677 (2004); *Helfman v. Ne. Univ.*, 485 Mass. 308, 149 N.E.3d 758 (2020); *Lev v. Beverly Enterprises-Massachusetts, Inc.*, 457 Mass. 234, 929 N.E.2d 303 (2010).

[10] Throughout their brief, the Greif Defendants have erroneously cited the case name as "*Lee*" rather than "*Lev*." Though referring to the Greif Defendant's citation, Plaintiffs use the correct name, *Lev*.

[11] To add yet another example of the many direct allegations Plaintiffs make, see Plaintiffs' citation to the MassDEP findings in its Notices of Responsibility against Defendants that "Seaman Paper, Otter Farm, and Greif all 'arranged for the transport, disposal, storage or treatment of hazardous material' to or at MassNatural's operations at Otter Farm." *SAC* ¶ 115.

a social host whose *friend*, after drinking beer he brought to the party himself, was involved in a car crash – in order to assert that "we do not owe others a duty to take action to rescue or protect them from conditions we have not created." *Seaman Br.* 13 (leaving out the preceding word "*ordinarily*"). This ignores the fundamental truth here that Seaman and Otter Farm (together with the other Defendants) *have* "created the conditions" causing harm to Plaintiffs, including by adding in PFAS and creating the waste containing PFAS, *SAC* ¶¶ 48–51, 113–14, 119–20, and negligently disposing it (while knowing it would be resold) at the Otter Farm Property, which they own. *Id.* ¶¶ 148–56, 168. These multiple, affirmative acts directly exposing Plaintiffs to harm could not be farther from the situation in *Cremins*. What is more, Justice Greaney makes clear he would have reached the opposite conclusion if, as is the case here, the defendant had "control" over the source of the harm or had taken any action exposing the plaintiff to harm. *See Cremins* at 297 ("[B]ecause he had no control over the beer supply and therefore neither served nor made the beer available, the defendant took no action that exposed the plaintiffs to harm.").[12]

The responsibilities of a social host whose friend became intoxicated with his own beer simply has no bearing to the actions here.[13] Here, Defendants not only had control over the sources of the harm, including their own creation of PFAS-contaminated waste and subsequent transport and disposal of the same, but undertook a multitude of actions, over decades, that directly breached

---

[12] Finally, even the case Seaman and Otter Farm cite merely to establish the basic legal standard for duty of care, involving an injury at a beach club, only undermines their argument, as the judge actually rejected the Defendant beach-club's motion for summary judgement, finding that it owed a duty based upon prevailing social norms "even absent the voluntary assumption" of such duty. *See Cohen v. Elephant Rock Beach Club, Inc.*, 63 F. Supp. 3d 130 (D. Mass. 2014).

[13] The Greif Defendants' remaining case citation is equally far afield. In *Remy*, 440 Mass. 675, the only negligence case cited by any Defendant that did not concern third-party intervention, the judge refused to expand the duty of care for a mother's negligent acts (*i.e.,* carelessness in crashing a car) while the child was in utero. The contrast between that case and the one here, where traditional claims of negligence are being brought by the foreseeable victims of contamination against the corporate perpetrators of that contamination, could not be sharper.

their duties and caused harm to Plaintiffs. *See Deshaies v. DJD Med.*, Civil Action 21-cv-12050-ADB, at *7-8 (D. Mass. Jan. 28, 2022) (where defendant-distributors failed to warn of risks associated with defect, which led to plaintiff suffering heavy metal poisoning, court held that factfinder could conclude that plaintiff's injuries were a foreseeable consequence of defendants' conduct); *see also Severa v. Solvay Specialty Polymers U.S., LLC*, 524 F. Supp. 3d 381, 398 (D.N.J. 2021) (permitting a claim of negligence because plaintiffs "alleged sufficient facts to support their claims that regardless of [third-party's] actions relative to the water supply, Defendants had a duty of care with regard to the proper handling of PFAS, and Defendants breached that duty by discharging PFAS into the environment, which directly caused Plaintiffs harm"); *Weirton Area Water Bd. v. 3M Co.*, CIVIL ACTION No. 5:20-CV-102, at *11 (N.D.W. Va. Dec. 30, 2020) (allowing claim against defendant for "negligently putting PFAS into the stream of commerce . . . when they knew or should have known about the dangers PFAS posed to water").

A.     ***Greif Defendants' Extrinsic Evidence and Factual Rebuttals Are Improper and Should be Disregarded.***

Beyond their unusual case citations, the Greif Defendants introduce evidentiary exhibits and factual rebuttals entirely improper for a motion to dismiss. For example, they attempt to introduce as "Exhibit A" an affidavit from the general manager of the Fitchburg Mill in order to advance several propositions, including that "[t]he Greif Defendants did not manufacture PFAS"; "[t]he Fitchburg Mill did not learn of the potential for PFAS6 in the mill's residuals until approximately May of 2022"; and MassDEP "never informed the Greif Defendants that they should test any materials or waste products for PFAS." *Greif Br.* 9–10. Setting aside that the

affidavit fails on its face to substantiate these supposed defenses,[14] it quite obviously goes to factual questions not properly introduced at this stage.[15]

In addition to these exhibits, the Greif Defendants also make numerous fact-based rebuttals only appropriate for summary judgment. They assert, for example, that "there were no signs available to the Greif Defendants that PFAS materials would leach from the MNF site and into the ground and drinking water of plaintiffs, and so the harms alleged were not reasonably foreseeable" and that "[o]nce the Greif Defendants' residual waste material left the Fitchburg mill, the Greif Defendants lacked any control whatsoever over [the waste material]." *Greif. Br.* 10, 8. Beyond being unpersuasive,[16] these attempts at countering the facts set forth in the SAC are improper at this stage. *See, e.g., Basf Corp. v. Martineaus Auto Body, Inc.,* Civil Action No. 18-cv-10881-ADB, at *10 (D. Mass. Jan. 30, 2019) (denying motion to dismiss where defendant's arguments "address the merits of Plaintiff's claim and ask the Court to consider matters outside of the pleadings, which is not an appropriate inquiry on a motion to dismiss"); *Deshaies*, at *7-8 ("questions of causation are typically best reserved for the factfinder").

---

[14] For example, Mr. Pelletier says he "has no knowledge of the Fitchburg Mill ever intentionally or knowingly adding any PFAS…" *Greif Br.*, Exhibit A. However, (1) just because this affiant alleges that he has no personal knowledge does not mean it did not happen, and (2) the standard for negligence does not require the Fitchburg Mill to have "intentionally or knowingly" added PFAS; they could have negligently done so (or negligently permitted it to be added).

[15] The same is true for the Greif Defendants' Exhibit B, which purports to show testing results from a particular moment in time that are not violative of MassDEP's PFAS standards. In addition to being improperly introduced, this one particular snapshot says nothing of the multiple tests with startlingly high, and clearly violative, results.

[16] Consider Greif's statement that "there were no signs available to the Greif Defendants that PFAS materials would leach from the MNF site and into the ground and drinking water of plaintiffs, and so the harms alleged were not reasonably foreseeable." Even if this *were* properly introduced, it defies logic that a multinational paper manufacturer, had "no signs available" – considering the well-known history of PFAS contamination in paper mills and the fact that any reasonably-performed testing would have revealed high levels of PFAS. *See SAC* ¶¶ 21–39, 55–60.

Plaintiffs have thus satisfied the elements of direct negligence against all Defendants, notwithstanding Defendants' attempts to cast these claims as indirect, third-party claims.

## II. DEFENDANTS ARE LIABLE FOR PLAINTIFFS' INJURIES UNDER SECTION 1962(c) OF RICO.

A plaintiff may bring a private action pursuant to section 1962(c) of RICO by alleging "(1) conduct (2) of an enterprise, (3) through a pattern (4) of racketeering activity" and (5) that the "RICO violation was the proximate cause of the plaintiff's injury." *Duggan v. Martorello*, Civil Action 18-12277-JGD, at *47, *51 (D. Mass. Mar. 30, 2022). Notwithstanding Defendants' arguments to the contrary, Plaintiffs have properly alleged each element of a RICO claim.

### A. *Defendants Formed a RICO Enterprise.*

A RICO enterprise is "any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity." *Metro. Prop. & Cas. Ins. Co. v. Savin Hill Family Chiropractic, Inc.*, 266 F. Supp. 3d 502, 520 (D. Mass. 2017). "The Supreme Court has held on multiple occasions that [the] definition [of 'enterprise'] is to be interpreted broadly." *Id.* at 522.; *see also D'Addario v. D'Addario*, 901 F.3d 80, 100 (2d Cir. 2018) ("the very concept of an association in fact is expansive"). "[A]n association-in-fact enterprise need not have any structural features beyond [1] a purpose, [2] relationships among those associated with the enterprise, and [3] longevity sufficient to permit these associates to pursue the enterprise's purpose." *Id.* Thus, a plaintiff need only show a "continuing unit that functions with a common purpose." *Boyle v. United States*, 556 U.S. 938, 948, 129 S. Ct. 2237, 2245, 173 L. Ed. 2d 1265 (2009).

Here, Defendants contend that there was no "enterprise" or illegal activity but rather that each Defendant merely "operat[ed] their own business[es] as usual." *See Greif Br.* 23–26; *Seaman Br.* 21–23; *MassNatural Br.* 3. But Plaintiffs' SAC sets forth, in painstaking detail, Defendants'

deliberate efforts to associate for the common purpose of (1) avoiding burdensome environmental regulatory compliance costs (2) concealing compliance failures, and (3) preventing investigations by MassDEP and other regulators that would lead to substantial fines and legal liability from such wrongful conduct. *SAC* ¶¶ 150–52, 155.

For example, the Complaint alleges MassNatural allowed Seaman Paper's unchecked dumping of toxic paper fiber sludge at MassNatural starting in the 1980's. ¶ 148. MassNatural's willingness to accept this material without testing it, and to lie about MassNatural's own compliance procedures to state authorities, allowed Seaman Paper to avoid paying for expensive hazardous waste transporters and for proper disposal. ¶ 148-49. This avoidance became more valuable over time as environmental regulatory compliance costs rose. *Id.*

To preserve this valuable benefit *and* prevent discovery of the Otter Farm Enterprise's activity by other potential buyers, Seaman Paper acted decisively when the viability of the Otter Farm Enterprise was threatened when MassNatural was foreclosed on. *See* ¶¶ 151, 153. As laid out by Plaintiffs' SAC, Seaman Paper bought the repossessed Otter Farm property out of foreclosure at public auction, incorporated Defendant Otter Farm, Inc., conveyed the Otter Farm property to Otter Farm, Inc. and then, knowing that MassNatural would allow Seaman Paper to continue to dump hazardous waste unchecked (because MassNatural had already done so for over a decade), leased the property *back to MassNatural for a nearly century-long term*. *Id*. MassNatural and Seaman Paper then welcomed Greif into the enterprise the same year by offering Greif Defendants' the same inexpensive, unchecked dumping privileges that had been afforded to Seaman Paper for decades. ¶ 154.

Defendants' dumping and lack of compliance provided MassNatural with a consistent supply of composting material which MassNatural was paid to accept and turned into PFAS6-

contaminated topsoil and sold for a profit to unsuspecting consumers. ¶ 151, 168. Defendants concealed this conduct from the public and regulators by submitting fraudulent annual compliance certifications to MassDEP, preventing governmental oversite. *Id.* ¶¶ 149–52.

Defendants' intention to engage in a lasting enterprise to accomplish their unlawful, shared purposes is clearly demonstrated by Seaman Paper and MassNatural four-decade association, as well as the two-plus decade association of all Defendants.[17] *Id.* ¶¶ 153–54. Unlike in cases involving mere parallel conduct, *see e.g.*, *Gov't Emps. Ins. Co. v. Analgesic Healthcare, Inc.*, CIVIL ACTION No. 16-11970-RGS, at *5 (D. Mass. Mar. 28, 2017) (finding parallel conduct where complaint failed to allege how defendants coordinated or collaborated with each other, or that they even knew one another to be participants in same scheme), Plaintiffs here plainly allege coordination and collaboration – all centered on the operations at the Otter Farm Property – sufficient to establish an association-in-fact enterprise. *See, e.g., Sourcing Unlimited, Inc. v. Elektroteks, LLC*, Civil Action No. 20-cv-11955-ADB, at *1 (D. Mass. July 8, 2021) (association-in-fact enterprise sufficiently pleaded by stating how each defendant stole parts and/or transported stolen parts, sharing the common and continuing purpose of buying and selling those stolen parts).

---

[17] The Greif Defendants claim that Plaintiffs have only described a "hub-and-spoke" structure with MassNatural at the "hub" and the remaining Defendants at the "spokes," which they say is insufficient to support an association-in-fact enterprise. *Greif Br.* 24–25. However, a "hub-and-spoke" structure is when there are "similarly disparate groups" and the "alleged participants did not have knowledge of each other's existence or participation." *Ezell v. Lexington Ins. Co.*, 286 F. Supp. 3d 292, 299 (D. Mass. 2017) ("hub-and-spoke" structure where complaint failed to state how brokers collaborated with each other or if brokers were even aware of each other's participation in scheme)). *See also Gov't Emps. Ins. Co. v. Analgesic Healthcare, Inc.,* CIVIL ACTION No. 16-11970-RGS, at *6 (D. Mass. Mar. 28, 2017) ("while GEICO adequately alleges that each provider accepted AHI's offer of a kickback in exchange for the prescription of AHI equipment, there is no 'unifying rim' even hinting that that the providers acted collectively"); *VanDenBroeck v. CommonPoint Mortg. Co.,* 210 F.3d 696, 700 (6th Cir. 2000) (rejecting RICO enterprise involving defendant bank and series of sub-lenders with whom bank associated where there were no allegations of any mechanism by which group "conducted its affairs or made decisions"). Yet unlike cases in which courts found a "hub-and-spoke" structure, Defendants here knew of each other's participation, which had the same geographical locus at the Otter Farm Property, and coordinated their efforts in a scheme to avoid and reduce costs and hide compliance failures. *SAC* ¶¶ 149–55.

Defendants also argue that their use, transport, disposal, sale, and distribution of hazardous materials was merely part of their "normal business operations." As discussed above, however, the Otter Farm Enterprise activities were separate from and in addition to each Defendant's individual business operations. The three groups of Defendants – MassNatural, the Greif Defendants, and the Seaman Defendants – would have been distinct businesses with no relationship to the others (Seaman and the Greif Defendants being separate paper manufacturing businesses; MassNatural being a composing company) were it not for the common enterprise they formed around the Otter Farm Property for accomplishing their shared purposes. *SAC* ¶ 152. On these facts, the SAC sufficiently alleges that Defendants formed a RICO enterprise. *See Metro. Prop. & Cas. Ins. Co.*, 266 F. Supp. 3d at 523 (rejecting defendants' argument that they were merely "carrying out every day, usual business activities" where, among other things, plaintiffs "alleged facts showing that the defendants engaged in a coordinated effort to carry out" fraudulent billing scheme, which was not part of normal operations).

### B.    *Defendants Participated in the Operation or Management of the Enterprise.*

As to the "conduct" element, "[i]n order to conduct or participate, directly or indirectly, in the conduct of [an] enterprise's affairs … one must participate in the operation or management of the enterprise itself…. However, this does not mean that RICO liability is ... limited to those with primary responsibility for the enterprise's affairs or those with a formal position in the enterprise[.]… It suffices for this element that a defendant be plainly integral to carrying out the enterprise's activities." *Metro. Prop. & Cas. Ins. Co.*, 266 F. Supp. 3d at 525 (citations and internal quotation marks omitted).

Defendants contend that Plaintiffs, even if they have alleged the existence of an enterprise, fail to demonstrate how each Defendant participated in the operation or management of the

enterprise. *Greif Br.* 26–27, *Seaman Br.* 21–23, *Mass Natural Br.* 3. However, Plaintiffs have set forth exactly how each Defendant was integral to carrying out the unlawful Otter Farm Enterprise. In an effort to avoid having to hire specially licensed hazardous waste transportation professionals or overhaul their manufacturing processes to comply with public health regulations, Seaman and the Greif Defendants, knowing or with reason to know that MassNatural circumvented proper testing procedures for incoming materials, paid MassNatural to pick up, transport, dispose of, store, treat, and process PFAS-containing material in amounts and concentrations dangerous to human health. *SAC* ¶ 156. This saved Seaman and the Greif Defendants substantial amounts of money because they did not need to overhaul their manufacturing processes or hire the required specially-licensed hazardous waste transportation companies. *Id.* MassNatural, for its part, illegally and in direct violation of its 2020 RCC Permit, transported, disposed of, stored, treated, and processed the hazardous, PFAS-containing materials acquired from Seaman and the Greif Defendants. *Id.* To get rid of the PFAS-contaminated material it acquired, MassNatural, turned the toxic waste into consumer products and sold the same to unknowing consumers, including Plaintiffs and Class Members (and undertook these actions on the property owned by Seaman and Otter Farm). *Id.* All of this was done in contravention of proper procedures, and Defendants thus coordinated to conceal the illegality of the Otter Farm Enterprise from authorities. *Id*. They were able to do so through annual certifications to MassDEP under penalty of perjury that MassNatural's operations at the Otter Farm Property were compliant, including with the 2020 RCC Permit (on which MassNatural is listed as Permittee, and George D. Jones *on behalf of Otter Farm and Seaman*, is listed as property owner), all while each Defendant knew of the falsity of such statements. *Id.* ¶¶ 156, 163.

Plaintiffs have thus established that, far from engaging in ordinary business relationships, each Defendant instead played a clear role in conducting the Otter Farm Enterprise. *See, e.g., In re Pharmaceutical Industry Average Wholesale Price Litig*, 307 F. Supp. 2d 196, 14-15 (D. Mass. 2004) (rejecting defendants' argument that "they were simply conducting their own affairs" where defendants did not just promote their own products but also promoted fraudulent pricing scheme).

### C.    *Defendants Engaged in a Pattern of Racketeering.*

As to the third element, a "plaintiff must allege a pattern of racketeering activity involving at least two predicate acts, the second of which must occur within 10 years of the first." *Metro. Prop. & Cas. Ins. Co.,* 266 F. Supp. 3d at 526–27. "Predicate acts for purposes of RICO are acts indictable under any one or more of certain specified laws, including the mail and wire fraud statutes." *Id.* at 527.

The Seaman Defendants contend that Plaintiffs fail to plead wire or mail fraud with the required particularity by not identifying the actions of each Defendant with respect to the predicate acts.[18] *Seaman Br.* 23–25. However, the SAC clearly alleges that Seaman, Otter Farm, and the Greif Defendants *each*, through MassNatural, transmitted or caused to be transmitted false monthly and annual compliance certifications to the Westminster Board of Health and MassDEP. *SAC* ¶¶ 157–58, 163–77, 544–49.

Specifically, Plaintiffs' have alleged that Defendants collectively caused MassNatural to sign and transmit two false annual 2020 RCC Permit compliance certifications to MassDEP on February 4, 2021 and January 11, 2022, respectively, *id.* ¶¶ 174, 545 – which establishes a "pattern" of racketeering activity. *See, e.g., H.J. Inc. v. Nw. Bell Tel. Co.*, 492 U.S. 229, 237, 109 S. Ct. 2893, 2899, 106 L. Ed. 2d 195 (1989) ("Congress envisioned circumstances in which no

---

[18] The Greif Defendants do not raise any specific arguments concerning "pattern of racketeering activity" in their motion to dismiss.

more than two predicates would be necessary to establish a pattern of racketeering[.]"); *see also Bos. Cab Dispatch, Inc. v. Uber Techs., Inc.*, Civil Action No. 13-10769-NMG, at *15 (D. Mass. Jan. 26, 2015) (pattern of racketeering activity sufficiently alleged where complaint indicated time period in which predicate acts occurred).

Plaintiffs also state that they expect to discover that MassNatural, additionally, likely fraudulently submitted, via U.S. mails, false certifications on a monthly and annual basis to MassDEP beginning in 1987. *SAC* ¶¶ 158, 160-62, 178. Specifically, Plaintiffs allege that beginning in 1987, MassNatural certified compliance with the 1987 Permits' requirements on a monthly and annual basis despite not maintaining a groundwater monitoring program or testing incoming materials as required by the 1987 Permits. *SAC* ¶¶ 158, 160-62, 178. *See In re Pharmaceutical Industry Average Wholesale Price Litig*, 307 F. Supp. 2d 196, 13 (D. Mass. 2004) ("courts have recognized that relaxation of pleading requirements [for a RICO claim] is permitted where information is in a defendant's sole possession"); *New England Data Services, Inc. v. Becher*, 829 F.2d 286, 290 (1st Cir. 1987) (holding "the draconian result of dismissal should not be automatic in RICO cases, especially when the facts underlying the claims are within the defendants' control," in which case allowance of discovery, and thereafter an opportunity to amend any defects, is proper).

As demonstrated above, Plaintiffs have specifically laid out in detail the wire and/or mail fraud committed by Defendants vis-à-vis the two sets of permits issued in 1987 and 2020, as well as the attendant reporting, monitoring, and certification requirements that the Otter Farm Enterprise violated. *SAC* ¶¶ 159–78. *See, e.g., Metro. Prop. & Cas. Ins. Co.,* 266 F. Supp. 3d at 533 (heightened pleading requirements satisfied in fraudulent billing scheme where plaintiffs listed specific dates, claim numbers, and amounts billed throughout relevant time period). And Plaintiffs

expect that discovery will reveal additional instances of false and misleading statements concerning Otter Farm Enterprise members' compliance with environmental regulations and permits, such that dismissal is further inappropriate at this stage.

**D.** **The Alleged Acts of Racketeering Were the Proximate Cause of Plaintiffs' Injuries.**

Finally, to establish standing for a private cause of action under RICO, a plaintiff must demonstrate proximate causation, *i.e.,* that "the alleged [RICO] violation led directly to the plaintiff's injuries." *Duggan*, Civil Action 18-12277-JGD, at *47. Defendants assert that proximate cause is lacking because Plaintiffs' property damage and damages incident thereto resulted from the alleged contamination itself rather than the predicate acts of wire and/or mail fraud and that Plaintiffs "stand at too remote a distance to recover." *Greif Br.* 27–29; *Seaman Br.* 25–26. However, Plaintiffs make (painstakingly) clear that their injuries were directly and proximately caused by the conduct of the Otter Farm Enterprise. Defendants' pattern of racketeering activity – wire and/or mail fraud, as discussed *supra Section II-C* – conduct which caused Plaintiffs and Class Members to suffer property damages in the form of diminution of their property value and expenses incurred in connection with necessary decontamination and remediation efforts. *SAC* ¶¶ 179, 541. Defendants' circumvention of MassDEP and other regulatory standards, *standards specifically designed to protect the community against dangerous contamination*, were essential to the hazardous materials being stored unsafely and integrated into MassNatural's composting operations – and thus spread to Plaintiffs' water supply and property. Given the water-soluble nature of PFAS and its well-known susceptibility to travel through soil and groundwater, this was an entirely foreseeable consequence. *Id.* ¶¶ 28–29, 180–82. Thus, the concealment from MassDEP of the PFAS-related regulatory violations was part and parcel of Defendants' dumping and redistribution scheme. Absent the predicate acts, Plaintiffs' properties would not be contaminated,

and Plaintiffs and Consumer Subclass Members would not have purchased PFAS-contaminated topsoil products; nor would the Otter Farm Enterprise be the cost-saving scheme it became for Defendants.

Plaintiffs, moreover, do not "stand at too remote a distance to recover." Because Seaman, Otter Farm, and the Greif Defendants knew the manner in which MassNatural would use the hazardous materials obtained from the paper mill facilities, concealing noncompliance with MassDEP regulations via wire and/or mail fraud, the injuries to Plaintiffs resulting from Defendants' RICO enterprise are far from attenuated.[19] *See, e.g., Kaiser Found. Health Plan, Inc. v. Pfizer, Inc. (In re Neurontin Mktg. & Sales Practices Litig.)*, 712 F.3d 21, 38–39 (1st Cir. 2013) (rejecting defendant's argument that the causal chain was too attenuated where defendant knew "that, because of the structure of the American health care system, physicians would not be the ones paying for the drugs they prescribed" but rather plaintiffs would be).

A finding of proximate cause is also consistent with the three-part proximate cause test for a RICO claim set forth by the United States Supreme Court, which inquires

> first, how difficult it is "to ascertain the amount of a plaintiff's damages attributable to the violation, as distinct from other, independent factors"; second, whether holding the defendant liable "would force courts to adopt complicated rules apportioning damages among plaintiff's removed at different levels of injury from the violative acts, to obviate the risk of multiple recoveries"; and third, whether "the need to grapple with these problems is simply unjustified by the general

---

[19] The Greif Defendants focus much of their argument concerning injury on a supposedly "unreasonable inference" regarding the timing of the contamination: "Plaintiffs essentially allege that the contamination *began* in the 1980s," and thus "essentially argue that had [MassNatural] tested for PFAS contamination as required by the 1987 and 2020 RCC Permits, PFAS would have been discovered and the contamination of the [MassNatural] site and surrounding properties of the Plaintiffs would have been prevented." *Greif Br.* 28. "The suggested foundational inference that [MassNatural]'s testing of incoming composting materials would have revealed, let alone prevented PFAS contamination is wholly speculative." *Id.* at 29. This argument hardly bears addressing, as it is not at all speculative that proper compliance with regulations would have prevented (or at the very least significantly reduced) Plaintiffs' and Class Members' injuries. That Defendants went to the extremes of acting illegally, including committing wire and/or mail fraud to avoid oversight, combined with the obvious public health rationales behind the testing requirements, together reinforce the causal connection between the predicate acts and the resulting injuries to Plaintiffs and Class Members.

interest in deterring injurious conduct, since directly injured victims can generally
be counted on to vindicate the law as private attorneys general."

*In re Pharmaceutical Industry Average Wholesale Price Litig*, 307 F. Supp. 2d 196, 15–16 (D.

Mass. 2004) (*quoting Holmes v. Sec. Investor Prot. Corp.,* 503 U.S. 258, 268 (1992)). As to the

first inquiry, Plaintiffs' and Class Members' injuries, stemming from PFAS contamination caused

by the Otter Farm Enterprise, are entirely attributable to Defendants' actions, *SAC* ¶¶ 182–83, 540–

41, 549, as opposed to other, independent factors, so damages allocation is not a concern. As to

the second inquiry, the court will not need a complicated damages apportionment scheme for

Plaintiffs removed at different levels of injury because Plaintiffs and Class Members comprise the

class of victims and suffer similar damages from the same violative acts. *Id.* Finally, as individuals

directly harmed by the Otter Farm Enterprise's wrongful conduct, Plaintiffs are best situated to

vindicate their own interests. *See, e.g., In re Pharmaceutical Industry Average Wholesale Price

Litig*, 307 F. Supp. 2d at 17 (applying factors and concluding "Defendants do not argue that there

would be any particular difficulty in allocating damages; there are no other victims that will be

sharing in the amounts claimed by Plaintiffs; and as the Plaintiffs are the ones directly injured, no

other party is better placed to vindicate their interests").

III.  **DEFENDANTS ENGAGED IN A CONSPIRACY AND ARE LIABLE FOR
      PLAINTIFFS' INJURIES UNDER SECTION 1962(d) OF RICO.**

To state a claim under Section 1962(d) of RICO for conspiracy, a "plaintiff must allege the

same elements of a RICO claim, plus allegations that each RICO co-conspirator knowingly joined

the conspiracy and involved himself or herself, directly or indirectly, in the commission of at least

two predicate offenses." *Duggan*, at *54 (*citing Fiorillo v. Winiker*, 85 F.Supp.3d 565, 572 (D.

Mass. 2015) (internal quotation marks omitted)). "In order to show that a defendant knowingly

joined the conspiracy to participate in the conduct of the affairs of the enterprise[,] the plaintiff

need only prove that the defendant agreed with one or more co-conspirators to participate in the conspiracy…. [I]t is not necessary for the conspiratorial agreement to be express, so long as its existence can plausibly be inferred from words, actions, and the interdependence of activities and persons involved." *Metro. Prop. & Cas. Ins. Co.*, 266 F. Supp. 3d at 528 (citations and internal quotation marks omitted).

Defendants' main argument as to RICO conspiracy is that Plaintiffs' allegations of a RICO conspiracy under Section 1962(d) cannot stand in the absence of viable substantive RICO claims under Section 1962(c). *Seaman Br.* 26–28; *MassNatural Br.* 3; *Greif Br.* 29–30. The Seaman Defendants additionally argue that Plaintiffs' RICO conspiracy claim fails as too conclusory and "virtually identical to the alleged 1962(c) theory." *Seaman Br.* 27–28. However, as discussed in greater detail, *supra,* Plaintiffs sufficiently allege each requisite element of a Section 1962(c) claim. *SAC* ¶ 152. Additionally, Defendants each conspired, in that they knowingly intended and ultimately agreed to violate Section 1962(c) by, *inter alia*, illegally dumping, transporting, and/or reselling hazardous PFAS waste in violation of regulatory standards and concealed that conduct through at least two instances of wire and/or mail fraud, *id.* ¶ 553, thereby facilitating the activities of the Otter Farm Enterprise. *See, e.g., Sourcing Unlimited, Inc.*, Civil Action No. 20-cv-11955-ADB, at *1 (denying motion to dismiss RICO conspiracy claim where plaintiff stated underlying claim for 1962(c) and alleged that defendants conspired to knowingly purchase stolen parts and to sell parts made using stolen molds).[20] Accordingly, Defendants' arguments for dismissal of Plaintiffs' RICO conspiracy claims should be rejected.

---

[20] As with Section 1962(c), Plaintiffs expect discovery to reveal additional relevant facts concerning Defendants' conspiracy under Section 1962(d), such that dismissal is further improper at this stage. *See New England Data Services, Inc.*, 829 F.2d at 290 (1st Cir. 1987).

## IV. PLAINTIFFS' CHAPTER 93A CLAIMS ARE PROCEDURALLY AND SUBSTANTIVELY PROPER.

### A. *Plaintiffs Provided Defendants with Notice of their Chapter 93A Claims.*

Defendants argue Plaintiffs' 93A claim must be dismissed because Plaintiffs sent notice to Defendants only after filing the original Complaint. *Greif Br.* 10–11; *Seaman Br.* 5–6; *MassNatural Br.* 2. However, Massachusetts courts have routinely held that 93A notice letters delivered after commencing an action are sufficient where the complaint is amended after the 30-day statutory period has lapsed. *See Rodi v. Southern New England School of Law*, 389 F.3d 5, 20 (1st Cir. 2004) (Massachusetts courts typically allow plaintiffs to cure pleading defects, and such defects will not be fatal to a 93A claim); *Francisque v. Wells Fargo Bank, N.A.,* 2012 WL 860212, at *5 (D. Mass. 2012) (plaintiff may amend the complaint to add a 93A claim where demand letter is sent after the suit is commenced). In *Burns*, for example, Judge Gorton concluded a 93A letter sent 81 days after commencing suit "was adequate and satisfied the purpose of the demand" requirement where "contents of the letter were adequate," "it served its purpose of encouraging … settlement," and the letter was served more than 30 days before amending the complaint. *Burns ex rel Off. of Pub. Guardian v. Hale & Dorr LLP*, 445 F. Supp. 2d 94, 96–97 (D. Mass. 2006); *see also Akar v. Federal Nat. Mortg. Ass'n*, 845 F.Supp.2d 381, 405 (D. Mass. 2012) (holding that plaintiff who had not delivered a demand letter until after filing suit could cure this).

Similar to *Burns* and *Akar,* Plaintiffs here have cured any deficiencies in the original Complaint. On August 5, 2022, Plaintiffs sent 93A demand letters to the Greif Defendants, Mass Natural, Seaman, and Otter Farm, via certified mail, return receipt requested. *SAC* ¶¶ 260, 324, 386, 448. Plaintiffs received acknowledgment of receipt from the Greif Defendants on August 25, 2022, from Mass Natural on September 6, 2022, and from Seaman and Otter Farm on September 7, 2022. *Id.* Plaintiffs thereafter filed the Amended Complaint on October 26, 2022, adding a 93A

claim, before ultimately filing this SAC on February 13, 2023. Thus, unlike in other cases cited by Defendants[21] where there was no attempt to issue a demand letter or a persistent failure to appraise defendants of the nature of the suit, Plaintiffs here sent a demand letter *82 days* prior to filing even the first Amended Complaint – easily satisfying the requirement set forth in Chapter 93A § 9(3). *See, e.g., Akar,* 845 F.Supp.2d at 404–05 (failure to deliver demand letter prior to suit was not fatal where "plaintiffs sent demand letters to the defendants over ten months after filing the lawsuit, but more than thirty days before moving to amend their complaint").

Despite receiving proper notice of the claims against them, the Greif Defendants add a new additional argument: that the demand letter was nonetheless faulty because "[i]t is improper to send a 93A demand letter to one corporate entity and attempt to have the language apply to multiple defendants in the lawsuit." *Greif Br.* 10. That the Greif Defendants, which exist in a parent-subsidiary relationship with one another, take issue with notice directed to all of them in one demand letter sent to the parent company is perplexing – particularly since the Greif Defendants share counsel in this matter and have submitted multiple briefs together. Not only were all three entities listed as future defendants by the placeholder language in the original Complaint, Dkt No. 1 at ¶ 332, but all three were specifically identified *in the demand letter* as defendants against whom a 93A claim will, absent redress, be brought. *SAC* ¶ 448. Critically, the Greif Defendants do not allege that any of them, whether Greif, Caraustar, or Newark Group, failed to receive actual notice of Plaintiffs' 93A claim because of a single demand letter being sent to the group. In fact,

---

[21] *See, e.g., Spring v. Geriatric Authority of Holyoke*, 394 Mass. 274, 287 (Mass. 1985) (demand letter insufficient where plaintiff "neither alleged in her complaint the sending of such a demand letter nor introduced such a letter in evidence at trial"); *O'Connor v. Nantucket Bank*, 992 F. Supp. 2d 24, 38 (D. Mass. 2014) (notice requirement not met where plaintiffs failed "to specifically allege that they sent a demand letter" and made no attempts to cure); *McKenna v. Wells Fargo Bank, N.A.*, 693 F.3d 218 (1st Cir. 2012) (rejecting plaintiff's argument that "no demand letter was required because (she says) a violation of the Massachusetts Consumer Credit Cost Disclosure Act is a per se violation of chapter 93A"); *see also In re Jamison,* 467 Mass. 269, 4N.E.3d 889 (Mass. 2014) (no 93A claim involved in case).

their collective response makes clear they did receive such notice, and they cite no case law for the specific proposition that a demand letter must be sent to each entity. *Burns*, 445 F. Supp. 2d 94, 96 (D. Mass. 2006) ("The purpose of the demand requirement is twofold: to encourage settlement and to limit the plaintiff's damages in the event that a reasonable settlement offer is rejected."). Thus, each Defendant received notice, and was well-appraised, of the 93A claims.

### B.     *Defendants' Wrongful Conduct in Trade or Commerce Injured Plaintiffs.*

Defendants also challenge Plaintiffs' 93A claims on substantive grounds. Under "[t]he broad language of G.L.c. 93A, § 9 (1) … a cause of action may be brought by '[a]ny person . . . who has been injured by another person's use or employment of any method, act or practice declared to be unlawful.'" *Ciardi v. Hoffmann-La Roche*, 436 Mass. 53, 58–59 (Mass. 2002) (emphasis omitted).[22] Defendants contend Plaintiffs' 93A claims should be dismissed because Plaintiffs do not allege (1) a business relationship between Plaintiffs and Defendants or (2) that Defendants' conduct was unfair or deceptive. *Greif Br.* 11–13; *Seaman Br.* 6–8; *MassNatural Br.* 2. Both contentions fail, as set forth below.

### 1.    Defendants and Plaintiffs Engaged in a Transaction in Trade or Commerce.

Section 2 of Chapter 93A "prohibits unfair or deceptive acts or practices . . . in the conduct of any trade or commerce." *D'Agostino v. Fed. Ins. Co.*, Civil Action No. 12-11628-DJC, at *11 (D. Mass. Mar. 3, 2014) (*quoting* Mass. Gen. L. c. 93A § 2). "'Trade or commerce' is [statutorily] defined as including 'the sale, rent, lease or distribution of any services and any property, tangible or intangible.'" *Id.* (*quoting* Mass. Gen. L. c. 93A § 1). Courts generally "apply a dual inquiry when determining whether parties are subject to 93A: first, the court assesses whether the

---

[22] The purpose of Chapter 93A is to "achieve a more equitable balance in the relationship of consumers to persons conducting business activities … promoting proper disclosure of information." *O'Keeffe v. Superior Carpet, Inc.*, 1987 Mass. App. Div. 108, 110 (Mass. Dist. Ct. App. 1987).

interaction is commercial in nature, and second, it evaluates whether the parties were both engaged in trade or commerce, and therefore acting in a business context." *Id.* (internal quotation marks omitted); *Allstate Ins. Co. v. Fougere*, 450 F. Supp. 3d 10, 18 (D. Mass. 2020) (critical issue is whether defendant offered services generally for sale to the public in a business transaction).

As an initial matter, MassNatural indisputably engaged in trade and/or commerce with Plaintiffs and members of the Class. As set forth in the *SAC*, Plaintiffs Thomas Ryan, Susan Ryan, Christopher Cerasuolos, and other Consumer Subclass Members purchased topshelf loam, compost, potting soil, fill, and other consumer products directly from MassNatural. *SAC* ¶¶ 121–133, 193–94, 252–62. MassNatural thus irrefutably engaged in a business-to-consumer sale transaction with Plaintiffs and Consumer Subclass Members, making MassNatural subject to a 93A claim. *See Kraft Power Corp. v. Merrill*, 464 Mass. 145, 155 (2013) (noting 93A was "originally enacted . . . to improve the commercial relationship between consumers and businessmen"). MassNatural does not dispute these facts and thus makes no express argument challenging that it engaged in a consumer transaction with Plaintiffs.

As to the remaining defendants, it is well established under Massachusetts law that "indirect purchasers can bring a cause of action under [93A]." *Suero v. Fed. Home Loan Mortg. Corp.*, Civil Action No. 13-13014-JGD, at *14 (D. Mass. Dec. 17, 2013).[23] For example, in *Moniz,* 484 F. Supp. 2d at 229–31 (Gorton, J.), a class action in which it was alleged that defendants conspired to fix the price of rubber and urethane products that defendants provided to other industrial manufacturers for incorporation into the production of consumer goods, the court denied the motion to dismiss plaintiffs' 93A claim and rejected the argument from the defendant-

---

[23] Indirect purchasers include "persons who buy products not directly from their original source, but from other parties further down the distribution chain." *Ciardi*, 436 Mass. at n.3 (2002) (*citing Illinois Brick Co. v. Illinois*, 431 U.S. 720, 726 (1977)).

manufacturers that there is no business relationship because "the plaintiff [did] not buy from them directly." In doing so, Judge Gorton, previously presiding over this matter, invoked a Massachusetts Superior Court case, *Grimaldi v. Akzo Nobel Chemicals International B.V.,* C.A. No. 04-1052 (December 28, 2005) (unpublished), where "the defendants were … manufacturers of rubber chemicals used by industrial manufacturers in the production of consumer goods" and yet the court held that "93A protects consumers even in such indirect transactions." *Id.* at 230–31.

Similarly here, Seaman, Otter Farm, and the Greif Defendants manufactured, stored, and/or provided the PFAS-contaminated short paper fiber sludge byproducts that MassNatural used to produce the consumer products topsoil, knowing those products would be sold to Plaintiffs and Consumer Subclass Members. *SAC* ¶¶ 48–50, 60, 110–20, 317, 380, 442. Each Defendant was thus part of a fully cognizable transaction in a trade or commercial relationship with Plaintiffs for purposes of 93A. *See, e.g., Ciardi,* 436 Mass. at 65–66 ("plaintiff has alleged a connection between herself and the defendants, albeit an indirect one, as parties to consumer transactions," as "defendants are manufacturing and distributing vitamin products that are intended for use by persons exactly like the plaintiff, the ultimate consumer").[24]

## 2. Defendants Each Engaged in Deceptive or Unfair Conduct Under 93A.

"[T]he boundaries of what may qualify for consideration as a [chapter 93A] violation is a question of law, [but] whether a particular set of acts, in their factual setting, is unfair or deceptive is a question of fact." *Full Spectrum Software, Inc. v. Forte Automation Sys., Inc.*, 858 F.3d at

---

[24] That each Defendant was party to the consumer transaction is further evidenced by the fact that Seaman, Otter Farm, and the Greif Defendants actively conspired with MassNatural to redistribute their PFAS byproduct vis-à-vis MassNatural's consumer sales. *SAC* ¶¶ 120, 151, 156. This active role is also, itself, more than sufficient to sustain a 93A claim. *See, e.g., Standard Register Co. v. Bolton-Emerson, Inc.*, 38 Mass. App. Ct. 545, 551 (Mass. App. Ct. 1995) ("privity is not required to maintain a nonwarranty-based action under 93A, i.e., one based on fraud").

671 (1ˢᵗ Cir. 2017) (internal quotation marks omitted). Although Massachusetts has no singular test, "Massachusetts courts have laid out a number of helpful guideposts for determining when conduct is deceptive or unfair for purposes of Chapter 93A." *Hanrahran v. Specialized Loan Servicing, LLC*, 54 F. Supp. 3d 149, 154 (D. Mass. 2014). The Seaman Defendants argue that Plaintiffs fail to allege that they "knowingly and recklessly" or "actually deceived Plaintiffs." *Seaman Br*. 7–8, *MassNatural Br*. 2.[25] The Greif Defendants similarly claim, in a conclusory fashion, that "Plaintiffs present no evidence whatsoever that the Greif Defendants made false representations to anyone, let alone ones done knowingly or recklessly." *Greif Br.* 12–13.

### i. *Deceptive Conduct*

"Conduct is 'deceptive' when it has the capacity to mislead consumers, acting reasonably under the circumstances, to act differently than they otherwise would have acted.'" *Hanrahan*, 54 F.Supp.3d at 153–54. Here, Defendants misled consumers, including Plaintiffs and Consumer Subclass Members, into purchasing products that they would not have purchased had they known that the products contained dangerous levels of PFAS. That Defendants, furthermore, actively concealed the products' elevated levels of PFAS (from consumers directly, and from MassDEP, knowing MassDEP would have exposed this conduct to the consumer public) – and that Defendants went so far as to exploit the cheaper dumping costs they could realize by offloading the PFAS-containing waste as consumer products – only magnifies the level of Defendants' considerable deception. *SAC* ¶¶ 120, 123–25, 148–50, 152, 155–56.

MassNatural knew, or should have known, that PFAS chemicals were in the products it sold to consumers. MassNatural conducted its composting operation on the Otter Farm Property –

---

[25] Whereas the Greif Defendants assert that their conduct was neither deceptive nor unfair, the Seaman Defendants appear to only argue that their conduct was not deceptive. *Seaman Br.* 7–8; *MassNatural Br*. 2.

land owned and used by Seaman, which openly acknowledged its use of PFAS on its website [26] – *and* accepted and redistributed PFAS-contaminated waste obtained directly from Seaman, Otter Farm, and the Greif Defendants. *Id.* ¶¶ 44, 48–52, 110–115, 255. MassNatural also deceptively represented that "[a]ll incoming materials are extensively tested prior to acceptance for composting" and that its products "are tested by the UMass soil lab" on its website[27] when that was clearly not the case, since such testing "would have detected dangerous levels of [PFAS] concentrations." *Id.* ¶¶ 125–29. MassNatural either did test its products and therefore knew, but did not inform consumers, that they contained toxic levels of PFAS, *or* did not in any effective way test its products and misrepresented to consumers otherwise. Both acts are unquestionably deceptive and caused reasonable consumers, including Plaintiffs and Consumer Subclass Members, to rely to their detriment on MassNatural's acts and omissions when purchasing MassNatural's products. *Id.* ¶¶ 129–33, 257–58.

The conduct of Seaman, Otter Farm, and the Greif Defendants was also deceptive.[28] As set forth in the SAC, each failed to disclose that the substances, and ultimately the topsoil products these Defendants knew or had reason to know would incorporate them, were contaminated with PFAS. *Id.* ¶¶ 318–19, 381, 4433; *see Casavant v. Norwegian Cruise*, 76 Mass. App. Ct. 73, 78 (Mass. App. Ct. 2009) (nondisclosure of a fact is material where "the plaintiff likely would have acted differently but for the nondisclosure"). Seaman, Otter Farm, and the Greif Defendants

---

[26] "Prior versions of Seaman Paper's website admitted that Seaman Paper had a history of using PFAS in the production of its products," but "[t]hose statements have been removed…" *SAC* ¶ 51.

[27] Although available at the time of filing the Amended Complaint, it appears that MassNatural no longer has an active website, at least as of January 27, 2023 (though likely removed earlier).

[28] Although Seaman and Otter Farm attempt to distance themselves from MassNatural's conduct, MassNatural contends throughout its brief that it is "in the same position as Seaman Paper and Otter Farm." *MassNatural Br.* 1–3.

engaged in this deception because disclosure would have resulted in substantially increased regulatory compliance costs and certainly would have ended MassNatural's ability to unload the contaminated topsoil onto uninformed consumers. *SAC* ¶ 120. This cost-saving conduct deceived reasonable consumers, including Plaintiffs and Consumer Subclass Members, who relied to their detriment on the acts and omissions of Defendants when, instead of receiving topshelf loam and other consumer products of the quality represented and advertised, they received toxic, PFAS-contaminated products. Not only did they pay more than they would otherwise have paid (and more than the products were worth) they also received products which contaminated their property. *Id.* ¶¶ 123–32, 185–89. Accordingly, Defendants' conduct was deceptive.

### ii. *Unfair Conduct*

In determining whether conduct is unfair, Massachusetts courts consider: "(1) whether the practice is within at least the penumbra of some common-law, statutory, or other established concept of unfairness; (2) whether it is immoral, unethical, oppressive, or unscrupulous; and (3) whether it causes substantial injury to consumers." *Hanrahan*, 54 F.Supp.3d at 153–54 (*citing Mass. Eye & Ear Infirmary v. QLT Phototherapeutics, Inc.*, 552 F.3d 47, 69 (1st Cir.2009)*.* "Massachusetts leaves the determination of what constitutes an unfair trade practice to the finder of fact, subject to the court's performance of a legal gate-keeping function." *Mass. Eye & Ear Infirmary*, 552 F.3d at 69.

Defendants' conduct falls squarely within all three categories of unfairness. Notwithstanding the well-known risks associated with PFAS, Defendants actively concealed the presence of PFAS in materials they knew would be turned into topsoil products and/or in the products that they themselves sold to consumers. *SAC* ¶¶ 25–37, 254–57, 317–21, 380–83, 442–45. Providing consumers with a product capable of causing substantial bodily injury (including

cancer), and purposely masking its contaminated nature from unknowing consumers, is immoral, unethical, oppressive, and unscrupulous. Additionally, Defendants' illegal avoidance of regulatory compliance costs, concealment of compliance failures, and prevention of investigations into those compliance failures, *Id*. ¶¶ 150–52, 155, 543, runs afoul of the penumbra of established concepts of fairness, directly affecting consumers who otherwise would not have purchased, or even been permitted to purchase, such products.

In fact, each Defendant violated several MassDEP regulations in failing to arrange for the proper transportation and storage of hazardous PFAS-contaminated waste. Defendants falsely certified compliance with multiple permits issued by the Town of Westminster and MassDEP during the Class Period, including specifically representing on multiple occasions that MassNatural's composting operation (which all Defendants engaged in through the transport, storage, disposal, and/or treatment of PFAS) was not a threat to public health or safety, when it plainly was, *id*. ¶¶ 156, 164–65. These false certifications were instrumental to the Otter Farm Property becoming contaminated at and/or worsening the contamination level to the highest level of contamination ever reported in Massachusetts – more than 286 times higher than the 20 ppt Imminent Health Hazard level. *Id.* ¶¶ 41, 95, 97. Given this startling rate, Defendants had every reason to expect that the consumer products made on such property were themselves highly contaminated. *Id.* ¶ 133. Second, where there is such contamination of PFAS in a public water supply well or private drinking water, as was the case with the private well on the Otter Farm Property, MassDEP regulations require parties to inform consumers – who are "affected persons" by virtue of their purchase of products made at a highly contaminated site – of this condition. *Id.* ¶ 42. Defendants did not do so, and Plaintiffs were thus left unaware.

The "equities between the parties" were such that all Defendants had reason to know of the PFAS-contamination in the consumer products, whereas Plaintiffs and Consumer Subclass Members had no reason to know. *See Burns ex rel. Office of Public Guardian v. Hale & Dorr LLP*, 445 F. Supp. 2d 94, 97-98 (D. Mass. 2006) ("[w]here a claimant alleges unfair as opposed to deceptive conduct [under Chapter 93A], the court is to consider the equities between the parties including what each knew or should have known"). Through this inequity, Defendants caused substantial injury to Plaintiffs and Consumer Subclass Members, who not only paid more than they would have for MassNatural's products while receiving less than what they bargained for but were also injured by those products' contamination of their persons and property. *SAC* ¶¶ 185–89, 193–94, 2589–59, 320–21, 384–85, 446–47. Accordingly, in addition to being deceptive, Defendants' conduct was, under all three factors, unfair.

## V. DEFENDANTS CREATED A PRIVATE NUISANCE.

A private nuisance is actionable in Massachusetts "when a property owner creates, permits, or maintains a condition . . . that causes a substantial and unreasonable interference with the use and enjoyment of the property of another." *Asiala v. Fitchburg,* 24 Mass. App. Ct. 13, 17 (1987). Critically, "it is not necessary for an individual [defendant] to own the property on which the objectionable condition is maintained" but rather liability in nuisance "turns upon whether a defendant [controls the property], either through ownership *or otherwise.*" *Belanger v. Com.,* 41 Mass. App. Ct. 668, 670, 673 N.E.2d 56, 58 (1996) (emphasis added), overruled on other grounds by *Morrissey v. New England Deaconess Ass'n--Abundant Life Communities, Inc.,* 458 Mass. 580, 940 N.E.2d 391 (2010). Accordingly, "[o]ne is subject to liability for a nuisance caused by an activity, not only when he carries on the activity but also when he participates to a substantial extent in carrying it on." *Com. of Mass. v. Pace*, 616 F. Supp. 815, 821 (D. Mass. 1985) (*quoting*

Restatement (Second) of Torts § 834). This requires "a determination that the interference [complained of] is intentional and unreasonable or results from conduct which is negligent, reckless or ultrahazardous." *Stop Shop Companies, Inc. v. Fisher*, 387 Mass. 889, 891 n.2 (1983). "[P]ollution of groundwater may constitute a private nuisance if the polluted water under a property comes into direct contact with and harms the owner or his property." *Anderson v. W.R. Grace Co.,* 628 F. Supp. 1219, 1233 (D. Mass. 1986).

Plaintiffs here have undoubtedly suffered a substantial interference with the use and enjoyment of their properties because of Defendants' improper creation, disposal, storage, transportation, and/or redistribution of PFAS-contaminated material and byproducts to or at the Otter Farm Property. As it did with respect to Plaintiffs' negligence claims, MassNatural has chosen not to move for dismissal of the private nuisance against it – because, as discussed below, it clearly cannot.[29] The remaining Defendants claim they lacked control over the "instrumentalities" through which PFAS contaminated Plaintiffs' and Class Members' properties, *Greif Br.* 13–15; *Seaman Br.* at 16–18, which is simply false. The Greif Defendants and Seaman operated paper mills in Massachusetts and, as part of their manufacturing processes, added the PFAS chemicals and created the PFAS-contaminated waste that harmed Plaintiffs and Class Members. *SAC* ¶¶ 48–51, 58–60, 113–14. This fact alone establishes that they exercised control over the instrumentality of the nuisance. *See, e.g., Lonsk v. Middlesex Water Co.*, 21cv19808 (EP) (ESK), at *16–17 (D.N.J. Oct. 31, 2022) (holding the class plausibly pled that defendant-manufacturer had control over the nuisance-causing activity because it was defendant's conduct in manufacturing and distributing the PFOA itself that caused the alleged PFOA-contamination).

---

[29] "Defendant [MassNatural] ... moves to dismiss Counts One, Three, Five, Six, Seven, Twenty-Nine, Thirty-Four, and Thirty-Five of the Amended Complaint," **but not Count 4, which is "Private Nuisance Against Defendant MassNatural."** *MassNatural Br*. at 1.

Moreover, the Greif Defendants and Seaman further exercised control over the instrumentality of the nuisance when they dumped PFAS-contaminated waste at the Otter Farm Property without taking proper disposal precautions, knowing not only that PFAS would inevitably spread to surrounding properties but that MassNatural would then redistribute the PFAS throughout the community as part of its composting sales, which is the very reason they could cheaply dump their waste there in the first place. *SAC* ¶¶ 48, 60, 115, 119–20, 150, 156. Seaman and Otter Farm also *own* the Otter Farm Property, *id.* ¶¶ 48, 52, and while control over the instrumentalities of a nuisance does not require a Defendant to "own the property on which the objectionable condition is maintained," *Belanger v. Com.,* 41 Mass. App. Ct. at 668, it certainly erases any doubt when they do. It is patently absurd for Seaman and Otter Farm to claim they had no control over what happens on *their* property.[30]

MassNatural, for its part, was also quite obviously in control of the instrumentality of the nuisance. Although it was aware, or should have been aware, that the waste dumped at the Otter Farm Property risked being contaminated with PFAS, MassNatural failed to test incoming and outgoing materials as required by law, improperly incorporated harmful PFAS chemicals into its consumer products, and then redistributed contaminated products throughout the community and beyond. *SAC* ¶¶ 44–47, 126, 129–30, 173–75. Operating the composting site that caused the

---

[30] The facts in this case could not be further from those in *Com. of Mass. v. Pace*, 616 F. Supp. 815 (D. Mass. 1985), relied on by Seaman, Otter Farm, and the Greif Defendants. *Seaman Br.* 18; *Greif Br.* 13. There the court held that the defendant did not contribute to the creation of the nuisance because its only activity was hauling waste materials to the disposal site. This case, by contrast, does not concern merely hired transporters of chemical waste who could claim a minor and unknowing role in the harmful conduct. The Greif Defendants and Seaman are the very owners and operators of the papermills responsible for the initial creation of the PFAS-contaminated waste; they transported the same with knowledge of the contamination; and they disposed of the waste on the Otter Farm Property, while Otter Farm, owned by Seaman, housed, allowed, and indeed facilitated MassNatural's composting and dangerous redistribution of contaminated soil.

contamination to further spread, MassNatural thus had clear control over the instrumentalities causing the nuisance, as well as the power to abate the nuisance.

Finally, by creating, permitting, and/or maintaining this private nuisance, Defendants caused a substantial and unreasonable interference with Plaintiffs' use and enjoyment of their property. Plaintiffs cannot use the water from their wells for drinking, cooking, bathing, and other ordinary household uses, cannot harvest or consumer the fruit, vegetables, or eggs produced on their land, and are confronted with reduced property values.[31] *Id.* ¶¶ 190–91. This is the essence of a private nuisance.

## VI.    DEFENDANTS CREATED A PUBLIC NUISANCE.

A defendant is liable for a public nuisance when they have unreasonably interfered with the exercise of a public right by directly encroaching on public property or by causing a common injury. *Connerty* v. *Metropolitan Dist. Comm'n*, 398 Mass. 140, 148 (1986), *abrogated on other grounds by Jean W. v. Commonwealth*, 414 Mass. 496, 504 (Mass. 1993). In determining whether there has been an unreasonable interference with a public right, a court may consider, *inter alia,* "[w]hether the conduct involves a significant interference with the public health, the public safety, the public peace, the public comfort or the public convenience. . . ." *Id.* As with private nuisance, public nuisance requires that the defendant have control over the instrumentality creating the nuisance. *Belanger,* 673. N.E.2d at 61 n.3. Additionally, a private plaintiff asserting a public nuisance claim must "show that the public nuisance has caused some special injury of a direct and substantial character other than that which the general public shares." *Connerty,* 398 Mass. at 148.

---

[31] Although Defendants were required by MassDEP to take over, arrange, and pay for remediation efforts, including bottled water delivery and installation of POET Systems, *SAC* ¶ 137, such remediation efforts have fallen short as a result of Defendants' disruption of bottled water deliveries and improper installation of POET systems. *Id.* at ¶¶ 138–11. Defendants thus not only failed to remediate the contamination, as required, but caused further injury to Plaintiffs.

Defendants first argue that Plaintiffs allege no "special harm" distinct from that of the general public. *Greif Br.* 15–18; *Seaman Br.* 16, 19; *MassNatural Br.* 2. However, in *Higgins*,[32] a case with substantially similar facts to those here, the court held that Plaintiffs suffered a special harm because they were forced to decontaminate their properties and water from PFAS contamination created by defendant paper mill owners and operators. *Higgins*, at *18–19. Similarly here, Plaintiffs' private wells have been contaminated with PFAS as a direct result of Defendants' use, discharge, and disposal of PFAS-contaminated waste at and around the Otter Farm Property. *SAC* ¶¶ 271–79, 335–43, 397–405, 459–67. As a result, Plaintiffs have been unable to use their water or the crops grown on their land for ordinary household needs and instead must use bottled water. *Id.* ¶¶ 96, 107, 136, 191. While MassDEP has required Defendants to install POET remediation systems on Plaintiffs' properties, that installation process remains ongoing, and installations already completed were performed incorrectly, by unlicensed contractors using out-of-code materials, and have not successfully decontaminated Plaintiffs' private wells. *Id.* ¶¶ 136–47. Thus, Plaintiffs still have a need to decontaminate their properties and water and, as a result, suffer the same special injury as the plaintiffs in *Higgins*. *See Higgins,* at *19 (denying motions to dismiss plaintiffs' public nuisance claims where "there is one harm that the Plaintiffs allege that they have suffered that might be considered a special harm, and that is their need to decontaminate their properties and water"); *see also Lewis v. General Elec. Co.,* 37 F. Supp. 2d 55, 61 (D. Mass. 1999) (denying motion to dismiss public nuisance claims where pollution affected general public but plaintiffs' unsuccessful attempts to sell their property constituted special injury).

---

[32] The standard under which the court in *Higgins* permitted a claim for public nuisance is substantially similar to the Massachusetts standard. As with Massachusetts, under Maine law, "it must be the case that the defendant has violated or threatens to violate a public right and the plaintiff has suffered an injury different in kind from that sustained by the public generally…. It is not enough for a private plaintiff to show that he has suffered the same kind of harm or interference but to a greater extent or degree as other members of the public." *Higgins*, at *18 (citations and internal quotation marks omitted).

Notwithstanding these cases, Defendants rely heavily on *Sullivan v. Chief Justice for Admin and Management of Trial Court*, 858 N.E.2d 699 (Mass 2006), an asbestos case involving construction at a courtroom facility, in which the judge held that employee-plaintiffs suffered no special injury compared to other members of the general public entering the court, even though their degree of harm from exposure may have been greater. *Seaman Br.* 19; *Greif Br.* 16–18. That holding is inapt here, however: the injury is not shared with the general public or only different by degree. Rather, as previously discussed, PFAS has specifically contaminated *Plaintiffs'* properties and water supplies, requiring decontamination of their water sources (and not others) to use their property for basic needs such as cooking and bathing. This harm, unlike that in *Sullivan*, is a special injury suffered by Plaintiffs. *See, e.g., Lonsk v. Middlesex Water Co.*, 21cv19808 (EP) (ESK), at *18 (D.N.J. Oct. 31, 2022) (finding that injury alleged to plaintiffs' specific property interests is a special injury distinct from the general harm suffered by the public of "interference with public health and safety to due PFOA-contaminated water").[33]

The Greif Defendants further assert that Plaintiffs' injuries are not "special" because it is estimated that "over 98% of Americans have PFAS in their blood" and "over 200 million Americans have drinking water sources that contain levels of PFAS," which they say means that Plaintiffs "bring claims that are identical to virtually every person living in the United States." *Greif Br.* 18. This (incredulous) argument conveniently ignores that while many people have safe background levels of PFAS in their blood, Plaintiffs' blood was found to be *well above those background levels,* including at levels over 10 times normal. *SAC* ¶¶ 185–89.

---

[33] *See also Corradetti v. Sanitary Landfill, Inc.,* 912 F. Supp. 2d 156, 163 (D.N.J. 2012) (defendants' pollution contaminating plaintiffs' drinking water and migrating onto plaintiffs' property constituted allegations of special injuries different from general injury to public of contaminated groundwater).

Finally, Defendants again argue that they lacked control over the instrumentality of the alleged public nuisance, which they view as limited to the composting operation itself. *Greif Br.* 19–20; *Seaman Br.* 17–18; *MassNatural Br.* 2. Just as with private nuisance, *supra,* this argument fails because Defendants each exerted control over the PFAS-dumping (as well composting operation). *See, e.g., Lonsk*, at *16-*17 (rejecting defendant-manufacturer's argument that it "did not create or control the physical conditions that introduced PFOA into [plaintiffs'] water supply" because defendant "did have a tangible role in creating and carrying out the nuisance-causing activity" by "manufacturing and distributing the PFOA itself that caused the complained of PFOA-contamination"). Thus, Defendants' motions to dismiss public nuisance claims should also be denied.

## VII. DEFENDANTS ARE LIABLE UNDER STRICT LIABILITY BECAUSE THEIR ABNORMALLY DANGEROUS ACTIVITY ESCAPED ONTO PLAINTIFFS' PROPERTY.

Under Massachusetts law, strict liability for an ultrahazardous or abnormally dangerous activity "requires an escape of the dangerous activity from defendant's property onto that of another, *Thomalen v. Marriott Corp.*, 845 F. Supp. 33, 36 (D. Mass. 1994), and is "consistent with the balancing test set forth in the Restatement (Second) of Torts §§ 519, 520." *Stearns v. Metro. Life Ins. Co.,* 308 F. Supp. 3d 471, 482 (D. Mass. 2018). Massachusetts considers six enumerated factors (the "Restatement factors") to determine whether an activity is "abnormally dangerous":

> [a] Whether the activity involves a high degree of risk of harm to the person, land or chattels of others; (b) Whether the gravity of the harm which may result from it is likely to be great; (c) Whether the risk cannot be eliminated by the exercise of reasonable care; (d) Whether the activity is not a matter of common usage; (e) Whether the activity is inappropriate to the place where it is carried on; and (f) The value of the activity to the community.

*Clark-Aiken Co. v. Cromwell-Wright Co.,* 367 Mass. 70, 89, 323 N.E.2d 876, 886 (1975) (*citing* Restatement (Second) Torts § 520 (1977)).[34]

Defendants first attempt to semantically distance themselves from the "activities" requirement, arguing that Plaintiffs' strict liability claim fails because it involves ultrahazardous *materials or products,* not "activities." *Greif Br.* 22, *Seaman Br.* 8–10; *MassNatural Br.* 2. The *SAC,* however, makes clear that Defendants caused the escape of a dangerous *activity*. SAC ¶¶ 281–82, 345–46, 407–08, 469–70. Through Defendants' combined efforts,[35] resulting in the compost and distribution of hazardous materials, PFAS-containing waste escaped the Otter Farm Property and leached onto Plaintiffs' property through soil and groundwater (as well as by further redistribution by MassNatural). *Id.* at ¶¶ 115–16, 133–135, 284, 348, 410, 472. Other courts have held that similar conduct constitutes an activity subjecting Defendants to strict liability.[36] *See, e.g., Higgins,* 1:21-cv-00369-NT, at *27-28 (denying defendants' motion to dismiss strict liability claim where defendants' disposal of PFAS-contaminated byproducts through operation of paper mills resulted in PFAS entering groundwater and aquifers and spreading to plaintiffs' wells, land, and animals, as well as plaintiffs' bodies). Accordingly, Defendants' attempts to misclassify the SAC as referring to ultrahazardous materials, and not their ultrahazardous activities, fails.

---

[34] Although "ordinarily several of [the Restatement] factors must be present, […] not all of them need be," and "analysis of no one factor is determinative." *Higgins v. Huhtamaki Inc.,* 1:21-cv-00369-NT, at *26 (D. Me. Jun. 23, 2022); *Barnes v. General Electric Co*., 1995 Ct. Sup. 8417, 8427 (1995) ("[i]t is not necessary that the court find each [Restatement] factor listed in [§] 520 to hold that an activity is abnormally dangerous.").

[35] *See, e.g., Andres v. Town of Wheatfield,* Case No. 1:17-cv-00377, at *16 (W.D.N.Y. Dec. 30, 2020) (recognizing that other cases have found that "[a] company which creates the Frankenstein monster of abnormally dangerous waste should not expect to be relieved of accountability for the depredations of its creature merely because the company entrusts the monster's care to another").

[36] The Greif Defendants further summarily state that they had no control over MassNatural's sale of products or discharge from MassNatural's property, *Greif Br.* 22, but as stated herein, it is the Greif Defendants' own conduct that makes them strictly liable.

Defendants next attempt to distance themselves from their "abnormally dangerous" or "ultrahazardous" conduct. *Greif Br.* 22, *Seaman Br.* 10–11; *MassNatural Br.* 2–3. The Seaman Defendants focus on just one of the six Restatement factors, arguing that the risk associated with their "handling of materials" is one that can be eliminated with due care,[37] *Seaman Br.* 10–11, while the Greif Defendants summarily claim that "the mere transport of hazardous material" is not an abnormally dangerous activity and they "didn't even engage in the transport of its byproduct." *Greif Br.* 22. Courts in other jurisdictions that also apply the Restatement factors, however, have held that the handling, disposal, and storage of a substance containing toxic waste, as happened here, is an abnormally dangerous activity for the purposes of strict liability. *See, e.g., Prospect Indus. Corp. v. Singer Co.*, 238 N.J.Super 394, 403 (N.J. Sup. 1989) (granting summary judgment on strict liability because "leakage of PCBs [a hazardous substance] is a disposal and an abnormally dangerous activity"); *Murray v. Bath Iron Works Corp.*, 867 F.Supp. 33, 48 (D. Me. 1994) (finding that Maine, like other jurisdictions, "would likely recognize a cause of action for strict liability for the disposal and storage of hazardous waste").

Analysis under all of the Restatement factors confirms that the Defendants' use, transport, disposal, and distribution of PFAS-contaminated materials constitutes an "abnormally dangerous" and "ultrahazardous" activity. Under factor one, these activities created a "high risk of harm" to Plaintiffs, Class Members, and their property, as PFAS readily travels through soil and groundwater and can easily escape one property to cause direct harm to another. *SAC* ¶¶ 28–29,

---

[37] This argument not only is wholly insufficient to rebut Plaintiffs' well-pleaded allegations to the contrary but more importantly it ignores that "one who carries on an abnormally dangerous activity is subject to liability for harm resulting from the activity, although he has exercised the utmost care to prevent such harm." *See Clark-Aiken*, 367 Mass. at 88.

286, 350, 412, 474.[38] The gravity of harm that may result from Defendants' activities – factor two – is exceedingly high, as exposure to PFAS, even at "low levels," is linked to diseases such as cancer and destructive environmental effects. *Id.* at ¶¶ 26–39; 283, 347, 409, 471. And, Defendants' activities are "inherently dangerous," per factor three, because they cannot be made safe by undertaking the utmost care due to the nature of PFAS "forever chemicals." *Id.* at ¶¶ 26–43, 281–83, 345–47, 407–409, 469–71. As to factor four, PFAS usage is not common and has decreased significantly over the years, with Massachusetts having set strict PFAS standards. *Id.* at ¶¶ 26–36, 40–43. As to factor five, the appropriateness of the location, the Otter Farm Property is the antithesis of an appropriate location for PFAS-related activities, given its close proximity to a highly populated residential area and the foreseeable risk that PFAS would escape to nearby private wells. *Id.* at ¶¶ 284–85; 347–48; 409–10; 471–72. Finally, as to factor six, Defendants' activities are of "little to no value to the surrounding community," as PFAS is exceedingly dangerous, Westminster does not depend on Defendants' activities, and the activity did not have to be centered in Westminster. *Id.* at ¶¶ 26–36, 287, 351, 413, 475.

Thus, consideration of all six of the Restatement factors together makes clear that Defendants' activities are "ultrahazardous" and "abnormally dangerous."[39]

---

[38] The foreseeable and probable contamination and effects of PFAS are indefinite and cannot be simply removed from the environment or humans, furthering the high degree of risk of harm, confirmed by the actual presence of PFAS in Plaintiffs' blood. *SAC* at ¶¶ 26–33, 185–89, 237, 200, 363, 425; *see, e.g., Henderson v. U.S.*, 965 F.2d 1488, 1496 (8th Cir. 1992) (applying the Restatement factors and denying defendant's summary judgment motion because rapidly releasing water through a dam creates a high degree of risk of harm caused by the defendant's activity, as evidenced by the death of a person and "near accidents" of others).

[39] Courts in other jurisdictions applying the Restatement factors regularly deny motions to dismiss strict liability claims for ultrahazardous activity in the PFAS context, recognizing that

> [a]ll six factors-the risk of harm caused by disposing PFAS-contaminated waste, the likelihood of that harm, the ability to eliminate the risk of that harm through the exercise of reasonable care, how common the production of PFAS-contaminated waste is, the appropriateness of

## VIII. DEFENDANTS' CONDUCT WAS WILLFUL AND WANTON.

To assert a claim for willful and wanton conduct under Massachusetts law, a plaintiff must allege that the defendant "intentionally persist[s] in conduct involving a high degree of probability that substantial harm would result to another." *Menard v. CSX Trans. Inc.*, 840 F.Supp.2d 421, 424 (D. Mass. 2012) (*citing Wright v. Conway*, 2003 WL 22391232, at *3 (D. Mass. Oct. 17, 2003)). "For conduct to be wilful and wanton, a risk of death or grave bodily injury must be known or reasonably apparent, and the harm must be a probable consequence of the defendant's election to run that risk or of his failure reasonably to recognize it." *Sarro v. Philip Morris USA Inc.*, 857 F. Supp. 2d 182, 188 (D. Mass. 2012).

The Greif defendants summarily assert, without offering support, that Plaintiffs' claims for willful and wanton conduct should be dismissed, *Greif Br.* 22–23,[40] while Seaman and Otter Farm

---

disposing of PFAS-contaminated waste on the lands at issue, and the economic value of the use and disposal of these PFAS-contaminated byproducts are intensely factual inquiries.

*Higgins,* 1:21-cv-00369-NT, at *27–28 (where "the use and disposal of PFAS-contaminated byproducts [was] the relevant activity that [was to] be evaluated for purposes of strict liability," court denied defendants' motion to dismiss plaintiffs' strict liability claim, finding it "difficult to evaluate whether this activity is inherently dangerous" at the motion to dismiss stage even though "whether an activity is abnormally dangerous is a question of law" because the court must "rely on factual information, which has not yet been developed"); *see also Cornett v. Northrop Grumman Corp.*, 18-CV-06453 (DRH)(AKT), at *16 (E.D.N.Y. Jan. 6, 2020) (where plaintiffs alleged that the discharge of PFAS contaminants met the test for strict liability because, among other things, PFAS has been linked to cancer, the claim "require[d] additional fact-finding before definitively determining this issue").

[40] Besides setting forth the standard for a willful and wanton conduct claim, the Greif Defendants' argument consists solely of the following conclusory statements, *Greif Br.* 23, which do nothing to rebut Plaintiffs' well-pleaded allegations:

Here, the Plaintiffs fail to make any claims showing the Greif Defendants had willful or wanton conduct towards them regarding PFAS6 discharge. Plaintiffs do not allege that the Greif Defendants had any knowledge or control as to how MNF handled materials received for composting. Nor have the Plaintiffs made any claims that the Greif Defendants were aware that [MassNatural] was not safely disposing of material that contained PFAS6. For the foregoing reasons, Plaintiffs' claims that the Greif Defendants acted willfully and wantonly must be dismissed.

argue that (1) Plaintiffs fail to allege a high probability of grave injury or death, (2) their conduct was "lawful business as usual," and (3) the claims are redundant of Plaintiffs' negligence claims. *Seaman Br.* 28–29. MassNatural joins in this "business as usual" argument, contending that it "was simply conducting lawful composting operations as part of its routine business, as licensed by [MassDEP]." *MassNatural Br.* 3. These arguments, however, ignore the SAC, replete with facts demonstrating that Defendants each acted willfully and wantonly.

Plaintiffs allege in detail that each Defendant's use, transport, disposal, storage, emissions, discharge, distribution, sale, and/or treatment of hazardous, PFAS-contaminated materials entailed a high probability that substantial harm would result. The serious risks from PFAS – which is mobile in groundwater and soil, remains in the environment indefinitely, and has a half-life in humans anywhere between 2 and 9 years – are well-recognized. *SAC* ¶¶ 26-36. It is similarly well known that PFAS exposure is linked to the development of several life-altering diseases, with every instance of exposure increasing the risk. *Id.*

These risks were known or reasonably apparent to Defendants.[41] Awareness of the toxic effects of PFAS is widespread, with an abundance of publicly available information. The EPA has warned of its dangers, and many states, including Massachusetts, have implemented stringent standards to protect people and the environment from PFAS contamination. *Id.* ¶¶ 40–43. Any entity involved in the use, transport, disposal, storage, emissions, discharge, distribution, sale, or treatment of PFAS – as Defendants are – should thus know of the substantial risk of grave bodily

---

[41] The knowledge requirement for willful and wanton conduct can be satisfied under "either a subjective or an objective standard." *Sarro*, 857 F.Supp.2d at 188 (*citing Boyd v. National R.R. Passenger Corp.*, 446 Mass. 540, 546 (2006)). A defendant, that is, must have known or had reason to know of the risk and deliberately acted or failed to act "with conscious disregard for or indifference to [the] risk" (subjective) or without "realize[ing] the high degree of risk" (objective). *Id.* at 185. The subjective standard is clearly met, since Defendants disregarded a known risk, as is the objective standard, since there is an objectively high degree of risk in Defendants' conduct which they failed to mitigate.

injury or death resulting from exposure to PFAS as well as the ability of PFAS to spread through soil and groundwater. Moreover, PFAS has been notoriously linked with paper manufacturing, *id.* ¶ 111, such that there is no question that the Greif Defendants and Seaman, two of the largest paper manufacturers in the world, were well aware of the PFAS risks in their manufacturing and disposal processes and the need to inhibit the spread of PFAS to the surrounding community.

And yet, notwithstanding all of these well-known risks, Defendants persisted in their course of conduct and concealed the same. *Id.* ¶¶ 150–52, 156–58, 224–25, 543, 546–47. In doing so, Seaman and the Greif Defendants consciously disregarded, or were at least indifferent to, the risk of PFAS produced in the manufacturing of their paper products and then spread widely via their chosen form of disposal, *id.* ¶¶ 51, 60, 110–14, 151, 154, 156 – *to wit*, that due to the nature of MassNatural's operations, PFAS-contaminated waste would be redistributed throughout the region, discharging dangerous amounts of PFAS into land and groundwater near a populated community.[42] *Id.* ¶¶ 44–46, 120, 156, 358, 482. MassNatural and Otter Farm, for their part, consciously disregarded, or were at least indifferent to, the risk of PFAS contamination emanating from the Otter Farm Property they own and/or operate on. *Id.* ¶¶ 120, 294, 420.

Defendants deliberately engaged in this conduct knowing that it would lead to substantial harm, which it did. PFAS chemicals spread to Plaintiffs' and Class Members' property and persons, with concentrations of between 333ppt and 1,815ppt detected in Plaintiffs' water wells (again, at levels far exceeding the 20ppt limit set by MassDEP to protect against the "adverse health effects" of PFAS)[43] and were then found in Plaintiffs' blood (at levels well beyond any

---

[42] *See, e.g., Menard*, 840 F. Supp. 2d at 425 ("allegations of actual knowledge that trespassers are on the tracks with enough time to avoid an accident may be sufficient for willful, wanton, or reckless conduct").

[43] Relatedly, this clear violation of a regulatory standard set by MassDEP to protect people from the adverse health effects of PFAS supports a finding of willful and wanton conduct. *See, e.g., Commonwealth v. Power*,

background levels). *Id.* ¶¶ 40–43, 91–96. Accordingly, Defendants' intentional use, emission, discharge, disposal, storage, and sale or disposal of PFAS-contaminated products and byproducts, knowing the high probability that substantial harm would result, but choosing to proceed regardless, constituted willful and wanton conduct.[44]

The Seaman Defendants' next argument – that their conduct was "lawful business as usual" – is equally unavailing. That they consider their use, transport, disposal and distribution of hazardous, PFAS-contaminated materials to be "lawful business as usual" only underscores the magnitude of Defendants' recklessness. Regardless, the general principle that initially lawful conduct can turn unlawful is well recognized. *See, e.g., Willett v. Herrick*, 242 Mass. 471, 479 (Mass. 1922) ("[a] strike may be for a lawful purpose but may become illegal because enforced by unlawful acts"). That MassNatural was authorized by MassDEP to legally compost materials (it no longer is) did not excuse it from the requirement to comply with all applicable regulatory standards, including the Imminent Hazard Level of 20ppt. Nor did the initial authorization, which MassDEP was forced to revoke, excuse Seaman and Otter Farm from knowingly, and in collusion with the other Defendants, dumping hazardous materials at the site where a composting operation would then redistribute them.

Finally, Seaman and Otter Farm label as "redundant" Plaintiffs' claims for negligence and willful and wanton conduct, an argument which ignores the distinction between the two claims.

---

76 Mass. App. Ct. 398 (Mass. App. Ct. 2010) (finding that violation of statutory and regulatory standards supported finding of wanton or reckless conduct creating a high likelihood of substantial harm).

[44] *See, e.g., Sa v. Red Frog Events, LLC*, 979 F. Supp. 2d 767, 780 (E.D. Mich. 2013) (allowing Plaintiffs' claim for willful and wanton conduct where "a reasonable jury *might* conclude that the act of encouraging participants to jump head first into the mud pit despite knowing the risks to the contrary—at the end of a grueling physical endurance challenge when participants are likely to be physically and mentally exhausted—could be interpreted as such indifferen[ce] to the likelihood that catastrophe would come…").

"[W]ilful and wanton conduct involves a degree of risk and a voluntary taking of that risk so marked that, compared to negligence, there is not just a difference in degree but also a difference in kind." *Sarro,* 857 F. Supp. 2d at 186. Plaintiffs have pleaded allegations specific to willful and wanton conduct, *i.e.,* that the conduct was "intentional" or "unreasonable" or "recklessness," as opposed to merely "negligent." *SAC* ¶¶ 291–95; 355–59; 417–21; 479–83.

## IX.     PLAINTIFFS ARE ENTITLED TO MEDICAL MONITORING.

In Massachusetts, a claim for medical monitoring requires that a plaintiff "become exposed to a hazardous substance that produced, at least, subcellular changes that substantially increased the risk of serious disease, illness or injury." *Donovan v. Philip Morris USA, Inc.*, 455 Mass. 215, 226 (2009) ("*Donovan I*"). "Subcellular," which is used interchangeably in this context with "physiological" and "subclinical," is defined as "the presence of a disease without manifest symptoms" which "may be an early stage in the evolution of a disease." *Genereux v. Hardric Labs. Inc.*, 950 F.Supp.2d 332 (D. Mass. Jun. 23, 2013) ("*Genereux II*") (*citing Donovan I,* 455 Mass. at 216 n.3 (*quoting Stedman's Medical Dictionary* 1492 (25th ed. 1990)).

In response to Plaintiffs' well-pled medical monitoring claims, the Seaman Defendants contend that Plaintiffs assert insufficiently "vague allegations," *Seaman Br.* 14-16;[45] *MassNatural Br.* 1-2, while the Greif Defendants argue that Plaintiffs make no allegations (1) of subcellular or physiological damage or (2) that there is an effective medical test for reliable early detection of disease or that medical examinations are reasonably necessary. *Greif Br.* 3–6. The allegations in the SAC are, however, far from vague and sufficiently set forth subcellular damage and the availability of effective medical testing.

---

[45] The Seaman Defendants also argue that Plaintiffs' claim for medical monitoring "fails at the first step because Plaintiffs' claims for negligence claims fail." *Seaman Br.* 14. As set forth, *supra* Section II, Plaintiffs' negligence claims are well pled and do not fail.

All of the elements of a medical monitoring claim have been readily met. First, Plaintiffs have been "exposed to dangerous levels of PFAS, exceeding the levels deemed dangerous by the MassDEP" and levels which have "been proven to cause disease and illness in humans." *SAC* ¶¶ 235, 297, 361, 423. As a result of this exposure, Plaintiffs have "ingested and absorbed PFAS6 into their bodies," the presence of which "represents a manifest change" that leaves them at an "increased risk of serious disease, illness, or injury." *Id.* ¶¶ 237, 299, 363, 425. Specifically, Plaintiffs expressly allege:

> The presence of this manmade foreign substance, PFAS, in their bodies, tissue, and cells represents a manifest change in Plaintiffs' bodies, tissue and cells and leaves Plaintiffs at an increased risk of serious disease, illness, or injury. This is *a physiological change* in Plaintiffs' bodies *occurring at a subcellular level.* Some Plaintiffs and other residents have had their blood tested, and detected the presence of PFAS6 in their blood above the background level.

*Id.* (emphasis added). These subcellular changes from PFAS exposure can lead to the development of at least *ten* different types of disease and illness that create changes that can manifest years after exposure. *Id.* ¶ 36. Even more significantly, blood test results confirm that the PFAS exposure has, *in fact,* created such subcellular changes; tests of particular Plaintiffs have found significantly elevated levels of PFAS in their blood.[46] *Id.* ¶¶ 183–89. Plaintiffs' physical exposure to and absorption of PFAS has thus created a subcellular change to their bodies that substantially increases their risk of developing numerous diseases.[47]

---

[46] While Plaintiffs in this case have demonstrated subcellular changes, the Massachusetts Supreme Judicial Court has not foreclosed the possibility of a viable medical monitoring claim even absent subcellular changes. "Beyond th[e] particular cause of action [recognized in *Donovan I*], the SJC ruminated about another possibility. It pondered whether, if a manufacturer exposes a person to a dangerous carcinogen, a cause of action for medical monitoring would lie even though no subcellular or other physiological change had yet occurred…. The court made no ruling on this hypothetical set of facts but, rather, left the question 'for another day.' *See Genereux v. Raytheon Co., III*, 754 F.3d at 51, 55 (1st Cir. 2014) ("Genereux III") (citation omitted).

[47] Moreover, the *Donovan I* court "recognized a need for flexible application of negligence principles in the toxic tort context, given that '[m]odern living has exposed people to a variety of toxic substances" and

Second, the circumstances of this case fall precisely within the purpose of medical monitoring relief, in that it is necessary to monitor the adverse health effects accompanying exposure to a toxic substance such as PFAS. *See, e.g., Genereux III*, 754 F.3d at 53 ("[a]lthough there is no known cure for CBD," which occurs due to exposure to the "hazardous substance" Beryllium, "early detection and treatment can ameliorate its ravages"); *Donovan v. Philip Morris USA, Inc.*, 268 F.R.D. 1, 6 (D. Mass. 2010) ("Donovan II") (noting that "LDCT scans … can identify lung cancer at a much earlier stage, significantly increasing survival rates from about fifteen percent to eighty-five percent"); *M.G. v. A.I. Dupont Hosp. for Children*, 393 F.App'x 884, 891 (3d Cir. 2010) (finding medical monitoring necessary, as it detects injuries and will be different from what is normally recommended, to prevent further injuries).

As set forth in the SAC, medical testing – testing which differs from what would normally be recommended in the absence of PFAS exposure – is "reasonably and medically necessary" for Plaintiffs' early detection and treatment of diseases scientifically proven to be caused by PFAS exposure. *SAC* ¶¶ 238–41, 01–04, 346–67, 426–29. For at least ten such diseases, that is, specific testing exists that would provide early detection to preserve the health, wellbeing, and lives of Plaintiffs and Class Members. *Id.* ¶¶ 22–39, 240–41, 303–04, 366–67, 428–29. Whether medical monitoring is reasonably necessary, moreover, is ordinarily a question for the jury after hearing competent expert testimony. *See In re Paoli R.R. Yard PCB Litig.*, 916 F.2d 829, 852 (3d Cir. 1990) (holding that competent expert testimony is required to prove that, *inter alia*, diagnostic monitoring and testing is reasonably necessary).

---

"[i]llness and disease from exposure to these substances are often latent, not manifesting themselves for years or even decades after the exposure.'" *Sarro v. Philip Morris USA, Inc.*, C.A. No. 08-10224-MLW, at *7 (D. Mass. May 12, 2010) (*quoting Donovan I*, 455 Mass. at 225). As a result, it is "appropriate to extend general negligence principles to claims regarding 'exposure to toxic substances . . . even if the full effects [of those substances] [we]re not immediately apparent.'" *Id.*

As Plaintiffs have properly alleged all of the elements of medical monitoring, Defendants' motions to dismiss these claims must be denied.

## **CONCLUSION**

For the foregoing reasons, Plaintiffs respectfully request that this Court deny Defendants' Motions to Dismiss Plaintiffs' well-pleaded Second Amended Complaint and allow this matter to properly proceed.

DATED:     April 14, 2023     Respectfully submitted,

*/s/ Ian W. Sloss*
Ian W. Sloss (pro hac vice)
Sean K. McElligott (BBO #651710)
Paul A. Slager (pro hac vice)
Zachary A. Rynar (pro hac vice)
SILVER GOLUB & TEITELL LLP
One Landmark Square, 15th Floor
Stamford, Connecticut 06901
Telephone: (203) 325-4491
Facsimile: (203) 325-3769
isloss@sgtlaw.com
smcelligott@sgtlaw.com
pslager@sgtlaw.com
zrynar@sgtlaw.com

J. Tucker Merrigan (BBO #681627)
Victoria Santoro Mair (BBO #679120)
SWEENEY MERRIGAN LAW LLP
268 Summer Street, LL
Boston, MA 02210
tucker@sweeneymerrigan.com
victoria@sweeneymerrigan.com
Telephone: (617) 391-9001
Facsimile: (617) 357-9001

David C. Strouss (BBO#546253)
Christian Uehlein (BBO#667325)
Leah M. McMorris (BBO#681437)
THORNTON LAW FIRM, LLP
One Lincoln St., 13th Fl.
State Street Financial Center
Boston, MA 02111
(617) 720-1333
lmcmorris@tenlaw.com

*Counsel for Plaintiffs Thomas Ryan, Susan Ryan, Sean Gallagher, Ashley Sultan Gallagher, Michele Burt, Christopher Cerasuolo, Nancy Donovan, and Lauren Ladue*

## CERTIFICATE OF SERVICE

I, Ian W. Sloss, hereby certify that a true copy of the above document was served upon the attorney of record for each other party through the Court's electronic filing service on April 14, 2023.

/s/  Ian W. Sloss
Ian W. Sloss