## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| RYAN et al.,<br>　　　　　Plaintiffs,<br><br>　　v.<br><br>GREIF, INC., et al.,<br>　　　　　Defendants. | )<br>)<br>)<br>)<br>)　　CIVIL ACTION<br>)　　NO. 22-cv-40089-MRG<br>)<br>)<br>)<br>) |

## <u>REPORT & RECOMMENDATION</u>

### September 1, 2023

Hennessy, M.J.

Plaintiffs Thomas Ryan, Susan Ryan, Sean Gallagher, Ashley Sultan Gallagher, Michele Burt, Christopher Cerasuolo, Nancy Donovan, and Lauren Ladue (collectively, "Plaintiffs") brought suit as a putative class[1] against Defendants Greif, Inc., Caraustar Industries, Inc., The Newark Group, Inc., Massachusetts Natural Fertilizer Co., Inc., Otter Farm, Inc., Seaman Paper Company of Massachusetts, Inc., and 3M Company (collectively, "Defendants") alleging Defendants discharged and distributed so-called "forever" chemical substances which contaminated their groundwater wells.

Before this Court are five motions to dismiss: (i) Otter Farm, Inc. ("Otter Farm") and Seaman Paper Company of Massachusetts, Inc. ("Seaman Paper") move to dismiss for failure to state a claim, [Dkt. No. 91]; (ii) Massachusetts Natural Fertilizer Co., Inc. ("MassNatural") moves to dismiss for failure to state a claim, [Dkt. No. 94]; (iii) Caraustar Industries, Inc. ("Caraustar") and Greif, Inc. ("Greif") move to dismiss for lack of personal jurisdiction, [Dkt. No. 95] and (iv)

---

[1] As of the date of this Report & Recommendation, the class has not been certified.

with the Newark Group, Inc. ("Newark") move to dismiss for failure to state a claim, [Dkt. No. 98]; and (v) 3M Company ("3M") moves to dismiss for failure to state a claim.  [Dkt. No. 100]. Plaintiffs have filed three separate oppositions to these five motions.  [Dkt. Nos. 107, 108, 109]. Judge Guzman granted Defendants' motion to file a joint reply brief.[2]   [Dkt. Nos. 111, 113]. Additional reply briefs were submitted by Caraustar and Greif in support of their motion to dismiss for lack of personal jurisdiction, [Dkt. No. 131], and by 3M in support of its motion to dismiss for failure to state a claim.  [Dkt. No. 124].

The five motions to dismiss have been referred to me for a Report & Recommendation and are now ripe for adjudication.  [Dkt. No. 112].[3]  For the reasons that follow, I recommend that:

- Greif and Caraustar's motion to dismiss for lack of personal jurisdiction, [Dkt. No. 95], be GRANTED.

- Otter Farm, Seaman Paper, MassNatural, Caraustar, Greif, and Newark's motions to dismiss for failure to state a claim, [Dkt. Nos. 91, 94, 98] be GRANTED in part, and DENIED in part.

- 3M's motion to dismiss for failure to state a claim, [Dkt. No. 100], be GRANTED in part, and DENIED in part.

## I.    Background

The instant putative class action was initiated following consolidation of two cases against the same seven Defendants.  [Dkt. No. 76].  The thirty-five counts of Plaintiffs' complaint arise out of Defendants' allegedly "intentional, reckless, and/or negligent acts and omissions in

---

[2] The joint reply brief was submitted by all Defendants with the exception of 3M.  [Dkt. No. 113].

[3] A stipulated consent order staying Plaintiffs' motion for a temporary restraining order and/or a preliminary injunction and for expedited (limited) discovery has been granted pending the resolution of these motions to dismiss.  [Dkt. No. 43].

connection with the discharge, distribution, and/or disposal of per- and polyfluoroalkyl substances and their constituents[,]" which have contaminated Plaintiffs' and other class members' real property and drinking water.  [Dkt. No. 77, ¶1].  The following is culled from Plaintiffs' second amended (and operative) complaint ("SAC"), [Dkt. No. 77], as, at the motion to dismiss stage, "[w]e take the complaint's well-pleaded facts as true, and we draw all reasonable inferences in the plaintiff's favor."  Barchock v. CVS Health Corp., 886 F.3d 43, 48 (1st Cir. 2018).

The named Plaintiffs live in Westminster, Massachusetts.  [Dkt. No. 77, ¶¶2-9].  Greif is a Delaware corporation with a principal office in Ohio; Caraustar (a Delaware corporation) and Newark (a New Jersey corporation) are wholly-owned subsidiaries of Greif.  [Id., ¶¶10-12].  MassNatural, Otter Farm, and Seaman Paper are Massachusetts corporations operating principally in this state.  [Id., ¶¶10-15].  3M is incorporated in and operates principally in Minnesota.  [Id., ¶16].

A.  The Chemical Compounds

Plaintiffs allege that Defendants contaminated the groundwater by releasing per- and polyfluoralkyl substances—specifically Perfluorooctanoic Acid ("PFOA") and Perfluorooctane Sulfonate ("PFOS")[4]—into the environment. These substances cause severe health outcomes when ingested at even low levels.  [Dkt. No. 77, ¶35].  The substances have many commercial uses "due to their ability to repel water, dirt, oil, and grease, resist heat and protect surfaces;" they also resist "biodegradation" and are "water soluble, making them mobile in groundwater and the environment."  [Id., ¶¶23, 27, 28].  PFAS's unique properties render them resistant to water treatment and filtration systems.  [Id., ¶30].

---

[4] Plaintiffs refer to PFOA and PFOS compounds collectively as "PFAS."  For the sake of clarity, this Report & Recommendation follows suit in adopting "PFAS" where disambiguation is unnecessary.

Plaintiffs cite findings from both the U.S. Environmental Protection Agency ("EPA") and regulations from the Massachusetts Department of Environmental Protection ("MassDEP"). Relying on EPA's research, Plaintiffs allege that possible outcomes of ingesting PFAS include decreased fertility, developmental effects in children, cancer, liver complications, and hormonal imbalances.  [Id., ¶36].  Reports issued from 2009 through 2022 reflect the EPA's increasing concern over health risks associated with human and animal ingestion of virtually any amount of PFAS; in June 2022 EPA advised that "negative health effects may occur with concentrations of [PFAS] in water that are near zero and below EPA's ability to detect at this time."  [Id., ¶39 (emphasis in original)].[5]  MassDEP regulations require notice of 20 nanograms per liter ("ppt") of PFAS or more in drinking water to affected persons and implementation of "Immediate Response Actions" ("IRA").  [Id., ¶¶42-43 (citing M.G.L. c. 21I)].  Plaintiffs allege research and conclusions as to the substances' adverse medical effects, and Defendants' knowledge dating back to the 1970s of such research and conclusions.  See, e.g., [id., ¶64].

B.  The Defendants

Seaman Paper is engaged in paper production and distribution and has owned and operated a paper mill in Otter River, Massachusetts since 1947.  [Dkt. No. 77, ¶¶48-49].  Seaman Paper has a history of using PFAS in the production of its paper products.  [Id., ¶51].  On January 10, 2002, Seaman Paper acquired 240 acres of land at 65 Bean Porridge Hill Road in Westminster ("the Property") at foreclosure; days later, on January 23, Seaman Paper incorporated "Otter Farm, Inc." [Id., ¶¶153(b-c)].  On February 1, 2002, Seaman Paper conveyed its rights in the Property to Otter

---

[5] EPA Announces New Drinking Water Health Advisories for PFAS Chemicals, $1 Billion in Bipartisan Infrastructure Law Funding to Strengthen Health Protections, U.S. ENVIRONMENTAL PROTECTION AGENCY, https://www.epa.gov/newsreleases/epa-announces-new-drinking-water-health-advisories-pfas-chemicals-1-billion-bipartisan (accessed Jul. 20, 2023).

Farm.  [Id., ¶153(d)].  In August 2002, Otter Farm leased the Property to MassNatural for use as a composting facility.[6]  [Id., ¶153].  MassNatural composts "a wide variety of organic materials, including short paper fiber[,] … [and] has marketed and sold its products [including allegedly PFAS-contaminated compost] to 'garden centers, landscape contractors, [and] homeowners[.]" [Id., ¶¶46-47].  Seaman deposits PFAS-contaminated "waste materials from its manufacturing processes[,]" at the Property.  [Id., ¶48]

Newark operates 20 manufacturing facilities across North America, including a container board mill at 100 Newark Way, Fitchburg, Massachusetts ("the Fitchburg Mill").  [Id., ¶¶58, 104, 110].  Newark acquired the then-nonoperational Fitchburg Mill in 2002 and converted it into a papermaking facility which uses PFAS in its processes.  [Dkt. No. 99, p. 2].  In 2015, Caraustar acquired Newark and its more than twenty manufacturing facilities across North America.  [Dkt. No. 96-12, p. 2].  In 2019, Greif acquired Caraustar and its subsidiary, Newark.  [Dkt. No. 77, ¶57].  Greif is a publicly-traded industrial packaging products company which has been in the packaging business since 1877.  [Id., ¶¶55-57].  Both subsidiaries operate within Greif's paper packaging and services group.  [Id.]  Defendants clarify that Greif, Inc. owns Greif Packaging, LLC, which in turn owns Paperboard Parent, Inc., which in turn owns Caraustar Industries, Inc., which, lastly, wholly owns Newark.  [Dkt. No. 96, p. 4].  After acquiring Caraustar in 2019, Plaintiffs allege that Greif "immediately integrated Caraustar's and Newark[]'s operations into its own and took control of, and began actively operating" the Fitchburg Mill.  [Dkt. No. 77, ¶58].  MassDEP concluded Greif has "dumped contaminated waste materials from Greif's paper manufacturing processes at MassNatural's composting facility on the Otter Farm Property since

---

[6] MassNatural's website represents that its facility is "fully permitted as a Recycling, Composting or Conversion (RCC) Operation[,]" though Plaintiffs allege that "MassNatural's composting operation became the primary business operating at 65 Bean Porridge Road[.]"  [Dkt. No. 77, ¶44].

2002."[7]  [Id., ¶60].  Defendants Greif, Caraustar, and Newark acknowledge that MassNatural "agreed to collect [] residual byproduct" created during the paper manufacturing process from the Fitchburg Mill.  [Dkt. No. 99, p. 2].

EPA has identified 3M as the "only US [m]anufacturer of PFOS[,]" and the "dominant global producer of PFOA and related chemicals."  [Dkt. No. 77, ¶62].  For decades 3M has commissioned external studies and run internal studies which have uniformly revealed the grievous dangers associated with human exposure to and ingestion of 3M's manufactured PFAS.[8]  [Id., ¶¶64-88].  In 2000, after the EPA "notified [] 3M that it intended to pursue more rigorous regulation of the [PFAS] manufactured by [3M][,] … 3M publicly announced that it was voluntarily withdrawing from the … manufacturing of PFOA."  [Id., ¶82].

C.  MassDEP Investigation and Orders

MassDEP first learned of groundwater contamination from a homeowner living near MassNatural's facility who "requested testing of the residence's private-well-supplied drinking water" in January 2022.  [Dkt. No. 77, ¶¶90-92].  Testing by MassDEP beginning in February 2022 revealed that five residential private wells near the Property, including those of Plaintiffs Thomas Ryan, Susan Ryan, Sean Gallagher, and Ashley Sultan Gallagher, had PFAS in drinking water at concentrations between 333 and 1,815 ppt.  [Id., ¶93].  Further testing by MassDEP indicated that "water from at least 250 Westminster[] homes may be impacted."  [Id., ¶94].

---

[7] Though MassDEP's Notice of Responsibility issued to Greif indeed suggests Greif has dumped paper and packaging materials at the Otter Farm composting plant since 2002, it is uncontested that Greif did not acquire Caraustar, Newark, or the Fitchburg Mill until 2019.  Plaintiffs do not address this discrepancy and rely on the appellation, "the Greif Defendants," to denominate Newark, Caraustar, and Greif.

[8] The first such study mentioned dates to 1976.  [Dkt. No. 77, ¶64].

MassDEP "concluded the PFAS6[9] contamination in the Study Area is the result of groundwater migration from … the Otter Farm Property." [Id., ¶98].

On March 13, 2022, MassDEP issued a Notice of Responsibility ("NOR") to MassNatural and Otter Farm that they are potentially liable under M.G.L. c. 21E, § 5 for Westminster groundwater contamination.[10] [Id., ¶99].  On May 13, 2022, MassDEP issued a NOR to Seaman Paper.  [Id., ¶100].  MassDEP issued a Unilateral Administrative Order ("UAO") on May 17, 2022, directing MassNatural to "cease and desist from distributing any material containing PFAS" at levels violative of MassDEP's regulatory threshold for drinking water.  [Id., ¶101].[11]  A further UAO issued on July 20, 2022 to Otter Farm and MassNatural found MassNatural's facility "poses

---

[9] "PFAS6" refers to six specific PFAS compounds regulated by MassDEP, including (1) PFOS; (2) PFOA; (3) perfluorohexane sulfonic acid (PFHxS); (4) perfluorononanoic acid (PFNA); (5) perfluoroheptanoic acid (PFHpA); and (6) perfluorodecanoic acid (PFDA).  [Dkt. No. 77, ¶41].  As stated, supra n.4, this Report & Recommendation will refer to the compounds relevant to this matter as "PFAS" where there is no reason to discuss a single compound with specificity.

[10] This section provides, in relevant part:

> (a) Except as otherwise provided in this section, (1) the owner or operator of a vessel or a site from or at which there is or has been a release or threat of release of oil or hazardous material; (2) any person who at the time of storage or disposal of any hazardous material owned or operated any site at or upon which such hazardous material was stored or disposed of and from which there is or has been a release or threat of release of hazardous material; (3) any person who by contract, agreement, or otherwise, directly or indirectly, arranged for the transport, disposal, storage or treatment of hazardous material to or in a site or vessel from or at which there is or has been a release or threat of release of hazardous material; (4) any person who, directly, or indirectly, transported any hazardous material to transport, disposal, storage or treatment vessels or sites from or at which there is or has been a release or threat of release of such material; and (5) any person who otherwise caused or is legally responsible for a release or threat of release of oil or hazardous material from a vessel or site, shall be liable, without regard to fault, (i) to the commonwealth for all costs of assessment, containment and removal incurred … to the commonwealth for all damages for injury to and for destruction or loss of natural resources, including the costs of assessing and evaluating such injury, destruction or loss, incurred or suffered as a result of such release or threat of release, (iii) to any person for damage to his real or personal property incurred or suffered as a result of such release or threat of release … Except as provided in paragraphs (b) and (k), such liability shall be joint and several.

[11] Unilateral Administrative Order to MassNatural, MassDEP (May 17, 2022) https://eeaonline.eea.state.ma.us/EEA/fileviewer/FileViewer.aspx?fileEncryptionId=gdhjjbej (last accessed Aug. 31, 2023) (hereinafter "MassNatural UAO").

a threat to public health and the environment[,]" and ordered Otter Farm and MassNatural to "cease composting operations at the [] Property."  [Id., ¶102].  MassDEP issued a NOR to Greif on July 20, 2022 for its disposal of waste products containing PFAS concentrations in excess of regulations at the Property.  [Id., ¶103-4].[12]  MassDEP has identified Otter Farm, MassNatural, Seaman Paper, and Grief as potentially liable for IRA costs and damages under M.G.L. c. 21E, §5."  [Id., ¶105].

D.  Alleged Collusion

Plaintiffs allege each Defendant contributed to contaminating drinking water wells near the Property and profited from doing so.  The "Greif Defendants"—Greif, Caraustar, and Newark— and Seaman Paper paid MassNatural to transport, dispose, store, or treat PFAS6-contaminated waste at the Property.  [Id., ¶119].  This arrangement was "a symbiotic or mutually beneficial business relationship[,]" by which PFAS-contaminated byproducts were brought to MassNatural's facility for composting before being redistributed and sold to Massachusetts consumers.  [Id., ¶120].  According to Plaintiffs, the Paper Disposal Defendants:

> could reduce their byproduct disposal costs by taking advantage of MassNatural's Otter Farm operations and its business of redistributing soil products, and MassNatural and Otter Farm could be directly or indirectly compensated … for accepting this disposal while knowing they could cheaply offload such waste upon individuals and homeowners … by incorporating it into their soil products.

[Id.]  MassNatural "falsely, misleadingly, unfairly, and deceptively represented to Massachusetts consumers" that they were selling tested and safe compost and other products, while such products were in fact "contaminated with dangerous levels of PFAS6."  [Id., ¶¶124-25].  MassNatural also "intentionally concealed" such contamination, and "fraudulent[ly]" certified to MassDEP that its operations were in compliance with MassNatural's permits and MassDEP regulations.  [Id., ¶149].

---

[12]   Notice of Responsibility to Greif, Inc., MassDEP (Jul. 20, 2022), https://eeaonline.eea.state.ma.us/EEA/fileviewer/FileViewer.aspx?fileEncryptionId=gfjhgcjj (accessed Aug. 31, 2023) (hereinafter the "Greif NOR").

E.  Plaintiffs' Harm

Plaintiffs assert that they and other class members "face an uncertain future[,]" namely the "risk of experiencing adverse health events known to be caused by PFAS6." [Dkt. No. 77, ¶106]. They will "require medical monitoring and/or treatment" to ensure early detection of any such effects. [Id.]  In support, Plaintiffs allege abnormally high PFAS concentration readings in blood samples from Thomas Ryan, Susan Ryan, and Nancy Donovan and other putative class members. [Id., ¶185-89].  Plaintiffs also suffered pecuniary harm from overpayment for PFAS-contaminated compost and materials sold by MassNatural which were unfit for the purposes for which they were sold.  [Id., ¶¶193-94].  Plaintiffs also expect a significant diminution of property value as a result of PFAS contamination.  [Id., ¶108].  Finally, Plaintiffs and putative class members cannot "fully enjoy the use of their property" and their use of private wells which were previously their "only source [of water] … for drinking, cooking, bathing, and many other day-to-day activities."  [Id., ¶¶96, 107].  Since May 2022, under a MassDEP order, Plaintiffs have relied on bottled water from Defendants for these activites.  [Dkt. No. 42, p. 1].

F.  The Complaint[13]

Plaintiffs allege thirty-five counts on behalf of themselves and the class.  Plaintiffs identify the following subsets of the putative class:

> 1.  **Property Damage Class (Groundwater)**: All natural persons who are or were owners of real property on or after January 31, 2022, which property is within the Study Area and supplied with water from a well contaminated with PFAS6.

---

[13] Plaintiffs' first complaint, filed on August 2, 2022, asserted twenty-eight claims against all Defendants named here except 3M.  [Dkt. No. 1].  The original complaint did not include claims brought under RICO. On October 3, 2022, Plaintiffs filed a motion for a TRO/PI, [Dkt. No. 28]; that motion was superseded by the Parties' stipulated consent order on the condition Defendants, while the instant motions to dismiss are pending, remain compliant with their obligations under MassDEP's order to (1) continue providing Plaintiffs and other affected Westminster residents bottled water, and (2) continue sampling water in residences provided with "Point of Entry Treatment" systems.  [Dkt. No. 43, p. 1].

2.    **Property Damage Class (Compost and Soil)**: All natural persons who are or were owners of real property on or after January 31, 2022, which property received compost, loam or soil that was purchased from Natural Fertilizer and is contaminated with PFAS6.

3.    **Consumer Subclass**: All natural persons who have purchased contaminated composted products from MassNatural during the Class Period (the "Consumer Subclass").

4.    **Medical Monitoring Class**: All natural persons who resided at a home within the Study Area between 1987 and present, which home was supplied by a well found to be contaminated by PFAS6, and who ingested PFAS6 contaminated water such that PFAS6 accumulated in their body and tissue, or any natural child born to a resident who meets and/or met these criteria at the time of the child's birth. (the "Medical Monitoring Class").

[Dkt. No. 77, ¶226].  The claims brought are as follows:

- *As against MassNatural*: Medical Monitoring (Count I); Negligence (Count II); Violation of Massachusetts Consumer Protection Act, M.G.L. ch. 93, §§1, et seq. (Count III); Private Nuisance (Count IV); Public Nuisance (Count V); Ultrahazardous Activity / Strict Liability (Count VI); Willful and Wanton Conduct (Count VII).

- *As against Seaman Paper*: Medical Monitoring (Count VIII); Negligence (Count IX); Violation of Massachusetts Consumer Protection Act, M.G.L. ch. 93, §§1, et seq. (Count X); Private Nuisance (Count XI); Public Nuisance (Count XII); Ultrahazardous Activity / Strict Liability (Count XIII); Willful and Wanton Conduct (Count XIV).

- *As against Otter Farm*: Medical Monitoring (Count XV); Negligence (Count XVI); Violation of Massachusetts Consumer Protection Act, M.G.L. ch. 93, §§1, et seq. (Count XVII); Private Nuisance (Count XVIII); Public Nuisance (Count XIX); Ultrahazardous Activity / Strict Liability (Count XX); Willful and Wanton Conduct (Count XXI).

10

- _As against Greif; Caraustar; and Newark_:[14] Medical Monitoring (Count XXII); Negligence (Count XXIII); Violation of Massachusetts Consumer Protection Act, M.G.L. ch. 93, §§1, et seq. (Count XXIV); Private Nuisance (Count XXV); Public Nuisance (Count XXVI); Ultrahazardous Activity / Strict Liability (Count XXVII); Willful and Wanton Conduct (Count XXVIII).

- _As against 3M_: Negligence (Count XXIX); Breach of Warranty for Failure to Warn (Count XXX); Breach of Warranty for Defective Design (Count XXXI); Violation of Massachusetts Consumer Protection Act, M.G.L. ch. 93, §§1, et seq. (Count XXXII); Medical Monitoring (Count XXXIII).

- _As against MassNatural; Seaman Paper; Otter Farm; Greif; Caraustar; and Newark_:[15] Violations of the Racketeer Influenced and Corrupt Organization Act ("RICO"), 18 U.S.C. § 1962(c) (Count XXXIV); Violations of RICO, 18 U.S.C. § 1962(d), by Conspiring to Violate 18 U.S.C. § 1962(c) (Count XXXV).

[Dkt. No. 77, pp. 57-132].

## II.    Analysis

### A.  Lack of Personal Jurisdiction: Greif and Caraustar

Defendant Greif and its subsidiary Caraustar move to dismiss for a lack of personal jurisdiction.   Plaintiffs assert in their opposition that they sufficiently allege three bases for personal jurisdiction, that: (1) Greif and Caraustar undertook direct business activities in Massachusetts related to Plaintiffs' claims in this case, including running the Fitchburg Mill and holding themselves out as doing so, [Dkt. No. 107, p. 13]; (2) Greif and Caraustar have ignored

---

[14] Plaintiffs refer to this subset of Defendants as the "Greif Defendants."

[15] Plaintiffs refer to this subset of Defendants as the "Paper Disposal Defendants," which includes all Defendants except 3M.  [Dkt. No. 77, ¶115].

corporate formalities and are the alter ego of Newark, justifying piercing the corporate veil, [id.,
p. 17]; and (3) the RICO claims authorize personal jurisdiction. [Id., p. 19]. For the reasons stated
below, I recommend that the Court grant Grief's and Caraustar's motion to dismiss for a lack of
personal jurisdiction.

On a motion to dismiss for lack of personal jurisdiction pursuant to Fed. R. Civ. P. 12(b)(2),
the plaintiff bears the burden of showing that the Court has authority to exercise jurisdiction over
defendants. Munsell v. Colgate-Palmolive Co., 463 F. Supp. 3d 43, 50 (D. Mass. 2020) (citing
Cossart v. United Excel Corp., 804 F.3d 13, 18 (1st Cir. 2015)). "Where the Court will decide a
motion to dismiss for lack of personal jurisdiction without first holding an evidentiary hearing, the
Court applies the 'prima facie' standard of review and takes the plaintiff's 'properly documented
evidentiary proffers as true and construe[s] them in the light most favorable to [plaintiff's]
jurisdictional claim.'" Id. (citing A Corp. v. All Am. Plumbing, Inc., 812 F.3d 54, 58 (1st Cir.
2016)). "A plaintiff cannot, however, rely on 'unsupported allegations' and 'must put forward
evidence of specific facts to demonstrate jurisdiction exists.'" Id. (quoting A. Corp., 812 F.3d at
58) (internal citations omitted). The court will "take the facts from the pleadings and whatever
supplemental filings (such as affidavits) are contained in the record, giving credence to the
plaintiff's version of genuinely contested facts." Baskin-Robbins Franchising LLC v. Alpenrose
Dairy, Inc., 825 F.3d 28, 34 (1st Cir. 2016). It will "then add to the mix facts put forward by the
defendants, to the extent that they are uncontradicted." N. Laminate Sales, Inc. v. Davis, 403 F.3d
14, 24 (1st Cir. 2005) (quoting Daynard v. Ness, Motley, Loadholt, Richardson & Poole, P.A., 290
F.3d 42, 51 (1st Cir. 2002)) (additional quotations and citation omitted).

    1. First Basis: Defendants' Related Contacts with Massachusetts

The Court's jurisdiction may be either "specific" or "general."  United States v. Swiss American Bank, Ltd., 274 F.3d 610, 618 (1st Cir. 2001).   Here, Plaintiffs allege specific jurisdiction.  [Dkt. No. 107, p. 11].  Specific jurisdiction may be invoked "where the cause of action arises directly out of, or relates to, the defendant's forum-based contacts."  United Elec., Radio and Mach., Workers of America v. 163 Pleasant St., 960 F.2d 1080, 1087 (1st Cir. 1992). "In Massachusetts, a court may exercise personal jurisdiction over a foreign defendant if such jurisdiction is authorized by statute or rule and its exercise does not offend due process."  Id. at 1087; Exxon Mobil Corp. v. Attorney Gen., 479 Mass. 312, 314 (2018).  Plaintiffs must "proffer evidence which, taken at face value, suffices to show all facts essential to personal jurisdiction" under the Massachusetts long-arm statute and the Fourteenth Amendment.  Baskin-Robbins, 825 F.3d at 34.  "The jurisdictional requirements imposed by the Massachusetts long-arm statute are quite similar to, though not completely congruent with, the jurisdictional requirements imposed by the Due Process Clause."  Id.  As the "modest differences" between the two are immaterial here, the analysis, infra, will focus on the constitutional test.  Id.

"The Fourteenth Amendment's concern of fundamental fairness is achieved by the central requirement that certain 'minimum contacts' exist between the defendant and the forum state." Sawtelle v. Farrell, 70 F.3d 1381, 1388 (1st Cir. 1995) (quoting International Shoe Co. v. State of Washington, 326 U.S. 310, 316 (1945)).  To satisfy the constitutional standard, specific jurisdiction requires a "demonstrable nexus" between the plaintiff's claims and the defendant's contacts in the forum state.  Id.  A plaintiff must make an "affirmative showing" that 1) the litigation relates to or arises out of the defendant's contacts with the forum state; 2) the defendant purposefully availed itself of the privilege of conducting business in the forum state; and 3) jurisdiction over the defendant is reasonable under the circumstances.  Munsell, 463 F. Supp. 3d at 50 (citing Sawtelle,

70 F.3d at 1388).  "An affirmative finding as to all three is required before a court can exercise specific jurisdiction over a defendant."  <u>Glowacki-Bishop v. W. & S. Fin. Grp. Inc.</u>, 578 F. Supp. 3d 124, 128 (D. Mass. 2021) (citing <u>Phillips Exeter Academy v. Howard Phillips Fund</u>, 196 F.3d 284, 288 (1st Cir. 1999)).

a.   <u>Relatedness</u>

"The relatedness prong ensures fundamental fairness by protecting a defendant from being hauled into an out-of-state forum based on a single contact with that forum that is wholly unrelated to the suit at issue."  <u>Swiss American Bank</u>, 274 F.3d at 623 (citations omitted).  A "flexible, relaxed standard," functionally equivalent to that under the long-arm statute, is to be applied.  <u>M–R Logistics, LLC v. Riverside Rail, LLC</u>, 537 F.Supp.2d 269, 277 n.6 (D. Mass. 2008) (quoting <u>Pritzker v. Yari</u>, 42 F.3d 53, 61 (1st Cir. 1994)).  A defendant's physical presence in the forum-state is not necessary to satisfy the relatedness requirement, though it is relevant.  <u>Walden v. Fiore</u>, 571 U.S. 277, 285 (2014); <u>see also</u> <u>BCCTC Associates, Inc. v. Summerdale/AAHFI, L.P.</u>, 656 F.Supp.2d 208, 215 (D. Mass. 2009) (finding that under Massachusetts' long-arm statute, "[a] defendant's physical presence in the Commonwealth is not necessary to 'transact business' in Massachusetts, rather it is the defendant's 'attempt to participate in the Commonwealth's economic life' that counts.") (quoting <u>United Elec. Workers</u>, 960 F.2d at 1087).  Where, as here, the lawsuit sounds in tort, then the relatedness inquiry "probe[s] the causal nexus between the defendant's contacts and the plaintiff's cause of action."  <u>Phillips Exeter Acad.</u>, 196 F.3d at 289 (internal citations omitted).  As articulated by the First Circuit:

> The relatedness requirement is not an open door; it is closely read, and it requires a showing of a material connection. This court steadfastly reject[s] the exercise of personal jurisdiction whenever the connection between the cause of action and the defendant's forum-state contacts seems attenuated and indirect.... A broad 'but-for' argument is generally insufficient. Because 'but for' events can be very remote, ... due process demands something like a 'proximate cause' nexus.

14

Negron-Torres v. Verizon Communications, Inc., 478 F.3d 19, 25 (1st. Cir. 2007) (quoting Harlow v. Children's Hosp., 432 F.3d 50, 61 (1st Cir. 2005)).

Here, Plaintiffs sufficiently allege a causal nexus between the Fitchburg Mill and the contamination of Plaintiffs' drinking water.  Among other things, Plaintiffs proffer the MassDEP July 2022 NOR issued to Greif.  In relevant part, it states "[a]vailable information indicates that [MassNatural] has accepted large volumes of short paper fiber sludge from [Greif] since approximately 2002 [and]…[o]n May 25, 2022, [MassDEP] collected samples of materials stockpiled at the [MassNatural facility], including a sample that originated from Greif, Inc. and identified as 'Greif Paper' for PFAS analysis."  [Dkt. No. 107, p. 4 n.5 (citing Greif NOR)].  According to the NOR, the 'Greif Paper' contained PFOA at a concentration of 1,250 [nanograms per kilogram][,] and contributed to "concentrations between 333 and 1,815 [nanograms per liter]"[16] in drinking wells surrounding the Property, including Plaintiffs'.  [Id.].

Under the relatedness inquiry then this Court must assess whether the contacts Plaintiffs allege between operation of the Fitchburg Mill, an alleged source of drinking water contamination, and Greif and Caraustar are sufficient to fairly exercise jurisdiction over them.  Before I set out Plaintiffs' allegations and examine their sufficiency, three preliminaries: first, Plaintiffs face a high bar, given the dates of the corporate acquisitions.  Contrary to the NOR, Caraustar could not have operated the Mill, if ever, any earlier than its acquisition of Newark in 2015.  Similarly, Greif could not have operated the Mill, if ever, any earlier than February 2019, when it acquired Caraustar's parent, and thereby acquired Caraustar's subsidiary, Newark.[17]  The NOR's charge against Greif

---

[16] MassDEP's "drinking water Maximum Contaminant Level (MCL)" is 20 nanograms/liter.  [Id.].

[17] In addition, the NOR does not elaborate on the "available information" to which it refers.  By its own terms the NOR advised Greif of only "potential" liability and the possibility of "claims against third parties for damages, including for contribution or reimbursement for the costs of cleanup."  [Greif NOR, supra, n.12].  Greif immediately contested that it was a responsible party; just two days after receiving the NOR,

of responsibility for dumping since 2002 simply cannot be squared with the record; I thus find Plaintiffs' reliance on the NOR, insofar as it identifies Greif as exclusively responsible for Fitchburg Mill's operation, to be misplaced.  Second, Plaintiffs often refer to Greif, Caraustar, and Newark collectively as the "Greif Defendants" and allege "they" dumped contaminated waste from the Fitchburg Mill on the Property since 2002.  [Dkt. No. 77, ¶60].  Such an approach, like the one taken in the NOR, fails to clarify Greif and Caraustar's contacts with operation of the Mill.  Third, "there is a longstanding common-law presumption that a separately incorporated subsidiary is institutionally independent of its parent and that jurisdiction cannot therefore be asserted over a parent based solely on the conduct of the subsidiary."  In re Lupron Mktg. & Sales Pracs. Litig., 245 F. Supp. 2d 280, 291 (D. Mass. 2003) (citing Cannon Mfg. Co. v. Cudahy Packing Co., 267 U.S. 333, 336 (1925)).[18]  The presumption yields only to "clear evidence" to the contrary.  See Escude Cruz v. Ortho Pharmaceutical Corp., 619 F.2d 902, 905 (1st. Cir. 1980) ("The mere fact that a subsidiary company does business within a state does not confer jurisdiction over its nonresident parent, even if the parent is the sole owner of the subsidiary.").[19]  "Clear evidence" includes "monitoring of the subsidiary's performance, supervision of the subsidiary's finance and capital budget decisions, and articulation of general policies and procedures."  United States v. Bestfoods, 524 U.S. 51, 72 (1998).

---

Greif's lawyers advised MassDEP that "the owner and operator of the paper mill … is The Newark Group." [Id.]; see Greif NOR Response, MassDEP (Jul. 22, 2022) https://eeaonline.eea.state.ma.us/EEA/fileviewer/FileViewer.aspx?fileEncryptionId=gfafifbj (last accessed Sept. 1, 2023).

[18] Overlap among some Greif and Caraustar executives, in itself, does not disturb the corporate separateness of Newark. The clear evidence necessary to overcome the presumption of corporate separateness includes the sharing of directors, officers, and employees.  United Elec. Workers, 960 F. 2d at 1083-84.

[19] Of course, the act of acquiring the majority of the shares of a corporation and thereby becoming its parent could not confer jurisdiction; otherwise, the presumption of separateness would be swallowed by the condition precedent to becoming the parent corporation.

To overcome the presumption of corporate separateness and supportably show Greif's operation of the Mill, Plaintiffs allege "Greif referred to the Fitchburg Mill as one of its own on its website, advertised employment opportunities at the Fitchburg Mill, provided welcome handbooks to new employees bearing the Greif logo, and installed signage inside and outside the Fitchburg Mill that said 'Greif[.]'"  [Dkt. No. 107, p. 18].  Plaintiffs add that Defendants (presumably Greif) "advertise for jobs and solicit and hire employees to work in their own 'Greif Fitchburg Mill.'" [Id., p. 14].  Finally, Plaintiffs point to the fact that managers and employees at the Fitchburg Mill identify their employer as Greif, some Greif executives also serve as Caraustar executives, and the Mill General Manager uses both "@caraustar.com" and "@grief.com" email addresses.  [Id. pp. 14-15, 18; Exs. 106-16 to 106-28].

I do not discount the sufficiency of these allegations as showing the corporate relationship between Greif and its subsidiaries; however, none shows Greif's direct control of the Mill.  Normal badges of ownership such as signage, listing facilities of a subsidiary as property of the conglomerate parent—here, signage not only in Fitchburg, but presumably in other North American locations where Newark facilities were located when Greif acquired Caraustar—an employee handbook, and shared personnel do not establish control of the Fitchburg Mill.  See Lupron, 245 F. Supp. 2d at 292 (D. Mass. 2003) (identifying "ownership, common personnel, profits, and managerial oversight" as such "customary incidents of a parent-subsidiary relationship"); Glowacki-Bishop, 578 F.Supp.3d at 128-29 (fact that the subsidiary was subject to an employment policy maintained by defendant parent corporation did not produce the "strong and robust evidence" required to prove that defendant parent corporation had control over subsidiary). Similarly, that Greif should advertise jobs at the Fitchburg Mill (and again presumably other

facilities belonging to subsidiaries in North America) as employment "with Greif" reflects, as Defendants suggest, "rebranding," but not operational control of a subsidiary.

I also consider Greif's proffer, comprising exhibits and the affidavit of Gary R. Martz, Secretary of Greif, Inc. since 2002. [Dkt. No. 96-11]. Among other things, Martz avers that Greif does not and has not owned or operated facilities in Massachusetts since 2005; that neither Greif nor Caraustar operate the Fitchburg Mill; that everyone who works at the Fitchburg Mill is an employee of Newark. [Id.]. Consistent with these averments, Martz proffers official and legal documents and utility bills which show that Newark continued to own and operate the Mill following each of the acquisitions: for instance, 2015 (post-Caraustar acquisition) correspondence regarding Newark's Restriction Emission Status application to MassDEP; a 2018 Comprehensive Plan Application from Newark regarding fuel consumption; and 2022 utility bills for gas and electric to run the Mill sent to Newark; and a City of Fitchburg Property Card generated on September 22, 2022 which identifies Newark as owner of the Mill. [Dkt. Nos. 96-1 through 96-9]. These documents support the Martz affidavit and contradict Plaintiffs' general assertion that corporate badges indicate Greif's direct control over the Fitchburg Mill.

Plaintiffs' reliance on D'Allessandro v. Lennar Higham Holdings, LLC, No. 17-cv-12567-IT, 2018 WL 3405251 (D. Mass. Jul. 12, 2018) for the proposition that such parent corporate "branding" in-state is sufficient to exercise personal jurisdiction is misplaced. There, this Court exercised specific jurisdiction over a parent corporation, Lennar, based on adequately pleaded allegations showing Lennar's active participation in misrepresentations which promoted sales of a condominium. Id. at *4. Although Lennar never registered to transact business in Massachusetts, never owned the condominium underlying the plaintiffs' claims, and never conducted business or owned any real or personal property in the state, Lennar held out itself as the owner and developer

in promoting the quality of the construction, and used its corporate branding on the condominium's website and promotional materials.  Id. at *4.  This Court found such conduct "'represent[ed] a meaningful link between [Lennar's] contact and the harm suffered' in the negligent misrepresentation claim insofar as the materials depict the quality of the Condominium alongside the company's apparent endorsement of such representations."  Id. (quoting Nowak v. Tak How Investments, Ltd., 94 F.3d 708, 715-16 (1st Cir. 1996)).  Here, on the other hand, even insofar as Greif has rebranded properties of its subsidiaries and created a unified corporate image as the employer of persons working for its subsidiaries, there is insufficient support for the allegation that Greif actually operated the Mill and hence caused the environmental contamination allegedly precipitated by two decades of waste from the Mill disposed at the Property.

Lastly, I consider that after the 2019 acquisition, the Mill continued a key behavior tied to the lawsuit: as it had since 2002, the Mill generated fiber sludge which was delivered to the Property.  The uninterrupted adherence to this key prior practice argues against the suggestion the corporate acquisitions effected a change in day-to-day operation of the Mill.  See, e.g., United States ex rel. Lokosky v. Acclarent, Inc., 270 F. Supp. 3d 526, 531–32 (D. Mass. 2017) (declining to impute liability to parent corporations on the basis of an allegation that the corporate parents "took over the day to day responsibilities for selling [subsidiary employer's] products[,]" where corporate parent "kept [subsidiary] as a separate division, and the [subsidiary's] sales force continued to report to the same [subsidiary] managers as before.").  This record supports the presumption of corporate separateness and undermines Plaintiffs' allegation that Greif operated the Mill since 2002.

I find there is an equally weak evidentiary record to support an exercise of personal jurisdiction over Caraustar.  Caraustar's signage on the Fitchburg Mill or its ownership of Newark

starting in 2015 do not show operational control of the Mill, which Plaintiffs do no more than allege in a conclusory fashion.  Indeed, apart from the Fitchburg Mill General Manager using, among others email addresses, "@caraustar", there is no development of evidence to support Caraustar's operation of the Mill at any time.

I find therefore that Plaintiffs have failed to show "relatedness," between the contamination of drinking water and either Greif's or Caraustar's operation of the Mill and have thus failed to show that an exercise of specific jurisdiction is warranted.  I will nevertheless address the two other parts of the constitutional standard.

b.  Purposeful Availment

I find Plaintiffs also have failed to show that Greif and Caraustar each purposefully availed itself of the privilege of conducting business in Massachusetts.

"The purposeful availment inquiry ... focuses on the defendant's intentionality."  Swiss American Bank, 274 F.3d at 623 (citation omitted).  According to the First Circuit:

> To satisfy the second requirement, 'the defendant's in-state contacts must represent a purposeful availment of the privilege of conducting activities in the forum state, thereby invoking the benefits and protections of that state's laws and making the defendant's involuntary presence before the state's courts foreseeable.' … The focus is on 'voluntariness and foreseeability.'

Astro–Med, Inc. v. Nihon Kohden America, Inc., 591 F.3d 1, 10 (1st Cir. 2009) (internal citations and quotations omitted).  Purposeful availment occurs "when a defendant deliberately targets its behavior toward the society or economy of a particular forum [such that] the forum should have the power to subject the defendant to judgment regarding that behavior."  Carreras v. PMG Collins, LLC, 660 F.3d 549, 555 (1st. Cir. 2011) (citing J. McIntyre Mach., Ltd. v. Nicastro, 564 U.S. 873, 881 (2011)); Jet Wine & Spirits, Inc. v. Bacardi & Co., 298 F.3d 1, 11 (1st Cir. 2002) ("there must be some voluntary action that [the corporation] has taken that should have put it fairly on notice

that it might one day be called to defend itself in [the forum state]").  "The cornerstones upon which the concept of purposeful availment rest are voluntariness and foreseeability."  Carreras, 660 F.3d at 555 (quoting Daynard, 290 F.3d at 61).

Here, Plaintiffs rely on the same contacts alleged to support "relatedness."  These fail to show that Greif voluntarily engaged in conduct that made suit in Massachusetts foreseeable.  There is no question that in 2019 Grief acquired Newark as an indirect consequence of Greif's acquisition of Paperboard Parent, Inc., the owner of Caraustar.  [Dkt. No. 96, p. 4].  However, the corporate acquisition does not show purposeful availment.  In 2019, Newark was a subsidiary of Caruastar; Caraustar is a Delaware corporation with a principal place of business in Georgia.  [Dkt. No. 96-11, ¶¶3, 10].  Caraustar is not registered to conduct business in Massachusetts, neither owns nor operates any property in Massachusetts, and employs no one working at the Fitchburg Mill.  [Id., ¶¶11, 15].  The record here shows Caraustar's relationship to the Mill is as corporate parent of Newark, the Mill's operator.  [Id., ¶7].  Insofar as the fact that a subsidiary company does business within a state does not confer jurisdiction over its nonresident parent, Cannon Mfg. Co., 267 U.S. at 336, it follows that the passive acquisition of a corporation, without more, does not confer jurisdiction over the acquiring parent.  Hence, Greif's indirect acquisition of Caraustar does not evidence a voluntary intent to conduct business in Massachusetts.

The same can be said for Caraustar.  It acquired Newark in 2015.  Newark is a New Jersey company.  While it is true that at the time of the acquisition, Newark operated the Fitchburg Mill and employed all its workers, Newark also "ha[d] approximately 1,500 employees and operate[d] more than 20 manufacturing facilities across North America."  [Dkt. No. 96-12, p. 2].  In the absence of evidence that Caraustar actually operated the Fitchburg Mill following the acquisition, I reject the argument that Caraustar purposefully availed itself of the privilege of doing business

21

in Massachusetts.  Hence, the 2015 acquisition does not reflect a targeted intent to conduct activities in Massachusetts.

Apart from the foregoing, reaping the economic benefit of in-forum dealings alone is insufficient to establish purposeful availment; a party must "foresee" that its voluntary, in-forum contacts may result in its "involuntary presence before the state's courts[.]"  Astro–Med, Inc., 591 F.3d at 10 (internal citations and quotations omitted); Jet Wine, 298 F.3d at 11 (noting that while the defendant brand owner's "benefit from the sale" of an asset in New Hampshire through a preexisting distribution contract was "not sufficient … to establish [] personal jurisdiction[,]" purposeful availment was satisfied when the defendant "assumed the various [contractual] obligations" of its subsidiary, rendering it liable to suit where such obligations could be enforced).

Here, Greif and Caraustar's acquisition of Caraustar and Newark, and rebranding of Caraustar and Newark's properties, is insufficient to render the underlying environmental contamination—which allegedly occurred over the last two decades, and, in part, years before such acquisitions—foreseeable.  See, e.g., Saturn Mgmt. LLC v. GEM-Atreus Advisors, LLC, 754 F. Supp. 2d 272, 280 (D. Mass. 2010) (finding purposeful availment where the defendants promised to invest in a partnership with its principal place of business in Boston, "specifically initiated a conversation with [plaintiff's agent], who was in Boston at that time, about th[at] prospect[,]" and thus "knew that the effects of their allegedly fraudulent conduct would impact a Boston-based partnership[,] … [and] should have reasonably foreseen that they would be asked to defend themselves in Massachusetts.").

For these reasons, Plaintiffs fail to show that either Greif or Caraustar purposely availed themselves of the privilege to do business in Massachusetts.

c.  Reasonableness

22

The final consideration in the constitutional analysis is whether the exercise of jurisdiction over the foreign defendant would be reasonable.  Certain "gestalt factors" are to be weighed in making this reasonableness determination, including:

> the defendant's burden of appearing, the forum State's interest in adjudicating the dispute, the plaintiff's interest in obtaining convenient and effective relief, the interstate judicial system's interest in obtaining the most efficient resolution of the controversy, and the shared interest of the several States in furthering fundamental substantive social policies.

Astro–Med, Inc., 591 F.3d at 10–11 (citing Burger King Corp. v. Rudzewicz, 471 U.S. 462, 477 (1985)).

I find the gestalt factors support resolution of this dispute in Massachusetts: Defendants' burden of appearing is not significant; as the dispute concerns drinking water in Massachusetts, Massachusetts has a compelling interest in adjudicating the rights of the parties; and, as Massachusetts landowners and citizens, a local forum will provide Plaintiffs the best opportunity to obtain relief.  However, the analysis suffers from the same fundamental absence of evidence that Greif and Caraustar operated the Fitchburg Mill and hence caused or contributed to the contamination of Plaintiffs' drinking water.  "The relationship between the defendant and the forum must be such that it is 'reasonable…to require the corporation to defend the particular suit which is brought there."  World-Wide Volkswagen Corp. v. Woodson, 444 U.S. 286, 292 (1980) (quoting International Shoe, 326 U.S. at 317).  Because I find that Plaintiffs have failed to support their allegations that Greif and Caraustar operated the Fitchburg Mill, and further that their corporate acquisitions do not show targeted conduct in Massachusetts, it is not reasonable to require Greif and/or Caraustar to defend against Plaintiffs' claims in a Massachusetts court.

2.  Second Basis: Piercing the Corporate Veil

Plaintiffs also assert as a basis of jurisdiction that Greif and Caraustar have exercised consistent control over Newark and the Mill sufficient for the Court to pierce the corporate veil and impute Newark's activities to Greif and Caraustar.  [Dkt. No. 107, p. 18].  Greif and Caraustar argue that "passive contacts between Greif [] and [] Newark [] hardly show the 'pervasive control' required to attribute the acts of a subsidiary to its parent corporations[;]" moreover, while both Caraustar and Newark are indeed "wholly-owned subsidiaries of Greif, Inc.[,]" the notion that Greif exercises any "operational control" over either Caraustar, Newark, or the Fitchburg Mill, is not reflected in Plaintiffs' proffers, including Greif's press releases, website material, or social media posts.  [Dkt. No. 96, pp. 5, 14].  Greif and Caraustar have the better argument.

As noted above, "[t]here is a presumption of corporate separateness that must be overcome by clear evidence that the parent in fact controls the activities of the subsidiary."  Negron-Torres, 478 F.3d at 27 (quoting Escude Cruz, 619 F.2d at 905).  "The doctrine of corporate disregard is an equitable tool that authorizes courts, in rare situations, to ignore corporate formalities, where such disregard is necessary to provide a meaningful remedy for injuries and to avoid injustice." Attorney Gen. v. M.C.K., Inc., 432 Mass. 546, 555 (Mass. 2000).  "To overcome the presumption of separate corporate identity and assert personal jurisdiction over a parent corporation based on its subsidiary's forum contacts, there must be a 'plus' factor 'beyond the subsidiary's mere presence within the bosom of the corporate family.'"  Genzyme Corp. v. Shire Hum. Genetic Therapies, Inc., 906 F. Supp. 2d 9, 19 (D. Mass. 2012) (quoting Donatelli v. Nat'l Hockey League, 893 F.2d 459, 465–466 (1st Cir. 1990)).  "Plus" factors include "an agency relationship between the two corporations, a degree of control by the parent that is more than common ownership and directorship, or clear and convincing evidence that the subsidiary is not a functioning entity but simply an empty shell."  Id. (citing Donatelli, 893 F.2d at 466); see also Escude Cruz, 619 F.2d at

905.  In other words, a parent corporation is liable for the actions of a subsidiary "only when compelling reasons justify disregarding corporate structure and piercing the corporate veil." Lokosky, 270 F. Supp. 3d at 531.

> Massachusetts courts employ twelve factors to guide their veil-piercing analysis, including:
>
> > (1) common ownership; (2) pervasive control; (3) confused intermingling of business assets; (4) thin capitalization; (5) nonobservance of corporate formalities; (6) absence of corporate records; (7) no payment of dividends; (8) insolvency at the time of the litigated transaction; (9) siphoning away of corporation's funds by dominant shareholder; (10) nonfunctioning of officers and directors; (11) use of the corporation for transactions of the dominant shareholders; and (12) use of the corporation in promoting fraud.

M.C.K., Inc., 432 Mass. at 555, n.19 (citing Pepsi–Cola Metro. Bottling Co. v. Checkers, Inc., 754 F.2d 10, 14–16 (1st Cir. 1985)); cf. Munsell, 463 F. Supp. 3d at 56–57.

"Empty shell" theories supporting veil-piercing generally evince a lack of independent operation and purpose on behalf of a subsidiary, which instead functions to carry out its parent's objectives.  See, e.g., M.C.K., Inc., 432 Mass. at 547 (finding clear and convincing evidence subsidiary was an "empty shell" of its parent where the subsidiary was "formed to carry out the objectives and purposes of the [parent] controlling them[.]"); My Bread Baking Co. v. Cumberland Farms, Inc., 353 Mass. 614, 620 (1968) ("Where there is common control of a group of separate corporations engaged in a single enterprise, failure (a) to make clear which corporation is taking action in a particular situation and the nature and extent of that action, or (b) to observe with care the formal barriers between the corporations with a proper segregation of their separate businesses …, records, and finances, may warrant some disregard of the separate entities in rare particular situations in order to prevent gross inequity[.]").

United States v. Bestfoods is instructive.  There, the Court considered whether veil-piercing warranted holding the parent corporation liable under the Comprehensive Environmental

25

Response, Compensation, and Liability Act of 1980 ("CERCLA") for industrial clean-up costs stemming from a subsidiary's operation of a chemical plant.  Bestfoods, 524 U.S. at 55.  The relevant CERCLA provision triggers liability for clean-up costs where an entity is found to "operate[] a polluting facility."  Id. at 65.  After discussing the underpinnings of the common-law corporate veil doctrine, the Court concluded that the relevant issue in Bestfoods was "not whether the parent operates the subsidiary, but rather whether it operates the facility, and that operation is evidenced by participation in the activities of the facility, not the subsidiary."  Id. at 68 (internal citation omitted).  The Court was unpersuaded that directors of the parent also serving on the subsidiary's board, and parent officers "in key management positions[,]" of the subsidiary indicated "that those individuals made major policy decisions and conducted day-to-day operations at the facility[.]"  Id.  The Court rather emphasized that:

> [C]ourts generally presume that the directors are wearing their 'subsidiary hats' and not their 'parent hats' when acting for the subsidiary[] … it cannot be enough to establish liability here that dual officers and directors made policy decisions and supervised activities at the facility.  The Government would have to show that, despite the general presumption to the contrary, the officers and directors were acting in their capacities as [corporate parent] officers and directors, and not as [subsidiary] officers and directors, when they committed those acts.

Id. at 69-70.

Here, the record sharply contrasts cases in which veil-piercing has been supported by "empty shell" or corporate parent control theories.  There is no supported allegation that either Caraustar or Newark is a mere shell or agent of Greif.  Greif proffers documents that Newark owns and pays the Fitchburg Mill's bills, the Mill's General Manager's stated on the record that Newark employs the Mill's staff.  Rather, to support veil-piercing, Plaintiffs point to the same allegations discussed, supra—namely, signage, job application websites, employee email addresses, and promotional materials identifying the Fitchburg Mill as a Greif property.  [Dkt. No. 107, pp. 17-18].  However, Plaintiffs fail to show supportable evidence that would implicate the factors recited

above, apart from evidence of common ownership.  Indeed, most factors have no support at all.

By contrast, the signage, website information, email domains are corporate badges, and this Court

has held that "emblems" of a parent-subsidiary relationship are "not suspect, and as federal case

law makes clear, they are insufficient in and of themselves to permit the assertion of vicarious

jurisdiction." Lupron, 245 F. Supp. 2d at 292; see also Glowacki-Bishop, 578 F.Supp.3d at 128-

29 (fact that the subsidiary was subject to an employment policy "maintained by [defendant parent

corp.] and directed for adoption by [subsidiary] … d[id] not produce the 'strong and robust

evidence' required to prove that [defendant parent corp.] had control over [subsidiary], control that

would reveal that [subsidiary] is a 'mere shell' of its corporate parent." Id. (quoting Negron-

Torres, 478 F.3d at 24); see also id. (collecting cases holding that a corporate parent's insistence

that subsidiaries follow corporate-wide policies does not make a subsidiary an agent of a parent,

and does not establish an alter ego relationship).

       I acknowledge Plaintiffs' proffer that some employees of the Mill identify their employer

as "Greif."  But on the basis of the record, I find the reports of employees to be insufficient to

warrant the equitable remedy of veil piercing, as I am not persuaded this means anything more

than Greif employs them because it owns Newark and Caraustar.  Even on the basis of the postings

Plaintiffs provide and cite, it is unclear how reliable the postings are.  For instance, while Dana

Pelletier posts that he is a General Manager at Greif, in the same posting he states he has worked

for Greif in the Fitchburg Mill "Jul[y] 2000 – Present."  [Dkt. No. 106-16, p. 2].  This is not

accurate insofar as Greif did not acquire the Mill until almost two decades after July 2000.  Michael

Berger posts that he is a Production Superintendent at Greif, Inc, but that he has worked for

Caraustar as a Superintendent from "Aug[ust] 2015 – Present" indicating that Caraustar, and not

Greif, employs him.  [Dkt. No. 106-18, p. 2].  Becky LaFreniere posts that she is a Regional Human

27

Resources Manager at Greif, Inc., and has been employed by Greif in Fitchburg since June 2010. [Dkt. No. 106-19, p. 2]. Robert Zanchi posts employment at Greif "Feb 2019 – Present," but states he has worked for The Newark Group December 2005 – Present, i.e. that he works for Newark. [Dkt. No. 106-20, p. 2]. In my view, none of these postings show Greif operates, as opposed to owns, Newark. See [Dkt. Nos. 106-16; 106-18 through 106-22].

In sum, Plaintiffs' allegations and evidence support the existence of a corporate parent-subsidiary relationship and "customary incidents" of corporate ownership. Lupron, 245 F. Supp. 2d at 292 (identifying "ownership, common personnel, profits, and managerial oversight" as such "customary incidents of a parent-subsidiary relationship"). However, as Bestfoods teaches, without properly documented evidence that Greif or Caraustar has disregarded corporate boundaries and assumed operation of the Fitchburg Mill, piercing the corporate veil and treating Greif and/or Caraustar as an alter-ego of Newark is not sufficiently grounded.

### 3. Third Basis: RICO Service of Process

Plaintiffs lastly argue that the RICO statute provides an alternative, stand-alone basis for exercising personal jurisdiction over Greif and Caraustar, citing Duggan v. Martorello, 596 F. Supp. 3d 158, 180 n.7 (D. Mass. 2022). [Dkt. No. 107, p. 19]. Greif and Caraustar argue that Plaintiffs added unmeritorious RICO claims in the SAC to evade their burden of establishing personal jurisdiction over them. [Dkt. No. 96, pp. 17-18]. Greif and Caraustar quote World Depot Corp. v. Onofri, No. 16-CV-12439-FDS, 2017 WL 6003052, at *5 (D. Mass. Dec. 4, 2017), for this Court's admonition that "courts should be particularly vigilant not to permit a plaintiff to assert a spurious RICO claim in order to try to obtain personal jurisdiction over other defendants[,]" in light of the statute's "broad jurisdictional reach." [Dkt. No. 96, pp. 17-18].

28

18 U.S.C. §1965 provides for nationwide service of process in civil RICO cases under certain circumstances, in order "to enable plaintiffs to bring all members of a nationwide RICO conspiracy before a single court in a trial." Butcher's Union Local No. 498 v. SDC Inv., Inc., 788 F.2d 535, 539 (9th Cir. 1986).  Rule 4 of the Federal Rules of Civil Procedure, in turn, provides that service of process establishes personal jurisdiction over a defendant. Fed. R. Civ. P. 4(k)(1)(C) ("Serving a summons ... establishes personal jurisdiction over a defendant when authorized by a federal statute.").  "Thus, under § 1965 and Rule 4, personal jurisdiction over defendants can be obtained in RICO cases under circumstances where it otherwise might not exist." World Depot Corp., 2017 WL 6003052, at *4.

The breadth of the RICO statute's personal jurisdictional grant has prompted a circuit split. See id., at *5 (identifying a circuit split as to whether § 1965(b) or § 1965(d) is the controlling provision with regard to personal jurisdiction and stating that the First Circuit has yet to rule on the issue).  No Party engages with the tension between § 1965(b), which provides that in any civil RICO action "in which it is shown that the ends of justice require that other parties residing in any other district be brought before the court, the court may cause such parties to be summoned[,]" (the so-called "forum-state" approach) and § 1965(d), which provides that "[a]ll other process ... may be served on any person in any judicial district in which such person resides" (the "national contacts" approach).  Indeed, Plaintiffs do not indicate on which provision they rely in arguing for RICO-based jurisdiction over Greif and Caraustar.

World Depot Corp. adopted "the approach of the majority of circuits" by finding that Section 1965(b) is the operative provision for an exercise of jurisdiction over a party lacking

Section 1965(a)[20] contacts with the forum.  2017 WL 6003052, at *5; see Butcher's Union, 788 F.2d at 539 ("the right to nationwide service in RICO suits is not unlimited[;] … the court must have personal jurisdiction over at least one of the participants in the alleged … conspiracy … merely naming persons in a RICO complaint does not, in itself, make them subject to section 1965(b)'s nationwide service provisions.").  I agree with this Court's reasoning in World Depot Corp. and adopt the same approach, namely "[w]hen a civil RICO action is brought in a district court where personal jurisdiction can be established over at least one defendant, summonses can be served nationwide on other defendants if required by the ends of justice." Cory v. Aztec Steel Bldg., Inc., 468 F.3d 1226, 1231 (10th Cir. 2006).  Here, Plaintiffs allege a RICO enterprise involving all Defendants except 3M.  Only Greif and Caraustar have contested personal jurisdiction; the remaining RICO Defendants—MassNatural, Otter Farm, Seaman Paper, Newark—have waived a jurisdictional challenge.  See Pilgrim Badge & Label Corp. v. Barrios, 857 F.2d 1, 3 (1st Cir. 1988) ("A defendant who files a responsive pleading, but who does not object to the personal jurisdiction of the court, has, in effect, consented to the court's jurisdiction.").  Accordingly, Plaintiffs established jurisdiction over at least one RICO defendant in satisfaction of Section 1965(b)'s threshold requirement.

Following the majority rule, Plaintiffs must next show "the ends of justice require" that Greif and Caraustar be brought before this Court.  "[T]he 'ends of justice' is a flexible concept uniquely tailored to the facts of each case." Cory, 468 F.3d at 1232.  The Tenth Circuit, as illustrated in Cory, adopted a less rigid formulation of "ends of justice" than did the Ninth Circuit in Butcher's Union; under Cory's formulation, a plaintiff can demonstrate that the "ends of justice"

---

[20] "Any civil action or proceeding under this chapter against any person may be instituted in the district court of the United States for any district in which such person resides, is found, has an agent, or transacts his affairs."  18 U.S.C.A. § 1965(a).

compel an exercise of personal jurisdiction by supporting "the desirability of having the whole action litigated in one court[,] the cost of the delay involved in transferring the case to another forum[,] and the general balance of hardships between plaintiff and defendant."  Doe v. Varsity Brands, LLC, No. 1:22-CV-02139, 2023 WL 4935933, at *16 (N.D. Ohio Aug. 2, 2023) (citing Cory, 468 F.3d at 1232).

In their opposition to the motion to dismiss, Plaintiffs fail to articulate why the "ends of justice" require an exercise of personal jurisdiction over Greif and Caraustar.  Drawing on the SAC and the submissions in support of and against personal jurisdiction, I find against Plaintiffs.  As will be discussed, infra, Plaintiffs fail to raise a cognizable RICO claim against Greif, Caraustar, and Newark, thus precluding the jurisdiction-granting effect of Section 1965.  See Butcher's Union, 788 F.2d at 539 (declining to exercise personal jurisdiction over certain defendants via RICO's nationwide service of process provision where "the complaint did not allege a single nationwide RICO conspiracy[.]"); BWP Media USA Inc. v. Hollywood Fan Sites, LLC, 69 F. Supp. 3d 342, 352 (S.D.N.Y. 2014) ("[T]he Court needs not reach [the Section 1965(b) personal jurisdiction] question, because Plaintiffs 'cannot rely upon 18 U.S.C. § 1965(b) to establish personal jurisdiction over each of the defendants' if the RICO claim is dismissed.") (quoting Cont'l Petroleum Corp. v. Corp. Funding Partners, LLC, No. 11 Civ. 7801(PAE), 2012 WL 1231775, at *8 (S.D.N.Y. Apr. 12, 2012)).

Hence, for the reasons set forth above, I recommend Greif's and Caraustar's motion to dismiss for lack of personal jurisdiction, [Dkt. No. 95], be GRANTED.

B.  Failure to State a Claim

On a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), the Court "must assume the truth of all well-plead[ed] facts and give the plaintiff the benefit of all reasonable

inferences therefrom." Ruiz v. Bally Total Fitness Holding Corp., 496 F.3d 1, 5 (1st Cir. 2007) (citing Rogan v. Menino, 175 F.3d 75, 77 (1st Cir. 1999)). Materials attached to a complaint, or incorporated by reference, are a part of the pleading itself, and the Court may consider them on a motion to dismiss. Trans–Spec Truck Serv. v. Caterpillar, 524 F.3d 315, 321 (1st Cir. 2008). To survive a motion to dismiss, the plaintiff must state a claim that is plausible on its face. Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007). That is, "[f]actual allegations must be enough to raise a right to relief above the speculative level, ... on the assumption that all the allegations in the complaint are true (even if doubtful in fact)." Id. at 555 (citations omitted). "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully[,]" Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Twombly, 550 U.S. at 556), when considered through the lens of "judicial experience and common sense ... [and] read[ing] [the complaint] as a whole." In re: Evenflo Co., Inc., Mktg., Sales Pracs. & Prods. Liab. Litig., 54 F.4th 28, 39 (1st Cir. 2022).

Dismissal is appropriate if a plaintiff's well-pleaded facts do not "possess enough heft to show that plaintiff is entitled to relief." Ruiz Rivera v. Pfizer Pharms., LLC, 521 F.3d 76, 84 (1st Cir. 2008) (quotations and alterations omitted). "[L]egal labels and conclusions" are to be "isolate[d] and ignore[d]." Schatz v. Republican State Leadership Committee, 669 F.3d 50, 55 (1st Cir. 2012); Haag v. United States, 736 F.3d 66, 69 (1st Cir. 2013) ("Although we view all well-pleaded facts in the light most favorable to the non-moving party, 'the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions.'") (quoting Iqbal, 556 U.S. at 678). Lastly, "the court's inquiry must focus on the reasonableness of the inference of liability that the plaintiff is asking the court to draw." Lynch v. Enlighten Software

Inc., No. CV 22-11997-NMG, 2023 WL 3794144, at *2 (D. Mass. June 2, 2023) (citing Ocasio-Hernández v. Fortuno-Burset, 640 F.3d 1, 13 (1st Cir. 2011)).

In sum, to determine the sufficiency of a complaint, a court shall: (1) take note of the elements of a claim; (2) identify allegations that, because they are no more than conclusions, are not entitled to the assumption of truth; and (3) when there are well-pleaded factual allegations, assume their veracity and then determine whether they plausibly give rise to an entitlement for relief.  Iqbal, 556 U.S. at 664, 675, 679 (alterations, quotations, and other citations omitted).[21]

### 1. *RICO*

Plaintiffs assert against Greif, Caraustar, Newark, Seaman Paper, Otter Farm, and MassNatural a substantive RICO claim and a RICO conspiracy.  [Dkt. No. 77, pp. 127-32].  They allege that the RICO Defendants acted in concert "for the common and/or shared purposes of (1) illegally avoiding regulatory compliance costs while transporting, processing, storing, and/or disposing of short fiber paper sludge, (2) concealing compliance failures while transporting, processing, storing, and/or disposing of short fiber paper sludge, and (3) preventing investigations into compliance failures which may lead to fines or legal liability."  [Id., ¶543].  Plaintiffs allege that Defendants pursued these goals "through a pattern of racketeering activity[,]" and by "commit[ting] [] fraud knowingly and with the intent to advance the scheme."  [Id., ¶544].

RICO "prohibits certain conduct involving a 'pattern of racketeering activity.'"  Anza v. Ideal Steel Supply Corp., 547 U.S. 451, 453 (2006) (quoting 18 U.S.C. § 1962).  Racketeering activity is defined "to include a host of so-called predicate acts," including mail or wire fraud. Bridge v. Phoenix Bond & Indem. Co., 553 U.S. 639, 647 (2008); see 18 U.S.C. § 1961(1)

---

[21] Because I recommend that Greif's and Caraustar's motion to dismiss for lack of personal jurisdiction be granted, I consider their motion to dismiss for failure to state a claim only under RICO because it is dispositive of Plaintiffs' third basis of personal jurisdiction.

(defining "racketeering activity").  Section 1962(c), under which Plaintiffs assert the substantive

RICO claim, provides:

> It shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce,[22] to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt.

18 U.S.C.A. § 1962(c).  Thus, Plaintiffs must plausibly allege "(1) conduct (2) of an enterprise (3)

through a pattern (4) of racketeering activity."  Sedima, S.P.R.L. v. Imrex Co., 473 U.S. 479, 496

(1985) (footnote omitted); Feinstein v. Resolution Tr. Corp., 942 F.2d 34, 41 (1st Cir. 1991).  The

RICO statute's civil component, 18 U.S.C. § 1964, provides a cause of action to "[a]ny person

injured in his business or property by reason of a violation of [the criminal RICO provisions]."  18

U.S.C. § 1964(c).

     As discussed below, I find that Plaintiffs sufficiently allege substantive RICO and RICO

conspiracy claims against Seaman Paper, Otter Farm and MassNatural.  However, I find Plaintiffs'

allegations against Greif, Caraustar, and Newark do not cross the plausibility threshold.

     a.  Enterprise

     RICO applies to both legitimate and unlawful enterprises.  United States v. Turkette, 452

U.S. 576, 580-82, 591 (1981); see also 18 U.S.C. § 1961(4).  "Enterprise" is defined broadly.  See

Boyle v. United States, 556 U.S. 938, 944-45 (2009).  The existence of an enterprise may be proved

on a theory of a legal enterprise, which "encompasses organizations such as corporations and

partnerships, and other legal entities," Turkette, 452 U.S. at 581 (internal quotations omitted), or

a theory of an association-in-fact enterprise, which "covers any union or group of individuals

associated in fact although not a legal entity[.]"  Id. at 582 (internal quotations omitted).

---

[22] No defendant contests the interstate commerce element of RICO.  Nor would such a challenge seem prudent: for instance, Plaintiffs allege Seaman Paper and the Greif Defendants purchased PFAS for their manufacturing operations from 3M, an out-of-state corporation.

Here, Plaintiffs rely on an "association-in-fact" enterprise. [Dkt. No. 77, ¶542]. An association-in-fact enterprise requires a showing of "a purpose, relationships among those associated with the enterprise, and longevity sufficient to permit these associates to pursue the enterprise's purpose." Boyle, 556 U.S. at 946. "[I]t is not sufficient that several organized, ongoing groups come together for one concerted action, unless those groups can also be shown to constitute a larger unit, over and above their separate structures and operations." Libertad v. Welch, 53 F.3d 428, 442 (1st Cir. 1995); Lerner v. Colman, 485 F. Supp. 3d 319, 339–40 (D. Mass. 2020), aff'd, 26 F.4th 71 (1st Cir. 2022) (quoting Boyle, 556 U.S. at 946).

I find Plaintiffs' factual allegations sufficient to allege an enterprise among Seaman Paper, Otter Farm, and MassNatural. The key allegations are that "MassNatural allowed Seaman Paper's unchecked dumping of toxic paper fiber sludge … starting in the 1980's[,]" and that MassNatural's "willingness to accept this material without testing it, and to lie about MassNatural's own compliance procedures to [S]tate authorities, allowed Seaman Paper to avoid paying for expensive hazardous waste transporters and for proper disposal." [Dkt. No. 77, ¶¶148-49]. Otter Farm is integral to this purpose. The three businesses comprising the association-in-fact are bound by a relationship which can be traced to the events of 2002. In that year, Seaman Paper purchased the Property at a foreclosure sale. Within days, it incorporated Otter Farm. After incorporating Otter Farm, Seaman Paper conveyed to it title to the Property. Then, Otter Farm entered into a renewable lease of nearly 100 years with MassNatural at allegedly below-market rent. [Id. at ¶153(e)]. This arrangement thus assured Seaman Paper a site at which to dump contaminated byproducts from its paper mill at an alleged discount. It also served to frustrate regulatory oversight: between Seaman Paper and MassNatural was Otter Farm, a separate corporation which nominally held title to the Property Seaman Paper purchased, and which served as MassNatural's landlord. There is no

apparent reason that Seaman Paper could not have held title to the Property.  And having given

MassNatural a long-term lease at a favorable rate, Otter Farm possessed the leverage to ensure

MassNatural's cooperation in receiving and handling Seaman's contaminated byproducts and

concealing violations of environmental regulations.  Accepting Plaintiffs' factual pleadings as true,

Seaman Paper's close and long-standing relationship with Otter Farm and MassNatural raises at

least a plausible inference of the alleged shared purpose of managing Seaman Paper's disposal

costs and avoiding regulatory oversight.  Lastly, because it is alleged that this arrangement was

created in 2002 and continued a practice from the 1980s, the alleged enterprise satisfies the

longevity requirement.  I find Plaintiffs' allegations that Seaman Paper and Otter Farm were aware

of MassNatural's regulatory violations plausibly inferable on the basis of the longevity and multi-

layered business relationship among those three Defendants.

However, I find that Plaintiffs have failed to allege the membership and participation of

Greif, Caraustar, and Newark in the RICO enterprise.  Accordingly, I recommend that the

substantive RICO and RICO conspiracy be dismissed as to them.[23]  Plaintiffs allege that

"MassNatural and Seaman Paper [] welcomed Greif into the enterprise [in 2002] by offering Greif

Defendants[] the same inexpensive, unchecked dumping privileges that had been afforded to

Seaman Paper for decades."  [Dkt. No. 77, ¶154].  This arrangement allegedly enabled the Greif

Defendants to avoid overhauling their manufacturing processes and hiring licensed hazmat

disposal companies to transport waste.  [Id. ¶ 156(a)].  As discussed with respect to personal

---

[23] While I recommend then that the RICO claims against Greif, Caraustar, and Newark be dismissed, this
Court has not found, nor have the Parties indicated, any binding authority that would preclude a Section
1962(c) or (d) claim from surviving a motion to dismiss with respect to some, but not all, members of an
alleged RICO enterprise.  See Jakuttis v. Town of Dracut, Mass., --- F.Supp.3d ---, 13, 26 (D. Mass. 2023)
(separately assessing two motions to dismiss Section 1962(d) claims filed by two separate "groups" of
defendants allegedly involved in a single RICO enterprise); Brennan v. Ferreira, 251 F.Supp.3d 338, 344
(D. Mass. 2017) (allowing a Section 1962(c) claim to proceed despite dismissing an accountant alleged to
be a member of the RICO enterprise).

jurisdiction, Plaintiffs have failed to support their conclusory allegation that Greif and Caraustar operated the Mill at all, and their ownership of Newark does not support a plausible claim that Greif or Caraustar participated in the longstanding scheme which Plaintiffs claim existed for years before either acquired Newark.

Plaintiffs have also failed to sufficiently plead Newark's membership in the enterprise.  I accept as true the allegation that Newark dumped contaminated byproduct at the Property.  This allegation is supported by findings from MassDEP that "Greif paper" was recovered from the Property in 2022 and was found to contain PFAS in excess of environmental hazard standards. [Dkt. No. 107, p. 4 n.5 (Greif NOR)].  However, Plaintiffs do not allege a connection between Newark and Seaman Paper and Otter Farm, other than conclusorily stating that "Defendants here knew of each other's participation, which had the same geographical locus at the Otter Farm Property and coordinated their efforts in a scheme to avoid and reduce costs and hide compliance failures." [Dkt. No. 108, p. 15 n.17 (citing Dkt. No. 77, ¶¶149-55)].  Newark may well have known or had a basis to know that MassNatural could not be honestly reporting its handling of contaminated byproducts.  However, such knowledge does not make Newark complicit in the alleged scheme to protect Seaman Paper from high disposal and overhauling costs.  Plaintiffs offer no elaboration on what is meant by the allegation that Newark and the other Defendants "coordinated their efforts."  Conclusory allegations, "unembellished by any supporting facts … provide[] no basis for a rational inference" that Newark was coordinating with Seaman Paper, Otter Farm, and MassNatural to unlawful ends.  A.G. ex rel. Maddox v. v. Elsevier, Inc., 732 F.3d 77, 81 (1st Cir. 2013).  In enterprise analysis terms, there is no "relationship" between Newark and Seaman and Otter Farm.

Further, as Greif Defendants argue, "RICO does not penalize parallel, uncoordinated fraud." Metro. Prop. & Cas. Ins. Co. v. Savin Hill Fam. Chiropractic, Inc., 266 F. Supp. 3d 502, 523 (D. Mass. 2017) (quoting United Food & Com. Workers Unions & Emps. Midwest Health Benefits Fund v. Walgreen Co., 719 F.3d 849, 855 (7th Cir. 2013)).   Allegations that "show different subsets of [a] group pursuing their own ends separately" rather than functioning "together as a coherent unit" fail to establish an association-in-fact enterprise.   Id. (quoting Nelson v. Nelson, 833 F.3d 965, 968 (8th Cir. 2016)); see also Ezell v. Lexington Ins. Co., 335 F. Supp. 3d 91, 97 (D. Mass. 2018), aff'd, 926 F.3d 48 (1st Cir. 2019) ("Where the complaint makes no allegation that the alleged RICO participants associated together with a common fraudulent purpose but only alleges that each was aware that there were likely others engaging in parallel practices, the complaint fails to establish an association-in-fact enterprise.") (citing In re Pharm. Indus. Average Wholesale Price Litig., 263 F.Supp.2d 172, 184 (D. Mass. 2003)).   Greif Defendants liken Plaintiffs' allegations to a "hub-and-spoke model," by which a single Defendant—in this case, MassNatural—operates at the center, and manages several independent relationships.   See In re Neurontin Mktg., Sales Pracs. & Prod., 433 F. Supp. 2d 172, 182 (D. Mass. 2006) (finding a "hub-and-spoke" model rather than a RICO enterprise where there were no allegations that the defendants "worked together … as a cohesive unit[;]" in other words, "there [was] no 'rim' to connect the spokes of the wheel"); see also Lupron, 295 F.Supp.2d at 174 n.29 (finding that a "hub-and-spoke" model without a "general agreement" did not amount to a RICO enterprise); In re Pharm. Indus. Average Wholesale Price Litig., 263 F. Supp. 2d 172, 183-84 (D. Mass. 2003) (rejecting RICO claim that did "not allege a network among all the members of these alleged enterprises" because "there was no rim to connect the spokes").   I agree that the allegations support such a model and undermine the reach of Plaintiffs' enterprise to include the Greif Defendants.

I thus find that while Plaintiffs have failed to plead that Greif, Caraustar, and Newark were members of a RICO association-in-fact enterprise as alleged, Plaintiffs have pleaded with sufficient plausibility the existence of such an enterprise with regard to Seaman Paper, Otter Farm, and MassNatural.

b.  Conduct

Assuming arguendo that Plaintiffs had sufficiently pleaded Newark's membership in the RICO enterprise, Plaintiffs' RICO claim would nevertheless fail because the allegations do not show that the Greif Defendants were integral to the enterprise, thereby failing to allege "conduct." However, the allegations are sufficient as to Seaman Paper, Otter Farm, and MassNatural.

A plaintiff must allege facts sufficient to show "how each of the defendants was integral to carrying out the activities of the alleged enterprise." Metro. Prop., 266 F. Supp. 3d at 525. The Supreme Court has defined the "conduct" element of a RICO claim as participation "in the operation or management of the enterprise itself." Reves v. Ernst & Young, 507 U.S. 170, 185 (1993) (quoting 18 U.S.C. § 1962(c)); United States v. Marino, 277 F.3d 11, 34 (1st Cir. 2002). While Reves states that RICO liability is not "limited to those with primary responsibility for the enterprise's affairs" or "those with a formal position in the enterprise," 507 U.S. at 179, "[i]t suffices for this element that a defendant be 'plainly integral to carrying out the enterprise's activities.'" Metro. Prop., 266 F. Supp. 3d at 525 (quoting United States v. Ramirez–Rivera, 800 F.3d 1, 20 (1st Cir. 2015) and United States v. Shifman, 124 F.3d 31, 36 (1st Cir. 1997)).

Here, Plaintiffs rely on their association-in-fact enterprise allegations, namely:

- "Seaman and the Greif Defendants, knowing or with reason to know that MassNatural circumvented proper testing procedures for incoming materials, paid MassNatural to pick up, transport, dispose of, store, treat, and process PFAS-containing material[,]" in turn "sav[ing] Seaman and the Greif Defendants substantial amounts of money" on "specially-licensed hazardous waste transportation companies."  [Dkt. No. 108, p. 17 (citing Dkt. No. 77, ¶156)].

39

- MassNatural "illegally and in direct violation of its 2020 RCC permit, transported, disposed of, stored, treated, and processed the hazardous, PFAS-containing materials acquired from Seaman and the Greif Defendants[,]" and "turned the toxic waste into consumer products and sold the same to unknowing consumers[.]"  [Id. (citing Dkt. No. 77, ¶156)].

- This unlawful "enterprise" was enabled "through annual certifications to MassDEP under penalty of perjury that MassNatural's operations at the Otter Farm Property were compliant, including with the 2020 RCC Permit … all while each Defendant knew of the falsity of such statements[]" by MassNatural.  [Id. (citing Dkt. No. 77, ¶¶156, 163)].

The SAC sufficiently alleges the integral role of Seaman Paper, Otter Farm and MassNatural.  Seaman Paper bought the land on which the Property is situated.  It incorporated "Otter Farm, Inc." and conveyed title to the Property Seaman Paper bought to Otter Farm.  Then Otter Farm entered into the long-term, allegedly below-market lease with MassNatural.  In my view, all were integral: Seaman Paper as financier and orchestrator, Otter Farm as a corporate entity to create distance between Seaman Paper and MassNatural, and MassNatural as the recipient of contaminated materials which it did not test, but rather sold to unwitting consumers while falsely certifying its actions were environmentally compliant.

However, the SAC allegations fail to allege the "conduct" element of their Section 1962(c) claim with respect to Greif, Caraustar, and Newark.  Plaintiffs fail to show how any of the Greif Defendants' choice of disposing byproduct at MassNatural's facility formed an "integral" component of the association-in-fact enterprise.  Plaintiffs state that "MassNatural and Seaman Paper [] welcomed Greif into the enterprise [in 2002] by offering Greif Defendants[] the same inexpensive, unchecked dumping privileges that had been afforded to Seaman Paper for decades." [Id., p. 14 (citing Dkt. No. 77, ¶154)].  Thus, the SAC intimates that the enterprise was established and operational when the Greif Defendants were allegedly "welcomed" into the scheme.  In other words, the alleged participation of a Greif Defendant was not necessary to initiate, sustain, or

advance the enterprise.  Thus, I find Plaintiffs fail to allege the participation of Greif Defendants in the enterprise.

### c.  Pattern of Racketeering Activity

I find Plaintiffs have alleged that Seaman Paper, Otter Farm, and MassNatural have participated in a pattern of racketeering activity.

This Court has defined "pattern of racketeering activity" to mean "the commission of at least two related acts of racketeering activity during a span of ten years." Lupron, 295 F.Supp.2d at 164 (citing Schultz v. Rhode Island Hospital Trust National Bank, N.A., 94 F.3d 721, 731–732 (1st Cir.1996)); see also 18 U.S.C. § 1961(5).  To demonstrate relatedness, the predicate acts must have the same or similar purposes, participants, victims, or methods, or otherwise be interrelated by distinguishing characteristics and not be isolated events.  Feinstein v. Resolution Trust Corp., 942 F.2d 34, 44 (1st Cir. 1991).  The plaintiff must demonstrate that the predicate acts amount to or pose a threat of continued criminal activity.  Efron v. Embassy Suites (Puerto Rico), Inc., 223 F.3d 12, 15 (1st Cir. 2000).  There must also be evidence of "continuity" sufficient to show that the predicate acts constituted a "pattern," that is, a "closed period of repeated conduct" or "a regular way of conducting the enterprise." Aetna Casualty Surety Co. v. P & B Autobody, 43 F.3d 1546, 1561 (1st Cir. 1994).

Plaintiffs allege wire fraud or, in the alternative, mail fraud based on two filings, one in 2020 and one in 2021, certifying to MassDEP MassNatural's compliance with Massachusetts environmental regulations.  [Dkt. No. 77, ¶¶174-75].  The mail fraud statute prohibits the use of the mails in connection with a "scheme or artifice to defraud."  18 U.S.C. § 1341.  The wire fraud statute differs only in that the government must prove the use of interstate or foreign wires to further the alleged scheme. 18 U.S.C. § 1343; see United States v. Simon, 12 F.4th 1, 33 (1st Cir.

2021).  Where plaintiffs allege fraud, they must meet the heightened pleading standards of Fed. R. Civ. P. 9(b).  See N. Am. Catholic Educ. Programming Found., Inc. v. Cardinale, 567 F.3d 8, 15 (1st Cir. 2009) (holding that the particularity requirement applies not only to actual fraud claims but also to "associated claims where the core allegations effectively charge fraud").  Rule 9(b) provides that "a party must state with particularity the circumstances constituting fraud or mistake."  "The First Circuit has interpreted this to require that beyond pleading 'the false statements and by whom they were made,' plaintiffs must also identify 'the basis for inferring scienter.'"  Bos. Carriage, Inc. v. Bos. Suburban Coach, Inc., No. 1:21-CV-10688-IT, 2022 WL 4626918, at *14 (D. Mass. Sept. 30, 2022) (quoting Cardinale, 567 F.3d at 13).  This standard renders a "general averment of the defendant's 'knowledge' of material falsity" insufficient.  Cardinale, 567 F.3d at 13 (internal quotation omitted).  Instead, Plaintiffs must put forth "specific facts that make it reasonable to believe that defendant knew that a statement was materially false or misleading."  Id.

According to Plaintiffs, "Defendants collectively caused MassNatural to sign and transmit" two false annual RCC Permit compliance certifications to MassDEP on February 4, 2021 and January 11, 2022, respectively.  [Dkt. No. 77, ¶¶157-58; 163-77; 544-49].  They allege that the February 4, 2021 RCC Certification form for the 2020 calendar year represented that MassNatural "is operating in compliance with all conditions of the RCC [] permit issued to the operation by MassDEP[.]"  [Dkt. No. 77, ¶¶13, 174].  Plaintiffs allege that a January 11, 2022[24] RCC Certification form for the 2021 calendar year made the same representation.  [Id., ¶175].

---

[24] According to the Greif NOR, "[l]aboratory analysis of a [private well water] sample collected by a homeowner … on January 31, 2022" confirmed hazardous PFAS levels.

I find these allegations satisfy Rule 9(b)'s pleading standard.  They allege the subject of the purportedly fraudulent mailings, their dates, the sender, and the recipient.  They also allege a basis to infer Defendants' knowledge that the statements were materially false: that MassNatural was not testing contaminated waste, but rather was composting and selling it; that Seaman Paper and Newark, as beneficiaries of these representations, knew or had reason to know of them and, as alleged, caused MassNatural to file them; that Otter Farm, as landlord of the Property and an agent of Seaman Paper, knew or had reason to know.  Indeed, as to Otter Farm, the SAC suggests that the reason for Otter Farm's very corporate existence was to insulate Seaman Paper from regulatory scrutiny and save Seaman Paper the costs of overhauling its manufacturing processes or paying higher  disposal costs.

In conclusion, because the SAC alleges Newark saved disposal and plant overhauling costs by dumping at the Property, it is reasonably inferable it knew or had reason to know that MassNatural was submitting by mail or wire false statements to cover non-compliance.  However, because I find that Newark did not participate in (or even know of) the RICO enterprise, its alleged knowledge and/or participation in the communications which support the pattern of racketeering does not change the RICO analysis as to Newark or Greif and Caraustar.

### d.  Causation

Lastly, "RICO requires 'some direct relation between the injury asserted and the injurious conduct alleged.'"  Lupron, 295 F. Supp. 2d at 174–75 (quoting Holmes v. Sec. Inv'r Prot. Corp., 503 U.S. 258, 268 (1992)).  "The Supreme Court has held that a plaintiff may sue under [Section 1962(c)] 'only if the alleged RICO violation was the proximate cause of the plaintiff's injury.'" Duggan v. Martorello, 596 F. Supp. 3d 158, 190–91 (D. Mass. 2022) (quoting Anza v. Ideal Steel Supply Corp., 547 U.S. 451, 453 (2006)).  "The proximate cause requirement has taken 'many

shapes' at common law, including foreseeability, directness, and certainty of damages."  In re Volkswagen "Clean Diesel" Mktg., Sales Pracs., & Prod. Liab. Litig., 467 F. Supp. 3d 849, 856 (N.D. CA 2020) (quoting Holmes, 503 U.S. at 268 (1992)).  However, "[f]or civil RICO claims, directness is most important."  Id. (citing Anza, 547 U.S. at 461); see also Anza, 547 U.S. at 461 ("When a court evaluates a RICO claim for proximate causation, the central question it must ask is whether the alleged violation led directly to the plaintiff's injuries."); Hemi Grp., LLC v. City of N.Y., 559 U.S. 1, 12 (2010) (plurality) ("Our precedents make clear that in the RICO context, the focus is on the directness of the relationship between the conduct and the harm.").  "Indirect" injuries separated from predicate acts by multiple steps in a "causal chain[,]" do not meet the pleading threshold for proximate cause.  Volkswagen "Clean Diesel" Mktg., 467 F. Supp. 3d at 856-57 (describing how the predicate act of "dup[ing] regulators into certifying—and consumers into buying—[] diesel cars" was the first step in a four-step causal chain involving discovery of regulatory violations, the decreased marketability of those cars, the manufacturer's decreased profits, and, finally, the plaintiffs' injury, namely car "salespersons ma[king] less money").

Plaintiffs argue "the concealment from MassDEP of the PFAS-related regulatory violations was part and parcel of Defendants' dumping and redistribution scheme[,]" absent which "Plaintiffs' properties would not be contaminated[.]" [Id., pp. 20-21].  The Greif Defendants argue that Plaintiffs' alleged injuries result from PFAS contamination itself, not the predicate acts of alleged mail or wire fraud.  [Dkt. No. 99, p. 27].  The Greif Defendants characterize Plaintiffs' allegations as supporting "but for" causation at best, rather than clearing the applicable proximate cause threshold.  [Id., p. 28].  Seaman Paper and Otter Farm similarly argue that the alleged wire or mail fraud is too remote from Plaintiffs' injuries, which "were not the foreseeable and natural consequences of [] Seaman Paper and Otter Farm's alleged wrongful acts."  [Dkt. No. 92, p. 26].

I find that Plaintiffs have nudged the causation component of their RICO claim across the plausibility threshold.  Plaintiffs here do not complain of a harm "flowing merely from the misfortunates visited upon a third person by the defendant's acts." Holmes, 503 U.S. at 268–69. Rather, the harm Plaintiffs allege is to their own land, water supply and health.  Indeed, there were no other "intended" or foreseeable victims of the alleged RICO enterprise.  Cf. id. at 271 (finding that "the link [to sustain a § 1964(c) claim was] too remote between the stock manipulation alleged and the customers' harm, being purely contingent on the harm suffered by the broker-dealers"). Neither is it the case that the cause of Plaintiffs' drinking water contamination is "entirely distinct from the alleged RICO violation[,]" Safe Streets Alliance v. Hickenlooper, 859 F.3d 865, 890 (10th Cir. 2017) (quoting Anza, 547 U.S. at 458), namely committing mail or wire fraud for the purpose of "(1) avoiding burdensome environmental regulatory compliance costs, (2) concealing compliance failures, and (3) preventing investigations by MassDEP and other regulators that would lead to substantial fines and legal liability from such wrongful conduct."  [Dkt. No. 108, p. 14].  Rather, had MassNatural truthfully reported its handling and disposal of contaminated waste and its use in retail products, it is plausible MassDEP would have intervened and prevented groundwater contamination; after all, Plaintiffs allege that MassDEP was responsive when elevated PFAS levels were reported in drinking water wells in early 2022: it tested other wells and ultimately suspended the composting operation at the Property.

I therefore find that Plaintiffs have sufficiently pleaded that the RICO violations alleged proximately caused their injuries.

      e.  Section 1962(d)

Plaintiffs next allege that Defendants are liable under Section 1962(d) of RICO, which provides that "it shall be unlawful for any person to conspire to violate any of the provisions of

subsection (a), (b), or (c) of this section."  [Dkt. No. 77, ¶¶551-59].  "To survive a motion to

dismiss, a RICO conspiracy claim must allege (1) that an enterprise affecting interstate commerce

existed, (2) that the defendant knowingly joined the conspiracy, and (3) that the defendant intended

to further an endeavor which, if completed, would have satisfied the pattern requirement of RICO."

Laverty v. Massad, No. 08-cv-40126-FDS, 2009 WL 1873646, at *6 (D. Mass. Mar. 10, 2009)

(citing P & B Autobody, 43 F.3d at 1561 and United States v. Cianci, 378 F.3d 71, 88 (1st Cir.

2004)).  In other words, to state a claim for RICO conspiracy, the plaintiff "must allege 'the same

elements of a RICO claim, plus allegations that each RICO co-conspirator knowingly joined the

conspiracy and involved himself or herself, directly or indirectly, in the commission of at least two

predicate offenses.'" Fiorillo v. Winiker, 85 F. Supp. 3d 565, 572 (D. Mass. 2015) (quoting Dickey

v. Kennedy, 583 F. Supp.2d 183, 188 (D. Mass. 2008)).  Thus, liability under Section 1962(d)

requires that a defendant agree to violate either Sections 1962(a), (b), or (c).  See Metro. Prop.,

266 F. Supp. 3d at 519 ("a plaintiff must meet 'the additional required element' of proving 'that

the defendant knowingly joined a conspiracy to violate § 1962(c).'") (internal quotations omitted).

"[I]t is not necessary for the conspiratorial agreement to be express, so long as its existence can

plausibly be inferred from words, actions, and the interdependence of activities and persons

involved." P & B Autobody, 43 F.3d at 1562.

I recommend dismissing Plaintiffs' Section 1962(d) claim as against Greif, Caraustar, and

Newark because, as discussed above, the allegations are insufficient to plausibly show their

participation in the RICO enterprise.  See Efron v. Embassy Suites (P.R.), Inc., 223 F.3d 12, 21

(1st Cir. 2000) (if Plaintiffs fail to state "a substantive RICO claim upon which relief may be

granted, then the conspiracy claim also fails.").

I recommend denying the motion of Seaman Paper, Otter Farm, and MassNatural to dismiss the RICO conspiracy claim. The allegations of the chronology and coordination of these parties are sufficient to permit an inference of an agreement to violate RICO. By the year 2002, Seaman had been manufacturing paper products in central Massachusetts since 1947. [Dkt. No. 77, ¶¶48-49]. There was an increased awareness of the dangers of PFAS. See, e.g., [id., ¶¶36, 39]. Seaman Paper used such compounds in its manufacturing process. [Id., ¶51]. It thus needed a cost-efficient means to dispose of such chemicals. In 2002, it purchased the Property; then it created Otter Farm; then it conveyed title to the Property it had purchased to Otter Farm; Otter Farm entered into a long-term renewable lease with MassNatural, which agreed to forego testing PFAS-contaminated byproduct received from Seaman Paper, and lying about the same. Proving all this at trial may be a challenge for Plaintiffs, but at this stage, the allegations are sufficient to allow the claim to proceed.

For these reasons, I recommend Counts XXXIV, for violations of Section 1962(c) of the RICO statute, and XXXV, for violations of Section 1962(d) of the RICO statute, be dismissed as against Greif, Caraustar, and Newark. However, I recommend that Seaman Paper, Otter Farm, and MassNatural's motions to dismiss those same claims, alleged in Counts XXXIV and XXXV, be denied.

### 2.  *Negligence*

Plaintiffs claim negligence against all Defendants. All Defendants, with the exception of MassNatural, [Dkt. No. 94], challenge Plaintiffs' negligence claims.

To sustain a negligence claim, "a plaintiff must prove that (1) the defendant owed the plaintiff a duty of reasonable care; (2) the defendant breached this duty; (3) damage to the plaintiff resulted; and (4) the breach of the duty caused this damage." Brown v. U.S., 557 F.3d 1, 3 (1st

Cir. 2009).  "The cause of the injury must be reasonably foreseeable."  Gaines v. General Motors Corp., 789 F.Supp 38, 41-42 (D. Mass 1991) (quoting Glick v. Prince Italian Foods, Inc., 25 Mass. App. Ct. 910, 902 (1987)); see also Staelens v. Dobert, 318 F.3d 77, 79 (1st Cir. 2003) ("Under Massachusetts law, in addition to being the cause in fact of the injury, the plaintiff must show that the negligent conduct was a proximate or legal cause of the injury as well.") (quoting Ken v. Commonwealth, 437 Mass. 312, 320 (2002)) (internal alterations omitted).  Generally, subsequent and intervening negligence by a third-party will not relieve the initial tortfeasor of liability as long as the negligence was foreseeable.  Staelens, 318 F.3d at 79 (citing Poskus v. Lombardo's of Randolph, Inc., 423 Mass. 637, 639-41 (1996); Jesionek v. Massachusetts Port Authority, 376 Mass. 101, 105-06 (1978)).  All moving Defendants challenge the sufficiency of Plaintiffs' duty of care and causation allegations.

The law regarding duty of care and causation is as follows: "The existence of a duty of care is generally a question of law for the court to decide.  Brettel v. Omron Sci. Techs., Inc., 302 F. Supp. 3d 460, 467 (D. Mass. 2018) (citing Jupin v. Kask, 447 Mass. 141, 146 (2006)).  "The concept of 'duty' is not sacrosanct in itself but is only an expression of the sum total of considerations of policy which lead the law to say that the plaintiff is entitled to protection. No better general statement can be made than that the courts will find a duty where, in general, reasonable persons would recognize it and agree that it exists."  Jupin, 447 Mass. at 146 (internal punctuation and citation omitted).  "As a general principle of tort law, every actor has a duty to exercise reasonable care to avoid physical harm to others."  Remy v. MacDonald, 440 Mass. 675, 677 (2004) (citing Restatement (Second) Torts § 302 comment a (1965)).  However, a "precondition to this duty is, of course, that the risk of harm to another be recognizable or foreseeable to the actor."  Jupin, 447 Mass. at 147 (internal citations omitted); see also Husband

v. Dubose, 26 Mass.App.Ct. 667, 669 (1988) (determining that whether a person has a duty to protect another from harm caused by a third party "involve[s], to some extent, the foreseeability of the harm").  Thus, "with some important exceptions, a defendant 'owes a duty of care to all persons who are foreseeably endangered by his conduct, with respect to all risks which make the conduct unreasonably dangerous.'"  Jupin, 447 Mass. at 147 (quoting Tarasoff v. Regents of the Univ. of Cal., 17 Cal. 3d 425, 434–435 (1976)).

Regarding causation, the Parties have not consistently or explicitly distinguished "factual" and "proximate" causation in their analyses.  The Supreme Judicial Court ("SJC") recently addressed core distinctions between the two concepts in Doull v. Foster, 487 Mass. 1 (2021).  Factual cause is a "but for" test, which carries a low threshold; "there are always multiple causes of any harm and 'most will not be of significance for tort law.'"  In re TelexFree Sec. Litig., No. CV 4:14-02566-TSH, 2023 WL 4236033, at *3–4 (D. Mass. June 27, 2023) (quoting Doull, 487 Mass. at 11-12).  The "but for" test can be relaxed and the "substantial factor" test apply in the context of toxic tort litigation.  Doull, 487 Mass. at 10.  The substantial factor test obviates the need for plaintiffs to establish "but for" causation, namely "which particular [toxic] exposures were necessary to bring about the harm" as "[i]n these cases, it can be difficult, if not impossible, for the plaintiff to identify" such exposures.  Id.  Nevertheless, Plaintiffs additionally bear the burden of showing proximate cause.  "[P]roximate cause is 'based on considerations of policy and pragmatic judgment.'"  Id. at 8 (citing Kent v. Commonwealth, 437 Mass. 312, 320-21 (2002)).  These implicate the "reasonable foreseeability of the harm."  Jupin, 447 Mass. at 147 (citation omitted).  "[T]he substantial factor test is not a replacement for the standard foreseeability analysis."  TelexFree, 2023 WL 4236033, at *4.  Thus, Plaintiffs must show that each Defendants' actions were a "substantial factor" causing the alleged harm, and that the harm was a "reasonably

foreseeable result" of Defendants' actions.  I apply this law to the separate motions to dismiss Plaintiffs' negligence claims and, for the reasons stated below, recommend the motions be denied.

a.   Seaman Paper & Otter Farm

Seaman Paper and Otter Farm argue that Plaintiffs allege only a "general" or "universal" duty, which is insufficient to sustain a negligence claim, and that MassNatural, as the "last stop" for the disposed PFAS-contaminated material, intervened or superseded any duty of care owed by Seaman Paper and Otter Farm.  [Dkt. No. 92, p. 13].  They further emphasize that "Seaman Paper and Otter Farm had no ability to control the actions of MassNatural[,]" which—contrary to Plaintiffs' allegations—Defendants claim "was in complete and exclusive control of its operations."  [Id.].  I reject these arguments and find the allegations of duty to be sufficient to support negligence against Seaman Paper and Otter Farm.

Plaintiffs allege on information and belief that Seaman Paper used PFAS in its operations and generated PFAS-contaminated waste byproducts.  [Dkt. No. 77, ¶114].[25]  They allege Seaman Paper "knew or should have known PFAS6 to be hazardous and harmful to real property and human beings, and it was substantially certain that its use, emission, discharge, and/or distribution of materials containing PFAS6 at Otter Farm would cause injuries and losses to the persons and property of Plaintiffs and the Class Members."  [Id., ¶335].  Plaintiffs highlight that "MassDEP's investigation found that Seaman Paper[] [and] Otter Farm … 'arranged for the transport, disposal, storage or treatment of hazardous material' to or at MassNatural's … operations" where it was mishandled and allowed to leach into groundwater; Plaintiffs further posit that the same byproducts were incorporated into compost and other retail products which, when used by consumers,

---

[25] Plaintiffs acknowledge that MassDEP's analysis of Seaman Paper byproduct dumped at the Property was inconclusive.

separately leached into groundwater, in each case causing contamination.  [Id., ¶¶115, 120, 182, 300, 342-358].

These allegations are sufficient to show the requisite duty of care.  They establish that Seaman Paper and Otter Farm knew PFAS compounds were dangerous and harmful to human and animal health.  Such knowledge is fairly attributed to Seaman Paper, which has operated a paper mill in central Massachusetts since 1947, and to Otter Farm, which Seaman Paper established in 2002 to hold title to the Property and lease it.  Despite this knowledge, Seaman Paper and Otter Farm arranged for the disposal of PFAS at the Property.

I am persuaded by the reasoning in two cases Plaintiffs cite for the proposition that facilities that use and dispose of PFAS-contaminated materials, knowing of risks associated with PFAS ingestion and the risks of environmental contamination following improper disposal, owe foreseeable victims of such contamination a duty of care.  See Parris v. 3M Co., 595 F. Supp. 3d 1288, 1331 (N.D. Ga. 2022) (applying a "duty to exercise reasonable care in [] use and disposal of unreasonably dangerous chemicals such as PFAS to avoid pollution of state waterways and injury to downstream water users[]" to a textile mill that purchased and used PFAS in manufacturing); Zimmerman v. 3M Co., 542 F. Supp. 3d 673, 681 (W.D. Mich. 2021) (finding that a shoe manufacturer that purchased and used PFAS owed groundwater contamination plaintiffs a duty, despite the lack of a "relationship" between the parties, as "[p]laintiffs were foreseeable victims of PFAS contamination[,]" and "any company engaged in the performance of an undertaking has an obligation to use due care, or to so govern actions as not to unreasonably endanger the person or property of others.") (internal quotations and citations omitted).

I reject Seaman Paper and Otter Farm's argument that neither had the ability to control the actions of MassNatural "[which] was in complete and exclusive control of its operations."  [Dkt.

No. 92, p. 12].   First, Plaintiffs allege that Otter Farm is MassNatural's landlord and gave MassNatural a nearly 100-year lease through renewals at allegedly below-market rent.   Second, Seaman Paper created Otter Farm and unilaterally funded its assets by conveying title to the Property to Otter Farm.   From a practical perspective, it can be reasonably interred Otter Farm <u>is</u> Seaman Paper.   Its office is at Seaman Paper.   Lastly, Plaintiffs allege Seaman Paper and Otter Farm knew, or had reason to know, that MassNatural was skirting environmental regulations and lying about it in filings with MassDEP.   These allegations undermine Seaman Paper's and Otter Farm's denial of control over MassNatual's operations.

These same allegations are sufficient to support the causation element of negligence.   The manner of disposal and distribution of PFAS-contaminated waste from Seaman Paper satisfies the substantial factor causation showing for contaminating Plaintiffs' drinking water.   Seaman Paper dumped such waste at the Property which is within a short distance of Plaintiffs' drinking water wells; further, MassDEP attributes the unsafe PFAS levels in drinking water to contaminants escaping the Property or found in products MassNatural sold.   The allegations similarly satisfy the proximate cause requirement.   Plaintiffs allege Seaman Paper operated a paper mill in central Massachusetts since 1947; it knew (or had to have learned of) the dangers of PFAS compounds; it used them anyway.   And because Seaman Paper allegedly benefitted financially from the careless disposal of contaminants at the Property, it and Otter Farm should, if proved, be held accountable for the alleged harm such conduct caused.

Here, I find <u>Higgins et al. v. Huhtamaki, Inc., et al.</u>, No. 1:21-cv-00369-NT, 2022 WL 4182475 (D. Me. Jun. 23, 2022) instructive.   <u>Higgins</u> concerned the "alleged discharge, distribution, disposal, and spreading" of PFAS by paper mills "owned and operated by the Defendants[.]"   <u>Id.</u> at *1.   The court found plaintiffs had plausibly pleaded that six local paper

mills, which "discharg[ed] [PFAS] into wastewater treatment facilities, … as surface water, plac[ed] them in landfills, and s[old] or distribut[ed] them as fertilizers and soil enhancers[,]" caused the plaintiffs' alleged drinking water contamination and their injuries.  Id. at *2.  Though the court acknowledged that the plaintiffs' allegations were "relatively general" in that Plaintiffs did not "directly trace the Defendants' disposal of PFAS-contaminated waste to the contamination of their Properties[,]" the court found "no support for the idea that such fine-grained specificity is required with respect to causation" at the motion to dismiss stage.  Id. at *5.  Instead, the court was persuaded by the plaintiffs' allegations that (1) all the defendants disposed of PFAS-contaminated waste by discharging it various specified ways; (2) once PFAS-contaminated waste is disposed of, "chemicals are all but certain to migrate through the soil to groundwater and aquifers[;]" and (3) those "waste products ultimately reached and contaminated" the plaintiffs' properties and bodies. Id.

I thus recommend DENYING Seaman Paper and Otter Farm's motion to dismiss Plaintiffs' negligence claims under Counts IX and XVI.

> b.  Newark

Though Newark submitted with Greif and Caraustar a joint motion to dismiss, [Dkt. No. 99], I will address Newark as the alleged operator of the Fitchburg Mill, since I recommend allowing Greif and Caraustar's motion to dismiss for a lack of personal jurisdiction.

Newark argues that Plaintiffs have not met their burden of demonstrating (1) that Newark owed them a duty of care, and (2) that the injuries alleged were foreseeable to Newark.  [Dkt. No. 99, pp. 6-8].  First, Newark states that in the absence of a "special relationship" between Newark and MassNatural, Newark could not "reasonably foresee" the alleged harm.  [Id., pp. 7-8]. Contesting allegations advanced by Plaintiffs, Newark claims it "lacked any control whatsoever

over" waste material deposited at MassNatural and had no influence over MassNatural's processing or composting methods.  [Dkt. Nos. 99, p. 8; 99-1].  Second, Newark argues that as it did not manufacture PFAS and did not use PFAS in any manufacturing or other processes at the Fitchburg Mill, it could not have reasonably foreseen the harms alleged by the Plaintiffs.  [Id.]. Newark notes that during visits to the Fitchburg Mill, MassDEP never mentioned or ordered that it should test any materials or waste products for PFAS.  [Dkt. No. 99, p. 10].  These assertions challenge Plaintiffs' allegations that "[u]pon information and belief, manufacturers of paper, cardboard, and packaging, including Seaman Paper and the Greif Defendants … have knowingly used PFAS6 chemicals in their manufacturing processes for many decades[,] … [and] have produced PFAS6-treated paper products and created waste byproducts containing PFAS6."  [Dkt. No. 77, ¶¶110, 113].

I find that Newark's arguments with regard to duty of care fail for much the same reason Seaman Paper and Otter Farm's arguments do.  It is of little moment that Newark "had no input on [MassNatural's] business decisions, [or] where it sourced other residuals for composting[,]" [Dkt. No. 99, p. 8]; Newark's duty of care depends on its use of PFAS in its manufacturing process, its knowledge of PFAS's toxicity, and the careless method it allegedly adopted to dispose of those chemicals.  To the extent Newark disputes using PFAS, that is an issue of fact; Plaintiffs support their use allegation with MassDEP's July 20, 2022 NOR, which identifies "Greif Paper" originating from the Fitchburg Mill as containing hazardous levels of PFAS.

As to causation, Plaintiffs plausibly allege that Newark arranged for byproducts from its manufacturing process to be transported to and handled by MassNatural at the Property; this is uncontested.  Plaintiffs also allege that Newark's byproducts included PFAS-contaminated waste and, as noted, support their allegation with MassDEP's July 20, 2022 NOR, which identifies "Greif

Paper" originating from the Fitchburg Mill as containing hazardous levels of PFAS, and that the Property is near Plaintiffs' wells and drinking water.  Lastly, Plaintiffs supplement their causation allegation with MassDEP's UAOs, which found the "use, emission, discharge, and/or distribution" of PFAS-contaminated material at the Property precipitated the groundwater contamination. [Dkt. No. 77, ¶¶101, 102 (MassNatural UAO)].

I thus recommend DENYING Newark's motion to dismiss Plaintiffs' negligence claim under Count XXIII.

c. <u>3M</u>

3M also challenges whether Plaintiffs' allegations of causation are sufficient to support their negligence claim against 3M.  For the reasons stated below, I recommend the motion be denied and the claim against 3M be allowed to proceed to discovery.

3M's alleged negligence arises in a context different from that of Seaman Paper or Newark. 3M did not operate a paper mill in Massachusetts and did not dispose of manufacturing byproducts at the Property.  Plaintiffs sue 3M as the alleged source of PFAS compounds sold to and used by Seaman Paper and Newark; they allege "3M 'manufactured and sold PFAS to [the Paper Manufacturer Defendants] … and otherwise manufactured PFAS that contaminated the private property of putative class members."  [Dkt. No. 77, ¶16].  Plaintiffs allege that the "EPA has identified 3M as the dominant global producer of PFOA and related chemicals[,]" that "3M manufactures at least eighty-five [] percent of worldwide volumes of PFOA[,]" and that 3M is "the only US Manufacturer of PFOS."  [Dkt. No. 77, ¶¶62, 63].

3M argues these allegations fall short of plausibly showing 3M's connection to Plaintiffs' alleged injuries.  According to 3M, Plaintiffs' failure to "describe the products … that 3M allegedly sold to the Paper Manufacturer Defendants[,]" "when those products were sold[,]" or plead that

"3M had any knowledge of, let alone participated in, the Paper Manufacturer Defendants' allegedly fraudulent and illegal waste-disposal practices" is cumulatively fatal to Plaintiffs' requisite causation showing. [Dkt. No. 101, pp. 6-7]. 3M emphasizes that "courts [] have rejected the argument that a defendant's having a large market share is evidence that the defendant's product—as opposed to a competitor's—caused the plaintiff's injury, because that would 'lead[] to the demonstrably wrong conclusion that one hundred percent of individuals were injured' by the defendant's product.'" [Dkt. No. 101, p. 8 (citing In re Asacol Antitrust Litig., 907 F.3d 42, 54 (1st Cir. 2018)].

As noted above, factual and proximate causation are distinct and each must be proved. Doull, 487 Mass. at 8. I focus first on factual causation. In toxic torts, but-for causation has been relaxed; evidence that a defendant's negligence was a substantial factor in a plaintiff's harmful exposure to a toxin is sufficient. Id. at 10. Here, that pleading threshold is satisfied against 3M. Plaintiffs sufficiently allege that PFAS compounds contaminated their drinking water, an allegation supported by MassDEP testing showing elevated PFAS levels. Plaintiffs also sufficiently allege that the source of their drinking water contamination is byproduct from Seaman Paper's mill and the Fitchburg Mill, which were disposed of at the Property and incorporated into products MassNatural sold. The proximity of the drinking wells to the Property, the known water solubility of PFAS compounds, and MassDEP's findings support Plaintiffs' allegations. Finally, Plaintiffs allege 3M is the source of the PFAS used and found in byproduct from the two mills. This allegation is supported by the allegations of 3M's market share of PFAS compounds. I find there is enough alleged at this juncture to support factual causation—that 3M's conduct was a substantial factor in contaminating Plaintiff's drinking water.

Second then, I turn to proximate causation: do considerations of policy and pragmatic judgment warrant requiring 3M to participate in this litigation?  As noted, this is largely a question of foreseeable risk arising from negligent conduct.  Id. at 8; Jupin, 447 Mass. at 147.  Plaintiffs allege that 3M has known for decades the PFAS compounds are toxic and harmful to human and animal life.  Plaintiffs allege that for decades 3M has conducted internal testing and commissioned independent testing which has repeatedly revealed the dangers of PFAS exposure and ingestion. [Dkt. No. 77, ¶¶64-80].  It is even alleged that employees, dissatisfied with 3M's handling of PFAS research, resigned.  [Id., ¶81].  Plaintiffs allege that 3M announced that it would withdraw from producing PFAS compounds.  [Id., ¶82].  I find these allegations to be sufficient to show that 3M appreciated the risk of harm involved in producing PFAS compounds and that the risk of groundwater contamination was foreseeable.

There is case law which supports such a proximate cause analysis.  Zimmerman addressed whether 3M's activities as a manufacturer and distributor of a PFAS-containing product, Scotchgard, in turn used by a shoe manufacturer, could be held liable for groundwater contamination allegedly caused by the shoe manufacturers' improper disposal of PFAS-contaminated materials from its tannery in Rockford, Michigan.  542 F.Supp.3d at 678.  The plaintiffs alleged that the shoe manufacturer started using Scotchgard at its tannery in 1958 and disposed of "remaining PFAS solution" at "various landfills" and a "dumpsite" owned by the shoe manufacturer between 1964 and 1978.  Id.  Hazardous PFAS readings were first recorded in 2017. Id.  The plaintiffs lastly alleged that 3M has known of health risks associated with PFAS since the 1950s, and that the shoe manufacturer was aware of those same risks since at least 1998 but continued using Scotchgard and sourcing it from 3M "through the end of 3M's phase-out process in 2002."  Id. at 678–79.  The Court ultimately held that "[b]ecause Plaintiffs were foreseeable

victims of PFAS contamination, a relationship existed between Plaintiffs and 3M sufficient to impose a duty[,]" and denied 3M's motion to dismiss the plaintiffs' negligence claim. <u>Id.</u> at 281; <u>see also id.</u> ("'a duty exists between manufacturers and foreseeable plaintiffs' and [] '[s]uch duty is not predicated on direct manufacturer/plaintiff contact[;]'" "'the ultimate inquiry in determining whether a legal duty should be imposed is whether the social benefits of imposing a duty outweigh the social costs of imposing a duty[.]'") (internal citation omitted).

Parris reached a similar result. 3M and three other PFAS manufacturers were sued for groundwater contamination traced to a textile mill, which allegedly sourced PFAS from the four "Manufacturing Defendants." <u>Parris</u>, 595 F.Supp.3d at 1306. The textile mill, which had operated for 35 years, had allegedly "discharged [PFAS-contaminated byproduct] via wastewater" at a water pollution control plant operating under a "National Pollutant Discharge Elimination System" permit; however, the plant was "not capable of degrading the PFAS in [the] wastewater[.]" <u>Id.</u> at 1306-07. According to the plaintiff, since 1992, the plant had thus disposed of "nearly 8,000 tons of PFAS-contaminated sludge in [a] watershed, including on property" the plaintiff owned. <u>Id.</u> at 1307. The Court stated that "Georgia courts have found that product suppliers have a duty to protect third parties from reasonably foreseeable harm that occurs during the normal use of their products." <u>Id.</u> at 1328. It thus concluded that "a duty arose where the Manufacturing Defendants continuously supplied PFAS to [the textile mill] with knowledge that the chemicals were unlikely to be made reasonably safe in their regular use and could foreseeably contaminate surface waters and downstream water supplies." <u>Id.</u> at 1330. The court was persuaded by the plaintiff's allegations that "the Manufacturing Defendants (1) have known for decades that PFAS are toxic and persistent in humans and other animals [], (2) have long been aware that conventional wastewater treatment processes are ineffective, resulting in PFAS discharges to surface waters and

accumulation in sewage sludge [], and (3) notwithstanding these known risks of harm, have supplied PFAS to [the textile mill] without taking necessary precautions to prevent PFAS from contaminating surface waters[.]" Id.

3M relies on Barnstable Cnty. v. 3M Co., No. CV 17-40002, 2017 WL 6452245 (D. Mass. Dec. 18, 2017), but that case is distinguishable. Barnstable concerned the County's suit against several manufacturers (including 3M) of a PFOS-containing firefighting agent, "AFFF," after ground water samples collected near County property in 2013 revealed hazardous levels of PFOS. Id. at *2-3. The property had been used for decades for firefighting training with AFFF; in the 1970s, public water supply wells were installed proximate to and downgradient of the property, which "provided Town residents with drinking water … until 2005." Id. at *2. This Court dismissed the defendants' negligence claims after finding insufficient factual allegations that the AFFF which allegedly contaminated the groundwater was manufactured by any of the defendants. Specifically, the Court found that the County's "complaint alleges that AFFF was developed and then used on the Property from the 1960s through 2009 but without any specification as to which defendants' products were used on the premises throughout that fifty-year period[,]" and "omits any specifics regarding why the County believes each of the named defendants were the manufacturers of the AFFF that was actually used on the Property—as opposed to other AFFF manufacturer[s]—and instead conclusorily asserts that each defendant made AFFF and is thus liable for the County's damages." Id., at *11. That is different than the allegations here, where Plaintiffs identify 3M as the "dominant global producer of PFOA and related chemicals[,]" "the only US Manufacturer of PFOS[,]" and manufacturer of "at least eighty-five [] percent of worldwide volumes of PFOA," [Dkt. No. 77, ¶¶62, 63], and where MassDEP's testing of "Greif

Paper" specifically indicated "PFOA at a concentration of 1,250 ng/kg[]" and "PFOS … at a concentration of 1,890 ng/kg[.]"  [Dkt. No. 107, p. 4 n.5 (Greif NOR)].

I also reject 3M's argument that it should have no liability here, where it lacked control over the actions of MassNatural at the Property.  The Court in <u>Parris</u> rejected an identical argument that the Manufacturing Defendants were insulated from liability by virtue of not "having directed or controlled [the water treatment plant's] sludge disposal operations."  <u>Id.</u> at 1332.  The court instead emphasized that, according to the plaintiff's allegations, the Manufacturing Defendants "had actual knowledge that their PFAS w[as] contaminating" the groundwater in question "due to inadequate treatment and disposal methods."  <u>Id.</u>  Moreover, rejecting the Manufacturing Defendants' arguments that the water treatment plant was an "intervening actor" in the causal chain linking the production and supply of PFAS to the groundwater contamination, the <u>Parris</u> court found that the plaintiff's "allegations [] support that the Manufacturing Defendants should have anticipated the other Defendants' intervening acts and their harmful consequences. The Plaintiff claims that the Manufacturing Defendants sold PFAS to [the textile mill] for decades with knowledge that the chemicals are toxic and persistent and would not be properly treated at the [water treatment plant]. … Under these circumstances, the Court cannot say that it was necessarily unforeseeable for third parties to use and dispose of PFAS in a manner that would contaminate surface waters[.]"  <u>Id.</u> at 1333.  That logic is equally applicable here.  It is alleged 3M has known of the dangers of PFAS compounds, that they were water soluble, that they would migrate into the groundwater.  The negligence of MassNatural is separate from 3M's knowledge and liability in such circumstances.

Addressing 3M's "market share" liability argument, I find it is inapposite to the merits of Plaintiffs' negligence claim at this juncture.  As clarified by this Court, which has in fact supported

market share theories in certain products liability cases,[26] "a plaintiff must still prove that the defendants were negligent before the court may proceed to apportion damages on the basis of market share." McCormack v. Abbott Lab'ys, 617 F. Supp. 1521, 1525 (D. Mass. 1985).  In sum, at the motion to dismiss stage, I interpret Plaintiffs' allegations as to 3M's PFOA and PFOS market share as facts supportive of Plaintiffs' claims that Seaman Paper and Newark sourced those chemicals from 3M.  Reading this in the light most favorable to Plaintiffs, I find them plausible.

A final point: I find that the Parris court's duty and proximate cause analyses—both centered on foreseeability and knowledge—comport with the analysis applicable in Massachusetts, as articulated in Doull.  I am less persuaded by 3M's reliance on SUEZ Water New York Inc., 578 F. Supp. 3d 511, where the court found that PFAS manufacturers were not liable to the plaintiffs for groundwater contamination stemming from PFAS disposal more directly attributable to consumer product manufacturers, distributors, and consumers.  Specifically, the SUEZ court concluded that the plaintiffs had not met the plausibility threshold in pleading that PFAS manufacturers either caused the relevant groundwater contamination, or that they owed plaintiffs a legal duty.  Rather than accepting the plaintiff's argument that the PFAS manufacturers owed a duty to mitigate "foreseeable harm to both their customers and foreseeable third-parties[,]" id. at 553, the SUEZ court found it dispositive that under New York law, "[a] defendant generally has no duty to control the conduct of third persons so as to prevent them from harming others, even where, as a practical matter, defendant can exercise such control."  Id. at 552.  I find the

---

[26] "The [SJC], however, did not reject outright a market-share theory. In fact, the court stated that on an adequate record, it might recognize 'some relaxation of the traditional identification requirement in appropriate circumstances so as to allow recovery against a negligent defendant of that portion of a plaintiff's damages which is represented by that defendant's contribution of DES to the market in the relevant time period.'" McCormack v. Abbott Lab'ys, 617 F. Supp. 1521, 1525 (D. Mass. 1985) (quoting Payton v. Abbott Labs, 386 Mass. 540, 574 (1982)); Santiago v. Sherwin Williams Co., 3 F.3d 546, 550 (1st Cir. 1993) (accepting "for the sake of argument … that the SJC would, in some circumstances, … allow a plaintiff to recover under a market share theory[,]" such as in the lead poisoning context).

SUEZ court's emphasis on control over "third-person tortfeasor[s]" such as consumers, products manufacturers, etc. as a pre-requisite to liability contrary to the approach in Doull, where foreseeability and knowledge of downstream risks are plausibly pleaded.

Moreover, I find that Plaintiffs here have far more robustly pleaded causation with regard to 3M's PFAS manufacturing as it relates to the Westminster contamination. The SUEZ court distinguished that case from several in which New York courts have denied motions to dismiss as plaintiffs had alleged that manufacturers "operated facilities within the plaintiff's water district or [] sold contaminants to customers who operated proximately to the contaminated water[,]" particularly where such contaminants "migrate rapidly into groundwater[.]" 578 F.Supp.3d at 540 (internal citations omitted). The SUEZ court emphasized that, unlike those other cases:

> [P]laintiff's allegations are bereft of any facts regarding market share, the identity of customers, or the location where the customers resided, or that would tie Manufacturing Defendant's conduct to Plaintiff's alleged injury. They amount to the claim that at some point in history the Manufacturing Defendants sold some (unknown) quantity of PFOA or PFOS to some (unknown) number of customers in some (unknown) part of a vast state and that because that same chemical has been found in SUEZ's water systems (located in a small part of the state), the Manufacturing Defendants somehow caused SUEZ's injury.

Id. at 543–44. Here, by contrast, Plaintiffs have included information regarding 3M's majority market share, specific levels of PFOA found in byproduct, specific paper mills alleged to have purchased PFAS from 3M (Seaman Paper and Newark), and the geographic trajectory of contaminated materials from those paper mills to Plaintiffs' residential drinking water wells. In sum, I find Plaintiffs' allegations here as to causation and duty analogous to those asserted in Parris and Zimmerman, and sufficient to plausibly allege that 3M's production and supply of PFAS to Newark and Seaman Paper was the proximate cause and a substantial factor of Plaintiffs' injuries.

With respect to Plaintiffs' opposed negligence claims,[27] I recommend that Seaman Paper and Otter Farm's motions to dismiss Counts IX and XVI be DENIED; I recommend Newark's motion to dismiss Count XXII be DENIED; I take no action on Greif and Caraustar's motion to dismiss Count XXII; and I recommend 3M's motion to dismiss Count XXIX be DENIED.

### 3. *Products Liability Claims Against 3M*

Plaintiffs assert two products liability claims against 3M: (1) breach of warranty for failure to warn (Count XXX) and breach of warranty for defective design (Count XXXI). Plaintiffs' products liability claims allege that 3M:

(1)   Negligently manufactur[ed] and s[old] PFAS to the [Paper Manufacturing Defendants];
(2)   Fail[ed] to adequately warn, advise, and/or provide sufficient instructions of the dangers of its PFAS products, either to [Paper Manufacturing Defendants] purchasing their products or to Plaintiffs and other foreseeable users;
(3)   Neglect[ed] to monitor the improper way its purchasers, including [Paper Manufacturing Defendants], used its PFAS; and
(4)   Produc[ed] PFAS products defective in design and unreasonably dangerous.

[Dkt. No. 117, p. 2]. Plaintiffs next contend that 3M's activities, as alleged, foreseeably resulted in harm to Plaintiffs, including:

(1)   Loss of enjoyment of their property, as they can no longer drink, cook, bathe, or otherwise use their water;
(2)   Diminution of property value and an impaired ability to sell their PFAS-contaminated homes; and
(3)   Subcellular changes and increased risk of deadly diseases, as demonstrated by levels of PFAS found in Plaintiffs' blood results elevated well above background levels.

[Id., p. 3]. Reading Plaintiffs' operative complaint in the light most favorable to them, I interpret Plaintiffs' causes of action to be (1) a breach of the implied warranty of merchantability based on

---

[27] As mentioned, supra, as MassNatural has not opposed Plaintiffs' negligence claim (Count II), I recommend that count survive.

design defect; and (2) breach of implied warranty based on a failure to warn.[28]   For the reasons

below, I find Plaintiffs have failed to plausibly plead either claim, and recommend granting 3M's

motion to dismiss Counts XXX and XXXI.

a.   Design Defect

As an initial matter, "Massachusetts law on products liability derives from the law on

implied warranties, as codified in the Uniform Commercial Code, Mass. G[en.] L[aws] c[h]. 106,

§§ 2–314–2–318."   Mavilia v. Stoeger Indus., 574 F. Supp. 107, 109 (D. Mass. 1983). "There is

no separate doctrine of strict products liability" in Massachusetts.   Id.; accord Taupier v. Davol,

Inc., 490 F. Supp. 3d 430, 448 (D. Mass. 2020).   A merchant who sells goods implicitly warrants

that their goods "are fit for the ordinary purposes for which such goods are used." M.G.L. c.106 §

2-314(2)(c).   "A seller breaches its warranty obligation when a product that is defective and

unreasonably dangerous, for the ordinary purposes for which it is fit[,] causes injury."   Ducat v.

Ethicon, Inc., 534 F. Supp. 3d 152, 160 (D. Mass. 2021) (quoting Evans v. Lorillard Tobacco Co.,

465 Mass. 411, 422 (2013)) (cleaned up).   "Ordinary purposes" refers to a product's intended and

foreseeable uses.   Id.   "'Fitness' is a question of degree that primarily, although not exclusively,

concerns reasonable consumer expectations."   Haglund v. Philip Morris Inc., 446 Mass. 741, 746–

747 (2006).   "Both 'ordinary purposes' and 'fitness' are concepts that demand close attention to

the actual environment in which the product is used."   Id. at 747.   "The plaintiff may base a claim

for breach of an implied warranty on a manufacturing, design or warning defect that makes the

---

[28] Plaintiffs do not allege that 3M has breached any express warranties.   Courts in this State recognize causes of action for design defect and failure to warn under both tort (negligence) and contract (breach of express or implied warranty) theories.   See, e.g., Shuras v. Integrated Project Servs., Inc., 190 F. Supp. 2d 194 (D. Mass. 2002) (separately assessing "negligent design," "implied warranty of merchantability," and "failure to warn as negligence and breach of warranty"); Taupier v. Davol, Inc., 490 F. Supp. 3d 430 (D. Mass. 2020) (same).   There is nevertheless overlap between the tort and contract analyses applicable to both claims, as discussed in this subsection.

product unreasonably dangerous." <u>Provanzano v. MTD Prod. Co.</u>, 215 F. Supp. 3d 134, 138 (D. Mass. 2016) (citing <u>Evans</u>, 465 Mass. at 422).

In determining warranty liability for defective design, "the relevant inquiry focuses on the product's features, not the seller's conduct." <u>Haglund</u>, 446 Mass. at 747. Although the manufacturer is not obliged "to design against bizarre unforeseeable accidents," it "must anticipate the environment in which the product will be used, and it must design against the reasonably foreseeable risks attending the product's use in that setting." <u>Back v. Wickes Corp.</u>, 375 Mass. 633, 640–41 (1978). Thus, a plaintiff bringing an implied warranty of merchantability claim based on a defective design must plead facts sufficient to allege that:

> (1) the defendant manufactured or sold the product that eventually injured the plaintiff; (2) the product had a defect or otherwise unreasonably dangerous condition such that it was unsuited for the ordinary use for which it was sold; (3) the plaintiff used the product as intended by the defendant or in a manner that was at least foreseeable to the defendant; and [4] the defect or unreasonably dangerous condition was a legal cause of the plaintiff's injury.

<u>DaSilva v. Toyota Motor Corp.</u>, 20-cv-10984-ADB, 474 F.Supp.3d 448, 454–55, (D. Mass. July 14, 2020) (citing <u>Fireman's Fund Ins. Co. v. Bradford-White Corp.</u>, 12-cv-10509-NMG, 2014 WL 1515266, at *7 (D. Mass. Apr. 15, 2014)); <u>see also</u> <u>Town of Westport v. Monsanto Co.</u>, 14-cv-12041, 2017 WL 1347671, at *4 (D. Mass. Apr. 7, 2017), aff'd, 877 F.3d 58 (1st Cir. 2017) ("To demonstrate that a product is defective under a design defect theory, it must be shown that the product was 'made according to an unreasonably dangerous design and does not meet a consumer's reasonable expectation as to its safety.'") (internal citations omitted).

When warranty liability is alleged based on design defect, it follows the same standard of proof as a negligence claim based on design defect. <u>Evans</u>, 465 Mass. at 443-44. That is, "the plaintiff must show 'an available design modification which would reduce the risk without undue cost or interference with the performance of the [product],' and the jury must consider whether a

safer alternative design was available in deciding whether the defendant was negligent for failing to adopt that design." Id. Regarding applicable pleading standards, this Court has acknowledged that "there is some ambiguity in Massachusetts law … concerning whether a plaintiff must prove the existence of a reasonable alternative design to prevail on a negligence defective design claim." Ducat, 534 F. Supp. 3d at 157. Thoroughly assessing the handful of cases to have addressed the matter, this Court has in at least one instance concluded, on the basis of Evans and Tersigni v. Wyeth, 817 F.3d 364 (1st Cir. 2016), that the "SJC has adopted the Third Restatement's requirement that 'to establish a prima facie case of defect, the plaintiff must prove the availability of a technologically feasible and practical alternative design that would have reduced or prevented the plaintiff's harm.'" Ducat, 534 F. Supp. 3d at 159 (quoting Evans, 465 Mass. at 428, and the Third Restatement of Torts § 2 at 24, comment f (1998)); see also Tersigni, 817 F.3d at 368-69 (granting drug manufacturer defendant's motion for summary judgment "because [the plaintiff] cannot offer proof of a reasonable alternative design, as Massachusetts law plainly requires.").

Honing in on the pre-requisite of alleging an alternative design, 3M argues that "Plaintiffs fail to allege facts suggesting that a reasonable alternative design was available[,]" precluding their design defect claim. [Dkt. No. 101, p. 13]. Plaintiffs, in turn, argue that even if such an element were a pre-requisite for a prima facie design defect claim, they have sustained their burden by alleging that (1) "Defendant 3M knew or should have known about reasonably safer and feasible alternatives to PFAS and other toxins[,]" [Dkt. No. 77, ¶514], and (2) by the "obvious logical implication[]" that 3M's "phase out" of PFAS indicates its contemporaneous development of substitutes. [Dkt. No. 117, p. 17]. While I do not hold Plaintiffs to a standard of proving or detailing with specificity at the motion to dismiss stage which alternative designs may be practicable, I nevertheless find that Plaintiffs' allegations fall short of any interpretation of this

State's case law with regard to the applicable pleading standard.  Plaintiffs' assertions that 3M should have known about safer alternative designs, or that 3M's phase out of PFAS manufacturing implies the existence of such knowledge, plainly fail to allege the existence of any alternative design, however unsubstantiated.  Indeed, if such an allegation were sufficient, it would render the pleading requirement a nullity: any plaintiff could similarly allege a defendant should have known.

As I find that Plaintiffs have failed to allege the existence of an alternative design, which I agree to be a pre-requisite to stating a design defect claim, as this Court found in <u>Ducat</u>, I recommend granting 3M's motion to dismiss Count XXXI.

b.  <u>Failure to Warn</u>

Under Massachusetts law, to sustain either a negligence or failure to warn claim, a plaintiff bears the burden of proving that a legal duty was owed by a manufacturer.  <u>Plourde v. Sorin Grp. USA, Inc.</u>, 517 F. Supp. 3d 76, 88 (D. Mass. 2021).  The SJC has held that "'a manufacturer of a product, which the manufacturer knows or should know is dangerous by nature or is in a dangerous condition,' is under a duty to give warning of those dangers to 'persons who it is foreseeable will come in contact with, and consequently be endangered by, that product.'"  <u>MacDonald v. Ortho Pharm. Corp.</u>, 394 Mass. 131, 135 (1985) (quoting <u>H.P. Hood & Sons v. Ford Motor Co.</u>, 370 Mass. 69, (1976)).  The SJC has "effectively collapsed the two standards for negligence and breach of warranty where the plaintiffs' allegations are based upon a failure to warn," determining that either cause of action is to be judged by "the reasonableness of the defendant's actions in the circumstances."  <u>Calisi v. Abbott Labs.</u>, No. 11-cv-10671, 2013 WL 5441355, at *14 (D. Mass. Sep. 27, 2013) (internal quotation omitted).  The breach of a duty to warn must be both the cause in fact and proximate cause of the plaintiff's injuries.  <u>See, e.g.</u>, <u>Wasylow v. Glock, Inc.</u>, 975

67

F.Supp. 370, 378-79 (D. Mass. 1996) (finding that a plaintiff's failure to read warnings provided

with a handgun, not a failure to warn, was the actual and proximate cause of his injuries).

The gist of Plaintiffs' theory with regard to 3M's alleged failure to warn is that:

> 3M had actual knowledge of the health hazards associated with PFAS … but, upon information and belief, failed to share such information with purchasers, users or those foreseeably exposed to their products, including Plaintiffs, Defendants MassNatural, Seaman Paper, Otter Farm, Greif, Caraustar, and Newark or with governmental agencies.

[Dkt. No. 77, ¶499].  Plaintiffs then allege that "[a]s a direct and proximate result of Defendant

3M's acts and omissions," namely, "failing to adequately warn and provide sufficient instructions

to purchasers such as Defendants … Plaintiffs have and will continue to suffer damages."  [Id.,

¶¶502, 503].

First, Plaintiffs' assertion that 3M should be held liable for failure to warn the Paper

Manufacturing Defendants cannot be squared with core allegations undergirding Plaintiffs' other

claims.  Plaintiffs allege throughout their complaint that Defendants, with the exception of 3M,

colluded to dispose of PFAS-contaminated byproduct cheaply at MassNatural's facility, knowing

or with reason to know that such a disposal method ran a high risk of contaminating groundwater

or otherwise causing environmental harm.  Accepting as plausible Plaintiffs' failure to warn

theory—that the Paper Manufacturing Defendants would have acted differently had 3M provided

adequate warnings as to the dangers of PFAS—stretches the bounds of Plaintiffs' factual

allegations too far.

However, Plaintiffs' allegations of 3M's failure to warn Plaintiffs, as opposed to the Paper

Manufacturing Defendants, warrants a different conclusion.  As noted, supra, "'a manufacturer of

a product, which the manufacturer knows or should know is dangerous by nature or is in a

dangerous condition,' is under a duty to give warning of those dangers to 'persons who it is

foreseeable will come in contact with, and consequently be endangered by, that product.'" MacDonald, 394 Mass. at 135.  For the reasons articulated in the negligence analysis, supra, and reflected in the approaches adopted by Zimmerman and Parris, I do find 3M owes such a duty to Plaintiffs, who are at a foreseeable risk of groundwater contamination due to proximate manufacturers' use and disposal of PFAS acquired from 3M.

I acknowledge that imposing such a duty may create a nearly impossible burden for manufacturers such as 3M.  For instance, would it require 3M to warn all homes and businesses near facilities that use or process PFAS bought from 3M?  If so, how is the warning communicated, in what languages, and to what communities does it go?  The instant case raises other issues: 3M allegedly sold PFAS to Newark.  However, Newark did not dispose of PFAS-contaminated byproduct in Fitchburg where it operated the Mill; it allegedly disposed of such byproduct at the Property in Westminster.  While the two locations may be only a few miles apart, it underscores the challenge of determining what warnings would look like.  I appreciate these concerns and even the possibility that 3M might forego doing business with any facility proximate to a large city or its water supply, to avoid undertaking a massive warning.  However, I find the allegations here sufficient to support negligence; it follows then that I must also find they support a duty to warn.

Turning to causation, I cannot say with certitude that if, for instance, a particular township were to receive a notice from a manufacturer like 3M of its sale of a substantial amount of PFAS to a local paper mill, that such township may not respond proactively.  For instance, it may initiate greater scrutiny of the mill's compliance with environmental regulations and determine how PFAS byproducts were being handled.  Similarly, a warning to residents may trigger requests to regulatory agencies to increase oversight.  Here, arguably, timely notice to municipalities or to

individual residents of the sale and use of PFAS compounds could have led to enhanced MassDEP and EPA oversight and preventative measures.

Thus, because I find Plaintiffs have plausibly alleged failure to warn persons who it is foreseeable will come in contact with, and consequently be endangered by, PFAS compounds allegedly sourced from 3M, I recommend denying 3M's motion to dismiss Count XXX.

4. *Medical Monitoring*

Plaintiffs assert medical monitoring claims against all Defendants.  To sustain a medical monitoring claim, a plaintiff must demonstrate that the defendant's negligence caused the plaintiff to:

> [1] become exposed to a hazardous substance that produced, at least, subcellular changes that substantially increased the risk of serious disease, illness, or injury [2] for which an effective medical test for reliable early detection exists, [3] and early detection, combined with prompt and effective treatment, will significantly decrease the risk of death or the severity of the disease, illness or injury, and [4] such diagnostic medical examinations are reasonably (and periodically) necessary, conformably with the standard of care, and [5] the present value of the reasonable cost of such tests and care, as of the date of the filing of the complaint.

Donovan v. Philip Morris USA, Inc., 455 Mass. 215, 226 (2009) (citing Sullivan v. Old Colony St. Ry., 197 Mass. 512, 516 (1908)); see also Genereux v. Raytheon Co., 754 F.3d 51, 54 (1st Cir. 2014) ("Genereux II") (calling Donovan the "cornerstone" of a medical monitoring claim).  "Proof of these elements usually will require competent expert testimony."  Donovan, 455 Mass. at 277; see also Genereux, 754 F.3d at 56 (summary judgment appropriate where plaintiffs' expert failed to testify that any member of the class "had already suffered harm (that is, subcellular or other physiological change)").  As noted in Genereux v. Hardric Lab'ys, Inc., 950 F. Supp. 2d 329, 332 (D. Mass. 2013) ("Genereux I"),[29] Donovan:

> uses the terms "subcellular change," "subclinical change," and "physiological change" nearly interchangeably. See id. at 894 (subclinical); id. at 901 (all three

---

[29] aff'd sub nom. Genereux II

terms); id. at 902 (subcellular); id. at 903 (subcellular and physiological). It defines "subclinical" as "[d]enoting the presence of a disease without manifest symptoms; may be [sic] an early stage in the evolution of a disease." Id. at 894 n.3 (quoting Stedman's Medical Dictionary 1492 (25th ed. 1990)).

Genereux, 950 F. Supp. 2d at 332.

In Donovan, the SJC found that a class of long-time cigarette smokers had alleged a cognizable claim warranting a remedy of a medical surveillance program that utilizes a specific technology which could timely advise them whether they have developed lung cancer.  455 Mass. at 219.  The SJC noted that the plaintiffs "have not contracted cancer, and they do not allege they are likely to contract cancer in the immediate future as a result of the alleged negligence of Philip Morris."  Id. at 223–24.  However, the SJC found that the plaintiffs had "produced sufficient proof of 'impact,' [] to safeguard against false claims[,]" by "proffer[ing] evidence of physiological changes caused by smoking, and … expert medical testimony that, because of these physiological changes, they are at a substantially greater risk of cancer due to the negligence of Philip Morris." Id. at 224–25.  The SJC further stated that:

> Subcellular or other physiological changes may occur which, in themselves, are not symptoms of any illness or disease, but are warning signs to a trained physician that the patient has developed a condition that indicates a substantial increase in risk of contracting a serious illness or disease and thus the patient will require periodic monitoring. Not all cases will involve physiological change manifesting a known illness, but such cases should be allowed to proceed when a plaintiff's reasonable medical expenses have increased (or are likely to increase, in the exercise of due care) as a result of these physiological changes. We leave for another day consideration of cases that involve exposure to levels of chemicals or radiation known to cause cancer, for which immediate medical monitoring may be medically necessary although no symptoms or subclinical changes have occurred.

Id. at 225.

In Genereux I and II, this Court and the First Circuit relied largely on Donovan in holding that a putative class of plaintiffs exposed to beryllium, a hazardous substance used in the defendant's manufacturing process, had not established a subcellular or physiological change

sufficient to sustain their medical monitoring claim.  754 F.3d at 53.  In affirming summary judgment for defendant, the First Circuit noted plaintiffs' expert witness "opined that [beryllium sensitization ("BeS")] is the first manifestation of subcellular change resulting from beryllium exposure," but the expert could not confirm that any named plaintiff or class member had developed BeS.  Id. at 55.  Rather, the expert "show[ed] only that every plaintiff faces a 'significantly increased risk' of harm."  Id. at 56.  Noting that risk and harm are "two materially different concepts," the First Circuit emphasized that Donovan "made pellucid that it was holding only that a cause of action for medical monitoring would lie if a plaintiff could make a showing of subcellular or other physiological change."  Id. at 56–57; see also id. at 54 ("increased epidemiological risk of illness caused by exposure, unaccompanied by some subcellular or other physiological damage, is not enough to permit recovery in tort.").[30]

The instant case is in a different procedural posture than Donovan and Genereux; here, Defendants move to dismiss the operative complaint, and, of course, there has been no expert testimony.  Hence, the question is whether Plaintiffs' allegations are sufficient to allow relief for medical monitoring to proceed.  I find that they are.

Plaintiffs allege that groundwater contamination "caused Plaintiffs and the Class Members to unknowingly ingest and absorb PFAS[] via, inter alia, their drinking water, the water they used to cook, and the food which they grew on their properties[,]" causing "PFAS[] to bioaccumulate over time in [their] bodies,"  [Dkt. No. 77 ¶¶183-84]; that the presence of PFAS "in their bodies,

---

[30] The First Circuit declined to address plaintiffs' alternative theory of liability, finding that the plaintiffs had not preserved their argument that a remedy was possible in "cases that involve exposure to levels of chemicals or radiation known to cause cancer, for which immediate medical monitoring may be medically necessary although no symptoms or subclinical changes have occurred."  Id. at 57.  Moreover, the Court emphasized that "[w]here state tort law is at issue, policy considerations are best reconciled by state courts. The SJC is the final arbiter of Massachusetts law, and a federal court sitting in diversity jurisdiction has no roving writ to rewrite that court's pronouncements about state law."  Id. (citing Jones v. Secord, 684 F.3d 1, 10–11 (1st Cir. 2012)).

tissue, and cells represents a manifest change in the bodies, tissue and cells[,]" leaving them "at an increased risk of serious disease, illness, or injury[,]" and amounts to "a physiological change in Plaintiffs' bodies occurring at a subcellular level."  [Id., ¶184].  They allege that blood analysis conducted in April and June 2022 revealed that Plaintiffs Thomas Ryan, Susan Ryan, and Nancy Donovan had PFAS concentration levels "several times the typical [] amounts[.]"  [Id., ¶¶186-87].  Specifically, Plaintiffs note that while "[t]ypical [b]lood PFAS6 [c]oncentration [l]evels" are ug/L 1.9 for PFOA and 13 for PFOS, Thomas Ryan's bloodwork indicated ug/L 15 for PFOA and 91 for PFOS, and Susan Ryan's bloodwork indicated 28 for PFOA and 200 for PFOS.  [Id.]; see also [Id., ¶238 ("Due to these subcellular changes from PFAS6 exposure, Plaintiffs and the Class Members are at an increased risk of developing cancer and other illnesses, diseases, and disease processes, which results in their present medical need for periodic diagnostic medical examinations and monitoring.")].  Citing EPA research, Plaintiffs allege:

> [H]uman exposure to PFOS and PFOA is associated with adverse health outcomes, which can manifest years after exposure. Adverse health outcomes linked to PFOS and PFOA include, but are not limited to: Reproductive effects such as decreased fertility or increased high blood pressure in pregnant women; Developmental effects or delays in children, including low birth weight, accelerated puberty, bone variations, or behavioral changes; Increased risk of some cancers, including prostate, kidney, and testicular cancers; Reduced ability of the body's immune system to fight infections, including reduced vaccine response; Interference with the body's natural hormones; Increased cholesterol levels and/or risk of obesity; Changes in liver enzymes; Increased risk of high blood pressure or pre-eclampsia in pregnant women; Small decreases in infant birth weights; and Suppression of vaccine response (decreased serum antibody concentrations) in children.

[Dkt. No. 77, ¶36].

Defendants argue that the absence of any "present injury" in Plaintiffs' pleadings preclude their medical monitoring claim.  [Dkt. No. 99, p. 4].  Citing Donovan, Defendants emphasize that the pleading standard applicable to such a claim places a burden on a plaintiff to demonstrate that a "hazardous substance … produced, at least, subcellular changes that substantially increased the

risk of serious disease, illness or injury," which Plaintiffs allegations—speaking only to "increased risk"—do not fulfill.  [Id., p. 4].  Defendants argue that "blood tests are simply proof of exposure to PFAS[,]" and that the "mere presence of PFSA in one's blood does not mean that there has been any actual subcellular damage or change."  [Dkt. No. 92, p. 15].  Moreover, Defendants emphasize that Plaintiffs do not indicate an "effective medical test for reliable early detection of any of the broad range of illnesses" mentioned, nor that any "medical examinations are reasonably necessary, within the standard of care and with reasonable cost."  [Dkt. No. 99, pp. 5-6].

In light of the procedural posture of this case, the well-supported research Plaintiffs have provided with regard to the dangers of PFAS ingestion, and the abnormal levels of PFAS present in the bloodwork of at least three Plaintiffs, I find it premature to dismiss Plaintiffs' medical monitoring claims on the basis that no "subcellular change" has occurred.  Insofar as my recommendation departs from Donovan, a showing which satisfies Donovan would ideally involve, if not absolutely require, expert testimony; Plaintiffs do not bear the burden of providing any such evidence at this stage of the litigation.  See Maddox, 732 F.3d at 82 ("The critical question is whether the claim, viewed holistically, is made plausible by 'the cumulative effect of the factual allegations' contained in the complaint.") (quoting Ocasio–Hernández, 640 F.3d at 14).  As to the remaining elements of a medical monitoring claim, Plaintiffs have identified specific and grievous health effects and diseases associated with PFAS exposure—including prostate, kidney, and testicular cancers, increased cholesterol levels, and interference with hormones, among others.  [Dkt. No. 77, ¶36].  Their allegations cite EPA findings.  Further, there is available testing for early detection of such effects.  These are sufficient at the motion to dismiss stage to support the

existence of available testing and the reasonable necessity of monitoring the development of such conditions.[31]

I thus recommend denying Defendants' motions to dismiss Counts I; VIII; XV; XXXIII; and with respect to Newark, I recommend denying the motion to dismiss Count XXII.[32]

### 5. *Private Nuisance*

Plaintiffs assert private nuisance claims against Seaman Paper, Otter Farm, MassNatural, and the Greif Defendants. All defendants, except MassNatural, [Dkt. No. 94, p. 1],[33] move to dismiss for a failure to state a claim.

"A private nuisance is a non-trespassory invasion of another's interest in the private use and enjoyment of land." Dusoe v. Mobil Oil Corp., 167 F. Supp. 2d 155, 163–64 (D. Mass. 2001) (citing Doe v. New Bedford Housing Authority, 417 Mass. 273, 288 (1994)). Private nuisance claims are actionable "when a property owner creates, permits, or maintains a condition or activity on [its] property that causes a substantial and unreasonable interference with the use and enjoyment of the property of another." Taygeta Corp. v. Varian Assocs., 436 Mass. 217, 231 (2002); see also Wiesman v. Hill, 629 F. Supp. 2d 106, 114 (D. Mass. 2009) (stating that "a nuisance claim requires two separately owned parcels of real property") (citing New Bedford Hous. Auth., 417 Mass. at 288–289); McEneaney v. Chestnut Hill Realty Corp., 38 Mass. App. Ct. 573, 577 (1995) ("[T]he law of nuisance requires two separate and distinct parcels, one on which a nuisance exists and one on which the occupants are burdened with the nuisance."). The SJC, citing the Restatement

---

[31] With the posture of the instant motion in mind, I leave for the progress of the litigation the Parties' dispute regarding the meaning of "subcellular change," and the evidentiary burden Plaintiffs must carry to sustain that such a change has in fact occurred.

[32] Because I recommend dismissing Greif and Caraustar for a lack of personal jurisdiction, I take no action insofar as they also move to dismiss Count XXII.

[33] I thus recommend Count IV, alleging private nuisance as to MassNatural, proceed as uncontested.

(Second) of Torts § 834, has held that "[o]ne is subject to liability for a [private or public] nuisance caused by an activity, not only when he carries on the activity but also when he participates to a substantial extent in carrying it on." Com. of Mass. v. Pace, 616 F. Supp. 815, 821 (D. Mass. 1985). In Morrissey v. New England Deaconess Ass'n--Abundant Life Communities, Inc., the SJC stated:

> It is difficult, if not impossible, to describe nuisance without reliance on concepts which are integrally related to negligence, intentional torts and strict liability." … Liability for the maintenance of a nuisance, premised on allegations of interference with the use and enjoyment of land, "should be based upon a determination that the interference is intentional and unreasonable or results from conduct which is negligent, reckless or ultrahazardous." … The term "nuisance" does not "per se bespeak absolute liability and it does not relieve the plaintiffs of the burden of showing that the conduct of the defendant was tortious within the above[-]stated principles."

458 Mass. 580, 589 n.15 (2010), holding modified by Shapiro v. City of Worcester, 464 Mass. 261 (2013) (internal citations omitted).

In Massachusetts, a private nuisance which allegedly caused land or water contamination must show that a defendant's conduct actually contaminated the subject land or water. See Blackmore v. Massachusetts Turnpike Authority, No. CA 990971A, 2000 WL 420844, at *3 (Mass. Super. Jan. 6, 2000) ("in the absence of physical damage to property, pure economic losses such as plaintiff's alleged 'loss of value of their property' are not recoverable.") (citing Gareth Corp. v. Boston Edison Co., 415 Mass. 303, 305 (1993) and Bay State Spray & Provincetown S.S., Inc. v. Caterpillar Tractor Co., 404 Mass. 103, 107 (1989)); see also Dusoe, 167 F.Supp 2d at 163 (holding that Blackmore controls and "Massachusetts law requir[es] plaintiffs to show proof of actual contamination to maintain a private nuisance claim.").

    a.   Seaman Paper & Otter Farm

Seaman Paper and Otter Farm move to dismiss "because Plaintiffs do not allege that either [Defendant] controlled the PFAS and PFAS-containing products at issue when they were

purportedly discharged." [Dkt. No. 92, p. 16]. According to Defendants, "[b]oth public and private nuisances [] require that the respective defendants exercise control over the instrumentality of the nuisance, either through ownership or otherwise." [Dkt. No. 92, p. 17 (citing Belanger v. Com., 41 Mass. App. Ct. 668, 670 (1996), overruled on other grounds by Morrissey, 458 Mass. 580)]. Here, Defendants argue, "Seaman Paper relinquished its control over its products upon their delivery to [MassNatural's] Facility[,]" and Plaintiffs "do not allege … any facts which show that Otter Farm ever controlled any of the PFAS-containing byproduct and/or products or directly participated in any way in releasing PFAS into the ground[.]" [Dkt. No. 92, p. 18]. Defendants cite Pace, 616 F.Supp. at 817, for the proposition that a mere "transporter of hazardous materials" cannot be held liable for the creation of or contribution to a nuisance "where its only 'activity' was hauling [] materials to [a] site, and there were no averments that transporter participated in allowing release of wastes into ground." [Id.]. I reject Defendants' challenge.

Pace is distinguishable. There, in granting defendant's motion for summary judgment, this Court stated that "[t]here is no allegation by the [plaintiff] that [defendant] participated in allowing this release of wastes into the ground. [The defendant's] only 'activity' was the hauling of materials to the site. Therefore, [the defendant] did not create nor contribute to the creation of a nuisance." 616 F. Supp. at 821. Here, as discussed in the section on RICO, Plaintiffs allege that Seaman Paper and Otter Farm colluded with MassNatural in contaminating the ground water; that Seaman created Otter Farm and gave it title to the Property as part of an alleged scheme to avoid hazardous material disposal costs and overhauling its manufacturing processes; that Seaman Paper and Otter Farm knew MassNatural failed to test deposited byproducts and encouraged MassNatural to submit fraudulent certifications of compliance. In sum, Plaintiffs allege that Seaman Paper and Otter Farm were instrumental in facilitating MassNatural's handling of PFAS-contaminated

byproducts.  Cf. Town of Westport v. Monsanto Co., 14-cv-12041-DJC, 2015 WL 1321466, at *4

(D. Mass. Mar. 24, 2015) (granting the defendants' motion to dismiss a nuisance claim where the

defendant "did not have the power or authority to maintain or abate" a third party's use of toxic

building materials) (internal citation omitted).

I am also unpersuaded by Defendants' argument that "control" over the instrumentality of

a nuisance is a pre-requisite for liability in Massachusetts.  This Court noted in Pace that "[o]ne is

subject to liability for a nuisance caused by an activity, not only when he carries on the activity

but also when he participates to a substantial extent in carrying it on."  616 F. Supp. at 821, quoting

(Restatement (Second) of Torts § 834).  The commentary to Section 834 clarifies that "[o]ne

participates in carrying on an activity that either directly or through the creation of a physical

condition causes an invasion of another's interest in the use and enjoyment of land when he acts

for his own benefit, but also when he acts in the capacity of … agent[;]"  moreover, "[w]hen a

person is only one of several persons participating in carrying on an activity, his participation must

be substantial before he can be held liable for the harm resulting from it."[34]  Similarly, under the

Restatement (Second), the general rule for private nuisance liability is:

> One is subject to liability for a private nuisance if, but only if, his conduct is a legal
> cause of an invasion of another's interest in the private use and enjoyment of land,
> and the invasion is either
> (a)  intentional and unreasonable, or
> (b)  unintentional and otherwise actionable under the rules controlling
> liability for negligent or reckless conduct, or for abnormally dangerous conditions
> or activities.

Restatement (Second) of Torts § 822 (1979).  The Restatement goes on describe the "type of

conduct essential to liability" as "(a) an act; or (b) a failure to act under circumstances in which

---

[34] By way of illustration, the Restatement provides that "if the operation of a dance hall unreasonably
interferes with the comfortable enjoyment of a neighboring residence, the proprietor is liable, but a patron
normally does not participate in the objectionable activity to such an extent as to justify imposing liability
upon him for the invasion."

the actor is under a duty to take positive action to prevent or abate the interference with the public interest or the invasion of the private interest."  Id. § 824.

Lastly, even if I were to entertain Defendants' argument that "control" over MassNatural's operation is a necessary element of Plaintiffs' nuisance claim, here Plaintiffs' allegations allow a reasonable inference of control.  As noted, Plaintiffs allege Seaman Paper created the corporate entity Otter Farm (whose address is the same as Seaman Paper's) after Seaman Paper had purchased the Property.  Seaman then conveyed title to the Property it paid for to Otter Farm.  Otter Farm entered into a long-term renewal lease with MassNatural at allegedly below-market rent.  These business relationships allow for an inference that Seaman Paper and Otter Farm had financial leverage and hence control over MassNatural and its disposal of contaminated byproduct.  I thus recommend denying Seaman Paper and Otter Farm's motion to dismiss Counts XI and XVIII.

### b.  Greif Defendants

The Greif Defendants advance two arguments to dismiss Plaintiffs' private nuisance claim: (1) that they hold no interest in the MassNatural facility, [Dkt. No. 99, pp. 14-15 (citing New Bedford Housing Authority, 417 Mass. at 288)]; and (2) that Plaintiffs have not alleged that Defendants "directly participated in any way in releasing PFAS into the ground around the [MassNatural] site[,] and [as] none of the Greif Defendants controlled the pollution site[,]" Defendants "did not create or contribute to the creation of any alleged nuisance."  [Id., p. 14].

I address the motion to dismiss only as to Newark, having recommended dismissal of Caraustar and Greif on jurisdictional grounds.  While there is no allegation that Newark holds a property interest in MassNatural's facility or controls it, the law discussed above shows that no such interest or control is necessary to support a private nuisance claim.  Insofar as the second

argument posits a requirement of direct participation, Newark overlooks the allegation that it dumped contaminated byproducts at the Property, with reason to know MassNatural was not testing such deposits and in fact was falsely certifying that it had, so that Newark could avoid the costs of overhauling its manufacturing processes or paying higher disposal costs to qualified haulers.  Accordingly, I recommend denial of the motion to dismiss Count XXV.

> ### 6.  *Public Nuisance*

Plaintiffs assert public nuisance claims against Seaman Paper, Otter Farm, MassNatural, and the Greif Defendants.  In Massachusetts, a public nuisance "interferes with the exercise of a public right by directly encroaching on public property or by causing common injury."  Sullivan v. Chief Justice for Admin. & Mgmt. of Trial Court, 448 Mass. 15, 34 (2006).  "To determine whether there has been an interference with a public right, a court considers '[w]hether the conduct involves a significant interference with the public health, the public safety, the public peace, the public comfort or the public convenience.'"  Monsanto, 2015 WL 1321466, at *2 (quoting Sullivan, 448 Mass. at 34).  "Public nuisance liability can be based upon conduct that is intentional, and unreasonable or negligent, reckless or ultrahazardous."  Connerty v. Metro. Dist. Comm'n, 398 Mass. 140, 149 (1986), abrogated on other grounds by Jean W. v. Commonwealth, 414 Mass. 496 (1993).

While the usual remedy for a public nuisance is an "information in equity by the Attorney General[,]" Mayor of Cambridge v. Dean, 300 Mass. 174, 175 (1938), private plaintiffs may bring a public nuisance claim when "the public nuisance has caused some special injury of a direct and substantial character other than that which the general public shares."  Sullivan, 448 Mass. at 35; see also Strahan v. Secretary, Mass. Exec. Off. of Energy and Env't. Affs., 436 F.Supp.3d 470, 476 (D. Mass. 2020), (holding that the plaintiffs had a "special interest" but not a unique injury as

required by <u>Sullivan</u>), <u>appeal</u> <u>dismissed</u>, No. 20-1281, 2020 WL 8995316, at *1 (1st Cir. Oct. 7,

2020).  The special injury must be "different in kind, not merely in degree, from that which is

occasioned to other persons by the alleged nuisance."  <u>Stop & Shop Companies, Inc. v. Fisher</u>, 387

Mass. 889, 894 (1983) (quoting <u>Eaton v. Locke</u>, 202 Mass. 324, 324-25 (1909)).

### a.   Seaman Paper, Otter Farm, & MassNatural

In addition to positing the same argument regarding Seaman Paper and Otter Farm's lack

of control over the instrumentality of the nuisance, Defendants' motion to dismiss argues that

"Plaintiffs do not allege – nor could they allege – that they have sustained some 'special and

peculiar damage []'" needed to sustain a public nuisance claim.  [Dkt. No. 92, p. 19].  Defendants

argue that Plaintiffs' alleged injuries are "common to the general public, and differ only, if at all,

in terms of degree[,]" such as the fact "some wells are contaminated more than others[.]"  [<u>Id.</u>].

Indeed, Defendants argue that Plaintiffs' claims are "identical to virtually every other person in

the United States who might be exposed to PFAS."  [<u>Id.</u>].

First, for the reasons stated under private nuisance above, I reject Defendants' argument

that control is a necessary element to sustain either a private or public nuisance claim.  Next,

Defendants rely on <u>Sullivan</u> for the proposition that Plaintiffs have not alleged a sufficiently

special or unique harm.  <u>See</u> [Dkt. No. 99, pp. 16-18; Dkt. No. 92, p. 19].  The plaintiffs in <u>Sullivan</u>

were a group of employees of the Sullivan Courthouse who brought a nuisance claim after it was

revealed that asbestos abatement maintenance and renovation in the courthouse was performed

from the 1980s through 2006 "without the implementation of any asbestos safety measures[,] …

expos[ing] building occupants, maintenance personnel, and outside contractors to friable asbestos,

without any warnings of hazardous conditions."  448 Mass. at 18-20.  The plaintiffs supported

their public nuisance claim with allegations that they "suffered an injury distinct from the public

at large because … they have been unduly exposed to asbestos fibers over a long period of time,

putting them at higher risk of mesothelioma." Id. at 34. Characterizing the "common right" the

plaintiffs' sought to redress as "the preservation of their health and safety[,]" the SJC concluded

that the plaintiffs' alleged harm—exposure to a highly toxic substance over a substantial period of

time with the attendant risk of developing mesothelioma—was "the same in kind as that suffered

by other members of the public who are exposed to the environmental conditions at the Sullivan

Courthouse." Id. at 36. The SJC went on to state that:

> While individuals employed by particular organizations housed in the building may
> face the greatest exposure, other members of both the legal community and the
> general public may very well spend significant periods of time in the Sullivan
> Courthouse and face the same kind of harm. Because the plaintiffs have not alleged
> a special injury of a direct and substantial character other than that which the
> general public shares, a public nuisance action can only be brought by the Attorney
> General.

Id. Here, Defendants argue that, like the Sullivan Courthouse employees, Plaintiffs suffer the

consequences of residential well water contamination around MassNatural's facility in the same

way every Westminster resident likely does, though levels of PFAS may vary.

The pleadings actually do not show what harms every Westminster resident likely will

suffer from contamination. Arguably, some may have no PFAS contamination. Others,

contamination that can be remedied by POET system installation. See, e.g., [Dkt. No. 77, ¶¶137-

38]. It is not alleged that other Westminster residents "cannot eat the fruits and vegetables from

their gardens or the eggs produced by their chickens[,]" as Plaintiffs state is the case for them. [Id.,

¶191]. Indeed, I find Sullivan distinguishable because the complained-of nuisance here has

impacted Plaintiffs' homes, and there is a difference between a publicly-accessible courthouse and

one's home. The several cases that have addressed public nuisance claims in the specific context

of PFAS groundwater contamination underscore this difference. For instance, Higgins denied the

defendants' (six paper mills) motion to dismiss the plaintiffs' public nuisance claim, rejecting the

defendants' argument that the plaintiffs' injuries stemming from PFAS contamination of their residential well water were not sufficiently "special" or "peculiar[.]" <u>Higgins</u>, 2022 WL 4182475 at *8. While the court acknowledged that "[m]ost of the damages that the Plaintiffs have suffered are not atypical[,]" and "the fact that some wells are contaminated more than others … is not a difference in the kind of harm suffered but only in the degree of harm suffered[,]" the court nevertheless singled out "the harms suffered by property owners who must pay the added costs of having to remove the PFAS contamination from their properties[.]" <u>Id.</u> at *9. The court found the "need to decontaminate" to be a sufficiently "special harm." <u>Id.</u> (citing <u>Johnson v. 3M et al.</u>, 563 F. Supp. 3d 1253, 1341–42 (N.D. Ga. 2021), aff'd sub nom., 55 F.4th 1304 (11th Cir. 2022)); <u>see also</u> <u>Parris</u>, 595 F.Supp.3d at 1341 (finding that diminished value of the plaintiffs' properties, interference with their use and enjoyment of properties, upset, annoyance, and inconvenience, and costs incurred to obtain alternate potable water supplies all constituted sufficiently "special damages" to deny the defendants' motion to dismiss a public nuisance claim).

Guided by <u>Higgins</u>, <u>Johnson</u>, and <u>Parris</u>, I find Plaintiffs have sufficiently pleaded special harm to survive MassNatural, Seaman Paper, and Otter Farm's motions to dismiss claims of public nuisance. Plaintiffs have alleged that, as a result of their water well contamination, they "will be forced to pay for the private removal of contaminants from their property emanating from pollution of public water sources[;]" and "out of pocket expenses, personal property damage, loss of use and enjoyment of property, diminution in property value, the necessity for long-term medical monitoring, annoyance, upset, aggravation, trauma, and inconvenience." [Dkt. No. 77, ¶¶278-79]. These allegations are sufficient to survive the motions to dismiss Counts V, XII, and XIX, and I so recommend.

b. <u>Greif Defendants</u>

The Greif Defendants argue that Plaintiffs' public nuisance claim fails, as (1) they have "failed to allege how they have suffered a special harm that is different in kind from that suffered by other members of the public enjoying the same common right," [Dkt. No. 99, p. 17], and (2) the Greif Defendants "lacked any control over the instrumentality of the alleged public nuisance[.]" [Id., pp. 19-20]. I address the merits of the motion as to Newark only. For the reasons stated above, I recommend that it be denied. First, for the reasons stated with respect to Seaman Paper's, Otter Farm's, and MassNatural's motions to dismiss, I find that Plaintiffs have alleged an injury that is unique and hence supports their public nuisance claim. Second, as noted in the discussion of private nuisance, there is no requirement that the offending defendant control the instrumentality of contamination. See Pace, 616 F. Supp. at 821; Restatement (Second) of Torts § 834. Accordingly, I recommend that Newark's motion to dismiss Count XXVI be denied.

### 7. *Ultrahazardous Activity / Strict Liability*

Plaintiffs assert ultrahazardous activity / strict liability claims against Seaman Paper, Otter Farm, MassNatural, and the Greif Defendants. Strict liability applies to ultrahazardous activities in Massachusetts only "when there is 'an escape of a dangerous activity from the land of the defendant onto the land of another, causing injury or damage.'" Heinrich ex rel. Heinrich v. Sweet, 49 F. Supp. 2d 27, 40 (D. Mass. 1999) (quoting Thomalen v. Marriott Corp., 845 F.Supp. 33, 36–37 (D. Mass. 1994)). This Court has emphasized the "extremely limited" scope of this tort under Massachusetts law, reiterating that "a Massachusetts court would not allow a claim of strict liability in [a] case where there was no escape of a dangerous instrumentality from [the defendant's] property." Heinrich, 49 F. Supp. 2d at 40 (quoting Thomalen, 845 F.Supp. at 37); see also Wajda v. R.J. Reynolds Tobacco Co., 103 F. Supp. 2d 29, 35 (D. Mass. 2000) (reiterating that strict liability does not extend to products liability in Massachusetts, but rather has been

84

"applied to[, inter alia,] manmade flooding, explosive blasting, and escaped wild animals"). "The doctrine of abnormally dangerous activities was developed in order to deal with cases in which an activity, while socially beneficial, could not be conducted in a manner that eliminated incidental damage." Heinrich, 49 F. Supp. 2d at 41.

It is a question of law whether an activity is so abnormally dangerous as to be ultrahazardous and trigger strict liability. Clark-Aiken Co. v. Cromwell-Wright Co., Inc., 367 Mass. 70, 76 (1975); see also id. at 84 ("[Strict liability] has been limited … to such unusual and extraordinary uses of property in reference to the benefits to be derived from the use and the dangers or losses to which others are exposed[.]"). "Massachusetts law of strict liability is consistent with the balancing test set forth in the Restatement (Second) of Torts §§ 519, 520." Stearns v. Metro. Life Ins. Co., 308 F. Supp. 3d 471, 482 (D. Mass. 2018). In determining whether an activity is abnormally dangerous, courts consider the following factors:

> (a) whether the activity involves a high degree of risk of harm to the person, land or chattels of others; (b) whether the gravity of the harm which may result from it is likely to be great; (c) whether the risk cannot be eliminated by the exercise of reasonable care; (d) whether the activity is not a matter of common usage; (e) whether the activity is inappropriate to the place where it is carried on; and (f) the value of the activity to the community.

Id. (quoting Clark-Aiken, 367 Mass. at 89 and the Restatement (Second) of Torts § 520, Comment f (Tent. Draft No. 12, 164)).

### a. Seaman Paper, Otter Farm & MassNatural

The activities Plaintiffs allege qualify as ultrahazardous are the "use, transport, disposal, storage, emissions, discharge, distribution, sale, and/or treatment of PFAS6-contaminated materials[.]" See, e.g., [Dkt. No. 77, ¶281]. Defendants argue these activities are not abnormally dangerous, and further that "[n]o Massachusetts court has ever held that the transfer of a purported hazardous byproduct is an abnormally dangerous activity warranting the imposition of strict

liability." [Dkt. No. 92, pp. 8-9]. Defendants further distinguish hazardous "materials" from abnormally dangerous "activities," noting only the latter are actionable.[35] Defendants stress that Plaintiffs' "allegations are that PFAS—the ultimate effects of the <u>material</u>—are what impose the alleged strict liability." [<u>Id.</u>, p. 10].

I recommend denying Seaman Paper, Otter Farm, and MassNatural's motions to dismiss Plaintiffs' ultrahazardous activity / strict liability claims. First, the requirement of ownership or authority over the land on which the dangerous activity occurs—here, the Property—is satisfied. Otter Farm is the nominal owner of the Property, MassNatural is the lessee, and Seaman Paper owns Otter Harm and had purchased the Property and conveyed title to its subsidiary. Thus, all are alleged to be in a position of preventing the "escape" of potentially ultrahazardous conditions from the Property. Second, I find Plaintiffs do, in fact, attribute abnormal danger to Defendants' activities. It goes beyond involvement in manufacturing which uses PFAS. <u>See, e.g.</u>, [Dkt. No. 77, ¶¶281, 282]. Rather, the hazardous activity is the routine of receiving, improperly disposing, and repurposing materials the defendants know or have reason to know is toxic to humans and can migrate into groundwater.

Lastly, I note that in <u>Higgins</u>, after weighing the same factors articulated in <u>Clark-Aiken</u>, 367 Mass. at 89, the Court concluded that further discovery was needed to adequately consider whether the PFAS disposal is in fact the kind of abnormally dangerous activity to which strict liability should be applied. <u>Higgins</u>, 2022 WL 2274876, at *12. I take a similar view here given

---

[35] Though Massachusetts courts have not explicitly articulated this proposition, several others have. <u>See, e.g.</u>, <u>BHK Realty, LLC v. Narragansett Elec. Co.</u>, 542 F. Supp. 3d 133, 138–39 (D.R.I. 2021) (holding that strict liability applies only "to ultrahazardous or abnormally dangerous activities ... not to ultrahazardous or abnormally dangerous materials."); <u>In re E.I. du Pont de Nemours & Co. C-8 Pers. Inj. Litig.</u>, Civil Action No. 2:13-md-2433, 2015 WL 4092866, at *18–19 (S.D. Ohio July 6, 2015) (explaining that "the activity itself" must be abnormally dangerous, "not simply the conditions that result"); <u>Read v. Corning Inc.</u>, 351 F. Supp. 3d 342, 358 (W.D.N.Y. 2018) (finding that the disposal of ordinary materials that just happen to contain hazardous chemicals "is not so inherently dangerous as to give rise to strict liability.").

Plaintiffs' allegations.  Plaintiffs allege, among other things, that "[t]ypical water treatment and filtration systems do not filter PFOS and PFOA from contaminated water due to the chemicals' physical and chemical properties[,]" suggesting some measure of risk cannot be eliminated by the exercise of reasonable care.  [Dkt. No. 77, ¶30].  Plaintiffs also allege that, at least since 2000, PFAS manufacturers such as 3M had committed to "phas[ing] out production of PFOS[,]" reflecting a need to decrease, and ultimately, discontinue commercial use of PFAS (and speaking to PFAS's decreasingly "common usage").

I find these allegations sufficient to allow Plaintiffs' ultrahazardous activity / strict liability claim to survive a motion to dismiss and proceed to discovery, as against MassNatural, Seaman Paper, and Otter Farm, and thus recommend denying Defendants' motions to dismiss Counts VI, XIII, and XX.

### b.  Greif Defendants

The Greif Defendants argue that as they had "no ownership or control" of the physical area from which the PFAS contamination emanated, and as ultrahazardous activity and associated strict liability does not apply to "the sale of products" as opposed to activities themselves, Plaintiffs' claim must be dismissed.  [Dkt. No. 99, pp. 20-21].  Addressing the merits of the motion as to Newark only, I agree that, under the "extremely" limited scope of this tort in Massachusetts, Plaintiffs have not sufficiently alleged a strict liability claim.  Heinrich, 49 F.Supp.2d at 40.  There is no allegation that Newark held any direct or indirect land interest whatsoever in the Property.  As articulated in Thomalen, and reiterated in Heinrich, this Court has expressly rejected an "extension" of the "ancient doctrine of Rylands v. Fletcher beyond its original use in land cases." Heinrich, 49 F.Supp.2d at 40 (citing Thomalen, 845 F.Supp. at 36-37); see also id. ("a Massachusetts court would not allow a claim of strict liability in [a] case where there was no escape

of a dangerous instrumentality from [the defendant's] property") (quoting <u>Thomalen</u>, 845 F.Supp. at 37).  I thus recommend granting Newark's motion to deny Count XXVII.

        8.   *Willful and Wanton Conduct*

      Plaintiffs assert claims of willful and wanton conduct against Seaman Paper, Otter Farm, MassNatural, and the Greif Defendants.  "The essence of wanton or reckless conduct is intentional conduct, by way either of commission or of omission where there is a duty to act, which conduct involves a high degree of likelihood that substantial harm will result to another."  <u>Commonwealth v. Catalina</u>, 407 Mass. 779, 789 (1990).  "The terms 'wil[l]ful,' 'wanton,' and 'reckless' are often used interchangeably."  <u>Sarro v. Philip Morris USA Inc.</u>, 857 F. Supp. 2d 182, 185 n.2 (D. Mass. 2012) (citing <u>Manning v. Nobile</u>, 411 Mass. 382, 387 n.3 (1991) and <u>Beausoleil v. Massachusetts Bay Transp. Auth.</u>, 138 F.Supp.2d 189, 204 (D.Mass.2001)).

      "The imposition of tort liability for willful and wanton conduct can be based on 'either a subjective or an objective standard for evaluating knowledge of the risk of harm.'"  <u>Id.</u> (quoting <u>Boyd v. National R.R. Passenger Corp.</u>, 446 Mass. 540, 546 (2006)).  Under a subjective standard, the actor knows, or has reason to know, of facts creating a high degree of risk of physical harm to another, and deliberately proceeds to act, or fails to act, with conscious disregard for or indifference to that risk.  <u>See</u> <u>id.</u> at 546–47.  Under an objective standard, the actor knows, or has reason to know, of facts creating a high degree of risk of physical harm to another, but unreasonably fails to realize the high degree of risk involved.  <u>Id.</u> at 547.  Under either standard, the risk must be an unreasonable one, and the actor's conduct must involve a risk of harm to others substantially exceeding that necessary to make the conduct negligent.  <u>Id.</u>  Therefore, willful and wanton conduct "involves a degree of risk and a voluntary taking of that risk so marked that, compared to negligence, there is not just a difference in degree but also a difference in kind."  <u>Sandler v.</u>

<u>Commonwealth</u>, 419 Mass. 334, 337 (1995); <u>see also</u> <u>Manning</u>, 411 Mass. at 387–88.  The facts

that are or should be known to the actor must support a high probability of substantial harm to

another; merely creating some chance of harm is insufficient.  <u>See</u> <u>Sarro</u>, 857 F. Supp. 2d at 189

(failing to find a high probability of substantial harm in selling cigarettes to a teenager who became

addicted to nicotine, and whose smoking inadvertently burned down the plaintiff's house); <u>see also</u>

<u>Manning</u>, 411 Mass. at 388-89 (holding that there were not facts supporting a high probability of

substantial harm in supplying hotel party with liquor and no bartender when a guest later drove

under the influence).

> a.   <u>Seaman Paper, Otter Farm & MassNatural</u>

Seaman Paper, Otter Farm, and MassNatural argue that Plaintiffs' allegations of willful

and wanton conduct are duplicative of those asserted under their negligence claim, and insufficient

to meet the markedly higher standard applicable to this tort.  [Dkt. No. 92, pp. 28-29].  Citing

<u>Manning</u>, Defendants emphasize that:

> Two characteristics of wil[l]ful, wanton, or reckless conduct distinguish it from
> negligence. First, the defendant must knowingly or intentionally disregard an
> unreasonable risk. … Second, the risk, viewed prospectively, must entail a "high
> degree of probability that substantial harm would result" to the plaintiff.

<u>See</u> [Dkt. No. 92, p. 28 (quoting <u>Manning</u>, 411 Mass. at 387–88) (citing Restatement (Second) of

Torts § 500 (1965)) (other citations omitted)].

I find Plaintiffs have plausibly alleged that Seaman Paper, Otter Farm, and MassNatural

have acted willfully and wantonly with regard to their alleged PFAS disposal activities.  As an

initial matter, taking as true Plaintiffs' allegations in support of their RICO claims, Seaman Paper,

Otter Farm, and MassNatural acted in concert to mishandle and sell PFAS-contaminated

byproducts, allegedly knowing or with reason to know that PFAS compounds were highly toxic.

These  same  defendants  knew,  or  had  reason  to  know,  MassNatural  submitted  fraudulent

certifications of compliance to MassDEP that MassNatural was testing incoming materials, or was arranging for such testing, to conceal the mishandling and retailing of hazardous and contaminated materials.  Plaintiffs allege that Seaman Paper and Otter Farm were well aware of MassNatural's repurposing of PFAS-contaminated byproduct into topsoil and other such products sold to consumers.  Lastly, Plaintiffs allege that this was done in order to enable Seaman Paper to avoid spending money to rehaul its manufacturing processes and/or to pay more expensive disposal costs to qualified hazmat handlers.  I find such allegations support a willful, financially motivated, and knowing assumption of a high risk of substantial environmental and human harm from the improper disposal and repurposing of PFAS-contaminated byproducts to unsuspecting consumers of MassNatural's products.

I therefore recommend denying Defendants' motions to dismiss Counts VII, XIV, and XXI.

### b.  Greif Defendants

The Greif Defendants similarly argue that Plaintiffs have not sustained their burden with respect to willful and wanton conduct, as they have not adequately alleged that the Greif Defendants have intentionally chosen to run an apparent risk that substantial harm will result to another.  [Dkt. No. 99, pp. 22-23].  I address the merits of the motion as to Newark only and find Plaintiffs have stated a plausible claim of willful and wanton conduct.

As mentioned in the context of allegations put forth for the purposes of Plaintiffs' RICO claim, Plaintiffs allege that Newark knew or had reason to know that MassNatural was improperly handling and selling PFAS-contaminated byproducts, that PFAS compounds were toxic, and that MassNatural could not be honestly reporting its handling of these byproducts.  Plaintiffs allege that Newark, like Seaman Paper, disposed of PFAS-contaminated byproducts at the Property to avoid the costs of overhauling manufacturing processes and qualified disposal costs.  While such

knowledge does not necessarily make Newark complicit in the alleged scheme to protect Seaman Paper from these same costs (and thus not complicit in the alleged RICO enterprise), I do find the allegations against Newark show an unreasonable and knowing assumption of a risk of groundwater contamination and substantial environmental harm to homes proximate to MassNatural's facility, and land for which consumers purchased MassNatural's compost products.

I therefore recommend denying Newark's motion to dismiss Count XXVIII.

### 9. *M.G.L. c. 93A*

Plaintiffs allege that all Defendants have violated Chapter 93A of the Massachusetts Consumer Protection Act ("MCPA").  The MCPA stipulates that "[u]nfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce are … unlawful," and any person injured by such acts or practice "may bring an action … for damages and such equitable relief, including an injunction, as the court deems to be necessary and proper."  M.G.L. c. 93A §§ 2(a), 9(1).  Thus, "[t]o state a claim for unfair or deceptive trade practices under Chapter 93A, a commercial plaintiff must plausibly allege '1) that the defendant engaged in an unfair method of competition or committed an unfair or deceptive act or practice, as defined by [Mass. Gen. Laws ch.] 93A, § 2, or the regulations promulgated thereunder; 2) a loss of money or property suffered as a result; and 3) a causal connection between the loss suffered and the defendant's unfair or deceptive method, act, or practice.'"  Conformis, Inc. v. Aetna, Inc., 58 F.4th 517, 540 (1st Cir. 2023) (quoting Auto Flat Car Crushers, Inc. v. Hanover Ins. Co., 469 Mass. 813, 820 (2014)).

A plaintiff's allegations must plausibly show that the defendant's actions fell "within at least the penumbra of some common-law, statutory, or other established concept of unfairness" or were "immoral, unethical, oppressive, or unscrupulous."  Ruiz v. Bally Total Fitness Holding Corp., 496 F.3d 1, 11 (1st Cir. 2007) (quoting PMP Assocs., Inc. v. Globe Newspaper Co., 366

Mass. 593, 595 (1975)); see also Baker v. Goldman, Sachs & Co., 771 F.3d 37, 51 (1st Cir. 2014) ("the SJC has repeatedly held that 'mere negligence,' standing alone, is not sufficient for a violation of ch. 93A—something more is required. … the SJC described that 'something more' as 'extreme or egregious' negligence").  Lastly, "[a] plaintiff's failure to establish both factual causation and proximate causation is fatal to her Chapter 93A claim."  Walsh v. TelTech Sys., Inc., 821 F.3d 155, 160 (1st Cir. 2016) (internal citations omitted).

a.  Procedural Bar

The Paper Manufacturing Defendants[36] argue that Plaintiffs are procedurally barred from asserting a Chapter 93A claim, as they failed to provide the required written notice thirty days prior to filing the claim, instead sending a 93A demand letter three days after serving the original complaint.  [Dkt. No. 99, p. 10; Dkt. No. 92, p. 5; Dkt. No. 94, p. 2].  Moreover, Greif Defendants indicate that only Greif—and neither Newark nor Caraustar—was named in the demand letter. [Dkt. No. 99, p. 11].  I recommend granting the motion to dismiss on this ground.

Chapter 93A, § 9(3) provides that "[a]t least thirty days prior to the filing of any such action, a written demand for relief, identifying the claimant and reasonably describing the unfair or deceptive act or practice relied upon and the injury suffered, shall be mailed or delivered to any prospective respondent."  Defendants uniformly urge that the statute's thirty-day written notice requirement under M.G.L. ch. 93A, § 9(3) "is a prerequisite to a suit under Chapter 93A … 'The purpose of the demand letter is to facilitate the settlement and damage assessment aspects of c. 93A and as such the letter and notice therein is a procedural requirement, the absence of which is a bar to suit.'"  Carrozza v. CVS Pharmacy, Inc., 992 F.3d 44, 49, n.2 (1st Cir. 2021) (quoting Entrialgo v. Twin City Dodge, Inc., 368 Mass. 812 (1975)).

---

[36] Namely Seaman Paper, Otter Farm, MassNatural, and the Greif Defendants.  3M does not join this procedural argument.

Plaintiffs acknowledge they did not send 93A demand letters to the "Greif Defendants, MassNatural, Seaman, and Otter Farm" until August 5, 2022, [Dkt. No. 108, p. 24], three days after filing their original complaint, which asserted four claims under 93A against those Defendants.  [Dkt. No. 1, pp. 33, 48, 63, 77].  Plaintiffs' first complaint alleges under each 93A-premised count that "[t]his Count provides notice that this Complaint shall be amended to demand all appropriate relief once Plaintiffs have provided notice pursuant to M.G.L. ch. 93A §9(3) to [Defendant] and the statutory period for a response has passed, subject to any response by [Defendant]."  See, e.g., [Id. at 33].  Citing case law, Plaintiffs argue that their issuance of demand letters "82 days prior to filing even the first Amended Complaint [] easily satisf[ies] the requirement set forth in Chapter 93A § 9(3)."  [Dkt. No. 108, p. 25].

Plaintiffs' undisputed failure to timely serve Chapter 93A demand letters before filing their original complaint is fatal to their 93A claims against Seaman Paper, Otter Farm, MassNatural, and the Greif Defendants.  As articulated by this Court, "Massachusetts courts have strictly adhered to Chapter 93A's demand requirement."  Burns ex rel Off. of Pub. Guardian v. Hale & Dorr LLP, 445 F. Supp. 2d 94, 97 (D. Mass. 2006); see, e.g., City of Boston v. Aetna Life Ins., 399 Mass. 569, 574 (1987) (summary judgment on Chapter 93A claim affirmed because "[t]he failure of the City to allege the sending of a demand letter is fatal to its ... claim").  Plaintiffs' reliance on case law for the proposition that sending a demand letter prior to filing an amended complaint fulfills the procedural requirement, see [Dkt. No. 108, p. 25], is not a fair statement of the law.  This Court, in Francisque v. Wells Fargo Bank, N.A.—a case cited by Plaintiffs—stated that "while a demand letter may be sent after suit is commenced, it must be sent before the 93A count is included in the complaint."  No. CIV.A. 11-10841-JGD, 2012 WL 860212, at *5 (D. Mass. Mar. 12, 2012); see also Tarpey v. Crescent Ridge Dairy, Inc., 47 Mass.App.Ct. 380, 391–92

(1999) (allowing plaintiff to amend complaint and add claim under Chapter 93A where demand letter sent after original complaint filed); Akar v. Fed. Nat. Mortg. Ass'n, 845 F. Supp. 2d 381, 404 (D. Mass. 2012) ("Massachusetts courts have allowed plaintiffs to amend their complaint to add a claim under Chapter 93A, despite not having delivered the demand letter to the defendant prior to filing the initial suit, where the letter has served the purposes of the demand requirement in encouraging negotiation and settlement."). In other words, a Chapter 93A demand letter is a prerequisite to a complaint alleging a 93A claim. If an original complaint does not contain such a claim, but an amended claim does, a Chapter 93A demand letter is timely if served after the original complaint but at least 30 days before filing the amended complaint.

Thus, the case law Plaintiffs cite provides them no relief. Here the original complaint asserted four counts under 93A. It matters little that the original complaint indicated that 93A letters would be forthcoming because the time for service here would have been at least 30 days before Plaintiffs filed the original complaint. The demand letters were not sent until three days after Plaintiffs filed the original complaint and were thus untimely. Plaintiffs' first amended complaint, [Dkt. No. 57], filed on October 26, 2022—eighty-two days after Defendants acknowledge they received 93A demand letters—asserted the same four counts under 93A against the same four Defendants. Furthermore, "a plaintiff must allege in the complaint that a demand letter has been sent in order to satisfy the procedural requirements of a 93A claim." Francisque, 2012 WL 860212, at *5; see also Spring v. Geriatric Auth. of Holyoke, 394 Mass. 274, 286–87 (1985) (confirming the requirement that plaintiff allege and prove the existence of a demand letter in order to sufficiently satisfy the requirements of a Chapter 93A claim). Here, as mentioned, Plaintiffs merely indicated that demand letters were forthcoming.

I thus recommend dismissing Plaintiffs' claims under 93A against MassNatural, Seaman Paper, Otter Farm, and the Greif Defendants, under Counts III, X, XVII, and XXIV.

b. Substantive Bar

While the procedural bar demands dismissal, I address the merits of Plaintiffs' Chapter 93A claims as to all Defendants, since I must do so in response to 3M's motion to dismiss.[37]

Defendants collectively make two arguments in support of dismissal: first, that Plaintiffs have not alleged between them and Defendants the business or commercial link necessary to state a ch. 93A claim; and second, that Plaintiffs have failed to adequately plead that any of Defendants' actions meet the definition of "deceptive" and/or "unfair." See [Dkt. No. 99, p. 11; Dkt. No. 92, p. 6; Dkt. No. 101, p. 15]. MassNatural joins Seaman Paper and Otter Farm as to the second of those two arguments, but does not contest that its sale of allegedly PFAS-contaminated products supports a business or commercial link between it and Plaintiffs. [Dkt. No. 94, p. 2].

i. *Commercial Transaction in a Business Context*

Massachusetts courts have repeatedly observed that Chapter 93A, § 2(a) "is intended to apply to individuals acting in a business context and is therefore not applicable 'where the transaction is strictly private in nature, and is in no way undertaken in the ordinary course of a trade or business.'" Sullivan v. Five Acres Realty Tr., 487 Mass. 64, 69 (2021) (quoting Lantner v. Carson, 374 Mass. 606, 607-608 (1978)). The SJC has articulated that the applicability of 93A "requires a dual inquiry: first, the court assesses whether the interaction is 'commercial' in nature, and second, it evaluates whether the parties were both engaged in 'trade or commerce,' and therefore acting in a 'business context.'" Linkage Corp. v. Trustees of Bos. Univ., 425 Mass. 1,

---

[37] In the operative complaint, Plaintiffs added a single count under 93A against 3M, who was joined as a Defendant after the consolidation of the two cases underlying this case. This 93A claim is not procedurally defective, and 3M does not claim otherwise.

22–23 (1997).  Chapter 93A "requires that there be a commercial transaction between a person engaged in trade or commerce [and] another person engaged in trade or commerce. Once it has been established that a commercial transaction exists, then [the court] address[es] whether the individuals were acting in a 'business context[.]'"  Id.

To first address MassNatural, I find Plaintiffs have pleaded a "commercial" interaction between MassNatural and the "Consumer Subclass"—namely "[a]ll natural persons who have purchased contaminated composted products from MassNatural during the Class Period."  [Dkt. No. 77 ¶226].  MassNatural does not dispute that its commercial activities, as pleaded by Plaintiffs, fall under the purview of Chapter 93A.

The thrust of Plaintiffs' opposition to the substantive component of the motion to dismiss by Seaman Paper, Otter Farm, 3M, and the Greif Defendants is that they "manufactured, stored, and/or provided the PFAS-contaminated short paper fiber sludge byproducts that MassNatural used to produce [] consumer products [], knowing those products would be sold to Plaintiffs and Consumer Subclass Members."  [Dkt. No. 108, p. 28].  Citing Ciardi v. Horrmann-La Roche, Ltd., 436 Mass. 53 (2002), Plaintiffs argue that 93A unequivocally regulates trade and commerce "directly or indirectly affecting the people of this commonwealth[,]" M.G.L. c. 93A, §§ 1, 9(1), and thus that the absence of any direct commercial relationship between Plaintiffs and 3M, Seaman Paper, Otter Farm, or any of the Greif Defendants does not preclude their Chapter 93A claims.

Ciardi involved antitrust and Chapter 93A claims by an indirect purchaser of vitamins against manufacturers and distributors allegedly involved in a price-fixing conspiracy.  Framing the issue before the Court as "whether indirect purchasers can assert claims for price-fixing or other anticompetitive conduct under [93A][,]" the SJC held that the MCPA's broad language contemplated protection for such plaintiffs, even where indirect purchasers lacked standing to sue

under federal antitrust or consumer statutes.  This Court has since applied <u>Ciardi</u>'s holding to find manufacturers of raw materials sold to other manufacturers for the production of consumer goods liable under chapter 93A.  See <u>Moniz v. Bayer Corp.</u>, 484 F. Supp. 2d 228, 230–31 (D. Mass. 2007).  Though this Court acknowledged that "the [manufacturing] defendants in th[at] case are arguably farther removed from the consumer than the defendants in <u>Ciardi</u> because they do not actually produce a product that is itself sold to consumers[,]" it nevertheless found the "distinction without a difference because the effect is exactly the same: price-fixing by an up-stream manufacturer results in an unfairly inflated price for the consumer product to the plaintiff's detriment."  <u>Id.</u> (citing <u>Ciardi</u>, 436 Mass. at 64-65); <u>see also</u> <u>id.</u> (citing <u>Grimaldi v. Akzo Nobel Chemicals International B.V.</u>, C.A. No. 04–1052 (Mass. Sup. Ct. Dec. 28, 2005), that came to the same conclusion regarding upstream manufacturing defendants).  This Court also emphasized the "relatively light burden" on Plaintiffs at the motion to dismiss stage, indicating that the SJC "held that the plaintiff in <u>Ciardi</u> had stated a valid claim despite the fact that she was a consumer of a wide range of products, many of which contained vitamin products as only a minor component." <u>Id.</u> (quoting <u>Ciardi</u>, 436 Mass. at 64-65).

While at first blush these cases would point to denying the motions to dismiss on substantive grounds, in my view there is a significant factual distinction which calls for granting the motion.  In each of the three cases mentioned above, the upstream defendants manufactured the product or ingredients of the product which the indirect purchaser bought.  In <u>Ciardi</u>, defendants manufactured and packaged vitamins; in <u>Moniz</u> and <u>Grimaldi</u>, the defendants manufactured rubber and urethane used in products the plaintiffs purchased.  There is an indirect commercial link.  Indeed, each case involved alleged price-fixing which adversely impacted the plaintiffs.  Here, on the other hand, the case sounds in tort, and only MassNatural made the compost

the Consumer Subclass purchased.  No other Defendant made the compost, and no other Defendant actually manufactured a component of the compost.  Instead, Seaman Paper and Newark manufactured paper products, and in that process created byproduct, some of which was allegedly contaminated.  What was disposed of at the Property was such byproduct.  In my view, this removes 3M, Seaman Paper, and Newark from the commercial chain of production with regard to topsoil and other compost products bought by the Consumer Subclass.  It would be different if Seaman Paper and Newark manufactured, say, biodegradable pots for plants and sold them to MassNatural.  And it would be different if 3M manufactured an ingredient (whether or not toxic) for the biodegradable plant pots.  Indeed, Seaman Paper and Newark did not sell their byproduct; Plaintiffs allege Seaman Paper and Newark paid for the byproduct to be hauled away.  Ciardi, Moniz, and Grimaldi were about defining the limits of commercial liability for the sale of consumer products.  In my view, when considered through the lens of "judicial experience and common sense ... [and] read[ing] [the complaint] as a whole[,]" Evenflo, 54 F.4th at 39, the allegations here stretch those limits beyond the scope of Chapter 93A, and Plaintiffs seek to put the proverbial square peg in a round hole.  Putting aside the procedural bar to Plaintiffs' claims against Newark, Seaman Paper, Otter Farm and MassNatural, I recommend that those Defendants' and 3M's motions to dismiss Plaintiffs' Chapter 93A claims be allowed.

ii.   *Deceptive or Unfair Conduct*

Recognizing the lack of case law for my analysis regarding indirect purchasers, I address whether the allegations show deceptive or unfair conduct.  I find they do.

"Although Chapter 93A broadly prohibits 'unfair' and 'deceptive' conduct in trade or commerce, the statute does not spell out what specific actions make the grade." McDermott v. Marcus, Errico, Emmer & Brooks, P.C., 775 F.3d 109, 116 (1st Cir. 2014) (noting that the statute

also omits definitions of "trade" and "commerce").  The SJC has stated that whether a particular violation qualifies as unfair or deceptive conduct "is best discerned 'from the circumstances of each case.'"  Kattar v. Demoulas, 433 Mass. 1, 14 (2000) (quoting Commonwealth v. DeCotis, 366 Mass. 234, 242 (1974)).  Plaintiffs premise their 93A claim on both unfair and deceptive conduct by Defendants.  [Dkt. No. 108, pp. 28-33].

The First Circuit has articulated that, to plausibly state a Chapter 93A claim premised on a deceptive act, "the plaintiff must allege '(1) a deceptive act or practice on the part of the seller; (2) an injury or loss suffered by the consumer; and (3) a causal connection between the seller's deceptive act or practice and the consumer's injury.'"  Tomasella v. Nestle USA, Inc., 962 F.3d 60, 71–72 (1st Cir. 2020) (quoting Mass. Gen. Laws ch. 93A, § 9) (other internal citations omitted). An act or practice is deceptive if it "has the capacity to mislead consumers, acting reasonably under the circumstances, to act differently from the way they otherwise would have acted (i.e., to entice a reasonable consumer to purchase the product)."  Aspinall v. Philip Morris Companies, Inc., 442 Mass. 381, 396 (2004).  "The spectrum of liability for deceptive acts or practices spans from affirmative misrepresentations, to certain kinds of nondisclosures, such as 'advertising [that] may consist of a half truth, or even may be true as a literal matter, but still create[s] an over–all misleading impression through failure to disclose material information[.]'"  Tomasella, 962 F.3d at 79–80 (quoting Aspinall, 442 Mass. at 394).  A nondisclosure, or an omission, "is the failure to disclose to another a fact that [one] knows may justifiably induce the other to act or refrain from acting in a business transaction ... [if one] is under a duty to the other to exercise reasonable care to disclose the matter in question."  Underwood v. Risman, 414 Mass. 96, 605 N.E.2d 832, 836 (1993) (quoting Restatement (Second) of Torts § 551 (1977)).

Here, Plaintiffs' allegations show deceptive conduct against the Consumer Subclass only. These consumers were falsely told that MassNatural extensively tested all materials accepting for composting and created the impression its compost and other products were environmentally safe when, as alleged, they were contaminated with PFAS compounds.  Such actions were deceptive and, in my view, actionable under Chapter 93A as to the consumers of such products.

Accordingly, I recommend that the motion by Seaman Paper, Otter Farm, MassNatural and Newark be granted on procedural grounds.  Alternatively, I recommend the same result as to Seaman Paper, Otter Farm, Newark and 3M on substantive ground because I find a lack of a commercial link between them and the Consumer Subclass.  Should the Court reject this recommendation, I find that the allegations of deceptive conduct are sufficient to support a Chapter 93A claim.

## III.    Conclusion

For the reasons set forth above, I recommend the following:[38]

That Greif and Caraustar's motion to dismiss for personal jurisdiction, [Dkt. No. 95], be GRANTED.[39]

That MassNatural's motions to dismiss: Medical Monitoring (Count I) be DENIED; Negligence (Count II) be DENIED as unopposed; Violation of Massachusetts Consumer

---

[38] The Parties are advised that pursuant to 28 U.S.C. § 636(b)(1) and Fed. R. Civ. P. 72(b)(2), they are entitled to object to the Court's Report and Recommendation by filing a specific written objection with the Clerk of this Court within fourteen (14) days of service of this Report and Recommendation.  Such written objections must specifically identify the portion of the Report and Recommendation to which objection is made and the basis for those objections.  The Parties are further advised that the First Circuit has repeatedly indicated that failure to comply with Fed. R. Civ. P. 72(b) shall preclude further appellate review.  See, e.g., M. v. Falmouth Sch. Dep't, 847 F.3d 19, 26 (1st Cir. 2017); Keating v. Sec'y of Health & Human Servs., 848 F.2d 271, 275 (1st Cir. 1988).

[39] As mentioned, supra, I address Greif, Caraustar, and Newark's joint 12(b)(6) motion to dismiss only as to Newark, having recommended dismissal of Caraustar and Greif on jurisdictional grounds.

Protection Act, M.G.L. ch. 93, §§1, et seq. (Count III) be GRANTED; Private Nuisance (Count IV) be DENIED as unopposed; Public Nuisance (Count V) be DENIED; Ultrahazardous Activity / Strict Liability (Count VI) be DENIED; Willful and Wanton Conduct (Count VII) be DENIED.

That Seaman Paper's motions to dismiss: Medical Monitoring (Count VIII) be DENIED; Negligence (Count IX) be DENIED; Violation of Massachusetts Consumer Protection Act, M.G.L. ch. 93, §§1, et seq. (Count X) be GRANTED; Private Nuisance (Count XI) be DENIED; Public Nuisance (Count XII) be DENIED; Ultrahazardous Activity / Strict Liability (Count XIII) be DENIED; Willful and Wanton Conduct (Count XIV) be DENIED.

That Otter Farm's motions to dismiss: Medical Monitoring (Count XV) be DENIED; Negligence (Count XVI) be DENIED; Violation of Massachusetts Consumer Protection Act, M.G.L. ch. 93, §§1, et seq. (Count XVII) be GRANTED; Private Nuisance (Count XVIII) be DENIED; Public Nuisance (Count XIX) be DENIED; Ultrahazardous Activity / Strict Liability (Count XX) be DENIED; Willful and Wanton Conduct (Count XXI) be DENIED.

And, with respect to Otter Farm, Seaman Paper, and MassNatural jointly, that their motions to dismiss Violations of the Racketeer Influenced and Corrupt Organization Act ("RICO"), 18 U.S.C. § 1962(c) (Count XXXIV); and Violations of RICO, 18 U.S.C. § 1962(d), by Conspiring to Violate 18 U.S.C. § 1962(c) (Count XXXV) both be DENIED.

That Newark's motions to dismiss: Medical Monitoring (Count XXII) be DENIED; Negligence (Count XXIII) be DENIED; Violation of Massachusetts Consumer Protection Act, M.G.L. ch. 93, §§1, et seq. (Count XXIV) be GRANTED; Private Nuisance (Count XXV) be DENIED; Public Nuisance (Count XXVI) be DENIED; Ultrahazardous Activity / Strict Liability (Count XXVII) be GRANTED; Willful and Wanton Conduct (Count XXVIII) be DENIED; Violations of the Racketeer Influenced and Corrupt Organization Act ("RICO"), 18 U.S.C. §

1962(c) (Count XXXIV) be GRANTED; Violations of RICO, 18 U.S.C. § 1962(d), by Conspiring to Violate 18 U.S.C. § 1962(c) (Count XXXV) be GRANTED.

That 3M's motions to dismiss: Negligence (Count XXIX) be DENIED; Breach of Warranty for Failure to Warn (Count XXX) be DENIED; Breach of Warranty for Defective Design (Count XXXI) be GRANTED; Violation of Massachusetts Consumer Protection Act, M.G.L. ch. 93, §§1, et seq. (Count XXXII) be GRANTED; Medical Monitoring (Count XXXIII) be DENIED.

/s/ David H. Hennessy
David H. Hennessy
United States Magistrate Judge