## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| RYAN et al., | ) |
| Plaintiffs, | ) |
| | ) |
| v. | ) CIVIL ACTION |
| | ) NO. 22-cv-40089-MRG |
| GREIF, INC., et al., | ) |
| Defendants. | ) |
| | ) |

## MEMORANDUM AND ORDER REGARDING REPORT AND RECOMMENDATION ON DEFENDANTS' MOTION TO DISMISS
### December 21, 2023

GUZMAN, D.J.

Plaintiffs Thomas Ryan, Susan Ryan, Sean Gallagher, Ashley Sultan Gallagher, Michele Burt, Christopher Cerasuolo, Nancy Donovan, and Lauren Ladue (collectively, "Plaintiffs") brought suit as a putative class[1] against Defendants Greif, Inc., Caraustar Industries, Inc., The Newark Group, Inc., Massachusetts Natural Fertilizer Co., Inc., Otter Farm, Inc., Seaman Paper Company of Massachusetts, Inc., and 3M Company (collectively, "Defendants") alleging Defendants discharged and distributed so-called "forever" chemical substances which contaminated their groundwater wells.

Defendants timely filed five motions to dismiss: (i) Otter Farm, Inc. ("Otter Farm") and Seaman Paper Company of Massachusetts, Inc. ("Seaman Paper") move to dismiss for failure to state a claim, [Dkt. No. 91]; (ii) Massachusetts Natural Fertilizer Co., Inc. ("MassNatural") moves to dismiss for failure to state a claim, [Dkt. No. 94]; (iii) Caraustar Industries, Inc. ("Caraustar") and Greif, Inc. ("Greif") move to dismiss for lack of personal jurisdiction, [Dkt. No. 95] and (iv)

---

[1] As of the date of this Memorandum and Order, the class has not been certified.

with the Newark Group, Inc. ("Newark") move to dismiss for failure to state a claim, [Dkt. No. 98]; and (v) 3M Company ("3M") moves to dismiss for failure to state a claim.  [Dkt. No. 100]. Plaintiffs filed three separate oppositions to these five motions.  [Dkt. Nos. 107, 108, 109].  This Court granted Defendants' motion to file a joint reply brief.[2]  [Dkt. Nos. 111, 113].  Additional reply briefs were submitted by Caraustar and Greif in support of their motion to dismiss for lack of personal jurisdiction, [Dkt. No. 131], and by 3M in support of its motion to dismiss for failure to state a claim.  [Dkt. No. 124].

On May 17, 2023, this Court referred the five motions to Magistrate Judge David H. Hennessy for a report and recommendation ("R&R"), [Dkt. No. 112]. On September 1, 2023, Judge Hennessy issued an R&R on the motions, [Dkt. No. 159]. Judge Hennessy recommended the following:

- Greif and Caraustar's motion to dismiss for lack of personal jurisdiction, [Dkt. No. 95], be GRANTED.

- Otter Farm, Seaman Paper, MassNatural, Caraustar, Greif, and Newark's motions to dismiss for failure to state a claim, [Dkt. Nos. 91, 94, 98] be GRANTED in part, and DENIED in part.

- 3M's motion to dismiss for failure to state a claim, [Dkt. No. 100], be GRANTED in part, and DENIED in part.

All parties timely filed objections to the R&R, [Dkt. Nos. 160, 161, 162, 163, 164]. Additionally, the parties replied to each other's objections, [Dkt. Nos. 169, 170, 174, 175, 176, 177]. Finally,

---

[2] The joint reply brief was submitted by all Defendants with the exception of 3M.  [Dkt. No. 113].

Plaintiffs filed a Notice of Supplemental Authority, [Dkt. No. 179], to which 3M filed a response, [Dkt. No. 180].

It is not necessary to recite the facts underlying this complaint. They were laid out in detail in Judge Hennessy's meticulous R&R. Similarly, it is not necessary for the Court to restate Judge Hennessy's well-reasoned analysis where the Court agrees with the R&R. The objections filed by the parties to the R&R merely repeat, in substantial degree, arguments that were carefully considered and properly rejected by Judge Hennessy; however, the Court will address the objections, where appropriate.

For the reasons set forth below, upon *de novo* review, the Court will adopt Judge Hennessy's R&R, in part. The Court will identify several areas where it adds further analysis and addresses Defendants' objections. Additionally, there are some sections where the Court declines to adopt Judge Hennessy's full analysis because the issue in question can be resolved on a preliminary prong.  Overall, the Court comes to many of the same conclusions on the motions as Judge Hennessy, albeit with some amendments to his reasoning. Accordingly, the Court rules as follows:

- Greif and Caraustar's motion to dismiss for lack of personal jurisdiction, [Dkt. No. 95], is GRANTED.

- Otter Farm, Seaman Paper, MassNatural, Caraustar, Greif, and Newark's motions to dismiss for failure to state a claim, [Dkt. Nos. 91, 94, 98] are GRANTED in part, and DENIED in part.

- 3M's motion to dismiss for failure to state a claim, [Dkt. No. 100], is GRANTED in part, and DENIED in part.

## I.      Legal Standard

When a District Court refers a dispositive motion to a Magistrate Judge for recommended disposition, it must "determine de novo any part of the magistrate judge's disposition that has been properly objected to." Fed. R. Civ. P. 72(b)(3).  "'[A party is] not entitled to a de novo review of an argument never raised' before the magistrate judge." Mills v. Turner, No. 15-13267-MLW, 2017 U.S. Dist. LEXIS 136887, at *3 (D. Mass. Aug. 25, 2017) (quoting Borden v. Sec'y of Health & Human Servs., 836 F.2d 4, 6 (1st Cir. 1987). "Parties must take before the magistrate, 'not only their best shot but all of their shots.'" Id. (internal citation omitted)

To survive a motion to dismiss, the complaint "must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Id. Although "[w]e accept as true the complaint's well-pleaded factual allegations and draw all reasonable inferences in favor of the non-moving party, we do not credit conclusory legal allegations [or] factual allegations that are too meager, vague, or conclusory to remove the possibility of relief from the realm of mere conjecture." Douglas v. Hirshon, 63 F.4th 49, 55 (1st Cir. 2023) (internal quotation marks and citations omitted). "In evaluating the plausibility of a claim, it is helpful to examine the claim against the background of the elements of a prima facie case for liability." Higgins v. Huhtamaki, Inc. ("Higgins I"), No. 1:21-cv-00369-NT, 2022 U.S. Dist. LEXIS 111062, *12 (D. Me. June 23, 2022). But "[i]t is not necessary to plead facts sufficient to establish a prima facie case at the pleading stage." Germanowski v. Harris, 854 F.3d 68, 72 (1st Cir. 2017).

## II.      Background

The Court adopts Judge Hennessy's statement of the facts, Plaintiffs' harm, and class descriptions in this case. [See R&R, pp. 2-11].  The Court turns now to the legal analysis of the claims in dispute and considers the parties' objections to the R&R.

## III.      Analysis

### A.  Lack of Personal Jurisdiction: Greif and Caraustar

Judge Hennessy recommended granting Grief and Caraustar's motion to dismiss for lack of personal jurisdiction. The Court accepts and adopts that recommendation. Although Judge Hennessy found that Plaintiffs sufficiently allege a casual nexus between the Fitchburg Mill ("the Mill") and the contamination of their drinking water, on the "relatedness" prong of the personal jurisdiction analysis, he concluded that Plaintiffs failed to allege facts sufficient to show Greif's or Caraustar's direct control over operations at the Mill. Therefore, Judge Hennessy ruled that Plaintiffs have failed to show "relatedness," between the contamination of drinking water and either Greif's or Caraustar's operation of the Mill and have thus failed to show that an exercise of specific jurisdiction is warranted.

Applying – as Judge Hennessy did – the *prima facia* method,[3] Plaintiff's evidence, taken at face value, does not suffice to show all facts essential to personal jurisdiction over Greif and Caraustar. See Baskin-Robbins Franchising LLC v. Alpenrose Dairy, Inc., 825 F.3d 28, 34 (1st Cir. 2016). Critical to this analysis is that Plaintiffs have failed to proffer clear evidence that would overcome the "longstanding common-law presumption that a separately incorporated subsidiary is institutionally independent of its parent and that jurisdiction cannot therefore be asserted over a

---

[3] In their objection to the R&R, Plaintiffs assert that Judge Hennessy improperly applied the *prima facie* method in his personal jurisdiction analysis. [Dkt. No. 160, p. 16]. The Court finds no merit to this argument.

parent based solely on the conduct of the subsidiary." In re Lupron Mktg. & Sales Pracs. Litig.,

245 F. Supp. 2d 280, 291 (D. Mass. 2003) (citing Cannon Mfg. Co. v. Cudahy Packing Co., 267

U.S. 333, 336 (1925)). As Judge Hennessy noted:

> To overcome the presumption of corporate separateness and supportably show Greif's operation of the Mill, Plaintiffs allege "Greif referred to the Fitchburg Mill as one of its own on its website, advertised employment opportunities at the Fitchburg Mill, provided welcome handbooks to new employees bearing the Greif logo, and installed signage inside and outside the Fitchburg Mill that said 'Greif[.]'" [Dkt. No. 107, p. 18]. Plaintiffs add that Defendants (presumably Greif) "advertise for jobs and solicit and hire employees to work in their own 'Greif Fitchburg Mill.'" [Id., p. 14]. Finally, Plaintiffs point to the fact that managers and employees at the Fitchburg Mill identify their employer as Greif, some Greif executives also serve as Caraustar executives, and the Mill General Manager uses both "@caraustar.com" and "@grief.com" email addresses. [Id. pp. 14-15, 18; Exs. 106-16 to 106-28].

[R&R, p. 17]. These allegations constitute badges of ownership that illustrate the corporate

relationship between Greif and its subsidiaries, but they are not sufficient to demonstrate the level

of control over the Mill that would be required to overcome the presumption of corporate

separateness to exercise personal jurisdiction over Greif and Caraustar.

Judge Hennessy relied in part on an affidavit of Gary R. Martz, Secretary of Greif, Inc.

since 2002, [Dkt. No. 96-11], where Martz avers that neither Grief nor Caraustar exercises

operational control over the Mill. The Martz affidavit also included official documents, such as

legal documents and utility bills, which show that Newark owned and operated the Mill through

the corporate acquisitions. [See id.] The Court declines to consider the factual statements in the

affidavit to the extent that they contradict Plaintiffs' assertions that Greif and Caraustar do retain

operational control as, at the motion to dismiss stage, the Court may only consider "facts put

forward by the defendant only to the extent that they are uncontradicted." Mora v. AngioDynamics,

Inc., No. 21-cv-11352-ADB, 2021 U.S. Dist. LEXIS 208157, at *8 (D. Mass. Oct. 28, 2021)

(citations omitted). However, the Court does take note of the official documents attached to the

affidavit as Plaintiffs make no assertions concerning which entity pays the Fitchburg Mill's bills or whether Greif or Caraustar handle administrative responsibilities. These documents indicate that Newark retained primary control of the Mill and Greif and Caraustar were not involved in managing the administrative responsibilities of the Mill.

The Court accepts and adopts Judge Hennessy's reasoning and conclusions in his analysis of purposeful availment and reasonableness, [R&R, pp. 20-23], as well as his findings on Plaintiffs' alternative sources of jurisdiction (piercing the corporate veil and RICO service of process), [R&R, pp. 23-31]. Accordingly, Greif and Caraustar's motion to dismiss for lack of personal jurisdiction is GRANTED.

B.  <u>Failure to State a Claim</u>

The Court accepts and adopts Judge Hennessy's statement of the legal standard for a motion to dismiss for failure to state a claim upon which relief can be granted. [R&R, pp. 31-33].

1.  *RICO*

As stated in the Report and Recommendation:

> Plaintiffs assert against Greif, Caraustar, Newark, Seaman Paper, Otter Farm, and MassNatural a substantive RICO claim and a RICO conspiracy. [Dkt. No. 77, pp. 127-32]. They allege that the RICO Defendants acted in concert "for the common and/or shared purposes of (1) illegally avoiding regulatory compliance costs while transporting, processing, storing, and/or disposing of short fiber paper sludge, (2) concealing compliance failures while transporting, processing, storing, and/or disposing of short fiber paper sludge, and (3) preventing investigations into compliance failures which may lead to fines or legal liability." [<u>Id.</u>, ¶543]. Plaintiffs allege that Defendants pursued these goals "through a pattern of racketeering activity[,]" and by "commit[ting] [] fraud knowingly and with the intent to advance the scheme." [<u>Id.</u>, ¶544].

[R&R, p. 33].

Judge Hennessy found that Plaintiffs have sufficiently alleged substantive RICO and RICO conspiracy claims against Seaman Paper, Otter Farm, and MassNatural, but that Plaintiffs'

allegations against Greif, Caraustar, and Newark do not cross the plausibility threshold. [R&R, pp. 33-47]. Upon *de novo* review, the Court accepts and adopts that recommendation.

First, the Court addresses all Defendants' objections that Judge Hennessy drew improper inferences from Plaintiffs' facts in coming to his conclusions. [Dkt. No. 161, pp. 4-6; Dkt. No. 164, pp. 8-18]. The plausibility standard for a motion to dismiss is in some ways one of the lowest burdens a plaintiff must overcome in the stages of dispositive motions leading up to trial. Additionally, the standard is framed in a way that favors plaintiffs. On a motion to dismiss under Rule 12(b)(6), a court "must assume the truth of all well-plead[ed] facts and give the plaintiff the benefit of all reasonable inferences therefrom." Ruiz v. Bally Total Fitness Holding Corp., 496 F.3d 1, 5 (1st Cir. 2007) (citing Rogan v. Menino, 175 F.3d 75, 77 (1st Cir. 1999)). "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully[.]" Iqbal, 556 U.S. at 678 (quoting Twombly, 550 U.S. at 556). Judges make their determination through the lens of "judicial experience and common sense . . . [and] read[ing] [the complaint] as a whole." Xavier v. Evenflo Co. (In re Evenflo Co.), 54 F.4th 28, 39 (1st Cir. 2022).

Furthermore, to survive a motion to dismiss, "a complaint does not have to evince a 'one-to-one relationship between any single allegation and a necessary element of the cause of action.'" A.G. ex rel. Maddox v. Elsevier, Inc., 732 F.3d 77, 82 (1st Cir. 2013) (quoting Rodrígues-Reyes v. Molina-Rodríguez, 711 F.3d 49, 55 (1st Cir. 2013). "The critical question is whether the claim, viewed holistically, is made plausible by 'the cumulative effect of the factual allegations' contained in the complaint." Id. (quoting Ocasio- Hernández v. Fortuno-Burset, 640 F.3d 1, 14 (1st Cir. 2011)).

While Defendants may dislike the inferences Judge Hennessy drew, the Court finds the inferences were not unreasonable and indeed draws the same inferences on many of Plaintiffs' claims. Furthermore, Judge Hennessy's evaluation of the complaint's plausibility properly considered the claims as a whole and did not penalize Plaintiffs by requiring them to prove every single element indisputably at this early stage.

With that, the Court turns to Plaintiffs' RICO claims. Judge Hennessy's findings as to Seaman Paper, Otter Farm, and MassNatural merit restating here. Judge Hennessy concluded:

> I find Plaintiffs' factual allegations sufficient to allege an enterprise among Seaman Paper, Otter Farm, and MassNatural. The key allegations are that "MassNatural allowed Seaman Paper's unchecked dumping of toxic paper fiber sludge . . . starting in the 1980's[,]" and that MassNatural's "willingness to accept this material without testing it, and to lie about MassNatural's own compliance procedures to [S]tate authorities, allowed Seaman Paper to avoid paying for expensive hazardous waste transporters and for proper disposal." [Dkt. No. 77, ¶¶148-49]. Otter Farm is integral to this purpose. The three businesses comprising the association-in-fact are bound by a relationship which can be traced to the events of 2002. In that year, Seaman Paper purchased the Property at a foreclosure sale. Within days, it incorporated Otter Farm. After incorporating Otter Farm, Seaman Paper conveyed to it title to the Property. Then, Otter Farm entered into a renewable lease of nearly 100 years with MassNatural at allegedly below-market rent. [Id. at ¶153(e)]. This arrangement thus assured Seaman Paper a site at which to dump contaminated byproducts from its paper mill at an alleged discount. It also served to frustrate regulatory oversight: between Seaman Paper and MassNatural was Otter Farm, a separate corporation which nominally held title to the Property Seaman Paper purchased, and which served as MassNatural's landlord. There is no apparent reason that Seaman Paper could not have held title to the Property. And having given MassNatural a long-term lease at a favorable rate, Otter Farm possessed the leverage to ensure MassNatural's cooperation in receiving and handling Seaman's contaminated byproducts and concealing violations of environmental regulations. Accepting Plaintiffs' factual pleadings as true, Seaman Paper's close and long-standing relationship with Otter Farm and MassNatural raises at least a plausible inference of the alleged shared purpose of managing Seaman Paper's disposal costs and avoiding regulatory oversight. Lastly, because it is alleged that this arrangement was created in 2002 and continued a practice from the 1980s, the alleged enterprise satisfies the longevity requirement. I find Plaintiffs' allegations that Seaman Paper and Otter Farm were aware of MassNatural's regulatory violations plausibly inferable on the basis of the longevity and multi-layered business relationship among those three Defendants.

[R&R, pp. 35-36]. On *de novo* review, the Court agrees with Judge Hennessy's assessment and conclusions above and adopts them as its own.

Seaman Paper and Otter Farm object to the R&R's conclusion, arguing that their conduct and relationship with each other and MassNatural amount to no more than innocent conduct of "different companies working together to save expense." [Dkt No. 164, p. 10]. However, the allegations here are that the Defendants utilized their business relationships as a vehicle to subvert regulatory oversight and save the expenses of environmental compliance. Drawing on the same caselaw as Judge Hennessy, the Court finds such conduct and relationships to be sufficient to form the basis of a RICO claim. Additionally, Seaman Paper and Otter Farm dispute that they had reason to know MassNatural's regulatory submissions were purportedly false. [Dkt. No. 164, p.14]. Here the Court finds sufficient Plaintiffs' allegations that the Defendants knew that MassNatural was improperly disposing of contaminated waste and falsely certifying compliance not only due to collusion, but also because of savings incurred from avoiding the increased costs that would accompany proper disposal methods. [Dkt. No. 77, ¶¶ 155-56]. Finally, with regard to causation, upon *de novo* review, the Court agrees with the conclusion of Judge Hennessy that had MassNatural truthfully complied with regulations and reported its handling and use of contaminated waste, it is plausible that regulators like MassDEP would have intervened earlier to prevent the harm to Plaintiffs – just as MassDEP did in early 2022 when elevated PFAS levels were reported in Plaintiffs drinking wells. Therefore, the Court finds that Plaintiffs have sufficiently pleaded that Seaman Paper, and Otter Farm, and MassNatural's RICO violations of submitting false environmental compliance certifications proximately caused Plaintiffs' injuries.

As to the RICO claim against the Newark,[4] the Court agrees with Judge Hennessy that Plaintiffs have failed to show the requisite relationship between Newark and the other three RICO Defendants (Seaman Paper, Otter Farm, and MassNatural) that would make Newark an integral member of the RICO association-in-fact enterprise laid out above. Accordingly, the Court DENIES Seaman Paper, Otter Farm and MassNatural's motion to dismiss the RICO and RICO conspiracy claims (Counts XXXIV and XXXV) and GRANTS Newark's motion to dismiss the same (Counts XXXIV and XXXV).

## 2. *Negligence*

All Defendants except MassNatural challenge Plaintiffs' negligence claims. Judge Hennessy recommended denying all Defendants' motions to dismiss these claims. The Court accepts and adopts Judge Hennessy's statement of law on Plaintiffs' burden for their negligence claim at a motion to dismiss stage. The Court highlights that it agrees with Judge Hennessy's assessment that "facilities that use and dispose of PFAS-contaminated materials, knowing of risks associated with PFAS ingestion and the risks of environmental contamination following improper disposal, owe foreseeable victims of such contamination a duty of care." [R&R, p. 51 (citing Parris v. 3M Co., 595 F. Supp. 3d 1288, 1331 (N.D. Ga. 2022); Zimmerman v. 3M Co., 542 F. Supp. 3d 673, 681 (W.D. Mich. 2021))]. Additionally, the Court adopts Judge Hennessy's conclusion that Seaman Paper, Otter Farm, and Newark all fall within the "facilities" described above and therefore owe a duty of care to foreseeable victims of PFAS contamination, which include the Plaintiffs in this case.

---

[4] The Court does not analyze Plaintiffs' RICO claims against Defendants Greif and Caraustar because it finds that the Court lacks personal jurisdiction over those Defendants and dismisses them as parties.

a. <u>Seaman Paper & Otter Farm</u>

Judge Hennessy found that Plaintiffs have alleged sufficient facts to sustain their negligence claim against Seaman Paper and Otter Farm. As stated above, Judge Hennessy concluded that Seaman Paper and Otter Farm owed a duty of care to the Plaintiffs for two reasons: (1) the Defendants' status as "facilities that use and dispose of PFAS-contaminated materials, knowing of risks associated with PFAS ingestion and the risks of environmental contamination following improper disposal," <u>see</u> <u>Parris</u>, 595 F. Supp. 3d at 1331; and, (2) Plaintiffs' status as foreseeable victims of such contamination given they are residents living in close proximity to MassNatural's composting facility and consumers of MassNatural's products. [R&R, pp. 51-52]. As to causation, Judge Hennessy found that Plaintiffs have sufficiently alleged that the conduct of Seaman Paper and Otter Farm was a substantial factor in contaminating Plaintiffs' drinking water and property. [<u>Id.</u>, p. 52]. As Judge Hennessy noted, Seaman Paper dumped contaminated waste at the MassNatural property, which is owned by Otter Farm, and is within a short distance of Plaintiffs' drinking water wells. [<u>Id.</u>, p. 52]. Further, Judge Hennessy noted, MassDEP attributes the unsafe PFAS levels in drinking water to contaminants escaping the property or found in products MassNatural sold. [Id.]. Plaintiffs' allegations as to breach and injury, also support that Seaman Paper and Otter Farm's conduct was a substantial factor causing Plaintiffs' harm. <u>See</u> <u>Higgins I</u>, 2022 U.S. Dist. LEXIS 111062, at *17 (finding substantial factor causation where "[t]he geographic proximity of the Mills to the Properties, combined with the Plaintiffs' factual allegations about how these chemicals were disposed of and how they disperse once disposed of, [made] it plausible that the contamination of the Properties resulted from chemicals produced at the Defendants' nearby Mills.")

With respect to these elements of Plaintiffs' negligence claims, Judge Hennessy rightly rested on Plaintiffs' allegations that Seaman Paper and Otter Farm "arranged for the transport, disposal, storage or treatment of hazardous material' to or at MassNatural's … operations" where it was mishandled and allowed to leach into groundwater; that the same byproducts were incorporated into compost and other retail products which, when used by consumers, separately leached into groundwater, in each case causing contamination." [Dkt. No. 77, ¶¶ 115, 120, 182, 300, 342-358]. After its own *de novo* review, the Court accepts and adopts Judge Hennessy's findings stated above and, accordingly, DENIES Seaman Paper and Otter Farm's motion to dismiss Plaintiffs' negligence claims under Counts IX and XVI.

b. Newark

Judge Hennessy found that Plaintiffs have sufficiently alleged a plausible negligence claim against Newark. The Court accepts and adopts that recommendation. As Judge Hennessy noted, "Newark's duty of care depends on its use of PFAS in its manufacturing process, its knowledge of PFAS's toxicity, and the careless method it allegedly adopted to dispose of those chemicals." [R&R, p. 54]. In addition to the key facts that Judge Hennessy highlighted, the Court adds the following: Plaintiffs have adequately pleaded that the dangers of PFAS are well-known [Dkt. No. 77, ¶¶ 36-39, 61-86], that PFAS chemicals are considered to be "generally used" within the paper manufacturing industry [id., ¶¶ 111-12, 118], that Newark is part of the paper manufacturing industry [id., ¶¶ 55-60], that PFAS contamination was found in the waste originating at Newark's Fitchburg Mill [id., ¶¶ 90-106, 113, 115, 117-20], that there was in fact contamination and that Newark was found by a state entity to be potentially liable [id., ¶¶ 40-43,  94-97, 104-05, 118], and that there was a long-term business relationship between Newark and MassNatural where

Newark contracted with MassNatural to dispose of its PFAS-containing waste without taking reasonable care to ensure such toxic waste was disposed of properly. [id., ¶ 60].

In essence, these facts alleged by Plaintiffs raise the reasonable inference that Newark, as an established paper manufacturer, should have known there was at least a high likelihood that there was toxic PFAS in its paper products and waste and was either negligent or willfully blind in its failure to ensure that proper protocols for safe disposal of PFAS-containing waste were in place. Further, Newark's assertion that it does not use PFAS in its products would imply that it must not have informed MassNatural that its products may contain PFAS. This undercuts Newark's attempt to escape liability by asserting that it lacked control over MassNatural or where is sourced other residuals for composting. [Dkt. No. 99, p. 8]. Moreover, the MassDEP's July 20, 2022, NOR identifies "Greif Paper" originating from the Fitchburg Mill as containing hazardous levels of PFAS – indicating that regardless of Newark's insistence that its products and waste did not contain PFAS, there is credible evidence that they in fact did contain PFAS. [Dkt. No. 77, ¶ 118].

Plaintiffs' allegations rely on and exceed what was alleged in Higgins I, where the court found the plaintiffs had sufficiently alleged causation for their negligence claims. 2022 U.S. Dist. LEXIS 111062.  In Higgins I, the plaintiffs alleged that (1) the defendants disposed of PFAS-contaminated waste by discharging it various specified ways; (2) once PFAS-contaminated waste is disposed of, "chemicals are all but certain to migrate through the soil to groundwater and aquifers[;]" and (3) those "waste products ultimately reached and contaminated" the plaintiffs' properties and bodies.  Id. at *15-16. Plaintiffs here have established substantial factor causation using similar facts with even greater support, such as the MassDEP's July 20, 2022, NOR and the MassDEP's UAOs, which found the "use, emission, discharge, and/or distribution" of PFAS-

contaminated material at the Property precipitated the groundwater contamination. [Dkt. No. 77, ¶¶101, 102]. Accordingly, the Court adopts Judge Hennessy's recommendation and DENIES Newark's motion to dismiss Plaintiffs' negligence claim under Count XXIII. The Court does not consider the negligence claims against Greif and Caraustar as the Court lacks personal jurisdiction over those Defendants.

c.  3M

Judge Hennessy recommended denying 3M's motion to dismiss Plaintiffs' negligence claim, finding that 3M owed a duty to Plaintiffs and that Plaintiffs have met their burden on establishing both factual and proximate causation. [R&R, pp. 55-63]. The Court accepts and adopts Judge Hennessy's analysis and recommendation, with a few amendments.

The Court emphasizes that 3M owes a duty to the Plaintiffs but clarifies the nature of that duty. The Court views Parris as the case most on point to the matter at hand as it is factually similar to this case and the Parris plaintiffs also brought claims against PFAS manufacturing defendants, including 3M, based on negligence and negligent failure to warn.[5] See Parris v. 3M Co., 595 F. Supp. 3d 1288.

The Court adopts Judge Hennessy's summary of Parris:

> 3M and three other PFAS manufacturers were sued for groundwater contamination traced to a textile mill, which allegedly sourced PFAS from the four "Manufacturing Defendants."  Parris, 595 F.Supp.3d at 1306.  The textile mill,

---

[5] Although Parris concerned negligence and failure to warn under Georgia law, Georgia law and Massachusetts law on both negligence and failure to warn are substantially similar such that comparison is appropriate. Compare Brown v. United States, 557 F.3d 1, 3 (1st Cir. 2009) (stating elements for negligence under Massachusetts law), with Parris, 595 F.Supp.3d at 1327 (stating elements for negligence under Georgia law), and Moore v. Mylan Inc., 840 F. Supp. 2d 1337, 1351 (N.D. Ga. 2012) (same). Compare Arbella Mut. Ins. Co. v. Field Controls, LLC, No. 16-10656-LTS, 2019 U.S. Dist. LEXIS 58319, at *15 (D. Mass. Apr. 4, 2019) (stating elements for failure to warn under Massachusetts law), with Parris, 595 F.Supp.3d at 1336 (stating elements for failure to warn under Georgia law), and Shelton v. Galco Int'l, Ltd., No. 3:16-cv-00033-TCB, 2017 U.S. Dist. LEXIS 184322, at *9 (N.D. Ga. July 19, 2017) (same).

which had operated for 35 years, had allegedly "discharged [PFAS-contaminated byproduct] via wastewater" at a water pollution control plant operating under a "National Pollutant Discharge Elimination System" permit; however, the plant was "not capable of degrading the PFAS in [the] wastewater[.]" Id. at 1306-07. According to the plaintiff, since 1992, the plant had thus disposed of "nearly 8,000 tons of PFAS-contaminated sludge in [a] watershed, including on property" the plaintiff owned. Id. at 1307. The Court stated that "Georgia courts have found that product suppliers have a duty to protect third parties from reasonably foreseeable harm that occurs during the normal use of their products." Id. at 1328. It thus concluded that "a duty arose where the Manufacturing Defendants continuously supplied PFAS to [the textile mill] with knowledge that the chemicals were unlikely to be made reasonably safe in their regular use and could foreseeably contaminate surface waters and downstream water supplies." Id. at 1330. The court was persuaded by the plaintiff's allegations that "the Manufacturing Defendants (1) have known for decades that PFAS are toxic and persistent in humans and other animals [], (2) have long been aware that conventional wastewater treatment processes are ineffective, resulting in PFAS discharges to surface waters and accumulation in sewage sludge [], and (3) notwithstanding these known risks of harm, have supplied PFAS to [the textile mill] without taking necessary precautions to prevent PFAS from contaminating surface waters[.]" Id.

[R&R, pp. 58-59].

Parris stands for the proposition that upstream manufacturers of PFAS products owe a duty to warn the entities to which they supply those products (downstream manufacturers) about the risks of PFAS for the protection of reasonably foreseeable third parties, including those who may bear the harms of environmental contamination arising from improper disposal of those products. Parris, 595 F.Supp.3d at 1336-38. And so, upstream manufacturers of PFAS, like 3M, owe a duty to Plaintiffs who are foreseeable victims of environmental contamination caused by PFAS, and that duty is the duty to warn downstream manufacturers or users, like the Paper Manufacturing

Defendants,[6] of the dangers of PFAS when not disposed of properly.[7,8] In <u>Parris</u>, the court found plaintiffs had sufficiently alleged that the manufacturing defendants breached their duty by supplying PFAS to a downstream manufacturer "without taking necessary precautions to prevent PFAS from contaminating surface waters" (i.e. providing a warning), despite knowing the risks of harm that PFAS pose. <u>Id.</u> at 1330. Plaintiffs' allegations against 3M in this case mirror those in <u>Parris</u> and the Court finds they are sufficient to allege a duty and breach.

Additionally, in terms of causation, in its objection to the R&R, 3M contends that Judge Hennessy improperly rejected its argument that the conduct of the Paper Manufacturing Defendants is an intervening cause that breaks the causal chain linking 3M to Plaintiffs' injuries. [Dkt. No. 162, p. 19]. 3M cites <u>Staelens v. Dobert</u>, 318 F.3d 77, 79 (1st Cir. 2003), to argue that criminal or otherwise willful conduct is not reasonably foreseeable and breaks the causal chain. [<u>Id.</u>] <u>Staelens</u> states that "[g]enerally, intervening negligent conduct of a third person will not relieve the original tortfeasor from liability where such conduct was reasonably foreseeable." 318 F.3d at 79. Thus, the key question is whether the risk of harm was reasonably foreseeable, which <u>Staelens</u> asserts is a question "ordinarily for the jury," unless the allegations and inferences drawn from them can lead only to "one conclusion." <u>Id.</u> <u>Parris</u> also considered a similar argument from the defendants in that case and found that 3M might have reasonably foreseen that third parties

---

[6] The Paper Manufacturing Defendants include Seaman Paper and Newark. The Court does not include Greif or Caraustar because the Court lacks personal jurisdiction over those Defendants.

[7] The nature of this duty to warn is discussed further in the section of this opinion on Plaintiffs' failure to warn claim, <u>see</u> <u>infra</u> Section 3.b.

[8] The court in <u>Higgins v. Huhtamaki, Inc.</u> found a similar duty, denying a motion to dismiss a failure to warn claim by a class of nonuser homeowners "who were foreseeably affected by a product hazard resulting from a manufacturer's failure to warn the user about the danger to the nonusers." ("Higgins II"), No. 1:21-cv-00369-JCN, 2023 U.S. Dist. LEXIS 179566, at *22 (D. Me. Oct. 5, 2023).

would dispose of PFAS-containing waste in a way that would contaminate water. 595 F.Supp.3d at 1333. Indeed, like in <u>Parris</u>, the Plaintiffs allege that 3M has been aware of PFAS contamination in its own wastewater and sludge since 2000. [Dkt. No. 77, ¶¶ 82-88]. Plaintiffs' allegations do not call for "one conclusion" that the Paper Manufacturing Defendants' conduct relieves 3M's of being the proximate cause of Plaintiffs' harm. <u>See</u> <u>Parris</u>, 318 F.3d at 79. Rather, Plaintiffs have made a plausible claim that 3M's conduct was a substantial factor causing their harm. Therefore, the issue of proximate causation should remain for the jury and Plaintiffs have met their burden on this element at this stage of the litigation.

Plaintiffs' allegations against 3M in this case are essentially identical to the <u>Parris</u> plaintiffs' allegations, and the Court finds that same conclusion regarding negligence applies here – that Plaintiffs have met their burden to survive a motion to dismiss the claim. Accordingly, the Court DENIES 3M's motion to dismiss Count XXIX.

### 3. *Products Liability Claims Against 3M*

#### a. <u>Design Defect</u>

Judge Hennessy concluded that, citing <u>Ducat v. Ethicon, Inc.</u>, 534 F. Supp. 3d 152, 160 (D. Mass. 2021), a plaintiff must allege the existence of an alternative design as a prerequisite to stating a design defect claim. [R&R, p. 67]. The Court agrees and finds that Plaintiffs have failed to allege the existence of an alternative design. Accordingly, the Court adopts Judge Hennessy's recommendation that 3M's motion to dismiss Count XXXI be GRANTED.

#### b. <u>Failure to Warn</u>

Judge Hennessy recommended denying 3M's motion to dismiss Plaintiffs' failure to warn claim, finding that 3M owes a duty to warn Plaintiffs, who are at a foreseeable risk of groundwater contamination due to proximate manufacturers' use and disposal of PFAS acquired from 3M.

[R&R, pp. 68-70]. First, the Court accepts and adopts Judge Hennessy's statement of the legal standard for a failure to warn claim. [R&R, pp. 67-68]. Second, the Court adopts the recommendation that 3M's motion be denied but declines to accept Judge Hennessy's conclusion that 3M owes a duty to warn *Plaintiffs* rather than a duty to warn the *Paper Manufacturing Defendants*.

Plaintiffs do contend that 3M has a duty to warn Plaintiffs themselves of the dangers of PFAS, but the bulk of Plaintiffs' allegations assert that 3M has a duty to warn "*users* of their PFAS products" and "*purchasers*" of their PFAS products, such as the Paper Manufacturing Defendants. [Dkt. No. 77, ¶¶ 501-02]. Judge Hennessy found that Plaintiffs' assertion that 3M should be held liable for failure to warn the Paper Manufacturing Defendants "cannot be squared" with their allegations that Defendants, with the exception of 3M, colluded to dispose of PFAS-contaminated byproduct cheaply at MassNatural's facility, knowing or with reason to know that such a disposal method ran a high risk of contaminating groundwater or otherwise causing environmental harm. [R&R, pp. 68]. Given the allegations of intentional collusion, Judge Hennessy found it implausible that the Paper Manufacturing Defendants would have acted differently had 3M provided adequate warnings as to the dangers of PFAS. [Id.] The Court disagrees.

First, Massachusetts law "permits an inference that a warning, once given, would have been followed." Harlow v. Chin, 545 N.E.2d 602, 606 (1989) (citing Wolfe v. Ford Motor Co., 376 N.E.2d 143, 147 (1978)). Therefore, the Court may infer that had 3M provided a warning to the Paper Manufacturing Defendants, they would have followed it and taken care to dispose of PFAS waste properly. Once a plaintiff establishes that a warning should have been given, as Plaintiffs have done here, "the burden is on 'the defendants to come forward with evidence tending to rebut such an inference.'" Evans v. Lorillard Tobacco Co., 990 N.E.2d 997, 1023-24 (Mass.

2013) (quoting <u>Wolfe v. Ford Motor Co.</u>, 376 N.E.2d 143, 147 (Mass. App. Ct. 1978)). In their objection to the R&R, 3M asserts that due to the intentional collusion between the Paper Manufacturing Defendants and MassNatural, it is implausible that those Defendants would have acted differently with additional warnings. [Dkt. No. 162, p. 20]. Further, with respect to Judge Hennessy's finding that 3M had a duty to warn Plaintiffs' community, 3M also asserts that unspecified additional warnings would not have changed any regulator's behavior. [<u>Id.</u>] In considering the issue *de novo*, the Court does not adopt Judge Hennessy's conclusion that 3M owes a duty to warn Plaintiffs or their community regulators, but rather finds that 3M has a duty to warn the Paper Manufacturing Defendants. As such, the Court does not opine on the effect of suggested warnings to regulators.

As to 3M's first argument, even with the allegations of collusion, the Court finds that had 3M warned the Paper Manufacturing Defendants of the risks posed by PFAS when not disposed of properly, the Paper Manufacturing Defendants may have actually acted differently. Liability for many of the claims in this case hinges in part on whether the Defendants (a) knew of the dangers of PFAS and their potential for environmental contamination when disposed of improperly, and (b) continued to improperly dispose of PFAS despite knowing those risks. A warning issued by 3M to the Paper Manufacturing Defendants would establish factual evidence that those Defendants were on notice and had actual knowledge of the dangers of PFAS and the risks of improper disposal. Such knowledge could support claims of negligence, unfair and deceptive conduct, and RICO conduct and would limit those Defendants' ability to deny that their products contained PFAS – as Newark is contending here. Even if the Paper Manufacturing Defendants decided to engage in illegal collusion to improperly dispose of PFAS waste, a prior warning from 3M would open those Defendants up to liability by providing key evidence about their mental state,

intentionality, and known disregard for substantially certain risks. The Court finds that this increased risk of liability stemming from a warning from 3M could have plausibly changed the Paper Manufacturing Defendants' conduct. Therefore, Plaintiffs have sufficiently alleged at the motion to dismiss stage that the breach of 3M's duty to warn was both the cause in fact and proximate cause of the plaintiff's injuries.  See, e.g., Wasylow v. Glock, Inc., 975 F. Supp. 370, 378-79 (D. Mass. 1996).

Third, regarding Judge Hennessy's finding that Plaintiffs' allegations as to the Paper Manufacturing Defendants' collusion are inconsistent with the allegations concerning 3M's failure to warn, the Court acknowledges the allegations are inconsistent with one another but notes the Federal Rules of Civil Procedure permit such inconsistencies. Pursuant to Rule 8(d)(3), a complainant may plead inconsistent claims. Fed. R. Civ. P. 8(d)(3). Additionally, plaintiffs need not plead consistent facts to survive a motion to dismiss. See § 1283 Consistency in Pleadings Not Demanded, 5 Fed. Prac. & Proc. Civ. § 1283 (3d ed.). Accordingly, Plaintiffs' inconsistent pleading does not preclude a finding that Plaintiffs have plausibly alleged a sufficient factual basis to withstand a motion to dismiss on the failure to warn claim. And the Court finds that they have.

As stated in the Court's negligence analysis for 3M, supra Section 2.c., upstream manufacturers of PFAS, like 3M, owe a duty to Plaintiffs who are foreseeable victims of environmental contamination caused by PFAS. That duty is the duty to warn immediate purchases and downstream manufacturers, like the Paper Manufacturing Defendants, of the dangers of PFAS when not disposed of properly. See Parris, 595 F.Supp.3d at 1336-38. Drawing on MacDonald, Parris, and Zimmerman, Judge Hennessy found a different duty.[9] He held that 3M owes a duty to

---

[9] See MacDonald v. Ortho Pharm. Corp., 475 N.E.2d 65 (Mass. 1985); Parris v. 3M Co., 595 F. Supp. 3d 1288 (N.D. Ga. 2022); Zimmerman v. 3M Co., 542 F. Supp. 3d 673 (W.D. Mich. 2021).

warn *the Plaintiffs* "who are at a foreseeable risk of groundwater contamination due to proximate manufacturers' use and disposal of PFAS acquired from 3M." [R&R, pp. 69-70]. In doing so, Judge Hennessy noted, "I acknowledge that imposing such a duty may create a nearly impossible burden for manufacturers such as 3M" due to the sheer number of people who would have to be warned, what the warning would contain, how it would be communicated, and its geographic scope. [R&R, p. 69]. In determining the nature of the duty that 3M owes to Plaintiffs, the Court again finds Parris instructive.

The court in Parris considered some of the same concerns Judge Hennessy expressed regarding imposing a duty on PFAS manufacturers to warn downstream consumers of products containing PFAS and residents of areas where PFAS has contaminated land or water supply. Parris, 595 F.Supp.3d at 1336-38. The Parris court concluded that such a warning would be impractical and ineffective due to its endless scope.  Id. The Parris court reviewed Reichwaldt v. General Motors LLC, 304 F. Supp. 3d 1312 (N.D. Ga. 2018), which concerned General Motor's ("GM") "CK" pickup truck, which was alleged to be defectively designed due to a defect in the fuel tank. The Reichwaldt plaintiff alleged that GM had a duty to warn reasonably foreseeable third-party victims about the dangerous fuel tank design. Id. at 1314, 1317. The Reichwaldt court disagreed, noting that such a duty would have "almost no fixed scope":

> With hundreds of thousands of CK pickup trucks on the road, there are countless individuals who could foreseeably come into contact with CK pickup trucks. It would be impractical, if not impossible, to fulfill this purported duty to warn. It is difficult to imagine the manner in which . . . GM would have been able to make such a warning, and it would be unreasonable to impose such a duty.

Id. at 1317 (quoted in Parris, 595 F.Supp.3d at 1337). The Parris court agreed with Reichwaldt that it would be unreasonable to impose a duty on the PFAS Manufacturing Defendants to warn the individual residents who may be exposed to contamination allegedly caused by the Defendants.

However, the court found that the Manufacturing Defendants had a duty to warn their immediate customers, i.e., downstream manufacturers using the Defendants' PFAS products in their own production, about the known hazards of PFAS and the proper methods of disposal. The <u>Parris</u> court distinguished such a warning from that proposed in <u>Reichwaldt</u>, noting it would be "neither impractical nor ineffective" because it "would have a more limited scope[.]" <u>Parris</u>, 595 F.Supp.3d at 1337.

In the present case, the Court finds it would be impractical and unreasonable to require that 3M warn any person who may foreseeably come into contact with PFAS it manufactures. Plaintiffs allege that 3M is the dominant global producer of PFOA and related chemicals and is "the only US Manufacturer of PFOS." [Dkt. No. 77, ¶¶ 62-63]. Additionally, Plaintiffs allege that PFOA and PFOS are utilized broadly, including for "machinery coatings, clothing, furniture, adhesives, food packaging, heat-resistant non-stick cooking surfaces, and the insulation of electrical wire" and "across a wide range of industries, including the paper industry." [<u>Id.</u> ¶ 24]. The sheer number of people that come in contact with PFAS originating from 3M has "almost no fixed scope." <u>See Reichwaldt</u>, 304 F. Supp. 3d at 1317. Additionally, it is difficult to envision what a warning to those individuals would look like when 3M is generally the upstream supplier of the PFAS that is incorporated by its immediate purchasers into other products before being sold to consumers.

Although the Massachusetts Supreme Judicial Court ("SJC") held in <u>MacDonald v. Ortho Pharm. Corp.</u>, that "a manufacturer of a product, which the manufacturer knows or should know is dangerous by nature or is in a dangerous condition, is under a duty to give warning of those dangers to persons who it is foreseeable will come in contact with, and consequently be endangered by, that product," it also noted that a manufacturer's warning to the immediate purchaser of its product rather than to its end consumer may satisfy this duty in the "limited instance" where "it is

unreasonable in such circumstances to expect the manufacturer to communicate with the consumer." 475 N.E.2d 65, 68 (Mass. 1985) (internal quotation marks and citations omitted). The Court finds it unreasonable here for 3M to directly warn consumers rather than immediate purchasers of its PFAS products. Instead, the Court finds that Plaintiffs have plausibly alleged that 3M has a duty to warn the Paper Manufacturing Defendants and other downstream manufacturers incorporating 3M PFAS into their products of the dangers of PFAS and the risk of environmental contamination if not disposed of properly.

Accordingly, the Court DENIES 3M's motion to dismiss Count XXX.

### 4. *Medical Monitoring*

Judge Hennessy recommended denying all of the Defendants' motions to dismiss for Plaintiffs' medical monitoring claims. [R&R, p.74]. Newark, MassNatural, Seaman Paper, and Otter Farm objected to this finding [Dkt. Nos. 161, 163, 164], arguing that Plaintiffs have not sufficiently alleged "subcellular changes" consistent with Donovan v. Philip Morris USA, Inc., 914 N.E.2d 891, 901 (Mass. 2009).

Defendants argue that Genereux v. Raytheon Co. 754 F.3d 51 (1st Cir. 2014), precludes Plaintiffs' claim due to Plaintiffs' failure to allege subcellular change has occurred. The First Circuit in Genereux held that "[u]nder the cause of action recognized in Donovan I, increased epidemiological risk of illness caused by exposure, unaccompanied by some subcellular or other physiological change, is not enough to permit recovery in tort." 754 F.3d at 55. Defendants fail to recognize the procedural posture of Genereaux – the First Circuit was evaluating an appeal of a summary judgment motion, not a motion to dismiss, and had the benefit of evidence from the plaintiffs' expert who testified as to the medical effects of beryllium exposure on the plaintiffs that was allegedly caused by the defendants.

Defendants' objections repeat their arguments from their original motions, and Judge Hennessy did consider them in the R&R. Judge Hennessy concluded, "[i]n light of the procedural posture of this case, the well-supported research Plaintiffs have provided with regard to the dangers of PFAS ingestion, and the abnormal levels of PFAS present in the bloodwork of at least three Plaintiffs, I find it premature to dismiss Plaintiffs' medical monitoring claims on the basis that no 'subcellular change' has occurred." [R&R, p. 74]. The Court agrees with Judge Hennessy that a showing that would satisfy <u>Donovan</u> in full would require expert testimony and that Plaintiffs do not bear the burden of providing any such evidence at this stage of the litigation.  At the pleading stage, Defendants are only entitled to sufficient notice of the claims facing them as a whole, not in terms of individual elements. <u>Higgins I</u>, 2022 U.S. Dist. LEXIS 111062, at *14 (citing <u>Redondo Waste Sys., Inc. v. Lopez-Freytes</u>, 659 F.3d 136, 141 (1st Cir. 2011)). What Plaintiffs have alleged regarding the effect of PFAS exposure on their bodies is sufficient at this stage.

The Court also agrees with Judge Hennessy that Plaintiffs have met their burden as to the remaining elements of a medical monitoring claim. Accordingly, the Court adopts Judge Hennessy's recommendation and DENIES MassNatural, Seaman Paper, Otter Farm's, motions to dismiss Counts I; VIII; XV; DENIES 3M's motion to dismiss Count XXXIII; and DENIES Newark's motion to dismiss Count XXII. The Court does not consider the medical monitoring claims against Greif and Caraustar as the Court lacks personal jurisdiction over those Defendants.

### 5. *Private Nuisance*

Judge Hennessy recommended denying Seaman Paper, Otter Farm, and Newark's motions to dismiss Plaintiffs' private nuisance claims. All Defendants objected to Judge Hennessy's reliance on the facts Plaintiffs allege for their RICO claims. [Dkt. No. 161, pp. 5-7; Dkt. No. 164, pp. 29-31]. Seaman Paper and Otter Farm also restated their argument that liability for private

nuisance only attaches when the defendant had control over the instrumentality of the nuisance. [Dkt. No. 164, pp. 29-31]. Newark objected that Plaintiffs have not sufficiently alleged Newark's participation in the carrying on the nuisance. [Dkt. No. 161, pp. 8-9].

After its own *de novo* review, the Court adopts Judge Hennessy's statement of the legal standard for a private nuisance claim. [R&R, pp. 75-76]. First, the Court overrules Seaman Paper and Otter Farm's objection that a defendant must have control over the instrumentality of the nuisance to be liable. Citing <u>Commonwealth v. Pace</u>, 616 F. Supp. 815, 821 (D. Mass. 1985) and the Restatement (Second) of Torts § 822 (1979), Judge Hennessy ruled that direct control of the instrumentality of a nuisance is not a prerequisite to a claim and that a defendant could be liable "not only when he carries on the activity but also when he participates to a substantial extent in carrying it on." [R&R, p. 78 (quoting <u>Pace</u>, 616 F. Supp. at 821)]. The Court adopts this statement of law and conclusion.

Regarding Defendants' objection that Judge Hennessy relied on facts that underly Plaintiffs' RICO claim, the Court finds that Judge Hennessy did not draw improper inferences from the complaint and that his conclusion that Plaintiffs have sufficiently alleged a RICO conspiracy between Seaman Paper, Otter Farm, and MassNatural is supported by the complaint. Therefore, the Court adopts Judge Hennessy's reasoning and recommendation that, based on the facts underlying the RICO claim, Plaintiffs have sufficiently alleged that Seaman Paper and Otter Farm substantially participated in the nuisance. [R&R, pp. 76-78].

As to Newark, the Court finds Plaintiffs' allegations against Newark for the RICO claims to be insufficient to sustain those claims and therefore chooses not to rely on such facts to sustain the private nuisance claim. However, the Court concludes that Plaintiffs have alleged a plausible private nuisance claim against Newark based instead on the facts that underlie Plaintiffs' negligence claim as articulated in Section 2.b. An allegation that Newark contracted with

MassNatural in order to intentionally avoid higher costs related to manufacturing and disposal is not necessary for Plaintiffs to meet their burden on the private nuisance claim. The Restatement (Second) of Torts describes "type of conduct essential to [private nuisance] liability" as "(a) an act; or (b) a *failure to act under circumstances in which the actor is under a duty* to take positive action to prevent or abate the interference with the public interest or the invasion of the private interest."  Restatement (Second) of Torts § 824 (emphasis added).   As noted in the negligence analysis regarding Newark, Newark had a duty to the Plaintiffs to use reasonable care to ensure that its paper sludge waste, which it knew or should have known contained toxic PFAS, was properly disposed of. This failure to act when Newark had a duty to take positive action to prevent or abate the PFAS contamination through ensuring proper disposal is sufficient to state a claim for private nuisance. Likewise, Newark "substantially participated" in the nuisance by supplying the toxic PFAS waste without ensuring proper disposal methods. See Pace, 616 F. Supp. at 821.

Accordingly, the Court adopts Judge Hennessy's recommendation and DENIES Seaman Paper and Otter Farm's motion to dismiss Counts XI and XVIII and DENIES Newark's motion to dismiss Count XXV.  The Court does not consider the private nuisance claims against Greif and Caraustar as the Court lacks personal jurisdiction over those Defendants.

### 6. *Public Nuisance*

Judge Hennessy recommended denying Seaman Paper, Otter Farm, MassNatural, and Newark's motions to dismiss Plaintiffs' public nuisance claims because Plaintiffs have alleged an injury that is sufficiently unique. [R&R, pp. 80-84]. The Court accepts and adopts Judge Hennessy's statement of the legal standard for a public nuisance claim, as well as his recommendations to deny Defendants' motions to dismiss. As Judge Hennessy summarized:

> Plaintiffs have alleged that, as a result of their water well contamination, they "will be forced to pay for the private removal of contaminants from their property

emanating from pollution of public water sources[;]" and "out of pocket expenses, personal property damage, loss of use and enjoyment of property, diminution in property value, the necessity for long-term medical monitoring, annoyance, upset, aggravation, trauma, and inconvenience." [Dkt. No. 77, ¶¶ 278-79].

[R&R, p. 83]. The Court adds that, based on these allegations, Plaintiffs' public nuisance claims are limited only to the Property Damage Class (Groundwater)[10] and the Property Damage Class (Compost and Soil).[11,12] These two classes, as opposed to the Consumer Subclass and the Medical Monitoring Class, are property owners who have sustained the "special harm" of needing to decontaminate their properties from PFAS. See Higgins I, 2022 U.S. Dist. LEXIS 111062 at *27 (citing Johnson v. 3M et al., 563 F. Supp. 3d 1253, 1341–42 (N.D. Ga. 2021), aff'd sub nom., 55 F.4th 1304 (11th Cir. 2022)). As to the Defendants' arguments that Plaintiffs' public nuisance claims must fail because Defendants' lack of control over the instrumentality of the nuisance, the Court agrees with Judge Hennessy that, "as noted in the discussion of private nuisance, there is no requirement that the offending defendant control the instrumentality of contamination." [R&R, p. 84 (citing Pace, 616 F. Supp. at 821 and Restatement (Second) of Torts § 834)]. Accordingly, the Court DENIES Seaman Paper, Otter Farm, and MassNatural's motions to dismiss Counts V, XII, and XIX and DENIES Newark's motion to dismiss Count XXVI. The Court does not consider the public nuisance claims against Greif and Caraustar as the Court lacks personal jurisdiction over those Defendants.

---

[10] Plaintiffs define the Property Damage Class (Groundwater) as, "[a]ll natural persons who are or were owners of real property on or after January 31, 2022, which property is within the Study Area and supplied with water from a well contaminated with PFAS6." [Dkt. No. 77, ¶ 226].

[11] Plaintiffs define the Property Damage Class (Compost and Soil) as, "[a]ll natural persons who are or were owners of real property on or after January 31, 2022, which property received compost, loam or soil that was purchased from Natural Fertilizer and is contaminated with PFAS6." [Dkt. No. 77, ¶ 226].

[12] As of the date of this Memorandum and Order, the class has not been certified.

7.  *Ultrahazardous Activity / Strict Liability*

Judge Hennessy recommended denying Seaman Paper, Otter Farm, and MassNatural's motion to dismiss Plaintiffs' ultrahazardous activity / strict liability claims but granting Newark's motion to dismiss the same. Upon *de novo* review, the Court accepts and adopts that recommendation. Seaman Paper, Otter Farm, and MassNatural's objection to Judge Hennessy's recommendation posits (1) that strict liability only applies to ultrahazardous or abnormally dangerous activities, not ultrahazardous or abnormally dangerous materials; (2) that Judge Hennessy did not apply the six factors for ultrahazardous activity before concluding that further discovery was warranted to evaluate those factors; and, (3) that Seaman Paper and Otter Farm should not be held liable because they did not control the activities of MassNatural. [Dkt. No. 164, pp. 24-17].

First, the Court adopts Judge Hennessy's statement of the legal standard for an ultrahazardous / strict liability claim, reproduced below:

> Strict liability applies to ultrahazardous activities in Massachusetts only "when there is 'an escape of a dangerous activity from the land of the defendant onto the land of another, causing injury or damage.'" Heinrich ex rel. Heinrich v. Sweet, 49 F. Supp. 2d 27, 40 (D. Mass. 1999) (quoting Thomalen v. Marriott Corp., 845 F.Supp. 33, 36–37 (D. Mass. 1994)).  This Court has emphasized the "extremely limited" scope of this tort under Massachusetts law, reiterating that "a Massachusetts court would not allow a claim of strict liability in [a] case where there was no escape of a dangerous instrumentality from [the defendant's] property." Heinrich, 49 F. Supp. 2d at 40 (quoting Thomalen, 845 F.Supp. at 37); see also Wajda v. R.J. Reynolds Tobacco Co., 103 F. Supp. 2d 29, 35 (D. Mass. 2000) (reiterating that strict liability does not extend to products liability in Massachusetts, but rather has been "applied to [, inter alia,] manmade flooding, explosive blasting, and escaped wild animals").  "The doctrine of abnormally dangerous activities was developed in order to deal with cases in which an activity, while socially beneficial, could not be conducted in a manner that eliminated incidental damage." Heinrich, 49 F. Supp. 2d at 41.
>
> It is a question of law whether an activity is so abnormally dangerous as to be ultrahazardous and trigger strict liability. Clark-Aiken Co. v. Cromwell-Wright Co., Inc., 367 Mass. 70, 76 (1975); see also id. at 84 ("[Strict liability] has been limited … to such unusual and extraordinary uses of property in reference to the

benefits to be derived from the use and the dangers or losses to which others are exposed[.]").  "Massachusetts law of strict liability is consistent with the balancing test set forth in the Restatement (Second) of Torts §§ 519, 520."  Stearns v. Metro. Life Ins. Co., 308 F. Supp. 3d 471, 482 (D. Mass. 2018).  In determining whether an activity is abnormally dangerous, courts consider the following factors:

> (a) whether the activity involves a high degree of risk of harm to the person, land or chattels of others; (b) whether the gravity of the harm which may result from it is likely to be great; (c) whether the risk cannot be eliminated by the exercise of reasonable care; (d) whether the activity is not a matter of common usage; (e) whether the activity is inappropriate to the place where it is carried on; and (f) the value of the activity to the community.

> Id. (quoting Clark-Aiken, 367 Mass. at 89 and the Restatement (Second) of Torts § 520, Comment f (Tent. Draft No. 12, 164)).

[R&R, pp. 84-85].

Second, as to Defendants' first objection, the Court agrees that Plaintiffs have alleged that Seaman Paper, Otter Farm, and MassNatural have engaged in an ultrahazardous *activity*, namely, as Judge Hennessy stated, "the routine of receiving, improperly disposing, and repurposing materials the defendants know or have reason to know is toxic to humans and can migrate into groundwater." [Id. at 86].  Therefore, even if strict liability only applies to activities and not materials, the complaint does base its claim on Defendants' activities rather than the mere presence of PFAS in the materials at issue.

Third, as to Defendants' third objection, Seaman Paper and Otter Farm are not relieved of liability by MassNatural's conduct. Plaintiffs alleged that Seaman Paper and Otter Farm were members of a conspiracy to improperly dispose of PFAS contaminated materials at MassNatural's site, thus, they were participants in the alleged ultrahazardous activity. Additionally, as stated above, strict liability may be found "when there is 'an escape of a dangerous activity from the land of the defendant onto the land of another, causing injury or damage.'"  Heinrich, 49 F. Supp. 2d at 40. Here, Seaman Paper and Otter Farm have ownership or authority over the land on which the dangerous activity occurs. As Judge Hennessy noted, "Otter Farm is the nominal owner of the

Property, MassNatural is the lessee, and Seaman Paper owns Otter Farm and had purchased the Property and conveyed title to its subsidiary.  Thus, all are alleged to be in a position of preventing the 'escape' of potentially ultrahazardous conditions from the Property." [R&R, p. 86]. This property interest combined with their own participation in the allegedly ultrahazardous activity draws Seaman Paper and Otter Farm into the orbit of liability for the claim.

Lastly, the Court overrules Defendants' second objection. Courts around the country considering whether PFAS-related activities meet the same Restatement factors listed above have denied motions to dismiss strict liability claims in order to allow plaintiffs to proceed to discovery so that the court has the factual information first required to evaluate the factors. See, e.g., Higgins I, 2022 U.S. Dist. LEXIS 111062, at *36 ("While I understand that whether an activity is abnormally dangerous is a question of law, to answer that question, I must rely on factual information, which has not yet been developed."); Cornett v. Northrop Grumman Corp., No. 18-CV-06453, 2020 U.S. Dist. LEXIS 1566, at *22 (E.D.N.Y. Jan. 6, 2020) (finding that plaintiffs had only satisfied the second restatement factor but denying motion to dismiss strict liability claim, concluding that "additional fact-finding" was required); see Restatement (Second) of Torts § 520, Comment l (the function of the Court is to determine whether the activity is abnormally dangerous by weighing factual evidence against the listed factors). Therefore, the Court adopts Judge Hennessy's recommendation that Plaintiffs' allegations suffice to allow Plaintiffs to proceed to discovery to determine "whether the PFAS disposal is in fact the kind of abnormally dangerous activity to which strict liability should be applied." [R&R, p. 86].

Accordingly, Seaman Paper, Otter Farm, and MassNatural's motions to dismiss Counts VI, XIII, and XX are DENIED.

As to Newark, the Court agrees with Judge Hennessy that the "extremely limited" scope of strict liability for ultrahazardous activities requires that the "dangerous instrumentality" escape

from the defendant's property, and that Plaintiffs have not alleged that Newark held any direct or indirect land interest whatsoever in the Property from which MassNatural operates its composting facility. Heinrich, 49 F. Supp. 2d at 40 (quoting Thomalen, 845 F.Supp. at 37); [R&R, p. 87]. Because Plaintiffs fail to allege that Newark has a land interest in the Property, they have not met their burden on their ultrahazardous activity / strict liability claim against Newark, and the Court GRANTS Newark's motion to dismiss Count XXVII. The Court does not consider the ultrahazardous activity / strict liability claim against Greif and Caraustar as the Court lacks personal jurisdiction over those Defendants.

8. *Willful and Wanton Conduct*

Judge Hennessy recommended denying the motions to dismiss filed by Seaman Paper, Otter Farm, MassNatural, and Newark as to Plaintiffs' claims of willful and wanton conduct. In their objections, the Defendants repeat their arguments put forth for the private nuisance claims and again assert that Judge Hennessy improperly relied on Plaintiffs' RICO allegations. [Dkt. No. 161, pp. 6-7; Dkt. No. 164, pp. 27-29]. The Court has already stated that it adopts Judge Hennessy's conclusions regarding Plaintiffs' RICO claims. Therefore, the Court overrules that portion of the Defendants' objections as to willful and wanton liability for Seaman Paper, Otter Farm, and MassNatural. Adopting Judge Hennessy's statement of the legal standard, the Court also agrees with his conclusion regarding Seaman Paper, Otter Farm, and MassNatural - that Plaintiffs' "allegations support a willful, financially motivated, and knowing assumption of a high risk of substantial environmental and human harm from the improper disposal and repurposing of PFAS-contaminated byproducts to unsuspecting consumers of MassNatural's products." [R&R, p. 89-90]. Accordingly, the Court DENIES Seaman Paper, Otter Farm, and MassNatural's motions to dismiss Counts VII, XIV, and XXI.

As with the negligence claim, the Court declines to rely on Plaintiffs' RICO allegations against Newark to substantiate their willful and wanton claim. Instead, the Court finds that the same facts supporting negligence suffice to meet Plaintiffs' heightened burden for a willful and wanton claim. "The essence of wanton or reckless conduct is intentional conduct, by way either of commission or of omission where there is a duty to act, which conduct involves a high degree of likelihood that substantial harm will result to another." Commonwealth v. Catalina, 556 N.E.2d 973, 979 (Mass. 1990). As stated in the negligence analysis for Newark, Newark had a duty to use reasonable care to dispose of PFAS waste safely. Its omission in failing to ensure proper protocols were in place, or even to confirm whether its byproducts contain PFAS, involved a high degree of likelihood that that the substantial harm of PFAS contamination would result from improper disposal.

Plaintiffs have alleged sufficient facts for Newark's conduct to meet either the subjective or objective standard for willful and wanton liability. See Sarro v. Philip Morris USA, Inc., 857 F. Supp. 2d 182, 185 (D. Mass. 2012) (quoting Boyd v. AMTRAK, 845 N.E.2d 356, 363 (Mass. 2006)). Under the subjective standard, Newark knew or had reason to know as a paper manufacturer that its byproducts contained PFAS, compounds which carry a high degree of risk of physical harm when not handled properly. Newark failed to act with either a conscious disregard for or indifference to that risk when it did not ensure proper protocols were in place to safely dispose of its waste." See id. Under the objective standard, the same is true, but rather than requiring that Newark knew of the risk, the objective standard only requires that Newark "unreasonably fail[ed] to realize the high degree of risk involved. See id. Accordingly, the Court DENIES Newark's motion to dismiss Count XXVIII. The Court does not consider the willful and

wanton claims against Greif and Caraustar as the Court lacks personal jurisdiction over those Defendants.

9.   *M.G.L. c. 93A*

Judge Hennessy recommended that Plaintiffs' Chapter 93A claims against all Defendants except for 3M be dismissed as Plaintiffs are procedurally barred from pursuing such claims because they did not provide the Defendants the required written notice via a 93A demand letter thirty days prior to filing the original complaint. Upon *de novo* review, the Court adopts in part and rejects in part this recommendation.

Plaintiffs allege that all Defendants have violated Chapter 93A of the Massachusetts Consumer Protection Act ("Chapter 93A").  Chapter 93A stipulates that "[u]nfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce are . . . unlawful," and any person injured by such acts or practice "may bring an action … for damages and such equitable relief, including an injunction, as the court deems to be necessary and proper." MASS. GEN. LAWS ch. 93A ("Chapter 93A"), §§ 2(a), 9(1).  The statute establishes private rights of action for both consumers and commercial plaintiffs. See id. §§ 9, 11. The two sections of Chapter 93A that create private rights of action "are mutually exclusive: section 11 entitles 'any person who engages in the conduct of any trade or commerce' to bring an action for unfair or deceptive practices, whereas section 9 grants essentially the same entitlement to aggrieved consumers." Cont'l Ins. Co. v. Bahnan, 216 F.3d 150, 156 (1st Cir. 2000). Therefore, "section 11 affords no relief to consumers and, conversely, section 9 affords no relief to persons engaged in trade or commerce." Id.

To state a claim under Section 9 of Chapter 93A, a consumer plaintiff must allege "(1) [a]n [unfair or] deceptive act or practice on the part of the defendant; (2) an injury or loss suffered by

the plaintiff, and (3) a causal connection between the defendant's [unfair or] deceptive act or practice and the plaintiff's injury." Whitman & Co. v. Longview Partners (Guernsey) Ltd., No. 14-12047-ADB, 2015 U.S. Dist. LEXIS 94100, at *15 (D. Mass. June 16, 2015) (citing Casavant v. Norwegian Cruise Line, Ltd., 919 N.E.2d 165, 168-69 (Mass. App. Ct. 2009), aff'd, 952 N.E.2d 908 (Mass. 2011)); Chapter 93A, § 9.

Chapter 93A itself does not define "unfair or deceptive acts or practices" as used in Section 2(a), but it provides that "courts 'will be guided' by the FTC's and federal courts' interpretations of the provisions of the FTC Act that also proscribe unfair or deceptive acts or practices." Tomasella v. Nestlé USA, Inc., 962 F.3d 60, 70 (1st Cir. 2020); Chapter 93A, § 2(b). The SJC has established that "an act or practice is unfair if it falls 'within at least the penumbra of some common-law, statutory, or other established concept of unfairness'; 'is immoral, unethical, oppressive or unscrupulous'; and 'causes substantial injury to consumers,'" plus the 'conduct must generally be of an egregious, non-negligent nature.'" Tomasella, 962 F.3d at 70-71 (quoting Walsh v. TelTech Sys., 821 F.3d 155, 160 (1st Cir. 2016) (quoting PMP Assocs. v. Globe Newspaper Co., 321 N.E.2d 915, 917 (Mass. 1975))). Similarly, an act or practice is deceptive "'if it possesses a tendency to deceive' and 'if it could reasonably be found to have caused a person to act differently from the way he [or she] otherwise would have acted.'" Id. at 70 (quoting Walsh, 821 F.3d at 160 (alteration in original) (quoting Aspinall v. Philip Morris Cos., 813 N.E.2d 476, 476-87 (Mass. 2004))).

Additionally, as stated by the statute, the defendant's conduct must occur within "trade or commerce." Chapter 93A, § 2(a). While there must be some kind of commercial link, a consumer action under Section 9 of the statute has a lower burden in establishing a commercial relationship than an action between two businesses under Section 11. See Begelfer v. Najarian, 409 N.E.2d

167, 190-191 (Mass. 1980) (establishing a multi-factor test to determine whether purportedly commercial parties were acting "in a business context" for the purposes of an action under Chapter 93A § 11). Plaintiffs suing under Section 9 can include indirect purchasers of upstream defendants' products. Ciardi v. F. Hoffmann La Roche, Ltd., 762 N.E.2d 303, 309-10 (Mass. 2002); Moniz v. Bayer Corp., 484 F. Supp. 2d 228, 230 (D. Mass. 2007). "The language of G. L. c. 93A, §§ 1, 9(1), allows *any* person who has been injured by trade or commerce *indirectly* affecting the people of this Commonwealth to bring a cause of action." Ciardi, 762 N.E2d at 309. Furthermore, "there is no requirement of contractual privity between the plaintiff and the defendants under G. L. c. 93A, § 9." Id. (citing Kattar v. Demoulas, 739 N.E.2d 246, 258 (Mass. 2000) ("Parties need not be in privity for their actions to come within the reach of c. 93A"). However, "even for a claim brought under section 9," "some business, commercial, or transactional relationship is required[.]" Steinmetz v. Coyle & Caron, Inc. (In re Steinmetz), 862 F.3d 128, 141 (1st Cir. 2017).

a)    Procedural Bar

1.    Factual Background

The relevant facts are as follows. This case is a consolidated action of two suits filed in the fall of 2023. Plaintiffs Thomas Ryan, Susan Ryan, Sean Gallagher, and Ashley Sultan Gallagher (the "*Ryan* Plaintiffs") filed their original complaint in this Court on August 2, 2022 against MassNatural, Otter Farm, Seaman Paper, and the Greif Defendants. Ryan v. Greif, No. 4:22-cv-40089-MRG (D. Mass.) In their original complaint, the *Ryan* plaintiffs brought Chapter 93A claims against MassNatural (Count III), Seaman Paper (Count X), Otter Farm (Count XVII), and the Greif Defendants (Count XXIV). [Dkt. No. 1]. Despite being stated as "claim[s] for relief," and including specific supporting allegations, Plaintiffs are now asserting that the original complaint in fact did not include Chapter 93A claims but rather only notice that those claims were forthcoming because for each Defendant, the complaint alleges that "Plaintiffs and the Class Members *intend to assert and prosecute claims* . . . [under Chapter

93A]." [Dkt. No. 1 ¶¶ 150, 211, 272, 332 (emphasis added); Dkt. No. 160, p. 10]. To each Defendant, the complaint further states, "[t]his Count provides notice that this Complaint shall be amended to demand all appropriate relief once Plaintiffs have provided notice pursuant to M.G.L. ch. 93A §9(3) to the [] Defendants and the statutory period for a response has passed, subject to any response by the [] Defendants." [Id., ¶¶ 150, 211, 272, 332]. Regardless of whether these statements in the complaint should be treated as claims rather than mere notice, it is undisputed that at the time of the filing of the action, the *Ryan* Plaintiffs had not yet sent the Defendants Chapter 93A demand letters. On August 5, 2022, three days after filing the original complaint, the *Ryan* Plaintiffs sent the demand letters to the relevant Defendants. [Dkt. No. 160, p. 11]. Eighty-two days later, the *Ryan* Plaintiffs filed their first amended complaint, which fully asserted Chapter 93A claims against MassNatural, Seaman Paper, Otter Farm, and the Greif Defendants. [Dkt. No. 57]. For each Defendant, the first amended complaint stated that the Plaintiffs had provided notice pursuant to Chapter 93A and the statutory period for a response had passed. [Id. ¶¶ 201, 264, 327, 389].

Plaintiffs Michele Burt, Christopher Cerasuolo, Nancy Donovan, and Lauren Ladue (the "*Burt* Plaintiffs") filed their original complaint in Massachusetts state court on August 12, 2022 against MassNatural, Otter Farm, Seaman Paper, the Greif Defendants, 3M, and John Doe Companies. See Complaint [Dkt. No. 1], Burt et al. v. Massachusetts Natural Fertilizer Company et al, No. 2285-CV-00922 (Mass.). The original complaint did not assert a Chapter 93A count or reference an intent to assert a Chapter 93A claim. See id. The *Burt* Plaintiffs then sent Chapter 93A notice letters to all Defendants on dates ranging from August 27, 2022 to August 31, 2022, and filed an amended complaint on October 6, 2022 adding Chapter 93A claims. *See* First Amended Complaint [Dkt. No. 3-1], Burt v. Massachusetts Natural Fertilizer Company, No. 2285-CV-00922 (Mass.). On November 14, 2022, the Greif Defendants removed the case to this Court. See Burt v Caraustar Industries Inc., No. 4:22-cv-11937-MRG (D. Mass.).

Upon motion of the *Ryan* plaintiffs and stipulation by the *Burt* parties, on February 10, 2023, District Court Judge Nathaniel M. Gorton consolidated the *Ryan* case and the *Burt* case into one consolidated action, merging *Burt* into *Ryan* and making *Ryan* the consolidated lead case. [See Ryan, Dkt. No. 76; Burt, Dkt. No. 18]. Subsequently, on February 13, 2023, the Plaintiffs collectively filed the second amended complaint ("SAC"), which is the master complaint in this case. [Ryan, Dkt. No. 77]. The SAC includes 3M as a party and dropped the John Doe Companies from the *Burt* complaint. [See id.] The SAC brings Chapter 93A claims against all Defendants, and in each instance alleges that Plaintiffs have provided notice pursuant to Chapter 93A and the statutory period for a response has passed. [Id. ¶¶ 252, 315, 378, 440, 525]. The SAC was filed 192 days after the *Ryan* Plaintiffs sent demand letters to all Defendants except for 3M and 166 days after the *Burt* Plaintiffs sent their letters to all Defendants.

### 2. Legal Standard

At least thirty days prior to bringing a legal action under Chapter 93A, the plaintiff must deliver to a purported violator a "written demand for relief" that identifies the claimant and reasonably describes the unfair act or practice at issue, as well as the injury suffered. Chapter 93A, § 9(3); Burns ex rel Off. of Pub. Guardian v. Hale & Dorr LLP, 445 F. Supp. 2d 94, 97 (D. Mass. 2006). The demand requirement has two purposes: "to encourage settlement and to limit the plaintiff's damages in the event that a reasonable settlement offer is rejected." Burns, 445 F. Supp. 2d at 97 (citing Thorpe v. Mut. of Omaha Ins. Co., 984 F.2d 541, 544 (1st Cir. 1993)). A plaintiff must allege in the complaint that a demand letter has been sent in order to satisfy the procedural requirements of a 93A claim. Francisque v. Wells Fargo Bank, N.A., No. 11-10841-JGD, 2012 U.S. Dist. LEXIS 32302, at *16 (D. Mass. Mar. 12, 2012). "Thus, while a demand letter may be sent after suit is commenced, it must be sent before the 93A count is included in the complaint." Id.; see Tarpey v. Crescent Ridge Dairy,

Inc., 713 N.E.2d 975, 983 (Mass. App. Ct. 1999)  (allowing plaintiff to amend complaint and add claim under Chapter 93A where demand letter was sent after suit had commenced).

Although some Massachusetts courts have adhered strictly to the 93A demand requirement, "those cases typically involve instances in which there is neither evidence of a demand letter nor any mention of such demand in the plaintiff's complaint." S. States Police Benevolent Ass'n, Inc. v. First Choice Armor & Equip., Inc., 241 F.R.D. 85, 92 (D. Mass. 2007); see Francisque, 2012 U.S. Dist. LEXIS 32302, at *16 (dismissing plaintiff's 93A claim on procedural grounds where plaintiff failed to provide evidence that they ever created a demand letter and failed to allege in the complaint that they had sent defendant a demand letter prior to filing suit). In other instances, courts have excused noncompliance with the demand requirement where the unique circumstances of the case demonstrate that the purposes of the demand requirement have been met or where plaintiffs have made efforts to cure a failure to deliver a demand letter. See S. States Police Benevolent Ass'n, Inc., 241 F.R.D. 85 at 92 (finding that plaintiffs in federal litigation complied with procedural requirements of Chapter 93A where demand letters satisfied the purpose of the demand requirement despite having been filed in an earlier state court action); Burns, 445 F. Supp. 2d at 97 (denying judgment on the pleadings where plaintiff sent a demand letter nearly one month prior to the filing of defendants' answer and thereafter moved to amend her complaint in order to plead that demand). In allowing a plaintiff to replead his 93A claim that was procedurally defective, the First Circuit stated, '[t]he view that the pleading of cases is a game in which every miscue should be fatal is antithetic to the spirit of the federal rules." Rodi v. S. New England Sch. Of L., 389 F.3d 5, 20 (1st Cir. 2004) (citing Fed. R. Civ. P. 1 and noting "the federal rules [are] designed to achieve, inter alia, the 'just' resolution of disputes"). In Rodi, the First Circuit directed the District Court to allow the plaintiff to amend his 93A claim to allege the demand requirement where the plaintiff was pro se, had a

colorable 93A claim, stated he did send the demand letter despite failing to plead so, and had sought to amend his complaint to cure the defect. Id.

3.   Discussion

Here, like in <u>Rodi</u>, "the circumstances cry out for affording the plaintiff[s] a fair opportunity to replead [their] Chapter 93A claim." <u>Id.</u> This case is a consolidated action where the plaintiffs in one of the two underlying suits, the *Burt* Plaintiffs, complied with and correctly pleaded the demand requirement of Chapter 93A, while the other set of plaintiffs, the *Ryan* Plaintiffs, did not. Still, the *Ryan* Plaintiffs did provide notice of their 93A claim in the filing of their original complaint in such a way that would have met the purposes of the demand requirement of encouraging negotiation and settlement. Additionally, the *Ryan* Plaintiffs amended their complaint after sending Defendants demand letters to correct their pleading of their 93A claim. As stated above, the SAC in the consolidated case was filed 192 days after the *Ryan* Plaintiffs sent demand letters to all Defendants except for 3M and 166 days after the *Burt* Plaintiffs sent their letters to all Defendants. The SAC properly alleged the demand requirement. Certainly, the Defendants were afforded sufficient notice of the 93A claims by the time they would be due to answer the SAC. Therefore, the Court finds that all Plaintiffs' letters were adequate to satisfy the purposes of the demand requirement and holds that Plaintiffs are not procedurally barred from pursuing their Chapter 93A claims.

b)   Substantive Bar

As summarized by Judge Hennessy:

Defendants collectively make two arguments in support of dismissal: first, that Plaintiffs have not alleged between them and Defendants the business or commercial link necessary to state a ch. 93A claim; and second, that Plaintiffs have failed to adequately plead that any of Defendants' actions meet the definition of "deceptive" and/or "unfair." See [Dkt. No. 99, p. 11; Dkt. No. 92, p. 6; Dkt. No. 101, p. 15]. MassNatural joins Seaman Paper and Otter Farm as to the second of those two arguments, but does not contest that its sale of allegedly PFAS-contaminated products supports a business or commercial link between it and Plaintiffs. [Dkt. No. 94, p. 2].

[R&R, p. 95].

Judge Hennessy concluded that Plaintiffs' allegations show deceptive conduct against the Consumer Subclass only, but that Seaman Paper, Otter Farm, Newark, and 3M lacked a commercial link to the Consumer Subclass such that Plaintiffs have failed to state a Chapter 93A claim. [R&R, p. 100].

First, the Court agrees with Judge Hennessy that Plaintiffs' 93A claims are limited to the Consumer Subclass, that is "all natural persons who have purchased contaminated composted products from MassNatural during the Class Period." [Dkt. No. 77, ¶ 226]. The Consumer Subclass is the only group that interacted with the Defendants in trade or commerce. It is the only group that can show injury as a result of the unfair or deceptive commercial conduct of the Defendants.

Second, the Court considers Plaintiffs' claims against MassNatural. MassNatural did not contest that it has a commercial link with the Plaintiffs. Judge Hennessy ruled that Plaintiffs' 93A claim against MassNatural be dismissed because it is procedurally barred. [R&R, p. 100]. However, he implied that MassNatural committed deceptive conduct by falsely advertising that it tested materials accepted for composting and representing that its compost and other products were environmentally safe when they allegedly contained harmful PFAS compounds. [Id.] As stated above, the Court finds that Plaintiffs' 93A claim against MassNatural is not procedurally barred.  Additionally, the Court adopts Judge Hennessy's conclusion that MassNatural engaged in deceptive conduct in trade or commerce that harmed the Consumer Subclass with its misrepresentations and omissions of material facts as described by Judge Hennessy. [Id.] It is reasonable to find that, had consumers known that MassNatural composting products contained PFAS compounds that could cause them physical harm and contaminate their land, they would have "act[ed] differently" – namely, by either declining to purchase MassNatural's products or paying less than what they were charged for them. See Tomasella, 962 F.3d at 70. Accordingly, the Court DENIES MassNatural's motion to dismiss Plaintiffs' Chapter 93A claim under Count III.

41

Third, the Court finds that Plaintiffs have failed to sufficiently allege a commercial link between the Consumer Subclass and Otter Farm. Plaintiffs allege that Otter Farm is the landlord of MassNatural. [Dkt. No. 77, ¶ 153]. Otter Farm does not sell MassNatural's products. Unlike Seaman Paper and Newark, Otter Farm does not even contribute any materials or byproduct that constitute part of MassNatural's products. Additionally, Plaintiffs have failed to allege that Otter Farm made representations of any kind about MassNatural's products. Accordingly, the Court GRANTS Otter Farm's motion to dismiss Plaintiffs' Chapter 93A claim under Count XVII.

Next, the Court considers the allegations against Seaman Paper, Newark, and 3M. The Court does not consider the claims against Greif or Caraustar as it lacks personal jurisdiction over those Defendants. In their objection to the R&R, Plaintiffs contest Judge Hennessy's finding that there is no commercial link between themselves and the Defendants in question because the Magistrate relied on caselaw concerning Section 11 of Chapter 93A rather than Section 9. [Dkt. No. 160, p. 14]. On *de novo* review, the Court finds that the Plaintiffs are subject to the requirements of consumer lawsuits of Chapter 93A § 9 rather than the requirements of commercial plaintiffs under Section 11. While the requirement of a commercial relationship is evaluated at a somewhat laxer standard under Section 9 compared to Section 11, See Begelfer, 409 N.E.2d at 190-191, "some business, commercial, or transactional relationship is [still] required." Steinmetz, 862 F.3d at 141.

Ciardi and Moniz are instructive but distinguishable. In Ciardi, an indirect purchaser of vitamins brought a Chapter 93A claim against manufacturers and distributors of vitamin products for alleged price fixing. Ciardi, 762 N.E.2d at 306 (2002). Noting that "[t]he plain and unambiguous language of G. L. c. 93A reveals no legislative intent to limit lawsuits for price-fixing to direct purchasers," the SJC held that indirect purchasers may bring a Chapter 93A claim against upstream manufacturers and distributors of consumer products *for price fixing*. Id. at 309. In Moniz, this Court held that indirect purchasers could bring claims under 93A for price fixing

against the manufacturers of raw materials used in the production of consumer goods, even where the manufacturers do not actually produce a product that is itself sold to consumers. Moniz, 484 F. Supp. 2d at 230-31. The Moniz defendants tried to distinguish themselves from the defendants in Ciardi because in Ciardi, the plaintiff had purchased vitamin products manufactured, produced, distributed, and sold by the defendants whereas the Moniz defendants manufactured rubber and urethane products that were sold to other industrial manufacturers and incorporated into the production process of consumer goods. Id. The Moniz court found this argument to be "a distinction without a difference because the effect is exactly the same: price-fixing by an up-stream manufacturer results in an unfairly inflated price for the consumer product to the plaintiff's detriment." Id. at 230. On these grounds, the court denied defendants' motion to dismiss plaintiffs Chapter 93A claim. Id. at 231.

While Ciardi and Moniz would seem to support Plaintiffs' claims, their utility here is limited to their factual context. The allegedly deceptive conduct at issue in those cases was price fixing, and the defendants, although somewhat removed from the point-of-sale transaction with the consumer, participated in the unfair and deceptive conduct by fixing prices at the upstream level, which in turn inflated prices for downstream consumers. In this case, Defendants did not participate, directly or indirectly, in the marketing, production, or sale of MassNatural's products. The facts of the complaint allege that the Defendants improperly disposed of PFAS through MassNatural, not that they played a role in MassNatural's commercial composting operations, such as by setting prices or directing advertising. Additionally, Seaman Paper and Newark did not gain any benefit from MassNatural's composting sales as they paid to have MassNatural process their waste. Therefore, it cannot be said that Seaman Paper and Newark commercially participated in the transactions between MassNatural and the Consumer Subclass that form the basis of

MassNatural's deceptive conduct. With respect to 3M, 3M's link to Plaintiffs stems from its alleged supplying PFAS compounds to Seaman Paper and Newark, which, again, unlike Ciardi and Moniz, does not show participation or fault for MassNatural's deceptive advertising or price inflation in the sale of contaminated products. Plaintiffs' failure to establish a commercial link is not because Plaintiffs are not direct purchasers of Defendants' products. The issue is that there is not a commercial link that is tied, directly or indirectly, to the deceptive conduct at hand, as was the case in Ciardi and Moniz. As a result, on *de novo* review, the Court finds that Plaintiffs have failed to allege a commercial link between the Consumer Subclass and Defendants.

Additionally, the Court finds that Plaintiffs' 93A claims must fail due to the insufficiency of their allegations. The primary defect in Plaintiffs' claims is that they have tied their 93A allegations against all Defendants to representations or omissions related specifically to MassNatural products when they make no corresponding allegations of actual representations, let alone false representations, that the Defendants made as to the characteristics or risks of MassNatural products.

Plaintiffs' allegations against Seaman Paper are as follows:

Knowingly or recklessly making a false representation as to the characteristics of its disposal of PFAS6 which it knew went into MassNatural products, in violation of 93A §2(a);

a. Falsely representing that MassNatural Products are safe for use despite the presence of PFAS6-contaminated chemicals, in violation of 93A §2(a);

b. Advertising Seaman Paper's composting operations and MassNatural Products with an intent not to sell it as advertised, in violation of 93A §2(a); and

c. Failing to disclose the material information that, as a result of Seaman Paper's and MassNatural's arranging for the transport, disposal, storage, or treatment of PFAS6-contaminated materials, deemed hazardous material under Massachusetts law, MassNatural products contained unsafe PFAS6 chemicals and that MassNatural product users were at risk of suffering adverse health effects, in violation of 93A §2(a).

[Dkt. No. 77, ¶ 314]. Plaintiffs' allegations against Newark are nearly identical to those above, but Plaintiffs do not allege Newark engaged in deceptive advertising. [See id., ¶ 443]. Plaintiffs fail to allege a false representation by Seaman Paper or Newark relating to MassNatural products or their safety for consumer use. Plaintiffs do not allege any facts about Seaman Paper's potentially deceptive advertising of MassNatural products, and do not include a single example of an advertisement at issue. With regard to Plaintiff's failure to disclose claim against Seaman Paper and Newark, despite the modifying clause about the paper manufacturers' disposal methods, the material information to which the beginning of the sentence refers is that MassNatural products contain unsafe PFAS chemicals and that users were at risk of suffering adverse health effects from the PFAS in MassNatural products. Once again, the claim is tightly bound to MassNatural's deception rather than any representations or omissions Seaman Paper or Newark made or failed to make regarding MassNatural's composting products.

As to 3M, Plaintiffs make the same allegations of false representations and deceptive advertising of MassNatural products that fail for the same reason: Plaintiffs do not allege any facts that 3M ever made a representation regarding MassNatural products. [Id. ¶ 520]. Plaintiffs also allege 3M failed to disclose the material information that MassNatural products and the constituent parts from which they are derived are contaminated with PFAS. [Id.] This allegation fails because Plaintiffs squarely allege that 3M sold PFAS compounds, therefore, 3M plainly did not fail to disclose the constituent part products it sells contain PFAS.

The Court finds Plaintiffs have failed to meet their burden on establishing a commercial link required for a Chapter 93A claim, as well as in alleging sufficient facts to sustain their claims. Accordingly, the Court GRANTS Seaman Paper, Newark, and 3M's motions to dismiss Plaintiffs Chapter 93A claims under Counts X, XXIV, and XXXII.

## IV.     Conclusion

For the reasons set forth above, the Court orders the following:

That Greif and Caraustar's motion to dismiss for personal jurisdiction be GRANTED.

That MassNatural's motions to dismiss: Medical Monitoring (Count I) be DENIED; Negligence (Count II) be DENIED as unopposed; Violation of Massachusetts Consumer Protection Act, M.G.L. ch. 93, §§1, et seq. (Count III) be DENIED; Private Nuisance (Count IV) be DENIED as unopposed; Public Nuisance (Count V) be DENIED; Ultrahazardous Activity / Strict Liability (Count VI) be DENIED; Willful and Wanton Conduct (Count VII) be DENIED.

That Seaman Paper's motions to dismiss: Medical Monitoring (Count VIII) be DENIED; Negligence (Count IX) be DENIED; Violation of Massachusetts Consumer Protection Act, M.G.L. ch. 93, §§1, et seq. (Count X) be GRANTED; Private Nuisance (Count XI) be DENIED; Public Nuisance (Count XII) be DENIED; Ultrahazardous Activity / Strict Liability (Count XIII) be DENIED; Willful and Wanton Conduct (Count XIV) be DENIED.

That Otter Farm's motions to dismiss: Medical Monitoring (Count XV) be DENIED; Negligence (Count XVI) be DENIED; Violation of Massachusetts Consumer Protection Act, M.G.L. ch. 93, §§1, et seq. (Count XVII) be GRANTED; Private Nuisance (Count XVIII) be DENIED; Public Nuisance (Count XIX) be DENIED; Ultrahazardous Activity / Strict Liability (Count XX) be DENIED; Willful and Wanton Conduct (Count XXI) be DENIED.

And, with respect to Otter Farm, Seaman Paper, and MassNatural jointly, that their motions to dismiss Violations of the Racketeer Influenced and Corrupt Organization Act ("RICO"), 18 U.S.C. § 1962(c) (Count XXXIV); and Violations of RICO, 18 U.S.C. § 1962(d), by Conspiring to Violate 18 U.S.C. § 1962(c) (Count XXXV) both be DENIED.

That Newark's motions to dismiss: Medical Monitoring (Count XXII) be DENIED; Negligence (Count XXIII) be DENIED; Violation of Massachusetts Consumer Protection Act, M.G.L. ch. 93, §§1, et seq. (Count XXIV) be GRANTED; Private Nuisance (Count XXV) be DENIED; Public Nuisance (Count XXVI) be DENIED; Ultrahazardous Activity / Strict Liability (Count XXVII) be GRANTED; Willful and Wanton Conduct (Count XXVIII) be DENIED; Violations of the Racketeer Influenced and Corrupt Organization Act ("RICO"), 18 U.S.C. § 1962(c) (Count XXXIV) be GRANTED; Violations of RICO, 18 U.S.C. § 1962(d), by Conspiring to Violate 18 U.S.C. § 1962(c) (Count XXXV) be GRANTED.

That 3M's motions to dismiss: Negligence (Count XXIX) be DENIED; Breach of Warranty for Failure to Warn (Count XXX) be DENIED; Breach of Warranty for Defective Design (Count XXXI) be GRANTED; Violation of Massachusetts Consumer Protection Act, M.G.L. ch. 93, §§1, et seq. (Count XXXII) be GRANTED; Medical Monitoring (Count XXXIII) be DENIED.

**SO ORDERED.**

Dated: December 21, 2023

   /s/ Margaret R. Guzman
Margaret R. Guzman
United States District Judge