# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

|  |  |
|---|---|
| THOMAS RYAN, SUSAN RYAN, SEAN GALLAGHER, ASHLEY SULTAN GALLAGHER, MICHELE BURT, NANCY DONAOVAN, and LAUREN LAUDE, individually and on behalf of others similarly situated.<br><br>              Plaintiffs,<br><br>    v.<br><br>THE NEWARK GROUP, INC., MASSACHUSETTS NATURAL FERTILIZER CO., INC., OTTER FARM, INC., SEAMAN PAPER COMPANY OF MASSACHUSETTS, INC., and 3M COMPANY,<br><br>              Defendants. | Civil Action No. 4:22-cv-40089-MRG |

## MEMORANDUM AND ORDER RE: ECF NOS. 233, 240, 246 & 274

**GUZMAN, J.**

On August 2, 2022, Plaintiffs Thomas Ryan, Susan Ryan, Sean Gallagher, Ashley Sultan Gallagher, Michele Burt, Nancy Donovan, and Lauren Ladue (collectively, "Plaintiffs") filed this putative class action against Defendants Greif, Inc., Caraustar Industries, Inc.,[1] The Newark Group, Inc. ("Newark"), Massachusetts Natural Fertilizer Company, Inc. ("MassNatural"), Otter Farm, Inc. ("Otter Farm"), and Seaman Paper Company of Massachusetts, Inc. ("Seaman Paper") to recover damages for the contamination of their groundwater, which was allegedly caused by the decades-long improper disposal of wastes containing per-and polyfluoroalkyl substances and their

---

[1] Plaintiffs' claims against Greif, Inc. and Caraustar Industries, Inc. were previously dismissed for lack of personal jurisdiction. [See ECF No. 181].

constituents (collectively referred to as "PFAS") at the MassNatural recycling and composting facility in Westminster, Massachusetts. [ECF No. 1]. On February 13, 2023, Plaintiffs filed their Second Amended Complaint adding 3M Company ("3M") for its role as an upstream manufacture of PFAS. [Second Am. Compl. ("SAC"), ECF No. 77].

Before the Court are several motions from the Moving Defendants (Newark, Seaman Paper, and Otter Farm) and 3M to join over fifteen (15) new entities as crossclaim defendants. [ECF Nos. 233, 240, 246]. Additionally, the Plaintiffs have moved for leave to file a Third Amended Complaint ("TAC") seeking to join several new parties, [ECF No. 274].

For the reasons stated below, all four of the aforementioned motions are **DENIED**.

## I.   **BACKGROUND**[2]

The named Plaintiffs are residents of Westminster, Massachusetts who allege that Defendants are liable for the PFAS contamination of Plaintiffs' drinking water and properties. [SAC ¶¶ 1-9]. Plaintiffs allege that MassNatural operated a commercial composting facility in Westminster, Massachusetts on Otter Farm ("the Facility") where it received organic byproduct from outside sources and suppliers, including materials that allegedly contained certain PFAS substances. [See SAC; ECF No. 241 at 3[3]]. Plaintiffs allege that MassNatural improperly disposed of the organic waste it received at the Facility, leading to PFAS leaching into the soil and nearby water sources, thereby contaminating Plaintiffs' land and drinking water. [ECF No. 241 at 3]. Further, Plaintiffs allege that MassNatural, Otter Farm, and Seaman Paper engaged in a RICO conspiracy to subvert compliance with environmental regulations. [See SAC ¶¶ 535-59]. Additionally, Plaintiffs allege that Seaman Paper and Newark are liable for the contamination

---

[2] For a more detailed recitation of the facts, please reference the Court's Motion to Dismiss Order, ECF No. 181.
[3] All pin cites refer to ECF pagination.

because they supplied PFAS-contaminated materials to MassNatural when they knew or should have known that the waste contained PFAS but failed to ensure it was disposed of properly. [See generally, SAC]. As to 3M, Plaintiffs allege that 3M is liable as an upstream manufacturer of PFAS compounds with a duty to prevent injury to downstream consumers who come in contact with 3M's PFAS. [Id.]

## A. PFAS6[4]

PFAS are used in many commercial products due to their ability to repel water, dirt, oil, and grease, resist heat and protect surfaces. [Id. ¶ 23]. They also resist biodegradation and are water soluble, making them mobile in groundwater and the environment. [Id. ¶¶ 27, 28]. PFAS chemicals are colloquially referred to as "forever chemicals" due to their ability to persist in the environment and human body indefinitely without breaking down. [Id. ¶ 26]. "PFAS6" refers to six specific PFAS compounds regulated by the Massachusetts Department of Environmental Protection ("MassDEP"), including (1) PFOS; (2) PFOA; (3) perfluorohexane sulfonic acid (PFHxS); (4) perfluorononanoic acid (PFNA); (5) perfluoroheptanoic acid (PFHpA); and (6) perfluorodecanoic acid (PFDA).[5] [Id. ¶ 41]. While PFAS are not illegal compounds, they are highly regulated.

The U.S. Environmental Protection Agency ("EPA") has concluded that human exposure to PFAS is associated with adverse health outcomes, which can manifest years after exposure. [Id. ¶ 36]. According to the EPA, human consumption of and oral exposure to PFAS is associated with decreased fertility, developmental effects in children, cancer, liver complications, and hormonal

---

[4] Preliminarily, the Court incorporates by reference Judge Hennessy's analysis on the chemical compounds of PFAS6 as stated in his Report and Recommendation on the first round of motions to dismiss. [Report and Recommendation ("R&R") at 3-4, ECF No. 159].
[5] This Order will refer to the compounds collectively as "PFAS" where there is no reason to discuss a single compound with specificity.

imbalances. [See id.] Reports issued from 2009 through 2022 reflect the EPA's increasing concern over health risks associated with human and animal ingestion of virtually any amount of PFAS. For example, in June 2022 EPA advised that "negative health effects may occur with concentrations of [PFAS] in water that are near zero and below EPA's ability to detect at this time." [Id. ¶ 39; R&R at 4].[6] In April 2024, the EPA finalized new drinking water regulations that established federal, legally enforceable levels, called Maximum Contaminant Levels (MCLs), for the six PFAS compounds and mixtures that contain PFAS.[7] The MCLs range from 4.0 parts per trillion (ppt) (also expressed as ng/L) for PFOS and PFOA, to 10.0 ppt for PFHxS, PFNA, and HFPO-DA.[8]

In addition to the federal regulations, Massachusetts has its own PFAS regulations. First, PFAS are considered hazardous materials under Mass. Gen. Laws Chapter 21E ("Chapter 21E"), also known as the Mass. Oil and Hazardous Material Release Prevention and Response Act. Chapter 21E § 5 establishes strict liability, and joint and several liability, for owners and operators of land contaminated with oil and hazardous materials, as well as for certain other parties identified in the statute. Section 4 of the statute establishes the process by which responsible private parties distribute the recovery of costs for response actions.  The Massachusetts Contingency Plan (310 CMR 40.0000 et seq.) ("MCP") is the set of regulations under Chapter 21E.  The MCP determines the protocol for required assessment, risk assessment and remediation of oil and hazardous materials contamination.

---

[6] EPA Announces New Drinking Water Health Advisories for PFAS Chemicals, $1 Billion in Bipartisan Infrastructure Law Funding to Strengthen Health Protections, U.S. Env't. Prot. Agency, https://www.epa.gov/newsreleases/epa-announces-new-drinking-water-health-advisories-pfas-chemicals-1-billion-bipartisan (May 25, 2023).

[7] Per- and Polyfluoroalkyl Substances (PFAS): Final PFAS National Primary Drinking Water Regulation, U.S. Env't. Prot. Agency, https://www.epa.gov/sdwa/and-polyfluoroalkyl-substances-pfas (July 12, 2024).

[8] Id.

As part of the MCP, in December 2019, MassDEP promulgated Reportable Concentrations (RCs) and Cleanup Standards for the six PFAS compounds, either individually or as a collective, depending upon the groundwater or soil category.[9] Relevant to this opinion, RCs for groundwater used for drinking are referred to as "RCGW-1" levels, while RCs for accessible soil or soil on property that has a sensitive use are referred to as "RCS-1" levels.[10] The RCGW-1 level for PFAS in drinking water is 20 nanograms per liter (ng/L) and the RCS-1 level for PFAS in soil ranges from 300 ng/kg to 720 ng/kg, depending on the type of PFAS.[11]  Additionally, on October 2, 2020, as part of the Massachusetts Drinking Water Program, MassDEP promulgated a drinking water standard of 20 ng/L for the sum of six PFAS compounds, matching the RCGW level.[12] If PFAS is detected at levels higher than the permissible RCs, the MCP requires notice be given to affected persons as well as implementation of "Immediate Response Actions" to contain and remedy potential contamination.[13] Once a release has been confirmed, MassDEP issues a Notice of Responsibility ("NOR") to notify any Potentially Responsible Party that it may be liable for the

---

[9] Sampling and Analysis Guidance for PFAS at Disposal Sites Regulated under the Massachusetts Contingency Plan, Mass. Dep't. Env't Prot., 8 (Nov. 13, 2023), https://www.mass.gov/doc/sampling-and-analysis-guidance-for-pfas-at-disposal-sites-regulated-under-the-massachusetts-contingency-plan-november-2023/download.

[10] MCP Numerical Standards, Mass. Dep't. Env't Prot., (Dec. 2017), https://www.mass.gov/doc/mcp-numerical-standards-derivation/download

[11] Sampling and Analysis Guidance for PFAS at Disposal Sites Regulated under the Massachusetts Contingency Plan, supra note 10 at 6.

[12] Id. at 5. The Massachusetts Drinking Water Program implements the federal and state drinking water MCLs and MassDEP anticipates that the Massachusetts MCL will be revised in the near future, in light of the new EPA regulations.

[13] See 310 CMR 40.000; Chapter 21E.

release of hazardous materials.[14] The NOR also directs the Potentially Responsible Party to engage a Licensed Site Professional to implement the Immediate Response Actions.[15]

**B. MassDEP Investigation and Timeline of Relevant PFAS Testing**

MassDEP began its investigation into the PFAS contamination in this case in 2022. There have been several rounds of testing since then to confirm the PFAS contamination and identify possible sources of PFAS materials. [See Tighe & Bond Report ("T&B Report"), ECF No. 241-5].[16]

MassDEP first learned of the groundwater contamination from a homeowner living near the Facility on Bean Porridge Hill Road, who requested testing of the residence's private-well-supplied drinking water (the "Initial Testing Site") in January 2022. [SAC ¶¶ 90-92]. In February 2022, MassDEP performed subsequent confirmatory sampling and testing of the private drinking water well at the Initial Testing Site and at five nearby residential wells. [T&B Report at 2]. MassDEP received the results of these additional tests between March 11, 2022, and March 14, 2022. [Id.] The testing detected PFAS6 in drinking water in each of the sampled private wells at concentrations between 333 and 1,815 ng/L, levels that exceeded the MCP RCGW-1 values. [Id.] Based upon MassDEP's preliminary investigation, MassDEP determined that a release of PFAS had occurred at the Facility. [SAC ¶ 135].

On March 30, 2022, Lessard Environmental ("LEI") sampled compost material at the Facility. [T&B Report at 2]. PFAS were detected at concentrations exceeding the RCS-1 values in

---

[14] See 310 CMR 40.000. An NOR is issued to a party when, based on the available information, MassDEP has reason to believe that the party is liable for response action costs and damages under Chapter 21E, § 5. The purpose of this notice is to inform the potentially liable party of its legal responsibilities under Massachusetts state law for assessing and/or remediating the subject release of a hazardous material.
[15] See 310 CMR 40.000.
[16] Tighe and Bond prepared a Compost and Material Sampling Report on September 16, 2022, which is an analysis of PFAS testing that took place at private residences in Westminster as well as at the Facility. [T&B Report].

each sample collected. [Id.] On March 31, 2022, MassDEP officially informed MassNatural that a PFAS release was detected at the Facility at an Imminent Hazard level and that remediation actions were required in accordance with the MCP regulations. [Id.]. MassNatural and Otter Farm agreed to engage LEI as a Licensed Site Professional to assist with testing remediation efforts.[17] On May 17, 2022, MassDEP issued a Unilateral Administrative Order ("UAO 1") to MassNatural, requiring, among other things, that MassNatural submit an Initial Plan to MassDEP to allow the sampling of materials stockpiled at the Facility. [Id. at 3]. In line with the Initial Plan, in May and June 2022, LEI collected samples of material stockpiled at the Facility (the "May/June 2022 LEI testing") and submitted its findings to Alpha Analytical for PFAS analysis. [Id.; R&R at 15]. The May/June 2022 LEI testing confirmed PFAS release above RCS-1 values in each sample, except, in relevant part, paper waste from Seaman Paper and lettuce waste; however, later sampling detected PFAS in those materials that exceeded RCS-1 values. [See T&B Report at 3, 5].

On June 30, 2022, Tighe & Bond submitted a Revised Stockpile Sampling Plan to MassDEP, in response to MassDEP's June 7, 2022 letter requiring amendments to the Initial Plan. [Id. at 3]. On July 7, 2022, Tighe & Bond staff arrived at the Facility (the "July 2022 T&B testing") and initiated the MassDEP-approved sampling plan by identifying and labeling each material, including mixtures of materials. [Id.] The July 2022 T&B testing further confirmed PFAS concentrations above RCS-1 values and identified sources of the materials that tested at hazardous levels. [SAC ¶ 102]. On July 20, 2022, MassDEP issued a Unilateral Administrative Order ("UAO 2") and Permit Suspension to Otter Farm and MassNatural, ordering all operations at the Facility to stop. [Id.]

---

[17] NOR to MassNatural, Mass. Dep't. Env't Prot. (Mar. 31, 2022), available at https://eeaonline.eea.state.ma.us/EEA/fileviewer/FileViewer.aspx?fileEncryptionId=gceedehj; NOR to Otter Farm, Mass. Dep't. Env't Prot. (Mar. 31, 2022), available at https://eeaonline.eea.state.ma.us/EEA/fileviewer/FileViewer.aspx?fileEncryptionId=gceedfbj.

In sum, initial testing in February and March 2022, the May/June 2022 LEI testing, the July 2022 T&B testing, further testing in January 2023, and the T&B report confirmed PFAS release at the Facility and identified parties that were potential sources for the PFAS-containing materials stockpiled at the Facility.

As of July 2023, MassDEP has issued NORs to seven Potentially Responsible Parties: Both (1) Mass Natural and (2) Otter Farm were issued NORs on March 31, 2022, (3) Seaman Paper was issued an NOR on May 13, 2022, both (4) Greif and (5) Newark were issued NORs on December 23, 2022, and both (6) Ball Corporation and (7) Rust-Oleum Corporation[18] were issued NORs on July 14, 2023. [SAC ¶¶ 99-103; ECF No. 234]. For all parties that were issued an NOR from MassDEP, the NOR expressed that "MassDEP, based on the available information, considers [issued party] a party with potential liability for response action costs and damages under [Chapter 21E], § 5." [SAC ¶¶ 99, 105].

### C. Proposed Additional Entities

On March 18, 2024, the Moving Defendants filed their motion [ECF No. 233] for leave to amend their answers to join, as crossclaim defendants, Ball Corporation ("Ball"), Rust-Oleum Corporation ("Rust-Oleum"), and John Doe Defendants. On April 17, 2024, Moving Defendants filed their second motion [ECF No. 240] for leave to amend their answers to join, as crossclaim defendants, New England Fertilizer Company ("NEFCO"); Synagro Technologies, Inc., individually and as successor-in-interest to New England Fertilizer Company ("Synagro"); Little Leaf Farms, LLC ("Little Leaf"); Jordan Dairy Farms, Inc. ("Jordan Farms"); President and Fellows of Harvard College f/k/a Harvard University ("Harvard"); Anaergia, Inc. and Anaergia Services, LLC (collectively, "Anaergia"); Rhode Island Bioenergy Facility, LLC and Rhode Island

---

[18] Ball and Rust-Oleum were issued NORs subsequent to the filing of Plaintiffs' SAC. [ECF No. 234].

Bioenergy, LLC (collectively, "Rhode Island Bioenergy"); Baro Properties Limited Partnership ("Baro"); Westminster Estates, LLC ("Westminster"); New England Waste Services of ME, Inc. d/b/a Casella Organics ("Casella Organics"); and EIDP, Inc., DuPont de Nemours, Inc., The Chemours Company, The Chemours Company FC, LLC, Corteva, Inc., (EIDP, Inc., DuPont de Nemours, Inc., The Chemours Company, The Chemours Company FC, LLC, and Corteva, Inc. are hereinafter collectively referred to as the "DuPont Entities"). The Moving Defendants bring crossclaims against the proposed entities under Mass. Gen. Laws ch. 231B for contribution and/or indemnification, as well as a claim for contribution under Mass. Gen. Laws. ch. 21E, §§ 4-5. [Id.].

On April 23, 2024, 3M filed its motion [ECF No. 246] for leave to file its second amended answer, incorporating by reference the Moving Defendants' crossclaims as its own. 3M asserts the same crossclaims against the same proposed entities; however, it does not raise any claims against the DuPont Entities.[19] [Id.]

On May 13, 2024, almost two years after this suit began, Plaintiffs requested leave of this Court to file the proposed TAC seeking to add the Dupont Entities, Ball, and Rust-Oleum as primary defendants. [ECF No. 274]. Plaintiffs' proposed TAC brings claims against Ball and Rust-Oleum for negligence, private nuisance, public nuisance, medical monitoring, and willful and wanton conduct; and against the Dupont Entities for negligence, medical monitoring, breach of warranty for failure to warn. [ECF No. 274; TAC, ECF No. 275-1].

The Court will now provide a brief factual background on each of the entities above that the current parties are seeking to join.

---

[19] For ease of legibility, from here on throughout the opinion, the Court will use "Moving Defendants" to refer to Newark, Seaman Paper, and Otter Farm *as well as* 3M, noting for the record that 3M joins in all proposed crossclaims except for those asserted against the DuPont Entities. Where that distinction is relevant, the Court will raise it.

The DuPont Entities

The Dupont Entities are global leaders in the chemical manufacturing industry. The TAC and Moving Defendants'[20] motions allege that the Dupont Entities, similarly to 3M, are liable for Plaintiffs' injuries due to their role as an upstream manufacturing of PFAS chemicals. [See ECF Nos. 241, 275]. None of the aforementioned testing at the private Westminster residences or the Facility identified the DuPont Entities as being responsible for any of positive PFAS samples and no party has alleged that DuPont had a direct commercial link to MassNatural's operations. As of the publication of this order, the DuPont Entities have not filed a response to this action and 3M has not filed any crossclaims against the DuPont Entities.

Ball Corporation

Ball owns and operates manufacturing facilities in Saratoga Springs, New York and Middletown, New York. [ECF No. 234 at 4]. Ball manufacturers aluminum canisters through a process which yields "diatomaceous earth filter cake" as a waste product. [Id. at 4-5]. The Moving Defendants allege that "[s]ince 2015, Ball has sent over 5,360 tons of diatomaceous earth filter cake byproduct from its operations to Mass Natural for composting." [Id. at 5]. The July 2022 T&B testing of Ball's diatomaceous earth filter cake stockpiled at the Facility detected concentration levels of one or more regulated PFAS above the RCS-1 values. [T&B Report at 5, 17]. MassDEP's July 14, 2023, NOR cites Ball's role in "directly or indirectly, arrang[ing] for the transport, disposal, storage or treatment of hazardous material to or in a site from or at which there is or has been a release of hazardous material" at the Otter Farm Property, including PFAS. [See ECF No. 234-1 at 29-37]. Plaintiffs' proposed TAC alleges only that, according to MassDEP, Ball disposed of PFAS-contaminated materials at the Facility, and brings claims against Ball for

---

[20] Here, regarding the claims against the Dupont Entities, "Moving Defendants" does not include 3M.

medical monitoring, negligence, private nuisance, public nuisance, and willful and wanton Conduct. [TAC at 3; id. ¶¶ 103-106]. As of the publication of this order, Ball has not filed a response to any of the motions.

Rust-Oleum

Rust-Oleum owns and/or operates a manufacturing facility in Attleboro, Massachusetts. [ECF No. 234 at 5]. Rust-Oleum manufactures coatings and sealants, including a food-grade shellac which yields "Red Mud" as a waste material. [Id.] The July 2022 T&B testing of Rust-Oleum food grade shellac process waste stockpiled at the Facility detected concentration levels of one or more regulated PFAS compounds above the permissible RCS-1 values. [T&B Report at 5, 18]. MassDEP's July 14, 2023, NOR cites Rust-Oleum's role in "directly or indirectly, arrang[ing] for the transport, disposal, storage or treatment of hazardous material to or in a site from or at which there is or has been a release of hazardous material" at the Facility, including PFAS. [See ECF No. 234-1 at 39-47]. Plaintiffs' proposed TAC alleges only that, according to MassDEP, Rust-Oleum disposed of PFAS-contaminated materials at the Facility,and brings claims against Rust-Oleum for medical monitoring, negligence, private nuisance, public nuisance, and willful and wanton conduct. [TAC at 4, 22-23, ¶¶ 107-110]. As of the publication of this order, Rust-Oleum has not filed a response to this action.

Little Leaf

Little Leaf owns and operates a 10-acre greenhouse in Devens, Massachusetts. [ECF No. 241 at 6]. Little Leaf grows lettuce year-round, and the production process yields used cultivated lettuce waste including "Rockwool soilless medium" as a waste product. [Id. at 6-7]. The Moving Defendants allege that "[s]ince 2016, Little Leaf has sent over 4,192 tons of cultivated lettuce waste from its operations to Mass Natural for composting." [Id, at 7].

The July 2022 T&B testing of lettuce waste stockpiled at the Facility detected concentration levels of one or more regulated PFAS compounds above the permissible RCS-1 values. [T&B Report at 19]. The T&B Report does not identify Little Leaf as the owner of the lettuce waste, but the Moving Defendants allege that Little Leaf was the only company that sent lettuce to the Facility for composting. [ECF No. 241 at 7].[21] As of the publication of this order, Little Leaf has not filed a response to this action.

Jordan Farms

Jordan Farms primarily produces dairy and beef products for consumers by raising live cattle in Rutland, Massachusetts. [Id.] Jordan Farms' farming operations yield cow manure as a waste product. [Id.] The Moving Defendants allege that "[s]ince at least 2015, Jordan Farms has sent, or arranged to have sent, at least 1,722 tons and 399 yards of cow manure" that contain PFAS. [Id.] The July 2022 T&B testing of cow manure from Jordan Farms that was stockpiled at the Facility detected concentration levels of one or more regulated PFAS compounds above the permissible RCS-1 values. [ECF No. 241-5 at 21; T&B Report at 5]. As of the publication of this order, Jordan Farms has not filed a response to this action.

Harvard

Harvard is a private educational institution based in Cambridge, Massachusetts. [ECF No. 241 at 7]. The Moving Defendants allege that Harvard utilized carbon pellets containing PFAS in the construction and/or renovation of a campus library, and that in "approximately 2022," Harvard arranged to transport a single shipment of these carbon pellets to the Facility, which MassNatural accepted for composting at the Facility. [See id. at 8].

---

[21] The T&B Report identifies "Lettuce leaf/Rockwool" but not Little Leaf. [T&B Report at 5].

The July 2022 T&B testing of carbon pellets stockpiled at the Facility revealed concentration levels of PFAS compounds above the permissible RCS-1 values. [ECF No. 241-5 at 18]. The T&B Report identified the carbon pellets as originating from the Harvard University Widener Library construction project. [T&B Report at 18]. The T&B Report further states the carbon pellet stockpile age was less than 1 month old. [Id. at 56].

In Harvard's opposition to Moving Defendants' crossclaim motions, Harvard contends the crossclaims seeking contribution and/or indemnification from Harvard would be futile because its single delivery, in June of 2022 – *after* the detection of PFAS in Plaintiffs' water and the filing of Plaintiffs' original complaint – is not part of the "same transaction or occurrence" as the Defendants' alleged conduct, and therefore there is no basis for liability to the Plaintiffs. [ECF No. 266 at 12-17]. Further, Harvard denies responsibility for the arrangement and/or transport of PFAS6-contaminated material to MassNatural and states that it had no knowledge (actual or constructive) about (1) MassNatural's disposal methods, or (2) that the carbon pellets contained PFAS. [Id. at 8].

Rhode Island Bioenergy & Anaergia

Rhode Island Bioenergy, an indirect subsidiary of Anaergia,[22] is the largest industrial anaerobic digester for food and solid organic waste in New England and is capable of processing over 100,000 tons of organic waste per year at its location in Johnston, Rhode Island. [ECF No. 241 at 8-9]. The Moving Defendants allege that Anaergia arranged for 70 tons of digestate to be sent to the Facility over the course of 2021 and 2022. [ECF No. 241-1 ¶ 69]. On January 19, 2023, LEI conducted testing of material labeled "Anaerobic Digestate" that was stockpiled at the Facility

---

[22] Anaergia, who acquired Rhode Island Bioenergy in 2021, is a global waste management business through extraction of organics from waste products, implementation of anaerobic digestion, and production of fertilizer, water, and natural gas. [ECF No. 241 at 8].

(the "January 2023 LEI testing"). [ECF No. 241-6]. The January 2023 LEI testing of the digestate detected concentration levels of one or more regulated PFAS compounds above the permissible RCS-1 values. [Id. at 3].

In Anaergia and Rhode Island Bioenergy's joint opposition filings, the companies raise various arguments as to why they should not be joined in this action. First, the companies challenge the sufficiency of the Moving Defendants' basis for joinder. They challenge the Moving Defendants' use of an affirmation from a counsel without direct knowledge of disposal or storage practices at the Facility, who claimed that the Anaergia Digestate was contained in a particular stockpile on the site. [ECF No. 280 at 6]. Further, the Moving Defendants do not identify what other materials were stored with the Digestate that purportedly originated from Anaergia and/or Rhode Island Bioenergy - raising the possibility for cross contamination. [Id.] Nor do the Moving Defendants state what proportion of the Anaergia materials were left at the time of the January LEI 2023 testing. [Id.] As to the January 2023 test results showing hazardous PFAS levels in the digestate attributed to Anaergia, the companies assert these results lack information as to the source of the Digestate tested (or what Digestate had been mixed with), the chain of custody of the materials, or how samples were taken. [Id. at 6-7]. The companies accurately assert that, in support of their motion as to Anaergia/Rhode Island Bioenergy, the Moving Defendants have only offered a single excerpted testing result chart that appears to have been extracted from a longer LEI report that is not on the docket. [See ECF No. 241-6; see ECF No. 241 ¶ 27; ECF No. 280 at 7].

Additionally, the companies assert the Moving Defendants lack a legal basis for their crossclaims because Plaintiffs' claims primarily concern the RICO allegations against MassNatural and the Moving Defendants, which involved intentional wrongdoing and collusion that is unique to those parties. [ECF No. 280 at 7-8]. Lastly, the companies contend that their contract with third-

party Casella Major Account Services, LLC[23] relieves them from any legal responsibility because Casella managed the disposal and demand for the digestate, and their contract includes a transfer of title provision under which Casella agreed to bear full responsibility for proper disposal of the digestate once it received it from Anergia/Rhode Island Bioenergy. [See ECF No. 280-1; ECF No. 280-2]. Further, Casella selected MassNatural as the disposal site. [ECF No. 280-1 at 3]. Therefore, the companies assert that they were not the title owners of the digestate when it was disposed of at MassNatural.

Synagro & NEFCO[24]

Since the late 1980s, NEFCO has operated the Massachusetts Water Resource Authority's ("MWRA") Deer Island Wastewater Treatment Plant in Quincy, Massachusetts.[25] [ECF No. 241 at 5]. The Treatment Plant dries wastewater solids, which originate in forty-three Greater Boston communities, and turns them into biosolid pellets for use as fertilizer. [Id.] NEFCO engaged Casella Organics, which arranged for the transport and disposal of the biosolid pellets at MassNatural. [Id. at 11]. As the basis for joinder, Defendants allege that since 2018, more than 2,800 tons of NEFCO biosolid pellets have been delivered to the Facility. [ECF No. 241-1 ¶ 31].

Various testing has detected PFAS compounds in biosolid pellets attributed to NEFCO, including NEFCO's own independent testing in April 2021 and March 2022. [Id. at ¶ 95]. Additionally, the May/June 2022 LEI testing collected samples from a stockpile identified as

---

[23] Note that Casella Major Account Services, LLC is a different entity from New England Waste Services of ME, Inc. ("Casella Organics"). The Defendants are seeking to add Casella Organics as a crossclaim defendant, not Casella Major Account Services, LLC.

[24] In May 2023, Synagro acquired NEFCO, however this order refers to both NEFCO and Synagro, collectively as "NEFCO." [ECF No. 241 ¶ 10].

[25] On July 1, 2024, the Court denied the Moving Defendants and 3M's motions to join MWRA [ECF No. 318]. In the Enabling Act, which originated the MWRA, the Massachusetts legislature specifically limited the MWRA's capacity "to sue and be sued," by giving the Massachusetts Supreme Judicial Court ("SJC") "original and exclusive jurisdiction of all state actions in which the [MWRA] is a defendant and water pollution is an issue." [Id. § 24 (emphasis added)]. [ECF No. 318 at 2; see ECF No. 302 at 5].

"Fiber Biopellets", which contained one or more regulated PFAS compounds above the RCS-1 values. [Id. at 15 ¶¶ 95-96; T&B Report at 3 & 16].  None of the testing identified NEFCO as being responsible for the "Fiber Biopellets" stockpiled at the Facility.

In March 2024, MassNatural, Otter Farm, and Newark sued NEFCO pursuant to Chapter 21E in Worcester Superior Court seeking contribution and reimbursement for damages and the reasonable costs of any response actions required of them relating to the PFAS contamination at the Facility. See Mass. Natural Fertilizer Co., Inc. v. New England Fertilizer Co., Inc., No. 2485CV00341 (Mass. Sup. Ct. Aug.8, 2024) (hereinafter the "Chapter 21E State Court Action").[26] The plaintiffs in the State Court Action then amended their complaint to add as defendants New Casella Organics and the general partners of NEFCO, alleging the same claims. See id., Docket Nos. 5, 9.

In their opposition filings to Defendants' crossclaim motions, NEFCO/Synagro contend that (1) the Moving Defendants' crossclaims are procedurally improper and any legal action should be brought as a third party claim, (2) the Moving Defendants' claims for contribution and indemnification are futile, (3) given the pending Chapter 21E Action in state court, this Court should abstain under Colorado River abstention, and (4) without the presence of MWRA as a co-party in the action, NEFCO's ability to protect its legal interests is impaired. [ECF No. 303 at 13-14; ECF No. 344 at 5-7].  Regarding 3M's motion [ECF No. 246], NEFCO indicates that 3M has

---

[26] "It is 'well-accepted that federal courts may take judicial notice of proceedings in other courts if those proceedings have relevance to the matters at hand.'" Barnstable Cty. v. 3M Co., No. 17-40002, 2017 U.S. Dist. LEXIS 207414, at *11 (D. Mass. Dec. 18, 2017) (quoting Kowalski v. Gagne, 914 F.2d 299, 305 (1st Cir. 1990). In general, "court filings are recognized not for the truth of the matters asserted within them, but instead only to establish the fact that related litigation has been initiated or to establish that the fact that documents have been filed in that related case." Id. (citations omitted). As a result, the Court takes judicial notice of the state court documents referenced by the parties to confirm the existence of the related state court action, the claims asserted by MassNatural, Otter Farm, and Newark against Casella Organics and NEFCO and what issues have been argued and decided to the extent that any of the foregoing is relevant to deciding this motion. See id. at 12.

16

not presented any evidence whatsoever or alleged that "NEFCO purchased, used or applied any chemicals or substances manufactured or sold by 3M . . . as part of NEFCO's operation of the NEFCO operated facility in Quincy." [ECF No. 303 at 14].

New England Waste Services of Me, Inc. d/b/a Casella Organics ("Casella Organics")

Casella Organics is a Maine corporation that collects and transports organic residuals, such as paper, plastic, metal, glass, organic bio-solids (biopellets), sludge, and specialized hazardous waste to composting facilities. [ECF No. 241 ¶ 34]. As the basis for joinder, the Moving Defendants allege that, since 2018, Casella Organics acted as a "broker" to form the business relationships between MassNatural and various companies that sent hazardous material containing PFAS to the Mass Natural site, including NEFCO. [Id. ¶ 35]. As such, the Moving Defendants assert that Casella Organics is liable because it "arranged for the transport, disposal, storage or treatment of hazardous material to or at Mass Natural's operations at the Mass Natural composting site." [ECF No. 305 at 11]. The Moving Defendants allege that, since 2018, Casella Organics has delivered more than 2,800 tons of biopellet material to the MassNatural Facility. [ECF No. 241-1 at 15 ¶ 94].

In its opposition briefs, Casella Organics contends: (1) the Moving Defendants' claims are futile, (2) the Moving Defendants Chapter 21E crossclaims are duplicative of the Chapter 21E State Court Action, and (3) that Casella Organics' involvement with the transportation of material to the Facility beginning in 2018 is not the same "transaction or occurrence" as the issues asserted by the Plaintiffs in their SAC or proposed TAC. [See ECF Nos. 286, 288 & 339].   Further, Casella Organics asserts that the Moving Defendants' motions to join new parties is untimely because the Moving Defendants identified purported suppliers to MassNatural as far back as January 2023

when they sent a Chapter 21E Demand Letter to Casella Organics in the Chapter 21E action. [ECF No. 339 at 2-3].

Westminster & Baro

Westminster and Baro own the Woods of Westminster Golf Course ("Woods of Westminster"), which is located near the MassNatural Facility. [ECF No. 241 ¶ 28]. The Woods of Westminster utilizes land applications of biosolids and biopellets as part of its golf course upkeep. [Id. ¶ 30]. As the basis for joinder, the Moving Defendants allege, that the Woods of Westminster is a potential alternative source of the PFAS release because it utilized NEFCO's biosolid pellets as part of the golf course upkeep and has a stockpile of biopellets stored on its property for future use. [Id. at 10 ¶ 31-33]. Notably, the Moving Defendants do not contend that Westminster or Baro ever contributed any materials to MassNatural.

In Baro's opposition memorandum [ECF No. 262], Baro contends that Defendants' claims against Baro are futile because there is no factual basis for liability: Baro's one-time purchase and limited use of biopellets from MassNatural is miniscule in comparison to the volume of contaminated material which is alleged to have passed through Facility. [See id. at 4-5]. Additionally, Baro argues that even if contaminated biopellets were applied to the golf course, the Moving Defendants have not demonstrated that "the contamination would have moved through the environment in the manner and to the extent as would be necessary to contaminate the plaintiffs' properties." [Id. at 5].

John Doe Defendant(s)

The Moving Defendants' and 3M's crossclaim motions seek to add John Defendant(s) as placeholders for any other yet-identified crossclaim defendants who may be suppliers of waste to MassNatural. [ECF Nos. 240 & 246].

## II.   **LEGAL STANDARDS**

### A.  Amending Pleadings

Fed. R. Civ. P. 15(a) governs the amendment of pleadings prior to trial. Fed. R. Civ. P. 15(a)(1) allows parties to amend their pleadings once as a matter of course within 21 days of serving their pleading or within 21 days after service of a Rule 12 motion. After the 21 days, Rule 15(a)(2) allows a party to amend its pleading only with the opposing party's written consent or the court's leave. "Rule 15 . . . was designed to facilitate the amendment of pleadings except where prejudice to the opposing party would result." United States v. Hougham, 364 U.S. 310, 316 (1960). Despite Rule 15(a)(2)'s liberal amendment policy, "the district court enjoys significant latitude in deciding whether to grant leave to amend," and a district court's decision whether to grant leave to amend is reviewed deferentially "if any adequate reason for the denial is apparent on the record." U.S. ex rel. Gagne v. City of Worcester, 565 F.3d 40, 48 (1st Cir. 2009).

Both the Plaintiffs and the Moving Defendants seek to amend their complaint and answers respectively to join additional defendants.  [ECF Nos. 233, 240, 246, 274].

The Moving Defendants cannot amend their answers as a matter of course, as each already amended their answers to the Second Amended Complaint once. MassNatural, Otter Farm, Seaman Paper, and Newark all filed their answers to the SAC on January 16, 2024, then Otter Farm and Seaman amended their answers on January 30, 2024, and Newark amended its answer on February 6, 2024. [ECF Nos. 186, 187, 188, 189, 190, 191, 200]. 3M amended its answer on February 6, 2024. [ECF No. 199]. Thus, the Moving Defendants' motions to amend require either the opposing party's written consent or the court's leave under Fed. R. Civ. P. 15(a)(2).

The Plaintiffs intend to amend their complaint to include the Dupont Entities, Ball, and Rust-Oleum and have the written consent of all five current Defendants to do so. [ECF No. 274].

Thus, the Plaintiffs' amendment to their complaint would generally be considered permissible under Rule 15(a)(2). Typically, when the opposing party has consented to an amendment to the pleading, the court has little discretionary control over the matter. See, e.g., Bilmar Drilling, Inc. v. IFG Leasing Co., 795 F.2d 1194, 1199 (5th Cir. 1986); Fern v. United States, 213 F.2d 674, 677 (9th Cir. 1954). Even so, consented-to amendments are not wholly outside the purview of the Court. Even consented-to amendments may be denied when the amendment is conditioned on the further action and discretion of the court or triggers the court's concerns about "the costs that protracted litigation places on the courts." See Fort. Howard Paper Co. v. Standard Havens, Inc., 901 F.2d 1373, 1380 (7th Cir. 1990) (finding the lower court properly exercised its discretion in refusing to allow an amendment to the complaint, even where the opposing party consented, because the amendment added new defenses and would require the reopening of discovery).

The Plaintiffs have not given their written consent to the Moving Defendants' motion to amend their answer to join NEFCO, Synagro, Little Leaf, Jordan Farms, Harvard, Anaergia, Rhode Island Bioenergy, Baro, Westminster, Casella Organics, and the DuPont Entities as crossclaim defendants, although they do not oppose the motion. [ECF No. 240]. Thus, the Moving Defendants must obtain the Court's leave to amend their answers and join these crossclaim defendants pursuant to Rule 15(a)(2).

The Supreme Court has held that "it is settled that the grant of leave to amend the pleadings pursuant to Rule 15 (a) is within the discretion of the trial court." Zenith Radio Corp. v. Hazeltine Rsch., 401 U.S. 321, 330 (1971). Leave sought need not be "freely given" where there is a declared reason not to join a party. Forman v. Davis, 371 U.S. 178, 182 (1962) (listing reasons such as "undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed undue prejudice to the opposing party by virtue

of allowance of the amendment, futility of amendment, etc."). "[A] request to amend – especially a belated request – requires the court to examine the totality of the circumstances and to exercise its informed discretion in constructing a balance of pertinent considerations," which may include undue delay, bad faith, "the absence of due diligence on the movant's part," and futility. See Palmer v. Champion Mortg., 465 F.3d 24, 30-31 (1st Cir. 2006).

"In the First Circuit, it is well-established that 'undue delay in moving to amend, even standing alone, may be . . . an adequate reason [to deny a motion for leave to amend].'" United States ex rel. Hagerty v. Cyberonics, Inc., 146 F. Supp. 3d 337, 343 (D. Mass. 2015) (quoting In re Lombardo, 755 F.3d 1, 3 (1st Cir. 2014)). "As a case progresses, and the issues are joined, the burden on a [moving party] seeking to amend a complaint becomes more exacting." Steir v. Girl Scouts of the USA, 383 F.3d 7, 12 (1st Cir. 2004). "Where . . . considerable time has elapsed between the filing of the complaint and the motion to amend, the movant has the burden of showing some 'valid reason for his neglect and delay.'" Stepanischen v. Merchs. Despatch Transp. Corp., 722 F.2d 922, 933 (1st Cir. 1983) (quoting Hayes v. New England Millwork Distribs., Inc., 602 F.2d 15, 19-20 (1st Cir. 1979)). The First Circuit has found undue delay for time periods of eleven months, four months, and even less than three months. See Calderón-Serra v. Wilmington Tr. Co., 715 F.3d 14, 19-20 (1st Cir. 2013) (affirming denial of a party's motion to amend following eleven-month delay); Villanueva v. United States, 662 F.3d 124, 127 (1st Cir. 2011) (affirming denial of a party's motion to amend following four-month delay); Kay v. N.H. Democratic Party, 821 F.2d 31, 34 (1st Cir. 1987) (affirming denial of a party's motion to amend following less than three-month delay). When determining whether delay is undue, "what the [moving party] knew or should have known and what he did or should have done are relevant to the question of whether justice

21

requires leave to amend under this discretionary provision." Leonard v. Parry, 219 F.3d 25, 30 (1st Cir. 2000); Hagerty, 146 F. Supp. 3d at 343.

A motion to amend may be found unduly prejudicial to the nonmoving party where it injects a new theory or relief into the litigation. See Steir v. Girl Scouts of the USA, 383 F.3d 7, 12 (1st Cir. 2004). Additionally, a district court may deny a motion for leave to amend as prejudicial to the nonmoving party where the moving party seeks to expand the scope and nature of the original litigation by bringing in new defendants or claims unrelated to earlier pleadings. See also Evans v. Thompson, No. 14-13024-JCD, 2016 U.S. Dist. LEXIS 65487, at *5 (D. Mass. May 18, 2016). "Leave to amend should neither expand the scope of discovery nor cause a disruption in the discovery or trial schedule." El Dia, Inc. v. Rossello, 30 F. Supp. 2d 160, 165 (D.P.R. 1998); Sunshine Lady Found., Inc. v. Rozek, No. 20-12146-LTS, 2021 U.S. Dist. LEXIS 260062, at *15 (D. Mass. June 1, 2021).

When deciding a motion for leave to amend "it is appropriate for the court to consider judicial economy and the most expeditious way to dispose of the merits of the litigation." Dussouy v. Gulf Coast Inv. Corp., 660 F.2d 594, 598 (5th Cir. 1981) (citing Zenith Radio v. Hazeltine Research, 401 U.S. 321, 329 (1971)) (affirming a grant of leave to amend a complaint where denial would have required moving party to file a new action and effectively restart the litigation process). "The burden to the judicial system can justify a denial of a motion to amend 'even if the amendment would cause no hardship at all to the opposing party.'" Perrian v. O'Grady, 958 F.2d 192, 195 (7th Cir. 1992) (quoting Tamari v. Bache & Co. S.A.L., 838 F.2d 904, 909 (7th Cir. 1988)) (affirming a denial of leave to amend a complaint where the lower court found the amendment would burden the judicial system through delay of discovery and trial). "Courts often consider efficiency and case management when deciding a motion to amend." Bd. of Trs. of the IUOE Local

4 Pension Fund v. Alongi, No. 21-cv-10163-FDS, 2022 U.S. Dist. LEXIS 221235, at *10 (D. Mass. Dec. 7, 2022) (citing Gouin v. Nolan Assocs., LLC, 325 F.R.D. 521, 523 (D. Mass. 2017)). Additionally, "[w]hile leave to amend must be freely given, that generous standard is tempered by the necessary power of a district court to manage a case." Little v. Liquid Air Corp., 952 F.2d 841, 846 (5th Cir. 1992) (quoting Shivangi v. Dean Witter Reynolds, Inc., 825 F.2d 885, 890 (5th Cir. 1987)).

Finally, and importantly, a district court may properly deny a motion for leave to amend where the moving party's amendments would be futile, i.e. the amended complaint would not withstand a Rule 12(b)(6) motion. See Efron v. UBS Fin. Servs. Inc. of P.R., 96 F.4th 430, 437 (1st Cir. 2024) (upholding a district court's determination that an amendment would be futile under the 12(b)(6) standard where the proposed amendment failed to plead fraud with sufficient particularity). Under the 12(b)(6) standard, the Court "must assume the truth of all well-plead[ed] facts and give the plaintiff the benefit of all reasonable inferences therefrom." Ruiz v. Bally Total Fitness Holding Corp., 496 F.3d 1, 5 (1st Cir. 2007) (citing Rogan v. Menino, 175 F.3d 75, 77 (1st Cir. 1999)). To survive a 12(b)(6) motion, the plaintiff must state a claim that is plausible on its face. Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007). That is, "[f]actual allegations must be enough to raise a right to relief above the speculative level, . . . on the assumption that all the allegations in the complaint are true (even if doubtful in fact) . . . ." Id. at 555 (citations omitted). In this context, plausible "means something more than merely possible," Schatz v. Republican State Leadership Comm., 669 F.3d 50, 55 (1st Cir. 2012) (citation omitted), and the pleadings must set forth allegations respecting each element necessary to sustain recovery under an actionable legal theory. Gagliardi v. Sullivan, 513 F.3d 301, 305 (1st Cir. 2008) (citation omitted). If a plaintiff's well-pleaded facts do not "possess enough heft to show that plaintiff is entitled to relief"

then dismissal is appropriate. <u>Ruiz Rivera v. Pfizer Pharms., LLC</u>, 521 F.3d 76, 84 (1st Cir. 2008) (quotation marks and alterations omitted).

   B.  <u>Joinder of Additional Parties</u>

The Moving Defendants seek to join fifteen entities to assert various crossclaims against them. [ECF Nos. 233, 240 & 246]. Fed. R. Civ. P. 13(h) governs the joinder of additional parties for the purposes of crossclaims. However:

> Rule 13(h) only authorizes the court to join additional persons in order to adjudicate a counterclaim or crossclaim that already is before the court or one that is being asserted at the same time the addition of a nonparty is sought. This means that a counterclaim or crossclaim may not be directed solely against persons who are not already parties to the original action, but must involve at least one existing party.

<u>Integrand Assurance Co. v. Puma Energy Caribe, LLC</u>, No. 19-1195 (FAB), 2019 U.S. Dist. LEXIS 221766, at *7-8 (D.P.R. Dec. 27, 2019) (quoting 6 Charles Alan Wright et al., <u>Federal Practice and Procedure</u> § 1435, at 319 (3d ed. 2010)). Several proposed crossclaim defendants assert that the Moving Defendants are barred from asserting a Chapter 21E crossclaim because they failed to lodge the same claims against their co-parties. But, upon review of the Moving Defendants' proposed crossclaims, Newark, Seaman Paper, and Otter Farm all assert Chapter 21E claims and claims for contribution and indemnification against existing parties. [<u>See</u> ECF Nos. 241-1, 241-2, 241-3]. In its proposed crossclaims, 3M includes Newark, Seaman Paper, Otter Farm, and MassNatural as proposed crossclaim defendants and incorporates by reference the other Moving Defendants' allegations and claims contained in their proposed crossclaims. [<u>See</u> ECF No. 247-1]. Therefore, the Moving Defendants and 3M are not procedurally barred from asserting a Chapter 21E crossclaim against new non-parties.

Fed. R. Civ. P. 13(h) states that "Rules 19 and 20 govern the addition of a person as a party to a counterclaim or crossclaim." Rule 19 governs required joinder of parties, whereas Rule 20 governs permissive joinder of parties. Fed. R. Civ. P. 19, 20 Here, there is no indication that "the

court cannot accord complete relief among existing parties," in the absence of the proposed crossclaim defendants, Fed. R. Civ. P. 19(a)(1)(A), as these entities are only proposed to be joined for the purposes of contribution and indemnification claims by the Moving Defendants and even joint tortfeasors are not considered required parties under Fed. R. Civ. P. 19(a)(1)(A). [ECF No. 240, 24]; Temple v. Synthes Corp., 498 U.S. 5, 7 (1990). Thus, the joinder of these parties should be analyzed under permissive joinder, rather than required joinder.

Where the Moving Defendants seek to join new defendants through a motion to amend the answer, the joinder must satisfy the requirements of permissive joinder under Fed. R. Civ. P. 20. "The purpose of permissive joinder of parties is 'to promote trial convenience and expedite the final determination of disputes.'" Third Degree Films v. Does 1-47, 286 F.R.D. 188, 196 (D. Mass. 2012) (quoting 7 Charles Alan Wright et al., Fed. Practice and Procedure § 1652 (3d ed. 2012)). Additionally, when considering permissive joinder "the impulse is toward entertaining the broadest possible scope of action consistent with fairness to the parties; joinder of claims, parties and remedies is strongly encouraged." United Mine Workers of Am. v. Gibbs, 383 U.S. 715, 724 (1966).

Despite the encouragement of joinder of claims and parties, the parties that the Moving Defendants seek to join must still meet the requirements laid out in Rule 20(a)(2) in order to be joined as defendants. Rule 20(a)(2) states that persons may be joined as defendants if:

> (A) any right to relief is asserted against them jointly, severally, or in the alternative with respect to or arising out of the same transaction, occurrence, or series of transactions or occurrences; and
> (B) any question of law or fact common to all defendants will arise in the action.

Fed. R. Civ. P. 20(a)(2). Even if the two-prong requirement of Fed. R. Civ. P. 20(a)(2) is met, Fed. R. Civ. P. 20(b) allows the court broad discretion to "issue orders — including an order for separate trials — to protect a party against embarrassment, delay, expense, or other prejudice." Patrick

<u>Collins, Inc. v. Does 1-38</u>, 941 F. Supp. 2d 153, 161 (D. Mass. 2013) (citation omitted). When determining whether joinder is permissible, courts may also consider the motives of the party seeking joinder and whether joinder would conform to principles of fundamental fairness, result in prejudice to either side, or confuse and complicate issues for the parties involved. See <u>Patrick Collins, Inc</u>, 941 F. Supp. 2d at 161 (holding that 34 individual "John Doe" defendants should not be joined where joining the defendants would create logistical difficulties as each defendant would likely raise unique defenses based on individualized facts).

## III.   <u>DISCUSSION</u>

For the reasons set forth below, the Court <u>DENIES</u> the Plaintiffs' motion to amend their complaint and <u>DENIES</u> each of the Moving Defendants' motions to amend their answers to join crossclaim defendants. The Court's decision is based on multiple considerations, but most salient are: (1) the motions to amend are untimely, (2) the Moving Defendants' allegations against some of the proposed entities do not derive from the same transaction or occurrence as the Plaintiffs' claims, and (3) some of the crossclaims would be futile as they would not withstand a 12(b)(6) motion to dismiss.

As a preliminary matter, the Court acknowledges that the scheduling order and subsequent extension adopted in this case permitted motions to add entities through May 13, 2024 [ECF Nos. 230, 231, 237]; however, the Court did not anticipate that the parties would be seeking to join entities whose addition now would significantly delay litigation, inappropriately expand the scope of the case, and prejudice the proposed entities. When the scheduling order was issued, the Court was not up to date on the status of the MassDEP investigation and remediation efforts. For example, it was not aware that MassDEP had identified Ball and Rust-Oleum as Potentially Responsible Parties back in July of 2023 until the filing of Plaintiff's motion for leave to amend

their complaint on May 13, 2024. Additionally, it was not until the hearing on this motion on July 11, 2024 that the Court became informed that the parties received information about supplier-customers of MassNatural, i.e. entities that might be joined, at least as far back as January of 2023 – when MassNatural and the Moving Defendants sent Chapter 21E § 4A demand letters to some of those entities relating to the ongoing Chapter 21E State Court Action. [See Mot. Hr'g Tr. 37:11-38:14, ECF No. 333]. Further, the scheduling orders set deadlines to allow the parties to file *motions* to amend or join parties. Motions are requests from the parties that the Court retains discretion to decide. Although the motions may have been filed within the permissible timeframe, the parties are not entitled to an automatic grant of their requests. The Court is obligated to serve as a gatekeeper and manage cases on its docket in a manner that is just and fair, which may require reconsideration of previous deadlines when more complete information becomes available.

A.    **Plaintiffs' Motion for Leave to File Third Amended Complaint**

The Court finds Plaintiffs' motion for leave to file their TAC to be untimely. As stated above, "[u]ndue delay, on its own, may be enough to justify denying a motion for leave to amend." Hagerty ex rel. United States v. Cyberonics, Inc., 844 F.3d 26, 34 (1st Cir. 2016) (citing Calderón-Serra, 715 F.3d at 20). As the movant, the Plaintiffs have a burden to provide a valid reason for the delay in moving to amend. Hagerty, 844 F.3d at 34. In evaluating whether Plaintiffs have met their burden, the Court considers what the Plaintiffs "knew or should have known and what [they] did or should have done.'" Id. (quoting Leonard, 219 F.3d at 30).

The Plaintiffs have known since at least July 14, 2023, that Rust-Oleum and Ball were "potentially responsible parties" as both companies received NORs from MassDEP on that date.[27]

---

[27] Notice of Responsibility to Rust-Oleum Corporation, MassDEP (July 14, 2023), https://eeaonline.eea.state.ma.us/EEA/fileviewer/FileViewer.aspx?fileEncryptionId=hhedhfjj (accessed Nov. 16, 2024); Notice of Responsibility to Ball Corporation, Mass DEP (July 14, 2023)

Plaintiffs did not file their motion until May 13, 2024. [ECF No. 274]. The fact that MassNatural, Otter Farm, Seaman Paper, Newark, and Greif Inc. all received NORs from MassDEP stemming from the contamination at MassNatural figured heavily as a basis for liability in Plaintiff's SAC. [See SAC ¶¶ 99, 100, 103; id. ¶ 119 ("MassDEP's findings [in the NORs] establish that each Paper Disposal Defendant individually, and in combination with the activities of the other Paper Disposal Defendants, caused the contamination at Otter Farm by substantially contributing to the transport, disposal, storage, or treatment of PFAS6-contaminated waste at the MassNatural composting site located at Otter Farm.")]. Plaintiffs have not put forth a reason why they would not be on notice that they might have similar claims against Ball or Rust-Oleum back in July 2023 when MassDEP issued the NORs to the two companies. A full eight months passed before Plaintiffs filed a motion to amend their complaint to add Ball and Rust-Oleum, and much activity had occurred in the case in the interim – including the Court entering an order on the Defendants' motion to dismiss on December 21, 2023. [ECF No. 181].

Nothing prevented the Plaintiffs from moving for leave to amend in July 2023 when they became aware that MassDEP had issued the NORs to Rust-Oleum and Ball. Their failure to do so in a timely manner constitutes undue delay and is an independent and adequate basis for the Court to deny their motion to amend now. Hagerty, 146 F. Supp. 3d at 343.

Plaintiffs' motion to add the DuPont Entities fares no better. Their claims against DuPont arise under the same theory as their claims against 3M. [See SAC ¶¶ 61-88, 484-534; TAC ¶¶ 92-102, 602-27]. Like 3M, the DuPont Entities are one of the most well-known chemical manufacturers in the world. Additionally, in reviewing similar PFAS litigation across the country, the DuPont entities are frequently named as co-defendants with 3M, including in lawsuits

---

https://eeaonline.eea.state.ma.us/EEA/fileviewer/FileViewer.aspx?fileEncryptionId=hhedhdie (accessed Nov. 16, 2024).

beginning in 2017.[28] To find the Plaintiffs were not on notice that Dupont was potentially liable as a PFAS manufacturer like 3M stretches the Court's imagination. Plaintiffs have cited to no new information about DuPont that would not have been available to them at the time they filed their SAC. In other words, the Plaintiffs "have not demonstrated 'due diligence' by offering a satisfactory explanation as to why the complaint as originally drafted did not contain these allegations and theories." Nw. Bypass Grp. v. United States Army Corps of Eng'rs, 244 F.R.D. 115, 117 (D.N.H. 2007) (holding that even under the "freely given" standard of Rule 15, the Court would deny the motion to amend "because to amend the complaint at this late date would cause undue delay and prejudice and the Plaintiffs failed to demonstrate due diligence.")

Accordingly, Plaintiffs' motion for leave to file their TAC is **DENIED**.

---

[28] 3M has been named as a co-defendant with DuPont in at least twelve PFAS lawsuits since 2017. See Banks v. E.I du Pont de Memours & Co., No. 19-1672-MN-JLH, 2022 U.S. Dist. LEXIS 138661, at *1 (D. Del.  Aug. 4, 2022) (Complaint filed 5/17/19, Order issued 8/4/22); N.J. Dep't of Envtl. Prot. v. E.I. du Pont de Nemours & Co., Nos. 19-14766,; 19-14767, 2021 U.S. Dist. LEXIS 247973, at *1 (D.N.J. Dec. 30, 2021) (Complaint filed 7/5/19, Order issued 12/30/21); Orange County Water Dist. v. 3m Co., No. 30-2020-01172419-CU-PL-CXC, 2021 Cal. Super. LEXIS 82156, at *1 (Cal. Super. Apr. 16, 2021) (Complaint filed 12/1/20, Order issued 4/16/21); Utils. Bd. of Tuskegee v. 3M Co., No. 2:22-CV-420-WKW, 2023 U.S. Dist. LEXIS 21983, at *1 (M.D. Ala. Feb. 9, 2023) (Complaint filed 7/17/22, Order issued 2/9/23); Weatherford v. E.I. Dupont de Neumours & Co., No. 4:22-cv-01427-RBH, 2023 U.S. Dist. LEXIS 237047, at *1 (D.S.C. Sept. 27, 2023) (Complaint filed 5/3/22, Order issued 9/27/23); Andrick v. St-Gobain Performance Plastics Corp., No. 1:17 CV-1058 (LEK/DJS), 2018 U.S. Dist. LEXIS 103594, at *1 (N.D.N.Y. June 21, 2018) (Complaint filed 9/21/17, Order issued 6/21/18); Wickenden v. Saint-Gobain Performance Plastics Corp., No. 1:17 CV-1056 (LEK/DJS), 2018 U.S. Dist. LEXIS 103591, at *1 (N.D.N.Y. June 21, 2018) (Complaint filed 9/21/17, Order issued 6/21/18); Lucey v. St.-Gobain Performance Plastics Corp., No. 1:17-CV-1054 (LEK/DJS), 2018 U.S. Dist. LEXIS 97400, at *1 (N.D.N.Y. June 11, 2018) (Complaint filed 9/21/17, Order issued 6/11/18); Baker v. Saint-Gobain Performance Plastics Corp., 632 F. Supp. 3d 19 (N.D.N.Y. 2022) (Complaint filed 7/27/16, Order issued 9/30/22; State v. 3M Co., No. 216-2019-CV-00445, 2020 N.H. Super. LEXIS 29, at *1 (N.H. Super. June 25, 2020) (Order issued 6/25/20); City of Stuart v. 3M Co. (In re Aqueous Film-Forming Foams Prods. Liab. Litig.), No. 2:180-cv-3487-RMG, 2023 U.S. Dist. LEXIS 88928, at *1 (D.S.C. May 19, 2023) (Complaint filed 12/7/18 Order issued 5/19/23); Vermont v. 3M Co., No. 2:24-cv-19, 2024 U.S. Dist. LEXIS 67268, at *1 (D. Vt. Apr. 12, 2024) (Complaint filed 1/3/24, Order issued 4/12/24).

B.     **Moving Defendants' Motion for Leave to Amend Their Answers**

    1.   **The Motions to Amend Are Untimely**

The Moving Defendants' motions are untimely for largely the same reasons as why the Plaintiffs' motion is untimely. Ball and Rust-Oleum should have been joined back in July of 2023 when the companies received the MassDEP NORs, and the Moving Defendants concede they certainly had that information available to them. [Mot. Hr'g Tr. 11:3-8]. As to the other entities, the Moving Defendants stated that they only received information about potential suppliers to MassNatural in April of 2024. However, when pressed by the Court, the Moving Defendants noted that the information regarding MassNatural suppliers had been disclosed and was available prior to April 2024, but they didn't "receive" records from MassNatural until April 2024. [Id. 10:1-11:16]. Further, counsel for the Moving Defendants (not including 3M) attempted to explain their delay by stating the parties had no obligation for due diligence in defending the case or prosecuting crossclaims during the dispositive motion period where the Court was considering the first round of motions to dismiss. [Id. 65:5-23 ("There isn't a case cited from this circuit that says we [(the Moving Defendants)] are charged during the dispositive motion period with due diligence . . . it is our position that until we are at issue in this case that the Court has ruled against our 12(b)(6)s that . . . our period to investigate truly begins . . ."). Contrary to counsel's assertion, such an argument has been rejected by the First Circuit. Hagerty, 844 F.3d at 34-35 ("[Plaintiff] argues that the only relevant period of delay [in moving to amend] was the four months after the granting of the motion to dismiss and places responsibility for any delay accruing before the dismissal squarely on the district court. Where we have excused delay based on the actions of a district court, it has been because the district court did not promptly deal with a motion to amend, not because the district

court took its time evaluating a motion to dismiss.") (citing <u>Farkas v. Tex. Instruments, Inc.</u>, 429 F.2d 849, 851 (1st Cir. 1970)).

Further, Ball and Rust-Oleum and the other proposed crossclaim defendants (who are largely suppliers of waste to MassNatural) would be prejudiced should they be added now. The significant passage of time hinders their abilities to mount a defense as it is increasingly difficult for them to conduct reliable, independent testing, procure fact witnesses who may have knowledge of MassNatural's storage procedures, or to determine if there was any comingling of their materials with materials from other sources. [<u>See</u> ECF No. 280 at 11]. While no existing party may be prejudiced by allowing these amendments, the Court has a duty to protect the interests of those proposed parties, who at this stage of the litigation have little meaningful way to protect themselves from inapt litigation.

> **2. Although Some of the Crossclaims Arise Under the Same Transaction and Occurrence, the Court Exercises Discretion Under Fed. R. Civ. P. 20 to Find Joinder Improper**

To join a person/entity as a defendant in a single action under permissive joinder, the moving party must satisfy the two requirements of Federal Rule of Civil Procedure 20: (A) any right to relief is asserted against them "jointly, severally, or in the alternative with respect to or arising out of the same transaction, occurrence, or series of transactions or occurrences; and (B) any question of law or fact common to all defendants will arise in the action." Fed. R. Civ. P. 20(a)(2). There is no bright-line rule in the First Circuit for determining what falls under the same "transaction or occurrence" for the purposes of permissive joinder, but the "logical relationship" test has been applied in the District of Massachusetts. <u>New Sensations, Inc. v. Does</u>, No. 12-10944-FDS, 2012 U.S. Dist. LEXIS 157504, at *7 (D. Mass. Nov. 2, 2012); <u>Patrick Collins, Inc.</u>, 941 F.

Supp. 2d at 162-63 (D. Mass. 2013). "[T]he logical relationship test would be satisfied in the joinder context where there was 'substantial evidentiary overlap in the facts giving rise to the cause of action of each defendant,' put another way, 'the defendants' alleged . . . acts . . . *share* an aggregate of operative facts.'" Third Degree Films v. Does 1-47, 286 F.R.D. 188, 194 (D. Mass. 2012) (quoting In re EMC Corp., 677 F.3d 1351, 1358 (Fed. Cir. 2012)). Additionally, "Rule 20 requires only that 'any question of law or fact [be] common to all defendants,' not that *every* question of law or fact be common." Patrick Collins, Inc., 941 F. Supp. 2d at 162 (alteration in original) (quoting Sunlust Pictures, LLC v. Does 1-75, No. 12 C 1546, 2012 U.S. Dist. LEXIS 121368, at *13-14 (N.D. Ill. Aug. 27, 2012)).

The Court agrees with the Moving Defendants that there are some common questions of law and fact present in the case; therefore, the second prong of Rule 20 is met. These questions include, among others, whether the residual waste of the defendants (including the proposed crossclaim entities), was contaminated by PFAS chemicals; whether any defendant had knowledge of said contamination, if any; and the scope and extent of any defendants' contributions to the contamination as relevant to damages apportionment. As only one common question of law *or* fact would satisfy the test, the Moving Defendants have met their burden on the second prong of Rule 20.

It is less clear whether the Moving Defendants can show that any right to relief asserted against the proposed crossclaim entities arises from the same transaction or occurrence as the claims against the existing defendants. "Setting aside the limited number of allegations unique to only certain of the Defendants, i.e., the RICO claims,"[29] the Moving Defendants state, "Plaintiffs'

---

[29] The Court acknowledges that Plaintiffs' claims under the Racketeer Influenced and Corrupt Organizations ("RICO") Act apply very specifically to MassNatural, Otter Farm, and Seaman Paper. In their opposition filings, many of the proposed crossclaim entities misstate the basis of the Moving Defendants' crossclaims as being primarily premised on the RICO allegations. The Moving Defendants themselves emphasize that

principal and overarching claim in this litigation is that various entities delivered PFAS-contaminated materials to the Mass Natural site that have and are continuing to cause contamination in the community, and that all such materials at the site must be remediated." [ECF No. 301-1 at 3]. Accordingly, they assert that the transaction and occurrence at the core of this case "necessarily then includes any such deliveries of PFAS-contaminated materials by [the proposed crossclaim entities], regardless of when and in what amount such deliveries occurred, and regardless of whether [those entities] were participants in the alleged RICO conduct." [Id.] Presumably in reference to joining the DuPont Entities, Westminster, and Baro, the Moving Defendants further allege that "the independent acts of sources other than those who supplied PFAS contaminated materials to Mass Natural caused or contributed to the contamination of Plaintiffs' properties." [ECF No. 343 at 4]. The Moving Defendants point out that this Court found similar claims sufficient to withstand motions to dismiss. [Id. at 4 n.3; see ECF No. 181 ("MTD Order")].

The Moving Defendants' interpretation of transaction and occurrence could mean that merely supplying MassNatural with any material that contained PFAS could be the basis for liability – regardless of when that material was delivered, how much material was delivered, whether the sender had any knowledge that the material contained PFAS, whether the sender knew or should have known MassNatural was not treating PFAS waste properly, or whether the sender actually chose or arranged for MassNatural as the final recipient of their material. To illustrate the expanses of this interpretation, simply consider that Newark subpoenaed a non-party, Mativ

the RICO claims are *not* the main basis for their crossclaims. [ECF No. 301-1 at 3]. Instead, their crossclaims for indemnification and contribution rest primarily on Plaintiffs' other claims, which include negligence, medical monitoring, private and public nuisance, and breach of warranty for failure to warn, among others. Plaintiffs' RICO claims are an isolated component of this action confined to just three defendants. As such, the Court sets asides argument that the substance of the RICO claims is the only transaction and occurrence in this case.

Holdings, Inc. ("Mativ"), seeking documents for a nearly forty-year time period simply because Mativ had at one time supplied waste to MassNatural. [See ECF No. 296]. The subpoena sought "[a]ny and all documents, records, or tangible things" ranging from 1986 (the year before MassNatural opened operations) to the present regarding any use of PFAS at Mativ's facilities and any contracts, communications, or contacts with MassNatural for the same time period. [Id. at 25]. Mativ moved to quash the subpoena as an overbroad fishing expedition. [Id. at 3]. Mativ also argued the request was unduly burdensome given that if any such documents still exist, they would be stored as physical papers in an out-of-state warehouse full of bankers boxes containing other historic business documents.  [Id. at 5-9]. Mativ withdrew its motion to quash, [ECF No. 324], but the Court was inclined to grant it for the reasons Mativ objected. The Moving Defendants' view stretches the Court's reasoning from the MTD Order to its logical extreme, with unjust results.

As explained below, the transaction and occurrence in this case is, in broad terms, defined by the supply chain beginning with the manufacturing of PFAS and ending with the treatment of waste products containing PFAS processed by MassNatural. However, the case rests heavily on whether players in the supply chain knew or should have known their products contained PFAS such that they had a duty to ensure safe disposal. Most of the proposed crossclaim entities share the fact that they participated in some way in the supply chain to MassNatural, but for joinder to be appropriate, they must share more than that single fact. More importantly, the Moving Defendants should show that the proposed crossclaim entities share an aggregate of *operative* facts. Operative facts are not simply "common fact[s]" or "tangential" shared facts, but rather "core facts" that underly the theory of liability of the legal claims in question. Salas v. Biter, No. 22-16767, 2024 U.S. App. LEXIS 26027, at *4 (9th Cir. Oct. 16, 2024) (citing Schneider v. McDaniel, 674 F.3d 1144, 1151 (9th Cir. 2012)). Such operative facts here would include the crossclaim

entities' knowledge or reasonably expected knowledge of PFAS use in their industries, and/or their knowledge that their materials would end up at MassNatural.

The epicenter of the transaction and occurrence in this case is the MassNatural Facility, but its shockwaves reverberate up the supply chain. The Plaintiffs allege that MassNatural failed to properly treat PFAS-containing waste that it received from suppliers, that this mishandling led to PFAS leaching into the groundwater near the Facility, and that MassNatural incorporated byproducts from the waste into compost and other retail products that their consumers used – creating a secondary spread of PFAS property and groundwater contamination. [ECF No. 77, ¶¶ 115, 120, 182, 300, 342-58]. Plaintiffs' allegations against Seaman Paper, Otter Farm, and Newark rest, in part, on their role in the supply chain leading to MassNatural. Plaintiffs allege that those defendants "arranged for the transport, disposal, storage or treatment of hazardous material" to or at MassNatural's operations. [SAC ¶ 81]. That quoted language originated from the MassDEP NORs issued to those defendants, and actually derives from Chapter 21E § 5(a)(3), which lists the types of entities that can be strictly liable for response costs related to cleaning up the hazardous release. See Chapter 21E § 5(a)(3). The list of potentially liable entities under § 5 includes owners and operators of a site of a hazardous release, as well other players in the supply chain who "arranged for the transport, disposal, storage or treatment of hazardous material." Id. Thus, the supply chain of the hazardous materials in question shapes the contours of liability under Chapter 21E. With Plaintiffs' factual allegations so heavily based on MassDEP's investigation – which is itself governed by the MCP and Chapter 21E – defining the transaction and occurrence of this case in terms of the PFAS supply chain logically follows.

However, if the transaction and occurrence is defined by participation in the supply chain with MassNatural overall, then merely being a supplier of PFAS-containing waste to MassNatural,

without more, could result in liability. In the MTD Order, the Court upheld some of Plaintiffs'
claims against supplier-defendants, such as Newark and Seaman Paper, but the basis of liability
there was premised on those defendants' positions in the paper industry, which is widely known to
create products containing PFAS. For example, in the MTD Order, the Court noted,

> [The] facts alleged by Plaintiffs raise the reasonable inference that Newark, as an
> established paper manufacturer, should have known there was at least a high
> likelihood that there was toxic PFAS in its paper products and waste and was either
> negligent or willfully blind in its failure to ensure that proper protocols for safe
> disposal of PFAS-containing waste were in place.

[MTD Order at 14]. Further, Plaintiffs met their burden on their claims against 3M due, in part, to
3M's sophisticated role in creating the PFAS compounds utilized by downstream manufacturers in
the supply chain. In their complaint against Newark, Seaman Paper, and 3M, Plaintiffs alleged the
operative fact that these entities knew or should have known their products contained PFAS by
virtue of their roles in the supply chain and the specific industries in which they operate. Therefore,
the transaction and occurrence underlying the case encompasses the supply chain of the PFAS that
contaminated Plaintiffs' bodies and properties, but must be limited to entities that share with the
existing defendants an aggregate of the following operative facts: (1) that they knew or should
have known that their materials contained PFAS, (2) that they have a sophisticated position or role
of special importance in the PFAS supply chain, and/or (3) that they chose or at least knew that
their materials would be disposed of at MassNatural.

Under this view of transaction and occurrence, joinder of some of the crossclaim entities
might be appropriate. For example, it would be appropriate to join both suppliers in industries
known to utilize PFAS and manufacturers of PFAS compounds, such as the DuPont Entities. But
joining others, such as Harvard, who lacked knowledge or reasonably expected knowledge that
their materials contained PFAS, would not be appropriate due to the absence of those operative

facts. Further, entities like Westminster and Baro, who have zero commercial connection to MassNatural and are not part of its supply chain, would not be brought in. Similarly, entities like Anaergia and Rhode Island Bioenergy, who contracted out their waste disposal and had no role in selecting MassNatural as a final destination,[30] would not be joined as they lack the operative fact of control or knowledge over their waste materials and the way they are disposed.

In evaluating this motion, the Court did consider narrowing the transaction and occurrence to the facts and parties of the MassDEP investigation, or even confining it to MassNatural's individualized conduct. However, to construe it so narrowly would invalidate much of the reasoning of the MTD Order, which the Court still stands by. This question of what is the transaction and occurrence underlying the case illustrates the tension between the Court's role as a gatekeeper on the scope of liability and Plaintiffs' right to bring any genuine claim for relief that they desire. But the ultimate issue of liability is beyond the scope of the motion before the Court. And the Court does not decide in this order whether an upstream entity in a supply chain involving hazardous materials, such as Newark or 3M, is liable in a case alleging specific, individualized mismanagement of those materials by one player at the end of the chain, such as a composting facility like MassNatural. Ultimate liability has yet to be determined, and Plaintiffs will have to meet their burdens in upcoming dispositive stages to win their case.

Even though the Moving Defendants have met both prongs of Rule 20, at least for some of the proposed entities, the Court still has discretion to deny the joinder. The purpose of permissive joinder is to "promote trial convenience and expedite the final determination of disputes." Patrick Collins, Inc., 941 F. Supp. 2d at 164 (citations omitted).  As a result, "joinder may be denied where

---

[30] "Anaergia or Rhode Island Bioenergy had [no] control over where their digestate was discarded, as per their contract with third-party [Casella Major Account Services LLC], who, in fact, took title and bore responsibility for the digestate's handling and disposition upon receipt." [ECF No. 280 at 7].

it would create logistical difficulties that undercut judicial efficiency," such as prejudice and undue delay. Local 589, Amalgamated Transit Union v. Mass. Bay Transp. Auth., No. 13-cv-11455-ADB, 2015 U.S. Dist. LEXIS 157248, at *7-8 (D. Mass. Nov. 20, 2015) (citations omitted).

"The case-by-case, fact-intensive nature of each [claim against the proposed crossclaim entities] would undoubtedly create logistical difficulties" in the case, as the defenses each entity raises "are likely to be factually individualized." Botero v. Commonwealth Limousine Serv., 302 F.R.D. 285, 287 (D. Mass. 2014) (citing Patrick Collins, Inc., 941 F. Supp. 2d at 165) (denying motion to amend the complaint to implead fourteen individuals because impleader would require a case-by-case analysis and individualized fact finding for each additional party). Indeed, this proposition is hardly hypothetical when considering the voluminous briefing submitted by the relevant entities on this motion, each raising different factual situations and different defenses. "Rather than expediting the litigation, the case would devolve into . . . 'mini-trials involving different evidence and testimony'" regarding each proposed crossclaim entity's factual circumstances. Id. (quoting Patrick Collins, Inc., 941 F. Supp. 2d at 165). Each proposed entity would undoubtedly challenge the testing results linking their materials to the PFAS release at MassNatural, potentially with confirmatory testing of their own. With fifteen-plus proposed crossclaim defendants each with their own factual circumstances and legal strategies, to allow joinder here would delay the case and create logistical difficulties in evaluating each individualized claim.

Additionally, even when joinder is "technically appropriate under Rule 20(a)(2), a district court must 'examine whether permissive joinder would comport with the principles of fundamental fairness or would result in prejudice to either side.'" Patrick Collins, Inc., 941 F. Supp. 2d at 164 (citation omitted). In doing so, courts "may also consider factors such as the motives of the party

seeking joinder and whether joinder would confuse and complicate the issues for the parties involved." Id. (citations and quotation marks omitted).  The Court has already noted the logistical difficulties the proposed crossclaim entities would face in defending this suit due to the passage of time and degradation of evidence. Thus, joining the crossclaims at this juncture would prejudice those entities. Further, as laid out in the section on futility, infra, many of the crossclaims would be futile, in part because they lack a sufficient factual basis given the proposed entities' minimal contact with MassNatural. There must be guardrails on this action to prevent it from spiraling into a black hole where any entity that had even isolated or minimal contact with the supply chain leading to MassNatural is ensnared in the burdens of defending an unmeritorious suit. Thus, although the Moving Defendants could meet the requirements of Rule 20, as a matter of fundamental fairness and logistical concerns, the Court **DENIES** the Moving Defendants' motions to amend on this additional basis.

### 3. Amending the Answers Would be Futile

As stated above, a district court may properly deny a motion for leave to amend where the moving party's amendments would be futile, i.e. the amended complaint would not withstand a Rule 12(b)(6) motion. Efron, 96 F.4th at 437. The Moving Defendants bring claims against the proposed crossclaim entities under Mass. Gen. Laws. ch. 231B for indemnification and contribution, as well as claims under Chapter 21E for damages and response costs.

### a. Indemnification

With respect to any indemnification crossclaim, the Moving Defendants motions are futile as there is no viable claim for indemnification that can be made against the proposed entities. "A right to indemnification may not be implied merely from the fact that [a defendant is] subject[] to tort liability for an injury that it believes [a proposed crossclaim defendant] played a role in

causing." Araujo v. Woods Hole, Martha's Vineyard, Nantucket S.S. Auth., 693 F.2d 1, 2 (1st Cir. 1982). "Such a theory 'turns indemnity on its head.'" Id. (quoting Santisteven v. Dow Chemical Co., 506 F.2d 1216, 1219 (9th Cir. 1974)). The First Circuit recognizes three circumstances which can bring about a right to indemnification: (1) the existence of an express agreement creating a right to indemnification, (2) "a contractual right to indemnification . . . implied from the nature of the relationship between the parties," or (3) "a tort-based right to indemnification." Araujo, 693 F.2d at 2 (citations omitted). None are applicable here.

First, there are no express agreements establishing a right to indemnification between the Moving Defendants and the proposed entities.  Therefore, the first theory cannot support the Moving Defendants' claims.

Second, there is no implied contractual right to indemnification based on the nature of the relationship between the parties. Such a right "will only be implied when there are unique special factors demonstrating that the parties intended that the would-be indemnitor bear the ultimate responsibility for the plaintiff's safety or when there is a generally recognized special relationship between the parties." Id. at 2-3 (citations omitted). These generally recognized special relationships include an "employer's vicarious liability for the tort of a [an employee]; an independent contractor, or an innocent partner, or a carrier held liable for the acts of another; [or] an automobile owner held liable for the conduct of the driver." R.I. Depositors Econ. Prot. Corp. v. Hayes, 64 F.3d 22, 26 (1st Cir. 1995) (citing Prosser and Keeton on the Law of Torts § 51 (5th ed. 1984) ). Additionally, "[t]he relationship between a vendor and a purchaser is not normally recognized as giving rise to a duty on the part of the purchaser" for purposes of an implied contractual right to indemnification.  Araujo, 693 F.2d at 3 (citing Roy v. Star Chopper Co., 442 F. Supp. 1010, 1019 (D.R.I. 1977)). Here, the parties do not fit into any of the recognized special

relationships, nor are there any special factors demonstrating that the Moving Defendants and the proposed entities intended that the latter would be responsible for Plaintiffs' safety.  Thus, the implied contract theory is equally unsupportable.

Third, the Moving Defendants cannot rely on the tort-based theory because they are facing claims of active negligence that preclude any claim for indemnification under this theory. Tort based indemnification "has usually been available only when the party seeking it was merely passively negligent while the would-be indemnitor was actively at fault." Id. (citations omitted). And so called "'[p]assive negligence' has been limited to instances in which the indemnitee was vicariously or technically liable." Id. (citations omitted). In other words, passive negligence is found only "where a non-culpable party—being held liable solely by dint of its relationship to a culpable party—seeks indemnification from that culpable party." Braintree Labs., Inc. v. Bedrock Logistics, LLC, No. 16-11936-IT, 2017 U.S. Dist. LEXIS 93655, at *3 (D. Mass. June 19, 2017) (citing Araujo, 693 F.2d at 2-3). "Where the party seeking indemnification was itself guilty of acts or omissions proximately causing the plaintiff's injury, tort indemnification is inappropriate." Araujo, 693 F.2d at 3 (citing Wedlock v. Gulf Miss. Marine Corp., 554 F.2d 240, 243 (5th Cir. 1977)). Although the ultimate liability of the Moving Defendants has yet to be determined here, the Plaintiffs' claims against them are not based solely on the Moving Defendants' relationship to the proposed indemnitors. Instead, those parties seeking indemnification are accused of their own individual acts of negligence, such that tort-based indemnification is inappropriate.

Finally, with respect to indemnification for response costs under Chapter 21E, "there is no common law right to indemnification for response costs borne from the actions statutorily required under Chapter 21E." Barnstable Cty., 2017 U.S. Dist. LEXIS 207414, at *39-40. Thus, "while the

[Moving Defendants] may seek contribution to recover damages for its response costs [under Chapter 21E], it cannot separately invoke common law indemnification." Id.

None of three circumstances which establish a right to indemnification apply in this case, and common law indemnification is not applicable to response costs under Chapter 21E. As a result, amending the complaint to assert a crossclaim for indemnification would be futile.

### b. Contribution

Mass. Gen. Laws ch. 231B, § 1(a) provides that "[w]here two or more persons become jointly liable in tort for the same injury to person or property, there shall be a right of contribution among them even though judgment has not been recovered against all or any of them." The purpose of the statute is "to distribute damages among all those liable in tort for the same offense." Berube v. Northampton, 602 N.E.2d 560, 562 (Mass. 1992) (citations omitted). Additionally, "contribution claims are derivative and not new causes of action," and where there is no liability in tort there is no right to contribution. Id. "No right of contribution exists unless the party would be 'directly liable to the injured person.'" LeBlanc v. Logan Hilton J.V., 974 N.E.2d 34, 42 (Mass. 2012) (quoting O'Mara v. H.P. Hood & Sons, 268 N.E.2d 685, 687 (Mass. 1971)). Lastly, "contribution is appropriate between persons who are liable jointly in tort for the same injuries, even if they are liable on different theories of tort liability." Wolfe v. Ford Motor Co., 434 N.E.2d 1008, 1011 (Mass. 1982).

Following the Court's previous MTD Order,  Plaintiffs' remaining claims against the existing defendants include: (1) Medical Monitoring (against all defendants), (2) Negligence (against all defendants), (3) Private Nuisance (against all defendants but 3M), (4) Public Nuisance (against all defendants but 3M), (5) Ultrahazardous Activity / Strict Liability (against Seaman Paper, Otter Farm, and MassNatural), (6) Willful and Wanton Conduct (against Newark, Seaman

42

Paper, Otter Farm, and MassNatural), (7) Breach of Warranty for Failure to Warn (against 3M only), (8) Violations of Mass. Gen. Laws ch. 93A (against MassNatural only) (9) Violations of the Racketeer Influenced and Corrupt Organization Act ("RICO"), 18 U.S.C. § 1962(c) (against Seaman Paper, Otter Farm, and MassNatural), and (10) Violations of RICO, 18 U.S.C. § 1962(d), by Conspiring to Violate 18 U.S.C. § 1962(c) (against Seaman Paper, Otter Farm, and MassNatural). The Court will take each claim in turn to analyze whether the proposed crossclaim defendants would be liable in tort to the Plaintiffs. There is no factual or legal basis for some of the claims; however, liability could be found on others.

The Court incorporates by reference the legal standards in the MTD Order, [ECF No. 181], as well as Judge Hennessy's Report and Recommendation for the motions to dismiss, [ECF No. 159, "R&R"].

As a preliminary matter, the Court finds there is no factual basis to support any liability on the part of the Westminster, Baro, and Harvard.

Regarding Westminster and Baro, the record shows that neither of these entities had any interactions or connections to MassNatural. The Moving Defendants allege that Westminster's use of fertilizer on its golf course is another potential cause of the PFAS contamination because the golf course is located near MassNatural. Westminster and Baro assert that Westminster accepted a single shipment of NEFCO biopellets, of which it only used a nominal amount. [ECF No. 262 at 4-5]. Without any connection to the operations at MassNatural and given the extremely limited amounts of biopellets used on a single occasion on the golf course, there simply is no factual basis for Westminster or Baro's liability to the Plaintiffs on any claim.

Similarly, Harvard's single delivery of demolition waste containing PFAS is insufficient to create liability. Further, the shipment was delivered in June of 2022, *after* the detection of PFAS

in Plaintiffs' water and the filing of Plaintiffs' original complaint. Harvard was not an original defendant and, to the Court's knowledge, has never received an NOR from MassDEP. Further, Harvard states that it had no knowledge that the demolition waste contained PFAS, nor any knowledge regarding MassNatural's disposal methods. This lacking factual foundation could not establish Harvard's liability to the Plaintiffs on any claim.

(1) RICO Claims

To state a RICO claim, Plaintiffs must plausibly allege "(1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity." Sedima, S.P.R.L. v. Imrex Co., 473 U.S. 479, 496 (1985) (footnote omitted); Feinstein v. Resolution Tr. Corp., 942 F.2d 34, 41 (1st Cir. 1991). In this case, the Plaintiffs rely on an "association-in-fact enterprise." An association-in-fact enterprise requires a showing of "a purpose, relationships among those associated with the enterprise, and longevity sufficient to permit these associates to pursue the enterprise's purpose." Boyle v. United States, 556 U.S. 938, 946 (2009). "[I]t is not sufficient that several organized, ongoing groups come together for one concerted action, unless those groups can also be shown to constitute a larger unit, over and above their separate structures and operations." Libertad v. Welch, 53 F.3d 428, 442 (1st Cir. 1995); Lerner v. Colman, 485 F. Supp. 3d 319, 339-40 (D. Mass. 2020), aff'd, 26 F.4th 71 (1st Cir. 2022) (quoting Boyle, 556 U.S. at 946). Plaintiffs allege that Seaman Paper, Otter Farm, and MassNatural conspired to commit mail or wire fraud by falsely certifying compliance with environmental PFAS regulations. As was the case with Plaintiffs' allegations against Newark at the motion to dismiss stage, the Moving Defendants have failed to show any requisite relationship between the proposed crossclaim entities and the other three RICO Defendants (Seaman Paper, Otter Farm, and MassNatural) that would make any of the proposed entities an integral member of the RICO association-in-fact enterprise. Therefore, none of the

proposed crossclaim entities could be liable to the Plaintiffs under RICO and the contribution crossclaim is futile.

(2) Ultrahazardous Activity / Strict Liability

The "extremely limited" scope of strict liability for ultrahazardous activities requires that the "dangerous instrumentality" escape from the defendant's property. Heinrich ex rel. Heinrich v. Sweet, 49 F. Supp. 2d 27, 40 (D. Mass. 1999) (quoting Thomalen v. Marriott Corp., 845 F.Supp. 33, 36-37 (D. Mass. 1994)). The Moving Defendants have not alleged that any of the proposed crossclaim entities held any direct or indirect land interest whatsoever in the MassNatural Facility. Therefore, none of those entities could be liable to the Plaintiffs for ultrahazardous activity strict liability and the contribution crossclaim is futile.

(3) Chapter 93A

In the MTD Order, this Court dismissed Plaintiffs' Chapter 93A claims against all defendants except for MassNatural because Plaintiffs failed to allege that the dismissed defendants commercially participated in the transactions between MassNatural and the Consumer Subclass that form the basis of MassNatural's deceptive conduct. [MTD Order at 42-43]. Further, the Plaintiffs did not allege any facts that the dismissed defendants ever made a representation regarding MassNatural products. [Id. at 42-45] For those same reasons, based on the record before the Court, the proposed crossclaim entities could not be liable to Plaintiffs under Chapter 93A and the contribution crossclaim is futile.

(4) Breach of Warranty for Failure to Warn

Plaintiffs bring this claim against 3M only and the Court's finding that Plaintiffs met their burden at the motion to dismiss stage was very specific to 3M and its duty as an original manufacturer of PFAS compounds. [See MTD Order at 18-24]. The only crossclaim entities that

are in the same position as 3M are the Dupont Entities. As such, only Dupont could potentially be liable to the Plaintiffs on this claim. While a contribution claim for failure to warn might not be futile as to Dupont, the Court still denies the Moving Defendants' motions to amend on the other grounds in this order.

(5) Negligence

The Court denied all defendants' motions to dismiss Plaintiffs' negligence claims against them for reasons that varied based on the defendants' positions in the supply chain to MassNatural and PFAS manufacturing overall. As discussed  in the section on Rule 20, <u>supra</u>, Newark's liability was primarily premised on its sophisticated position in the supply chain as a paper manufacturer, given the paper industry is well-known to utilize PFAS. Some of the proposed crossclaim entities are in a similar position to Newark in that they are suppliers to MassNatural who might have had the requisite knowledge or expected knowledge that their materials contained PFAS. As such, they would be under a duty to protect foreseeable victims like the Plaintiffs from the harms of improper disposal of those materials. However, the record before the Court is not complete as the Moving Defendants have not alleged facts about the crossclaim entities' knowledge of PFAS in their materials or industries. The factual allegations against the crossclaim entities must be developed further before the Court could truly apply a 12(b)(6) analysis to the Moving Defendants' crossclaims for contribution based on negligence.

Separately, Casella Organics raised an important objection to its potential negligence liability – that it did not breach the standard of reasonable care that was required of it because it complied with all legal regulations applicable to it. As the basis for joinder, the Moving Defendants allege that, since 2018, Casella Organics acted as a "broker" to form the business relationships between MassNatural and various companies that sent hazardous material containing PFAS to the

MassNatural site, including NEFCO. Regarding its transport of biopellets, at the hearing on these

motions, counsel for Casella Organics stated:

> [W]e are dealing with a highly regulated product endorsed by the DEP, endorsed
> by the EPA. That is a product that's an agricultural product to be added to land
> that we then ship to a place where it's going to be -- supposed to be used as an
> agricultural product added to land. It went to the very facility it was supposed to
> go to. There's no mistake that -- that NEFCO, Casella, and MWRA have not
> received NORs from the DEP. And the reason we haven't received NORs is
> because we didn't do anything wrong. We complied with the regs. What went
> sideways is the operation of these defendants of their -- the way they conducted
> their operations at the [MassNatural Facility].

[Mot. Hr'g Tr. 40:12-24]. Casella Organics' objection raises the tension underlying many toxic tort

claims involving dangerous, but legal and regulated products. PFAS compounds are not illegal.

Instead, they are highly regulated. Therefore, a potential defendant might raise as a defense to

negligence that it complied with the standard of care provided by the PFAS regulations in place.

While the factual allegations in this case demonstrate that PFAS compounds pose a serious threat

to human health, simply being involved in the supply chain of PFAS would not necessarily make

a defendant liable if they complied with the laws created to allow society to utilize PFAS as safely

as possible. Given the flood of PFAS litigation that is emerging across the country, legislators may

ultimately decide to ban the use of PFAS entirely. But that is not the state of the law today. The

question of ultimate liability is not before the Court with this motion and the Court declines to

state definitively whether a defense like Casella Organics' would relieve any existing party of

liability. However, parties are free to raise this argument in future dispositive motions.

(6) Private Nuisance

The Restatement (Second) of Torts describes "type of conduct essential to [private

nuisance] liability" as "(a) an act; or (b) *a failure to act* under circumstances in which the actor is

under a duty to take positive action to prevent or abate the interference with the public interest or

the invasion of the private interest."  Restatement (Second) of Torts § 824 (emphasis added.  The

MTD order found Plaintiffs met their burden on private nuisance due to the failure to act in part

(b) above. For Newark, the MTD Order stated

> As noted in the negligence analysis regarding Newark, Newark had a duty to the
> Plaintiffs to use reasonable care to ensure that its paper sludge waste, which it knew
> or should have known contained toxic PFAS, was properly disposed of. This failure
> to act when Newark had a duty to take positive action to prevent or abate the PFAS
> contamination through ensuring proper disposal is sufficient to state a claim for
> private nuisance.

[MTD Order at 27]. As demonstrated by this quote, the basis for defendants' private nuisance

liability in the MTD Order rested first on their duties the Court found in its preceding negligence

analysis. For the same reasons already discussed with respect to the lack of information to evaluate

a negligence claim against the proposed crossclaim entities, the Court declines to wade into an

analysis on potential private nuisance liability.

   (7) Public Nuisance

   Liability for public nuisance may be found not only when a defendant controls the

instrumentality of the nuisance, but also when it "participates to a substantial extent in carrying it

on." Com. of Mass. v. Pace, 616 F. Supp. 815, 821 (D. Mass. 1985) (quoting (Restatement

(Second) of Torts § 834). The Court denied all defendants' motions to dismiss Plaintiff's public

nuisance claims because of their roles in facilitating MassNatural's handling of PFAS-

contaminated byproducts. As many of the proposed crossclaim entities are suppliers to

MassNatural, a comparison to Newark is appropriate. The Court found Plaintiffs had met their

burden on their public nuisance claim against Newark because of their allegations that Newark

"dumped contaminated byproducts at the Property, with reason to know MassNatural was not

testing such deposits and in fact was falsely certifying that it had, so that Newark could avoid the

costs of overhauling its manufacturing processes or paying higher disposal costs to qualified

haulers." [R&R at 80]. The record before the Court does not contain sufficient allegations regarding the proposed crossclaim entities' knowledge of MassNatural's conduct, or even regarding the entities' knowledge of PFAS in their materials. As a result, the public nuisance contribution claim is futile.

(8) Medical Monitoring

Medical monitoring first requires a finding that a defendant was negligent and that the defendants' negligence caused the plaintiff to "become exposed to a hazardous substance that produced, at least, subcellular changes that substantially increased the risk of serious disease, illness, or injury . . ." Donovan v. Philip Morris USA, Inc., 914 N.E.2d 891, 902 (Mass. 2009) (citation omitted). There are other elements that must be met on a medical monitoring claim, but as the claim first requires negligence and the Court declines to make findings on a negligence contribution claim, it similarly declines to determine whether the contribution claim relating to medical monitoring would be futile.

(9) Willful and Wanton Conduct

The Court finds that there is not sufficient information available to conduct a 12(b)(6) analysis on whether any of the proposed crossclaim entities engaged in conduct demonstrating "a willful, financially motivated, and knowing assumption of a high risk of substantial environmental and human harm from the improper disposal and repurposing of PFAS-contaminated byproducts to unsuspecting consumers of MassNatural's products." [MTD Order at 32 (adopting R&R language at 89-90)]. Therefore, it declines to determine whether the contribution claim relating to willful and wanton conduct would be futile.

(10)    Conclusion

The Moving Defendants could meet their burden on futility on some of their contribution claims, but not all. For some claims, the Court simply does not have sufficient information to truly apply a 12(b)(6) analysis. However, with regard to the claims where the Court can definitively conclude that the proposed crossclaim entities could not be liable to the Plaintiffs, allowing the Moving Defendants to amend their answers would be futile. This is sufficient basis to deny the Moving Defendants' motions as to those clams. See Efron, 96 F.4th at 437.

### c. Chapter 21E Claim

While the Moving Defendants'[31] Chapter 21E claim may not be entirely futile, the Court would decline to consider it until a determinative and yet-unanswered question is certified to the Massachusetts Supreme Judicial Court ("SJC"). "Federal courts can certify questions to the SJC in cases where there is no controlling precedent and where the questions may be determinative of the pending cause of action." Stevenson v. Amazon.com, Inc., No. 15-13505-FDS, 2016 U.S. Dist. LEXIS 63537, at *7 (D. Mass. May 13, 2016) (citing In re Engage, Inc., 544 F.3d 50, 52 (1st Cir. 2008)); Mass. Sup. Jud. Ct. R. 1:03. Chapter 21E provides that "a person who is responsible for cleanup, such as [the Moving Defendants], may independently commence cleanup and then bring an action to seek recovery from others who are also liable." Mailman's Steam Carpet Cleaning Corp. v. Lizotte, 616 N.E.2d 85, 91 (Mass. 1993) (discussing Chapter 21E § 4). The unanswered question is whether Chapter 21E's provisions allowing responsible parties to recover contribution or reimbursement for "response costs" or "other liability pursuant to the provisions of this chapter" encompass recovery of part of a judgment resulting from a federal lawsuit with personal injury claims.

---

[31] In this section, "Moving Defendants" does not include 3M.

The Moving Defendants assert that their "cross-claims are directly derivative of the damages claimed by Plaintiffs in this matter" and "certain items of damage, or certain relief that ultimately might be entered by the Court, could ultimately be interpreted as constituting response costs recoverable under 21E." [ECF No. 343 at 10-11].  The Moving Defendants distinguish their crossclaims from the claims they pursue in their Chapter 21E State Court Action, noting that the crossclaims in this case seeking indemnity and/or contribution for "Plaintiff's claims of property damage, medical monitoring, out-of-pocket costs and injunctive relief" are not duplicative of response costs sought in the state court. [Id.] By bringing a Chapter 21E crossclaim in this case, the Moving Defendants hope the Court will classify certain damages or injunctive relief that may result from this civil lawsuit as "response costs," which would allow them to seek contribution for those costs from the proposed crossclaim entities. For example, the Moving Defendants suggest that if the Court were to order relief such as changes in the POET water treatment systems,[32] those costs might be recoverable under Chapter 21E. Additionally, should Plaintiffs prevail on their medical monitoring claim, the Moving Defendants could be liable for medical testing expenses that might be recoverable. However, any judgment that might result in this case is not a part of the Moving Defendants' pending Chapter 21E State Court Action. Therefore, they assert they may be precluded from recovering contribution for any judgment in this case if the Court denies their motion for leave to amend.

In Thomas & Betts Corp. v. New Albertson's, Inc., the First Circuit provided a concise overview of Chapter 21E. For efficiency, the Court reproduces that overview here:

> Chapter 21E is the Massachusetts version of the Comprehensive Environmental Response, Compensation, and Liability Act ("CERCLA"), 42 U.S.C.

---

[32] POET systems refer to Point of Entry Treatment systems, which remove PFAS from potable water. MassDEP ordered the Moving Defendants to pay for and install these systems to over 175 residences when it issued the Moving Defendants their NORs. See Second Am. Compl. ¶ 40, Dkt. No. 9 in Chapter 21E State Court Action, No. 2485CV00341 (Mass. Sup. Ct. July 23, 2024).

§§ 9601-28. See John S. Boyd Co. v. Boston Gas Co., 992 F.2d 401, 404 n.3 (1st Cir. 1993). The Massachusetts Supreme Judicial Court ("SJC") has explained that Chapter 21E, like its federal analogue, seeks "to compel the prompt and efficient cleanup of hazardous material and to ensure that costs and damages are borne by the appropriate responsible parties." Bank v. Thermo Elemental Inc., 888 N.E.2d 897, 911 (Mass. 2008) (quoting Taygeta Corp. v. Varian Assocs., 763 N.E.2d 1053, 1059 (Mass. 2002)). To that end, whenever the MassDEP "has reason to believe" that "hazardous material has been released" or that there is a "threat" of such a release, it "is authorized to take or arrange for such response actions as it reasonably deems necessary." Mass. Gen. Laws ch. 21E, § 4.

Section 4 further provides that, when the MassDEP has reason to believe that there has been such a release or the threat of one, it must notify the "owner or operator of the site . . . of its intent to take such action," except under certain circumstances not relevant here. Id. Section 4 then provides that "[a]ny person who undertakes a necessary and appropriate response action regarding the release or threat of release of . . . hazardous materials shall be entitled to reimbursement from any other person liable for such release or threat of release for the reasonable costs of such response action." Id. And, § 4 provides as well, "[i]f two or more persons are liable pursuant to section five [of Chapter 21E] for such release or threat of release, each shall be liable to the others for their equitable share of the costs of such response action." Id.

Section 5(a) in turn spells out the "person[s]" who are "liable" for such release or threat of release and to whom they are "liable." The "person[s]" who are "liable" pursuant to § 5 for a release or threat of such release include, in relevant part: "the owner or operator of . . . a site from or at which there is or has been a release or threat of release of oil or hazardous material," id. § 5(a)(1); "any person who at the time of storage or disposal of any hazardous material owned or operated any site at or upon which such hazardous material was stored or disposed of and from which there is or has been a release or threat of release of hazardous material," id. § 5(a)(2); and "any person who otherwise caused or is legally responsible for a release or threat of release of oil or hazardous material from a . . . site," id. § 5(a)(5). A "person" described in § 5(a) is, under § 5(a)(i), "liable . . . to the [C]ommonwealth [of Massachusetts] for all costs of assessment, containment and removal incurred . . . relative to such release or threat of release;" and, under § 5(a)(iv), "liable . . . to any person for any liability that another person is relieved of pursuant to [Mass. Gen. Laws ch. 21E, § 4.]"

. . . Section 4A of Chapter 21E creates a cause of action premised on the liability that § 4 imposes. It provides that parties may seek reimbursement from other parties, based on their liability under § 4, for the costs that they have incurred in undertaking response actions. *Specifically, § 4A provides that "any person who has given notice pursuant to this section may commence a civil action in the superior court department of the trial court seeking from the notice recipient contribution,*

> *reimbursement or an equitable share of the costs of such response action or of such actual or potential liability."* Id. § 4A

915 F.3d 36, 42-44 (1st Cir. 2019) (emphasis added).

The statute and its companion regulations do not present a clear answer to the question above, as references to "litigation," "response costs," and "liability" do not specifically authorize recovery for a judgment regarding personal injury claims in a federal lawsuit. MassDEP implements Chapter 21E through the Massachusetts Contingency Plan ("MCP"), 310 CMR 40 et seq; see Chapter 21E, § 3(b). The MCP defines a "response action" as the "assessment[], containment[], and/or removal[]" of hazardous materials. 310 CMR 40.0006(2)(a). The MCP defines "response action costs" and "cost" as "any cost *incurred by [MassDEP]* in the course of carrying out or overseeing directly or indirectly a response action," including, among other things, "any fees or other costs reasonably incurred in connection with a response action, including, but not limited to, fees and other costs associated with requisite federal, state and local permits *and litigation costs*." Id. at 40.0006(12) (emphasis added). This definition seems to contemplate only litigation costs incurred by MassDEP, not those incurred by a responsible party. Additionally, the SJC noted that a § 4 award for attorney's fees would only be for "legitimate response costs, not litigation costs that could only be recovered, if at all, under G. L. c. 21E, §§ 4A (d), or 15." Bank v. Thermo Elemental Inc., 888 N.E.2d at 915. Litigation costs and expenses typically consist of attorneys' fees, court costs, and other expenses related to trying a case. The SJC routinely distinguishes damages from litigations costs, therefore, it is unlikely that any damages from a judgment in this case would be recoverable under § 15. See, e.g., Vt. Mut. Ins. Co. v. Poirier, 189 N.E.3d 306, 311-12 (Mass. 2022) ("[D]amages are defined as '[m]oney claimed by, or ordered to be paid to, a person as compensation for loss or injury[,]'" whereas, litigation costs, such as

attorney's fees, "reflect the cost of bringing suit to recover the . . . relief requested." (alteration in original) (citation omitted)).

Regarding private response cost recovery lawsuits, the SJC has noted that "the only condition [§ 4] imposes on a private party's recovery of such costs is that the response action undertaken be 'necessary and appropriate,' that the costs be 'reasonable,' and that the private party follow the presuit notice and settlement procedures set out in § 4A." Bank v. Thermo Elemental Inc., 888 N.E.2d at 912. The question remains as to whether a court-ordered civil judgment would be a "necessary[,] appropriate[, and] reasonable" response action.

Case law interpreting contribution claims brought under both common law contribution and contribution under Chapter 21E suggests that recovery for other common law claims, like negligence, nuisance, and breach of warranty, are separate from recovery for response costs under the statute.  In Lizotte, the SJC held that a party could recover liability for costs paid under Chapter 21E but also pursue common law remedies that were "not dependent upon either actual or potential liability under G.L. c. 21E." 616 N.E.2d at 89. In other words, "the court concluded a party may bring any applicable common law claims against another entity when it seeks damages *separate and apart* from the clean-up costs associated with G.L. c. 21E." Barnstable Cty., 2017 U.S. Dist. LEXIS 207414, at *40 (emphasis added) (citing Lizotte, 616 N.E.2d at 89). While common law claims may be brought in an action that also raises a Chapter 21E contribution claim, any damages for those common law claims are separate from damages under Chapter 21E for response costs. Indeed, in Lizotte, the SJC separated out damages for breach of warranty from damages for Chapter 21E contributions and indicated that the 21E damages are limited to costs of cleaning up the hazardous release, "including assessment, containment and removal." 616 N.E.2d at 90. It

remains unclear whether expenditures from injunctive relief in a judgment, rather than damages, could be considered as part of clean up costs in a Chapter 21E claim.

Other portions of Chapter 21E indicate that damages or other liability from this suit might be recoverable. For example, § 4A(a), regarding apportioning costs among responsible parties, provides for recovery of an "equitable share" of "the costs of such response action *or other liability pursuant to the provisions of this chapter*." Chapter 21E, § 4A(a) (emphasis added). Similarly, § 4A(d) states "[i]n any civil action in which a claim, third–party claim, counterclaim or cross-claim is filed pursuant to section four or this section, the court shall award contribution, reimbursement *or the equitable share of liability* for which one or more other parties is found to be responsible, if any." Id. § 4A(d) (emphasis added). In terms of liability for private damages, the statute is somewhat silent. However, § 5(a)(iii) of the statute states that responsible parties, as well as persons who arranged for the transport, disposal, storage, or treatment of the released hazardous material, shall be liable, without regard to fault, "to any person for damage to his real or personal property incurred or suffered as a result of such release." Chapter 21E, § 5(a)(iii). This explicit reference to individual property damage suggests that such damage could be a form of "*other liability* pursuant to the provisions of [Chapter 21E]." Chapter 21E, § 4A(a) (emphasis added). Such a reading supports the Moving Defendants' argument that damages from this suit regarding the Plaintiffs' real or personal property might be recoverable. Similarly, an equitable judgment relating to property damage could also be recoverable. However, the Court notes that in many cases, plaintiffs seeking contribution for property damage under Chapter 21E are themselves the property owners. In the proposed crossclaim action, the Moving Defendants would be seeking contribution for a judgment that corresponds to Plaintiffs' property damage caused by the Defendants, not necessarily for the Moving Defendants' own property damage.

Still, if the legislature intended to prohibit recovery for judgments resulting from personal injury or negligence, it might have included language to that effect. As a counter example, the fourth paragraph of § 4 provides an exception to a general shield against liability for persons who provide assistance in the response to a release of oil into tidal waters. Chapter 21E, § 4. The exception provides that a qualifying person may still be liable if the damages relate to "personal injury or wrongful death, or if such person is grossly negligent or engages in willful misconduct." Id. The section goes on to state, "the term damages shall mean any damages, costs, expenses or economic loss of any kind for which liability may exist under the laws of this state resulting from, arising out of or related to the discharge or threatened discharge of oil." Id. Presumably, state law claims such as negligence, nuisance, and products liability would be included in this definition. The fact that the legislature was specific in § 4 regarding liability from personal injury and negligence in the event of a release of oil into water suggests that if lawmakers wanted to disclaim similar judgments in other contexts, they would have included explicit language to that effect.

The answer to this question could have a sweeping impact on Massachusetts environmental regulations and the import of Chapter 21E. To interpret Chapter 21E as a contribution mechanism for judgments owed to private individual plaintiffs for personal injury claims could stretch the statute beyond its intended purpose. Most often, the response costs in a Chapter 21E action are clearly related to physically mitigating and remediating the hazardous contamination, with attorneys' fees and costs of experts and witnesses being a secondary concern. Further permitting such a recovery could create a logistical tangle for the courts. Once liability is found under Chapter 21E, the fact finder (which could be a jury) must apportion the damages amounts amongst those liable based on their varying degrees of fault. Allocating damages could become very complicated in a case like this, with the three Moving Defendants plus the fifteen-plus proposed crossclaim

defendants owing varying amounts for damages or costs relating to specific injunctive relief. The fact finder would have to consider whether the ordered injunctive was relief was "necessary" and "reasonable" such that financial responsibility for it would be appropriate for any entity besides the primary defendants in this case. Despite these reservations, this Court does not want to bar litigants from testing this theory should the SJC find it viable in a future state case – maybe even in the Moving Defendants' Chapter 21E State Court Action.

Given the importance of the statute to the state's environmental regulatory scheme and the lack of controlling precedent in the SJC's decisions on the issue, the Court would be inclined to certify the question to the SJC. However, certification is only appropriate if the question of law may be determinative of the case. See Mass. Sup. Jud. Ct. R. 1:03. As stated at the start, the Court denies the Moving Defendants' motions for leave to amend for various reasons. Therefore, the question is not determinative of the case since the Chapter 21E claim does not survive this order. Thus, certification is inappropriate. Still, the Court's above discussion of the ambiguities in the statute is relevant should the Moving Defendants raise the Chapter 21E contribution claim again at a future time.

Lastly, the Moving Defendants' proposed Chapter 21E claim may be premature as the Moving Defendants have not yet been found liable. Recoverable costs under Chapter 21E are "limited to reimbursement of cleanup costs already paid by the party seeking recovery." Lizotte, 616 N.E.2d at 91 (citing Oliveira v. Pereira, 605 N.E.2d 287, 290 (Mass. 1992) (a prerequisite for an action for reimbursement under Chapter 21E is that the sum sought to be recovered have been paid)). When a claim is "contingent upon events that may not occur as anticipated or may not occur at all," the claim is unripe and warrants dismissal. Barnstable Cty., 2017 U.S. Dist. LEXIS 207414, at *18 (quoting Lincoln House, Inc. v. Dupre, 903 F.2d 845, 847 (1st Cir. 1990) (internal quotation

marks omitted). In the context of indemnification and contribution, "district courts within the First Circuit have dismissed or stayed actions for indemnity [and contribution] on the basis that the claim is not ripe because the party seeking indemnification has not yet been found liable for any costs or damages." Id. at *18-19 (collecting cases and giving plaintiffs an opportunity to amend their complaint once liability for a Chapter 21E claim was determined in a related state court action). That the claim may be unripe is a further basis for denying leave to amend and assert the Chapter 21E crossclaims at this juncture.[33]

## IV.   **CONCLUSION**

For the reasons stated above, all parties' motions for leave to amend, [ECF Nos. 233, 240, 246 & 274], are **DENIED**.


**SO ORDERED.**


Dated: November 18, 2024

                /s/ Margaret R. Guzman
                Margaret R. Guzman
                United States District Judge

---

[33] Some of the proposed crossclaim defendants assert that the Court should invoke a federal abstention doctrine and abstain from hearing the Chapter 21E claim. The Court considered both Colorado River abstention, as well as Burford abstention, but concludes that neither are appropriate here. See Colorado River Conservation Dist. v. United States, 424 U.S. 800 (1976); Burford v. Sun Oil Co., 319 U.S. 315, 334 (1943). "As a threshold matter, a stay or dismissal of a federal lawsuit under Colorado River 'necessarily contemplates that the federal court will have nothing further to do in resolving any substantive part of the case.'" Glassie v. Doucette, 55 F.4th 58, 64 (1st Cir. 2022) (quoting Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp., 460 U.S. 1, 28 (1983)). In other words, "the state action must resolve all of the claims in the federal case." Id. The Moving Defendants' Chapter 21E State Court Action is only parallel to their Chapter 21E crossclaim, and the state court case would not resolve all of the claims of this case. Therefore, Colorado River abstention does not apply. Further, in examining futility of a contribution claim, the Court applies the same 12(b)(6) standard as a motion to dismiss. Efron, 96 F.4th at 437. The Supreme Court has held that Burford abstention does not allow a federal court to dismiss claims for damages. See Quackenbush v. Allstate Ins. Co., 517 U.S. 706, 721 (1996) ("[W]hile we have held that federal courts may stay actions for damages based on abstention principles, we have not held that those principles support the outright dismissal or remand of damages actions."). As the Moving Defendants' crossclaims seek damages rather than equitable relief, dismissal under Burford abstention is not appropriate.