UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| THOMAS RYAN, SUSAN RYAN, SEAN GALLAGHER, ASHLEY SULTAN GALLAGHER, MICHELE BURT, NANCY DONOVAN, and LAUREN LADUE, individually and on behalf of others similarly situated, <br><br> Plaintiffs, <br><br> v. <br><br> THE NEWARK GROUP, INC., MASSACHUSETTS NATURAL FERTILIZER CO., INC., OTTER FARM, INC., SEAMAN PAPER COMPANY OF MASSACHUSETTS, INC., and 3M COMPANY, <br><br> Defendants. | Civil Action No: 4:22-cv-40089 MRG <br> (Lead Case) |
| THOMAS RYAN, SUSAN RYAN, SEAN GALLAGHER, ASHLEY SULTAN GALLAGHER, MICHELE BURT, NANCY DONOVAN, and LAUREN LADUE, individually and on behalf of others similarly situated, <br><br> Plaintiffs, <br><br> v. <br><br> EIDP, INC., DUPONT DE NEMOURS, INC., THE CHEMOURS COMPANY, THE CHEMOURS COMPANY FC, LLC, CORTEVA, INC., BALL CORPORATION, RUST-OLEUM CORPORATION, NEW ENGLAND WASTE SERVICES OF ME, INC. D/B/A CASELLA ORGANICS, SYNAGRO TECHNOLOGIES, INC., NEW ENGLAND FERTILIZER COMPANY, NEFCO GP I, and NEFCO GP II. <br><br> Defendants. | Civil Action No. 4:25-cv-40026-MRG |

**ORDER ON PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION**
**[ECF No. 430]**

**GUZMAN, J.**

Plaintiffs are residents of Westminster, MA whose land and private well water was contaminated by PFAS chemicals, allegedly due to Defendants' use of PFAS compounds in manufacturing and their improper handling and disposal of waste materials containing PFAS. On July 8, 2025, the Court issued a temporary restraining order ("TRO") to preserve the status quo until a full evidentiary hearing could be held for a preliminary injunction, [ECF No. 448]. The hearing was held on July 21, 2025. For the reasons stated in the TRO Order, in the Court's remarks at the hearing, and further detailed below, the Court **GRANTS IN PART AND DENIES IN PART** Plaintiffs' motion for a preliminary injunction.

## I.     BACKGROUND

The Court incorporates all factual findings from the TRO Order, ECF No. 448, and adds the following:

### A.  MassDEP Criteria for Ending Bottled Water Deliveries

Pursuant to Section 7.3 of the May 2022 Immediate Response Action ("IRA") Plan, approved by the Massachusetts Department of Environmental Protection ("MassDEP"), "bottled water deliveries will continue at all properties with confirmed PFAS6 impact above 20 ppt until POET installation and confirmation of system effectiveness." [Lessard Aff. ¶ 17, ECF No. 442-1]. On June 16, 2022, MassDEP issued a conditional approval of the IRA Plan. One of the conditions imposed by MassDEP was that going forward, POET systems were required to be sampled on a monthly basis for the first quarter after installation and quarterly thereafter. [Id. ¶ 8]. MassDEP reiterated the criteria for evaluating the effectiveness of a POET system on July 15, 2024, allowing bottled water deliveries to cease where "at least three (3) consecutive monthly sampling events have demonstrated that the POET systems, including ancillary UV lights, are effective, and treatment does not result in other adverse conditions, e.g. discoloration or odor," in accordance

with a July 15, 2024 Immediate Response Action Plan Status and Plan Modification Conditional Approval issued by MassDEP. [Id. ¶ 17]

### B. LSP's Compliance with MassDEP Testing Protocol

Plaintiffs argued that the Defendants have not complied with their obligations under the MassDEP IRA because some homes did not receive consecutive monthly testing. Licensed Site Professional ("LSP") Lawrence Lessard testified that, initially, water testing was conducted quarterly, but in June of 2022, MassDEP created the condition that monthly testing be done for the first quarter after installation of the POET system, then the schedule would switch to quarterly testing. [Lessard Aff. ¶ 8]. Homes that received POET systems prior to June 2022 are not covered by the monthly testing requirement and only have quarterly test results. The monthly testing requirement was not made retroactive. Lessard stated that he has been in full compliance with the testing protocols issued by MassDEP and that MassDEP has not issued any notices of non-compliance regarding this site.

Homes are tested on a staggered basis, with the LSP testing sixty to seventy homes per month. Lessard testified that it would not be feasible given limited staffing to conduct confirmatory water sampling at all 190 homes within the same month.

### C. Inconsistent Non-Detect Test Results

When the POET systems were initially installed on an expedited emergency timeline, UV disinfection systems were not installed with the POET systems. MassDEP expressed a concern about potential bacteria growth in the carbon in the POET systems, which can be eliminated using UV light systems. The UV light systems contain some compounds that can leech PFAS, and tests conducted immediately after a UV light system is installed will show levels of PFOS. However, over subsequent monitoring, the residual PFOS from the UV light system disappeared. This

3

explains why some residences showed non-detectable PFAS levels in initial tests of the POET system without the UV light system, then seemingly regressed to show PFOS at elevated levels immediately after the UV light system was installed. Subsequent testing showed these PFOS levels returning to non-detect levels.

### D. Adverse Effects of Treatment: Odor and Discoloration

Potential adverse effects of the POET system can include water discoloration and sulfurous odor. These conditions impact water quality, but are not indicative of PFAS contamination. Plaintiffs assert there are numerous homeowners still experiencing water discoloration and odor, while Defendants assert that they have dealt with requests to ameliorate these conditions in a timely manner, and they have no pending requests for secondary treatment.

There remains a factual dispute as to whether homeowners' water discoloration and odor predated the POET installation, or whether the issues arose after the POET system was installed. The Court heard testimony about the general challenges of water quality and water pressure from private wells. MassDEP included as a condition precedent to ending bottled water deliveries that "treatment does not result in other adverse conditions, e.g. discoloration or odor." [Lessard Aff. ¶ 17]. If the adverse conditions arose after the POET system was installed, residents who continue to experience water discoloration and odor should be entitled to bottled water deliveries until these conditions are ameliorated with secondary treatment.

### E. Items Not Covered at the Hearing

Plaintiffs did not produce their own independent testing results. They noted at the hearing that they do not question the accuracy of the Defendants' water test results.

The Court did not hear any testimony or receive any evidence about potential PFAS accumulation in household plumbing.

The Court did not hear any testimony or receive any evidence about the difference between sampling water at the tap instead of the inlet and outlet of the POET system.

The Court did not hear any testimony from residents themselves, but counsel presented their concerns about the adverse affects of treatment i.e. water odor and discoloration, and the Court has reviewed residents' declarations that were filed with the motion for temporary restraining order.

### F. Status of POET Systems

LSP Lessard testified that out of the 190 POET systems, there are four different categories of sites: (1) sites that have been non-detect for an extended period of time ("ND Group); (2) sites that have a residual PFOS concentration below the drinking water standards, but not "non-detect" levels, that is related to the UV filtration system that accompanies the POET system ("Residual Group"); (3) sites showing non-detectable levels of PFAS but that are experiencing adverse secondary effects such as water discoloration and odor ("Adverse Effects Group"); and (4) sites where the LSP has not had access to adequately do water sampling for testing ("Non-Accessible Group"). This Non-Accessible Group includes residences where homeowners have refused to allow the LSP to access the home or who have not responded to any communication from the LSP. Some of these residences had POET systems installed but have refused access for any kind of confirmatory water safety testing. Lessard testified that there are about 170 homes in the ND Group at this time, meaning 170 out of 190 homes have test results showing that the POET systems are effectively removing PFAS from residents' drinking water.

## II.  LEGAL STANDARDS

A preliminary injunction is an "extraordinary and drastic remedy" that is "never awarded as of right." Munaf v. Geren, 553 U.S. 674, 689-90 (2008) (citations omitted). The First Circuit

has outlined a four-part framework to determine the appropriateness of a preliminary injunction. See Ross-Simons of Warwick, Inc. v. Baccarat, Inc., 102 F.3d 12, 15 (1st Cir. 1996). To obtain a preliminary injunction in this Court, Plaintiffs bear the burden to show "(1) a substantial likelihood of success on the merits, (2) a significant risk of irreparable harm if the injunction is withheld, (3) a favorable balance of hardships, and (4) a fit (or lack of friction) between the injunction and the public interest." NuVasive, Inc. v. Day, 954 F.3d 439, 443 (1st Cir. 2020) (quoting Nieves-Márquez v. Puerto Rico, 353 F.3d 108, 120 (1st Cir. 2003)). Although each of the four considerations are important, the most critical factor is the likelihood of success on the merits. Corp. Techs., Inc. v. Harnett, 731 F.3d 6, 9–10 (1st Cir. 2013) (explaining that likelihood of success is the "main bearing wall" of the preliminary injunction framework) (quoting Ross-Simons, 102 F.3d at 16). Further, "[i]rreparable harm is measured on a sliding scale in relation to the likelihood of success - the greater the likelihood, the less harm must be shown." Soscia Holdings, LLC v. Rhode Island, 684 F. Supp. 3d 47, 49 (D.R.I. 2023) (citing Braintree Labs., Inc. v. Citigroup Glob. Markets Inc., 622 F.3d 36, 42-43 (1st Cir. 2010)).

The Court applies the same standard for issuing a temporary restraining order as for issuing a preliminary injunction. ACA Int'l v. Healey, 457 F. Supp. 3d 17, 23 (D. Mass. 2020) (quoting Bourgoin v. Sebelius, 928 F. Supp. 2d 258, 267 (D. Me. 2013)). In both circumstances, "trial courts have wide discretion in making judgments regarding the appropriateness of preliminary injunctive relief." Sanchez v. Esso Standard Oil Co., 572 F.3d 1, 14 (1st Cir. 2010). Further, the Court must "tailor[] [an injunction] to the specific harm to be prevented." Ross-Simons of Warwick, Inc. v. Baccarat, Inc., 217 F.3d 8, 14 (1st Cir. 2000)

### III. DISCUSSION

The Court already ruled in its TRO Order that Plaintiffs have met their burden on factors 1, 3, and 4. [ECF No. 448]; see NuVasive, Inc. v. Day, 954 F.3d at 443. As the standard is the same for a TRO as for a preliminary injunction, ACA Int'l, 457 F. Supp. 3d at 23, the Court incorporates its rulings from the TRO and finds the same three factors are satisfied for a preliminary injunction. The sole issue to be considered at the hearing was the risk of irreparable harm should the injunction be withheld.

The Plaintiffs have demonstrated that PFAS are extremely harmful to human health, even at small exposures. Nothing in the hearing changes that finding. However, prior to the hearing, Plaintiffs continued to assert that the test results showing non-detectable levels of PFAS in affected homes were unreliable and that the Defendants could not be trusted. Plaintiffs raised concerns about the way water was sampled, i.e from the inlet and outlet of the POET system and not from the tap. Plaintiffs argued that PFAS can accumulate in household plumbing, and only sampling from the tap could detect this. Despite being offered an opportunity to present their own independent test results to contradict Defendants' testing, Plaintiffs did not present any alternative test results and now concede the Defendants' test results are accurate. Prior to the hearing, Plaintiffs argued the Defendants' inconsistency in test schedule indicated they were out of compliance and unreliable in their remediation efforts. At the hearing, LSP Lessard explained that some homes show a lack of initial monthly testing because the POET systems in those homes were installed prior to the monthly testing requirement taking effect, and the monthly testing requirement was not made retroactive. Plaintiffs did not rebut this assertion, except to request documentation of communication between the LSP and MassDEP regarding the monthly test requirement only applying to homes where POET systems were installed after the requirement was instituted.

The Court finds that there continues to be a risk of irreparable harm to *some* residents but that the vast majority have consistent test results over a long period of time showing non-detectable levels of PFAS. A subset of homeowners are experiencing secondary issues, but not all of these individuals claiming odor and discoloration have contacted the LSP for remediation. As the MassDEP criteria to end water deliveries included a condition precedent regarding no adverse effects of treatment, any home experience secondary issues should continue to receive bottled water deliveries until those issues are remediated. Further, regarding the Non-Accessible Group, the parties agree that the Defendants should not be obligated to provide bottled water to homes refusing testing.

Accordingly, the Court orders the following preliminary injunction:

1. As to the ND Group – Residences whose effluent water sampling results show non-detectable levels of PFAS consistently over the past twelve (12) months shall receive one more test within the next forty-five (45) days. If that test continues to show non-detectable levels of PFAS in the water, bottled water deliveries may cease to that residence. Quarterly testing and maintenance of the POET systems shall continue unchanged, even to homes where bottled water deliveries cease.

2. As to the Residual Group – Bottled water deliveries shall continue to these residences until three (3) consecutive months of effluent testing show non-detectable levels of all PFAS. Upon three (3) consecutive months of effluent non-detectable PFAS results, bottled water deliveries may cease to these homes.

3. As to the Adverse Effects Group – Bottled water deliveries shall continue to these residences until the adverse affects of treatment, i.e. water odor and discoloration, are remediated. Any resident experiencing these issues must notify the LSP of the problem

within thirty (30) days of receiving notice (Notice discussed below, *infra*). Should a resident have a new onset of adverse effects after the thirty (30) days, the LSP shall review their claims on an individual basis and make a determination as to whether bottled water deliveries shall resume until the adverse effects are ameliorated. If water discoloration and odor in a residence predated the installation of the POET system (as indicated by pre-existing remedial tools such as water softeners), the Defendants shall not be obligated to provide bottled water to the residence so long as the residence's water sampling is showing effluent non-detectable levels of PFAS for the preceding three (3) test dates. The three (3) preceding test dates can be quarterly results, consecutive monthly test results are not required.

4. Regarding the Non-Accessible Group - Bottled water deliveries may be discontinued to residences refusing site access for testing of the POET systems, and bottled water delivery may not resume until access for testing is granted. Access must be granted within thirty (30) days of issuance of this order for homes to be considered for continued deliveries. Deliveries will only be reinstated upon effluent test results showing detectable levels of PFAS, and deliveries will cease when three (3) consecutive monthly effluent tests show non-detectable levels of PFAS.

5. Regarding Notice – The Defendants, in conjunction with the LSP, must provide two notices to affected residences. First, within fourteen days (14) days of this Order, affected residences must be notified of the existence of this Order and of the requirement that the Adverse Effects Group notify the LSP of any continued issues with water discoloration and odor within thirty (30) days of receiving notice. Second, any residence where bottled water

deliveries are ending due to criteria 1-4 above must receive thirty (30) days' notice before bottled water deliveries cease. The notice shall include contact information for the LSP.

6. In all cases, bottled water deliveries shall continue for forty-five (45) days uninterrupted while homes meeting the criteria in this Order are identified.

### IV.  **Bond**

The Court exercises its discretion to waive the requirement to post a bond under Rule 65(c). D.V.D. v. United States Dep't of Homeland Sec., No. 25-10676-BEM, 2025 U.S. Dist. LEXIS 74197, at *56-57 (D. Mass. Apr. 18, 2025) (collecting cases); Int'l Assoc. of Machinists and Aerospace Workers v. Eastern Airlines, 925 F.2d 6, 9 (1st Cir. 1991) ("there is ample authority for the proposition that the provisions of Rule 65(c) are not mandatory and that a district court retains substantial discretion to dictate the terms of an injunction bond").

### V.  **CONCLUSION**

For the reasons stated above, Plaintiffs' motion for preliminary injunction, ECF No. 430, **GRANTED IN PART AND DENIED IN PART.**

**SO ORDERED.**

Dated: July 21, 2025

                                            /s/ Margaret R. Guzman
                                            Margaret R. Guzman
        p                              United States District Judge