**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACUSETTS**

| | |
|---|---|
| **THOMAS RYAN, et al.,** ) | |
| ) | |
| **Plaintiffs,** ) | |
| ) | **Civ. No.: 4:22-cv-40089-MRG** |
| **v.** ) | |
| ) | |
| **THE NEWARK GROUP, INC., et. al.** ) | |
| ) | |
| ) | |
| **Defendants.** ) | |

**CONSOLIDATED WITH**

| | |
|---|---|
| **THOMAS RYAN, et al.,** ) | |
| ) | |
| **Plaintiffs,** ) | |
| ) | **Civ. No.: 4:25-cv-40026-MRG** |
| **v.** ) | |
| ) | |
| **EIDP, INC, et al.** ) | |
| ) | |
| ) | |
| **Defendants.** ) | |

**MEMORANDUM AND ORDER ON RUST-OLEUM CORPORATION'S MOTION TO DISMISS [ECF No. 433]**

**GUZMAN, J.**

### I.    INTRODUCTION

Plaintiffs, residents of Westminster, MA, bring this putative class action lawsuit to recover damages for the contamination of their groundwater, which was allegedly caused by the decades-long improper disposal of wastes containing per-and polyfluoroalkyl substances and their constituents (collectively referred to as "PFAS") at the MassNatural recycling and composting facility in Westminster, Massachusetts. [ECF No. 16]. The present action ("*Ryan II*") is the second

1

lawsuit in a related action stemming from the same underlying facts, see Ryan v. The Newark Grp., Inc., No. 4:22-cv-40089 ("*Ryan I*"), and the two actions have been consolidated for case management purposes. There are several motions to dismiss pending before the Court; however, this order concerns only the motion to dismiss brought by Defendant Rust-Oleum Corporation ("Rust-Oleum"). Rust-Oleum moves to dismiss under Rule 12(b)(6) for failure to state a claim. [ECF No. 433].

For the reasons stated below, Rust-Oleum's motion to dismiss is **GRANTED.**

## II.    BACKGROUND

### A.  Relevant Facts

#### i.  PFAS Contamination

The named Plaintiffs are residents of Westminster, Massachusetts who allege that Defendant is liable for the PFAS contamination of Plaintiffs' drinking water and properties. [Am. Compl. ¶¶ 356–407, ECF No. 16]. Plaintiffs allege that Massachusetts Natural Fertilizer Company, Inc. ("MassNatural") operated a commercial composting facility in Westminster, Massachusetts on Otter Farm ("the Facility") where it received organic byproduct from outside sources and suppliers, including materials that allegedly contained certain PFAS substances. [See id. ¶¶ 205–263]. Plaintiffs allege that MassNatural improperly disposed of the organic waste it received at the Facility, leading to PFAS leaching into the soil and nearby water sources, thereby contaminating Plaintiffs' land and drinking water. [Id. ¶ 262–66].

#### ii.  PFAS6

PFAS are used in many commercial products due to their ability to repel water, dirt, oil, and grease, resist heat and protect surfaces. [Am. Compl. ¶¶ 29–31]. They also resist biodegradation and are water soluble, making them mobile in groundwater and the environment.

[Id. ¶¶ 35, 36]. PFAS chemicals are colloquially referred to as "forever chemicals" due to their ability to persist in the environment and human body indefinitely without breaking down. [Id. ¶ 34]. "PFAS6" refers to six specific PFAS compounds regulated by the Massachusetts Department of Environmental Protection ("MassDEP"), including (1) PFOS; (2) PFOA; (3) perfluorohexane sulfonic acid (PFHxS); (4) perfluorononanoic acid (PFNA); (5) perfluoroheptanoic acid (PFHpA); and (6) perfluorodecanoic acid (PFDA).[1] [Id. ¶ 50]. While PFAS are not illegal compounds, they are highly regulated.

The U.S. Environmental Protection Agency ("EPA") has concluded that human exposure to PFAS is associated with adverse health outcomes, which can manifest years after exposure. [Id. ¶ 44]. According to the EPA, human consumption of and oral exposure to PFAS is associated with decreased fertility, developmental effects in children, cancer, liver complications, and hormonal imbalances. [See id.] Reports issued from 2009 through 2022 reflect the EPA's increasing concern over health risks associated with human and animal ingestion of virtually any amount of PFAS. For example, in June 2022 EPA advised that "negative health effects may occur with concentrations of [PFAS] in water that are near zero and below EPA's ability to detect at this time." [Id. ¶ 47; Report and Recommendation ("R&R") at 4, ECF No. 159].[2] In April 2024, the EPA finalized new drinking water regulations that established federal, legally enforceable levels, called Maximum Contaminant Levels (MCLs), for the six PFAS compounds and mixtures that

---

[1] This Order will refer to the compounds collectively as "PFAS" where there is no reason to discuss a single compound with specificity.

[2] EPA Announces New Drinking Water Health Advisories for PFAS Chemicals, $1 Billion in Bipartisan Infrastructure Law Funding to Strengthen Health Protections, U.S. Env't. Prot. Agency, https://www.epa.gov/newsreleases/epa-announces-new-drinking-water-health-advisories-pfas-chemicals-1-billion-bipartisan (May 25, 2023).

contain PFAS.[3] The MCLs range from 4.0 parts per trillion (ppt) (also expressed as ng/L) for PFOS and PFOA, to 10.0 ppt for PFHxS, PFNA, and HFPO-DA.[4]

In addition to the federal regulations, Massachusetts has its own PFAS regulations. First, PFAS are considered hazardous materials under Mass. Gen. Laws Chapter 21E ("Chapter 21E"), also known as the Mass. Oil and Hazardous Material Release Prevention and Response Act. Chapter 21E § 5 establishes strict liability, and joint and several liability, for owners and operators of land contaminated with oil and hazardous materials, as well as for certain other parties identified in the statute. Section 4 of the statute establishes the process by which responsible private parties distribute the recovery of costs for response actions. Mass. Gen. Laws ch. 21E § 4. The Massachusetts Contingency Plan (310 CMR 40.0000 et seq.) ("MCP") is the set of regulations under Chapter 21E. The MCP determines the protocol for required assessment, risk assessment and remediation of oil and hazardous materials contamination.

As part of the MCP, in December 2019, MassDEP promulgated Reportable Concentrations (RCs) and Cleanup Standards for the six PFAS compounds, either individually or as a collective, depending upon the groundwater or soil category.[5] Relevant to this opinion, RCs for groundwater used for drinking are referred to as "RCGW-1" levels, while RCs for accessible soil or soil on

---

[3] Per- and Polyfluoroalkyl Substances (PFAS): Final PFAS National Primary Drinking Water Regulation, U.S. Env't. Prot. Agency, https://www.epa.gov/sdwa/and-polyfluoroalkyl-substances-pfas (July 12, 2024).

[4] Id.

[5] Sampling and Analysis Guidance for PFAS at Disposal Sites Regulated under the Massachusetts Contingency Plan, Mass. Dep't. Env't Prot., 8 (Nov. 13, 2023), https://www.mass.gov/doc/sampling-and-analysis-guidance-for-pfas-at-disposal-sites-regulated-under-the-massachusetts-contingency-plan-november-2023/download.

property that has a sensitive use are referred to as "RCS-1" levels.[6] The RCGW-1 level for PFAS in drinking water is 20 nanograms per liter (ng/L) and the RCS-1 level for PFAS in soil ranges from 300 ng/kg to 720 ng/kg, depending on the type of PFAS.[7]  Additionally, on October 2, 2020, as part of the Massachusetts Drinking Water Program, MassDEP promulgated a drinking water standard of 20 ng/L for the sum of six PFAS compounds, matching the RCGW level.[8] If PFAS is detected at levels higher than the permissible RCs, the MCP requires notice be given to affected persons as well as implementation of "Immediate Response Actions" to contain and remedy potential contamination.[9] Once a release has been confirmed, MassDEP issues a Notice of Responsibility ("NOR") to notify any Potentially Responsible Party that it may be liable for the release of hazardous materials.[10] The NOR also directs the Potentially Responsible Party to engage a Licensed Site Professional to implement the Immediate Response Actions.[11]

### iii.   **Rust-Oleum**

---

[6]  MCP Numerical Standards, Mass. Dep't. Env't Prot., (Dec. 2017), https://www.mass.gov/doc/mcp-numerical-standards-derivation/download

[7] Sampling and Analysis Guidance for PFAS at Disposal Sites Regulated under the Massachusetts Contingency Plan, supra note 10 at 6.

[8] Id. at 5. The Massachusetts Drinking Water Program implements the federal and state drinking water MCLs and MassDEP anticipates that the Massachusetts MCL will be revised in the near future, in light of the new EPA regulations.

[9] See 310 CMR 40.000; Chapter 21E.

[10] See 310 CMR 40.000. An NOR is issued to a party when, based on the available information, MassDEP has reason to believe that the party is liable for response action costs and damages under Chapter 21E, § 5. The purpose of this notice is to inform the potentially liable party of its legal responsibilities under Massachusetts state law for assessing and/or remediating the subject release of a hazardous material.

[11] See id.

Rust-Oleum Corporation is a manufacturer of paints, varnishes, coatings, wood finishes, and sealers. [Am. Compl. ¶ 132]. Plaintiffs allege that Rust-Oleum, together with other defendants and non-parties, disposed of materials containing dangerous levels of PFAS at the MassNatural site, eventually causing injury to the Plaintiffs and their property. [Id. ¶ 224]. One of the company's manufacturing facilities is located at 113 Olive St, Attleboro, MA 02703. [Id. ¶ 133]. Plaintiffs allege that, since 2018, Rust-Oleum has arranged for the transport and disposal of waste to MassNatural, and that, between January 1 and July 20, 2022, Rust-Oleum disposed of at least 330.12 tons of food-grade shellac process waste (i.e. "Red Mud") at MassNatural. [Id. ¶¶ 148–49]. The Amended Complaint details several Rust-Oleum products that Plaintiffs allege may contain PFAS. [Id. ¶¶ 135-44]. Plaintiffs allege Rust-Oleum knew or should have known its materials contained PFAS, stating PFAS chemicals have been vital ingredients in the types of products Rust-Oleum manufactures for decades. [Id. ¶ 135]. Absent from the Amended Complaint is any allegation that those products were actually manufactured at Rust-Oleum's Attleboro Facility or an allegation that Rust-Oleum actually disposed of any materials deriving from those products at MassNatural at any time.[12]

On July 11, 2022, Tighe & Bond, on behalf of MassNatural, collected samples of materials stockpiled at the MassNatural Site for PFAS analysis. [Id. ¶ 150; Tighe & Bond Report ("T&B Report"), ECF No. 241-5].[13] Tighe & Bond collected four samples, identified as N-1A through N-

---

[12] Rust-Oleum asserts that none of the products mentioned by Plaintiffs in the Amended Complaint are manufactured at the Attleboro Facility are disposed of at MassNatural. [ECF No. 434 at 3 n.3].

[13] Tighe and Bond prepared a Compost and Material Sampling Report on September 16, 2022, which is an analysis of PFAS testing that took place at private residences in Westminster as well as at the Facility. [T&B Report]. This report is incorporated by reference repeatedly in the Amended Complaint. On a motion to dismiss for failure to state a claim under Rule 12(b)(6), "the Court can consider only facts alleged in the complaint or documents fairly incorporated therein."

1D, from a stockpile containing an estimated volume of 340 cubic yards of food grade shellac process waste. [Am. Compl. ¶ 150]. Plaintiffs identify the shellac process waste as "Red Mud," which they attribute solely to Rust-Oleum. [Id. ¶ 148]. However, the Tighe & Bond report identifies "Red Mud" as a raw material pile composed of "Rust-O-leum, insect secretion, tree bark, DE, water." [T&B Report at 5]. "DE" refers to diatomaceous earth, which originates from Defendant Ball Corp and contains detectable PFAS. [Id.] In Tighe & Bond's testing of the Red Mud waste piles, "one or more regulated PFAS compounds were detected in each of the four samples at concentrations above the RCS-1 soil Reportable Concentrations." [Am. Compl. ¶ 153]. In Table 4A of the T&B Report, titled "Summary of Raw Material Pile Composite Sample in Analytical Data," Tighe & Bond identified the Red Mud sample, dated July 11, 2022, as having PFAS values exceeding the limits allowed by MassDEP's MCP. [T&B Report at 21]. Apart from stockpiles solely listing Red Mud, Tighe & Bond also tested samples from mixed stockpiles of materials from Rust-Oleum and Ball Corp., sample Q1-A through Q1-C. [Am. Compl. ¶ 152]. The mixed stockpile samples of Rust-Oleum and Ball Corp. also tested as exceeding the PFAS limit values. [Id. at 23]. On July 14, 2025, MassDEP issued an NOR to Rust-Oleum, identifying the company as a Potentially Responsible Party. [Am. Compl. ¶ 153].

In its motion to dismiss, Rust-Oleum relies on public records and documents whose authenticity is not disputed[14] to challenge Plaintiffs' factual assertions that any of the materials the

---

Theophile v. Conklin, No. CV 17-10868-FDS, 2017 WL 3140363, at *4 (D. Mass. July 24, 2017) (citing Rivera v. Centro Medico de Turabo, Inc., 575 F.3d 10, 15 (1st Cir. 2009)).

[14] "It is well established that a district court may take judicial notice of public records or indisputably authentic documents on a 12(b) motion without converting even a 12(b)(6) motion into one for summary judgment." Branch v. F.D.I.C., 825 F. Supp. 384, 398 n.8 (D. Mass. 1993) (citing Watterson v. Page, 987 F.2d 1, 3 (1st Cir.1993)). The Court takes judicial notice of Rust-Oleum's filings on the EEA Portal containing documents related to the MassDEP clean-up action at Otter Farm.

company sent to MassNatural actually contained PFAS. [ECF No. 434 at 3]. Prior to MassDEP's T&B testing, Rust-Oleum enlisted BAL Laboratory to conduct independent testing of Red Mud (also called "Bird Mud") at its Attleboro Facility on March 17, 2022, at the request of MassNatural. [T&B Report at 25; Rust-Oleum Response to NOR at 2[15]; EEA Record submitted by Rust-Oleum on November 14, 2024[16]]. The results of the March 17, 2022 testing revealed a complete set of non-detect results of all PFAS compounds. [Id.] Further, Rust-Oleum conducted its own testing of Red Mud collected from the company's Attleboro facility at certified laboratories on August 17, 2023, October 27, 2023, and March 19, 2024; the results showed either no PFAS6 compounds or a well-below-limit PFAS compound detection, which the testing lab attributed to "ubiquitous ambient background conditions in the laboratory environment." [ECF No. 434 at 3; EEA Record submitted by Rust-Oleum on July 29, 2025[17]]. In its response to the NOR, Rust-Oleum raised these test results and asserted, "Rust-Oleum must assume that the PFAS detections found in stockpiles allegedly attributable to Rust-Oleum's red mud waste transport was a result of cross-contamination

---

[15] Rust-Oleum Response to NOR, dated September 25, 2023, available at: https://fileservice.eea.comacloud.net/V3.1.0/FileService.Api/file/ijabgbej?Un6vLB3mcxLi8hGR R6uwByRT7bnT2/KpNYN8mZaiYxY6JIUFZ5IDr5f6e601JN4i1mMCc5t2kMHlBznG8TWbSZ k7rGFzTrMmfKURZOriP23RjyEeVQyPS2BVE/jiFQtr, ID #: 1613569.

[16] Rust-Oleum 2022 PFAS Sampling Report - Rust-Oleum.Attleboro.pdf, dated March 28, 2022 available at: https://fileservice.eea.comacloud.net/V3.1.0/FileService.Api/file/aejaaggge?Q8gqS8CJlzYGEES 0peIO1LWKWWspaE3FEFc+M1g6DQwqCpwVxk1+tpMPHb8lCrlGhw9n2DMQtaHHS8OoO0 G8nNFtH/B4Sj29osGCJoyxZdiAF1d3emfm/098KH3RzsLl, ID #: 1839791.

[17] 2024.07.23 March 2024 Sampling Memorandum 4855-7013-4484 v.1.pdf, dated July 23, 2024, available at: https://fileservice.eea.comacloud.net/V3.1.0/FileService.Api/file/igjegajj?pwy/HZ6UrGXRsM/T ISNmjSRT7bnT2/KpNYN8mZaiYxY6JIUFZ5IDr5f6e601JN4i1mMCc5t2kMHlBznG8TWbSZk 7rGFzTrMmfKURZOriP23RjyEeVQyPS2BVE/jiFQtr, ID #: 1766411.

from the MNF Site itself."[18] And, "[i]t is notable that almost every stockpile tested with results in the Tighe & Bond report contains some level of PFAS."[19] The T&B Report also directly references the possibility of cross-contamination; for example, noting the increase of PFAS concentration in the Seaman Paper waste piles at MassNatural in comparison to the Seaman Paper waste stream at the Seaman Paper facility could be attributed to "cross-contamination resulting from moving and working these piles at [MassNatural]." [T&B report at 7].

### B.  Procedural History

On August 2, 2022, a subset of Plaintiffs initiated the action now-captioned Ryan v. Newark Grp., No. 22-cv-40089-MRG (D. Mass) against defendants 3M, MassNatural, Newark Group, Greif, Inc., Caraustar Industries, Otter Farm, Inc., and Seaman Paper ("*Ryan I*"). On September 1, 2023, Magistrate Judge David Hennessy issued a Report and Recommendations on the *Ryan I* defendants' respective motions to dismiss the *Ryan I* Second Amended Complaint, mostly denying the *Ryan I* defendants' motions but dismissing certain entities related to The Newark Group for lack of personal jurisdiction. [See *Ryan I*, ECF No. 159]. On December 21, 2023, this Court largely adopted Judge Hennessy's R&R with slight modifications. [See *Ryan I*, ECF No. 181]. On May 13, 2024, some of the Defendants in *Ryan I* sought to amend their answers to assert crossclaims against the DuPont Entities, Ball, Rust-Oleum, NEFCO, and several other non-party proposed

---

[18]  Rust-Oleum Response to NOR, dated September 25, 2023, available at: https://fileservice.eea.comacloud.net/V3.1.0/FileService.Api/file/ijabgbej?Un6vLB3mcxLi8hGR R6uwByRT7bnT2/KpNYN8mZaiYxY6JIUFZ5IDr5f6e601JN4i1mMCc5t2kMHlBznG8TWbSZ k7rGFzTrMmfKURZOriP23RjyEeVQyPS2BVE/jiFQtr, ID #: 1613569.

[19]  Rust-Oleum Response to NOR, dated September 25, 2023, available at: https://fileservice.eea.comacloud.net/V3.1.0/FileService.Api/file/ijabgbej?Un6vLB3mcxLi8hGR R6uwByRT7bnT2/KpNYN8mZaiYxY6JIUFZ5IDr5f6e601JN4i1mMCc5t2kMHlBznG8TWbSZ k7rGFzTrMmfKURZOriP23RjyEeVQyPS2BVE/jiFQtr, ID #: 1613569

defendants. [*Ryan I*, ECF No. 271]. Simultaneously, the Plaintiffs in *Ryan I* moved for leave of Court to file a Third Amended Complaint adding the DuPont Entities, Ball, and Rust-Oleum as defendants to the *Ryan I* action. [*Ryan I*, ECF No. 274].

On October 8, 2024, in a 58-page order, the Court denied the motions to amend because joining the additional parties at that stage, two years into the litigation, would cause undue delay and prejudice the proposed defendants. [Joinder Order, ECF No. 360]. In that Order, the Court noted that the significant passage of time between the filing of *Ryan I* complaint and the joinder motion hindered the proposed defendants' abilities to mount a defense because it is "increasingly difficult for them to conduct reliable, independent testing . . . or to determining if there was any comingling of their materials with materials from other sources [in MassNatural]." [Joinder Order at 31].

Having been barred from adding the DuPont Entities, Ball, and Rust-Oleum to *Ryan I* by amending their complaint, on February 23, 2025, Plaintiffs decided to file this entirely separate lawsuit against those same entities, as well as the NEFCO Defendants, on the eve of the tolling of the statute of limitations for their claims. See Ryan v. EIDP, INC., No. 4:25-cv-40026-MRG, ECF No. 1 ("*Ryan II*"). After hearing arguments from all parties, the Court consolidated *Ryan I* and *Ryan II* for purposes of case management. [*Ryan I*, ECF No. 423]. Plaintiffs filed their Amended Complaint in this action on April 22, 2025. [*Ryan II*, ECF No. 16]. Rust-Oleum filed its motion to dismiss on June 30, 2025. [*Ryan I*, ECF No. 433]. Plaintiffs opposed the motion on August 11, 2025. [*Ryan I*, ECF No. 483]. Rust-Oleum filed a reply to Plaintiffs opposition on September 3, 2025. [ECF No. 488].

## III.    **LEGAL STANDARD**

On a motion to dismiss for failure to state a claim upon which relief can be granted pursuant to Rule 12(b)(6), the court "must assume the truth of all well-plead[ed] facts and give the plaintiff the benefit of all reasonable inferences therefrom." Ruiz v. Bally Total Fitness Holding Corp., 496 F.3d 1, 5 (1st Cir. 2007) (citing Rogan v. Menino, 175 F.3d 75, 77 (1st Cir. 1999)). To survive a motion to dismiss, the complaint must state a claim that is plausible on its face. Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007). In other words, the "[f]actual allegations must be enough to raise a right to relief above the speculative level, . . . on the assumption that all the allegations in the complaint are true (even if doubtful in fact)." Id. at 555 (citations omitted).

"In resolving a motion to dismiss, a court should employ a two-pronged approach." Ocasio-Hernandez v. Fortuño-Burset, 640 F.3d 1, 12 (1st Cir. 2011). "It should begin by identifying and disregarding statements in the complaint that merely offer 'legal conclusion[s] couched as ... fact[ ]' or '[t]hreadbare recitals of the elements of a cause of action.'" Id. (alterations in original) (quoting Ashcroft v. Iqbal, 566 U.S. 662, 678 (2009). "A plaintiff is not entitled to 'proceed perforce' by virtue of allegations that merely parrot the elements of the cause of action." Ocasio-Hernandez, 640 F.3d at 12 (citations omitted). Still, Plaintiffs' burden is relatively low as "[a] court may not disregard properly pled factual allegations even if actual proof of those facts is improbable. . . . Rather, the relevant inquiry focuses on the reasonableness of the inference of liability that the plaintiff is asking the court to draw." Afrasiabi v. Massachusetts, 272 F. Supp. 3d 256, 260 (D. Mass. 2017) (citing Ocasio-Hernandez, 640 F.3d at 13).

On a Rule 12(b)(6) motion, the court "can consider (a) implications from documents attached to or fairly incorporated into the counter complaint, (b) facts susceptible to judicial notice, and (c) concessions in [the complainant's] response to the motion to dismiss." Schatz v.

Republican State Leadership Comm., 669 F.3d 50, 55 (1st Cir. 2012) (quoting Arturet-Velez v. R.J. Reynolds Tobacco Co., 429 F.3d 10, 13 n.2 (1st Cir. 2005) (internal quotations omitted)).

## IV.    **DISCUSSION**

As discussed below, the Court finds that Plaintiffs have failed to state a claim against Rust-Oleum because their core allegation that Rust-Oleum sent PFAS-contaminated waste to the MassNatural facility does not meet the plausibility threshold in light of uncontroverted – and therefore, conceded – test results of Rust-Oleum's Red Mud that showed either no PFAS6 compounds present or a well-below limit PFAS compound detection. There are multiple test results, dating back to March 2022, all showing Rust-Oleum's Red Mud does not contain PFAS or contains only minor, permissible levels of PFAS. Rust-Oleum presented these results squarely in its motion to dismiss and cited to the EEA Record document repository for the MassDEP response to the MassNatural release. These results are a matter of public record, and the Court takes judicial notice of them. See Watterson v. Page, 987 F.2d 1, 3 (1st Cir. 1993) ("courts have made narrow exceptions for documents the authenticity of which are not disputed by the parties; [and] for official public records[]").

Further, Plaintiffs completely ignore Rust-Oleum's test results and do not oppose the assertion that the results showed the materials that Rust-Oleum sent to MassNatural from its Attleboro facility do not contain PFAS or contained only minor, permissible levels of PFAS. As Plaintiffs have failed to contest Rust-Oleum's test results or otherwise respond in any way to Rust-Oleum's argument that its test results refute the core allegations of Plaintiffs' case, the negative test results and accompanying argument are deemed conceded. See Sigma-Aldrich Corp. v. Stonebrook, No. 23-cv-10140-DJC, 2025 WL 1927623, at *7 (D. Mass. July 12, 2025) (citing Uranga v. U.S. Citizenship & Immigr. Servs., 490 F. Supp. 3d 86, 109 (D.D.C. 2020) (explaining

12

that "when a plaintiff files an opposition to a motion to dismiss addressing only certain arguments raised by the defendant, a court may treat those arguments that the plaintiff failed to address as conceded"); Mahoney v. Found. Med., Inc., 342 F. Supp. 3d 206, 217 (D. Mass. 2018) (deeming a claim not addressed in an opposition to a motion to dismiss waived); Perkins v. City of Attleboro, 969 F.Supp.2d 158, 177 (D. Mass. 2013) (same).

Additionally, Plaintiffs' existing allegations are insufficient to state a claim. In the Amended Complaint, Plaintiffs cite to the Tighe & Bond Report test results regarding composting piles containing Rust-Oleum Red Mud, but in each sample, Rust-Oleum's Red Mud was mixed with other waste products. [T&B Report at Table 4A]. Even the Tighe & Bond Report acknowledged the real potential for cross-contamination. [Id. at 7]. As stated above, Plaintiffs included numerous allegations about different Rust-Oleum product lines that may contain PFAS; however, absent from the Amended Complaint is any assertion that Rust-Oleum manufactured these products at its Attleboro facility. Plaintiffs do not allege any other source for Rust-Oleum's Red Mud that the company sent to MassNatural. MassDEP did not cite any other Rust-Oleum facility as a potential source of materials sent to MassNatural. The failure to link generalized allegations about cherry-picked products to the actual and only relevant Rust-Oleum operation is fatal to Plaintiff's claims.

The Court next analyzes how the deficiencies of the Amended Complaint explained above prevent Plaintiffs from stating a claim upon which relief can be granted.

**A. <u>Negligence</u>**

To state a claim for negligence under Massachusetts law, a plaintiff must plausibly allege that the defendant owed a duty of reasonable care, breached that duty, and that the breach caused

the plaintiff's alleged injuries. <u>Brown v. United States</u>, 557 F.3d 1, 3 (1st Cir. 2009). The dispositive element in this motion is causation. Under Massachusetts law, causation contains two components: factual causation and proximate causation. <u>See</u> <u>Staelens v. Dobert</u>, 318 F. 3d 77, 79 (1st Cir. 2003). The Supreme Judicial Court clarified in <u>Doull v. Foster</u> that factual causation ordinarily requires the plaintiff to plausibly allege that the harm would not have occurred "but for" the defendant's conduct. <u>Doull v. Foster</u>, 163 N.E.3d 976, 983 (Mass. 2021). In toxic tort cases, the "substantial factor" may be used to address the difficulty of isolating particular exposures, but plaintiffs must still allege that the defendant "exposed the plaintiffs to the toxic substance." <u>Id.</u> at 985.

To show that Rust-Oleum was a substantial factor in contributing to the release of PFAS at MassNatural, Plaintiffs must plausibly allege that Rust-Oleum's waste contained PFAS. Where Plaintiffs cannot plausibly allege the threshold fact, their negligence claim fails at the causation element as a matter of law. Here, the Amended Complaint identifies only commingled stockpiles, which Tighe & Bond acknowledged were subject to cross-contamination due to MassNatural's handling practices. [T&B Report at 7]. All piles sampled by Tight & Bond that contained Rust-Oleum materials also contained materials from Ball Corp or other sources, some of which are known to contain PFAS. Rust-Oleum's own testing results, which Plaintiff did not contest, undercut any inference that PFAS detected in the mixed piles originated from Rust-Oleum. To the contrary, the judicially noticeable testing Rust-Oleum submitted, which includes independent laboratory analyses from March 2022, August 2023, October 2023, and March 2024, consistently found no detectable PFAS or only background-level artifacts not attributable to Rust-Oleum's waste stream.

Having failed to address Rust-Oleum's negative results, Plaintiffs' claim against Rust-Oleum rests solely on the inference that because PFAS were detected in the commingled piles at

MassNatural, any defendant who disposed of any material at MassNatural is responsible. Courts in this circuit consistently reject claims that rest on non-specific, group-pleaded theories of exposure. See Barnstable Cnty. v. 3M Co., No. CV 17-40002, 2017 WL 6452245, at *11 (D. Mass. Dec. 18, 2017) (dismissing PFAS claims where complaint failed to allege how "each defendant" contributed to the contamination at issue); Higgins v. Huhtamaki, Inc., No. 1:21-CV-00369-NT, 2022 WL 2274876, at *4 (D. Me. June 23, 2022) (plaintiffs must plead "sufficient facts to make a plausible case that they were exposed to waste from each of the Defendants"). Here, Plaintiffs offer only the existence of contamination in a mixed environment, without factual allegations showing that this Defendant's material contained the contaminant or contributed to the release. Accordingly, the causation element is not plausibly pleaded.

Because Plaintiffs have not plausibly alleged either factual or proximate causation, they fail to state a negligence claim against Rust-Oleum. The Court therefore need not reach duty or breach, and, accordingly, **GRANTS** Rust Oleum's motion to dismiss Plaintiffs' negligence claim under Count VIII.

### B. **Medical Monitoring**

To sustain a medical monitoring claim, a plaintiff must prove the following:

"(1) the defendant's negligence (2) caused (3) the plaintiff to become exposed to a hazardous substance that produced, at least, subcellular changes that substantially increased the risk of serious disease, illness, or injury (4) for which an effective medical test for reliable early detection exists, (5) and early detection, combined with prompt and effective treatment, will significantly decrease the risk of death or the severity of the disease, illness or injury, and (6) such diagnostic medical examinations are reasonably (and periodically) necessary, conformably with the standard of care, and (7) the present value of the reasonable cost of such tests and care, as of the date of the filing of the complaint."

Donovan v. Phillip Morris USA, Inc., 914 N.E.2d 891, 902 (Mass. 2009) (citing Sullivan v. Old Colony St. Ry., 83 N.E. 1091, 1092 (Mass. 1908)). A defendant's negligence is a prerequisite to medical monitoring liability. Id. Because Plaintiffs have failed to state a viable negligence claim against Rust-Oleum, their medical-monitoring claim necessarily fails as well. Accordingly, the Court **GRANTS** Rust Oleum's motion to dismiss Plaintiffs' medical monitoring claim under Count VII.

### C.  Private nuisance

Private nuisance claims are actionable "when a property owner creates, permits, or maintains a condition or activity on [its] property that causes a substantial and unreasonable interference with the use and enjoyment of the property of another." Taygeta Corp. v. Varian Assocs., 763 N.E.2d 1053, 1064 (Mass. 2002) (citations omitted). Because Plaintiffs have not plausibly alleged that Rust-Oleum's waste sent to MassNatural contained PFAS or otherwise contributed to the alleged contamination at MassNatural, they cannot establish that Rust-Oleum created or maintained a condition that caused a "substantial and unreasonable interference" with their property. Id. Absent a plausible causal connection between Rust-Oleum's conduct and any interference with Plaintiffs' property, the Court **GRANTS** Rust-Oleum's motion to dismiss Plaintiff's private nuisance claim under Count IX.

### D.  Public nuisance

In Massachusetts, a claim for public nuisance arises when the defendant causes a "significant interference with the public health, the public safety, the public peace, the public comfort or the public convenience," Town of Westport v. Monsanto Co., 14-cv-12041-DJC, 2015 WL 1321466, at *2 (D. Mass. Mar. 24, 2015), "by directly encroaching on public property or by

causing common injury." <u>Sullivan v. Chief Just. for Admin. & Mgmt. of Trial Ct</u>, 858 N.E.2d 699, 715 (Mass. 2006) (quoting <u>Connerty v. Metropolitan Dist. Comm'n</u>, 495 N.E.2d 840 , 845 (Mass. 1986)). Public nuisance liability may be based on negligent conduct, among other theories. <u>Connerty</u>, 495 N.E.2d at 846 (citation omitted). To sustain a public nuisance action, a plaintiff must show the nuisance has caused "some special injury of a direct and substantial character other than that which the general public shares." <u>Id.</u> at 645 (citing <u>Stop & Shop Cos. v. Fisher</u>, 444 N.E.2d 368, 372 (Mass. 1983).

Although control over the nuisance is not a prerequisite for liability, a defendant may be held liable only where its own conduct caused or participated to a substantial extent in the activity that created the alleged nuisance. <u>Massachusetts v. Pace</u>, 616 F. Supp. 815, 821 (D. Mass. 1985) (quoting Restatement (Second) of Torts § 834). Accordingly, a public nuisance claim requires a plausible causal connection between the defendant's conduct and the alleged interference with a plaintiff's individualized injury.

The Court finds Plaintiffs have not plausibly alleged that Rust-Oleum caused or substantially participated in the activity that allegedly interfered with a public right, causing Plaintiffs' injuries. Plaintiffs' public nuisance claim against Rust-Oleum rests on the premise that PFAS contamination at the MassNatural site poses a threat to public health, but Plaintiffs do not allege non-speculative facts showing that Rust-Oleum introduced PFAS into the environment. And, as stated, Plaintiffs failed to contest Rust-Oleum's test results, which contradict Plaintiff's assertion that its waste contained PFAS. Plaintiffs cannot plausibly allege that Rust-Oleum's conduct caused or substantially participated in the nuisance-causing activity. Accordingly, the Court **GRANTS** Rust-Oleum's motion to dismiss Plaintiffs' public nuisance claim under Count X.

### E.  **Willful and Wanton Conduct**

Willful or wanton conduct requires intentional conduct, by act or omission, involving a high degree of likelihood that substantial harm will result to another. Commonwealth v. Catalina, 556 N.E.2d 973, 979 (Mass. 1990) (citation omitted). Such conduct "involves a degree of risk and a voluntary taking of that risk so marked that, compared to negligence, there is not just a difference in degree but also a difference in kind." Sandler v.  Commonwealth, 644 N.E.2d 641, 644 (Mass. 1995) (citing Commonwealth v. Welansky, 55 N.E.2d 902, 910 (Mass. 1944)). The facts known, or that should be known, to the actor must support a high probability of substantial harm; merely creating some chance of harm is insufficient. Sarro v. Philip Morris USA Inc., 857 F. Supp. 2d 182, 189 (D. Mass. 2012).

Plaintiffs' willful and wanton conduct claim fails because they do not plausibly allege that Rust-Oleum engaged in intentional conduct involving a high probability of substantial harm. The claim is premised on the assertion that Rust-Oleum knowingly disposed of PFAS-containing materials at the MassNatural site. But, as discussed above, Plaintiffs do not plausibly allege that Rust-Oleum's waste contained PFAS at all. Therefore, Plaintiffs cannot establish that Rust-Oleum intentionally engaged in risk-laden conduct required to state a claim for willful misconduct. Accordingly, the Court **GRANTS** Rust-Oleum's motion to dismiss Plaintiffs' claim under Count XI.

### F.  **Chapter 21E § 5**

Chapter 21E § 5(a) imposes strict liability on enumerated classes of persons liable for release of hazardous materials. Mass. Gen. Laws ch. 21E, § 5(a). Plaintiffs allege Rust-Oleum is a liable party as an arranger or transporter under Chapter 21E § 5(a)(3)-(4). [Am. Compl. ¶ 407].

Section 5(a)(3) applies to a person who "arranged for the transport, disposal, storage, or treatment of hazardous material to or in a site," and § 5(a)(4) applies to a person who "transported any hazardous material to transport, disposal, storage, or treatment vessel sites." Mass. Gen. Laws ch. 21E, § 5. In both provisions, the operative conduct – arranging for disposal or transport, or transporting hazardous material to a selected site – is expressly tied to the handling of hazardous material itself, not to the mere presence of contamination at the site or the defendant's generalized association with it. To fall within § 5(a)(3) or (4), the defendant must have arranged for or transported material that was hazardous at the time of disposal or transport. See Mass. Gen. Laws ch. 21E § 5. Where the material handled by the defendant is not plausibly alleged to contain the hazardous substance giving rise to liability—here, PFAS—the statutory predicates for liability under § 5(a)(3) and (4) are not satisfied.

Because Plaintiffs have failed to plausibly allege Rust-Oleum's materials sent to MassNatural contained hazardous PFAS, Rust-Oleum cannot be liable under Chapter 21E § 5(a)(3)-(4). The statutory basis for liability rests on the presence and release of hazardous materials, here, PFAS compounds. But Plaintiffs do not allege non-speculative facts showing that the specific waste Rust-Oleum disposed of contained PFAS, and Plaintiffs do not contest Rust-Oleum's results disclaiming PFAS in its products sent to MassNatural. Accordingly, the Court **<u>GRANTS</u>** Rust-Oleum's motion to dismiss Plaintiff's claims under Count XII.

### G. <u>Standing</u>

The heart of this case concerns PFAS contamination, but Plaintiffs have failed to pass the plausibility threshold in showing that Rust-Oleum's products were truly a source of the PFAS that injured them. Accordingly, Plaintiffs encounter yet another obstacle: standing. "[A] plaintiff must have standing to bring each and every claim [they] assert[]." <u>Katz v. Pershing, LLC</u>, 672 F.3d 64,

71 (1st Cir. 2012) (citing <u>Pagan v. Calderon</u>, 448 F.3d 16, 26 (1st Cir. 2006). To satisfy the personal stake requirement for standing, "a plaintiff must establish each part of a familiar triad: injury, causation, and redressability." <u>Id.</u>, 672 F.3d at 71 (citing <u>Lujan v. Defs of Wildlife</u>, 504 U.S. 555, 560–61 (1992)). The element of causation requires the plaintiff to show a "sufficiently direct causal connection," between the injury and the conduct complained of such that the injury is "fairly . . . trace[able] to the challenged action of the defendant." <u>Id.</u> at 71, 77 (citing <u>Lujan</u>, 504 U.S. at 560). Rust-Oleum's test results, combined with Plaintiffs' failure to allege production of PFAS-containing products at Rust-Oleum's Attleboro facility, break the causal chain that could show Plaintiff's injuries are fairly traceable to Rust-Oleum. As a result, Plaintiffs lack standing for their claims against Rust-Oleum, which deprives this Court of subject-matter jurisdiction. <u>United Seniors Ass'n, Inc. v. Philip Morris USA</u>, 500 F.3d 19, 26 (1st Cir. 2007). Lacking subject-matter jurisdiction, the Court is obligated to dismiss the action. Fed. R. Civ. P. 12(h)(3)

A dismissal for lack of subject matter jurisdiction is typically without prejudice; however, as detailed above, this Court also finds on the merits that Plaintiffs have failed to state a claim against Rust-Oleum. Such a finding warrants dismissal with prejudice. <u>See</u> <u>Giangrande v. Shearson Lehman/E.F. Hutton</u>, 803 F. Supp. 464, 474 n.23 (D. Mass. 1992) ("Dismissal for want of subject matter jurisdiction, of course, is without prejudice on the merits"); <u>Adames v. Fagundo</u>, 198 F. App'x 20, 21 (1st Cir. 2006) (A dismissal for failure to state a claim "is with prejudice unless the order of dismissal explicitly says otherwise."). Accordingly, Rust-Oleum's motion to dismiss is granted in full, with prejudice.

V.    **<u>CONCLUSION</u>**

For the reasons stated above, Rust-Oleum's motion to dismiss, ECF No. 433, is **<u>GRANTED</u>**.

**SO ORDERED.**

Dated: December 30, 2025

_/s/ Margaret R. Guzman_
Margaret R. Guzman
United States District Judge
