## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| **THOMAS RYAN, et al.,** | ) | |
| | ) | |
| **Plaintiffs,** | ) | |
| | ) | **Civ. No.: 4:22-cv-40089-MRG** |
| v. | ) | |
| | ) | |
| **THE NEWARK GROUP, INC., et. al.** | ) | |
| | ) | |
| | ) | |
| **Defendants.** | ) | |
| | ) | |

### CONSOLIDATED WITH

| | | |
|---|---|---|
| **THOMAS RYAN, et al.,** | ) | |
| | ) | |
| **Plaintiffs,** | ) | |
| | ) | **Civ. No.: 4:25-cv-40026-MRG** |
| v. | ) | |
| | ) | |
| **EIDP, INC, et al,** | ) | |
| | ) | |
| | ) | |
| **Defendants.** | ) | |
| | ) | |

### ORDER ON CASELLA ORGANIC'S MOTION TO DISMISS [ECF No. 435]

**GUZMAN, J.**

### I.    INTRODUCTION

Plaintiffs, residents of Westminster, MA, bring this putative class action lawsuit to recover

damages for the contamination of their groundwater, which was allegedly caused by the decades-

long improper disposal of wastes containing per-and polyfluoroalkyl substances and their

constituents (collectively referred to as "PFAS") at the MassNatural recycling and composting

facility in Westminster, Massachusetts. [Am. Compl. ECF No. 16]. The present action ("*Ryan II*") is the second lawsuit in a related action stemming from the same underlying facts, see Ryan v. The Newark Grp., Inc., No. 4:22-cv-40089 ("*Ryan I*"), and the two actions have been consolidated for case management purposes. There are several motions to dismiss pending before the Court; however, this order concerns only the motion to dismiss raised by Defendant New England Waste Services of ME, Inc. ("Casella Organics" or "Casella"), [ECF No. 435]. For the reasons stated below, the motion to dismiss is **GRANTED.**

## II.    BACKGROUND

### i.    PFAS Contamination

The named Plaintiffs are residents of Westminster, Massachusetts who allege that Casella and other defendants are liable for the PFAS contamination of Plaintiffs' drinking water and properties. [Am. Compl. ¶¶ 495–546]. Plaintiffs allege that Massachusetts Natural Fertilizer Company, Inc. ("MassNatural") operated a commercial composting facility in Westminster, Massachusetts on Otter Farm ("the Facility") where it received organic byproduct from outside sources and suppliers, including materials that allegedly contained certain PFAS substances. [See id. ¶¶ 205-263]. Plaintiffs allege that MassNatural improperly disposed of the organic waste it received at the Facility, leading to PFAS leaching into the soil and nearby water sources, thereby contaminating Plaintiffs' land and drinking water. [Id. ¶¶ 262-66].

### ii.    PFAS6

PFAS are used in many commercial products due to their ability to repel water, dirt, oil, and grease, resist heat and protect surfaces. [Am. Compl. ¶¶ 29-31]. They also resist biodegradation and are water soluble, making them mobile in groundwater and the environment. [Id. ¶¶ 35, 36]. PFAS chemicals are colloquially referred to as "forever chemicals" due to their

ability to persist in the environment and human body indefinitely without breaking down. [Id. ¶ 34]. "PFAS6" refers to six specific PFAS compounds regulated by the Massachusetts Department of Environmental Protection ("MassDEP"), including (1) PFOS; (2) PFOA; (3) perfluorohexane sulfonic acid (PFHxS); (4) perfluorononanoic acid (PFNA); (5) perfluoroheptanoic acid (PFHpA); and (6) perfluorodecanoic acid (PFDA).[1] [Id. ¶ 50]. While PFAS are not illegal compounds, they are highly regulated.

The U.S. Environmental Protection Agency ("EPA") has concluded that human exposure to PFAS is associated with adverse health outcomes, which can manifest years after exposure. [Id. ¶ 44]. According to the EPA, human consumption of and oral exposure to PFAS is associated with decreased fertility, developmental effects in children, cancer, liver complications, and hormonal imbalances. [See id.] Reports issued from 2009 through 2022 reflect the EPA's increasing concern over health risks associated with human and animal ingestion of virtually any amount of PFAS. For example, in June 2022 EPA advised that "negative health effects may occur with concentrations of [PFAS] in water that are near zero and below EPA's ability to detect at this time." [Id. ¶ 47; Report and Recommendation ("R&R") at 4, ECF No. 159].[2] In April 2024, the EPA finalized new drinking water regulations that established federal, legally enforceable levels, called Maximum Contaminant Levels (MCLs), for the six PFAS compounds and mixtures that contain

---

[1] This Order will refer to the compounds collectively as "PFAS" where there is no reason to discuss a single compound with specificity.

[2] EPA Announces New Drinking Water Health Advisories for PFAS Chemicals, $1 Billion in Bipartisan Infrastructure Law Funding to Strengthen Health Protections, U.S. ENV'T. PROT. AGENCY, (May 25, 2023), https://www.epa.gov/newsreleases/epa-announces-new-drinking-water-health-advisories-pfas-chemicals-1-billion-bipartisan.

PFAS.[3] The MCLs range from 4.0 parts per trillion (ppt) (also expressed as ng/L) for PFOS and PFOA, to 10.0 ppt for PFHxS, PFNA, and HFPO-DA.[4]

In addition to the federal regulations, Massachusetts has its own PFAS regulations. First, PFAS are considered hazardous materials under Mass. Gen. Laws Chapter 21E ("Chapter 21E"), also known as the Mass. Oil and Hazardous Material Release Prevention and Response Act. Chapter 21E § 5 establishes strict liability, and joint and several liability, for owners and operators of land contaminated with oil and hazardous materials, as well as for certain other parties identified in the statute. Section 4 of the statute establishes the process by which responsible private parties distribute the recovery of costs for response actions.  The Massachusetts Contingency Plan (310 CMR 40.0000 et seq.) ("MCP") is the set of regulations under Chapter 21E.  The MCP determines the protocol for risk assessment and remediation of oil and hazardous materials contamination.

As part of the MCP, in December 2019, MassDEP promulgated Reportable Concentrations (RCs) and Cleanup Standards for the six PFAS compounds, either individually or as a collective, depending upon the groundwater or soil category.[5] Relevant to this opinion, RCs for groundwater used for drinking are referred to as "RCGW-1" levels, while RCs for accessible soil or soil on

---

[3] <u>Per- and Polyfluoroalkyl Substances (PFAS): Final PFAS National Primary Drinking Water Regulation</u>, U.S. ENV'T. PROT. AGENCY, (July 12, 2024), https://www.epa.gov/sdwa/and-polyfluoroalkyl-substances-pfas.

[4] <u>Id.</u>

[5] <u>Sampling and Analysis Guidance for PFAS at Disposal Sites Regulated under the Massachusetts Contingency Plan</u>, MASS. DEP'T. ENV'T PROT., 5 (Nov. 13, 2023), https://www.mass.gov/doc/sampling-and-analysis-guidance-for-pfas-at-disposal-sites-regulated-under-the-massachusetts-contingency-plan-november-2023/download.

property that has a sensitive use are referred to as "RCS-1" levels.[6] The RCGW-1 level for PFAS in drinking water is 20 nanograms per liter (ng/L) and the RCS-1 level for PFAS in soil ranges from 300 ng/kg to 720 ng/kg, depending on the type of PFAS.[7]  Additionally, on October 2, 2020, as part of the Massachusetts Drinking Water Program, MassDEP promulgated a drinking water standard of 20 ng/L for the sum of six PFAS compounds, matching the RCGW level.[8] If PFAS is detected at levels higher than the permissible RCs, the MCP requires notice be given to affected persons as well as implementation of "Immediate Response Actions" to contain and remedy potential contamination.[9] Once a release has been confirmed, MassDEP issues a Notice of Responsibility ("NOR") to notify any Potentially Responsible Party that it may be liable for the release of hazardous materials.[10] The NOR also directs the Potentially Responsible Party to engage a Licensed Site Professional to implement the Immediate Response Actions.[11]

---

[6]  MCP Numerical Standards, MASS. DEP'T. ENV'T PROT., (Dec. 2017), https://www.mass.gov/doc/mcp-numerical-standards-derivation/download.

[7] Sampling and Analysis Guidance for PFAS at Disposal Sites Regulated under the Massachusetts Contingency Plan, supra note 10 at 6.

[8] Id. at 5. The Massachusetts Drinking Water Program implements the federal and state drinking water MCLs and MassDEP anticipates that the Massachusetts MCL will be revised in the near future, in light of the new EPA regulations.

[9] See 310 CMR 40.000; Mass. Gen. Laws ch. 21E.

[10] See 310 CMR 40.000. An NOR is issued to a party when, based on the available information, MassDEP has reason to believe that the party is liable for response action costs and damages under Chapter 21E, § 5. The purpose of this notice is to inform the potentially liable party of its legal responsibilities under Massachusetts state law for assessing and/or remediating the subject release of a hazardous material.

[11] See 310 CMR 40.000.

There are presently few regulations relating to PFAS in the biosolids industry. However, in August 2020, MassDEP increased the frequency with which biosolids must be tested for PFAS to quarterly, reflecting an increased concern with PFAS in biosolids. [Am. Compl. ¶ 187, n.27].

### iii.  **Casella Organics**

Casella Organics, or "Casella," is a Maine corporation engaged in the collection and transportation of organic residuals, including biosolids (biopellets), sludge, and other specialized waste, to composting facilities. [Am. Compl. ¶ 197]. Casella operates as a subsidiary of Casella Waste Systems, Inc., a Vermont-based corporation specializing in waste management services. [Id. ¶ 198]. Casella provides solid waste services across multiple industries, including the transportation, processing, and recycling of biosolids, biomaterials, and related hazardous or specialized waste. [Id. ¶ 199].

Starting in 2018, Casella contracted with co-defendant, the New England Fertilizer Company ("NEFCO"), to transport biopellets produced at NEFCO's Quincy, Massachusetts facility. [Id. ¶¶ 178-201]. In the parties' contract (executed in 2016 and 2021), Casella ("Contractor") agreed to provide NEFCO ("Customer") with a comprehensive service for the distribution and marketing of NEFCO's biosolids ("Product"), including the biopellets at issue. [See ECF No. 438-1, Ex A. § Definitions]. Pursuant to the contract, Casella chose the destination for NEFCO's biopellets and subsequently transported the pellets to the MassNatural composting facility. [Id.; Am. Compl. ¶ 179]. In total, Casella transported more than 2,800 tons of NEFCO biosolid pellets at MassNatural. [Id. ¶ 193]. Casella did not test the materials it was transporting for NEFCO for PFAS before, during, or after the transport. [Id. ¶ 203]. Later testing of the NEFCO materials transported to MassNatural by Casella revealed dangerous levels of PFAS. [Id. ¶¶ 196, 204].

Plaintiffs do not assert any independent allegations establishing that Casella had specific knowledge of PFAS in the NEFCO biopellets. Rather, they rely on general assertions directed primarily at NEFCO and the wastewater treatment industry as a whole. [Id. ¶¶ 180, 182-85, 200]. Plaintiffs allege NEFCO knew or should have known its materials contained PFAS because "numerous scientific studies, state advisories, and high-profile contamination incidents have demonstrated PFAS's persistence through wastewater treatment and concentration in biosolid products." [Id. ¶¶ 180, 181]. For the same reasons as NEFCO, Plaintiffs argue Casella knew or should have known NEFCO's biopellets contained dangerous levels of PFAS. [Id. ¶ 200]. Plaintiffs further note that beginning in 2018, the Vermont Department of Environmental Conservation identified PFAS as a contaminant of concern in biosolids produced from municipal wastewater treatment facilities, conducted PFAS contamination investigations at other wastewater treatment facilities, and tested all biosolids produced in Vermont. [Id. ¶ 183–85]. From these background facts, and from Casella's corporate affiliation with Vermont-based Casella Waste Systems, Inc., Plaintiffs call for the inference that Casella, operating in the same industry as NEFCO, likewise knew or should have known that NEFCO biopellets contained PFAS. [Id. ¶ 200]. Casella did not receive a Notice of Responsibility from MassDEP during the agency's investigation. [ECF No. 436 at 20].

### iv.    Procedural History

On August 2, 2022, a subset of Plaintiffs initiated the action now-captioned Ryan v. Newark Grp., No. 22-cv-40089-MRG (D. Mass) against defendants 3M, MassNatural, Newark Group, Greif, Inc., Caraustar Industries, Otter Farm, Inc., and Seaman Paper ("*Ryan I*"). On September 1, 2023, Magistrate Judge David Hennessy issued a Report and Recommendations on the *Ryan I* defendants' respective motions to dismiss the *Ryan I* Second Amended Complaint, mostly denying

the *Ryan I* defendants' motions but dismissing certain entities related to The Newark Group for lack of personal jurisdiction. [See *Ryan I*, R&R, ECF No. 159]. On December 21, 2023, this Court largely adopted Judge Hennessy's R&R with slight modifications. [See *Ryan I*, MTD Order, ECF No. 181]. On May 13, 2024, some of the Defendants in *Ryan I* sought to amend their answers to assert crossclaims against the DuPont Entities, Ball, Rust-Oleum, NEFCO, and several other non-party proposed defendants. [*Ryan I*, ECF No. 271]. Simultaneously, the Plaintiffs in *Ryan I* moved for leave of Court to file a Third Amended Complaint adding the DuPont Entities, Ball, and Rust-Oleum as defendants to the *Ryan I* action. [*Ryan I*, ECF No. 274].

On November 18, 2024, in a 58-page order, the Court denied the motions to amend because joining the additional parties at that stage, two years into the litigation, would cause undue delay and prejudice the proposed defendants. [Joinder Order, ECF No. 360]. In that Order, the Court noted that the significant passage of time between the filing of *Ryan I* complaint and the joinder motion hindered the proposed defendants' abilities to mount a defense because it is "increasingly difficult for them to conduct reliable, independent testing . . . or to determining if there was any comingling of their materials with materials from other sources [in MassNatural]." [Joinder Order at 31].

Having been barred from adding the DuPont Entities, Ball, and Rust-Oleum to *Ryan I* by amending their complaint, on February 23, 2025, Plaintiffs decided to file this entirely separate lawsuit against those same entities, as well as the NEFCO Defendants, on the eve of the tolling of the statute of limitations for their claims. See Ryan v. EIDP, INC., No. 4:25-cv-40026-MRG, ECF No. 1 ("*Ryan II*"). After hearing arguments from all parties, the Court consolidated *Ryan I* and *Ryan II* for purposes of case management. [*Ryan I*, ECF No. 423]. Plaintiffs filed their Amended Complaint in this action on April 22, 2025. [*Ryan II*, ECF No. 16]. Casella filed its motion to

dismiss on June 30, 2025. [*Ryan I*, ECF No. 435]. Plaintiffs opposed the motion on August 8, 2025. [*Ryan I*, ECF No. 477]. Casella filed a reply to Plaintiffs' opposition on September 3, 2025. [*Ryan I*, ECF No. 487].

### III.    LEGAL STANDARD

On a motion to dismiss for failure to state a claim upon which relief can be granted pursuant to Rule 12(b)(6), the court "must assume the truth of all well-plead[ed] facts and give the plaintiff the benefit of all reasonable inferences therefrom." Ruiz v. Bally Total Fitness Holding Corp., 496 F.3d 1, 5 (1st Cir. 2007) (citing Rogan v. Menino, 175 F.3d 75, 77 (1st Cir. 1999)). To survive a motion to dismiss, the complaint must state a claim that is plausible on its face. Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007). In other words, the "[f]actual allegations must be enough to raise a right to relief above the speculative level, . . . on the assumption that all the allegations in the complaint are true (even if doubtful in fact)." Id. at 555 (citations omitted).

"In resolving a motion to dismiss, a court should employ a two-pronged approach." Ocasio-Hernandez v. Fortuno-Burset, 640 F.3d 1, 12 (1st Cir. 2011). "It should begin by identifying and disregarding statements in the complaint that merely offer 'legal conclusion[s] couched as ... fact[ ]' or '[t]hreadbare recitals of the elements of a cause of action.'" Id. (alterations in original) (quoting Ashcroft v. Iqbal, 566 U.S. 662, 678 (2009). "A plaintiff is not entitled to 'proceed perforce' by virtue of allegations that merely parrot the elements of the cause of action." Ocasio-Hernandez, 640 F.3d at 12 (citations omitted). Still, Plaintiff's burden is relatively low as "[a] court may not disregard properly pled factual allegations even if actual proof of those facts is improbable. . . . Rather, the relevant inquiry focuses on the reasonableness of the inference of liability that the plaintiff is asking the court to draw." Afrasiabi v. Massachusetts, 272 F. Supp. 3d 256, 260 (D. Mass. 2017) (citing Ocasio-Hernández, 640 F.3d at 13).

9

Unlike a motion made under Rule 12(b)(2) that allows the Court to look beyond the pleadings, on a motion to dismiss for failure to state a claim under Rule 12(b)(6), "the Court can consider only facts alleged in the complaint or documents fairly incorporated therein." Theophile v. Conklin, No. CV 17-10868-FDS, 2017 WL 3140363, at *4 (D. Mass. July 24, 2017) (citing Rivera v. Centro Medico de Turabo, Inc., 575 F.3d 10, 15 (1st Cir. 2009)).

Finally, as this matter is just one motion in three years of litigation, the Court is mindful to follow the law of the case doctrine, which provides that "legal decisions, or rulings of law, made by a court at a particular stage of a civil or criminal proceeding become 'law of the case,' and that thereafter these determinations govern the same issues in subsequent stages of the same litigation, unless corrected by appellate review." McConaghy v. Sequa Corp., 294 F. Supp. 2d 151, 160 (D.R.I. 2003) (citing Arizona v. California, 460 U.S. 605, 618 (1983); Ellis v. United States, 313 F.3d 636, 646 (1st Cir. 2002)).

## IV.    DISCUSSION

### i.    Negligence (Count XXIV)

To state a claim for negligence under Massachusetts law, "a plaintiff must prove that (1) the defendant owed the plaintiff a duty of reasonable care; (2) the defendant breached this duty; (3) damage to the plaintiff resulted; and (4) the breach of the duty caused this damage." Brown v. U.S., 557 F.3d 1, 3 (1st Cir. 2009). The plaintiff must also show the cause of the injury was reasonably foreseeable. Gaines v. General Motors Corp., 789 F.Supp 38, 41-42 (D. Mass. 1991) (quoting Glick v. Prince Italian Foods, Inc., 514 N.E. 2d 100, 102 (Mass. App. Ct. 1987)); see also Staelens v. Dobert, 318 F.3d 77, 79 (1st Cir. 2003) ("Under Massachusetts law, in addition to being the cause in fact of the injury, the plaintiff must show that the negligent conduct was a proximate or legal cause of the injury as well." (quoting Kent v. Com., 771 N.E.2d 770, 777 (Mass. 2002)

(internal alterations omitted)).  Generally, subsequent and intervening negligence by a third-party will not relieve the initial tortfeasor of liability as long as the negligence was foreseeable.  Staelens, 318 F.3d at 79 (citing Poskus v. Lombardo's of Randolph, Inc., 670 N.E. 2d 383, 385 (Mass. 1996); Jesionek v. Massachusetts Port Authority,  378 N.E. 2d 995, 997 (Mass. 1978)).

The law regarding duty of care and causation is as follows: "The existence of a duty of care is generally a question of law for the court to decide."  Brettel v. Omron Sci. Techs., Inc., 302 F. Supp. 3d 460, 467 (D. Mass. 2018) (citing Jupin v. Kask, 849 N.E. 2d 829, 835 (Mass. 2006)). "The concept of 'duty' is not sacrosanct in itself but is only an expression of the sum total of considerations of policy which lead the law to say that the plaintiff is entitled to protection. No better general statement can be made than that the courts will find a duty where, in general, reasonable persons would recognize it and agree that it exists."  Jupin, 849 N.E. 2d at 835  (internal punctuation and citation omitted).   "As a general principle of tort law, every actor has a duty to exercise reasonable care to avoid physical harm to others."  Remy v. MacDonald, 801 N.E. 2d 260, 262-63 (Mass. 2004) (citing Restatement (Second) Torts § 302 comment a (1965)).  However, a "precondition to this duty is, of course, that the risk of harm to another be recognizable or foreseeable to the actor."  Jupin, 849 N.E. 2d at 835  (internal citations omitted); see also Husband v. Dubose, 531 N.E. 2d 600, 602 (Mass. App. Ct. 1988) (determining that whether a person has a duty to protect another from harm caused by a third party "involve[s], to some extent, the foreseeability of the harm").  Thus, "with some important exceptions, a defendant 'owes a duty of care to all persons who are foreseeably endangered by his conduct, with respect to all risks which make the conduct unreasonably dangerous.'" Jupin, 849 N.E. 2d at 835 (quoting Tarasoff v. Regents of the Univ. of Cal., 17 Cal. 3d 425, 434–35 (1976)).

11

The Supreme Judicial Court ("SJC") recently addressed core distinctions between but for and proximate causation in Doull v. Foster, 163 N.E. 3d 976 (Mass. 2021). Factual cause is a "but for" test, which carries a low threshold; "there are always multiple causes of any harm and 'most will not be of significance for tort law.'" In re TelexFree Sec. Litig., No. CV 4:14-02566-TSH, 2023 WL 4236033, at *3–4 (D. Mass. June 27, 2023) (quoting Doull, 163 N.E. 3d at 987). The "but for" test can be relaxed and the "substantial factor" test applies in the context of toxic tort litigation. Doull, 163 N.E. 3d at 984-85. The substantial factor test obviates the need for plaintiffs to establish "but for" causation, namely "which particular [toxic] exposures were necessary to bring about the harm" as "[i]n these cases, it can be difficult, if not impossible, for the plaintiff to identify" such exposures. Id. Nevertheless, Plaintiffs additionally bear the burden of showing proximate cause. "[P]roximate cause is 'based on considerations of policy and pragmatic judgment.'" Id. at 983 (citing Kent v. Commonwealth, 771 N.E. 2d 770, 777 (Mass. 2002)). These implicate the "reasonable foreseeability of the harm." Jupin, 849 N.E. 2d at 836 (citation omitted). "[T]he substantial factor test is not a replacement for the standard foreseeability analysis." TelexFree, 2023 WL 4236033, at *4. Thus, Plaintiffs must show that each Defendant's actions was a "substantial factor" causing the alleged harm, and that the harm was a "reasonably foreseeable result" of Defendants' actions.

Plaintiffs assert that Casella "owed Plaintiffs and the Class Members a duty of reasonable care to avoid dumping, emitting, discharging, disposing, and/or distributing materials with high levels of PFAS chemicals in a manner and location that would cause Plaintiffs and the Class Members injury or harm"; and that "Plaintiffs and the Class Members were located within the scope of the risk created by Defendant Casella Organics' conduct and they were foreseeable victims of negligent disposal of contaminated waste by Defendant Casella Organics." [Am. Compl.

¶ 506]. Plaintiffs allege Casella acted below the standard of reasonable care by "failing to test/screen" the materials it transported and by negligently dumping said materials without taking steps to prevent or minimize PFAS contamination. [Id. ¶ 509]. For its part, Casella asserts it abided by the appropriate standard of care and was not careless in disposing materials at MassNatural, both because it followed applicable regulations and because the biopellets are not waste to be disposed, but rather a fertilizer product for which MassNatural served as a beneficial use market. [ECF No. 436 at 2, 15]. Casella also argues that Plaintiffs have failed to plausibly allege Casella had knowledge, actual or constructive, that the NEFCO biopellets contained PFAS. [Id. at 6].

The Court agrees with Casella. Following the law of the case, the duty recognized in Parris and adopted in *Ryan I* attaches to any entity that continues to supply, distribute, or introduce PFAS-containing material into a disposal stream with knowledge, actual or constructive, of PFAS's persistence, toxicity, and resistance to conventional treatment processes. See Parris v. 3M Co., 595 F. Supp. 3d 1288, 1328 (N.D. Ga. 2022) ("suppliers have a duty to protect third parties from reasonably foreseeable harm that occurs during the normal use of their products."). In addressing the motion to dismiss of The Newark Group, Inc. ("Newark") in *Ryan I*, the R&R focused on Newark's role in the paper industry and its disposal at MassNatural of paper fiber waste which is widely known to contain PFAS. This Court adopted Judge Hennessy's statement of law that "facilities that use and dispose of PFAS- contaminated materials, knowing of risks associated with PFAS ingestion and the risks of environmental contamination following improper disposal, owe foreseeable victims of such contamination a duty of care." [R&R at 51 (citing Parris, 595 F. Supp. 3d at 1331)]. The theory of liability that constitutes the law of the case does not fit neatly in application to Casella.

Casella is unlike other defendants in this case. The company acts more like a broker or transporter rather than a manufacturer that uses PFAS in its products. It does not introduce PFAS into the stream of commerce. With respect to NEFCO's biopellets – the only PFAS-containing material Plaintiffs allege Casella transported to MassNatural – upon review of NEFCO and Casella's contract, it is clear that Casella was not disposing of NEFCO's biopellets but rather sending them to MassNatural as a useful fertilizer product. [See ECF No. 438-1, Ex. A[12]]. Said another way, Casella did not create the danger or contribute as a substantial factor in the same way that other defendants like Newark or even NEFCO, as it had no role in the production of a product containing PFAS and it did not carelessly dispose of PFAS-containing materials.

Further, Plaintiffs do not plausibly allege Casella's knowledge, actual or constructive, that the materials it handled contained PFAS, nor that Casella knew of PFAS's persistence, toxicity, and resistance to conventional treatment processes. Under the law of this case, this lack of knowledge is fatal to establishing that Casella owed Plaintiffs a duty of care. Plaintiffs provide minimal support for Casella's purported knowledge. They cite to a news article from the New Hampshire Department of Environmental Services regarding an investigation into PFAS in biosolids in 2017 that stated, "[i]n 2016, PFAS contamination in biosolids became a topic of discussion around the country." [Am. Compl. ¶ 182]. Plaintiffs assert that Casella had knowledge of PFAS due to increased concerns about the chemicals in the biosolids industry generally. [Id. ¶

---

[12] The NEFCO-Casella contact [ECF No. 438-1, Ex. A] is referenced in, and integral to, the Amended Complaint. [See, e.g., Am. Compl. ¶¶ 178, 186, 488]. Thus, the Court is permitted to, and will, consider the contract in deciding the motion to dismiss. McCabe v. Ford Motor Co., 774 F. Supp. 3d 349, 365 n.1 (D. Mass. 2025) (citing Beddall v. State St. Bank & Trust Co., 137 F.3d 12, 17 (1st Cir. 1998) ("Where a complaint's factual allegations are expressly linked to—and admittedly dependent upon—a document (the authenticity of which is not challenged), that document effectively merges into the pleadings and the trial court can review it in deciding a motion to dismiss under Rule 12(b)(6).").

180–81, 200]. Plaintiffs additionally argue that because Casella is a subsidiary of a Vermont-based entity, it should have been aware that, in 2018, the Vermont Department of Environmental Conservation recognized PFAS as a contaminant of concern in biosolids and began an investigation into PFAS at wastewater treatment facilities. [Id. ¶¶ 183–85].

While Plaintiffs might have succeeded in alleging that Casella's parent company had the requisite knowledge to establish duty, the same cannot be said of Casella when knowledge of a principal or parent "cannot generally be imputed to an agent." Restatement (Third) of Agency §§ 5.02 cmt. b; 5.03 cmt. d; 5.03 cmt. g (Am. Law Inst. 2006)); Corinth Pellets, LLC v. Andritz, Inc., No. 1:20-CV-00082-NT, 2020 WL 5578412, at *4 (D. Me. Sept. 17, 2020) ("This protects the agent from the legal consequences of facts that only the principal knows or has reason to know." (quoting id § 5.03 cmt. g)). Generalized allegations about regulators' actions in Vermont and New Hampshire is not enough to impute knowledge to Casella simply because it is affiliated with a Vermont-based company. Further, general allegations about trends in the biosolids industry overall is not sufficient to establish Casella's knowledge of PFAS where Casella interacts with the biosolids industry but primarily works in waste hauling. Plaintiffs do not allege any facts showing Casella's specific knowledge that NEFCO's biopellets contained PFAS. While the Court must make all inferences in favor of the Plaintiff when ruling on a motion to dismiss, the Court "need not accept bald assertions, unsupportable conclusions, periphrastic circumlocutions, and the like." Vega v. Cruz-Burgos, 537 F.3d 14, 20 (1st Cir. 2008) (internal quotation marks omitted) (quoting Doyle v. Hasbro, Inc., 103 F.3d 186, 190 (1st Cir.1996)). Plaintiffs fail to plausibly allege with sufficient specificity that Casella had knowledge, actual or constructive, that NEFCO's biopellets contained PFAS and that facilitating the sale of the pellets to MassNatural would foreseeably result

15

in groundwater contamination at the MassNatural site. Accordingly, the Court **GRANTS** Casella's motion to dismiss Count XXIV.

### ii.    Medical Monitoring (Count XIII)

To sustain a medical monitoring claim, a plaintiff must demonstrate that the defendant's negligence caused the plaintiff to:

> [1] become exposed to a hazardous substance that produced, at least, subcellular changes that substantially increased the risk of serious disease, illness, or injury [2] for which an effective medical test for reliable early detection exists, [3] and early detection, combined with prompt and effective treatment, will significantly decrease the risk of death or the severity of the disease, illness or injury, and [4] such diagnostic medical examinations are reasonably (and periodically) necessary, conformably with the standard of care, and [5] the present value of the reasonable cost of such tests and care, as of the date of the filing of the complaint.

Donovan v. Philip Morris USA, Inc., 914 N.E. 2d 891, 902 (Mass. 2009) (citing Sullivan v. Old Colony St. Ry., 83 N.E. 1091 (Mass. 1908)); see also Genereux v. Raytheon Co., 754 F.3d 51, 54 (1st Cir. 2014) ("Genereux II") (calling Donovan the "cornerstone" of a medical monitoring claim).

Medical monitoring first requires a finding that a defendant was negligent, and, as the Court has relieved Casella of negligence liability, Plaintiffs' claim for medical monitoring against Casella must also fail. Accordingly, the motion to dismiss Count XIII is **GRANTED**.

### iii.    Private and Public Nuisance (Counts XXV & XXVI)

Another session of this Court, citing the Restatement (Second) of Torts § 834, has held that "[o]ne is subject to liability for a [private or public] nuisance caused by an activity, not only when he carries on the activity but also when he participates to a substantial extent in carrying it on."

Com. of Mass. v. Pace, 616 F. Supp. 815, 821 (D. Mass. 1985). In Pace, a case involving a hazardous waste release, the court granted summary judgment in favor of the defendant waste-transporter, holding that a mere "transporter of hazardous materials" cannot be held liable for the creation of or contribution to a nuisance where its only "activity" was "hauling [] materials to [a] site," and where plaintiffs made no allegations that the transporter "participated in allowing [the] release of wastes into ground." Id.

Casella is identically situated to the transporter in Pace and the same result should follow. Plaintiffs merely allege that Casella transported NEFCO's biopellets to MassNatural, [Am. Compl. ¶¶ 201–04], and make no allegations that Casella contributed in any other way to allow the release of PFAS into the ground at MassNatural. While the *Ryan I* R&R distinguished Pace from the facts regarding defendants Seaman Paper and Otter Farm, concluding "[i]n sum, Plaintiffs allege that Seaman Paper and Otter Farm were instrumental in facilitating MassNatural's handling of PFAS-contaminated byproducts," [R&R at 77-78], Casella is in an entirely different position from Seaman Paper and Otter Farm and Plaintiffs make no similar allegations as to any "instrumental" role Casella may have had.

Following the clear directive set by Pace, the Court finds Plaintiffs have failed to state either a private or public nuisance claim against Casella. Accordingly, the motion to dismiss Counts  XXV & XXVI is **GRANTED**.

### iv.    Willful and Wanton Conduct (Count XXVII)

Willful and wanton conduct represents a qualitatively higher degree of culpability than negligence, requiring more than inadvertence and poor judgment. Sarro v. Philip Morris USA Inc., 857 F. Supp. 2d 182, 185-86 (D. Mass. 2012) (citing Boyd v. National R.R. Passenger Corp., 845

N.E.2d 356, 363 (Mass. 2006)). "The essence of wanton or reckless conduct is intentional conduct, by way either of commission or omission where there is a duty to act, which conduct involves a high degree of likelihood that substantial harm will result to another." Commonwealth v. Catalina, 556 N.E.2d 973, 979 (Mass. 1990). "The terms 'wi[l]ful,' 'wanton,' and 'reckless' are often used interchangeably.' Sarro v. Philip Morris USA Inc., 857 F. Supp. 2d 182, 185 n.2 (D. Mass. 2012) (citing Manning v. Nobile, 582 N.E.2d 942, 946 n.3 (Mass. 1991) and Beausoleil v. Massachusetts Bay Transp. Auth., 138 F. Supp. 2d 189, 204 (D. Mass. 2001)).

The imposition of tort liability for willful and wanton conduct may be evaluated under "either a subjective or an objective standard" for assessing the defendant's knowledge of risk. Sarro, 857 F. Supp. 2d at 185 (quoting Boyd v. AMTRAK, 845 N.E.2d 356, 362 (Mass. 2006)). Under a subjective standard, "the actor knows, or has reason to know, . . . of facts creating a high degree of risk of physical harm to another, and deliberately proceeds to act, or fail to act, in conscious disregard of, or indifference to that risk." Id. (citing Boyd, 845 N.E.2d at 363). Under an objective standard, "the actor knows, or has reason to know, . . . of facts creating a high degree of risk of physical harm to another," but unreasonably fails to realize the high degree of risk involved. Id. Under either standard, the risk must be unreasonable and must involve a probability of harm substantially exceeding that required to establish negligence. Id.

Where Plaintiffs have failed to plausibly allege Casella's knowledge sufficient to create a duty under a negligence standard, their allegations must likewise fall short of meeting the higher standard required to plead willful and wanton conduct. As stated in the section on negligence, *supra*, Plaintiffs do not plausibly allege that Casella had actual or constructive knowledge that NEFCO's biopellets contained PFAS or that Casella had knowledge of PFAS's persistence, toxicity, and resistance to conventional treatment processes. Therefore, Plaintiffs fail to establish

that Casella knew, or had reason to know "of facts creating a high degree of risk of physical harm to another" Sarro, 857 F. Supp. 2d at 185 (citing Boyd, 845 N.E.2d at 363). Accordingly, Casella's motion to dismiss Count XXVII is **GRANTED**.

### v.    **Chapter 21E, § 5 (Count XXVIII)**

In Count XXVIII, Plaintiffs allege that Casella Organics is liable for damages to Plaintiffs' property incurred as a result of the release of PFAS at the MassNatural facility. [Am. Compl. ¶ 546]. In response, Casella asserts that it is relieved from liability under the useful product defense because the NEFCO biopellets it transported were products for market rather than waste products. [ECF No. 436 at 6]. In the alternative, Casella urges the Court to dismiss the Chapter 21E claim in this case and allow it to be adjudicated in a parallel state action under the Colorado River doctrine.[13] [Id. at 11–12].

Chapter 21E is the Massachusetts version of the Comprehensive Environmental Response, Compensation, and Liability Act ("CERCLA"), 42 U.S.C. §§ 9601-28, and Massachusetts courts look to CERCLA case law when interpreting analogous provisions of Chapter 21E. Martignetti v. Haigh-Farr Inc., 680 N.E.2d 1131, 1137 n. 12 (Mass. 1997) (consistent interpretations of CERCLA and 21E are desirable when there are similarities in language and structure); Newly Weds Foods v. Westvaco Corp., No. 99-5194-C, 2001 WL 1586691, at *2 (Mass. Super. Ct. Dec. 12, 2001)

---

[13] The Court considered Colorado River abstention, but concludes that it is not appropriate here. See Colorado River Conservation Dist. v. United States, 424 U.S. 800 (1976). "As a threshold matter, a stay or dismissal of a federal lawsuit under Colorado River 'necessarily contemplates that the federal court will have nothing further to do in resolving any substantive part of the case.'" Glassie v. Doucette, 55 F.4th 58, 64 (1st Cir. 2022) (quoting Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp., 460 U.S. 1, 28 (1983)). In other words, "the state action must resolve all of the claims in the federal case." Id. The Chapter 21E State Court Action would not resolve all of the claims of this case; it would only potentially resolve Plaintiffs' Chapter 21E claim. Therefore, Colorado River abstention does not apply.

("21E is modeled on CERCLA, and, absent a compelling reason to do otherwise, should be construed consistently with CERCLA."). Both Chapter 21E and CERCLA regulate the cleanup of hazardous waste contamination and contain cost shifting mechanisms to distribute the financial burden of cleanup costs. See Mass. Gen. Laws ch. 21E; 42 U.S.C. §§ 9601-28.

The definition of who can be liable for cleanup costs is largely the same under CERCLA as under Chapter 21E. "There are four types of persons liable under CERCLA: owners, operators, arrangers, and transporters." El Paso Nat. Gas Co. LLC v. United States, No. CV-14-08165-PCT-DGC, 2017 WL 3492993, at *2 (D. Ariz. Aug. 15, 2017) (citing 42 U.S.C. § 9607(a)). The Supreme Court has noted that these are "broad categories" of liable persons. United States v. Atl. Research Corp., 551 U.S. 128, 134 (2007). Chapter 21E has the same categories of liable persons: owners, operators, arrangers, and transporters, as well as a fifth catch-all category of "any person who otherwise caused or is legally responsible for a release or threat of release of oil or hazardous material from a vessel or site." Mass. Gen. Laws ch. 21E § 5(a). As the two definitional provisions of the statutes are analogous, the Court will refer to CERCLA case law to inform the discussion that follows. See Martignetti, 680 N.E.2d at 1137 n. 12.

At first glance, under the two statutes, NEFCO would be an arranger and Casella would be a transporter; however, upon further analysis, the labels of arranger and transporter do not match the facts of this case as NEFCO's biopellets are a useful product rather than mere hazardous waste for disposal. An "arranger" is "any person who by contract, agreement, or otherwise arranged for disposal or treatment, or arranged with a transporter for transport for disposal or treatment, of hazardous substances owned or possessed by such person. . . ." 42 U.S.C. § 9607(a)(3). A "transporter" is "any person who accepts or accepted any hazardous substances for transport to disposal or treatment facilities . . . ." Id. § 9607(a)(4). Under CERCLA, arranger liability exists

"to deter and, if necessary, to sanction parties seeking to evade liability by 'contracting away' responsibility." United States v. Gen. Elec. Co., 670 F.3d 377, 382 (1st Cir. 2012) (citing Team Enters., LLC v. W. Inv. Real Estate Trust, 647 F.3d 901, 907 (9th Cir. 2011) ("Arranger liability ensures that owners of hazardous substances may not free themselves from liability by selling or otherwise transferring a hazardous substance to another party for the purpose of disposal.")). Accordingly, "liability would clearly 'attach . . . if an entity were to enter into a transaction for the sole purpose of discarding a used and no longer useful hazardous substance.'" Id. (quoting Burlington N. & Santa Fe Ry. Co. v. United States, 556 U.S. 599, 610 (2009)). However, arranger liability does not attach when an entity "merely [sells] a new and useful product if the purchaser of that product later, and unbeknownst to the seller, disposed of the product in a way that led to contamination." Burlington N., 556 U.S. at 610 (citations omitted). In other words, "CERCLA liability will not flow from "the sale of a useful hazardous substance *for its original intended purpose.*" United States v. Atlas Lederer Co., 85 F. Supp. 2d 828, 836 (S.D. Ohio 2000) (quoting United States v. Cello-Foil Prods., Inc., 100 F.3d 1227, 1232 n.1 (6th Cir. 1996)).

NEFCO's biopellets are a useful product. NEFCO is in the business of treating wastewater solids and processing them into biosolid pellets, which the Plaintiffs acknowledge are "used as fertilizer." [Am. Compl. ¶ 175; ECF No. 436 at 7]. NEFCO and Casella's contract explicitly refers to the biosolid pellets as "product" and NEFCO contracts with Casella to find "beneficial use markets" for those products. [ECF No. 438-1, Ex A. § 1.1.1]. [14] In their opposition to NEFCO's

---

[14] The Court restates the following: The NEFCO-Casella contact [ECF No. 438-1, Ex. A] is referenced in, and integral to, the Amended Complaint. [See, e.g., Am. Compl. ¶¶ 178, 186, 488]. Thus, the Court is permitted to, and will, consider the contract in deciding the motion to dismiss. McCabe v. Ford Motor Co., 774 F. Supp. 3d 349, 365 n.1 (D. Mass. 2025) (citing Beddall v. State St. Bank & Trust Co., 137 F.3d 12, 17 (1st Cir. 1998) ("Where a complaint's factual allegations are expressly linked to—and admittedly dependent upon—a document (the authenticity of which

21

motion to dismiss, Plaintiffs also acknowledge that the biopellets are referred to as "Products" in the NEFCO-Casella contract. [ECF No. 479 at 23 ("'Product' refers to the biosolids at issue in this litigation.")]. The NEFCO-Casella Contract references how NEFCO engages Casella "to develop and build a market for more than 18,000 tons per year of the Product in the Northeast," [ECF No. 438-1, Ex. A. at 2], and states how the biosolids will be collected and transported to "Beneficial Use Markets" that include "farmland application, land reclamation, turf production & maintenance, topsoil manufacturing, landfill capping, and any use where the Product is used to improve soil growth characteristics," [id. at 3, § 1.1.1]. The Contract also explicitly states that the biopellets "are not classified as hazardous waste under United States Environmental Protection Agency (USEPA) and/or any other applicable laws & regulations, including but not limited to, state laws and regulations." [Id. at 12, § 3.1]. Furthermore, in the Contract, NEFCO certifies that it will not provide any biopellets to Casella that contain hazardous waste. [Id. § 3.3].

Plaintiffs cite to Gen. Elec. Co., for the proposition that further factual development is required to determine whether NEFCO and Casella's true underlying intent is to dispose of the biopellets and that any profit NEFCO derives from the pellets is "subordinate and incidental to the immediate benefit of being rid of" an unusable waste product. [ECF No. 477 at 12 (quoting Gen. Elec. Co., 670 F.3d at 385)].  While the First Circuit in Gen. Elec. Co. did describe the question of intent under CERCLA as a "spectrum," the present matter falls on the "easy" end of the spectrum where the parties' intent is obvious. 670 F.3d at 384. As cited in the previous paragraph, the NEFCO-Casella Contract is abundantly clear that the biopellets are products intended for sale and explicitly disclaims their characterization as hazardous waste. Additionally, Plaintiffs' allegations

---

is not challenged), that document effectively merges into the pleadings and the trial court can review it in deciding a motion to dismiss under Rule 12(b)(6).").

actually support the conclusion that the biopellets are a useful product, not hazardous waste, where they allege that NEFCO's "primary business involves treating wastewater solids from forty-three Greater Boston communities and processing them into biosolid pellets, which are used as fertilizer." [Am. Compl. ¶ 175]. There is no plausible inference that NEFCO treats the biopellets as anything other than a useful fertilizer product and that it contracts with Casella to find markets for those products, including the composting facility at MassNatural. Accordingly, NEFCO cannot be liable as an arranger under CERCLA due to the useful product defense.

Turning next to Casella, as NEFCO is relieved of arranger liability under the useful product defense, Casella is relieved of transporter liability because, rather than contracting to dispose waste, it was the broker of a sale for a useful product. Section 9607(a)(3) ("arranger") and Section 9607(a)(4) ("transporter") of CERCLA share the term "disposal or treatment." 42 U.S.C. §§ 9607(a)(3); 9607(a)(4). Accordingly, if a person does not "arrange[ ] for disposal or treatment" of hazardous substances when he arranges for the sale of a useful product, it follows that a person does not "transport [hazardous substances] to disposal or treatment facilities" when he transports a useful product. See also Team Enters., LLC. v. W. Inv. Real Est. Tr., No. CV F 08-0872 LJO SMS, 2010 WL 3133195, at *12 (E.D. Cal. Aug. 9, 2010), aff'd sub nom. Team Enters., LLC v. W. Inv. Real Est. Tr., 647 F.3d 901 (9th Cir. 2011)). Casella cannot be a transporter of hazardous waste when referring to the biopellets in question because those biopellets are a useful product, not waste.

Plaintiffs argue that the Court should not apply the useful product defense from CERCLA to Chapter 21E in this case because Section 5(a) of Chapter 21E is broader than CERCLA given the inclusion of the fifth "catch-all" liability category described above. [ECF No. 477 at 9]. The Court disagrees. Liability under a statute begins with definitions, and the definitional provisions analyzed above are essentially identical between CERCLA and Chapter 21E. Although the fifth

category of persons under Chapter 21E § 5(a) extends liability to "any person who otherwise caused or is legally responsible for a release or threat of a release of . . . hazardous material," <u>see</u> Mass. Gen. Laws ch. 21E, § 5(a)(5), the Court has already ruled above that Casella is not otherwise liable for the release of hazardous PFAS at the MassNatural facility. Therefore, that section is not relevant to the Court's analysis here.

In sum, the Court concludes that the useful product defense extends from NEFCO to Casella and neither meets the definitional requirements for arranger or transporter liability under CERCLA and Chapter 21E. <u>See</u> <u>Newly Weds Foods</u>, 2001 WL 1586691, at *2 ("21E is modeled on CERCLA, and, absent a compelling reason to do otherwise, should be construed consistently with CERCLA."). Accordingly, Casella's motion to dismiss Count XXVIII is **<u>GRANTED</u>**.

## V.    <u>CONCLUSION</u>

For the foregoing reasons, Casella's Motion to Dismiss [ECF No. 435] is **<u>GRANTED</u>** as to all counts with prejudice. <u>Adames v. Fagundo</u>, 198 F. App'x 20, 21 (1st Cir. 2006) (A dismissal for failure to state a claim "is with prejudice unless the order of dismissal explicitly says otherwise.").

**SO ORDERED.**

Dated: December 30, 2025

                                        */s/ Margaret R. Guzman*
                                        Margaret R. Guzman
                                        United States District Judge