# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| **THOMAS RYAN, et al.,** ) | |
| ) | |
| **Plaintiffs,** ) | |
| ) | **Civ. No.: 4:22-cv-40089-MRG** |
| **v.** ) | |
| ) | |
| **THE NEWARK GROUP, INC., et. al.** ) | |
| ) | |
| ) | |
| **Defendants.** ) | |
| ) | |

## CONSOLIDATED WITH

| | |
|---|---|
| **THOMAS RYAN, et al.,** ) | |
| ) | |
| **Plaintiffs,** ) | |
| ) | **Civ. No.: 4:25-cv-40026-MRG** |
| **v.** ) | |
| ) | |
| **EIDP, INC, et al** ) | |
| ) | |
| **Defendants.** ) | |
| ) | |

## ORDER ON NEFCO DEFENDANTS' MOTIONS TO DISMISS & PLAINITFFS' MOTION FOR JURDISCTIONAL DISCOVERY [ECF Nos. 437 & 481]

**GUZMAN, J.**

## I.    INTRODUCTION

Plaintiffs, residents of Westminster, MA, bring this putative class action lawsuit to recover damages for the contamination of their groundwater, which was allegedly caused by the decades-long improper disposal of wastes containing per-and polyfluoroalkyl substances and their constituents (collectively referred to as "PFAS") at the MassNatural recycling and composting

1

facility in Westminster, Massachusetts. [ECF No. 16]. The present action ("*Ryan II*") is the second lawsuit in a related action stemming from the same underlying facts, see Ryan v. The Newark Grp., Inc.,No. 4:22-cv-40089 ("*Ryan I*"), and the two actions have been consolidated for case management purposes. There are several motions to dismiss pending before the Court; however, this order concerns only those pertaining to the "NEFCO Defendants" (i.e., *collectively*, New England Fertilizer Company ("NEFCO"), NEFCO GP I, NEFCO GP II, and Synagro Technologies, Inc. ("Synagro"). The NEFCO Defendants move to dismiss based on Rule 12(b)(2) lack of personal jurisdiction, as well as Rule 12(b)(6) for failure to state a claim. [ECF No. 437]. Plaintiffs oppose the motion, [ECF No. 479] and seek jurisdictional discovery in leave of dismissal should the Court find that personal jurisdiction is lacking against any defendant. [ECF No. 481].

The first section of this opinion will discuss personal jurisdiction, finding that the Plaintiffs have established this Court's personal jurisdiction over each of NEFCO, NEFCO GP I, and NEFCO GP II, but not over Synagro. Second, the Court will analyze the claims against the remaining Defendants under the 12(b)(6) motion to dismiss standard for failure to state a claim. For the reasons stated below, the motion to dismiss is **GRANTED IN PART, DENIED IN PART.**

## II.    BACKGROUND

### A.  Relevant Facts

#### i.    PFAS Contamination

The named Plaintiffs are residents of Westminster, Massachusetts who allege that Defendants are liable for the PFAS contamination of Plaintiffs' drinking water and properties. [Am. Compl. ¶¶ 452-94, ECF No. 16]. Plaintiffs allege that Massachusetts Natural Fertilizer Company, Inc. ("MassNatural") operated a commercial composting facility in Westminster,

Massachusetts on Otter Farm ("the Facility") where it received organic byproduct from outside sources and suppliers, including materials that allegedly contained certain PFAS substances. [See id. ¶¶ 205–263]. Plaintiffs allege that MassNatural improperly disposed of the organic waste it received at the Facility, leading to PFAS leaching into the soil and nearby water sources, thereby contaminating Plaintiffs' land and drinking water. [Id. ¶ 262–66].

ii.   **PFAS6**

PFAS are used in many commercial products due to their ability to repel water, dirt, oil, and grease, resist heat and protect surfaces. [Id. ¶¶ 29-31]. They also resist biodegradation and are water soluble, making them mobile in groundwater and the environment. [Id. ¶¶ 35-37]. PFAS chemicals are colloquially referred to as "forever chemicals" due to their ability to persist in the environment and human body indefinitely without breaking down. [Id. ¶ 34]. "PFAS6" refers to six specific PFAS compounds regulated by the Massachusetts Department of Environmental Protection ("MassDEP"), including (1) PFOS; (2) PFOA; (3) perfluorohexane sulfonic acid (PFHxS); (4) perfluorononanoic acid (PFNA); (5) perfluoroheptanoic acid (PFHpA); and (6) perfluorodecanoic acid (PFDA).[1] [Id. ¶ 50]. While PFAS are not illegal compounds, they are highly regulated.

The U.S. Environmental Protection Agency ("EPA") has concluded that human exposure to PFAS is associated with adverse health outcomes, which can manifest years after exposure. [Id. ¶ 44]. According to the EPA, human consumption of and oral exposure to PFAS is associated with decreased fertility, developmental effects in children, cancer, liver complications, and hormonal imbalances. [See id.] Reports issued from 2009 through 2022 reflect the EPA's increasing concern

---

[1] This Order will refer to the compounds collectively as "PFAS" where there is no reason to discuss a single compound with specificity.

over health risks associated with human and animal ingestion of virtually any amount of PFAS. For example, in June 2022 EPA advised that "negative health effects may occur with concentrations of [PFAS] in water that are near zero and below EPA's ability to detect at this time." [Id. ¶ 47; Report and Recommendation ("R&R") at 4, ECF No. 159].[2] In April 2024, the EPA finalized new drinking water regulations that established federal, legally enforceable levels, called Maximum Contaminant Levels (MCLs), for the six PFAS compounds and mixtures that contain PFAS.[3] The MCLs range from 4.0 parts per trillion (ppt) (also expressed as ng/L) for PFOS and PFOA, to 10.0 ppt for PFHxS, PFNA, and HFPO-DA.[4]

In addition to the federal regulations, Massachusetts has its own PFAS regulations. First, PFAS are considered hazardous materials under Mass. Gen. Laws Chapter 21E ("Chapter 21E"), also known as the Mass. Oil and Hazardous Material Release Prevention and Response Act. Chapter 21E § 5 establishes strict liability, and joint and several liability, for owners and operators of land contaminated with oil and hazardous materials, as well as for certain other parties identified in the statute. Section 4 of the statute establishes the process by which responsible private parties distribute the recovery of costs for response actions. The Massachusetts Contingency Plan (310 CMR 40.0000 et seq.) ("MCP") is the set of regulations under Chapter 21E. The MCP determines

---

[2] EPA Announces New Drinking Water Health Advisories for PFAS Chemicals, $1 Billion in Bipartisan Infrastructure Law Funding to Strengthen Health Protections, U.S. Env't. Prot. Agency, https://www.epa.gov/newsreleases/epa-announces-new-drinking-water-health-advisories-pfas-chemicals-1-billion-bipartisan (May 25, 2023).

[3] Per- and Polyfluoroalkyl Substances (PFAS): Final PFAS National Primary Drinking Water Regulation, U.S. Env't. Prot. Agency, https://www.epa.gov/sdwa/and-polyfluoroalkyl-substances-pfas (July 12, 2024).

[4] Id.

the protocol for required assessment, risk assessment and remediation of oil and hazardous materials contamination.

As part of the MCP, in December 2019, MassDEP promulgated Reportable Concentrations (RCs) and Cleanup Standards for the six PFAS compounds, either individually or as a collective, depending upon the groundwater or soil category.[5] Relevant to this opinion, RCs for groundwater used for drinking are referred to as "RCGW-1" levels, while RCs for accessible soil or soil on property that has a sensitive use are referred to as "RCS-1" levels.[6] The RCGW-1 level for PFAS in drinking water is 20 nanograms per liter (ng/L) and the RCS-1 level for PFAS in soil ranges from 300 ng/kg to 720 ng/kg, depending on the type of PFAS.[7] Additionally, on October 2, 2020, as part of the Massachusetts Drinking Water Program, MassDEP promulgated a drinking water standard of 20 ng/L for the sum of six PFAS compounds, matching the RCGW level.[8] If PFAS is detected at levels higher than the permissible RCs, the MCP requires notice be given to affected persons as well as implementation of "Immediate Response Actions" to contain and remedy potential contamination.[9] Once a release has been confirmed, MassDEP issues a Notice of Responsibility ("NOR") to notify any Potentially Responsible Party that it may be liable for the

---

[5] Sampling and Analysis Guidance for PFAS at Disposal Sites Regulated under the Massachusetts Contingency Plan, Mass. Dep't. Env't Prot., 8 (Nov. 13, 2023), https://www.mass.gov/doc/sampling-and-analysis-guidance-for-pfas-at-disposal-sites-regulated-under-the-massachusetts-contingency-plan-november-2023/download.

[6] MCP Numerical Standards, Mass. Dep't. Env't Prot., (Dec. 2017), https://www.mass.gov/doc/mcp-numerical-standards-derivation/download

[7] Sampling and Analysis Guidance for PFAS at Disposal Sites Regulated under the Massachusetts Contingency Plan, supra note 10 at 6.

[8] Id. at 5. The Massachusetts Drinking Water Program implements the federal and state drinking water MCLs and MassDEP anticipates that the Massachusetts MCL will be revised in the near future, in light of the new EPA regulations.

[9] See 310 CMR 40.000; Chapter 21E.

release of hazardous materials.[10] The NOR also directs the Potentially Responsible Party to engage a Licensed Site Professional to implement the Immediate Response Actions.[11]

There are presently few regulations relating to PFAS in the biosolids industry. However, in August 2020, MassDEP increased the frequency with which biosolids must be tested for PFAS to quarterly, reflecting an increased concern with PFAS in biosolids. [Am. Compl. ¶ 187, n.27].

### iii.    **NEFCO Defendants**

NEFCO is a general partnership, and its general partners are Defendants NEFCO GP I, NEFCO GP II. [Id. ¶ 16]. The general partnership's principal place of business is located at 500 Victory Road, North Quincy, Massachusetts. [Id.] Defendants NEFCO GP I and NEFCO GP II are Delaware Limited Liability Companies with their principal places of business in Maryland. [Id. ¶¶ 17-18]. Synagro is a Delaware corporation with its principal place of business in Texas. [Id. ¶ 19]. Synagro acquired NEFCO in 2023. [Id. ¶ 177]. Synagro conducts business in Massachusetts, including by operating and maintaining a biosolid drying facility in North Andover, Massachusetts, where it processes biosolids for the Massachusetts Water Resources Authority ("MWRA"). [ECF No. 484 at 16; ECF No. 479-3 at 2].[12]

---

[10] See 310 CMR 40.000. An NOR is issued to a party when, based on the available information, MassDEP has reason to believe that the party is liable for response action costs and damages under Chapter 21E, § 5. The purpose of this notice is to inform the potentially liable party of its legal responsibilities under Massachusetts state law for assessing and/or remediating the subject release of a hazardous material.

[11] Id.

[12] In ruling on a motion to dismiss for lack of subject matter jurisdiction, the Court may consider "the facts from the pleadings and whatever supplemental filings (such as affidavits) are contained in the record," including a defendant's offerings to the extent that they are uncontradicted. Baskin-Robbins Franchising LLC v. Alpenrose Dairy, Inc., 825 F.3d 28, 34 (1st Cir. 2016).

NEFCO was founded in 1988 and was selected by the MWRA that same year to manage sewage sludge disposal from the Greater Boston area. [Id. ¶ 175]. NEFCO primarily treats wastewater solids from forty-three Greater Boston communities, processing them into biosolid pellets, which are used as fertilizer. [Id.] NEFCO operates throughout North America, including Quincy, Massachusetts. [Id. ¶ 176].

Since 2018, and during the class period, NEFCO regularly contracted with Defendant Casella Organics ("Casella") for Casella to dispose of the biosolid pellets that NEFCO produced at its Quincy, Massachusetts facility. [Id. ¶¶ 178, 192]. Casella subsequently transported NEFCO's biosolid pellets from Quincy, Massachusetts, to MassNatural. [Id. ¶ 179]. NEFCO asserts that it had no role in selecting MassNatural as the site for its biosolids, and that Casella's decision to dispose of the biosolids at MassNatural presents an intervening cause breaking the chain of liability. [ECF No. 438 at 10]. NEFCO's contract with Casella (executed in 2016 and 2021) provides that Casella ("Contractor") will provide NEFCO ("Customer") with "itemized reports tracking the transportation and disposition" of the biosolids ("Product"). [See ECF No. 438-1, Ex A. § 1.7].[13] There is no allegation in the Amended Complaint that Casella actually did provide NEFCO with such itemized reports.

In March 2019, testing done by the MWRA showed that the biosolids from NEFCO's Quincy facility contained "over 18,000 parts per trillion of three PFAS." [Am. Compl. ¶¶ 188,

---

[13] The NEFCO-Casella contact [ECF No. 438-1] is referenced in, and integral to, the Amended Complaint. [See, e.g., Am. Compl. ¶¶ 178, 186, 488]. Thus, the Court is permitted to, and will, consider the contact in deciding the motion to dismiss. McCabe v. Ford Motor Co., 774 F. Supp. 3d 349, 365 n.1 (D. Mass. 2025) (citing Beddall v. State St. Bank & Trust Co., 137 F.3d 12, 17 (1st Cir. 1998) ("Where a complaint's factual allegations are expressly linked to—and admittedly dependent upon—a document (the authenticity of which is not challenged), that document effectively merges into the pleadings and the trial court can review it in deciding a motion to dismiss under Rule 12(b)(6).").

189[14]]. Despite these high-level results, NEFCO continued sending its materials from the Quincy, MA plant to MassNatural without testing them for PFAS. [Id. ¶ 189]. On April 30, 2021, and March 3, 2022, NEFCO tested its biosolid pellet samples, which identified numerous PFAS compounds in the samples, including PFOA at a level of 126 ppt. [Id. ¶ 194]. In July 2022, Tighe & Bond tested composting piles at MassNatural containing NEFCO's biosolid pellets and found dangerous levels of PFAS. [Id. ¶ 196]. Despite the high levels of PFAS in NEFCO biosolid pellets, no NEFCO entity received a Notice of Responsibility from MassDEP during the agency's investigation.

### iv.   Procedural History

On August 2, 2022, a subset of Plaintiffs initiated the action now-captioned Ryan v. Newark Grp., No. 22-cv-40089-MRG (D. Mass) against defendants 3M, MassNatural, Newark Group, Greif, Inc., Caraustar Industries, Otter Farm, Inc., and Seaman Paper ("*Ryan I*"). On September 1, 2023, Magistrate Judge David Hennessy issued a Report and Recommendations on the *Ryan I* defendants' respective motions to dismiss the *Ryan I* Second Amended Complaint, mostly denying the *Ryan I* defendants' motions but dismissing certain entities related to The Newark Group for lack of personal jurisdiction. [See *Ryan I*, ECF No. 159]. On December 21, 2023, this Court largely adopted Judge Hennessy's R&R with slight modifications. [See *Ryan I*, MTD Order, ECF No. 181]. On May 13, 2024, some of the Defendants in *Ryan I* sought to amend their answers to assert crossclaims against the DuPont Entities, Ball, Rust-Oleum, NEFCO, and several other non-party proposed defendants. [*Ryan I*, ECF No. 271]. Simultaneously, the Plaintiffs

---

[14] Citing David Abel, '*Forever chemicals' are found in MWRA fertilizer, drawing alarm*, BOSTON GLOBE (Dec. 1, 2019), https://www.bostonglobe.com/metro/2019/12/01/levels-toxic-chemicals-mwra-fertilizer-found-tests-are-raising-concern/tlnN0BffyugFKCweSpFq5J/story.html.

in *Ryan I* moved for leave of Court to file a Third Amended Complaint adding the DuPont Entities, Ball, and Rust-Oleum as defendants to the *Ryan I* action. [*Ryan I*, ECF No. 274].

On November 18, 2024, in a 58-page order, the Court denied the motions to amend because joining the additional parties at that stage, two years into the litigation, would cause undue delay and prejudice the proposed defendants. [Joinder Order, ECF No. 360]. In that Order, the Court noted that the significant passage of time between the filing of *Ryan I* complaint and the joinder motion hindered the proposed defendants' abilities to mount a defense because it is "increasingly difficult for them to conduct reliable, independent testing . . . or to determining if there was any comingling of their materials with materials from other sources [in MassNatural]." [Joinder Order at 31].

Having been barred from adding the DuPont Entities, Ball, and Rust-Oleum to *Ryan I* by amending their complaint, on February 23, 2025, Plaintiffs decided to file this entirely separate lawsuit against those same entities, as well as the NEFCO Defendants, on the eve of the tolling of the statute of limitations for their claims. See Ryan v. EIDP, INC., No. 4:25-cv-40026-MRG, ECF No. 1 ("*Ryan II*"). After hearing arguments from all parties, the Court consolidated *Ryan I* and *Ryan II* for purposes of case management. [*Ryan I*, ECF No. 423]. Plaintiffs filed their Amended Complaint in this action on April 22, 2025. [*Ryan II*, ECF No. 16]. The NEFCO Defendants filed their motion to dismiss on June 30, 2025. [*Ryan I*, ECF No. 437]. Plaintiffs opposed the motion on August 11, 2025. [*Ryan I*, ECF No. 484]. The NEFCO Defendants filed a reply to Plaintiffs opposition on September 3, 2025. [ECF No. 489]. Plaintiffs also moved for jurisdictional discovery regarding the NEFCO Defendants, should the Court find personal jurisdiction lacking. [*Ryan I*, ECF No. 481]. The NEFCO Defendants opposed the motion for jurisdictional discovery. [*Ryan I*, ECF No. 486].

### III.    PART I – PERSONAL JURISDICTION

#### A.  Legal Standard

Dismissal under 12(b)(2) is appropriate if, when a court's jurisdiction is contested, the plaintiff fails to meet their burden that personal jurisdiction lies in the forum state. See Sawtelle v. Farrell, 70 F.3d 1381, 1387 (1st Cir. 1995). The plaintiff has the "ultimate burden of showing by a preponderance of the evidence that jurisdiction exists." Vapotherm, Inc. v. Santiago, 38 F.4th 252, 257 (1st Cir. 2022) (quoting Adams v. Adams, 601 F.3d 1, 4 (1st Cir. 2010)). "[A] district court 'may choose from among several methods for determining whether the plaintiff has met [their] burden.'" Id. (quoting Adelson v. Hananel, 510 F.3d 43, 48 (1st Cir. 2007)). As the Court makes its determination without first holding an evidentiary hearing, the *prima facie* standard is applied. Motus, LLC. v. Cardata Consultants, Inc., 23 F.4th 115, 121 (1st Cir. 2022). Under the *prima facie* approach, the court "must accept the plaintiff's (properly documented) evidentiary proffers as true" and construes them in the light most favorable to the plaintiff in determining the adequacy of their jurisdictional claim. Adelson, 510 F.3d at 48 (quoting Foster-Miller, Inc. v. Babcock & Wilcox Can., 46 F.3d 138, 145 (1st Cir. 1995)). The court will not, however, credit "conclusory allegations or conclusory averments without evidence of specific facts," and plaintiffs may not "rely on unsupported allegations in their pleadings." Blanding v. Fedx Ground Package Sys., Inc., 722 F. Supp. 3d 12, 15 (D. Mass. 2024) (internal quotations omitted) (quoting Platten v. HG Bermuda Exempted Ltd., 437 F.3d 118, 134 (1st Cir. 2006)). At this stage, facts brought forth by the defendant "become part of the mix only to the extent that they are uncontradicted." Adelson, 510 F.3d at 48. However, the court may properly consider affidavits proffered by the defendant, as courts can look "beyond the pleadings to examine not only the plaintiff's properly

documented evidentiary proffers but also the defendant's undisputed jurisdictional facts." <u>Kuan Chen v. U.S. Sports Acad., Inc.</u>, 956 F.3d 45, 56 (1st Cir. 2020).

To establish personal jurisdiction over a non-resident defendant for a claim, "the Due Process Clause requires that the defendant must have sufficient minimum contacts with the state, such that maintenance of the suit does not offend traditional notions of fair play and substantial justice." <u>Nandjou v. Marriott Int'l, Inc.</u>, 985 F.3d 135, 148 (1st Cir. 2021) (internal quotation marks omitted) (quoting <u>Adelson</u>, 510 F.3d at 49); <u>Int'l Shoe Co. v. Washington</u>, 326 U.S. 310, 316 (1945). Personal jurisdiction can be general or specific, but the plaintiff must allege sufficient contacts to sustain either theory. <u>See</u> <u>Nandjou</u>, 985 F.3d at 148. In assessing personal jurisdiction over a non-resident defendant, "a federal court exercising diversity jurisdiction is the functional equivalent of a state court sitting in the forum state." <u>Ticketmaster-New York, Inc. v. Alioto</u>, 26 F.3d 201, 204 (1st Cir. 1994). Therefore, Plaintiffs must demonstrate that Massachusetts' long-arm statute grants personal jurisdiction and that personal jurisdiction comports with the Due Process Clause of the United States Constitution. <u>See</u> <u>Astro-Med, Inc. v. Nihon Kohden Am., Inc.</u>, 591 F.3d 1, 8 (1st Cir. 2009).

General jurisdiction exists "when [a foreign-state corporation's] affiliations with the State are so 'continuous and systematic' as to render them essentially at home in the forum State." <u>Blanding</u>, 722 F. Supp. 3d at 15 (alteration in original) (quoting <u>Goodyear Dunlop Tires Operations, S.A. v. Brown</u>, 564 U.S. 915, 919 (2011)). "A corporation is 'at home' where it is incorporated and where it maintains its principal place of business." <u>Roy v. FedEx Ground Package Sys., Inc.</u>, No. 3:17-CV-30116-KAR, 2018 WL 2324092, at *6 (D. Mass. May 22, 2018) (quoting <u>Daimler AG v. Bauman</u>, 571 U.S. 117, 136 (2014)).

11

Specific jurisdiction may be invoked where "there is a demonstrable nexus between a plaintiff's claims and a defendant's forum-based activities." United States v. Swiss Am. Bank, Ltd., 274 F.3d 610, 618 (1st Cir. 2001) (citing Mass. Sch. of Law at Andover, Inc. v. Am. Bar Ass'n, 142 F.3d 26, 34 (1st Cir. 1998)). Accordingly, "for each claim and each defendant, [Plaintiffs] must make a tripartite showing: that the claim is sufficiently related to the defendant's contacts with Massachusetts, that the defendant's contacts with Massachusetts constitute purposeful availment of the protections and privileges of conducting business in the Commonwealth, and that the exercise of jurisdiction there is reasonable." Nandjou, 985 F.3d at 148 (citing Nowak v. Tak How Invs., Ltd., 94 F.3d 708, 712–13 (1st Cir. 1996)).

There is a longstanding common-law presumption of "corporate separateness" between an incorporated subsidiary and its parent. In re Lupron Mktg. & Sales Pracs. Litig., 245 F. Supp. 2d 280, 291 (D. Mass. 2003) (citing Cannon Mfg. Co. v. Cudahy Packing Co., 267 U.S. 333, 336 (1925)). Corporate separateness exists when a "separately incorporated subsidiary is institutionally independent of its parent," in these cases, "jurisdiction cannot therefore be asserted over a parent based solely on the conduct of the subsidiary." Id. The presumption yields only to "clear evidence" to the contrary. See Escude Cruz v. Ortho Pharm. Corp., 619 F.2d 902, 905 (1st. Cir. 1980) ("The mere fact that a subsidiary company does business within a state does not confer jurisdiction over its nonresident parent, even if the parent is the sole owner of the subsidiary."). The "clear evidence" necessary to overcome the presumption of corporate separateness includes the sharing of directors, officers, and employees, United Elec. Workers v. 163 Pleasant St. Corp., 960 F. 2d 1080, 1083-84 (1st Cir. 1992), as well as "monitoring of the subsidiary's performance, supervision of the subsidiary's finance and capital budget decisions, and articulation of general policies and procedures," United States v. Bestfoods, 524 U.S. 51, 72 (1998).

B.  **Discussion**

       i.     **Massachusetts Long Arm Statute**

The Massachusetts Long Arm Statute, Mass. Gen. Laws. ch. 223A, § 3(a) provides in relevant part: "[a] court may exercise personal jurisdiction over a person, who acts directly or by an agent, as to a cause of action in law or equity arising from the person's . . . transacting any business in this commonwealth . . . ." Id. For jurisdiction to be proper under § 3(a), "the defendant must have transacted business in Massachusetts, and the plaintiff's claim must have arisen from the transaction of business by the defendant." Tatro v. Manor Care, Inc., 625 N.E.2d 549, 551 (Mass. 1994). The "'transacting any business' clause [in § 3] has been construed broadly." Id. (alteration in original) (quoting Heins v. Wilhelm Loh Wetzlar Optical Mach. GmbH & Co. KG., 522 N.E.2d 989, 991 (Mass. 1988)). "[G]enerally the purposeful and successful solicitation of business from residents of the Commonwealth, by a defendant or its agent, will suffice to satisfy this requirement." Id. at 551-52.

Here, Plaintiffs meet the requirements for the Massachusetts long arm statute for NEFCO, NEFCO GP I, and NEFCO GP II, but not Synagro.

      1.     **Synagro**

Turning first to Synagro, Plaintiffs' allegations against Synagro are inadequate to establish personal jurisdiction, or to state a claim. The only allegation the Plaintiffs raise directly against Synagro in the Amended Complaint is that it acquired NEFCO in 2023. [Am. Compl. ¶ 177]. In their opposition memorandum, Plaintiffs assert for the first time that Synagro does business in Massachusetts by operating and maintaining a biosolids drying facility in North Andover, MA. [ECF No. 484 at 16]. The Amended Complaint makes no reference to the North Andover facility or Synagro's activities there. The Court declines to consider this new allegation, as it does not

appear in the Amended Complaint. Allegations in a complaint are meant to "give the defendant fair notice of what the . . . claim is and the grounds on which it rests." Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555, (2007) (quoting Conley v. Gibson, 355 U.S. 41, 47 (1957)). By introducing new contacts for the first time in briefing, Plaintiffs do not satisfy this requirement and cannot cure defective jurisdictional allegations. Barrett v. Lombardi, 239 F.3d 23, 27 (1st Cir. 2001) ("allegations in a lawyer's brief or legal memorandum are insufficient, even under the relatively relaxed *prima facie* standard, to establish jurisdictional facts.") (emphasis added); see Gulf Oil Ltd. P'Ship v. Petro. Mktg. Grp., 308 F.Supp. 3d 453, 462 n.8 (D. Mass. 2018) (disregarding plaintiff's assertions made in its brief when no similar allegations appeared in the complaint); Folan v. Santander Consumer USA Inc., No. 1:25-cv-11341-JEK, 2025 WL 1707231, at *3 n.8 (D. Mass. June 18, 2025) (declining to consider assertions raised only in plaintiff's reply to defendant's opposition brief and not alleged in the complaint); Ortiz v. Jimenez-Sanchez, 98 F. Supp. 3d 357, 366 n.5 (D.P.R. 2015) ("the plaintiffs' oppositions introduce a plethora of new allegations and legal theories. But the plaintiffs cannot, of course, add allegations or claims by furnishing them for the first time in an opposition to a motion to dismiss"). In other words, a brief cannot supply the jurisdictional bricks missing from the complaint's foundation.

To meet the Long Arm Statute, Plaintiffs' claim must have arisen from the defendant's business transaction in the state. Tatro, 625 N.E.2d at 551. Plaintiffs have failed to allege any specific actions that Synagro took distinct from NEFCO. Plaintiffs likewise fail to show how their claims arose out of Synagro's activities in Massachusetts. Essentially, Plaintiffs are arguing that Synagro is liable, solely by virtue of being the parent company of NEFCO. This flies in the face of the presumption of corporate separateness. See In re Lupron, 245 F. Supp. 2d at 291 (citing Cannon Mfg. Co., 267 U.S. at 336). The presumption may be overcome only by "clear evidence"

to the contrary. See Escude Cruz, 619 F.2d at 905. Plaintiffs asserted slightly more facts regarding Synagro's business in Massachusetts, including that Massachusetts business records list the principal place of business for NEFCO GP I and II as Synagro's head office in Baltimore, [ECF No. 479 at 16]; however, this hardly suffices to pierce the corporate veil. Hartford Fin. Sys., Inc. v. Fla. Software Servs., Inc., 550 F. Supp. 1079, 1092 (D. Me. 1982) ("[S]uperficial indicia such as common offices and telephone numbers between corporate entities is (sic) not enough to show that one corporation is an alter ego of another." (citation omitted)). Plaintiffs did not plead any other alter ego or veil piercing facts in their Amended Complaint or supplemental pleadings.

With a single allegation that Synagro acquired NEFCO in 2023, [Am. Compl. ¶ 177], Plaintiffs have failed to establish this Court's personal jurisdiction over Synagro. Accordingly, Synagro's motion to dismiss based on Rule 12(b)(2) is **GRANTED** as to all counts. In the Part II of this Order, *infra*, the Court also concludes that Plaintiffs have made insufficient allegations to state a claim against Synagro under Rule 12(b)(6).

### 2. NEFCO, NEFCO GP I, & NEFCO GP II

The remaining NEFCO Defendants argue the Court lacks personal jurisdiction over NEFCO's general partners, NEFCO GP I and II. Although the NEFCO Defendants do not contest that this Court has personal jurisdiction over NEFCO itself, the Court will analyze its jurisdiction over NEFCO because it has substantial importance to the issue of whether personal jurisdiction over a general partnership confers jurisdiction over its partners.

Turning now to NEFCO, Plaintiffs have plausibly alleged that NEFCO transacts business in Massachusetts through its biosolid processing for the MWRA in Quincy, MA, and that their claim of PFAS contamination arises from that business, namely from the biosolid pellets that NEFCO produces there and contracts with Casella to send to MassNatural. This satisfies the

requirements of § 3(a) of the Massachusetts Long Arm Statute. See Tatro, 625 N.E.2d at 551 (The "'transacting any business' clause [in § 3] has been construed broadly." (citation omitted)).

Regarding NEFCO GP I and II, § 3(a) of the Long Arm Statute is likewise satisfied on the same basis as NEFCO because the general partners act as agents of NEFCO. O'Keefe v. Amin, No. 95-12595-WGY, 1996 WL 463685, at *2 (D. Mass. Aug. 2, 1996) ("The Massachusetts long-arm statute explicitly asserts jurisdiction based equally on the acts of a party or her agent."); Donatelli v. Nat'l Hockey League, 893 F.2d 459, 467 (1st Cir.1990) ("a partner is deemed by law and contract to be the partnership's agent"); Mass. Gen. Laws ch. 223A, § 3.

### ii.   Due process

The Due Process Clause requires that to subject a nonresident defendant to jurisdiction within a state, the defendant must "have certain minimum contacts with [that state] such that the maintenance of the suit does not offend 'traditional notions of fair play and substantial justice.'" Int'l Shoe Co., 326 U.S. at 316 (quoting Milliken v. Meyer, 311 U.S. 457, 463 (1940)). As stated above, general jurisdiction is found where a defendant is "at home," which includes the defendant's principal place of business. Roy, 2018 WL 2324092, at *6 (quoting Daimler, 134 S. Ct. at 760). Plaintiffs allege NEFCO's principal place of business is in Quincy, MA. [Am. Compl. ¶ 16]. Accordingly, the Court has general personal jurisdiction over NEFCO. See Roy, 2018 WL 2324092, at *6 (quoting Daimler, 134 S. Ct. at 760).

The Court likewise finds that it has personal jurisdiction over NEFCO GP I and II. The law is clear that personal jurisdiction may be conferred from a general partner's contacts to their partnership. Daynard v. Ness, Motley, Loadholt, Richardson & Poole, P.A., 290 F.3d 42, 54 (1st Cir. 2002) ("the activities of the partner are generally attributed to the partnership and jurisdiction over the partnership follows from the partner's contacts, if sufficient, regardless of the absence of

independent contacts between the partnership *qua* entity and the forum.") (quoting <u>Donatelli</u>, 893 F.2d at, 466 (alteration in original)). However, the First Circuit has not conclusively addressed the issue of whether the reverse is true, i.e., whether personal jurisdiction over a partnership confers personal jurisdiction over the partnership's general partners. In <u>Cambridge Literary Properties, Ltd. v. W. Goebel Porzellanfabrik G.m.b.H. & Co. Kg.</u>, the Appeals Court declined to reach the ultimate question but suggested that the issue "may turn on the law where the partnership was formed." 295 F.3d 59, 67 (1st Cir. 2002). Plaintiffs do not state in the Amended Complaint where NEFCO's partnership was formed.

Regardless, this Court concludes that case law supports a finding of personal jurisdiction over the NEFCO general partners. Under Massachusetts law, general partnerships exist when two or more people function as co-owners of a business for profit. Mass. Gen. Laws ch. 108A, § 6. Both partners are liable "jointly and severally for everything chargeable to the partnership . . . ." <u>Id.</u> § 15. The First Circuit in <u>Donatelli</u> emphasized this point, describing a general partnership as an arrangement "where partners and partnership are symbiotic in virtually every sense" and explaining that "the partnership purposefully avails itself of the benefits and privileges of conducting business in the forum state whenever the partner does so because the latter is the former for the purposes of personal jurisdiction." 893 F.2d at 467-68. Despite these clear indications that partnerships and their partners should receive the same treatment under a personal jurisdiction analysis, <u>Donatelli</u> did not analyze the reverse relationship at hand here.

An apt comparison with more recent case law is to consider whether personal jurisdiction over a partnership provides personal jurisdiction over an out-of-state partner. Another session of this Court concluded that it does. As articulated in <u>Risktimetry Analytics, LLC v. Altaira, LLC</u>, "out-of-state general partners usually can be haled into court in the state where the partnership

conducts business because, by investing in the partnership, they have purposefully availed themselves of the privilege of conducting activities within the partnership state." 752 F. Supp. 2d 141, 146 (D. Mass. 2010) (citation omitted). This conclusion is in line with <u>Donatelli</u>'s assertion that the Due Process Clause's requirements of notice, predictability, and foreseeability are satisfied between partners and their partnership by virtue of "the partnership agreement, a contract that puts the partners on notice that they all act on behalf of one another within the scope of their partnership activity" and partnership law which "also provides notice that partners are conclusively considered agents of the partnership." 893 F.2d at 467 n.5. The <u>Donatelli</u> court went on to say, "by agreeing to enter into a partnership with others, a person should reasonably foresee being haled into court in those jurisdictions in which his partners conduct activities on the partnership's behalf," and concluded by noting partnerships and partners "share the foreseeable burdens" of each other's conduct. <u>Id.</u> Under the same logic, the Court's personal jurisdiction over a partnership must extend to the general partners of that partnership.

The Court is also mindful that NEFCO GP I and NEFCO GP II are likely indispensable parties to this action under Fed. R. Civ. P 19, which covers the required joinder of parties. Under Massachusetts partnership law, "to reach all the assets of a business being conducted as a general partnership, under the common law and under [Mass. Gen. Laws ch. 108A], it is necessary to sue all the partners." <u>Fusco v. Rocky Mt. I Invs. Ltd. Pshp.</u>, 677 N.E.2d 1165, 1169 (Mass. App. Ct. 1997) (citing <u>Fowle v. Torrey</u>, 131 Mass. 289, 291 (Mass. 1881)). This "means that all partners must be named in any suit." <u>Verizon Yellow Pages Co. v. Sims & Sims, P.C.</u>, No. 02-00961, 2003 Mass. Super. LEXIS 44, at *4 (Mass. Super. Ct. Feb. 25, 2003) (citing <u>Fusco</u>, N.E.2d 1165 at 1169). Failure to include the general partners of a partnership as parties warrants dismissal

of all claims against the partnership. <u>Gosselin v. O'Dea</u>, 40 F. Supp. 2d 45, 47 (D. Mass. 1999), <u>vacated sub nom. on other grounds</u> <u>Gosselin v. Webb</u>, 242 F.3d 412 (1st Cir. 2001).

The Court finds that this quirk of suits against general partnerships means, in practice, that the general partners of the partnership are indispensable parties to the action. Rule 19 calls for the joinder of required parties when feasible, but if joinder is not feasible and the Court finds that the party is indispensable, the appropriate remedy is dismissal of the suit. <u>Jay v. Bean</u>, No. 24-CV-11937-AK, 2025 U.S. Dist. LEXIS 14747, at *8 (D. Mass. Jan. 28, 2025) (citing <u>Bacardí Int'l Ltd. v. V. Suárez & Co.</u>, 719 F.3d 1, 9 (1st Cir. 2013)); Fed. R. Civ. P. 19. Here, the NEFCO general partners have been named as defendants with the specific allegation that they are general partners of NEFCO. [Am. Compl. ¶¶ 17-18]. As explained above, this suffices to establish personal jurisdiction over NEFCO GP I and NEFCO GP II. With those parties remaining in the case, the Court is not bound to dismiss the claims against NEFCO for failure to sue its general partners.

Accordingly, the NEFCO Defendant's motion to dismiss for lack of personal jurisdiction over NEFCO GP I and II is **<u>DENIED</u>**.

IV.    **<u>PART II – FAILURE TO STATE A CLAIM</u>**

    A.  **<u>Legal Standard</u>**

On a motion to dismiss for failure to state a claim upon which relief can be granted pursuant to Rule 12(b)(6), the court "must assume the truth of all well-plead[ed] facts and give the plaintiff the benefit of all reasonable inferences therefrom." <u>Ruiz v. Bally Total Fitness Holding Corp.</u>, 496 F.3d 1, 5 (1st Cir. 2007) (citing <u>Rogan v. Menino</u>, 175 F.3d 75, 77 (1st Cir. 1999)). To survive a motion to dismiss, the complaint must state a claim that is plausible on its face.  <u>Twombly</u>, 550 U.S. at 570. In other words, the "[f]actual allegations must be enough to raise a right to relief above

the speculative level, . . . on the assumption that all the allegations in the complaint are true (even if doubtful in fact)." Id. at 555 (citations omitted).

"In resolving a motion to dismiss, a court should employ a two-pronged approach." Ocasio-Hernandez v. Fortuño-Burset, 640 F.3d 1, 12 (1st Cir. 2011). "It should begin by identifying and disregarding statements in the complaint that merely offer 'legal conclusion[s] couched as ... fact[ ]' or '[t]hreadbare recitals of the elements of a cause of action.'" Id. (alterations in original) (quoting Ashcroft v. Iqbal, 566 U.S. 662, 678 (2009). "A plaintiff is not entitled to 'proceed perforce' by virtue of allegations that merely parrot the elements of the cause of action." Ocasio-Hernandez, 640 F.3d at 12 (citations omitted). Still, Plaintiff's burden is relatively low as "[a] court may not disregard properly pled factual allegations even if actual proof of those facts is improbable. . . . Rather, the relevant inquiry focuses on the reasonableness of the inference of liability that the plaintiff is asking the court to draw." Afrasiabi v. Massachusetts, 272 F. Supp. 3d 256, 260 (D. Mass. 2017) (citing Ocasio-Hernández, 640 F.3d at 13).

Unlike a motion made under Rule 12(b)(2) that allows the Court to look beyond the pleadings, on a motion to dismiss for failure to state a claim under Rule 12(b)(6), "the Court can consider only facts alleged in the complaint or documents fairly incorporated therein." Theophile v. Conklin, No. 17-10868-FDS, 2017 WL 3140363, at *4 (D. Mass. July 24, 2017) (citing Rivera v. Centro Medico de Turabo, Inc., 575 F.3d 10, 15 (1st Cir. 2009)).

Finally, as this matter is just one motion in three years of litigation, the Court is mindful to follow the law of the case doctrine, which provides that "legal decisions, or rulings of law, made by a court at a particular stage of a civil or criminal proceeding become 'law of the case,' and that thereafter these determinations govern the same issues in subsequent stages of the same litigation, unless corrected by appellate review." McConaghy v. Sequa Corp., 294 F. Supp. 2d 151, 160

(D.R.I. 2003) (citing <u>Arizona v. California</u>, 460 U.S. 605, 618 (1983); <u>Ellis v. United States</u>, 313 F.3d 636, 646 (1st Cir. 2002)).

### B. <u>Discussion</u>

#### 1. <u>Synagro</u>

In addition to finding that it lacks personal jurisdiction over Synagro, the Court also finds that Plaintiffs' sole allegation against Synagro in the Amended Complaint – that Synagro acquired NEFCO in 2023 – to be wholly inadequate to state a claim against Synagro. [<u>See</u> Am. Compl. ¶ 177]. By referring to NEFCO, NEFCO GP I, NEFCO GP II, and Synagro collectively as "NEFCO," Plaintiffs essentially seek to collapse the distinctions among these separate entities. [<u>See</u> <u>id.</u> ¶ 16]. The Amended Complaint makes almost no effort to differentiate the conduct of various NEFCO-related entities. With respect to Synagro, Plaintiffs thus ask the Court to pierce the corporate veil or find successor liability without alleging any facts that would justify doing so. The events underlying this action occurred between 2018 and 2022, [<u>id.</u> ¶¶ 192, 211], but Plaintiffs allege Synagro acquired NEFCO in 2023, [<u>id.</u> ¶ 177].

"Under generally accepted corporate law principles, the purchaser of the assets of another corporation does not assume the debts and liabilities of the transferor. The traditional rule is subject to four generally recognized exceptions: (1) the purchasing corporation expressly or impliedly agrees to assume the selling corporation's liabilities; (2) the transaction is a merger of the two entities; (3) the purchaser is a mere continuation of the seller corporation; and (4) the transaction is a fraudulent attempt to evade the seller's liabilities." <u>Am. Paper Recycling Corp. v. IHC Corp.</u>, 707 F. Supp. 2d 114, 119 (D. Mass. 2010) (quoting <u>Devine & Devine Food Brokers, Inc. v. Wampler Foods, Inc.</u>, 313 F.3d 616, 618 (1st Cir.2002)). Plaintiffs have made no allegations that

any of the four exceptions apply such that Synagro would assume NEFCO's liabilities predating acquisition.

Regarding piercing the corporate veil, In <u>My Bread Baking Co. v. Cumberland Farms, Inc.</u>, the Massachusetts Supreme Judicial Court ("SJC") set forth two narrow circumstances in which the corporate veil may be pierced:

> (a) when there is active and direct participation by the representatives of one corporation, apparently exercising some form of pervasive control, in the activities of another and there is some fraudulent or injurious consequence of the intercorporate relationship, or (b) when there is a confused intermingling of activity of two or more corporations engaged in a common enterprise with substantial disregard of the separate nature of the corporate entities, or serious ambiguity about the manner and capacity in which the various corporations and their respective representatives are acting.

233 N.E.2d 748, 752 (Mass. 1968). Plaintiffs allege no facts showing that Synagro or its representatives participated in, controlled, or directed the activities of any NEFCO subsidiaries. Nor do Plaintiffs meet their burden of showing a "confused intermingling" of Synagro's and the NEFCO entities' activities or a "substantial disregard of the separate nature of the corporate entities." <u>My Bread</u>, 233 N.E.2d at 752. Plaintiffs have failed to allege that Synagro was involved or otherwise assumed liability for NEFCO's alleged conduct during the relevant timeframe. Accordingly, the Court also **<u>GRANTS with prejudice</u>** Synagro's motion to dismiss based on Rule 12(b)(6) as to all counts.

## 2.  <u>NEFCO, NEFCO GP I & NEFCO GP II</u>

### i.  <u>Negligence (Count XVIII)</u>

To state a claim for negligence under Massachusetts law, "a plaintiff must prove that (1) the defendant owed the plaintiff a duty of reasonable care; (2) the defendant breached this duty; (3) damage to the plaintiff resulted; and (4) the breach of the duty caused this damage." <u>Brown v. U.S.</u>, 557 F.3d 1, 3 (1st Cir. 2009). The plaintiff must also show the cause of the injury was

reasonably foreseeable. <u>Gaines v. Gen. Motors Corp.</u>, 789 F.Supp 38, 41-42 (D. Mass 1991) (quoting <u>Glick v. Prince Italian Foods of Saugus, Inc.</u>, 514 N.E.2d 100, 102 (Mass. App. Ct. 1987)); <u>see also</u> <u>Staelens v. Dobert</u>, 318 F.3d 77, 79 (1st Cir. 2003) ("Under Massachusetts law, in addition to being the cause in fact of the injury, the plaintiff must show that the negligent conduct was a proximate or legal cause of the injury as well." (quoting <u>Kent v. Com.</u>, 771 N.E.2d 770, 777 (Mass. 2002) (internal alterations omitted)). Generally, subsequent and intervening negligence by a third-party will not relieve the initial tortfeasor of liability as long as the negligence was foreseeable. <u>Staelens</u>, 318 F.3d at 79 (citing <u>Poskus v. Lombardo's of Randolph, Inc.</u>, 670 N.E.2d 383, 484-85 (Mass. 1996); <u>Jesionek v. Massachusetts Port Authority</u>, 378 N.E.2d 995, 997 (Mass. 1978)).

The law regarding duty of care and causation is as follows: "The existence of a duty of care is generally a question of law for the court to decide." <u>Brettel v. Omron Sci. Techs., Inc.</u>, 302 F. Supp. 3d 460, 467 (D. Mass. 2018) (citing <u>Jupin v. Kask</u>, 849 N.E.2d 829, 835 (Mass. 2006)). "The concept of 'duty' is not sacrosanct in itself but is only an expression of the sum total of considerations of policy which lead the law to say that the plaintiff is entitled to protection. No better general statement can be made than that the courts will find a duty where, in general, reasonable persons would recognize it and agree that it exists." <u>Jupin</u>, 849 N.E.2d at 835 (internal punctuation and citation omitted). "As a general principle of tort law, every actor has a duty to exercise reasonable care to avoid physical harm to others." <u>Remy v. MacDonald</u>, 801 N.E.2d 260, 263 (Mass. 2004) (citing Restatement (Second) Torts § 302 comment a (1965)). However, a "precondition to this duty is, of course, that the risk of harm to another be recognizable or foreseeable to the actor." <u>Jupin</u>, 849 N.E.2d at 835 (internal citations omitted); <u>see also</u> <u>Husband v. Dubose</u>, 531 N.E.2d 600, 602 (Mass. App. Ct. 1988) (determining that whether a person has a

duty to protect another from harm caused by a third party "involve[s], to some extent, the foreseeability of the harm"). Thus, "with some important exceptions, a defendant 'owes a duty of care to all persons who are foreseeably endangered by his conduct, with respect to all risks which make the conduct unreasonably dangerous.'" Jupin, 849 N.E.2d at 835 (quoting Tarasoff v. Regents of the Univ. of Cal., 551 P.2d 334. 34217 (Cal. 1976)).

The SJC recently addressed core distinctions between but for and proximate causation in Doull v. Foster, 163 N.E.3d 976, 976 (Mass. 2021). Factual cause is a "but for" test, which carries a low threshold; "there are always multiple causes of any harm and 'most will not be of significance for tort law.'" In re TelexFree Sec. Litig., No. CV 4:14-02566-TSH, 2023 WL 4236033, at *3–4 (D. Mass. June 27, 2023) (quoting Doull, 163 N.E.3d at 990). The "but for" test can be relaxed and the "substantial factor" test applies in the context of toxic tort litigation. Doull, 163 N.E.3d 976 at 989. The substantial factor test obviates the need for plaintiffs to establish "but for" causation, namely "which particular [toxic] exposures were necessary to bring about the harm" as "[i]n these cases, it can be difficult, if not impossible, for the plaintiff to identify" such exposures. Id. at 984 Nevertheless, Plaintiffs additionally bear the burden of showing proximate cause. Proximate cause is "based on considerations of policy and pragmatic judgment." Id. at 983 (citing Kent, 771 N.E.2d at 776 ). These implicate the "reasonable foreseeability of the harm." Jupin, 849 N.E.2d at 836 (citation omitted). "[T]he substantial factor test is not a replacement for the standard foreseeability analysis." TelexFree, 2023 WL 4236033, at *4. Thus, Plaintiffs must show that each Defendants' actions were a "substantial factor" causing the alleged harm, and that the harm was a "reasonably foreseeable result" of Defendants' actions. See id.

NEFCO[15] argues that Plaintiffs have not satisfied the foreseeability element of their negligence claim because NEFCO did not direct biosolids to MassNatural composting facility. [ECF No. 438 at 9]. NEFCO further contends that MassNatural's allegedly deficient composting practices constitute an "intervening factor," and Plaintiffs have not alleged that NEFCO knew or should have known of these practices. [Id. at 9, 12].

The Court has already rejected this argument of a superseding/intervening actor theory in both the Report and Recommendation and in the *Ryan I* Motion to Dismiss. [*Ryan I* R&R at 60; *Ryan I* MTD Order at 17-18]. As previously held, MassNatural's involvement does not relieve Defendants of their duty nor provide a defense to negligence. [*Ryan I* R&R at 60]. To briefly restate the reasoning adopted from Parris v. 3M Co., 595 F.Supp. 3d 1288 (N.D. Ga. 2022): "suppliers have a duty to protect third parties from reasonably foreseeable harm that occurs during the normal use of their products." Id. at 1328.

In Parris, 3M and other PFAS manufacturers were sued for groundwater contamination that resulted after a textile mill discharged PFAS-contaminated wastewater to a publicly operated treatment facility unequipped to degrade PFAS. Id. at 1306. Over decades, that disposal resulted in "nearly 8,000 tons of PFAS-contaminated sludge" being spread into the watershed. Id. at 1307. Duty arose because the defendants "continuously supplied PFAS . . . with  knowledge that the chemicals were unlikely to be made reasonably safe in their regular use and could foreseeably contaminate surface waters and downstream water supplies." Id. at 1330. The court found persuasive the allegations that the manufacturers: (1) had long known PFAS were toxic and persistent; (2) knew wastewater treatment processes do not remove PFAS; and (3) nevertheless

---

[15] From this point forward, "NEFCO" refers to NEFCO, NEFCO GP I, and NEFCO GP II, collectively.

continued supplying PFAS without precautions to prevent foreseeable contamination. Id. Notably, the manufacturer's lack of control over downstream disposal did not absolve it of liability. [*Ryan I* R&R at 60; Parris, 595 F. Supp. 3d at 1332.] An "intervening actor" does not break the causal chain where the defendant should have anticipated the downstream disposal practices and their consequences. Parris, 595 F. Supp. 3d at 1333. The negligence of MassNatural is separate from NEFCO's knowledge and liability in such circumstances.

The Court's prior negligence analysis of Manufacturing Defendants was not premised on whether a defendant manufactured PFAS. Rather, the relevant foreseeability inquiry focused on whether the defendant knew or should have known that the materials it generated, handled, or supplied contained PFAS and posed a foreseeable risk of groundwater contamination when disposed of through ordinary channels. NEFCO's alleged role is not meaningfully different from that of the PFAS manufacturers in Parris or the Manufacturing Defendants in the *Ryan I* motion to dismiss order. NEFCO occupies a quasi-manufacturer, quasi-supplier position: it produces biopellets that it knows contain PFAS, and arranges for their distribution and disposal. As with the defendants in Parris, Plaintiffs allege that NEFCO continued to generate and supply PFAS-laden material despite long-standing knowledge of PFAS's environmental persistence and the inability of conventional treatment methods to remove these chemicals. [Am. Compl. ¶¶ 175–95]. While some of Plaintiffs' allegations against NEFCO are specifically tied to MassNatural, Plaintiffs also more generally assert that NEFCO was negligent "by failing to employ safe methods of disposal [of biopellets] to adequately prevent, control, or eliminate PFAS discharge into the environment," and "by failing to institute proper procedures and training to prevent, minimize, and/or promptly and effectively respond to the release of PFAS from its waste products into the environment." [Am. Compl. ¶ 456(c)–(d)]. Thus, a distinction between a Manufacturing Defendant, like 3M, and

a quasi-manufacturer defendant like NEFCO, is immaterial. The duty recognized in Parris and adopted in *Ryan I* attaches to any entity that continues to supply, distribute, or introduce PFAS-containing material into a disposal stream with knowledge, actual or constructive, of PFAS's persistence, toxicity, and resistance to conventional treatment processes.

The Court finds that Plaintiffs have satisfied the pleading threshold of negligence against NEFCO. First, Plaintiffs have plausibly alleged factual causation. The Amended Complaint alleges that PFAS compounds contaminated Plaintiffs' drinking water and property, an allegation supported by MassDEP testing, which showed elevated PFAS levels. [Am. Compl. ¶ 214]. Plaintiffs further allege that the source of their drinking water contamination was, in part, caused by PFAS originating from NEFCO biopellets sent to MassNatural. [Id. ¶¶ 213, 224]. Plaintiffs also allege that Casella Organics transported NEFCO's biosolid pellets from NEFCO's facilities to MassNatural. [Id. ¶ 179]. These allegations, taken together, adequately support that NEFCO's conduct was a substantial factor in causing Plaintiffs' injuries.

As to foreseeability, Plaintiffs allege that NEFCO has long known that biopellets, even after wastewater treatment, continue to contain PFAS. [Id. ¶ 180]. NEFCO also operates in multiple states where PFAS have been detected in biosolids produced through standard wastewater treatment processes. [Id. ¶¶ 181-85]. More specifically, Plaintiffs allege that, as early as March 2019, testing conducted by the Massachusetts Water Resources Authority revealed that biopellets generated at the NEFCO Quincy facility contained "over 18,000 parts per trillion of three PFAS." [Am. Compl. ¶ 188]. Additional testing on April 30, 2021, and March 3, 2022,[16] done by NEFCO

---

[16] The Complaint lists the date of the second testing as "March 3, 3022." For purposes of this motion, the Court assumes this to be a typographical error and understands the intended date to be March 3, 2022.

likewise identified PFAS compounds in NEFCO's biopellets, including 126 ppt of PFOA. [Id. ¶ 194; ECF No. 241-4 at 16]. Despite this knowledge and the results confirming the presence of PFAS in its biosolids, NEFCO continued sending biopellets to MassNatural via Casella. [Am. Compl. ¶ 195]. NEFCO does not contest their knowledge of PFAS in biosolids, and merely challenges that Plaintiffs did not make "allegations that NEFCO had constructive or actual knowledge of any deficient MassNatural composting practice," [ECF No. 438 at 12] – an argument already rejected by the Court. These allegations, taken together, are sufficient to show that NEFCO appreciated the risk of harm involved in producing biopellets which contained PFAS compounds and that the risk of groundwater contamination was foreseeable.

NEFCO asserts that NEFCO's NPDES permit ("Biosolids Permit"), which governs NEFCO's processing of wastewater solids from MWRA's Deer Island facility, insulates it from tort liability as Plaintiffs have not pled anything regarding NEFCO's failure to comply with the terms of the permit. [ECF No. 438 at 12-13].[17] NEFCO asserts it is using "reasonable diligence" in complying with the Biosolids Permit, and if it is "not shown that the defendant did anything which its license did not authorize it to do, the plaintiff cannot recover for negligence." [Id. at 14]. In support, NEFCO cites a series of older cases unrelated to wastewater permits suggesting that failure to allege permit noncompliance warrants dismissal at the pleading stage. [Id.[18]]

---

[17] NEFCO raises its biosolids permit as a defense to both Plaintiffs' negligence and nuisance claims. [ECF No. 438 at 12–14]. The applicability of NEFCO's permit to Plaintiffs' nuisance theory is examined in the corresponding section below.

[18] Citing Sawyer v. Boston Elevated R. Co., 243 Mass. 469, 471 (1923) (reversing denial of defendant's motion for directed verdict; dismissing negligence claim based on automobile collision with permitted traffic signal pole) (citing White v. Kennedy, 157 Mass. 12 (1892); Murtha v. Lovewell, 166 Mass. 391 (1896); Washburn v. Easton, 172 Mass. 525 (1899); Commonwealth v. Packard, 185 Mass. 64 (1904); Levin v. Goodwin, 191 Mass. 341 (1906); Dolan v. Charles J. Jacobs Co., 221 Mass. 256, 258 (1915); Whitcomb v. Vigeant, 240 Mass. 359 (1922)). [ECF No. 438 at 14].

NEFCO's argument is unavailing, mainly because the Biosolids Permit is not properly before the Court. First, on a 12(b)(6) motion, a court may only consider documents whose authenticity is not disputed under three narrow exceptions: (1) official public records, (2) documents central to plaintiffs' claim, or (3) documents sufficiently referred to in the complaint. Watterson v. Page, 987 F.2d 1, 3 (1st Cir. 1993). NEFCO's permit does not satisfy any of these categories. The Amended Complaint does not attach or reference the permit, and Plaintiffs' tort theories are not pled based on the permit or its contents. [See Am. Compl.] Second, even if the Court were to consider documents outside the pleadings at this stage, the Biosolids permit submitted by NEFCO suffers from authenticity concerns. The copy provided is marked as an electronic version of the MWRA Permit issued on May 20, 1999, modified on July 10, 2000, becoming effective on August 10, 2000. [ECF No. 438-2, Ex. B]. The document is dated more than 25 years ago; was issued to MWRA, not NEFCO; bears no signature on the signature page, and contains no further indication of amendment, renewal, or current applicability. [Id.]

Because the permit is raised solely by NEFCO in support of a defense it is properly treated as evidence of an affirmative defense rather than as a document incorporated into the pleadings. In contrast, the Court is taking into consideration NEFCO's contract with Casella, as the contract is properly referenced and incorporated in the Amended Complaint. [Am. Compl. ¶ 178; ECF No. 438-1, Ex. A].

Procedural restrictions aside, Massachusetts law also indicates that the existence of a discharge permit does not automatically bar tort liability at the pleadings stage and that such argument is an affirmative defense that must be asserted and proven by the defendant. See Baranofsky v. Rousselot Peabody, Inc., No. 2084-CV-00896-BLS2, 2020 Mass. Super. LEXIS 93, at *4 (Mass. Super. Ct. May 29, 2020). In Baranofsky, the defendant contended it could not be

sued for nuisance because it operated the facility in question pursuant to a wastewater discharge permit issued by the MassDEP Id. at *3. The court disagreed, holding that a discharge permit constitutes "an affirmative defense that must be pleaded and proved by [the defendant], not something that Plaintiffs must address in their complaint." Id. at *7. The court further reasoned that a permit does not immunize a defendant from liability where the defendant failed to comply with the permit, acted negligently even while operating under it, or engaged in conduct exceeding what the permit authorizes. Id. at *8.

Here, the same reasoning applies. The mere existence of NEFCO's Biosolids Permit does not demonstrate compliance, nor does it establish that NEFCO's conduct met the applicable standard of care. The standard imposed by tort law is distinct from, and often more demanding than, regulatory compliance. Environmental permits define the minimum conduct necessary to satisfy administrative or statutory obligations; they do not define what constitutes reasonable care under the common law. This principle is consistent with long-standing First Circuit and District of Massachusetts precedent. In Hubbard-Hall Chem. Co. v. Silverman, the First Circuit held that compliance with a federally approved label did not establish due care, because federal approval "merely satisfied the conditions laid down by Congress" for shipment and did not displace "the possibly higher standard of due care imposed by the common law of torts." 340 F.2d 402, 405 (1st Cir. 1965). More recent decisions reiterate that regulatory compliance is, at most, *prima facie* evidence of due care, not a complete defense. Preferred Mut. Ins. Co. v. Barros Co., Inc., No. 15-13414-FDS, 2018 WL 3977122, at *9 (D. Mass. Aug. 20, 2018) (compliance with codes "is not conclusive" because a defendant may still fail to take reasonable precautions). Likewise, in Rochleau v. Town of Millbury, the court emphasized that while regulatory compliance can be considered, it does not foreclose liability where additional reasonable measures were available.

115 F. Supp. 2d 173, 179 (D. Mass. 2000). Plaintiffs have plausibly alleged that NEFCO's conduct fell below the standard of reasonable care dictated by common law, particularly on the issue of whether NEFCO should have taken more precautions before allowing "any direct land application" of its materials that it knew or should have known had dangerously high levels of PFAS. [ECF No. 479 at 23; Am. Compl. ¶¶ 453–58 (describing various measures NEFCO could have taken)].

A permit does not define, limit, or satisfy the common-law duty of reasonable care. A defendant may act negligently even while operating in technical compliance with regulatory requirements. Thus, even if NEFCO's permit were properly before the Court, the permit would not negate Plaintiffs' negligence allegations at the pleading stage. Consistent with the Court's reasoning for denying 3M's Motion to Dismiss on the negligence claim, Plaintiffs have adequately plead duty, breach, foreseeability, and causation as to NEFCO. Apart from the claims asserted against Synagro, NEFCO's Motion to Dismiss Count XVIII is therefore **DENIED**.

### ii. Medical monitoring (Count XVII)

To sustain a medical monitoring claim, a plaintiff must demonstrate that the defendant's negligence caused the plaintiff to:

> [1] become exposed to a hazardous substance that produced, at least, subcellular changes that substantially increased the risk of serious disease, illness, or injury [2] for which an effective medical test for reliable early detection exists, [3] and early detection, combined with prompt and effective treatment, will significantly decrease the risk of death or the severity of the disease, illness or injury, and [4] such diagnostic medical examinations are reasonably (and periodically) necessary, conformably with the standard of care, and [5] the present value of the reasonable cost of such tests and care, as of the date of the filing of the complaint.

Donovan v. Philip Morris USA, Inc., 914 N.E. 2d 891, 902 (Mass. 2009) (citing Sullivan v. Old Colony St. Ry., 83 N.E. 1091 (Mass. 1908)); see also Genereux v. Raytheon Co., 754 F.3d 51, 54 (1st Cir. 2014) ("Genereux II") (calling Donovan the "cornerstone" of a medical monitoring

claim). "Proof of these elements usually will require competent expert testimony." Donovan, 914 N.E. 2d 891, 902; see also Genereux II, 754 F.3d at 56 (summary judgment appropriate where plaintiffs' expert failed to testify that any member of the class "had already suffered harm (that is, subcellular or other physiological change)"). As noted in Genereux v. Hardric Lab'ys, Inc., 950 F. Supp. 2d 329, 332 (D. Mass. 2013) ("Genereux I"), the terms "subcellular change," "subclinical change," and "physiological change" are used nearly interchangeably in the Donovan opinion. See Donovan, 914 N.E. 2d at 894 (subclinical); id. at 901 (all three terms); id. at 902 (subcellular); id. at 903 (subcellular and physiological). The Donovan court defined "subclinical" as "[d]enoting the presence of a disease without manifest symptoms; may be [sic] an early stage in the evolution of a disease." Id. at 894 n.3 (quoting Stedman's Medical Dictionary 1492 (25th ed. 1990)); Genereux, 950 F. Supp. 2d at 332.

In Donovan, the SJC found that a class of long-time cigarette smokers had alleged a cognizable claim warranting medical surveillance as a remedy which could timely advise the plaintiffs whether they have developed lung cancer. 914 N.E. 2d at 896-97. The SJC noted that the plaintiffs "have not contracted cancer, and they do not allege they are likely to contract cancer in the immediate future as a result of the alleged negligence of [defendant]." Id. at 900. However, the SJC found that the plaintiffs had "produced sufficient proof of 'impact,' [] to safeguard against false claims[,]" by "proffer[ing] evidence of physiological changes caused by smoking, and . . . expert medical testimony that, because of these physiological changes, they are at a substantially greater risk of cancer due to the negligence of [the defendant]." Id. at 900-01. The SJC further stated:

> [S]ubcellular or other physiological changes may occur which, in themselves, are not symptoms of any illness or disease, but are warning signs to a trained physician that the patient has developed a condition that indicates a substantial increase in risk of contracting a serious illness or disease and thus the patient will require

periodic monitoring. Not all cases will involve physiological change manifesting a known illness, but such cases should be allowed to proceed when a plaintiff's reasonable medical expenses have increased (or are likely to increase, in the exercise of due care) as a result of these physiological changes.

Id. at 901. The court did not foreclose the viability of a medical monitoring claim based on a continued elevated risk of medical harm due to the defendant's negligence that is unaccompanied by symptoms or subclinical changes. Id.

However, in Genereux I and II, in considering a summary judgment motion, another session of this Court and the First Circuit relied largely on Donovan in holding that a putative class of plaintiffs exposed to beryllium, a hazardous substance used in the defendant's manufacturing process, had not established a subcellular or physiological change sufficient to sustain their medical monitoring claim. Genereux II, 754 F.3d at 53. In affirming summary judgment for the defendant, the First Circuit noted that the plaintiffs' expert witness "opined that [beryllium sensitization ("BeS")] is the first manifestation of subcellular change resulting from beryllium exposure," but the expert could not confirm that any named plaintiff or class member had developed BeS. Id. at 55. Rather, the expert "show[ed] only that every plaintiff faces a 'significantly increased risk' of harm." Id. at 56. Noting that risk and harm are "two materially different concepts," the First Circuit emphasized that Donovan "made pellucid that it was holding only that a cause of action for medical monitoring would lie if a plaintiff could make a showing of subcellular or other physiological change." Id. at 56–57; see also id. at 54 ("increased epidemiological risk of illness caused by exposure, unaccompanied by some subcellular or other physiological damage, is not enough to permit recovery in tort.")

The Court finds that Plaintiffs have alleged sufficient allegations of physiological changes to allow relief for medical monitoring to proceed at this stage. NEFCO essentially presents the

same argument as presented by the *Ryan I* defendants in their motions to dismiss: that because Plaintiffs have only shown increased risks of subcellular change instead of actual subcellular change, Plaintiffs' argument is insufficient to sustain a claim for medical monitoring. [ECF No. 438 at 15]. The Court reaffirms its reasoning in *Ryan I*: at the motion to dismiss stage and without expert testimony, Plaintiff's situation is in a different procedural posture than Genereux I & II, which were considered at the summary judgment stage. [See R&R at 72; *Ryan I* MTD at 24]. The Court finds that Plaintiffs have met their burden. A showing that would satisfy Genereux I & II in full would require expert testimony and Plaintiffs do not bear the burden of providing any such evidence at this stage of litigation. At the current stage, facing an operative complaint with no expert testimony, Defendants are only entitled to sufficient notice of the claims facing them as a whole, not in terms of individual elements. Higgins v. Huhtamaki, Inc., No. 1:21-cv-00369-NT, 2022 U.S. Dist. LEXIS 111062, at *14 (D. Me. June 23, 2022) (citing Redondo Waste Sys., Inc. v. Lopez-Freytes, 659 F.3d 136, 141 (1st Cir. 2011)).

The growing body of evidence surrounding the persistence of PFAS in the environment and the potential health risks associated with human exposure raises deep concerns with the Court. The United States EPA has shown that even low levels of PFAS exposure in the human body are linked to significant adverse health outcomes. [Am. Compl. ¶¶ 43-44]. Here, Plaintiffs allege their unknowing consumption of PFAS has resulted in PFAS bioaccumulating in Plaintiff's and Class Members' bodies, causing a manifest change in the bodies, tissue, and cells of Plaintiffs and Class Members, leading to an increased risk of serious disease, illness, or injury. [Id. ¶¶ 265-66]. The increased risk, as Plaintiffs represent, is a physiological change in their bodies at a subcellular level. [Id. ¶ 266]. Plaintiff Thomas Ryan and several others have tested their blood and found

elevated levels of PFAS, in several cases multiple times the amount of typical blood PFAS concentration levels. [Id. ¶¶ 267-69].

The well-supported research and the abnormal blood levels of PFAS Plaintiffs have provided at this stage are sufficient to support a claim of medical monitoring, and the Court rejects NEFCO's argument that Plaintiffs must show actual changes of subcellular change at this procedural stage. The medical monitoring claim is made possible by the "cumulative effect of the factual allegations" contained in the complaint. A.G. v. Elsevier, Inc., 732 F.3d 77, 82 (1st Cir. 2013). Accordingly, the Court finds that Plaintiffs have met their burden as to the elements of a medical monitoring claim and NEFCO's motion to dismiss Count XVII is **DENIED**.

### iii.    Public Nuisance (Count XX)

In Massachusetts, a public nuisance "interferes with the exercise of a public right by directly encroaching on public property or by causing common injury." Sullivan v. Chief Just. for Admin. & Mgmt. of Trial Ct., 858 N.E.2d 699, 715 (Mass. 2006). "To determine whether there has been an interference with a public right, a court considers '[w]hether the conduct involves a significant interference with the public health, the public safety, the public peace, the public comfort or the public convenience.'" Town of Westport v. Monsanto Co., No. 14-cv-12041-DJC, 2015 WL 1321466, at *2 (D. Mass. Mar. 24, 2015) (quoting Sullivan, 858 N.E.2d 699 at 715 ) (granting the defendants' motion to dismiss a nuisance claim where the defendant "did not have the power or authority to maintain or abate" a third party's use of toxic building materials). "Public nuisance liability can be based upon conduct that is intentional, and unreasonable or negligent, reckless or ultrahazardous." Connerty v. Metro. Dist. Comm'n, 495 N.E.2d 840, 845-46 (Mass. 1986), abrogated on other grounds by Jean W. v. Commonwealth, 610 N.E.2d 305 (Mass. 1993). While the usual remedy for a public nuisance is an "information in equity by the Attorney

General[,]" <u>Mayor of Cambridge v. Dean</u>, 14 N.E.2d 163, 165 (Mass. 1938), private plaintiffs may bring a public nuisance claim when "the public nuisance has caused some special injury of a direct and substantial character other than that which the general public shares." <u>Sullivan</u>, 858 N.E.2d at 716; <u>see also</u> <u>Strahan v. Sec'y, Mass. Exec. Off. of Energy and Env't. Affs.</u>, 436 F.Supp.3d 470, 476 (D. Mass. 2020), (holding that the plaintiffs had a "special interest" but not a unique injury as required by <u>Sullivan</u>), <u>appeal dismissed</u>, No. 20-1281, 2020 WL 8995316, at *1 (1st Cir. Oct. 7, 2020). The special injury must be "different in kind, not merely in degree, from that which is occasioned to other persons by the alleged nuisance." <u>Stop & Shop Co.s, Inc. v. Fisher</u>, 444 N.E.2d 368, 372 (Mass. 1983) (quoting <u>Eaton v. Locke</u>, 88. N.E. 838, 838 (Mass. 1909)).

As noted previously, NEFCO advances compliance with its Biosolids Permit as a defense to both Plaintiffs' negligence and nuisance claims. In the public nuisance context, Massachusetts law recognizes that a defendant acting pursuant to a valid license or permit is generally shielded from public nuisance liability so long as it complies with the terms of that authorization. This Court recently applied that principle in <u>Strahan v. Sec'y</u>, 436 F.Supp.3d 470. There, the Court ruled that "an enterprise is generally not liable under a theory of public nuisance where it acts 'in conformity with the licenses granted to it,'" and failure to make allegations that defendants "have not complied in all respects with the terms of the licenses and permits" warrants dismissal of the claim. <u>Id.</u> at 477 (citing <u>Strachan v. Beacon Oil Co.</u>, 146 N.E. 787,790 (1925)).

Here, Plaintiffs do not allege that NEFCO failed to comply with its Biosolids Permit or that any of NEFCO's on-site activities fell outside the Permits' scope. To the contrary, Plaintiffs assert only that NEFCO produced biosolids containing PFAS, conduct that, as pleaded, is not prohibited by or expressly in violation of any clause of the permit. Under Strahan and Strachan, such allegations are insufficient to sustain a nuisance claim. The Court need not consider the actual

terms of the permit, and, indeed, as discussed above, the Court may not consider the permit as evidence at this stage. However, because the Complaint contains no well-pleaded facts suggesting the NEFCO exceeded, violated, or acted contrary to its permit, the permit defense provides an independent basis for dismissal of the public nuisance claims against NEFCO. Therefore, the Court **GRANTS** NEFCO's motion to dismiss on Count XX of public nuisance.

### iv.    Private nuisance (Count XIX)

"A private nuisance is a non-trespassory invasion of another's interest in the private use and enjoyment of land." Dusoe v. Mobil Oil Corp., 167 F. Supp. 2d 155, 163–64 (D. Mass. 2001) (citing Doe v. New Bedford Hous. Auth., 630 N.E.2d 248, 257 (Mass. 1994)). Private nuisance claims are actionable "when a property owner creates, permits, or maintains a condition or activity on [its] property that causes a substantial and unreasonable interference with the use and enjoyment of the property of another." Taygeta Corp. v. Varian Assocs., 763 N.E.2d 1053, 1064 (Mass. 2002); see also Wiesman v. Hill, 629 F. Supp. 2d 106, 114 (D. Mass. 2009) (stating that "a nuisance claim requires two separately owned parcels of real property") (citing New Bedford Hous. Auth., 630 N.E.2d at 257-58McEneaney v. Chestnut Hill Realty Corp., 650 N.E.2d 93, 97 (Mass. App. Ct. 1995) ("[T]he law of nuisance requires two separate and distinct parcels, one on which a nuisance exists and one on which the occupants are burdened with the nuisance."). The SJC, citing the Restatement (Second) of Torts § 834, has held that "[o]ne is subject to liability for a [private or public] nuisance caused by an activity, not only when he carries on the activity but also when he participates to a substantial extent in carrying it on." Com. of Mass. v. Pace, 616 F. Supp. 815, 821 (D. Mass. 1985).

In Massachusetts, a claim for private nuisance which allegedly caused land or water contamination must be accompanied by allegations that a defendant's conduct actually

contaminated the subject land or water. See Blackmore v. Massachusetts Turnpike Authority, No. CA 990971A, 2000 WL 420844, at *3 (Mass. Super. Jan. 6, 2000) ("in the absence of physical damage to property, pure economic losses such as plaintiff's alleged 'loss of value of their property' are not recoverable.") (citing Gareth Corp. v. Boston Edison Co., 613 N.E.2d 92, 93-95 (Mass. 1993) and Bay State Spray & Provincetown S.S., Inc. v. Caterpillar Tractor Co., 553 N.E.2d 1350, 1354 (Mass. 1989)); see also Dusoe v. Mobil Oil Corp., 167 F. Supp. 2d 155, 163 (D. Mass. 2001) (holding that Blackmore controls and "Massachusetts law requir[es] plaintiffs to show proof of actual contamination to maintain a private nuisance claim.").

The Court finds that Plaintiffs have failed to state a tort claim against NEFCO for private nuisance. In reaching this conclusion, the Court finds it instructive to contrast NEFCO's conduct with that of The Newark Group ("Newark") in *Ryan I*. There, the Court denied Newark's motion to dismiss after finding that Plaintiffs had plausibly alleged a private nuisance against Newark by asserting that Newark dumped contaminated byproducts at MassNatural with reason to know that MassNatural was not testing such deposits. [R&R at 79-80].

The Court's conclusion in *Ryan I* does not compel a different result here. In that decision, the Court held that a plaintiff need not allege that the defendant purposefully chose MassNatural to maintain a plausible private nuisance claim. [*Ryan I* MTD Order at 26-27]. That holding, however, rested on factual allegations unique to Newark, which are absent from Plaintiffs' allegations against NEFCO. First, Newark's duty to take positive action to ensure proper disposal arose from its own use of PFAS in its manufacturing process, its knowledge of PFAS's toxicity, and the careless method it allegedly adopted to dispose of those chemicals. [Id. at 13-14]. Second, Newark was alleged to have a long-standing, direct business relationship with MassNatural under which it contracted for the disposal of its PFAS-containing waste without taking reasonable care

to ensure that such toxic waste was disposed of properly. [Id.] Third, Newark "substantially participated" in the nuisance because it supplied PFAS-laden materials to MassNatural without ensuring proper disposal methods, thereby failing to act under circumstances that imposed a duty to prevent or abate the interference. [Id. at 27].

By contrast, Plaintiffs do not allege facts showing that NEFCO adds PFAS to its biopellets or that NEFCO exercised a similar level of participation and control in the site-specific disposal decisions that ultimately caused the alleged nuisance. Although NEFCO produced PFAS-containing biopellets, Plaintiffs do not allege that NEFCO introduced PFAS into the material through its own manufacturing processes or otherwise engaged in conduct that created or increased the PFAS content of the biopellets. Rather, PFAS persists through wastewater solids into processed biosolid pellets, [Am. Comp. ¶¶ 175, 180], which is a materially different level of participation from Newark's active use and handling of PFAS in its industrial operations.

Further, Plaintiffs plead that Casella, not NEFCO, directly selected MassNatural as the disposal destination and controlled the manner in which the material was transported and ultimately applied to land. [Id. ¶ 489]. The NEFCO-Casella contract, properly incorporated, contains no clauses granting NEFCO authority to select, supervise, or approve the ultimate disposal site. [See ECF No. 438-2, Ex. A]. The contract references NEFCO as having protected client lists, to which Casella must limit its distribution of biosolids, but MassNatural is neither listed on the client lists nor anywhere else in the contract. [See generally, id.]

These factual distinctions are critical because the Court in Ryan I expressly tied Newark's nuisance liability to the same factual predicates that supported Plaintiffs' negligence claim—namely, Newark's use of PFAS, its knowledge of PFAS's dangers, and its direct role in arranging for disposal through a long-term relationship with MassNatural. [Ryan I MTD at 13–14]. Plaintiffs

allege none of these foundational elements for NEFCO. Nuisance liability is distinct from negligence, although some allegations might overlap between the two claims. As stated above, the Court has found Plaintiffs plausibly state a claim for negligence against NEFCO based on NEFCO's continued conduct in supplying, distributing, or introducing PFAS-containing material into a disposal stream with knowledge, actual or constructive, of PFAS's persistence, toxicity, and resistance to conventional treatment processes. While Plaintiffs' allegations were sufficient to sustain a negligence claim against NEFCO, the absence of allegations that NEFCO created, exacerbated, or controlled the PFAS content of its biopellets, or that it retained any authority over Casella's disposal decisions, Plaintiffs cannot plausibly allege that NEFCO "substantially participated" in the nuisance or failed to act under a duty to prevent the interference.

Unlike Newark, NEFCO is not alleged to have directed, supervised, or meaningfully influenced the choice of disposal site; nor are there allegations that NEFCO had the authority to redirect or condition the disposal on any particular method of location. Accordingly, the Court **GRANTS** NEFCO's motion to dismiss Count XIX.

### v.    Willful and Wanton Conduct (Count XXI)

Willful and wanton conduct represents a qualitatively higher degree of culpability than negligence, requiring more than inadvertence and poor judgment. Sarro v. Philip Morris USA Inc., 857 F. Supp. 2d 182, 185-86 (D. Mass. 2012) (citing Boyd v. National R.R. Passenger Corp., 845 N.E.2d 356, 363 (Mass. 2006)). "The essence of wanton or reckless conduct is intentional conduct, by way either of commission or omission where there is a duty to act, which conduct involves a high degree of likelihood that substantial harm will result to another." Commonwealth v. Catalina, 556 N.E.2d 973, 979 (Mass. 1990). "The terms 'wi[l]ful,' 'wanton,' and 'reckless' are often used interchangeably.' Sarro, 857 F. Supp. 2d at 185 n.2 (citing Manning v. Nobile, 582 N.E.2d 942,

946 n.3 (Mass. 1991) and <u>Beausoleil v. Massachusetts Bay Transp. Auth.</u>, 138 F. Supp. 2d 189, 204 (D. Mass. 2001)).

The imposition of tort liability for willful and wanton conduct may be evaluated under "either a subjective or an objective standard" for assessing the defendant's knowledge of risk. <u>Sarro</u>, 857 F. Supp. 2d at 185 (quoting <u>Boyd</u>, 845 N.E.2d at 362). Under a subjective standard, "the actor knows, or has reason to know, . . . of facts creating a high degree of risk of physical harm to another, and deliberately proceeds to act, or fail to act, in conscious disregard of, or indifference to that risk." <u>Id.</u> (citing <u>Boyd</u>, 845 N.E.2d at 363). Under an objective standard, "the actor knows, or has reason to know, . . . of facts creating a high degree of risk of physical harm to another," but unreasonably fails to realize the high degree of risk involved. <u>Id.</u> Under either standard, the risk must be unreasonable and must involve a probability of harm substantially exceeding that required to establish negligence. <u>Id.</u>

Therefore, willful and wanton conduct "involves a degree of risk and a voluntary taking of that risk so marked that, compared to negligence, there is not just a difference in degree but also a difference in kind." <u>Sandler v. Commonwealth</u>, 644 N.E.2d 641, 643 (Mass. 1995); see also <u>Manning v. Nobile</u>, 582 N.E.2d 942, 946-97 (Mass. 1991). The facts that are or should be known to the actor must support a high probability of substantial harm to another; merely creating some chance of harm is insufficient. See <u>Sarro</u>, 857 F. Supp. 2d at 189 (failing to find a high probability of substantial harm in selling cigarettes to a teenager who became addicted to nicotine, and whose smoking inadvertently burned down plaintiff's house); <u>see also</u> <u>Manning</u>, 582 N.E.2d at 946-47 (holding that there were no facts supporting a high probability of substantial harm where defendant supplied a hotel party with liquor but no bartender and a guest later drove under the influence).

"Two characteristics of willful, wanton or reckless conduct distinguish it from negligence. First the defendant must knowingly or intentionally disregard an unreasonable risk. . . . Second, the risk, viewed prospectively, must entail a 'high degree of probability that substantial harm would result' to the plaintiff." Manning, 582 N.E.2d at 946 (quoting Restatement (Second) of Torts § 500 (1965)). Willful or wanton conduct therefore requires an "intentional or unreasonable disregard of a risk . . . of death or grave bodily injury [that] must be known or reasonably apparent, [where] the harm must be a probable consequence of the defendant's election to run that risk or of his failure to reasonably recognize it." Ali v. City of Boston, 804 N.E.2d 927, 932 (Mass. 2004) (citing Sandler v. Commonwealth, 644 N.E.2d 641, 643 (Mass. 1995)). Such risk is substantially more than what is necessary to make a defendant's conduct negligent. Restatement (Second) of Torts § 500 (1965).

Plaintiffs' allegations fall short of the exacting standard required to plead willful and wanton conduct. Plaintiffs allege that NEFCO was generally aware of the health risks associated with PFAS and that PFAS contamination can cause serious harm. [See Am. Compl. ¶¶ 479-80]. But generalized knowledge of the potential dangers of PFAS does not establish that NEFCO knowingly or intentionally disregarded a grave, site-specific risk presenting a high probability of substantial harm. Willful and wanton liability requires a voluntary decision to run the very risk that materialized, not merely awareness that a substance may be hazardous in the abstract. See Ali, 804 N.E.2d at 932.

The bulk of Plaintiffs' allegations of willful and wanton conduct rest on assertions that NEFCO "dump[ed] or dispos[ed]" PFAS-containing materials at MassNatural and failed to test, monitor, warn, or otherwise prevent contamination at the site. [Am. Compl. ¶ 481(a)-(j)]. These allegations, however, presuppose that NEFCO selected MassNatural as the disposal location or

exercised control over the site-specific disposal and composting practices that allegedly caused the PFAS release. By contrast, in *Ryan I*, the Court sustained willful and wanton conduct claims against Newark, Seaman Paper, and Otter Farm based on Plaintiffs alleging "a willfully, financially motivated, and knowing assumption of a high risk of substantial environmental and human harm." [*Ryan I* MTD Order at 32]. The <u>*Ryan I*</u> R&R concluded that those defendants "acted in concert" to chose MassNatural when they knew, or had reason to know, that MassNatural submitted fraudulent certifications of compliance to MassDEP that MassNatural was testing incoming materials, or was arranging for such testing, in order to "enable Seaman Paper to avoid spending money to rehaul its manufacturing process and/or pay more expensive disposal costs to qualified hazmat handlers." [*Ryan I* R&R at 89-90]. In contrast, Plaintiffs  allegations against NEFCO fall short of the intentionality in the allegations they make against Newark, Seaman Paper, and Otter Farm. Plaintiffs have not alleged that NEFCO knew MassNatural was inadequately composting, that NEFCO knew testing was not occurring at that site, that NEFCO benefitted financially in maintaining willful blindness, nor that NEFCO deliberately proceeded with disposal at MassNatural despite knowledge of improper disposal. To the contrary, the properly incorporated contract between NEFCO and Casella demonstrates that NEFCO never intentionally directed any of its materials at MassNatural. Under these circumstances, the Court finds that NEFCO cannot be said to have knowingly or intentionally disregarded a grave risk that ultimately materialized.

As such, while Plaintiffs' allegations describe generalized risks associated with PFAS and conclusory allegations of indifference, they do not plausibly allege that NEFCO knowingly or intentionally disregarded an unreasonable, site-specific risk presenting a high probability of substantial harm, which is required to sustain a claim of willful and wanton conduct. <u>See</u> <u>Manning</u>,

582 N.E.2d at 946-47. Accordingly, the Court **GRANTS** NEFCO's Motion to Dismiss Count XXI

for Willful and Wanton Conduct.

### vi.    Chapter 21E, § 5 (Count XXII)

In Count XXII, Plaintiffs allege that NEFCO is liable under Chapter 21E, § 5(a)(iii) for

damages to Plaintiffs' property arising from the release of PFAS at the MassNatural facility. [Am.

Compl. ¶ 494]; Mass. Gen. Laws ch. 21E, § 5. NEFCO responds by stating that Plaintiffs fail to

state a claim because they have not alleged that the claimed damage is not remediable, and in the

alternative, NEFCO urges the Court abstain under the Colorado River doctrine[19] in favor of the

pending Chapter 21E proceedings in state court. [ECF No. 438 at 15-16].

As discussed below, the Court concludes that Plaintiffs' Chapter 21E claim against NEFCO

must be dismissed for two primary reasons. First, NEFCO is not subject to arranger liability under

Chapter 21E § 5(a)(3) due to the useful product defense. Second, even if NEFCO were potentially

liable under Chapter 21E § 5(a)(5), Plaintiffs' claim for property damage is not ripe as § 5 permits

recovery only for damage "that cannot be cured or compensated by remediation or the recovery of

response costs." Grand Manor Condo. Ass'n v. Lowell, 88 N.E.3d 1154, 1161 (Mass. 2018).

Chapter 21E is the Massachusetts version of the Comprehensive Environmental Response,

Compensation, and Liability Act ("CERCLA"), 42 U.S.C. §§ 9601-28, and Massachusetts courts

---

[19] The Court considered Colorado River abstention, but concludes that it is not appropriate here. See Colorado River Conservation Dist. v. United States, 424 U.S. 800 (1976). "As a threshold matter, a stay or dismissal of a federal lawsuit under Colorado River 'necessarily contemplates that the federal court will have nothing further to do in resolving any substantive part of the case.'" Glassie v. Doucette, 55 F.4th 58, 64 (1st Cir. 2022) (quoting Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp., 460 U.S. 1, 28 (1983)). In other words, "the state action must resolve all of the claims in the federal case." Id. The Chapter 21E State Court Action would not resolve all of the claims of this case, it would only potentially resolve Plaintiffs' Chapter 21E claim. Therefore, Colorado River abstention does not apply.

look to CERCLA case law when interpreting analogous provisions of Chapter 21E. <u>Martignetti v. Haigh-Farr Inc.</u>, 680 N.E.2d 1131, 1137 n. 12 (Mass. 1997) (consistent interpretations of CERCLA and 21E are desirable when there are similarities in language and structure); <u>Newly Weds Foods v. Westvaco Corp.</u>, No. 99-5194-C, 2001 WL 1586691, at *2 (Mass. Super. Ct. Dec. 12, 2001) ("21E is modeled on CERCLA, and, absent a compelling reason to do otherwise, should be construed consistently with CERCLA."). Both Chapter 21E and CERCLA regulate the cleanup of hazardous waste contamination and contain cost shifting mechanisms to distribute the financial burden of cleanup costs. <u>See</u> Mass. Gen. Laws ch. 21E; 42 U.S.C. §§ 9601-28.

The definition of who can be liable for cleanup costs is largely the same under CERCLA as under Chapter 21E. "There are four types of persons liable under CERCLA: owners, operators, arrangers, and transporters." <u>El Paso Nat. Gas Co. LLC v. United States</u>, No. CV-14-08165-PCT-DGC, 2017 WL 3492993, at *2 (D. Ariz. Aug. 15, 2017) (citing 42 U.S.C. § 9607(a)). The Supreme Court has noted that these are "broad categories" of liable persons. <u>United States v. Atl. Research Corp.</u>, 551 U.S. 128, 134 (2007). Chapter 21E has the same categories of liable persons: owners, operators, arrangers, and transporters, as well as a fifth catch-all category of "any person who otherwise caused or is legally responsible for a release or threat of release of oil or hazardous material from a vessel or site." Mass. Gen. Laws ch. 21E § 5(a). As the two definitional provisions of the statutes are analogous, the Court will refer to CERCLA case law to inform the discussion that follows. <u>See</u> <u>Martignetti</u>, 680 N.E.2d at 1137 n. 12.

At first glance, under the two statutes, NEFCO would be subject to arranger liability; however, upon further analysis, the arranger label does not match the facts of this case, as NEFCO's biopellets are a useful product rather than mere hazardous waste for disposal. An "arranger" is "any person who by contract, agreement, or otherwise arranged for disposal or

treatment, or arranged with a transporter for transport for disposal or treatment, of hazardous substances owned or possessed by such person. . . ." 42 U.S.C. § 9607(a)(3). Under CERCLA, arranger liability exists "to deter and, if necessary, to sanction parties seeking to evade liability by 'contracting away' responsibility." United States v. Gen. Elec. Co., 670 F.3d 377, 382 (1st Cir. 2012) (citing Team Enters., LLC v. W. Inv. Real Estate Trust, 647 F.3d 901, 907 (9th Cir. 2011) ("Arranger liability ensures that owners of hazardous substances may not free themselves from liability by selling or otherwise transferring a hazardous substance to another party for the purpose of disposal.")). Accordingly, "liability would clearly 'attach . . . if an entity were to enter into a transaction for the sole purpose of discarding a used and no longer useful hazardous substance.'" Id. (quoting Burlington N. & Santa Fe Ry. Co. v. United States, 556 U.S. 599, 610 (2009)). However, arranger liability does not attach when an entity "merely [sells] a new and useful product if the purchaser of that product later, and unbeknownst to the seller, disposed of the product in a way that led to contamination." Burlington N., 556 U.S. at 610 (citations omitted). In other words, "CERCLA liability will not flow from the sale of a useful hazardous substance *for its original intended purpose.*" United States v. Atlas Lederer Co., 85 F. Supp. 2d 828, 836 (S.D. Ohio 2000) (quoting United States v. Cello-Foil Prods., Inc., 100 F.3d 1227, 1232 n.1 (6th Cir. 1996)).

NEFCO's biopellets are a useful product. NEFCO is in the business of treating wastewater solids and processing them into biosolid pellets, which the Plaintiffs acknowledge are "used as fertilizer." [Am. Compl. ¶ 175; ECF No. 436 at 7]. NEFCO and Casella's contract explicitly refers to the biosolid pellets as "product" and NEFCO contracts with Casella to find "beneficial use markets" for those products. [ECF No. 438-1, Ex A. § 1.1.1]. [20] In their opposition to NEFCO's

---

[20] The Court restates the following: The NEFCO-Casella contract [ECF No. 438-1] is referenced in, and integral to, the Amended Complaint. [See, e.g., Am. Compl. ¶¶ 178, 186, 488]. Thus, the Court is permitted to, and will, consider the contract in deciding the motion to dismiss. McCabe v.

motion to dismiss, Plaintiffs also acknowledge that the biopellets are referred to as "Products" in the NEFCO-Casella contract. [ECF No. 479 at 23 ("'Product' refers to the biosolids at issue in this litigation.")]. The NEFCO-Casella Contract references how NEFCO engages Casella "to develop and build a market for more than 18,000 tons per year of the Product in the Northeast," [ECF No. 438-1, Ex A. at 2], and states how the biosolids will be collected and transported to "Beneficial Use Markets" that include "farmland application, land reclamation, turf production & maintenance, topsoil manufacturing, landfill capping, and any use where the Product is used to improve soil growth characteristics," [id. at 3, § 1.1.1]. The Contract also explicitly states that the biopellets "are not classified as hazardous waste under United States Environmental Protection Agency (USEPA) and/or any other applicable laws & regulations, including but not limited to, state laws and regulations." [Id. at 12, § 3.1]. Furthermore, in the Contract, NEFCO certifies that it will not provide any biopellets to Casella that contain hazardous waste. [Id. § 3.3].

Plaintiffs cite to Gen. Elec. Co., for the proposition that further factual development is required to determine whether NEFCO and Casella's true underlying intent is to dispose of the biopellets and that any profit NEFCO derives from the pellets is "subordinate and incidental to the immediate benefit of being rid of" an unusable waste product. [ECF No. 477 at 12 (quoting Gen. Elec. Co., 670 F.3d at 385)]. While the First Circuit in Gen. Elec. Co. did describe the question of intent under CERCLA as a "spectrum," the present matter falls on the "easy" end of the spectrum where the parties' intent is obvious. 670 F.3d at 384. As cited in the previous paragraph, the

---

Ford Motor Co., 774 F. Supp. 3d 349, 365 (D. Mass. 2025) (citing Beddall v. State St. Bank & Trust Co., 137 F.3d 12, 17 (1st Cir. 1998) ("Where a complaint's factual allegations are expressly linked to—and admittedly dependent upon—a document (the authenticity of which is not challenged), that document effectively merges into the pleadings and the trial court can review it in deciding a motion to dismiss under Rule 12(b)(6).").

NEFCO-Casella Contract is abundantly clear that the biopellets are products intended for sale and explicitly disclaims their characterization as hazardous waste. Additionally, Plaintiffs allegations actually support the conclusion that the biopellets are a useful product, not hazardous waste where they allege that NEFCO's "primary business involves treating wastewater solids from forty-three Greater Boston communities and processing them into biosolid pellets, which are used as fertilizer." [Am. Compl. ¶ 175]. There is no plausible inference that NEFCO treats the biopellets as anything other than a useful fertilizer product and that it contracts with Casella to find markets for those products, including the composting facility at MassNatural. Accordingly, NEFCO cannot be liable as an arranger under CERCLA, or by extension Chapter 21E, due to the useful product defense. See Newly Weds Foods, 2001 WL 1586691, at *2 ("21E is modeled on CERCLA, and, absent a compelling reason to do otherwise, should be construed consistently with CERCLA.").

There is still another potential category of liable persons under Chapter 21E which could include NEFCO, given the Court's determination that Plaintiffs have stated plausible negligence and medical monitoring claims against NEFCO. Chapter 21E § 5(a)(5) contemplates liability for "any person who otherwise caused or is legally responsible for a release or threat of release of oil or hazardous material from a vessel or site." Mass. Gen. Laws ch. 21E, § 5(a)(5). If NEFCO is ultimately held liable under negligence or medical monitoring for the release of PFAS from MassNatural, it could fall into the category of "legally responsible" persons contemplated by § 5(a)(5). While the Court has found Plaintiffs' claims sufficient to pass the plausibility threshold on a motion to dismiss, NEFCO may still have a viable defense to negligence depending on the terms of its permit.[21] The Court is procedurally barred from considering the permit submitted by

---

[21] As negligence is a prerequisite to medical monitoring, should Plaintiffs' negligence claim fail, so too would the medical monitoring claim. See Donovan, 914 N.E. 2d at 902 (citation omitted).

NEFCO at this stage; however, upon proper consideration of an authenticated and current permit, NEFCO may very well mount a successful affirmative defense. NEFCO's ultimate liability is not a foregone conclusion.

Likewise, Plaintiffs' *irremediable* property damage is not a foregone conclusion as the cleanup and remediation process from the PFAS release at the site is ongoing. Plaintiff's recovery for property damage under Chapter 21E § 5(a)(iii) is "limited to those residual damages that are not cured by the remediation process and cleanup cost recovery available under §§ 4 and 4A." Grand Manor Condo. Ass'n, 88 N.E.3d at 1162. Damage that is recoverable under § 5 must be "residual" that persists "even after undergoing the cleanup mandated by the MCP process," for example, when the property "may still contain pollutants diminishing [its] fair market value." Id. While there may be some damage that "cannot be cured or compensated by remediation and response costs" "such as lost rent," the Plaintiffs make no allegation of lost rents. In any event, the SJC is clear that § 5 contemplates recovery for *residual* damages. Id. at 1161-62 This is why the statute of limitations period for property damage claims under Chapter 21E § 5(a)(iii) "does not begin to run until the plaintiff knows there is residual damage not subject to such remediation and compensation" under §§ 4 and 4A. Id. at 1163. In other words, "if a plaintiff is to have notice of a claim under § 5 for statute of limitations purposes, the plaintiff must have knowledge that he or she suffered damage that is not curable by the MCP remediation process." Id.

The MCP remediation process is still ongoing in this matter. As the Court learned during the proceedings regarding a temporary restraining order to require the *Ryan I* Defendants to continue bottled water deliveries, there is an ongoing effort to install POET water treatment systems in all affected homes that effectively eliminate PFAS in drinking water in the homes. [ECF 488 at 3–4]. Further, there is a plan to connect all affected homes to the municipal water supply,

thereby eliminating the concern of Plaintiffs relying on private wells contaminated with PFAS from the MassNatural site. [Id. at 5]. NEFCO further asserts that the topsoil of Plaintiffs' properties could be replaced, if contaminated. [ECF No. 438 at 16]. The MCP cleanup standards contemplate that any permanent solution to a hazardous waste release "shall, to the extent feasible, reduce the concentrations of oil and hazardous material in the environment to levels that achieve or approach background." 310 CMR 40.0859(3). The first priority of Chapter 21E is "remediating environmental contamination" through "the performance and financing of cleanup efforts," "while compensating owners for property damage is [the statute's] secondary purpose." Grand Manor Condo. Ass'n, 88 N.E.3d at 1161. The dust is far from settled on determining the extent of Plaintiffs' property damage, if any, that remains incurable after the remediation process comes to a close.

When a claim is "contingent upon events that may not occur as anticipated or may not occur at all," the claim is unripe and warrants dismissal. Barnstable Cty. v. 3M Co., No. 17-40002, 2017 U.S. Dist. LEXIS 207414, at *18 (D. Mass. Dec. 18, 2017) (quoting Lincoln House, Inc. v. Dupre, 903 F.2d 845, 847 (1st Cir. 1990) (internal quotation marks omitted). In the context of indemnification and contribution, "district courts within the First Circuit have dismissed or stayed actions for indemnity [and contribution] on the basis that the claim is not ripe because the party seeking indemnification has not yet been found liable for any costs or damages." Id. at *18-19 (collecting cases and giving plaintiffs an opportunity to amend their complaint once liability for a Chapter 21E claim was determined in a related state court action). Given that Plaintiffs' Chapter 21E § 5(a)(iii) claim is contingent on both NEFCO's ultimate negligence liability as well as on the persistence of residual damage after the remediation and clean-up efforts are complete, the Court

will dismiss Count XVII with leave to refile it should the preconditions for liability come to fruition. Accordingly, NEFCO's motion to dismiss Count XXII is **GRANTED**, without prejudice.

### vii.    Class Allegations

NEFCO moves to strike Plaintiffs' class allegations at the pleadings stage. [ECF No. 438 at 19–20]. In the First Circuit, such a "drastic remedy" is generally "disfavored because it requires a reviewing court to preemptively terminate the class aspects of . . . litigation, solely on the basis of what is alleged in the complaint, and before plaintiffs are permitted to complete the discovery to which they would otherwise be entitled on questions relevant to class certification." Manning v. Bos. Med. Ctr. Corp., 725 F.3d 34, 59 (1st Cir. 2013) (first quoting 5C Charles Alan Wright, et. al., Federal Practice & Procedure § 1380 (3d ed.2011), then quoting Mazzola v. Roomster Corp., 849 F.Supp.2d 395, 410 (S.D.N.Y.2012) (citations omitted)). Where the Rule 23 prerequisites of class certification must be shown "by a preponderance of the evidence," In re Nexium Antitrust Litig., 777 F.3d 9, 19 (1st Cir. 2015) (citation omitted), the First Circuit advises, "a court should typically await the development of a factual record before determining whether the case should move forward on a representative basis," Manning, 725 F.3d at 59. Accordingly, the motion to strike is **DENIED** as premature.

### viii.    Jurisdictional Discovery

As the Court has dismissed the claims against Synagro and found personal jurisdiction over the remaining NEFCO entities, there is no need for jurisdictional discovery regarding the NEFCO Defendants, and Plaintiffs' motion with respect to those Defendants, [ECF No. 481], is **DENIED as moot.**

### C.  CONCLUSION

For the foregoing reasons, NEFCO's Motion to Dismiss [ECF No. 437] is **GRANTED IN PART** and **DENIED IN PART**.

- The motion is **GRANTED** as to Synagro for both lack of personal jurisdiction and failure to state a claim; accordingly, such dismissal is on the merits, **with prejudice on all counts.**

- As to the remaining NEFCO entities, the motion is **GRANTED IN PART** and **DENIED IN PART**.

  o The motion to dismiss for lack of personal jurisdiction under Rule 12(b)(2) is **DENIED.**

  o The Court rules as follows regarding the motion to dismiss for failure to state a claim under Rule 12(b)(6):

    ▪ The motion is **DENIED** as to Count XVII (medical monitoring) and Count XVIII (negligence).

    ▪ The motion is **GRANTED with prejudice** as to Count XIX (private nuisance), Count XX (public nuisance), and Count XXI (willful/wanton conduct).

    ▪ The motion is **GRANTED without prejudice** as to Count XXII (Chapter 21E § 5).

Finally, Plaintiff's Motion for Jurisdictional Discovery as to the NEFCO entities [ECF No. 481] is **DENIED**.

**SO ORDERED.**

Dated: December 30, 2025

> /s/ Margaret R. Guzman
> Margaret R. Guzman
> United States District Judge